UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

ROSLYN LA LIBERTE,                                    Case No.: 1:18-cv-05398-DLI-VMS
                                                     ECF Case
                              Plaintiff,

              -against-

JOY REID,

                              Defendant.

-------------------------------------------------------------

**DEFENDANT JOY-ANN REID'S MEMORANDUM OF LAW IN
SUPPORT OF HER MOTION TO DISMISS THE ACTION AND
<u>STRIKE PLAINTIFF'S AMENDED COMPLAINT</u>**

Wachtel Missry LLP
John H. Reichman
Jason L. Libou
885 Second Avenue, 47th Floor
New York, NY 10017
*Attorneys for Defendant Joy-Ann Reid*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 4

ARGUMENT ............................................................................................................................. 10

    I.     CALIFORNIA LAW GOVERNS THIS ACTION ..................................................... 10

    II.   THE STANDARDS GOVERNING THIS MOTION ...................................................... 12

        A.   The Rule 12(b)(6) Standards for Dismissing Defamation Actions ........................... 12

        B.   The Anti-SLAPP Statute ......................................................................................... 13

    III.   PLAINTIFF'S CLAIMS ARE BARRED BY SECTION 230 ..................................... 16

    IV.   REID DID NOT ACT "MALICIOUSLY" ................................................................. 19

        A.   La Liberte is a Limited Public Figure And Must Show Actual Malice ...................... 20

        B.   The Actual Malice Standards ................................................................................... 21

        C.   La Liberte Cannot Meet the Actual Malice Test ....................................................... 22

    V.   THE PUBLICATIONS WERE STATEMENTS OF OPINION ...................................... 23

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

Adelson v. Harris, 774 F.3d 803 (2d Cir. 2014)................................................................12, 13

Adelson v. Harris, 973 F.Supp.2d 467 (S.D.N.Y. 2013), aff'd 774 F.3d 803 (2d. Cir. 2014) ........11, 12, 13

Aisenson v. American Broadcasting Co., 220 Cal.App.3d 146 (1990).......................................24

Annette F. v. Sharon S., 119 Cal.App.4th 1146 (2004)...........................................14, 15, 20, 22

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ...................................................12, 13, 14, 19

Atlantic Recording Corp. v. Project Playlist, 603 F.Supp.2d 690 (S.D.N.Y. 2009) .............16, 17

Barrett v. Rosenthal, 40 Cal.4th 33 (2006)....................................................3, 15, 16, 17, 18

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) .................................................13

Biro v. Conde Nast, 807 F.3d 541 (2d Cir. 2015) .............................................3, 19, 21

Cohen v. Facebook, Inc., 252 F.Supp.3d 140 (E.D.N.Y. 2017)....................17, 18, 19, 20

Covino v. Hagemann, 165 Misc. 2d 465 (Sup. Ct. Richmond Co. 1995).................................24

Franklin v. X Gear 101, LLC, 2018 WL 3528731 (S.D.N.Y. July 23, 2018)............................18

FTC v. LeadClick Media LLC, 838 F.3d 158 (2d. Cir 2016) .......................................16, 18

Garrison v. State of La., 379 U.S. 64 (1964).......................................................22

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)................................................3, 20, 21, 23

Harte-Hanks Comms. v. Connaughton, 491 U.S. 657 (1989)..............................................4, 22

Hassell v. Bird, 5 Cal.5th 522 (2018)...............................................................17

Jackson v. Mayweather, 10 Cal.App.5th 1240 (2017) ..................................................15

Jones v. Dirty World Entertainment Recordings, LLC, 755 F.3d 398 (6th Cir. 2014) ...............19

Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138 (2d Cir. 2013)................................2, 12

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)....................................................23

Navellier v. Sletten, 29 Cal.4th 82 (2002),..........................................................15, 16

New York Times v. Sullivan, 376 U.S. 254 (1964) ..............................................13, 14, 21, 22

<u>Palin v. New York Times Co.</u>, 264 F.Supp.3d 527 (S.D.N.Y. 2017)............................................4, 13, 14, 23

<u>Ratajack v. Brewster Fire Dep't</u>, 178 F.Supp.3d 118 (S.D.N.Y. 2016) ......................................................24

<u>Reader's Digest Assn. v. Superior Court</u>, 37 Cal.3d 244 (1984) ......................................................20, 22

<u>Reeves v. American Broadcasting Cos.</u>, 719 F.2d 602 (2d. Cir. 1983)......................................................11

<u>Ricci v. Teamsters Union Local 456</u>, 781 F.3d 25 (2d Cir. 2015) ........................................................3, 17

<u>Seldon v. Magedson</u>, 2012 WL 4475274 (S.D.N.Y. July 10, 2012)....................................................18, 20

<u>St. Amant v. Thompson</u>, 390 U.S. 727 (1968)............................................................................................22

<u>Stolz v. KSFM 102 FM</u>, 30 Cal.App.4th 195 (1994) .................................................................................21

**Statutes**

CA CIV. §425.16 ...................................................................................1, 2, 13, 14, 15, 16

47 U.S.C. §230 .............................................................................................16, 17, 18, 19

Fed. R. Civ. P. 12(b)(6)...............................................................................................12, 13

## PRELIMINARY STATEMENT

Defendant Joy-Ann Reid submits this memorandum of law in support of her motion to: (i) dismiss plaintiff Roslyn La Liberte's defamation claim pursuant to Federal Rule 12(b)(6) and California's Anti-SLAPP Statute (strategic lawsuit against public participation), CA CIV. §425.16 (the "Anti SLAPP Statute" or the "Statute"); and (ii) award defendant her attorney's fees pursuant to the Anti-SLAPP Statute.

