UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                        :   Civil Action No. 1:18-cv-05398

ROSLYN LA LIBERTE,                :   (DLI)
                                          :

       Plaintiff,                       :   ECF Case
                                          :

                -against-             :
                                          :

JOY REID,                             :
                                          :

       Defendant.                    :
                                          :
------------------------------------------------------------------------ x

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE ACTION AND STRIKE THE AMENDED COMPLAINT

L. LIN WOOD, P.C.                  OLASOV, LLP

L. Lin Wood (*pro hac vice*)          David M. Olasov
lwood@linwoodlaw.com               (a Member of the Firm and of the Bar)
Nicole Jennings Wade (*pro hac vice*)     dolasov@olasov.com
nwade@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)       485 Madison Avenue, 7th Floor
twilson@linwoodlaw.com              New York, New York 10022
                                          212-588-0540
1180 West Peachtree Street         212-202-4840 (fax)
Suite 2040
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)

*Attorneys for Plaintiff Roslyn La Liberte*

Date of service:  January 14, 2019

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 2

   I.   La Liberte's Limited Participation in SB 54 and Status as a Private Figure. .................... 2

   II.   Reid is Nationally Known as a "Heroine of the Resistance" to President Trump. ............. 3

   III.   Reid Maliciously Accused La Liberte of Screaming Racial Slurs at a Minor and of Otherwise Engaging in Racist Conduct. ............................................................ 3

   IV.   Reid's Accusations Are False. ....................................................................... 6

ARGUMENT ................................................................................................................. 6

   I.   California's Anti-SLAPP Statute Cannot Be Applied in Federal Court. ........................... 7

   II.   Standard of Review. ..................................................................................... 11

      A.   The 12(b)(6) Standard Requires Only "Plausibility." ....................................... 11

      B.   The Anti-SLAPP Standard Is Analyzed Under the Rule 56 Standard. ..................... 11

   III.   Reid Authored the Accusations and Therefore the CDA Does Not Apply. ..................... 13

   IV.   Reid's Accusations Are Defamatory and Are Not Protected Opinion. ........................... 15

   V.   La Liberte is a Private Figure. ....................................................................... 18

      A.   La Liberte Did Not Thrust Herself to the Forefront of the SB 54 Issue. .................. 19

      B.   Accusations of Racist Conduct Are Not Germane to La Liberte's Limited Public Participation in SB 54. ...................................................................... 21

   VI.   La Liberte Plausibly Alleged and Substantiated Reid's Actual Malice. ......................... 22

      A.   Reid Deliberately Altered the Vargas Tweet. ................................................. 23

      B.   Reid Had Actual Knowledge of Falsity and Otherwise Avoided the Truth While Relying on a Single Biased Source. ............................................................. 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015)...................................... 9, 10

*Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014) ........................................................................ 8, 9

*Am. Dental Ass'n v. Khorrami*, 2004 WL 3486525 (C.D. Cal. Jan. 26 2004)............................ 29

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). ........................................................................ 14

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................................ 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 12

*Austin v. PMG Acquisition LLC*, 278 Ga. App. 539 (2006) ......................................................... 26

*Barrett v. Rosenthal*, 40 Cal. 4th 33 (2006)................................................................................. 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 12

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015) ........................................................................ 13

*Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711 (1989) ............................................................ 21

*Calder v. Jones*, 465 U.S. 783 (1984) .......................................................................................... 12

*Cantrill v. Herald Co.*, 1992 WL 119135 (N.D.N.Y. May 22, 1992) ..................................... 24, 25

*Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018)................................... 9, 10

*Carr v. Forbes, Inc.*, 259 F.3d 273 (4th Cir. 2001) ..................................................................... 21

*Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704 (1994) ............................................................... 14

*Como v. Riley*, 287 A.D.2d 416 (1st Dept. 2001) ........................................................................ 18

*Cummins v. Suntrust Capital Markets, Inc.*, 649 F. Supp. 2d 224 (S.D.N.Y 2009), *aff'd*, 416 Fed.

    App'x 101 (2d Cir. 2011) .......................................................................................................... 24

*Curtis Publishing v. Butts*, 388 U.S. 130 (1967) ......................................................................... 29

*Davis v. Cox*, 351 P.3d 862 (2015) .............................................................................................. 11

*Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446 (E.D. Va. 2012)................ 15

*Ernst v. Carrigan*, 814 F.3d 116 (2d Cir. 2016) ............................................................................ 8

*Fair Hous. Council of San Fernando Val. V. Roomates.Com, LLC*, 521 F.3d 1157 (9th Cir.

    2008).......................................................................................................................................... 15

*Fisher v. Larsen*, 138 Cal. App. 3d 627 (1982) ................................................................ 29

*Galarpe v. United Airlines, Inc.*, 2918 WL 1586202 (N.D. Cal. Apr. 2, 2018) ........................ 20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ................................................... 21, 23

*Grenier v. Taylor*, 234 Cal. App. 4th 471 (2015). ....................................................... 25

*Harris v. City of Seattle*, 152 Fed. App'x 565 (9th Cir. 2005) ....................................... 30

*Harte-Hanks*, 491 U.S. 657 (1989) ...................................................................... 27, 28

*Herbert v. Lando*, 441 U.S. 153 (1979) ...................................................................... 27

*Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250 (1st Dept. 1995) .......................................... 19

*Hutchinson v. Proxmire*, 443 U.S. 11 (1979) ....................................................... 21, 24

*In re Gawker Media LLC*, 571 B.R. 612 (Bankr. S.D.N.Y. 2017) ............................................ 10

*Intercon Cols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) ........................... 9, 11

*John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300 (2016) ............................................... 19

*Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398 (6th Cir. 2014) ................ 16

*Khawar v. Globe Intern., Inc.*, 19 Cal. 4th 254 (1998). ......................................... 21, 23

*Leiendecker v. Asian Women United of Minn.*, 895 N.W.2d 623 (Minn. 2017) ......................... 11

*Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123 (2d Cir. 1984) .................................... 22

*Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) ............................. 8

*Liberty Synergistics Inc. v. Microflo Ltd.*, 637 Fed. App'x 33 (2d Cir. 2016) ......................... 8, 9

*Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429 (2000). ....................................................... 13

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018)............. 9

*MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117 (1996) ........................................... 18

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013) ........................................ 10

*Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686 (2008)................................. 18

*Masson v. New Yorker Mag., Inc.*, 510 U.S. 496 (1991). ........................................... 28

*McFarlane v. Sheridan Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996)................................. 27

*McGraw v. Superior Ct.*, 2014 WL 940306 (Cal. Ct. App. Mar. 11, 2014) ........................ 22

*McGugan v. Aldana Bernier*, 752 F.3d 224 (2d Cir. 2014) ........................................ 12

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). ............................................................... 17, 19

*Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590 (9th Cir. 2010) .................................................. 13

*Nadel v. Regents of Univ. of California*, 28 Cal. App. 4th 1251 (1994)........................................ 25

*Navellier v. Sletten*, 29 Cal. 4th 82 (2002).................................................................................... 13

*New York Times Co. v. Sulivan*, 376 U.S. 254 (1964) ................................................................... 26

*Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010) .................................................... 18

*Overstock.com, Inc. v. Gradient Analysis, Inc.*, 151 Cal. App. 4th 688 (2007) .......................... 30

*Parks v. Steinbrenner*, 131 A.D.2d 60 (1st Dept. 1987).............................................................. 19

*Payne v. WS Services, LLC*, 2016 WL 3926486 (W.D. Okla. July 18, 2016) .............................. 18

*Planned Parenthood Fedn. Of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828 (9th Cir. 2018)

........................................................................................................................................... 14, 26

*Reader's Digest Assn. v. Superior Ct.*, 37 Cal. 3d 244 (1984) ........................................ 22, 25, 27

*Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1997);........................................... 21

*Scott v. Cooper*, 226 A.D.2d 360 (2d Dept. 1996)....................................................................... 19

*Seldon v. Magedson*, 2012 WL 4475274 (S.D.N.Y. July 10, 2012)............................................. 16

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010) .......... 9

*Shiamili v. Real Estate Group of New York, Inc.*, 17 N.Y.3d 281 (2011) ....................... 15, 16, 17

