# EXHIBIT K

```
-----------------------------X
                              :
ROSLYN LA LIBERTE,            :
                              :    18-CV-5398 (DLI)(VMS)
              Plaintiff,      :
                              :    January 11, 2021
                              :
          V.                  :    Brooklyn, New York
                              :
JOY REID,                     :
                              :
              Defendant.      :
-----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          DAVID OLASOV, ESQ.
                            LUCIEN L. WOOD, ESQ.


For the Defendant:          JOHN REICHMAN, ESQ.
                            DAVID YEGER, ESQ.
                            THEODORE BOUTROUS, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE COURT:  La Liberte v. Reid, 18-CV-5398.

2          Let's start with plaintiff's counsel's

3 appearance.

4          MR. OLASOV:  David Olasov for Roslyn La

5 Liberte and Lin Wood for Roslyn La Liberte.

6          MR. WOOD:  Yes, good morning, your Honor,

7 this is Lin Wood.

8          THE COURT:  Hello.

9          All right, for the defendant?

10          MR. REICHMAN:  Good morning, your Honor.

11 This is John Reichman from John Reichman Law, and I am

12 joined by my colleague, David Yeger.  We also have our

13 co-counsel from Gibson Dunn, who will introduce

14 themselves.

15          MR. BOUTROUS:  Yes, your Honor.  This is

16 Theodore Boutrous from Gibson Dunn & Crutcher for Ms.

17 Reid, and I'm joined by my colleagues, Marissa Moshell

18 and Marcellus McRea.

19          THE COURT:  All right.  So we're here for

20 the discovery issues since you're back from the

21 circuit.  So we have at 57 your proposed order and then

22 at 58, the letter complaining about the initial

23 disclosures.  I've read the letter.  I think it's

24 premature.  We don't have a scheduling order and so you

25 can complain that there wasn't a need to have these

1  initial disclosures done.  I know you submitted your

2  initial -- proposed initial scheduling order having

3  some earlier dates on there but they're not the

4  effective dates from a court order, so I'm just going

5  to reset it.

6          Plaintiff, you should look at the criticism

7  that the defendant is offering as to the alleged

8  incompleteness of your initial disclosures and you

9  should both have a conversation.  Then if you still

10 can't work it out, you can let me know.

11         Obviously, there's a fairly extensive record

12 already in this case on that legal issue.  Is there

13 anything anybody wants to say with regard to the merits

14 that you think I should know.  Mostly, does it affect

15 discovery, and then we'll talk about the particulars of

16 the discovery schedule.  So for plaintiff?

17         MR. OLASOV:  This is David Olasov.  Mr.

18 Reichman and I have had a conversation in which I

19 pointed out to him that the answer to the amended

20 complaint that was filed after the Second Circuit's

21 decision in our view pleaded matters that we believe

22 are foreclosed by the decision.  I've agreed to -- for

23 plaintiff to provide them with a letter that indicates

24 which defenses that they've raised we believe are

25 foreclosed by this decision.  Of course, that has some

1  bearing on the scope of discovery since there's no

2  point in having discovery on matters that are

3  foreclosed by the decision.

4         THE COURT:  All right.  Defendants, your

5  view?

6         MR. REICHMAN:  Well, we await the letter but

7  I don't think it's really going to have an impact

8  whatsoever on discovery.  In our view, I think the only

9  defense that is arguably precluded is the legal defense

10  with respect to whether the posts were opinion or not,

11  but that wouldn't be the subject of discovery in any

12  event.

13         THE COURT:  All right.  And before we dive

14  into the discovery, is there any possibility of having

15  settlement discussions?  You've been at this for a

16  while now.  Has there been anything?  I mean, you could

17  have discussions with each other, you could have a

18  mediator try to bridge whatever gap there is because

19  you obviously having been doing this, what, since 2018?