Plaintiff's single count defamation action should be dismissed and stricken for three reasons: (i) it is barred by Section 230 of the Communications Decency Act of 1996 ("Section 230"), which immunizes the republication of internet content initially created by another internet user; (ii) La Liberte has not shown, and cannot show, that Reid acted with actual malice; and (iii) the bulk of Reid's alleged defamatory publications were constitutionally protected statements of opinion.

The Amended Complaint describes La Liberte as "passionate about this country's immigration policies." (¶ 33). La Liberte is, in fact, an anti-immigration activist, who testified throughout California in opposition to SB 54, the California law that limits cooperation with federal immigration authorities. One of her stops was the Simi Valley, California Council Meeting held on June 25, 2018 (the "Council Meeting").

There is no dispute that ugly, racial slurs were shouted at the Council Meeting. A local paper posted a photograph of La Liberte apparently screaming at a distressed 14-year-old, Joseph Luevanos, with her hand at her throat in a menacing gesture (the "Photograph"). Alan Vargas, who attended the Council Meeting, tweeted the Photograph along with this: "you are going to be the first deported" and "dirty Mexican" were "some of the things they yelled at this 14 year old boy." Vargas, added, "spread this far and wide this woman needs to be put on blast." The

Photograph, the Vargas tweet, and other earlier tweets regarding La Liberte's alleged racism and the racial slurs went viral.

Reid saw the Vargas tweet <u>after</u>, and because, it had already gone viral. Reid republished the Photograph and the gist of the Vargas tweet on Instagram (the "Instagram Post"). Reid also republished on Instagram and Facebook the Photograph alongside an image of adults angrily shouting at children attempting to integrate Little Rock High School in 1957 (the "Little Rock Repost"). She added the comment that the hate shown at the Council Meeting was comparable to the hate shown in Little Rock. Unlike countless other posts, Reid did not identify La Liberte by name in either the Instagram Post or the Little Rock Repost (collectively, the "Publications").

While there is no dispute that racial slurs were shouted at the Council Meeting and that the Photograph was legitimate, the Amended Complaint alleges that La Liberte was not one of the persons making the racial slurs. La Liberte has sued Reid, and Reid alone, for falsely accusing her "of making racist statements and of being a racist." (¶ 65).

La Liberte's complaint must meet not only the pleading standards set forth in Rule 12(b)(6), but also the requirements of California's Anti-SLAPP Statute. La Liberte is a California resident and her claim is governed by California law. The Anti-SLAPP Statute provides that a defamation claim arising in connection with a public issue must be dismissed unless the plaintiff can establish a probability that she will prevail on the claim. CA CIV, §425.16 (the "Anti-SLAPP statute"). Because the Anti-SLAPP Statute provides substantive state law protections against defamation claims, this court must consider a pre-answer motion to strike under that Statute. <u>Liberty Synergistics Inc. v. Microflo Ltd.</u>, 718 F.3d 138, 147-48 (2d Cir. 2013) (ordering the District Court to consider defendant's motion to strike under California's Anti-SLAPP Statute).

La Liberte's defamation claim should be stricken under the Anti-SLAPP Statute and dismissed under Rule 12(b)(6) for three reasons. First, Section 230 precludes any user liability for republishing previously published internet content. Because Reid was not the "original speaker" of the allegedly defamatory content, she is immune from liability. Ricci v. Teamsters Union Local 456, 781 F.3d 25, 27-29 (2d Cir. 2015); Barrett v. Rosenthal, 40 Cal.4th 33, 58-62 (2006).

Second, La Liberte cannot show that Reid acted with actual malice. By participating in the Council Meeting and becoming a "passionate" public advocate against SB 54 around the State, La Liberte is a limited public figure. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974) ("an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."). Accordingly, La Liberte must allege specific facts from which malice may be plausibly alleged, Biro v. Conde Nast, 807 F.3d 541, 545 (2d Cir. 2015), and show a likelihood of proving actual malice at trial under the Anti-SLAPP Statute.

La Liberte alleges that Reid acted maliciously because the Publications were made up "out of whole cloth," Reid did not independently investigate what La Liberte said, and Reid was motivated by her animus towards Donald Trump and Trump supporters wearing MAGA hats. These inherently contradictory and conclusory allegations do not adequately allege malice as a matter of law and are belied by other allegations in the Amended Complaint.

To prove actual malice, La Liberte must show that Reid either knew her Publications were false or had substantial doubts to the truth of the allegations. La Liberte has cited no plausible facts to support this. At the time of the Instagram Post: (i) there was an eyewitness who identified La Liberte as making racial slurs; (ii) there was the Photograph backing up the eyewitness account; (iii) there were other publications identifying La Liberte as making the racial slurs; and (iv) there

was <u>no</u> public evidence contradicting any of the aforementioned things.  Reid's retraction of the Publications on the <u>very day</u> that she learned that there was conflicting evidence with respect to whether La Liberte made the racial slurs also belies La Liberte's malice claim.  *See* <u>Palin v. New York Times Co.</u>, 264 F.Supp.3d 527, 537 (S.D.N.Y. 2017).