*St. Amant v. Thompson*, 390 U.S. 727 (1968)...................................................................... 27, 29

*Travelers Cas. Ins. Co. of Am. v. Hirsh*, 831 F.3d 1179 (9th Cir. 2016).................................. 8, 10

*Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990)............................................................. 18

*Vegod Corp. v. Am. Broadcasting Companies, Inc.*, 25 Cal. 3d 763 (1979) ............................... 21

*Visher v. City of Malibu*, 126 Cal. App. 4th 364 (2005).............................................................. 1

*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980). ............................ 22

*Westmoreland v. CBS Inc.*, 596 F. Supp. 1170 (S.D.N.Y. 1984) ................................................ 28

*ZL Tech., Inc. v. Does 1-7*, 13 Cal. App. 5th 603 (2017)............................................................ 20

**Statutes**

47 U.S.C. § 230.......................................................................................................................... 15

CA CIV. § 425.16 .................................................................................................... 11, 13

CA CIV. § 425.17 ......................................................................................................... 7

Fed. R. Civ. P. 12 ................................................................................................... 12, 13

Fed. R. Civ. P. 56 ....................................................................................................... 14

## INTRODUCTION

Plaintiff Roslyn La Liberte ("La Liberte") was one of many private citizens to attend city council meetings to discuss California Senate "Sanctuary State" Bill 54 ("SB 54"). As a result of the exercise of her First Amendment right to participate as a private citizen in a local government forum, La Liberte became a victim of Defendant Joy Reid's ("Reid") known bias against President Trump when Reid falsely accused La Liberte of screaming at a Hispanic child that he "would be the first deported" "dirty Mexican." The false accusation by Reid (and others) turned La Liberte into the object of a social media hate mob simply because she was a private citizen publicly participating in a local government proceeding. Ironically, and incorrectly, Reid now seeks to sanction and punish La Liberte under California's anti-SLAPP statute ("Anti-SLAPP") for pursuing her legal right to redress a false attack on her reputation by the first (and believed only) member of the media to specifically accuse her. In doing so, Reid asks the Court to ignore the Federal Rules of Civil Procedure and to test La Liberte's factual allegations without the benefit of a full factual record developed through the procedures permitted by the Federal Rules.

Here, Reid misuses the Anti-SLAPP statute as a sword against La Liberte to immediately challenge the factual merits of her Complaint when it was intended to be a shield to protect a private citizen's public participation in government. Anti-SLAPP statutes were not created to punish litigants for pursuing plausible defamation actions filed to redress harm to reputation. Nor were anti-SLAPP statutes intended to penalize public participation by imposing public figure status on private citizens and then testing factual issues such as actual malice without discovery:

> A strategic lawsuit against public participation, also known as a SLAPP, aims to prevent defendants from exercising their constitutionally protected rights of free speech and petition. Rather than necessarily hoping to win the lawsuit, a party who files a SLAPP tries to wear down the other side by forcing it to spend time, money, and resources battling the SLAPP instead of the protected activity.

*Visher v. City of Malibu*, 126 Cal. App. 4th 364, 368 (2005). No purpose of the Anti-SLAPP statute is served by its application to the scenario presented in this litigation. The allegations of La Liberte's Amended Complaint ("Complaint"), if accepted as true, set forth a plausible cause of

1

action for defamation. Even if the Court finds that the Anti-SLAPP statute does apply, La Liberte's limited participation in local government did not convert her to public figure status and Reid acted with actual malice regardless. For these reasons, Reid's Anti-SLAPP motion must be denied.

**FACTUAL BACKGROUND**

**I.      La Liberte's Limited Participation in SB 54 and Status as a Private Figure.**

La Liberte is a private citizen who has enjoyed a private life outside the public eye. (Compl. ¶¶ 31-32, 74-75). Prior to the social media explosion of publicity resulting from this incident, La Liberte's public participation in SB 54 was limited to exercising her constitutional right to participate in our local governments. *(Id.* ¶¶ 8, 20, 35; La Liberte Dec. ¶ 4).[1] She appeared at eight local city council meetings on the issue. (La Liberte Dec. ¶ 11). She had not participated in, requested, or received a media interview on SB 54 or any other topic related to immigration. (*Id.* ¶ 5). She had not provided, authored, or published any public comment on the issue aside from her participation in city council meetings. (*Id.* ¶ 4). She is not a member of any activist organization and was not even aware of the existence of the particular "hate group" described by Reid in her Motion to Dismiss the Action and Strike the Complaint (the "Motion"). (Mot. at 5-6). La Liberte joined hundreds of other concerned citizens at the June 25, 2018, Simi Valley, California City Council meeting (the "Council Meeting"), where, in a meeting lasting over five hours, she spoke publicly for just two minutes and twelve seconds. (Compl. ¶¶ 36-37; La Liberte Dec. ¶ 12).[2]

While Reid's counsel was able after combing the Internet to locate sparse images of La Liberte in three media publications and a blogsite – one of which is not even identified – none of those publications interviewed, sought to interview, or otherwise included any comment from La Liberte. (*See* Reichman Aff. ¶¶ 4-5, 9-10). She was not the subject of any media reporting, nor

_____

[1] Although it is unclear whether the Court will apply the Anti-SLAPP and permit Reid to challenge the factual merits of the Complaint, out of caution La Liberte submits evidence regarding her private figure status and Reid's actual malice.  Due to space constraints, the allegations and evidence are addressed together.

[2] According to the Ventura County Star article relied upon by Reid, at least 121 individuals spoke at the Council Meeting. (Hoffman Aff. ¶ 18; Wilson Dec. ¶ 6).

does Reid's proffered evidence show there was any controversy surrounding La Liberte. Rather, the "evidence" shows only that La Liberte's photo was contained within larger publications that were not about La Liberte, at all.  (*Id.*)

## II.    Reid is Nationally Known as a "Heroine of the Resistance" to President Trump.

Reid is the host of "AM Joy," which broadcasts nationally from 10 am to 12 pm each weekend on MSNBC. (Compl. ¶ 1; Wilson Dec. ¶ 3). Reported ratings for Reid's show in 2018 range from approximately 960,000 viewers per episode to 1.287 million viewers per episode.  (*Id.*). In a February 2018 *New York Times* article entitled "How Joy Reid of MSNBC Became a Heroine of the Resistance" and sub-headlined "The daughter of immigrants, she spars fiercely with supporters of President Trump, both on the air and in the Twitter ether," Reid's bias against Trump is recounted in detail. (Compl. ¶ 7; Wilson Dec. ¶¶ 25-26). Per the *NYT* article, Reid stated, among other things,  that "[o]ur primary objective is to constantly remind people that this [the architecture of President Trump's presidency] is not normal and not to allow it to become mundane," and that when she saw a white woman on an elevator praising Trump for his anti-immigration stance, she "should have known then that Trump would win." (*Id.*). Reid uses her social media account to promulgate her pre-conceived goals and agenda. (Compl. ¶¶ 10, 21; Wilson Dec. ¶ 24, Ex. J).[3]

## III.    Reid Maliciously Accused La Liberte of Screaming Racial Slurs at a Minor and of Otherwise Engaging in Racist Conduct.

Reid went beyond merely labeling La Liberte a racist. She accused her of engaging in specific racist conduct – yelling racial slurs at a minor. While La Liberte was attending the Council Meeting, a young man named Joseph Luevanos, age 14, approached La Liberte. (Compl. ¶ 39; La Liberte Dec. ¶¶ 12-14). On June 26, 2018, the Ventura County Star published a series of photographs from the Council Meeting, one of which was an out-of-context photograph of La Liberte's discussion with Mr. Luevanos (the "Photograph"), describing it as a "spirited

---

[3] Reid has also been profiled elsewhere, including in a *Variety* feature entitled "How Joy Reid Took on Trump and Became MSNBC's New Star," a piece that reasons Reid's stance on the ongoing White House controversy earned Reid and MSNBC new heights in ratings.  (Compl. ¶ 1; Wilson Dec. ¶¶ 27-28).

discussion." (Wilson Dec. ¶ 6, Ex. A). On June 28, 2018, Alan Vargas – teenaged social media activist and self-described member "of the student revolution" – tweeted the Photograph and accompanying post stating, in material part: "'You are going to be the first deported' 'dirty Mexican' [w]ere some of the things *they yelled* . . . at this 14 year old boy" (the "Vargas Tweet"). (Compl. ¶ 41; Wilson Dec. ¶¶ 8-10, Ex. B) (emphasis added).