20         MR. WOOD:  Your Honor, this is Lin Wood.  I

21  think it's standard handling, from my experience at

22  least, that from the plaintiff's perspective, the

23  plaintiff is always willing to listen to any reasonable

24  offer that a defendant makes.  But if the defendant has

25  no interest, then obviously, our hands our tied.  So I

1    would kind of throw the ball over to the defense to say

2    if there's an interest and, if so, if there are any

3    suggestions on how a discussion could take place.  If

4    there's no interest, then we obviously can just

5    continue to move forward.

6              MR. REICHMAN:  This is John Reichman, your

7    Honor.  I think for reasons that we set out already to

8    the Court with respect to the initial disclosures, we

9    don't know of any real damages that the plaintiff has

10   sustained.  And before even considering any kind of

11   settlement, we need to know at least what the

12   plaintiff's damages are and the basis for them, and we

13   could then take it from there.

14             THE COURT:  All right, so I'll take that as

15   a maybe and say that we're going to set the dates --

16             MR. WOOD:  I like -- Judge, I appreciate

17   someone who is always on the optimistic side.

18             THE COURT:  I try.  All right, what --

19             MR. REICHMAN:  Your Honor -- I'm sorry.

20   There is another matter that we'd like to bring to the

21   Court's attention, and it involves Mr. Wood,

22   plaintiff's lead counsel.  Over the weekend, we have

23   come across some very disturbing information about the

24   conduct of Mr. Wood.  I'm sure you're aware that since

25   the election, Mr. Wood has been actively engaged in

1  attempting to overturn the election results.  All of

2  those cases have been dismissed.  There have also been

3  sanctions and disqualification motions filed.

4            MR. WOOD:  I have not been sanctioned.

5            MR. REICHMAN:  Now Mr. Wood --

6            THE COURT:  One at a time.

7            MR. REICHMAN:  -- has taken an even far

8  darker turn.  He is actively and has actively supported

9  the insurrection against our government and called for

10 the execution of the Vice President.

11           MR. WOOD:  Oh, nonsense.

12           MR. REICHMAN:  He's been permanently barred

13 from Twitter and his recent attempt to submit a post on

14 Parler calling for the Vice President's execution was

15 not permitted.  In fact, the posting of his tweet on

16 Parler was one of the reasons cited by Apple and Google

17 to ban Parler from their platforms.  The right to

18 appear pro hac vice in this District is a privilege and

19 not a right, and we believe there are at least three

20 reasons why that privilege should be revoked by the

21 Court.

22           First, in New York, every attorney pledges

23 to solemnly swear that he or she will support the

24 Constitution of the United States.  Mr. Wood is seeking

25 to undermine, not support the U.S. Constitution.  His

call for violence in the streets and his tweets and

public utterances have been an impetus of the

insurrections to seize the Capitol.  It's noteworthy

that the last tweet of the woman shot at the Capitol,

Ashley Babbitt, was a re-posting of one of Mr. Wood's

posts.

Second, in violation of the disciplinary

rules, Mr. Wood has gone around the country filing

utterly frivolous lawsuits based on outright lies and

nonexistent legal theories.  In Delaware, a court has

issued a show-cause order, citing his conduct in

Wisconsin and Georgia actions, asking him to show cause

why he should not be disqualified from practicing law

in Delaware.  In Michigan, after the dismissal of the

lawsuit he filed there, a motion has been filed seeking

sanctions and disqualification and disbarment.

Third, Mr. Wood is actively threatening the

well-being of the judiciary, especially Justice

Roberts.  He has painted Justice Roberts as a murderous

pedofile.  He suggested that the Chief Justice was

mixed up in the death of Justice Scalia, was

trafficking in children, and apparently hinting that he

may have had Epstein killed if he was killed at all.

He recently tweeted, "My information from reliable

sources is that Roberts arranged an illegal adoption of

two children from Wales through Jeffrey Epstein."