A political motive also "cannot provide a sufficient basis for finding actual malice" under either federal or constitutional law. <u>Id.</u> at 537 (quoting <u>Harte-Hanks Comms. v. Connaughton,</u> 491 U.S. 657, 665 (1989)).  Ironically, it could not be clearer that this lawsuit is politically motivated. La Liberte has not sued the countless other persons, including celebrities and journalists, who identified La Liberte by name, revealed her personal contact information, accused her of racism and making racial slurs, and sought to boycott her business.

Finally, La Liberte's claim fails because all of the Little Rock Repost and much of the Instagram Post constitute nothing more than Reid's opinion -- that the hate and incivility shown at the Council Meeting are comparable to the hate shown in 1957 Little Rock.

The Anti-SLAPP Statute mandates an award of attorney's fees if a successful motion to strike is made, even if an action is made in good faith.  Here, the Amended Complaint not only fails to state a claim for relief, but also is riddled with falsehoods, which are belied by irrefutable documentary evidence, all of which a rudimentary Google search would have uncovered.  The Court should award Reid her attorney's fees upon dismissal of this action.

## STATEMENT OF FACTS

The following is a summary of the relevant facts set forth more fully in the accompanying affidavits of John H. Reichman ("Reichman Aff."), Davian Hoffman ("Hoffman Aff."), and Joy-Ann Reid ("Reid Aff.").

The Amended Complaint alleges that on June 25, 2018, La Liberte attended the Council Meeting "to provide her opinion on California's sanctuary law." (¶ 35). She is described as "passionate about this country's immigration policies." (Id., ¶ 33).

La Liberte is, in fact, an anti-immigrant activist. In 2018, anti-immigrant activists were urging California cities and towns to take positions opposing SB 54, the controversial state law that limits cooperation between California law enforcement officials and federal immigration authorities. La Liberte was one of those activists and became one of the faces of the SB 54 opposition. A widely circulated photograph of La Liberte was taken in Los Alamitos, California protesting SB54 with the caption:

> Jeanie Nyuyen, 18, a pre-sanctuary law protester, argues with Rosalyn La Liberte, 69, an anti-sanctuary law protester outside of the Los Alamitos City Hall.

Many of the protestors against SB 54 were affiliated with hate groups, who were stoking racial fears. On May 22, 2018, the Southern Poverty Law Center ("SPLC") issued a report entitled "Racism rampart at California City County meetings on sanctuary policies." (Reichman Aff., Ex. B). The SPLC report states:

> For the past two months, a campaign orchestrated by national anti-immigrant hate group the Federation for American Immigration Reform (FAIR) and its legal arm the Immigration Reform Law Institute (IRLI) has mobilized a small but vocal group of activists hell-bent on pushing city council members in Orange County, and other parts of southern California, to take a stance against the state's sanctuary policies. ...

> . . .

> FAIR is also quiet on the fact that its orchestrated campaign has **whipped a small band of anti-sanctuary activists from California and elsewhere into a frenzy, with this group traveling from city to city on a nightly basis and stoking racial tensions at city council meetings**. . . . "Anti-sanctuary people showing at city council meetings in OC have become more aggressive and they feel more emboldened to launch racially

> charged slurs.  They have become more aggressive that at times
> they have physically confronted young people attending city
> council meetings,"…

While we do not know if La Liberte was a member of FAIR or other hate groups, she was one of the anti-immigrant activists who went from city to city protesting SB 54.  La Liberte testified against SB 54 at Council meetings in Torrance, Hawthorne, Hermosa Beach, and Thousand Oaks, California.

The Simi Valley Council Meeting on June 25, 2018 was one of La Liberte's stops.  The City Council was taking up its prior decision to support the Trump administration's lawsuit against SB 54.  Racial slurs were directed at SB 54 proponents at the Council Meeting.  (Amended Compl., ¶46).  On June 26, 2018, Ruth Luevanos, Joseph Luevanos's mother, tweeted:

> Sad to hear Trump supporters booing my 14 year old son, telling
> him he'll "be deported," "go back to Mexico" and calling Mexicans
> "rapists."  Proud of 350+majority residents who DID respect my
> son's right to be an active citizen.

On June 26, 2018, the Ventura County Star published photographs of the Council Meeting, including the Photograph of La Liberte apparently screaming at 14 year old Joseph Luevanos with her hand at her throat in a menacing gesture.  The caption identified La Liberte by name and gave her city of residence.

As detailed in the Reichman and Hoffman Affidavits, the Photograph, accusations of racism against La Liberte, and calls to boycott La Liberte's business quickly went viral.  One of the most influential twitter users was from Resistance Northridge, a grassroots activist group.  On June 28, 2018, Resistance Northridge tweeted the Photograph with this comment:

> This horrible woman is Roslyn La Liberte. She yelled at this 14 yr
> old boy at a Simi Valley City Council mtg who was there to talk
> about immigration & supporting SB54. This MAGA zealot racist
> runs RC Design Construction in Woodland Hills. BOYCOTT RC
> DESIGN https://t.co/ry5rrTGaB2 https://t.co/BJYyIUSNyG

The Resistance Northridge tweet went viral.  For example, on June 28, 2018 at 9:50 p.m., the singer and actress, Nancy Sinatra retweeted the Resistance Northbridge tweet to her 201,000 twitter followers with the comment: "Roslyn La Liberte represents what's wrong with America."

The rapper Immortal Technique also retweeted the Resistance Northridge tweet to his 269,000 Twitter followers on June 28, 2018.