On June 29, 2018, Reid retweeted the Vargas Tweet to her 1.24 million followers at a time when it had no more than 1,731 comments, 16,300 retweets, and 14,300 likes. (Compl. ¶ 42; Wilson Dec. ¶¶ 9-11). After her retweet, the Vargas Tweet received at least 76,900 comments and 78,300 likes, an increase of 4,523% and 547%, respectively. (*Id.* ¶ 11; Hoffman Aff. ¶¶ 9-10). In addition to using Twitter almost exclusively for political activism, Mr. Vargas published a video to Twitter on June 29, 2018, entitled "My message to racists" and stating, in part, as follows:

> I am not going to apologize to racists.  I am not going to be nice to racists.  I don't care how old you are.  I don't care if you're in your late 80s.  If you support family separation I am not going to be kind to you and I don't care what people think because there is never a need to be kind to someone who hates a human being and children.

(Compl. ¶¶ 44, 50; Wilson Dec. ¶¶ 19-23, Ex. I).[4]

Just hours later, on June 29, 2018, Reid published the Photograph alongside the following post to Instagram and her 96,600 followers on that platform:

> He showed up to a rally to defend immigrants. … She showed up too, in her MAGA hat, and screamed, "You are going to be the first deported" … "dirty Mexican!"

> He is 14 years old.  She is an adult.  Make the picture black and white and it could be the 1950s and the desegregation of a school.  Hate is real, y'all.  It hasn't even really gone away.

(The "June 29 Instagram Post") (Compl. ¶ 48; Wilson Dec. ¶ 12, Ex. C, D). Prior to its deletion, the June 29 Instagram Post garnered at least 89,625 shares, 66,000 likes, and 12,000 comments. (Wilson Dec. ¶ 13). Of critical importance, Reid deliberately altered the Vargas Tweet from "they

---

[4] Although Reid's Motion states Mr. Vargas is an "eyewitness" to the event, there is no evidence in the record before the Court establishing that Mr. Vargas was an "eyewitness" or that Reid assumed, believed, or knew that Mr. Vargas was an "eyewitness."

yelled" to La Liberte, herself, "screamed" the racial slurs.

Contemporaneously with the June 29 Instagram Post, a local Fox affiliate in Los Angeles, Fox 11, published an article entitled "People online twist the real story behind photo of woman yelling at boy," which included an interview of Mr. Luevanos stating, among other things, that La Liberte "was being civil." (Compl. ¶¶ 5, 52; Wilson Dec. ¶ 16). A video of the interaction between La Liberte and Mr. Luevanos shows La Liberte and Mr. Luevanos hugging and Mr. Luevanos' mother stating that "they are having a civil conversation." (Compl. ¶ 4; La Liberte Dec. ¶ 14).

On June 30 and July 1, 2018, La Liberte's son, Doug Codron, e-mailed Reid explaining that Reid's accusations were false and providing to her the Fox 11 article and a separate article by another publication. (Compl. ¶¶ 53-54; Codron Dec. ¶ 4, Ex. A). The subject of Mr. Codron's e-mails is "I am the Son of Roslyn LaLiberte (Woman accused of racist slurs towards boy)." (*Id.*) Mr. Codron and others also posted the Fox 11 story as replies to Reid's own social media posts. (Compl. ¶ 55; Codron Dec. ¶ 3, Ex. A). Reid never contacted La Liberte, nor otherwise investigated the truth of her accusations in any manner. (Compl. ¶¶ 51, 83-84; La Liberte Dec. ¶ 15).

Yet, on July 1, 2018, Reid again posted to Instagram and Facebook (~206,400 followers) the Photograph side by side with a photograph of racist conduct during desegregation in 1957, alongside the following original post:

> It was inevitable that this image would be made.  It's also easy to look at old black and white photos and think:  I can't believe that person screaming at a child, with their face twisted in rage, is real.  B[ut] every one of them were.  History sometimes repeats.  And it is full of rage.  Hat tip to @joseiswriting.  #regram #history #chooselove

(The "July 1 Instagram Post" and the "July 1 Facebook Post," respectively) (Compl. ¶ 56; Wilson Dec. ¶ 17, Ex. F, G).[5]

It was not until Reid was confronted by a lawyer threatening a defamation claim that she removed the posts. (Compl. ¶¶ 57-58; Wilson Dec. ¶ 29). However, rather than openly state that

---

[5] The June 29 Instagram Post, July 1 Instagram Post, and July 1 Facebook Post are collectively referred to herein as the "Accusations."

La Liberte did not yell the slurs, she equivocated, stating: "It appears I got this wrong.  My apologies to Mrs. La Liberte and Joseph." (Compl. ¶ 58; Wilson Dec. ¶ 29). Incredibly, Reid's Motion now even disputes her claimed apology by contending that there "remain substantial questions about what La Liberte was screaming at the Council Meeting and whether they were racial slurs." (Reichman Aff. ¶¶ 46-49; Mot. at 10). Reid – having allegedly retracted – now continues to bully and accuse La Liberte, and in doing so, highlights her malice in issuing her accusations by relying on social media posts stating that the Vargas Tweet was true. (*Id.*). Perhaps it was: the Vargas Tweet *did not specifically accuse* La Liberte, unlike Reid who clearly did so in each of her Accusations. The Vargas Tweet is susceptible of multiple meanings, one of which is the technical reading that an unidentified "they" yelled racial slurs, not La Liberte. Reid, on the other hand, pointed the finger directly and unequivocally at La Liberte.

IV.     **Reid's Accusations Are False.**

Reid's decision to undo her supposed retraction notwithstanding, there is no genuine issue as to falsity. Both La Liberte and Mr. Luevanos have confirmed La Liberte was being civil and did not yell racial slurs. (Compl. ¶¶ 4-5; La Liberte Dec. ¶¶ 8, 12-13; Wilson Dec. ¶ 16). A video of the interaction shows La Liberte and Mr. Luevanos hugging, and Mr. Luevanos' mother stating twice that "they are having a civil conversation." (Compl. ¶ 4; La Liberte Dec. ¶ 14).

## ARGUMENT

Reid's two principle arguments for dismissal are premised on the same notion: other people did it first. Thus, Reid asserts, she could not have acted with actual malice and/or her defamatory posts are entitled to absolute immunity under the Communications Decency Act because accusations against La Liberte were previously posted on the Internet.

Contrary to Reid's suggestion, she was not sued to the exclusion of other accusers because La Liberte has a political motive. (La Liberte Dec. ¶¶ 9-10). This suit is not politically motivated. (*Id.*). Reid was sued because: (1) she is the only known member of the media to deliberately alter the Vargas Tweet to specifically accuse La Liberte of yelling racial slurs; (2) Reid was directly provided documentary evidence that her Accusations were false in the form of multiple e-mails

6

and through posts to her own defamatory Accusations; (3) as a result, Reid either knew or purposefully avoided the truth, including by ignoring the Fox 11 interview of Mr. Luevanos and by contacting La Liberte or other witness; (4)  Reid relied upon a single, obviously biased source without any investigation; (5) Reid has personal animus toward President Trump and his supporters; (6) Reid has the largest social media following of any accuser known to La Liberte; and (7) Reid equivocated when she issued her purported retraction. (*Id.*)

While La Liberte is appropriately classified as a private figure, the above facts present a clear jury issue on actual malice. As to alleged immunity under the CDA, none of the Accusations were authored by someone else or even someone that Reid relied upon as a source. The CDA offers no safe harbor because Reid, herself, authored the Accusations. Finally, Reid's assertion that her Accusations are protected opinion is fatally flawed. She did not just accuse La Liberte of generally being a racist (which is arguably subjective), she accused La Liberte of engaging in specific conduct motivated by racism (i.e., an objective event that either occurred or did not, and is thus, factual). Regardless of whether the Anti-SLAPP statute applies, La Liberte has demonstrated that her claim has merit and Reid's Motion should be denied.