Now, as we all now clearly and sadly know, words can and will lead to violence. So under the Disciplinary Rules at Section 8.3, we believe we have an ethical duty to report this matter to the Court and we would --

MR. OLASOV: Who is speaking now?

MR. REICHMAN: Please.

MR. OLASOV: Who is speaking?

MR. REICHMAN: John Reichman.

THE COURT: Please stop, stop interrupting.

MR. REICHMAN: And we welcome --

THE COURT: All right, continue.

MR. REICHMAN: So we welcome the Court's guidance with respect to whether and how to further this issue. You know, we are prepared to provide more information about Mr. Wood's activity. I would add that all of these are matters of public record. It seems to us there are at least two options with respect to how to proceed. We could submit a letter brief under your Honor's rules directly seeking the revocation of the pro hac vice order. The other way would be to present the information and ask the Court whether it could issue a show-cause order such as was done in Delaware. That's a procedure that some judges

1 have used in considering the revocation of the right to

2 practice.

3        THE COURT: All right, let's first hear from

4 Mr. Wood. Then we'll talk about the procedure.

5        Go ahead, Mr. Wood.

6        MR. WOOD: Thank you, your Honor. It's kind

7 of hard to respond to such serious accusations when I

8 am not at all sure about the accuracy of some of the

9 things that have been said to the Court. In fact, I

10 know some of them are inaccurate. And I have not been

11 sanctioned by any court in 43 and a half years, not any

12 court over the course of my career, nor any court now.

13        It's almost like I'm being -- trying to make

14 me into a scapegoat. I've had nothing to do, number

15 one, with what happened in Washington D.C. I didn't

16 call for the people to go up there and meet, I didn't

17 call for anybody to go to the Capitol. I certainly

18 didn't call for anybody to create a scene of what

19 appeared to be some type of violence. So whether this

20 lady that died had re-tweeted me, I have no control

21 over that.

22        What I can say to the Court and, if

23 necessary, at the appropriate time, present to the

24 Court is that what I have said publicly, I have

25 reliable information to support the truth of it. What

1  I have done with Sidney Powell is, she asked me to sign

2  on to two or three lawsuits where she was the lead

3  counsel, in anticipation that there may be a need for a

4  trial lawyer.  I didn't draft the lawsuits.  There were

5  some typographical errors and things done in some of

6  them that upset a judge in Wisconsin, I believe, maybe

7  Michigan.  But if you had a full hearing on what

8  happened there, I didn't have anything to do with that,

9  other than I did agree to sign on to help Sidney.

10            I know for a matter of fact that all of the

11  information that Sidney Powell has presented in the

12  litigation with respect to the fraud in the election,

13  there is a mountain of admissible evidence in the form

14  of affidavits, authenticated videos, expert evidence

15  from reliable and credible experts.  So the lawsuits

16  were filed as they are allowed to be filed.

17            The only other lawsuits that I've been

18  involved in, I filed for myself as it related to the

19  Georgia election, where I contended that the election

20  was conducted illegally and in violation of precedent

21  of the Supreme Court that requires that the election

22  rules be set by the state legislature.  In Georgia,

23  they conducted the election with absentee ballots and

24  mail-in ballots based on a procedure that came up --

25  that came up from a settlement agreement by the

1  Secretary of State with the Democratic Party.  It was

2  never adopted by the legislature, so that any

3  allegation that I filed a frivolous lawsuit is in fact

4  frivolous.

5          The lawsuit that I have presently have is

6  pending before the United States Supreme Court in a

7  writ of certiorari.  It has not yet been ruled on but

8  yet it's been pending for some almost three weeks.

9  They may still accept it.  So the Georgia litigation

10 I'm involved in is certainly within the rules and the

11 laws of this country.  The litigation that Sidney

12 Powell has filed, where I've been asked to sign on to,

13 is also based on legitimate causes of action, and I

14 know for a fact based on a wealth of material and

15 admissible evidence to support the allegations.