On June 28, 2018, there were also YELP reviews identifying La Liberte by name as a MAGA zealot and racist and targeting her business.

On June 28, 2018 at 8.51 p.m., Alan Vargas also tweeted the Photograph of La Liberte and said "you are going to be the first deported" and "dirty Mexican" were "some of the things they yelled at this 14 year old boy." Vargas, added, "spread this far and wide this woman needs to be put on blast." (emphasis added).  (Amended Compl., ¶41).  As detailed in the Reichman and Hoffman Affidavits, the Vargas tweet went viral.  A snapshot of the Vargas tweet showed it had at least 78,300 likes and 76,900 comments.

The Northridge and Vargas tweets continued to go viral on June 29th.  On June 29, 2018 at 1:50 p.m., actress and three-time Emmy winner Nadine van der Velde posted the Photograph of La Liberte with a 1957 photo of Little Rock and Nazis.  She also states that La Liberte screamed racial slurs:

> "You're going to be the first deported!  Filthy Mexican!" screams #RoslynLaLiberte in a hate filled photo reminiscent of other iconic hate filled images.  History is being written.  Roslyn La Liberte has crystallized her place on the wrong side of history for future generations.

The van der Velde tweet was retweeted at least 2,088 times, including by the actress Debra Messing.

On June 29, 2018 at 1:10 p.m., David Hogg, the anti-gun activist and Parkland student, retweeted the Vargas tweet. Hogg had 900,000 followers.

Reid retweeted the Vargas tweet on June 29, 2018 at 2:55 p.m. In the Amended Complaint, La Liberte falsely alleges that Vargas tweet, "had not received much attention." until it was retweeted by Reid on June 29, 2018 and then went "viral." (Amended Compl., ¶ 43). As set forth above and in more detail in the accompanying affidavits, by this time the Vargas and Northridge tweets had gone viral, and celebrities and activists with huge numbers of followers had retweeted both tweets. Reid had nothing to do with any of this.

On the evening of June 29, 2018, Reid published the Instagram Post in which she republished the Photograph and the gist of what Vargas and countless others said and described about the hate shown at the Council Meeting. The Instagram Post reads:

> He showed up to rally to defend immigrants. ... She showed
> up too, in her MAGA hat, and screamed, "You are going to
> be the first deported" ... "dirty Mexican!" He is 14 years
> old. She is an adult. Make the picture black and white and
> it could be the 1950s and the desegregation of a school. Hate
> is real, y'all. It hasn't even really gone away.

La Liberte alleges that this was the first time that anyone put the racist slurs "in La Liberte's mouth." (Amended Compl., ¶49). This is demonstrably false. Putting aside that the Vargas tweet did exactly that by tweeting the Photograph and saying this woman [La Liberte] had to be put on blast, at least 8 individuals published comments on Twitter, Instagram, and Facebook alleging that La Liberte made the racial slurs. (Hoffman Aff., Ex. A). One of those from Nadia van der Velde is quoted above. In addition, over 150 other individuals accused La Liberte of being racist. (Hoffman Aff., Ex. B).

Before, at and around the Instagram Post, the controversy around La Liberte continued to grow, independent of Reid. On June 29, 2018 at 8:11 p.m., Soledad O'Brian of CNN retweeted

the Vargas tweet.  On June 30, 2018 at 4:03 a.m., the journalist, cultural critic, and television personality Touré Neblett shared the Vargas tweet and tweeted his 190,000 followers:

> In the picture below you see an adult woman screaming at a 14 yo [sic] child.  Roslyn La Liberte, a MAGA zealot racist who runs RE Design Construction in California.  Wow

Neblett's tweet had 6,000 retweets, including by the actress Rosanna Arquette, and over 5,500 likes.

On June 30, 2018, CNN's Ana Navaro tweeted:

> Oh look, here is today's racist dujour.  Does she have a name, or should we call her, #RedHatHarriet?

Ana Navaro has over 1.1 million twitter followers.  Her tweet had at least 9,600 retweets and 16,400 likes.

On July 1, 2018, Reid also reposted on Instagram and Facebook the Photograph alongside one of the 1957 Little Rock photographs. (Amended Compl., ¶ 56).  The images were a republication of what journalist Jose Antonio Vargas had posted.  Reid then added the following comment, adding a "hat tip" to those who previously had posted the image:

> It was inevitable that this image would be made.  It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real.  B[ut] every one of them were. History sometimes repeats.  And it is full of rage.  Hat tip @joseiswriting.  #regram #history #chooselove

The Complaint alleges that on Saturday, June 30, 2018 and Sunday, July 1, 2018, La Liberte's son emailed Reid stating that the accusations against La Liberte were false. (Amended Compl., ¶¶ 53, 54).  Reid did not see those weekend emails sent to a company email account. (Reid Aff., ¶ 2).

On July 2, 2018, Reid learned about a report broadcast on a local Fox News station in California that raised doubts about whether La Liberte had made the racial slurs attributed to her. (Id., ¶ 3).  On July 2, 2018, the very day that Reid learned for the first time that La Liberte may not have made the racial slurs, (Reid Aff., ¶ 4), Reid deleted her Publications and issued the following apology:

> It appears I got this wrong.  My apologies to La Liberte and Joseph. (Amended Compl., ¶ 58).