## I.   California's Anti-SLAPP Statute Cannot Be Applied in Federal Court.

This Court should not apply the Anti-SLAPP statute because it conflicts with Federal Rules of Civil Procedure that answer the question in dispute. This matter presents the dark side of anti-SLAPP statutes, whereby a powerful media figure is undermining a private citizen's right to participate in government and to petition the courts to redress the damage wrought upon her reputation.[6] The Ninth Circuit has begun to retreat from its previous applications of the Anti-SLAPP. The former Chief Judge of the Ninth Circuit has lamented that the court's "precedents [applying the Anti-SLAPP] have not aged with grace.  Ever since we allowed them to take root, anti-SLAPP cases have spread like kudzu through the federal vineyards." *Travelers Cas. Ins. Co.*

---

[6] The California legislature itself has declared "that there has been a disturbing abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16."  CA CIV. § 425.17.

*of Am. v. Hirsh*, 831 F.3d 1179, 1182 (9th Cir. 2016) (Kozinski, C.J., concurring).

Moreover, contrary to Reid's suggestion, the Second Circuit has never allowed California's Anti-SLAPP to take root in this Circuit. Reid cites to *Liberty Synergistics Inc. v. Microflo Ltd.* ("*Liberty Synergistics I*"), 718 F.3d 138 (2d Cir. 2013) to support her contention that the Anti-SLAPP "must be considered." (Mot. at 12). But Reid ignores the Second Circuit's subsequent opinion in the very same case confirming that it did "not reach the issue of whether California's anti-SLAPP statute is applicable in federal court," including because the court did not determine if the statute conflicts with valid Federal Rules of Civil Procedure. *Liberty Synergistics Inc. v. Microflo Ltd.*, 637 Fed. App'x 33, 34 n.1 ("*Liberty Synergistics II*") (2d Cir. 2016) (internal brackets omitted); *see also Ernst v. Carrigan*, 814 F.3d 116, 122 (2d Cir. 2016) (noting the "narrowness of our *Liberty Synergistics [I]*" decision).[7]

Since *Liberty Synergistics I*, several circuits have held that anti-SLAPP statutes akin to California's cannot apply in federal court because they conflict with valid Federal Rules that answer the question in dispute. The first do so was the D.C. Circuit in a well-reasoned opinion by now Justice Kavanaugh refusing to apply the District's anti-SLAPP statute: *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015) (holding the anti-SLAPP failed to meet the Supreme Court's test for applying state law articulated in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010)). The Eleventh Circuit recently

---

[7] *Liberty Synergistics I* suggests that the Second Circuit would hold that the Anti-SLAPP does not apply in federal court. First, the court assumed jurisdiction based on the collateral order doctrine rather than applying the Anti-SLAPP's provision permitting interlocutory appeal. Second, *Liberty Synergistics I* held that the California Anti-SLAPP "is not a substantive immunity from suit." 718 F.3d at 148 n.9 (internal quotation marks omitted); *see also Ernst*, 814 F.3d at 121 ("the California courts have ruled that the California statute (upon which the Vermont statute is based) does not provide a 'substantive immunity from suit'"). This holding sets California's Anti-SLAPP apart from the Nevada anti-SLAPP statute, which the Second Circuit applied, in part, because Nevada's statutory language expressly made it an "immunity from civil liability." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (observing that a state may "define the defenses to . . . [a] claim, including the defense of immunity," as Nevada did in N.R.S. § 41.650). In any event, *Liberty Synergistics II* post-dates *Adelson*, and made imminently clear that the Second Circuit has not decided whether California's Anti-SLAPP can be applied in federal courts. *Liberty Synergistics II*, 637 Fed. App'x at 34 n.1.

expanded on *Abbas's* reasoning, dismantling the notion that Georgia's anti-SLAPP statute applied in federal court. *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1348-58 (11th Cir. 2018).[8] Importantly, the reasoning in these two opinions applies to California's Anti-SLAPP Statute without running afoul of the Second Circuit's opinion in *Adelson v. Harris*, 637 Fed. App'x 33 (2d Cir. 2014) applying Nevada's anti-SLAPP statute: neither the District's, Georgia's, nor California's anti-SLAPP statutes are codified immunities, unlike Nevada's.

The only decision within the Second Circuit to answer whether California's Anti-SLAPP conflicts with the Federal Rules and thus cannot be applied in federal court is the bankruptcy court for the Southern District of New York in *In re Gawker Media LLC*, 571 B.R. 612 (Bankr. S.D.N.Y. 2017). There, the Court resoundingly rejected the application of the anti-SLAPP statute under the same reasoning as *Abbas* and *Carbone* and refused to apply California's Anti-SLAPP Statute. *Id.* at 625-33 ("the Court concludes that even though the California anti-SLAPP statute is substantive under *Erie*, the literal application of the special motion procedures conflict with Rule 56 (and Rule 12 …) and does not apply" in federal court).

This Court should similarly refuse to apply the Anti-SLAPP because it conflicts with Federal Rules 8, 12, and 56, which answer the question in dispute: i.e., whether La Liberte's "complaint states a claim for relief supported by sufficient evidence to avoid pretrial dismissal." *See Carbone*, 910 F.3d at 1350. The Federal Rules and the Anti-SLAPP statute conflict because the Federal Rules are sufficiently broad to control the issue before the court, and because, on its face, the Anti-SLAPP (1) imposes a heightened pleading standard of probability, rather than the federal standard of plausibility;[9] (2) requires the court to weigh evidence rather than determine if there is a genuine dispute of material fact; and (3) stays discovery, contravening Rule 56. *See id.* at 1349-57 (analyzing Georgia's analogous anti-SLAPP); *Abbas*, 783 F.3d at 1333-35 (analyzing

---

[8] *See also Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659 (10th Cir. 2018) (refusing to apply New Mexico's anti-SLAPP); *Intercon Cols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) (refusing to apply Washington state anti-SLAPP).

[9] *Compare* Reid's Motion, p. 13, stating the "plausibility standard is *not* akin to a 'probability requirement.'"

D.C.'s analogous anti-SLAPP); *Travelers Casualty*, 831 F.3d at 1183-86 (analyzing California's anti-SLAPP) (Kozinski, C.J., concurring); *In re Gawker*, 571 B.R. at 629-33 (analyzing California's anti-SLAPP); *see also Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 275 (9th Cir. 2013) (Kozinski, C.J., concurring) (applying the Anti-SLAPP "was a big mistake. … It's time we led the way back out of the wilderness.  Federal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules").  This Court, too, should avoid disrupting the Federal Rules in favor of the wilderness.

The Anti-SLAPP is also unconstitutional. First, it violates the Seventh Amendment right to a jury trial on disputed issues of material fact – which must "be preserved inviolate," U.S. Const. amend. XII – by directing courts to "consider . . . supporting and opposing affidavits" to determine if a plaintiff meets his burden of establishing a "probability that [he] will prevail" on the merits of his claim, CA CIV. § 425.16.  *Cf. Leiendecker v. Asian Women United of Minn.*, 895 N.W.2d 623, 634-37 (Minn. 2017) (ruling that Minnesota's anti-SLAPP statute violates the state's constitutional right of trial by jury); *Davis v. Cox*, 351 P.3d 862, 295-96 (2015) (ruling that Washington anti-SLAPP statute violates the state's constitutional right of trial by jury); *Intercon Cols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) (applying *Davis*).[10]

Further, the Anti-SLAPP violates the Fourteenth Amendment's equal protection and due process provisions because it lacks a rational basis for singling out defamation plaintiffs for unequal treatment, including by denying them due process before a court and awarding onerous attorneys' fee penalties under different standards. Unlike all other personal injury plaintiffs, defamation plaintiffs subject to the Anti-SLAPP must meet a higher, factual burden at the time of filing and face sanctions even where the suit is non-frivolous and its allegations are plausible. Anti-SLAPP statutes are allegedly based on a state's interest in protecting First Amendment rights, but

---

[10] The anti-SLAPP statutes in these cases included a "clear and convincing" standard of review, while California's Anti-SLAPP has a "probability of success" standard. But each of the statutes require a judicial weighing of disputed facts that intrudes on the province of the jury. As shown in Section II, *infra*, federal courts that have applied the anti-SLAPP statutes have engaged in constitutional avoidance to re-write the statute and avoid these concerns.

the U. S. Supreme Court has refused to grant defamation defendants additional procedural protections under the First Amendment "in addition to the constitutional protections embodied in the substantive laws" lest the Court engage in "a form of double counting." *Calder v. Jones*, 465 U.S. 783, 790–91 (1984). Additional First Amendment protection cannot serve as a rational basis for the Anti-SLAPP statute's violation of the Fourteenth Amendment.[11]

## II.     Standard of Review.[12]

Highlighting the disparate standards of Rule 12(b)(6) and the Anti-SLAPP, La Liberte addresses each separately below.