16          No court in any of the rulings -- no court

17 for some reason has mentioned the evidence of the

18 election fraud.  So there's been no finding by any

19 court that the evidence of election fraud is lacking.

20 In fact, if they discussed it, they would have to say

21 it was literally conclusive that there was fraud.  So

22 now I'm being attacked for taking legitimate actions as

23 a lawyer, legitimate actions as a plaintiff in Georgia.

24 They're trying to pin on me the sad tragedy of what

25 happened in Washington D.C., and now they're even

saying that my tweet brought down Parler.  I've never

heard of where one man -- I know the pen is mightier

than the sword but what I tweeted about the Vice

President was rhetorical hyperbole.  I did not call for

any violence against any individual that would result

in immanent harm or a serious threat of harm to that

person.

I've seen tweets and posts where people have

asked protestors to be shot.  I didn't do that.  I've

seen tweets where they hold the President's head up

where it's been beheaded.  I didn't do that.  So this

is a matter of what's in the eye of the beholder.  What

I did was, I posted a photograph of where a Capitol

police officer had opened the doors to let people in

that appear to be, and the evidence seems to be

suggesting, were members of either Antifa or Black

Lives Matter.  I posted the photograph of that and I

said, they let them in.  They're all traitors, get the

firing squads ready, tense first.

Now, I don't control firing squads.  I

couldn't run out and put together a firing squad and go

shoot the Vice President.  But the law is that if you

are guilty of treason, one of the penalties available,

as publicly ratified recently in the last month by the

Department of Justice is the death penalty by firing

1  squad, even by hanging.

2          If you look over and say that the doctor who

3  commits an abortion is a murderer, that's rhetorical

4  hyperbole.  So what I said, because I know the law of

5  defamation, my statement was rhetorical hyperbole.  It

6  was not intended, nor did anybody seriously think that

7  that was a call to run out and put the Vice President

8  in front of a firing squad.  But for some reason, my

9  voice has reached a level, not because I wanted it to

10 -- I've never sought recognition in my life as a

11 lawyer.  I just do my job.  But for some reason, my

12 voice has reached a level where many people listen to

13 me.  That's their choice.  But I talk about facts and

14 truth, I don't make things up.

15          But what I do differently than most I guess

16 people that are voices to be heard is I relate almost

17 all of what I say to people to my belief in God, so

18 that my voice is one both of truth and a voice that

19 talks about things from a faith basis.  So I'm entitled

20 to those opinions and I don't think I ought to be

21 chastised and called upon to be put on trial in effect

22 for doing what the law allows me to do and saying

23 things that I believe are consistent with what I know

24 to be the teachings of Jesus Christ.

25          So I've been accused of being crazy, nuts.

1    I've never read such things about me.  If you went back

2    a few months ago, people would have told you I was the

3    greatest, smartest defamation lawyer in the world.

4    I've fought for truth and I've handled some big cases,

5    starting with Richard Jewell in 1996, where I went up

6    against the FBI and the media through representing a

7    number of other people in high-profile cases.

8           I've had cases of success against CNN,

9    Washington Post, a number of media outlets.  I

10   represent Nicholas Sandman (ph) and we've had very good

11   success in Kentucky.  Nobody has complained about my

12   conduct in Kentucky.  I just won a motion to dismiss

13   against Gannett newspapers, and then I did some work

14   when I formed a 501(c)(4) foundation this summer,

15   #fightback.  The foundation's purpose was, I thought

16   and still believe that the country is undergoing a

17   color revolution.  So I said our constitutional rights

18   are going to be at risk and I formed that foundation

19   to, in the future, be an advocate for maintaining and

20   protecting our constitutional rights.