There nevertheless remain substantial questions about what La Liberte was yelling.  On July 3, 2018, Ruth Luevanos tweeted this about the Vargas tweet:

> I will verify that this tweet is absolutely accurate.  These things WERE shouted at this meeting.  My son DID get shouted down, threatened with deportation, harassed with a selfie stick and called racist slurs while he gave his speech. (emphasis added).

Joseph Luevanos's aunt, Dr. Norma Hernandez, tweeted this after Reid issued her apology:

> No apologies needed.  Fox News misrepresented my nephew's story.  This woman did shout at him and the exchange was NOT civil.  Fox News cut out the most important part.

Alan Vargas also did not back down from his original post, tweeting:

> There are those who say the tweet I posted is false and I'm a liar and blast me with the [F]ox 11 story.  Well I just got in contact with the family of the 14 year old.   And the mother had this to say "everything [Vargas] wrote was true and [Vargas] can quote me on that".

## ARGUMENT

## I.    CALIFORNIA LAW GOVERNS THIS ACTION

There should be no dispute that California law governs this action.  Plaintiff is a California resident, the harm she allegedly incurred was in California, and Plaintiff's November

13, 2018 letter to the Court is based upon California law.[1]  Because the letter also inconsistently states that La Liberte is not ceding that California law applies, we address this issue at the outset.

Under New York choice of law rules in defamation cases, "the state of the plaintiff's domicile will usually have the most significant relationship to the case," and its law will therefore govern. Reeves v. American Broadcasting Cos., 719 F.2d 602, 605 (2d. Cir. 1983) (applying California law to a defamation action brought by a California resident).

Adelson v. Harris, 973 F.Supp.2d 467 (S.D.N.Y. 2013), aff'd 774 F.3d 803 (2d. Cir. 2014) mirrors in many respects the facts of this action.  (La Liberte's attorneys represented Adelson in the action.)  Adelson, a Nevada resident, brought a defamation action in New York.  The defendant was a District of Columbia resident, who published alleged defamatory statements on his website.  In applying Nevada law, the District Court found that when a defamatory statement is published nationally, the presumptive rule is that the law of plaintiff's domicile applies. Id. at 477.  To do away with that presumption, there must be some other state other than Plaintiff's domicile that "has a more significant relationship to the issue or the parties." Id.

The court in Adelson found that "Nevada's interest in this case is significant and incontrovertible" because Adelson lived in Nevada, his business interests were in Nevada and Nevada has an interest in protecting its citizens from tortuous conduct. Id. at 477-78.  The interest of the place of the defendant's residence was not sufficient to overcome the presumption. Id.

The Adelson analysis applies with equal if not greater force here.  The Amended Complaint alleges that La Liberte was forced to "cancel her business website and implement security measures at her home and business," both of which are in California. (Amended Compl., ¶ 92).

---

[1] See Amended Compl., ¶ 22 ("La Liberte resides in California."); ECF Doc. No. 14 ("As to the legal positions cited by Ms. Reid, Ms. La Liberte does not concede that California law applies to this matter.").

Adelson also noted that when courts applied New York law in defamation cases it was because "New York has a strong policy in protecting its media defendants." Adelson, 973 F.Supp.2d at 478 (citations omitted). Here, California offers protections to media defendants that New York does not have, a mechanism for early dismissal of defamation claims and an award of attorney's fees for having to defend meritless suits.

New York has another interest in applying California law here: to limit forum shopping. Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (applying Nevada Anti-SLAPP Statute to New York federal court action because, among other things, it "will serve to discourage forum shopping and avoid inequity").

Applying California law also means that California's Anti-SLAPP Statute must be considered at the outset of this action. Liberty Synergistics Inc. v. Microflo Ltd., supra, 718 F.3d at 147-48 (ordering the District Court to consider defendant's motion to strike under California's Anti-SLAPP Statute); Adelson, supra, 774 F.3d at 809 (affirming motion to dismiss of defamation case under Nevada's Anti-SLAPP statute, which is based on California's Anti-SLAPP Statute). In Adelson, the court dismissed a plaintiff's defamation claim and awarded attorney's fees under Nevada's Anti-SLAPP Statute, which is "similar in purpose and language" to the California's Anti-SLAPP statute. 973 F.Supp.2d at 493. Adelson established that Anti-SLAPP statutes provide substantive protections that must be applied by federal courts in this Circuit. 774 F. 3d at 809.

## II.   THE STANDARDS GOVERNING THIS MOTION

### A.   The Rule 12(b)(6) Standards for Dismissing Defamation Actions

To survive a Fed. R. Civ. P. 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). "[A] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (citations omitted).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Thus, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679.

The Iqbal standards apply with particular force in defamation actions.  The Iqbal standard "must be applied consistently with the First Amendment protections famously put forward in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny.  Thus, in 'defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.' " Palin, supra, 264 F.Supp.3d at 533 (citation omitted).

## B.      The Anti-SLAPP Statute

California's Anti-SLAPP Statute requires this action to be dismissed unless La Liberte can show a probability of success on the merits.

The Anti-SLAPP Statute was enacted to provide an efficient procedural mechanism for the early and inexpensive dismissal of non-meritorious claims arising from a person's right of petition

or free speech in connection with a public issue. CA CIV. §425.16(b)(1); <u>Annette F. v. Sharon S.</u>, 119 Cal.App.4th 1146, 1159 (2004) ("<u>Annette F.</u>").   A defamation claim arising from a communication in connection with a public issue shall be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." CA CIV. §425.16(b)(1).