### A.     The 12(b)(6) Standard Requires Only "Plausibility."

A complaint should not be dismissed under Rule 12(b)(6) unless it the factual allegations fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[A]ll reasonable inferences" are to be drawn "in the plaintiff's favor." *McGugan v. Aldana Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). The Rule 12(b)(6) standard does not change in a defamation case. *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015).

### B.     The Anti-SLAPP Standard Is Analyzed Under the Rule 56 Standard.

If the Court decides to apply the Anti-SLAPP statute, a Rule 12(b)(6) standard to assess the legal sufficiency of the Complaint and a Rule 56 standard to assess its factual merits must be also applied. The Anti-SLAPP purports to require the plaintiff to "establish[] that there is a probability that [she] will prevail on the claim." CA CIV. § 425.16(b)(1). On its face, this presents a high burden, and requires the Court to usurp the jury's function of weighing the evidence to

---

[11] The California Anti-SLAPP also violates the First Amendment by infringing on the right "to petition the Government for a redress of grievances."

[12] Due to space constraints and the number and import of the dispositive issues before the Court, La Liberte does not contest the application of California law.

determine if La Liberte has established a "probability" of prevailing. However, in an effort to harmonize the Anti-SLAPP with a plaintiff's inviolate constitutional right to a jury trial, California state and federal courts have effectively re-written the standard. While Reid references a requirement to show a "reasonable probability" of prevailing, (Mot. at 16), "'[r]easonable probability' . . . has a specialized meaning . . . require[ing] only a 'minimum level of legal sufficiency and triability.' Indeed, the second step of the anti-SLAPP inquiry is often called the 'minimal merit' prong." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (citing, e.g., *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 438 n.5 (2000).

> [I]n order to establish the requisite probability of prevailing, the plaintiff need only … demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute – i.e., that arises from protected speech or petitioning *and* lacks even minimal merit – is a SLAPP, subject to being stricken[.]

*Navellier v. Sletten*, 29 Cal. 4th 82, 88-89 (2002) (internal citations and punctuation omitted) (emphasis in original). California courts have referred to the standard as being akin to a "motion for summary judgment in reverse," in that it skips the defendant's typical summary judgment initial burden of production but requires the plaintiff to substantiate her case. *Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal.4th 704, 719 (1994).

More recently, however, as cracks have begun to show in the Ninth Circuit's approval of the Anti-SLAPP in federal court, the Ninth Circuit held that the Anti-SLAPP must be construed in federal court as requiring a Rule 12(b)(6) standard when testing the legal sufficiency of the claim and a Rule 56 summary judgment standard when testing the factual merits of the claim:

> we hold that, on the one hand, when an anti-SLAPP motion to strike challenges the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated. And, on the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. … A contrary reading of these anti-SLAPP provisions would lead to the stark collision of the state rules of procedure with the governing Federal Rules of Civil Procedure while in a federal district court.

*Planned Parenthood Fedn. Of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018). Under Rule 56, the court considers all inferences drawn from the underlying facts in a light most favorable to the non-movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Though applying Rule 12(b)(6) and Rule 56 standards to the Anti-SLAPP effectively requires this Court to re-write the "probability" standard, and though the application of a Rule 56 standard at the pleading stage still collides with the Federal Rules, it should be the applicable standard if this Court applies the Anti-SLAPP statute.

## III.     Reid Authored the Accusations and Therefore the CDA Does Not Apply.

Reid seeks unprecedented relief and asks this Court to ignore centuries of black letter defamation law and, instead, hold that the Accusations are protected by the Communications Decency Act, 47 U.S.C. § 230 (the "CDA") because other individuals first branded La Liberte a racist on social media.[13] [14] She posits that as long as somewhere on the Internet somebody else said it first, then individuals have blanket immunity from defamation even if the defendant does not rely on, know of, or repost someone else's pre-existing Internet post.

Reid, again, asks this Court to focus on the conduct of others, not her own: she authored, created, and developed the Accusations, not someone else. The dispositive question here is whether Reid is an "information content provider," i.e., "any person . . . that is responsible, in whole or in part, for the creation or development of information[.]" 47 U.S.C. § 230(f)(3). Being

---

[13] As with all other factual challenges made by Reid, if the Court does not apply the Anti-SLAPP, it should not consider any of the information provided by Reid that is outside the four corners of the Complaint, including her extensive references to other social media posts.

[14] Noticeably absent from Reid's argument is any applicable case law.  The CDA has seemingly never been applied to social media, and doing sowould overturn well-established principles of defamation.  It would be a "license to libel" "subject to tremendous abuse" and "could have widespread and potentially catastrophic consequences for individuals."  *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 453 (E.D. Va. 2012).  The CDA was not enacted to protect individuals who do not function as "internet service providers" performing editorial functions, but was instead "enacted to protect websites against the evil of liability for *failure to remove* offensive content." *Fair Hous. Council of San Fernando Val. V. Roomates.Com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008). La Liberte questions the application of the CDA to this case, where Reid, an individual, actively chose to publish the Accusations (including her initial retweet).

13

a "user" of social media does not mean that she is not also an "information content provider." *See,* e.g., *Shiamili v. Real Estate Group of New York, Inc.*, 17 N.Y.3d 281, 289 (2011) ("any piece of content can have multiple [content] providers"); *Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 408 (6th Cir. 2014) (the CDA "applies only to the extent that an interactive computer service [or user] is not also the information content provider of the content at issue"). The Accusations are not reposts of a third-party's post; they are posts authored and originally posted by Reid. (Compl. ¶¶ 48-49, 56; Wilson Dec. ¶¶ 12, 17).

Reid argues that a "republication does not have to be verbatim to obtain protection" under the CDA but ignores that it must be a republication of someone else's post in the first instance. (Mot. at 18). She did not repost someone else's post. She was not acting as a mere editor or publisher selecting information provided by others for display. The words were her own words. This undeniable fact alone distinguishes every case relied upon by Reid and it is dispositive. *See,* e.g., *Jones,* 755 F.3d at 415-16 ("Dirty World and Richie did not author the statements at issue . . . . To be sure, Richie was an information content provider as to his comment on the December 7 post," a comment authored by the defendant on another person's post, "[b]ut Jones did not allege that *Richie's* comments were defamatory") (emphasis in original); *Seldon v. Magedson*, 2012 WL 4475274, at *17 (S.D.N.Y. July 10, 2012) ("it is undisputed that defendants did not create the content to which plaintiff objects – the allegedly defamatory posts. Instead, as discussed above, those posts were written and submitted by one or more website users.").

*Shiamili* crystallizes the distinction between a defendant merely editing another's post and authoring her own. In *Shiamili*, "the complaint allege[d] that the defamatory statements were first posted by anonymous users; there is no allegation that defendants actually authored the statements" complained of by the plaintiff. 17 N.Y.3d at 290. However, the defendants were "'content providers' with respect to the heading, subheading, and illustration that accompanied the reposting," and which defendants had authored themselves. *Id.* at 292. Here, the Accusations are not "republications of third party content" subject to the CDA. *Barrett v. Rosenthal*, 40 Cal. 4th

14

33, 57 (2006).[15]

## IV.     Reid's Accusations Are Defamatory and Are Not Protected Opinion.

The Accusations do not merely brand La Liberte a racist in a conclusory, abstract sense. The Accusations unequivocally accuse her of specific conduct – conduct that either occurred or did not occur, i.e., conduct that is capable of being proven true or false. Moreover, the Accusations are not protected opinion on an alternative, but equally dispositive basis because they imply Reid's knowledge of undisclosed defamatory facts demonstrating her so-called opinion to be true.