21          Right after I formed it, people asked me to

22   help a young man named Kyle Rittenhouse.  I did.  I

23   went out and I took the time and made the effort to

24   raise two million dollars to make the boy's cash bond

25   in Kenosha.  Actually -- yeah, in Kenosha.  Then since

1 that time, I'm not doing anything with respect to

2 raising any more money for Kyle, but I was trying to

3 help the young boy because I believe, based on the

4 video evidence, that the young man was exercising his

5 right of self defense and he was in effect a political

6 prisoner and he ought to be let out.  I was worried

7 about them hurting him when he was in jail.

8          So if you want to, your Honor, look at these

9 recent accusations against me, I would question why are

10 they being made, who's behind it?  But I would also

11 urge the Court to take the time to look at the body of

12 my life's work for 43 years.  I love this country.  I

13 love the rule of law.  I have never advocated that

14 anyone should break the law.  I've advocated for people

15 to follow the law.

16          I've been upset with what I've seen from the

17 evidence about how this election was conducted.  I

18 believe it was a fraud.  Now, I'm not going to be the

19 ultimate arbiter of that but I have the right to serve

20 as a lawyer for people that do litigate it, and I have

21 the right, in the case of Georgia, to be a plaintiff

22 because I believe my constitutional right to vote has

23 been diminished and it's in violation of equal

24 protection.

25          So how Lin Wood, the lawyer, has become now

1  Lin Wood, the guy that this man would sit there and

2  represent to you is advocating the overthrow of our

3  government, the death of our Vice President, and

4  violence in the streets, you know, I can only say this:

5  It's errant nonsense.  I believe it's part of a

6  political agenda to harm me because of my message.  If

7  you can't shoot the message because it's solid, shoot

8  the messenger.  That's what they're trying to do,

9  Judge.  They're trying to attack the messenger because

10  they can't attack the message.

11          THE COURT:  So --

12          MR. WOOD:  So I would ask for at least -- if

13  the Court is interested in hearing all of this stuff, I

14  believe I'm entitled to due process and an opportunity

15  to respond to, with evidence and other information, any

16  type of accusation that's made against me before your

17  Honor does something that has never been done to me.

18  I've practiced law in 27 states.  Even in Michigan, the

19  City of Detroit is trying to get me disbarred.  Why?

20  I'm not a member of the Michigan Bar.  They're taking

21  action -- they're saying that I ought to be sanctioned

22  in Delaware for what I did in Wisconsin.  Well,

23  Wisconsin hasn't taken any action against me.  So

24  something is not right about this, your Honor, and I

25  hope that you'll treat me fairly because I've spent my

1   life working for the law, representing people that

2   needed help, putting them first and myself second.

3           MR. McRAE:  Your Honor --

4           MR. WOOD:  So I would -- I would simply end

5   by saying I'm entitled to respond with due process to

6   any of these accusations being made against because

7   they're false.  I reject the idea that I'm a scapegoat

8   in all of this.  I think it's an effort to hurt the

9   messenger because the message frightens them.  I don't

10  know.  That's up to them to decide.

11          THE COURT:  So the question --

12          MR. McREA:  Your Honor, Mr. Boutrous got

13  dropped from the call.  I'm sorry to interrupt.  This

14  is Mr. McRea.

15          THE COURT:  Okay.

16          MR. McREA:  I wouldn't interrupt, except my

17  partner got dropped from the call and the host has to

18  let him back in.  He got dropped a while ago but I

19  didn't want to interrupt.

20          THE CLERK:  I can do that.  The only problem

21  is, the other conference will be let in as well, Judge.

22          THE COURT:  That's fine.  If you do that,

23  then I'll ask them to --

24          THE CLERK:  Okay.

25          THE COURT:  -- not to speak.

1           MR. McREA:  Thank you, your Honor.

2           THE CLERK:  It takes a few minutes.

3           MR. REICHMAN:  Your Honor, if I may --

4           THE COURT:  Hold on, just wait until

5    everybody is back.