Deciding an Anti-SLAPP motion "requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . .  If the court finds that such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." <u>Annette F.</u>, 119 Cal.App.4th at 1159 (quoting <u>Equilon Enterprises v. Consumer Cause, Inc.</u>, 29 Cal.4th 53, 67 (2002)).

"A defendant may meet her burden of establishing that the complaint 'arises from' protected activity by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)." <u>Id.</u> (quoting <u>City of Cotati v. Cashman</u>, 29 Cal.4th 69, 78 (2002)).  CA CIV. §425.16(e) broadly defines protected speech as follows:

> (e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

In determining whether a cause of action falls within the scope of subdivision (e), courts must broadly construe the Anti-SLAPP Statute. Annette F., 119 Cal.App.4th at 1160.

The Publications come within each of the last three prongs of Section 425.16(e). The Publications were "made in connection with an issue under consideration or review by a legislature, executive or judicial body or any other official proceeding authorized by law." CA CIV. §425.16(e). The Simi Valley Council was considering whether Simi Valley would join the Trump administration's opposition to SB 54. Similar issues were actively being addressed, debated, and determined all over California and throughout the country by governmental bodies and courts.

The Publications also were "made in a place open to the public or a public forum in connection with an issue of public interest." CA CIV. §425.16(e). "Web sites accessible to the public... are public forums for purposes of the anti-SLAPP statute." Barrett, supra, 40 Cal.4th at 41 n.4; Jackson v. Mayweather, 10 Cal.App.5th 1240, 1252 (2017). Facebook and Instagram are each public forums and Reid's Publications involved matters of public interest -- immigration, sanctuary cities, the racism of anti-immigrant protestors, and public civility.

Finally, the Publications fall squarely within the "constitutional right of free speech in connection with a public issue or an issue of public interest." CA CIV. §425.16(e). Just as La Liberte attended the Council Meeting to exercise her First Amendment right, Reid had the right to comment on La Liberte's statements and conduct at the Council Meeting.

Because Reid's Publications fall within the protections of Section 425.16(e), La Liberte must be able to show a probability of success on the merits. In making that determination, this Court need not take plaintiff's allegations as true. Navellier v. Sletten, 29 Cal.4th 82, 88-89 (2002) (holding that to survive a motion to strike under California's Anti-SLAPP Statute, a plaintiff bears

the burden to demonstrate not only that the complaint is legally sufficient, but also put forth *prima facie* evidence to substantiate its claims and show a "reasonable probability" of recovery). The Court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." CA CIV. §425(b)(2).

### III.    PLAINTIFF'S CLAIMS ARE BARRED BY SECTION 230

After Plaintiff commenced this action, Reid's counsel submitted a letter asking for a pre-motion conference with respect to her motion to strike the complaint under the Anti-SLAPP Statute. As a result of Reid's letter, La Liberte filed the Amended Complaint, which dropped one of her claims – that Reid's June 29, 2018 retweet of the Vargas tweet was defamatory. La Liberte belatedly recognized that this claim was barred by Section 230. As set forth below, La Liberte should have recognized that Section 230 also immunized the other Publications.

Section 230(c)(1) provides, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1) (emphasis added). Section 230(e)(3) states: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. §230(e)(3).

Congress enacted Section 230 to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." FTC v. LeadClick Media LLC, 838 F.3d 158, 173 (2d. Cir 2016) (quoting 47 U.S.C. §230(b)(2)). Section 230 confers "blanket immunity from tort liability for online republication of third party content." Barrett, supra, 40 Cal.4th at 57.

"Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." Atlantic Recording Corp. v. Project Playlist, 603 F.Supp.2d 690, 699

(S.D.N.Y. 2009); see also Barrett, supra, 40 Cal.4th at 39 (stating all of the immunity provisions within Section 230 "have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source."). "A limited construction of section 230 would conflict with Congress's goal of facilitating online discourse," subject Internet users to the same common law defamation standards, and "chill online speech." Hassell v. Bird, 5 Cal.5th 522, 539 (2018).

To be immune from liability under Section 230, a defendant need only show that: (1) she is a user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim treats the defendant as the publisher or speaker of that information. FTC, supra, 838 F.3d at 173. "[I]f the statute's barrier to suit is evident from the face of the complaint" the complaint should be dismissed. Ricci, supra, 781 F.3d at 28 (citation omitted).

Each of the criteria for dismissal under Section 230 is easily met here. La Liberte's claim is, of course, treating Reid as the publisher of the Publications; it's the basis for her claim. Reid was also a user of an interactive computer service. Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. §230(f)(2). "The statute defines 'interactive computer service' expansively . . . to effectuate the statute's speech-protective purpose." Ricci, supra, 781 F.3d at 28-29. Instagram and Facebook fall squarely within the definition of an interactive computer service. Cohen v. Facebook, Inc., 252 F.Supp.3d 140, 156-57 (E.D.N.Y. 2017) (Facebook is an

interactive computer service); <u>Franklin v. X Gear 101, LLC</u>, 2018 WL 3528731 *19 (S.D.N.Y. July 23, 2018) (Instagram is an interactive computer service).

Reid was also a "user" of Instagram and Facebook. Section 230 "immunizes individual 'users' of interactive computer services." <u>Barrett</u>, <u>supra</u>, 40 Cal.4th at 40. The term "user" simply refers to "anyone using an interactive computer service, without distinguishing between active and passive use." <u>Id.</u> at 43. Congress has exempted from liability anyone "who actively selects and posts material based on its content." <u>Id.</u> at 62.