Contrary to Reid's position, there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2 (1990). The "threshold question in defamation suits is not whether a statement 'might be labeled 'opinion,' but rather whether a reasonable factfinder could conclude that the statement 'implies an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (internal citations omitted).

Reid all but concedes that the June 29 Instagram Post conveys a provably false fact – whether or not La Liberte screamed the identified racial slurs. And so she should. "This either happened or it did not." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 728 (2008). La Liberte recognizes that generically referring to someone as a "racist" may be non-actionable opinion in some circumstances. However, where the defamatory publication alleges specific

---

[15] Even if the Court finds that Reid is not liable as the author and poster of the Accusations, she is liable on the alternative basis that she "materially contribut[ed] to" the defamatory sting of the Vargas Tweet by changing "they yelled" to La Liberte "screamed." *See Roomates.Com,* 521 F.3d 1157, 1169 (9th Cir. 2008). Reid's extensive references to other individuals who allegedly accused La Liberte of being the specific person who yelled racial slurs are unavailing; not only are none of them the same as Reid's, but she has not even stated that she saw or relied on those posts or that she "used" them, and thus is not being held liable as the "publisher . . of any information provided [to Reid] by another."  47 U.S.C. § 230(c)(1).  With respect to the July 1 Instagram and Facebook Posts, Reid contends only that the photograph accompanying her posts is a republication. And while these Posts are independently actionable due to the words used, the photograph is also actionable because Reid specifically solicited the creation of this photograph in her June 29 Instagram Post, stating "[m]ake the picture black and white and it could be the 1950s and the desegregation of a school." *Roomates.Com*, 521 F.3d at 1165 ("The CDA does not grant immunity for inducing third parties to express" defamatory content).

factual occurrences that are allegedly racist, the line between protected opinion and actionable fact is crossed. *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010) is controlling. In *Overhill*, the court held that while "general statements charging a person with being racist, unfair, or unjust – without more – . . . constitute mere name calling," the "defendants did not merely accuse Overhill of being 'racist,' in some abstract sense." *Id.* at 1262. Rather, the publication "contains language which expressly accuses it of engaging in racist *firings*," and "refers to Overhill's *conduct* as 'racist and discriminatory abuse against Latina women immigrants.'" *Id.* (emphasis in original). The accusation, "when viewed in that specific factual context, is not merely a hyperbolic characterization of Overhill's black corporate heart – it represents an accusation of concrete, wrongful conduct." *Id.*[16]

The July 1 Instagram and Facebook Posts fare no better. Each states that "I can't believe that person screaming at a child, with their face twisted in rage, is real.  B[ut] every one of them were.  History sometimes repeats.  And it is full of rage." (Compl. ¶ 56; Wilson Dec. ¶ 17). These statements were intentionally juxtapositioned with a side-by-side of the Photograph and a photo of racist conduct during the 1950s desegregation of a school. (*Id.*). Accordingly, Reid's own Posts state that there was an event – La Liberte was screaming at a child with her face twisted in rage – that actually happened; i.e., that it was "real." Thus, by Reid's own words, it is provably false.

Moreover, by stating that "it was *inevitable* that this image would be made" and/or by implying her personal knowledge that the event was "real," Reid implied knowledge of undisclosed defamatory facts justifying her accusation. *See, e.g., Milkovich*, 497 U.S. at 18 ("If a

---

[16] This distinction is made regularly.  *See, e.g., Como v. Riley*, 287 A.D.2d 416 (1st Dept. 2001) (finding statement that plaintiff's office "contained a statuette of a black man hanging from a white noose" actionable); *Payne v. WS Services, LLC*, 2016 WL 3926486, at *3-4 (W.D. Okla. July 18, 2016) (applying *Overhill* and finding statement that "they don't hire women" and company are "male-womanizing people" actionable); *MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117, 126-27 (1996) (statement that "appellant was acting in a racist manner in his official capacity as district attorney" held actionable); *Scott v. Cooper*, 226 A.D.2d 360, 260-61 (2d Dept. 1996) (accusation of "racial discrimination" did "not constitute personal opinion"); *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 261 (1st Dept. 1995) (accusations that plaintiff "was anti-Semitic and biased in her treatment of Jewish volunteers" held actionable).

16

speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth"); *John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300, 1314 (2016) ("Actionable statements of opinion are the mixed type, where an opinion in form or context, is apparently based on fact regarding the plaintiff or his conduct that have not been stated by the defendant but gives rise to the inference that there are undisclosed facts that justify the forming of the opinion"); *Parks v. Steinbrenner*, 131 A.D.2d 60, 62-63 (1st Dept. 1987) ("when a defamatory statement of opinion implies that it is based upon undisclosed detrimental facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and actionable"). The case of *Galarpe v. United Airlines, Inc.*, 2918 WL 1586202 (N.D. Cal. Apr. 2, 2018) is instructive, holding that the use of the word "egregious" implied the existence of undisclosed, defamatory facts regarding the plaintiff's racist creation of a noose.  2018 WL 1586202, at *5.

Finally, Reid's argument ignores the fundamental principle that "courts use a totality of the circumstances test," including "examining the nature and full content of the particular communication, as well as the knowledge and understanding of the audience targeted by the publication" to ascertain defamatory meaning. *ZL Tech., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624-25 (2017). Hence, the photograph accompanying the July 1 Instagram and Facebook Posts must be considered in ascertaining the Posts' defamatory meaning; here, the accompanying photograph makes clear that La Liberte is alleged to have engaged in specific heinous conduct akin to that demonstrated during desegregation.[17] Further, it is reasonable that the July 1 Instagram and Facebook Posts – utilizing the Photograph and responding to a thread regarding this specific controversy on the same social media platform as prior accusations – would be read by average reader in the context of the immediate controversy surrounding La Liberte and Reid's accusation

---

[17] La Liberte does not assert that the June 29 Instagram Photograph, by itself, is defamatory. Rather, it is the language of the June 29 Instagram Post that is actionable. However, the "Little Rock Repost" (the Photograph next to photo of desegregation) is in a different category, because the side-by-side does more than merely depict La Liberte; it informs and reinforces the defamatory nature of Reid's Accusations by conveying La Liberte's conduct is representative of racist conduct during desegregation, rendering it false and an inaccurate portrayal of La Liberte.

that La Liberte screamed racial slurs to a minor.

Finally, Reid's attempt to parse out certain words within the Accusations as opinion misses the mark.  *Id.* at 625 ("Not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action"). Reid's Accusations are not protected opinion.

## V.    La Liberte is a Private Figure.

Reid asserts that La Liberte is a limited purpose public figure as to the issue of SB 54 and that her Accusations of racist conduct are related to SB 54.[18] [19] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) defines private and public figures; criteria ignored by Reid. Whereas private figures have not "assumed an influential role in ordering society," public figure status is reserved for those who "have assumed roles of special prominence in the affairs of society." *Gertz*, 418 U.S. at 345; *see also Khawar v. Globe Intern., Inc.*, 19 Cal. 4th 254, 263-64 (1998).

In making the public figure determination, courts consider "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Vegod Corp. v. Am. Broadcasting Companies, Inc.*, 25 Cal. 3d 763, 767-68 (1979) (citing *Gertz*, 418 U.S. at 352). The role played in a controversy by a public figure should be more than "trivial." *Khawar*, 19 Cal. 4th at 267; *see also Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 745 (1989) ("A fairly high threshold of public activity is necessary to elevate a person to public figure status."). "In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves *into the forefront* of particular public controversies." *Reader's Digest Assn. v. Superior Ct.*, 37 Cal. 3d 244, 254-55 (1984) (emphasis added).[20] Public figure status "is often a close question which can

---

[18] Reid bears the burden of proving La Liberte's status as a limited purpose public figure.  *See, e.g., Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y. 1997); *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001).

[19] Reid does not assert that La Liberte is a public figure due to the controversy surrounding her discussion with Mr. Luevanos, nor could she.  *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 11, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

[20] Reid's rote reference to isolated language in the public figure analysis in attempt to have this Court apply a lesser standard (*see* Mot. at 20 ("Under California law, a plaintiff is a limited purpose

only be resolved by considering the totality of the circumstances which comprise each individual controversy." *Id.* at 255. "No one parameter is dispositive; the decision still involves an element of judgment." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1295 (D.C. Cir. 1980).