6           MR. BOUTROUS:  I'm back.  Thank you, your

7    Honor.

8           THE COURT:  We only heard one person come

9    in.  If anyone is on --

10          MR. BRAND:  Your Honor, Ian Brand (ph) for

11   plaintiff in the Hargrave/State Farm litigation.

12          THE COURT:  If you're on for Hargrave, just

13   mute yourself.  We're not on the Hargrave case yet.

14          MR. BRAND:  Okay.

15          THE COURT:  We have probably another five or

16   ten minutes on what we're talking about now.  It's up

17   to you.  You can stay on or you can call back in a

18   couple of minutes, whatever you like.

19          MR. BRAND:  I'll mute.

20          THE COURT:  So on this point about whether

21   plaintiff's counsel should continue as counsel in this

22   case, I think the cleanest posture of this would be, if

23   the defendants want to make a motion to disqualify or

24   revoke the pro hac grant, then you can do that.  Let's

25   then have a schedule for your papers and counsel's

1  papers, and a brief reply if that's what you want.  I

2  think it's a serious set of allegations so if you're

3  pursuing it, I think -- yes, I agree, I normally do

4  things by letter motion but this probably should have

5  some more formality.

6            So on the defendant's side, if you're going

7  to do this motion, what do you think, two weeks?

8            MR. REICHMAN:  That would be fine.

9            THE COURT:  All right.  So you will serve

10  your papers by the 25th of January.

11            And then, plaintiff's counsel, if you want

12  to respond, can you do that by the 8th?

13            MR. WOOD:  The date for the defense's papers

14  would be when?

15            THE COURT:  The 25th.

16            MR. WOOD:  The 25th?  And then two weeks for

17  us to respond on the 8th?  Is that what I understood?

18            THE COURT:  Yes.  And then a reply by -- is

19  the 15th a holiday weekend that weekend?

20            MR. REICHMAN:  Yes, the 15th if Presidents'

21  Day.

22            THE COURT:  So the 16th for your reply.

23            MR. REICHMAN:  Okay.  Thank you, your Honor,

24  that works for us.

25            THE COURT:  All right.  Now let's talk about

1   the discovery schedule.  In terms of the initial

2   disclosures, they should both -- both of your sets of

3   papers should be exchanged by the same date.  Except

4   for this motion practice, I would say two weeks is

5   enough time given the length of time that this case has

6   been pending, so you can tell me.  What I want

7   obviously is that before you raise anything with me,

8   that you speak with each other about it.

9           MR. REICHMAN:  Yes, your Honor.  This is

10  John Reichman again.  We did -- each side has already

11  served the initial disclosures.

12          THE COURT:  Yes.

13          MR. REICHMAN:  I don't think the plaintiff

14  has any problem with our disclosures and our problem is

15  limited to the disclosure with respect to damages, as

16  we've laid out.  So I'm not sure if -- so I'm not sure

17  where that puts us in terms of what you are suggesting.

18          THE COURT:  So let's say you try to work out

19  your concerns about the damages and have a date --

20  today is the 11th.  By the 29th of January, a revised,

21  complete set of the initial disclosures.  And then if

22  you still have your concerns about the damages issues

23  or any other issues, you can raise it as you go.

24          Then initial document requests and

25  interrogatories -- defendants, you've said you've done

1   it, and plaintiff, you're going to.  You can start

2   obviously responding as you like but the time line for

3   when those responses are due -- we'll count off.  So

4   I'm going to put you down as the same date.  So by

5   February 8th, thirty days from there.  Is there any

6   possibility of joinder or amendment at this stage,

7   given again how long this has been around for?

8           MR. OLASOV:  We don't think so.

9           MR. REICHMAN:  I don't think either side --

10  we don't, either.

11          THE COURT:  Okay, all right, so we'll just

12  leave that as it is.  All right, the fact discovery

13  date is fine.  I'm going to change some of the dates

14  for the expert disclosures.  So the expert disclosure

15  should be provided with the close of fact discovery,

16  and I'll just tell you how I look at it.  I don't know

17  if this is going to match with what you have as a

18  general matter.