Finally, the term "information content provider," "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Here, the "information content providers" were Vargas, Nadine van der Velde, and countless others.

A republication does not have to be <u>verbatim</u> to obtain the protection afforded under Section 230; it has to be <u>materially different</u> from a prior publication to trigger liability. A defendant "will not be held responsible unless it assisted in the development of what made the content unlawful." <u>FTC</u>, <u>supra</u>, 838 F.3d at 174. Even where, as Plaintiff claims, the reposting of content causes a plaintiff harm, the speaker is immune from liability under Section 230. <u>Cohen</u>, <u>supra</u>, 252 F.Supp.3d at 157-58 (E.D.N.Y. 2017) (holding that Facebook was not liable for offensive content provided by Hamas that incited terrorist attacks). A defendant must have altered the "substance, meaning, or purpose" of the initial content for there to be liability. <u>See</u> <u>Seldon v. Magedson</u>, 2012 WL 4475274, at *17 (S.D.N.Y. July 10, 2012).

La Liberte alleges that the Instagram Post was materially different from all prior publications because Reid, supposedly was "the very first person to put [the racial slurs] in La Liberte's mouth." (Amended Compl., ¶ 49). As shown above, this allegation, which is the linchpin

of La Liberte's claim, is demonstrably false and belied by incontrovertible documentary evidence. Prior to the Instagram Post: (i) at least 8 individuals specifically stated that La Liberte made the racial slurs at the Council Meeting, including the van der Velde tweet cited above; (ii) more than 150 other tweets and publications had accused La Liberte of racism; and (iii) the Vargas tweet included the Photograph with the statement "spread this far and wide this woman needs to be put on the blast," thereby clearly identifying the woman in the Photograph as the person making the racial slurs and thus "put[ting] the words in La Liberte's mouth."

The side by side images in the Little Rock Repost (besides for not being defamatory), were also republications of an earlier Instagram post by the writer Jose Antonio Vargas @joseiswriting as the Little Rock Repost itself indicates.  Reid's commentary about how the picture was comparable to the hate shown in Little Rock in 1957 is both a protected statement of opinion[2] and did not add anything to what was allegedly defamatory.  Commentary that "did not materially contribute to the defamatory content of the [previously published] statements" does not alter the protections provided for under Section 230. Jones v. Dirty World Entertainment Recordings, LLC, 755 F.3d 398, 416 (6th Cir. 2014).

Put simply, Section 230 is a complete bar to La Liberte's claims.

## IV.     REID DID NOT ACT "MALICIOUSLY"

In the aftermath of Iqbal, this Circuit has recognized that a public figure must "plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." Biro, supra, 807 F.3d at 546 (citations omitted).  Under the Anti-SLAPP Statute, La Liberte also must go one step further by

---

[2] See Point V, infra.

showing that she will likely be able to prove actual malice at trial.  La Liberte has not adequately alleged malice and has not presented a single relevant fact to support such a claim.

## A.   La Liberte is a Limited Public Figure And Must Show Actual Malice

In Gertz v. Robert Welch, Inc., supra, the Supreme Court recognized two different categories of public figures with respect to constitutionally protected speech.  The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." 418 U.S. at 351.  The second is the "limited purpose" public figure who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id.  "A limited purpose public figure loses certain protection for [her] reputation only to the extent that the allegedly defamatory communication relates to [her] role in a public controversy." Reader's Digest Assn. v. Superior Court, 37 Cal.3d 244, 253-54 (1984).

Under California law, a plaintiff is a limited purpose public figure if she has "undertaken some voluntary act through which [s]he seeks to influence the resolution of the public issues involved." Id. at 254.  A "public controversy" has been defined as " 'a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.' " Annette F., supra, at 1164 (citations omitted).  "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." Id.

Here, La Liberte "voluntarily invited attention and comment" with respect to her activities. La Liberte actively sought to influence not only the Simi Valley Council, but cities throughout California with respect to a SB 54, a very public controversy.  To put it in La Liberte's own words, she appeared "at a democratic forum to share her opinion on the hotly contested issue of the

California's [sic] sanctuary State status." (Amended Compl., ¶20).  Not only that, after the Council

Meeting, La Liberte sat for an hour-long interview with a journalist after her Photograph had gone

viral.[3]

In her November 13, 2018 letter to the Court, Plaintiff argued that La Liberte was not a

public figure because she was not at the Council Meeting to address racism.  The standard is

whether La Liberte injected herself or was drawn into a public controversy. <u>Gertz</u>, <u>supra</u>, 418 U.S.

at 351.  In addition, the issue of racism by SB 54 opponents was an issue at the Council Meeting,

both generally and specifically, where it is undisputed that anti-immigration protestors were

shouting racist slurs.  The almost identical argument that La Liberte is attempting to make here

was rejected under California law in <u>Stolz v. KSFM 102 FM</u>, 30 Cal.App.4th 195 (1994) ("Plaintiff

argues that at the time of defendants' broadcast, there was no public concern regarding plaintiff

condoning racist remarks over the air…  However, plaintiff takes too narrow a view.").  Because

the allegedly defamatory Publications relate directly to La Liberte's role in a public controversy at

a public meeting, La Liberte is a limited public figure.