*Gertz* articulated two reasons for imposing actual malice on public figures, "because such persons 'usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy' and because they 'have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Khawar*, 19 Cal.4th at 263 (citing *Gertz*, 418 U.S. 344-45). Neither of these rationales apply here.

### A. La Liberte Did Not Thrust Herself to the Forefront of the SB 54 Issue.[21]

Reid's assertion that La Liberte is a "public figure" is belied by her need to retain a litigation consultant to conduct extensive Internet research regarding La Liberte and her admission that La Liberte had to be "identified and doxed" in order for the public to discover her identity. (Hoffman Aff. ¶¶ 21, 34).[22] Indeed, Reid, herself, appears not to have known La Liberte's identity.

---

public figure if she has 'undertaken some voluntary act through which []she seeks to influence the resolution of the public issues involved') (citing *Reader's Digest*, 37 Cal. 3d at 253-54)), divorces the public figure discussion from any meaningful context and the criteria espoused by the Supreme Court and the very California Supreme Court decision on which Reid relies. *Reader's Digest*, like *Gertz*, requires the Court to look at the specific facts of this case and determine if La Liberte "thrust [herself] into the *forefront* of" the public debate on SB 54. *Id.* at 254-55. The California Supreme Court faithfully applies *Gertz* and its progeny. *See McGraw v. Superior Ct.,* 2014 WL 940306, at *3 (Cal. Ct. App. Mar. 11, 2014) ("Whether a person in a defamation action is a 'public figure' is determined by federal law"); *compare Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136-37 (2d Cir. 1984) (requiring that plaintiff "assumed a position of prominence in the public controversy" and "maintained regular and continuing access to the media"); *Waldbaum,* 627 F.2d at 1298 ("the court must ask whether a reasonable person would have concluded that this individual would play or was seeking to play *a major role* in determining the outcome of the controversy").

[21] La Liberte does not contest that SB 54 is a public issue but she does dispute that she played a major or prominent public role in that issue, and that the Accusations are germane to her role.

[22] If this Court does not apply the Anti-SLAPP, it should restrict its consideration of La Liberte's status for the purposes of 12(b)(6) to the four corners of the Complaint. Moreover, Reid does not rely on the few insignificant media clippings containing photographs of La Liberte and other social media posts within her argument, likely because those photographs were neither *voluntary* nor were they accompanied by any commentary by La Liberte on the issue of SB 54. La Liberte's limited post-controversy media participation was both defensive and no greater than the access

At bottom, Reid asserts only that La Liberte's attendance of the city council meetings and sitting for an undated, unsolicited, and unwanted telephone interview to respond to the accusations against her are sufficient to accord her public figure status. (Mot. at 20-21). Reid cannot identify a single public pre-controversy comment made by La Liberte on the issue of SB 54 outside of her limited participation in local government, an activity that hundreds (if not thousands) of other private citizens engaged in and during which La Liberte attained no prominence setting her apart. Unsurprisingly, Reid cannot cite to any case supporting her assertion that a plaintiff's mere participation in local government, without any corresponding media access or other attempt to engage the general public, is sufficient to confer public figure status.

La Liberte's entire voluntary public participation on the issue of SB 54 consists of her attending eight city council meetings. (La Liberte Dec. ¶ 4). Before this controversy, Liberte had received no media attention of any kind and had not made any public comments regarding SB 54 outside of those meetings. (*Id.* ¶¶ 4-5). Often surrounded by hundreds of other citizens engaged in precisely the same conduct, La Liberte had not even achieved notoriety within the group of individuals present at the meetings, much less on the national basis Reid published her Accusations. She is not a member of any public organization or other activist group. (*Id.* ¶ 6). In the absence of any evidence that La Liberte voluntarily participated in any efforts to communicate with the public at large, finding La Liberte to be a public figure "would effectively require finding that every [person who attended city council meetings on SB 54] was a public figure for purpose of" critical national comment concerning SB 54 or defamatory attacks on their reputations. *Cummins v. Suntrust Capital Markets, Inc.*, 649 F. Supp. 2d 224, 242 (S.D.N.Y 2009), *aff'd*, 416 Fed. App'x 101 (2d Cir. 2011) (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 134-36 (1979)). La Liberte's public status is distinguishable from all of those other individuals only by virtue of Reid's

---

any ordinary private figure would enjoy in such circumstances. *Cf. Khawar*, 719 Cal. 4th at 266 ("Although this single interview demonstrates that Khawar enjoyed some media access, it is only the media access that would likely be available to any private individual who found himself the subject of sensational and defamatory accusations in a publication with a substantial nationwide circulation.").

accusations against her which gave rise to the controversy. *Id.* (collecting cases showing in public figure cases "the plaintiff [assumed] a far more prominent role than the plaintiff" in this case).

Reid has not provided and La Liberte has not discovered a single case in which a plaintiff was held to be a public figure based solely upon participation in local government without corresponding actions to engage the public's attention. The case of *Cantrill v. Herald Co.*, 1992 WL 119135 (N.D.N.Y. May 22, 1992) is the closet analogy discovered by La Liberte. In *Cantrill*, the Court drew the dispositive distinction necessary in this case:

> Plaintiff Cantrill asserts that he has never had access to the media regarding the issue of debate recruiting, much less "regular and continuing" access. The record is devoid of any indication that Cantrill ever received such exposure or that he attempted to assume a position of prominence in the public controversy surrounding debate recruiting. … Defendants also contend that Cantrill argued before one of the intercollegiate debate's governing bodies in favor of amending the rules related to the debate recruiting issue. *While this participation did occur, it does not provide a sufficient basis for the court to conclude that Cantrill assumed a 'position of prominence' in the public controversy. Although it would not be unreasonable to say that by means of this participation, Cantrill 'voluntarily injected himself' into the controversy, it is apparent that Cantrill's greatest stature in this regard has involuntarily resulted from the negative implication in defendants' article.*

*Id.* at 18 (emphasis added, internal quotations and citations omitted); *cf. Nadel v. Regents of Univ. of California*, 28 Cal. App. 4th 1251 (1994) (finding plaintiffs who had attended city council meetings public figures but only where they had substantially utilized the media to advance their position, were members of an organized group of protestors, and organized public protest events, relying on *Gertz's* rationale that public figures "usually enjoy significant greater access" to the media). For the reasons set forth herein, *Nadel* is plainly distinguishable from this case.

## B. Accusations of Racist Conduct Are Not Germane to La Liberte's Limited Public Participation in SB 54.

In addition to establishing that La Liberte thrust herself to the forefront of SB 54 through affirmative, voluntary actions, Reid must also establish that her accusations of racist conduct "relates to [La Liberte's] role" in SB 54. *Reader's Digest*, 37 Cal. 3d at 254. As an initial matter, the Accusations do not comment on or reference SB 54 at all, much less La Liberte's comments or views on SB 54. The Accusations concern discrete racist conduct that occurred during a break

21

in the public proceedings. While Reid asserts that La Liberte takes "too narrow a view," Reid's "interpretation of the limited purpose public figure doctrine is too broad." *Grenier v. Taylor*, 234 Cal. App. 4th 471, 484 (2015). In short, a reasonable reader of the Accusations would not consider them to be a public criticism of La Liberte's position on SB 54 but would consider them to be assertions of fact constituting personal attacks on La Liberte's character and reputation. *See Austin v. PMG Acquisition LLC*, 278 Ga. App. 539, 541 (2006) (finding accusations concerning criminal arrest of president of policy department's Crimestopper program irrelevant to plaintiff-President's participation in the Crimestopper program).  Reid's position only highlights the unfairness and dangers inherent in labeling as public figures all individuals who participate in local government.

Even if the Court finds La Liberte to be a public figure, the Accusations are too far removed from SB 54 and La Liberte's position on the issue to be considered germane.