19          The way I would see it is, whoever is

20  carrying the burden of proof or raising an issue

21  uniquely -- so for example, if one of those defenses

22  that was mentioned required the burden of proof and you

23  were offering an expert with regard to that, that's the

24  moving report, the initial report.  So if you fall into

25  that category, your initial report disclosures would be

1   due May 31ˢᵗ, and then we'll put the June 30ᵗʰ date for

2   the initial report, so that's 7(b) on this list.  Then

3   I will for now leave 8/6 as the rebuttal.  I think it

4   depends on what the topics are, whether a month is a

5   reasonable turnaround time or not.  I don't know yet

6   and we don't need to figure it out on this call.  We'll

7   have a status conference before you get to that.  Then

8   the other dates you have are largely -- they're all

9   fine.

10          So with the text order that comes out of

11  this conference, we'll have a status conference set

12  sometime in April.  And then a week or a little more

13  than a week before that, I'll ask you for -- submit a

14  letter letting me know what you've covered, what you

15  still have to cover.  And then particular at that

16  point, I would like to know, are you going to have

17  expert discovery or not?  If you're not, then many of

18  these dates will be moved up.  You won't need the

19  couple of months that are indicated on the schedule for

20  that.

21          A pretrial conference, that will be with the

22  district judge.  You have dates here that you put in

23  for having a demand and a response, and I see that

24  you're not asking for ADR at this point.  If you change

25  your mind and you want a referral to ADR, we could give

1    you that.

2              A couple of other things.  Let me just pull

3    up the docket here.  So you do have a jury demand.

4    Again, this is something we can talk about more in the

5    future.  But as you can imagine, the trial calendar is

6    quite backed up.  Just so you know, there haven't been

7    many trials here since March of last year and the

8    general preference will be given to criminal trials

9    over civil trials.  The (ui) that was taken in the fall

10   when we were having trials was to have a criminal trial

11   calendar and a backup civil trial-ready calendar.  So

12   basically, if the criminal cases pled out, we would

13   bring the civil cases in because the jurors have been

14   summoned and we could move along that way.

15             I imagine in this case, there will be some

16   motion practice.  So this issue of when you're having a

17   jury trial, if you're having a jury trial, may be a

18   ways out.  To the extent you're thinking about how long

19   you're going to be litigating this, if you're

20   envisioning a trial at the end or almost the end, it's

21   going to be a while.  So just take that into account

22   when you're thinking about whether you want to have

23   settlement discussions or not.

24             All right, anything else?  Let me just say,

25   if you have (ui) on the way, for example if you don't

resolve your question of what damages information needs

to be turned over, you can raise it, preferably by a

joint letter.  Other issues we should talk about?

MR. WOOD:  Your Honor, this is Mr. Wood.

Because I'm not the best note taker in the world --

THE COURT:  There will be an order.

MR. WOOD:  Could I ask the Court to also

have, and we'll certainly pay whatever cost, an

expedited transcript of this hearing prepared and filed

with the record of the Court?

THE COURT:  So we'll do two things:  There

will be a text order coming out of this and on the text

order, it will have the time stamp for the recording.

If you look on our court's website, there's a number

for ESR, which is our transcription service, and you

order the transcript there.  They give different rates

for the speed at which they do it, so I think you have

a couple of options with regard to the turnaround time.

MR. WOOD:  I bet the sooner you ask for it,

the more it costs, as it should.

THE COURT:  Yeah.  It's quite a difference

and you can decide what you need.

Okay, anything else?

MR. REICHMAN:  No, your Honor.

THE COURT:  All right, take care, Happy New

1  Year.
2          MR. OLASOV:  Thank you very much, your
3  Honor.
4          MR. WOOD:  Thank you very much, your Honor.
5                      * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    January 12, 2021