**B.**     **The Actual Malice Standards**

Public figures suing for defamation must do more than prove that the statements about

them were false. They must also prove by "clear and convincing evidence" that the statements

were "made with 'actual malice'—that is, with knowledge that it was false or with reckless

disregard of whether it was false or not." <u>New York Times</u>, <u>supra</u>, 376 U.S. at 279-80; <u>Biro</u>, <u>supra</u>,

807 F.3d at 276.

Because free debate inevitably leads to some mistaken statements and punishment of these

statements would chill the freedom of speech, reckless disregard requires a "high degree of

---

[3] <u>See</u> https://soundcloud.com/citizeninterviews/interview-with-roslyn-la-liberte (last visited on Dec. 17, 2018).

awareness of ... probable falsity." <u>Garrison v. State of La.</u>, 379 U.S. 64 (1964). <u>New York Times</u>, <u>supra</u>, 376 U.S. at 279-80, requires a showing that the allegedly false statement was made with "actual malice".

The existence of actual malice turns on the defendant's <u>subjective belief</u> as to the truthfulness of the allegedly false statement. <u>Reader's Digest</u>, <u>supra</u>, 37 Cal.3d at 257. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968).

"[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." <u>Harte-Hanks</u>, 491 U.S. at 666-67 (1989). "[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." <u>Id.</u> at 688.

## C.   <u>La Liberte Cannot Meet the Actual Malice Test</u>

The Amended Complaint does not contain any plausible <u>facts</u> showing that Reid acted with actual malice. The timeline of events shows that La Liberte cannot even make a claim for negligence, much less present clear and convincing evidence of malice.

At the time of the Instagram Post, this was the state of play: racial slurs were made at the Council Meeting, there was the eyewitness account of Alan Vargas that La Liberte was the one screaming racial slurs, there was the Photograph documenting La Liberte screaming at a teenage Mexican-American, there were numerous other posts identifying La Liberte as the person making the racial slurs, and there was <u>no</u> public evidence to contradict any of this. The Fox News story and the weekend emails from La Liberte's son came later.

The Little Rock Repost, which was made on Sunday, July 1, 2018, is not defamatory, does not identify La Liberte by name, and does not claim that La Liberte made the racial slurs in

question.  Putting this aside, Reid did not learn there was even an issue regarding whether La Liberte made the racial slurs until she learned of the Fox News report on Monday, July 2, 2018. That very day, Reid both took down the Publications and issued an apology. (Reid Aff., ¶¶ 2-4). Reid's rapid apology and the deletion of the Publications is very clear and convincing evidence of her lack of malice.  "Such behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice."  Palin, 264 F.Supp.3d at 537.

Finally, Reid's alleged political biases do not make Reid's acts "malicious."  Just to the contrary, this alleged motivation conclusively establishes that Reid's actions were constitutionally protected speech.  "[A] sharp attack on a disfavored political figure… has [n]ever been enough to prove actual malice." Id. at 537 (citation omitted).  A political motive "cannot provide a sufficient basis for finding actual malice… For 'it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity.' " Id. (citation omitted).

## V.     THE PUBLICATIONS WERE STATEMENTS OF OPINION

"[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990).  "A statement on matters of public concern must be provable as false before liability can be assessed." Id. at 2.

There should be no serious question that all of the Little Rock Repost and most of the Instagram Post are statements of opinion.  The Little Rock Repost sets out Reid's opinion that "History sometimes repeats …".  It makes no mention of racial slurs.  It is not actionable under

any stretch of the most fevered imagination.[4]  Most of Reid's Instagram Post -- make the picture black and white and it could be the 1950's, hate hasn't even really gone away -- is also Reid's opinion.

Under California law, the publication of the Photograph of La Liberte is also not actionable.  "Photographs are not actionable if they are fair and accurate depictions of the person and scene in question, even if they place the person in a less than flattering light … [.]" Aisenson v. American Broadcasting Co., 220 Cal.App.3d 146, 161 (1990).

The only portion of the Publications that is even arguably defamatory is the first sentence of the Instagram Post where there is an implication that the unidentified woman in the Photograph, La Liberte, "screamed, 'you are going to be the first deported' … 'dirty Mexican!' "

For all the reasons set forth above, this statement is not actionable.  It is not Reid's original content; there is no evidence that Reid knew that the Publications were not true; Reid immediately apologized and deleted the Publications once she learned that there was an issue with regard to their veracity; and there is no possibility that these statements caused La Liberte any harm given the torrent of prior publications accusing La Liberte of racism and "putting the racial slurs in La Liberte's mouth."

---

[4] Even falsely accusing someone of being a racist or acting in a racist manner is a statement of opinion, where, as here, the basis for that opinion is also provided. Ratajack v. Brewster Fire Dep't, 178 F.Supp.3d 118, 165 (S.D.N.Y. 2016) (statement that plaintiff was a racist is non-actionable opinion unless it implies that the speaker's opinion is based on knowledge of undisclosed facts); Covino v. Hagemann, 165 Misc. 2d 465 (Sup. Ct. Richmond Co. 1995).

## CONCLUSION

The Court should dismiss the action, strike the Amended Complaint, and award defendant

for her attorney's fees.

Dated: New York, New York
      December 17, 2018

WACHTEL MISSRY LLP

By: _____
     John H. Reichman
     Jason L. Libou
     885 Second Avenue, 47th Fl.
     New York, New York 10017
     (212) 909-9500
     reichman@wmllp.com
     jlibou@wmllp.com
     *Attorneys for Defendant Joy-Ann Reid*