## VI.    La Liberte Plausibly Alleged and Substantiated Reid's Actual Malice.

La Liberte has plausibly alleged Reid's knowledge of falsity or reckless disregard for the truth, and, should this Court apply the Anti-SLAPP statute,[23] her claim has "minimal merit" and creates a jury issue on actual malice.[24]

Actual malice requires a showing that the defendant published the defamation "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). However, because defendants are highly unlikely to admit to this state of mind, a defendant "cannot…automatically insure a favorable verdict by testifying that he published with a belief that the statements were true," and the Court should instead determine "whether the publication was indeed made in good faith." *Herbert v.*

---

[23] The Court has denied La Liberte's request for pre-hearing discovery relating solely to the issue of actual malice.  It would be improper to dismiss the Complaint while denying discovery and precluding La Liberte from discovering additional information bearing on Reid's actual malice. *See, e.g., Planned Parenthood*, 890 F.3d 828, 834 (when factual challenges are raised in an Anti-SLAPP Motion, "discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court").

[24] California applies an ordinary negligence standard to private figure defamation claims. *See Khawar*, 19 Cal. 4th 254, 273-74.

*Lando*, 441 U.S. 153, 170 (1979); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). "'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition" and "its outer limits will be marked out through case-by-case adjudication[.]" *St. Amant*, 390 U.S. at 731. Accordingly, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence. *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). Though not all-inclusive, the California Supreme Court has provided the following examples of indicia of actual malice:

> Evidence of negligence, of motive and of intent may be adduced for the purposes of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or his knowledge of falsity. A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff – such factors may . . . indicate that the publisher himself had serious doubts regarding the truth of the publication.

*Reader's Digest*, 37 Cal. 3d. 244, 257-58 (internal citations omitted). The Court should consider such evidence in the aggregate, and not conduct a piecemeal evaluation, construing same most favorably to La Liberte. *McFarlane v. Sheridan Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996).

### A.     Reid Deliberately Altered the Vargas Tweet.

The Vargas Tweet specifically stated that an unidentified "they yelled" racial slurs at Mr. Luevanos at the Council Meeting. (Compl. ¶ 41; Wilson Dec. ¶ 8). Neither of the parties dispute that racial slurs may have been yelled by an unidentified "they." Reid took that undisputed printed quote and changed it to La Liberte, herself, screamed racial slurs. (Compl. ¶¶ 48-49; Wilson Dec. ¶ 12). In other words, while the Vargas Tweet may be true in a broad sense, Reid's deliberate alteration rendered the June 29 Instagram Post entirely false. These facts are undisputed and bear a strong resemblance to the Supreme Court's decision in *Masson v. New Yorker Mag., Inc.*, 510 U.S. 496, 511-25 (1991). In *Masson* – relying on California's substantial truth doctrine – the Court held that a defendant may have actual malice when it deliberately alters its source's quote, which "alteration results in a material change in the meaning conveyed" by the quote. *Id.* at 517.

Reid's position that she did not materially alter the meaning conveyed by the Vargas Tweet is unsupportable. (Mot. at 18-19). The Vargas Tweet leaves open whether La Liberte made the

slurs, while the June 29 Instagram Post has one, definitive, false meaning, and it comes with Reid's credibility as a member of the national news media. This demonstrates recklessness, especially when considered in combination with the below evidence. *See,* e.g., *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1176 (S.D.N.Y. 1984) (malice may be established when defendant "knowingly or recklessly misstates the evidence to make it seem more convincing or condemnatory than it is" or if "it distorts statements of witnesses so that they seem to say more than in fact was said").

**B.    Reid Had Actual Knowledge of Falsity and Otherwise Avoided the Truth While Relying on a Single Biased Source.**

"While failure to investigate will not *alone* support a finding of actual malice…the purposeful avoidance of the truth is in a different category" and malice is supported where "it is likely that the [defendant's] inaction is a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity." *Harte-Hanks*, 491 U.S. at 692 (holding that failure to investigate despite source bias may demonstrate purposeful avoidance). Moreover, "recklessness may be found where there are obvious reasons to doubt the veracity of the information or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

Compounding her deliberate alteration, Reid relied upon an obviously biased teenaged social media activist who had posted just hours before the June 29 Instagram Post his "Message to racists" and is a self-declared member of the "revolution" who uses his Twitter to promote his anti-Trump agenda. (Compl. ¶ 41, 44, 50; Wilson Dec. ¶ 19-23). Coupled with Reid's failure to conduct *any* investigation, by contacting La Liberte or any other witness (La Liberte Dec. ¶ 15), or to seek out any documentary evidence to discover the truth of the matter, her reliance on Vargas and altering his tweet crosses the line from a mere failure to investigate to purposeful avoidance of the truth. *See,* e.g., *St. Amant* at 692-93 (finding purposeful avoidance sufficient to show actual malice where defendant relied on biased source, failed to interview key witnesses, and otherwise failed to investigate claim of unreliable source); *Fisher v. Larsen*, 138 Cal. App. 3d 627, 638-39 (1982) (fact issue on malice where defendants knew source was biased but "made no effort to check the truthfulness" of the accusation); *Am. Dental Ass'n v. Khorrami*, 2004 WL 3486525, at *11-14

(C.D. Cal. Jan. 26, 2004) (denying anti-SLAPP motion where there was evidence of fabrication, reliance on biased source, and failure to consult contrary information creating fact issue on purposeful avoidance); *Curtis Publishing v. Butts*, 388 U.S. 130, 156-57 (1967) (failure to investigate the truth of unreliable source's allegations may support finding of actual malice); *Hopkins v. city of Gloucester*, 358 N.J. Super. 271, 282 (2003) ("failure to pursue the most obvious available sources for corroboration may be clear and convincing evidence of actual malice").

Moreover, Reid was also expressly advised via two separate e-mails on June 30 and July 1, 2018, that her accusations were false, in e-mails subject "I am the Son of Roslyn Laliberte (Woman accused of racist slurs toward boy)" and via replies to her own Accusations, and otherwise continued to publish in the face of the Fox 11 report. (Codron. Dec. ¶¶ 3-4; La Liberte Dec. ¶ 8). These facts raise a legitimate inference of knowledge of falsity, and at a minimum, reckless disregard in the form of purposeful avoidance.

Confirming Reid's purposeful avoidance is her own bias and pre-conceived agenda against President Trump and his perceived supporters, explaining her deliberate alteration and decision to plow forward with only the Internet-word of a teenaged activist. Reid is in the business of promoting anti-Trump sentiment. And while Reid asks the Court to engage in a piecemeal analysis and disregard her political agenda, a pre-conceived storyline and predisposition to sensationalizing accusations is probative of actual malice. *See, e.g., Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) (evidence of pre-conceived narrative "may often prove to be quite powerful evidence" of malice); *Overstock.com, Inc. v. Gradient Analysis, Inc.*, 151 Cal. App. 4th 688, 711 (2007) (model resulting in "defamatory implication to achieve preconceived result" "suffices to show a reasonable probability that the statements discussed above were made with actual malice"). Reid's opposition to and bias against President Trump and his supporters is well-documented, and she has been quoted as stating "our prime directive is to constantly remind people that this is not normal and not to allow it to become mundane." (Wilson Dec. ¶¶ 24-26).

## CONCLUSION

For the foregoing reasons, Reid's Motion should be denied.

Respectfully submitted this 14th day of January, 2019.

L. LIN WOOD, P.C.

By: */s/ L. Lin Wood*
L. Lin Wood (*admitted pro hac vice*)
lwood@linwoodlaw.com
Nicole Jennings Wade (*admitted pro hac vice*)
nwade@linwoodlaw.com
G. Taylor Wilson (*admitted pro hac vice*)
twilson@linwoodlaw.com
1180 West Peachtree Street
Suite 2040
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)

OLASOV, LLP

By:  */s/ David M. Olasov*
David M. Olasov
 (a Member of the Firm and of the Bar of this Court)
 dolasov@olasov.com

485 Madison Avenue, 7th Floor
New York, New York 10022
212-588-0540
212-202-4840 (fax)

*Attorneys for Plaintiff Roslyn La Liberte*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2019, the foregoing document was filed with the

Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or

the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon

the following parties and participants:

John H. Reichman
885 Second Avenue, 47th Floor
New York, NY 10017

Counsel for Joy Reid

This 14th day of January, 2019.

/s/ G. Taylor Wilson
G. Taylor Wilson
twilson@linwoodlaw.com

L. Lin Wood, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)