UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                       :

ROSLYN LA LIBERTE,                 :

                  Plaintiff,       :   Civil Action No. 1:18-cv-05398 (DLI) (JRC)

                                           :

          v.                         :   **Oral Argument Requested**

                                         :

JOY REID,                          :

                  Defendant.     :

---------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 3

LEGAL STANDARD........................................................................................... 7

ARGUMENT .................................................................................................... 8

I.  La Liberte Cannot Prove Reid's Posts Caused Her Alleged Injuries. ............................. 8

   A.  La Liberte Cannot Establish "But For" Causation Under The "Substantial Factor" Test. ................................................................................ 8

      1.  La Liberte Cannot Establish Causation as to Her Reputational Harm................. 11

      2.  La Liberte Cannot Prove Causation as to Her "Hate Messages.".......................... 12

      3.  La Liberte Also Cannot Demonstrate Causation for Alleged Business Losses. ........................................................................ 14

   B.  The First Amendment Similarly Forecloses La Liberte's Causation Theory. ....................................................................................... 16

II.  La Liberte Cannot Show Any Actual Damages, Let Alone Actual Damages Attributable To Reid's Posts. ............................................................... 19

   A.  For This Matter of Public Concern, the First Amendment Prevents La Liberte from Recovering Presumed or Punitive Damages........................................ 19

   B.  La Liberte Cannot Show Actual Damages................................................ 21

CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ampex Corp. v. Cargle*,
128 Cal. App. 4th 1569 (2005) ...............................................................................19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................7

*Benanti v. Satterfield*,
2020 WL 1491374 (Tenn. Ct. App. Mar. 27, 2020) ...............................................24

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)........................................................................................16, 20

*Brookhouser v. State*,
10 Cal. App. 4th 1665 (1992) ..............................................................................8, 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................8

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) .............................................................................24, 25

*Contemp. Mission, Inc. v. New York Times Co.*,
842 F.2d 612 (2d Cir. 1988)...................................................................................20

*Counterman v. Colorado*,
600 U.S. 66 (2023)..................................................................................................18

*Curley v. Vick*,
211 Cal. App. 2d 670 (1963) ...................................................................................10

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ...........................................................14

*Davis v. McKenzie*,
2017 WL 8809359 (S.D. Fla. Nov. 3, 2017), *report and recommendation adopted*, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018) ............................................24

*Dewitt v. Outlet Broad., Inc.*,
1999 WL 1334932 (R.I. Super. 1999) .....................................................................23

*Farokhrany v. Jackson*,
2010 WL 2977134 (Mich. Ct. App. July 29, 2010)...................................................10

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002).......................................................................................25

*Ferreri v. Plain Dealer Publ'g Co.*,
756 N.E.2d 712 (Ohio Ct. App. 2001) ......................................................................11

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)........................................................................................20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)......................................................................................14

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)................................................................................19, 21

*Gonzalez v. Morse*,
  2017 WL 4539262 (E.D. Cal. Oct. 11, 2017)................................................17

*Guam Fed'n of Teachers v. Ysrael*,
  492 F.2d 438 (9th Cir. 1974)..........................................................................8

*Guccione v. Hustler Magazine, Inc.*,
  800 F.2d 298 (2d Cir. 1986)..........................................................................23

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989).......................................................................................20

*Jones v. Globe Int'l Inc.*,
  1995 WL 819177 (D. Conn. Sept. 26, 1995)...........................................11, 23

*Khawar v. Globe Int'l, Inc.*,
  19 Cal. 4th 254 (1998)...................................................................................19

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020)............................................................................19

*Lam v. Ngo*,
  91 Cal. App. 4th 832 (2001)..........................................................................17

*Lion, Inc. v. Cap. Cities/ABC, Inc.*,
  964 F. Supp. 956 (M.D.N.C. 1997)...............................................................24

*Malden Transp., Inc. v. Uber Techs., Inc.*,
  404 F. Supp. 3d 404 (D. Mass. 2019)......................................................24, 25

*Miller v. Nestande*,
  192 Cal. App. 3d 191 (1987)..........................................................................21

*Mitchell v. Gonzales*,
  54 Cal. 3d 1041 (1991)..............................................................................9, 16

*Modisette v. Apple Inc.*,
  30 Cal. App. 5th 136 (2018)..........................................................................15

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024)...................................................................................12

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)...........................................................................16, 17, 18

iv

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................18

*Novak v. Cont'l Tire N. Am.*,
    22 Cal. App. 5th 189 (2018) ...............................................................8, 9

*Palin v. New York Times Co.*,
    588 F. Supp. 3d 375 (S.D.N.Y. 2022) .................................................21

*Phelan ex rel. Phelan v. Mullane*,
    512 F. App'x 88 (2d Cir. 2013) ...........................................................14

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ............................................................................18

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    2023 WL 3568077 (N.D. Cal. Apr. 21, 2023) ...................................21

*Saelzler v. Advanced Grp. 400*,
    25 Cal. 4th 763 (2001) .........................................................................9

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .......................................................................19, 20

*Stiffarm v. Burlington N. R. Co.*,
    81 F.3d 170 (9th Cir. 1996) .................................................................10

*Ulloa v. McMillin Real Estate & Mortg., Inc.*,
    149 Cal. App. 4th 333 (2007) ...............................................................8

*Viner v. Sweet*,
    30 Cal. 4th 1232 (2003) ..................................................................9, 10

*Wilens v. Doe Defendant No. 1*,
    2015 WL 4606238 (N.D. Cal. July 31, 2015) ....................................23

*Wolf St. Supermarkets, Inc. v. McPartland*,
    108 A.D.2d 25 (N.Y. App. Div. 4th Dep't 1985) ...............................24

*Xavier v. Philip Morris USA, Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) .............................................10

## Constitutional Provisions

U.S. Const. amend. I ..........................................................................................1

## Other Authorities

Judicial Council of California Civil Jury Instructions No. 1702 ......................9

2 R. Smolla, *Law of Defamation* § 11:50 (2d ed. 2018) ...............................16

## PRELIMINARY STATEMENT

In 2018, Plaintiff Roslyn La Liberte was at the center of a media firestorm. While protesting California's law protecting undocumented immigrants at a city council meeting, La Liberte argued heatedly with a 14-year-old Latino boy who spoke in favor of the law. La Liberte yelled so loudly her throat hurt; she was photographed grabbing it while screaming at the boy. A local newspaper published the photograph along with her name and hometown. La Liberte testified the photograph "destroyed [her] life." The photograph and commentary about La Liberte's conduct circulated quickly on social and traditional media. Social media users—including prominent users with large followings—posted about La Liberte; many shared her name and contact information and urged others to harass her. After La Liberte and the photograph went viral, Joy Reid entered the conversation with her own posts—one republished the photograph that accurately showed La Liberte screaming at a child; the other juxtaposed the photograph with an image of school desegregation. Reid never published La Liberte's name or contact information.

La Liberte sued Reid—and Reid alone—over this social media controversy. And La Liberte candidly admits she seeks to hold Reid—and Reid alone—responsible for all consequences of this widespread controversy, including the consequences of *other people's* speech that *pre-dated* or was entirely unrelated to Reid's speech. But La Liberte's claim does not satisfy even the most basic requirements under California tort law and the First Amendment:  causation and damages. Undisputed facts and basic legal principles require summary judgment in Reid's favor.

*First*, La Liberte has identified no evidence that could satisfy the essential element of causation. Under California law, a defendant's conduct is not a "substantial factor" in a plaintiff's harm—and cannot be the basis for liability—if the plaintiff's harm would have occurred anyway, without the challenged conduct. The First Amendment independently requires plaintiffs to prove the challenged conduct actually caused their harm. La Liberte claims she suffered reputational

harm, harassing messages, and business losses from the public controversy over the photograph. But La Liberte never even tried to establish that *Reid's posts* caused the purported harms she claims. Undisputed evidence, and La Liberte's expert's report, shows the alleged harassing messages were highly correlated with *other* people's publications and *not* Reid's (Reid, unlike many others, never posted La Liberte's name or contact information). And there is no dispute that any alleged business losses occurred before Reid posted or were the result of unrelated causes. Four years of discovery have merely confirmed there is no proof Reid's challenged posts caused La Liberte any harm. At trial, La Liberte could only ask the jury to speculate about causation.

*Second*, even if La Liberte could establish causation, La Liberte cannot recover damages. As Reid's posts involved a matter of public concern, the First Amendment prohibits La Liberte—even as a "private figure"—from recovering presumed or punitive damages unless she proves Reid acted with actual malice. But the record is clear Reid did not. At most, La Liberte can recover only actual damages traceable to Reid's posts. But she has no evidence of *any* actual monetary or reputational injury. It is undisputed her business earned *more* the year after the controversy than the previous year, refuting the claim these events caused her to lose money. Even if La Liberte could show actual damages, she has not even tried to disaggregate damages traceable to Reid's actionable conduct, as she must. La Liberte's proposed damages expert *admits* he calculated damages based on a generalized "defamation event": the "widespread telephone, digital, and social media campaign of false information and harassment which peaked on June 30, 2018." Ex. 209 at 2. He never *mentions* Reid's name in his report. And La Liberte's reputation was already in tatters before this incident based on her past controversial behavior and associations.

La Liberte should not be permitted to proceed to trial given these fundamental failures of proof. If she does, future plaintiffs could arbitrarily scapegoat a single person to compensate them

2

for widespread controversies, even without any proof that the chosen person caused any harm. California law and the Constitution forbid that ploy.

## BACKGROUND

In 2017, California enacted Senate Bill 54 ("SB54"), which prohibited local law enforcement from cooperating with federal immigration agencies. 56.1 ¶¶ 1–2. In the summer of 2018, La Liberte traveled around the state attending city council meetings in communities where she did not live to protest SB54. 56.1 ¶¶ 3–5, 8. La Liberte attended these meetings with activists from the fringe of American politics and recognized hate organizations. 56.1 ¶¶ 8, 29–30, 32–73. La Liberte already had a well-publicized history of explosive conduct in politically charged confrontations. In 2017, a video circulated online showing La Liberte shouting at and punching a young woman in the head at a protest. 56.1 ¶¶ 24–27, 27 n.3. In May 2018, *The Washington Post* printed a picture of La Liberte arguing about SB54 with a young woman in Los Alamitos, California. 56.1 ¶¶ 29, 31.

**June 25, 2018: The Simi Valley City Council Meeting.** La Liberte attended a Simi Valley, California city council meeting to protest SB54. 56.1 ¶¶ 9–13. A 14-year-old named Joseph Luevanos attended the meeting to speak in favor of SB54. 56.1 ¶¶ 11, 14–15. When Luevanos approached La Liberte to ask about her opposition, La Liberte raised her voice until screaming and grabbed her own throat—as captured by a photograph. 56.1 ¶¶ 16–23, ¶ 19 n.2; *see* 56.1 ¶ 74 ("Photograph").



**June 26–28, 2018: La Liberte Goes Viral Before Reid Posts.** On June 26, local news outlet the *Ventura County Star* published the Photograph with La Liberte's name and hometown. 56.1 ¶¶ 74, 78. The morning of June 27, the Photograph, along with La Liberte's name, began circulating widely on social media: her name first appeared on Twitter (now "X") by 9:25 a.m. (all times Pacific). 56.1 ¶¶ 79–81; Dkt. 137 (Kelly Expert Report) at 8. The next morning, users continued posting La Liberte's contact information and the name of her business, R.C. Construction. *E.g.*, 56.1 ¶¶ 82–88; *see also* Dkt. 137 at 8. Other users called La Liberte a "MAGA zealot" and "racist scum," among other comments. *E.g.*, 56.1 ¶¶ 88, 103, 109. Users posting about La Liberte included influential celebrities and others with large online followings, such as rapper and activist Immortal Technique (over 279,000 followers) and singer and actress Nancy Sinatra (over 186,000 followers). 56.1 ¶¶ 91–94; Dkt. 137 at 9, 23. At 8:52 p.m. on June 28, Twitter user Alan Vargas posted the Photograph of La Liberte, quoted two racist remarks, and urged readers to "[s]pread this far and wide this woman needs to be put on blast." 56.1 ¶ 95.



Following Vargas's post, other social media users piled on, repeatedly posting the name and information of La Liberte and her business and urging others to harass her. 56.1 ¶ 82 at rows 26–41; *see also* ¶ 83 at rows 23–36, ¶ 84 at rows 14–24. Starting on June 28, phone calls to La Liberte's personal and business numbers significantly increased—La Liberte testified callers

yelled slurs at her, with the calls increasing throughout the day.  56.1 ¶¶ 89–90, 104; *see also id.* ¶ 115.  By the end of June 28, there were at least 41 posts on Twitter alone about La Liberte, at least 36 of which contained identifying information about her.  56.1 ¶¶ 82–83.  It is undisputed that all of this occurred before Reid posted *anything*.

**June 29–30, 2018:  Ongoing Viral Controversy; Reid's First Post.**  Vargas's tweet was so viral it appeared in Reid's Twitter feed even though she did not follow him.  56.1 ¶¶ 99–102. On June 29, Reid reposted Vargas's tweet to her 1.24 million Twitter followers ("Retweet").  56.1 ¶¶ 117–18, 123.  La Liberte has no claims about Reid's Retweet; it cannot be a basis for liability or damages.  Dkt. 16 (Am. Compl.).

That day, Fox 11 Los Angeles filmed interviews with La Liberte and Luevanos for an online article and news segment about the media firestorm.  56.1 ¶¶ 132–34.  La Liberte's phone calls declined throughout the afternoon.  Ex. 210 (Walker Expert Report) Figs. 5, 7.  But significant social media attention continued, including from users with nearly a million followers.  56.1 ¶¶ 135–39, ¶ 140 at rows 113–63 (*e.g.*, Soledad O'Brien (844,981 followers) and David Hogg (847,617 followers)).  By the evening—before Reid posted anything that is at issue in this litigation—there were at least 153 posts on Twitter alone containing identifying information about La Liberte.  56.1 ¶ 141.

Around 6:58 p.m. on June 29, Reid posted the Photograph with a caption on her Instagram, which (in contrast to her 1.24 million Twitter followers) had only 96,600 followers.  56.1 ¶¶ 123, 144, 146.  Reid's Instagram account also automatically uploaded the same post to her linked Facebook page (with 206,400 followers) (together, the "June 29 Post"), 56.1 ¶ 145:



La Liberte alleges the June 29 Post defamed her by "publish[ing] the accusation that La Liberte . . . screamed racial slurs at a minor." Dkt. 16 ¶ 64. The June 29 Post is Reid's first post at issue in this litigation. It is undisputed that after Reid's June 29 Post, calls to La Liberte's phone continued to *decrease* steadily for hours. Ex. 210 at Figs. 5, 7.

In the evening on June 29, Fox 11 Los Angeles published its online article and aired the interviews with La Liberte and Luevanos it had recorded earlier. 56.1 ¶¶ 149–51. Through the evening and following day, other social media users, including celebrities and prominent organizations, continued posting about La Liberte. *E.g.*, 56.1 ¶¶ 154–65 (*e.g.*, Occupy Democrats (7.3 million followers), Ana Navarro (933,192 followers), Debra Messing (490,906 followers), Call to Activism (274,507 followers)). Social media users continued to post La Liberte's name and contact information—information Reid never posted. 56.1 ¶¶ 148, 154–65; Dkt. 137 at 9–12. After the Fox 11 Los Angeles story, La Liberte's phone calls increased again before gradually declining through June 30. Ex. 210 at Fig. 5, 7; Dkt. 137 at 17–18.

**July 1, 2018:  Reid's Second Post.**  The next day, July 1, Reid published another post on Instagram, which again automatically uploaded to Facebook (together, the "July 1 Post"; with the June 29 Post, the "Posts"). 56.1 ¶¶ 167–68. The July 1 Post included an image first created by a different Instagram user; the image juxtaposed the Photograph with protestors at the integration of Little Rock High School during the Civil Rights Movement. *Id.* Others had already posted this

image online.  *E.g.*, 56.1 ¶¶ 87, 126–27, 162.  Reid included a caption.  56.1 ¶¶ 169–70.



La Liberte alleges the July 1 Post defamed her by "accus[ing] La Liberte of making those racist statements and of being a racist."  Dkt. 16 ¶ 65; *but see* ¶ 142 (posts making such accusation before either of Reid's Posts).

**July 2, 2018:  At La Liberte's Request, Reid Removes the Posts and Apologizes.**  On July 2, Reid's friend sent her the Fox 11 Los Angeles story.  Reid concluded the story "raised . . . questions" about what happened between La Liberte and Luevanos.  56.1 ¶¶ 173, 176. (Luevanos later testified the Fox 11 broadcast did not reflect the full story Luevanos told during his interview.  56.1 ¶¶ 152–53.)  In caution, and after La Liberte's counsel threatened litigation and demanded Reid take down her Posts, Reid removed the Posts and apologized on Instagram, Facebook, and Twitter:  "It appears I got this wrong[,] [m]y apologies to Mrs. La Liberte and Joseph[,]" linking to the Fox 11 Los Angeles article.  56.1 ¶¶ 174–78.

**This Litigation.**  La Liberte sued Reid on September 25, 2018, and filed the operative First Amended Complaint (the "Complaint") on November 27, 2018.  56.1 ¶¶ 192–93.  The Complaint includes one claim for defamation based only on Reid's June 29 and July 1 Posts.  56.1 ¶¶ 125, 193–94.  La Liberte never sued anyone else for statements about her conduct at the meeting.

## LEGAL STANDARD

This Court should grant summary judgment if there is "no genuine issue of material fact," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), or if La Liberte cannot identify

sufficient evidence to establish an element as to which she bears the burden of proof, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Because the prospect of civil liability "may have a chilling effect on First Amendment rights," summary judgment serves an important purpose in defamation cases; a court's "close[] scrutin[y] [of] the evidence to determine whether the case should be terminated in a defendant's favor[] provides a buffer against possible First Amendment interferences." *Guam Fed'n of Teachers v. Ysrael*, 492 F.2d 438, 441 (9th Cir. 1974).

## ARGUMENT

The Court should grant summary judgment to Reid.  La Liberte cannot prove causation consistent with ordinary tort principles or the precision the First Amendment requires.  And even if she could establish that the Posts may have caused her *some* harm, La Liberte cannot identify any actual damages, much less such damages traceable to *Reid's* conduct.  And without any evidence Reid acted with "actual malice," La Liberte cannot recover presumed or punitive damages, but only actual damages *Reid caused*—there are none.

## I.  La Liberte Cannot Prove Reid's Posts Caused Her Alleged Injuries.

Under bedrock tort principles and the First Amendment, La Liberte must raise a genuine dispute of material fact that *Reid's Posts* harmed her.  After four years of discovery, she cannot.

### A.  La Liberte Cannot Establish "But For" Causation Under The "Substantial Factor" Test.

California tort law recognizes causation as an "essential element" of every cause of action. *Ulloa v. McMillin Real Estate & Mortg., Inc.*, 149 Cal. App. 4th 333, 336 (2007).  "It is axiomatic that a defendant cannot be held liable in tort for an injury he or she did not cause." *Brookhouser v. State*, 10 Cal. App. 4th 1665, 1677 (1992).  A plaintiff must establish that the defendant's conduct was a "substantial factor" in her harm; "substantial factor" generally means the same thing as "the 'but for' rule of causation." *Novak v. Cont'l Tire N. Am.*, 22 Cal. App. 5th 189, 195–96

(2018). "[A] defendant's conduct is" a "substantial factor" "if the injury would not have occurred 'but for' that conduct." *Id*. And a defendant's conduct is *not* a substantial factor "when the [injury] would have occurred without it." *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1053 (1991). "[S]peculative" or "tenuous" evidence cannot prove the necessary causal link between a defendant's conduct and a plaintiff's injury. *Saelzler v. Advanced Grp. 400*, 25 Cal. 4th 763, 781 (2001). That causation requirement applies to La Liberte's defamation claim. *See* Judicial Council of California Civil Jury Instructions (CACI) No. 1702 (requiring a defamation plaintiff suing over statements on a matter of public concern, as here, to "prove that [the defendant's] wrongful conduct was a substantial factor in causing" damages).

La Liberte can identify *no* evidence linking Reid's Posts to any harms La Liberte claims she experienced. And La Liberte's proposed experts cannot cure that fatal gap.[1] La Liberte's causation expert, Dr. Bernard Jansen, never analyzed but-for causation—whether La Liberte's alleged harm would have occurred "even if Ms. Reid didn't post." Ex. 208 at 201:12–22 ("I was not asked to identify that. . . . [I]t's outside the scope of my reports."). And La Liberte's damages expert, Burt Flickinger, never even *mentions* Reid in his report. He only identified damages from a generalized "defamation event": the "widespread telephone, digital, and social media campaign of false information and harassment which peaked on June 30, 2018." Ex. 209 at 2.

In this litigation, La Liberte has suggested she need not prove "but-for" causation because, she argues, this case involves "concurrent causation." Dkt. 173 at 3. Not so. "Concurrent causation" is a narrow exception under California law and does not apply here. *See Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003). Concurrent independent causes are those that "operat[e] *at the*

---

[1] La Liberte's proposed experts suffer from significant, disqualifying defects in both their qualifications and opinions. If necessary, at the appropriate time, Reid will move *in limine* to exclude their testimony from trial. But it is not necessary now to determine that their opinions are inadmissible: even if admitted, their opinions could not create a genuine dispute of material fact as to the defects in La Liberte's case that require summary judgment in Reid's favor.

*same time* and *independently*, each of which would have been sufficient *by itself* to bring about the harm." *Id*. (emphasis added).  "For example, if two gunmen shot the same victim at the same time, each bullet might be a sufficient independent cause of the victim's death." *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1080 (N.D. Cal. 2011).  La Liberte and her proposed experts never even attempted to show Reid's Posts could have *independently* caused any alleged harm, apart from the publications and posts from unrelated third parties that preceded and inspired them. Reid's Posts were entirely *dependent* on the viral social media firestorm that erupted before she ever posted.  Chronologically, Reid's Posts cannot be "concurrent" together with the mainstream media reporting and avalanche of social media posts that happened *before* Reid posted because Reid's Posts came *after*.  And Reid never shared La Liberte's name or contact information, or urged others to call and harass her, 56.1 ¶¶ 144–45, 148, 167–69; many others—including accounts with far larger followings than Reid's—did, causing any alleged harms La Liberte identifies.  *E.g.*, 56.1 ¶¶ 83–88, 91–94, 103, 105–112, 126–27, 137–39, 141, 143, 154–65.

Even if Reid's Posts were somehow "independent" of the preceding controversy that caused them, there is *no* evidence the Posts were "sufficient by [themselves] to bring about [La Liberte's alleged] harm."  *Viner*, 30 Cal. 4th at 1240.  As explained below, La Liberte can identify *no* evidence linking Reid's Posts to any reputational, harassment, or business harms La Liberte claims she experienced.  This case does not involve concurrent independent causes.  The but-for test governs.  La Liberte cannot—and has not tried to—satisfy that standard.[2]  *See Farokhrany v. Jackson*, 2010 WL 2977134, at *2 (Mich. Ct. App. July 29, 2010) (entering directed verdict for

---

[2] La Liberte cannot argue Reid is jointly and severally liable.  One speaker cannot be liable, jointly or otherwise, for statements published by others—not even republication of that speaker's own statements.  *Stiffarm v. Burlington N. R. Co.*, 81 F.3d 170 (9th Cir. 1996); *Curley v. Vick*, 211 Cal. App. 2d 670, 673 (1963) ("[T]he author of defamatory statements is not liable for a publication thereof where he neither authorized nor intended such publication to be made").  And, as explained in Section I.B *infra*, it also would violate bedrock First Amendment law to hold a speaker jointly liable for non-actionable speech or the speech of others.

defendant against defamation claim because "there [was] nothing more than speculation" "whether the [actionable] statements . . . were a proximate cause of the plaintiff's injury"); *Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712, 723 (Ohio Ct. App. 2001) (affirming dismissal of defamation claim where statements "could not harm appellant's reputation in any way beyond the harm already caused by the other non-actionable statements in the article"); *Jones v. Globe Int'l Inc.*, 1995 WL 819177, at *10 (D. Conn. Sept. 26, 1995) (granting summary judgment to defendant because plaintiff "failed to prove" allegedly libelous statements "caused him to suffer any further injury" beyond injury caused by "true facts").

### 1. La Liberte Cannot Establish Causation as to Her Reputational Harm.

Everything in the record points to the conclusion that any harm to La Liberte's reputation stemmed from the accurate Photograph of her screaming at Luevanos and the ensuing firestorm of news articles and social media posts Reid did not publish. La Liberte never even tried in this litigation to develop evidence linking Reid's Posts to harm to her reputation. La Liberte may regret that tactical decision now, but that is no reason to excuse her inability to meet the standard.

La Liberte admitted that the Photograph of her screaming at Luevanos—which news outlets and hundreds of people shared online—"destroyed [her] life." 56.1 ¶¶ 74, 77, 78; *e.g.*, *id.* ¶ 140 at rows 1–9, 11–13, 15, 17–18, 22, 31, 34, 37, 45, 48, 52, 57, 69, 115, 130, 132–33, 136, 142, 144, 149, 152–53, 155. It is undisputed that in an interview recorded shortly after the Photograph was published, La Liberte admitted to yelling at Luevanos ("that was wrong to be yelling, that was wrong[]"), and conceded the Photograph made her look like a "monster." 56.1 ¶¶ 17–19, 75–76, 114. La Liberte cannot impose liability on anyone for harm to her reputation caused by her own actions as depicted accurately in the Photograph. La Liberte has never even tried to explain how Reid's Posts caused reputational injury beyond that caused by the Photograph itself.

Apart from the Photograph, La Liberte also found herself the subject of a viral traditional news and social media controversy before Reid posted anything. Throughout June 29, La Liberte conducted a long phone interview with an independent reporter, Tony Aaron II; spoke with a CBS News reporter in New York; and was interviewed by a Fox 11 Los Angeles reporter. 56.1 ¶ 113, 116, 132. There is no dispute that *all* La Liberte's interactions with mainstream media outlets about her confrontation with Luevanos occurred before Reid posted anything. *Compare* 56.1 ¶¶ 113, 116, 132 *with id.* ¶ 144. Many social media users—some with hundreds of thousands of followers—also condemned La Liberte, by name, before Reid's Posts. *See, supra*, at pp. 4–5; *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1989 (2024) (holding "a causal link is possible only if [harm occurred] *after* [challenged conduct]"). For example, La Liberte admitted at her deposition that Reid's earlier Retweet was "extremely harmful," but the Complaint does *not* allege Reid's Retweet defamed her; the Retweet cannot be a basis for liability. 56.1 ¶¶ 124–25, 193–94. In other words, the only element of Reid's conduct that La Liberte even *claimed* caused her harm is conduct La Liberte did not sue over. La Liberte has no evidence—not even her own testimony—connecting the Posts at issue to any reputational injury. La Liberte did not find *anyone*—such as personal business contacts she could have easily subpoenaed—to testify they read Reid's Posts and formed a worse view of La Liberte. *She never even tried*.

## 2. La Liberte Cannot Prove Causation as to Her "Hate Messages."

La Liberte alleges she "suffered public hatred, contempt, scorn, and ridicule," as well as "reputational damage and emotional distress," in the form of "hate messages." Dkt. 16 ¶¶ 88–92. But La Liberte *admitted* she has *no* evidence that *Reid's Posts* caused any of these alleged harms:

> Q. So your answer is 'no', you cannot—you have no idea what caused any particular person to send you hate mail or take action to say terrible things about you; correct?
>
> A. No one would know that, yes.

56.1 ¶ 171.  This concession is dispositive:  "[N]o one would know" what caused any particular person to send La Liberte "hate messages"—because *La Liberte never tried to find out*.

Phone records reflect that between June 28 and July 1, 2018, La Liberte (and her business) received a number of calls; La Liberte alleges these calls were "hate[ful]."  Ex. 210 at 38–41 & Figs. 5–7; Dkt. 16 ¶ 90.  La Liberte has not established—and cannot establish—even a correlation (let alone a causal link) between Reid's Posts and those calls.  It is undisputed that La Liberte's single proposed expert on causation, Dr. Bernard Jansen, specifically testified La Liberte's "hate calls" were linked with people "post[ing] [her] name" and "phone number."  Ex. 208 at 248:16–249:13.  Many social media users posted La Liberte's name and phone number online; mainstream media also identified La Liberte's name and hometown alongside the Photograph, including Fox 11 and the *Ventura County Star*.  *Supra*, at pp. 4–6.  La Liberte's expert Jansen acknowledged *Reid* did *not* publish any of this information—not even La Liberte's name.[3]  *Id*. at 249:14–22.  Jansen admitted "other posts" and "other people may have been a substantial factor" in the "hate calls" La Liberte claims, *id.* at 250:23–251:15, and other social media posts "would represent a substantial factor," *id.* at 190:13–191:19.  And Jansen admitted he has no opinion, did no analysis, and knows of no evidence showing anyone who saw Reid's Posts actually contacted La Liberte.  *Id*. at 193:8:–15, 248:16–249:13.  Jansen did not even attempt to determine whether "Ms. La Liberte's hate calls would have occurred even if Ms. Reid didn't post."  *Id*. at 201:12–22.  These omissions are fatal.

Jansen asserts that the *timing* of Reid's Posts is "highly consistent with the hypothesis that" the Posts "played a material role in [the] increase" of "hate calls to plaintiff La Liberte."  Dkt. 134

---

[3] La Liberte also cannot recover damages for other claimed costs incurred to prevent being harassed, such as redecorating her house, changing her phone number and email addresses, or installing a security system, for the same reasons she cannot recover for alleged damage from hate calls—especially where such costs are obviously linked to harassment caused by the publication of her contact information that *Reid never shared*.  *See* 56.1 ¶¶ 148, 169.

at 19–20.  But Jansen's own analysis shows there is *no relationship* between the timing of Reid's Posts and the pattern of calls to La Liberte:  It is undisputed that La Liberte received a swell of calls *before* Reid's June 29 Post; La Liberte's call volume had *already fallen* dramatically from its first spike by the time of Reid's June 29 Post; and after Reid's June 29 Post, La Liberte's call volume *continued* to decline.  Ex. 210 at Fig. 5.  It is also undisputed there was no increase in calls to La Liberte after Reid's July 1 Post either; call volume was *already* declining before that Post and *continued* to decline after.  Ex. 208 at 244:22–245:14, 256:23–257:22.

Jansen's own analysis strongly indicated the posts of *others* drove "hate" calls to La Liberte; Jansen's only rebuttal to his own analysis was to say, with no evidence, that Reid's Posts "certainly seemed to be a substantial factor to [him]."  *Id*. at 189:13–190:2.  This is far too attenuated and "speculative to create a triable issue of fact on the issue of causation" and cannot survive summary judgment.  *Phelan ex rel. Phelan v. Mullane*, 512 F. App'x 88, 93 (2d Cir. 2013).  "[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" when "there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  All Dr. Jansen can say is that some calls occurred after Reid's Posts.  This attenuated relationship—*post hoc ergo propter hoc*—is a fundamental error of logic and far too speculative to prove causation.

### 3.  La Liberte Also Cannot Demonstrate Causation for Alleged Business Losses.

La Liberte must show Reid's Posts—those specific June 29 and July 1 publications, not an undifferentiated cluster of publications spanning days and hundreds of speakers—are to blame for her injuries.  *CZ Servs., Inc. v. Express Scripts Holding Co*., 2020 WL 4518978, at *5 (N.D. Cal. Aug. 5, 2020) (admonishing expert for not "attribut[ing] any portion of the valuation or lost profits damages to specific defamatory statements, as she should have done").  La Liberte has never even

14

*tried* to link Reid's Posts to any business losses she claims to have suffered.  And La Liberte

*admitted* she has no evidence that Reid caused any customer to stop doing business with her:

> Q. Who specifically emailed you and mentioned Joy Reid as a reason that they were not going to do future business with you?
>
> A. *I don't think they mentioned Joy Reid*, per se, but they said that there were too many—*they never even acknowledged that it was because of this*. . . .
>
> Q. So the answer is no client—none of your clients said that they were terminating you or refusing to do future business with you because of Joy Reid, just to button that up; correct?  No one said that?
>
> A. Not in—not in words or . . . emails or phone, no.

56.1 ¶ 183 (emphasis added).  These candid admissions doom La Liberte's claims.

In any case, the record now shows La Liberte has no business losses to trace to Reid's Posts.  *See, infra*, at pp. 21–22.  La Liberte's own husband—her business partner and co-owner of R.C. Construction—testified that the Simi Valley incident *did not cause* any customer to avoid hiring R.C. Construction.  56.1 ¶¶ 183, 189.  The only time a customer of R.C. Construction *mentioned* the Simi Valley incident was to express sympathy for La Liberte.  56.1 ¶ 189.  While La Liberte claimed in this litigation she lost business from eight specific customers, Mr. La Liberte detailed the specific reasons why each of those eight customers stopped doing business with R.C. Construction—reasons not related to Simi Valley at all, much less because of Reid's Posts in particular.  56.1 ¶¶ 181–89 (identifying lost contacts, price disputes, and competition, among other causes).

La Liberte seeks to jettison the causation requirement and hold Reid alone responsible for the widespread attention from traditional and social media, despite the "axiomatic" principle "that a defendant cannot be held liable in tort for an injury he or she did not cause."  *Brookhouser*, 10 Cal. App. 4th at 1677; *accord Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 157 (2018).  When, as here, "the conduct [] claimed to have caused the injury had nothing at all to do with the injuries,

15

it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries." *Mitchell*, 54 Cal. 3d at 1052. Summary judgment should issue.

**B. The First Amendment Similarly Forecloses La Liberte's Causation Theory.**

Even if California law allowed plaintiffs to impose collective liability for a supposed "defamation event," the First Amendment would prohibit it. *See* 2 R. Smolla, *Law of Defamation* § 11:50 (2d ed. 2018) ("One of the most powerful themes in modern First Amendment jurisprudence . . . is that the causal nexus between speech and [harm] must be extremely tight and compellingly obvious before liability for the speech may be imposed."). As the Supreme Court has explained, courts in defamation actions must "conduct[] an independent review of the record [] to be sure that the speech in question actually falls within the unprotected category . . . to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984).

In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the Supreme Court held that the First Amendment requires "'precision of regulation'" "in the context of constitutionally protected activity," and forbids liability arising from a defendant's protected speech or from harm caused by another. *Id.* at 916. The *Claiborne* plaintiffs sought to hold the organizers of a boycott liable for damage caused in part by lawful boycott activity and in part by unlawful violent activity from some boycott participants. *Id.* at 921. The Court held that "[o]nly those losses proximately caused by unlawful conduct may be recovered," and that damages should be "restricted to those directly and proximately caused by wrongful conduct *chargeable to the defendants*." *Id.* at 918 (emphasis added). The Court then applied this precision-of-regulation principle: although the organizers denounced the boycotted business owners as "racists" and "bigots" and implied they were murderers, rapists, and liars, the Court held that such inflammatory language was

16

"constitutionally inadequate to support [a] damages judgment" against the *organizers* for damage caused by *other boycott participants* who in turn resorted to violence. *Id.* at 929, 935–37.

California courts have followed *Claiborne*. In *Lam v. Ngo*, 91 Cal. App. 4th 832 (2001), for example, a store owner sued the organizer of a protest, claiming the protest damaged his business. The Court of Appeal held there was "insufficient evidence to implicate the sole named defendant" in the unprotected activity that had actually injured the plaintiff. *Id.* at 837. Although the organizer had violated a restraining order by crossing a court-imposed buffer zone and committed other infractions, the Court held that that the "effect" of that unlawful conduct was at most "de minimis in terms of the tort causes of action alleged against him." *Id.* at 846–47. In short, the "aspects of the protest" "in which [the defendant] was implicated" could not, "consistent with *NAACP v. Claiborne Hardware*, support tort liability." *Id.* at 837*; see also Gonzalez v. Morse*, 2017 WL 4539262, at *3 n.5 (E.D. Cal. Oct. 11, 2017) ("[A] plaintiff may only seek damages causally linked to the harm alleged.") (citing *Claiborne*, 458 U.S. at 918))*.* That holding applies here: La Liberte must show that Reid's challenged speech *caused* La Liberte's claimed injuries, apart from any injury caused by statements not at issue in this case, whether the statements of others or Reid's own unchallenged speech. *Lam*, 91 Cal. App. 4th at 832.

As explained above, no evidence ties the challenged Posts to any alleged reputational injury, harassment, or business losses, which—if they exist at all—were caused by events before or unrelated to Reid's Posts. *Supra*, at pp. 11–16. La Liberte admitted she was harmed by the damning, but accurate, Photograph of her screaming at Luevanos. 56.1 ¶ 75–77. La Liberte also claimed that Reid's Retweet *did* cause her harm, 56.1 ¶ 124—but Reid's Retweet, which predates the Posts at issue, cannot be a basis for liability. There is no evidence Reid's Posts caused any calls at all—unsurprising because Reid never disclosed any identifying information about La

Liberte. *Supra*, at pp. 1, 2, 6, 10, 13 & n.3. But traditional media outlets and many other social media users did share La Liberte's name and contact information, and those publications did cause a swell of calls to La Liberte. Reid's Posts cannot have caused, and cannot be responsible for any damage flowing from, the huge swell of calls La Liberte received *before* either of Reid's Posts went live. La Liberte cannot satisfy the "precision of regulation" the First Amendment demands. *Claiborne*, 458 U.S. at 916.

La Liberte's anything-goes approach to causation threatens the First Amendment. Under her theory, any one speaker could face liability for all harm caused by a media firestorm, even without proof that person's wrongful conduct caused *any* harm. That approach would turn tort causation and defamation law upside down, imposing damages for harm caused by non-actionable speech and the speech of others. La Liberte's gambit is especially dangerous because, as this Court has recognized, Reid's Posts commented on a matter of public concern. Dkt. 33 at 15. Even when plaintiffs are private figures, the First Amendment affords heighted protections to speech on matters of public concern. *See, e.g.*, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). La Liberte's attempt to foist this viral social media event arising from a public controversy onto Reid alone would chill even "true speech on matters of public concern" given "the fear that liability will unjustifiably result." *Id.* at 777–78. That would violate *Claiborne* and deny speakers the "breathing space" the First Amendment safeguards. *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964); *see Counterman v. Colorado*, 600 U.S. 66, 76 (2023) (First Amendment guards against "fear of 'self-censorship'—the worry that . . . uncertainties and expense of litigation will deter speakers from making even truthful statements" (cleaned up)).

## II.  La Liberte Cannot Show Any Actual Damages, Let Alone Actual Damages Attributable To Reid's Posts.

La Liberte fails at the first step:  she cannot hold Reid liable because she cannot show causation as California law and the First Amendment both require.  Even if she could establish a link to some harm, however, summary judgment is warranted because the First Amendment limits La Liberte to seeking actual damages, which she cannot prove on this record.

### A.  For This Matter of Public Concern, the First Amendment Prevents La Liberte from Recovering Presumed or Punitive Damages.

The First Amendment prohibits La Liberte's requests for presumed and punitive damages. This Court already correctly held Reid's statements "were made in connection to an issue of public interest": "the public controversy surrounding SB54."  Dkt. 33 at 15.  Because Reid's Posts related to a matter of public concern, the First Amendment forbids presumed and punitive damages unless La Liberte can establish Reid acted with actual malice—a rule governing both public and private figure plaintiffs.[4]  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974); *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 274 (1998) ("to recover" "either punitive damages or damages for presumed injury," "even a private figure plaintiff must prove actual malice if the defamatory statement involves matters of public concern").  There is no evidence Reid acted with actual malice.

Actual malice requires "clear and convincing evidence" the defendant acted with "knowledge of falsity or reckless disregard for truth."  *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577 (2005).  La Liberte must show Reid "in fact entertained serious doubts as to the truth of [the] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or acted with "high degree

---

[4] The Second Circuit has previously held in this case that La Liberte is not a public figure and does not need to demonstrate actual malice for purposes of liability.  *See La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020).  Reid does not contest that ruling.  However, the Second Circuit's prior determination did not consider or address the separate requirement under *Gertz* that *any* plaintiffs—including private-figure plaintiffs—suing over statements on matters of public concern *must* establish actual malice in order to recover presumed or punitive damages.  That separate inquiry was not raised at the motion to dismiss stage and was not previously addressed by this Court or the Second Circuit.

of awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). The question is not "whether a reasonably prudent [speaker] would have published, or would have investigated before publishing," but whether there is "sufficient evidence to permit the conclusion that the defendant" seriously doubted the publication's truth and published it anyway. *St. Amant*, 390 U.S. at 731. It is not enough to say "'that the jury . . . could[] disbelieve the defendant's denial'" that she acted with actual malice; "'[s]ome facts must be asserted to support the claim that the state of mind existed.'" *Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621–22 (2d Cir. 1988); *see also Bose*, 466 U.S. at 511 ("Judges . . . must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice."); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) ("[T]he reviewing court must examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect").

La Liberte alleges Reid defamed her by accusing La Liberte in the Posts of screaming racist statements at Luevanos. Dkt. 16 ¶¶ 64–65. La Liberte has developed no evidence that Reid acted with "actual malice" when she published those statements. It is undisputed that, after reading Vargas's post, Reid thought Vargas "witnessed" these events and she "honestly believed at that moment . . . [Vargas] was identifying [La Liberte] [as] the woman to put on blast for saying those things" that Vargas put in quotation marks in his post. 56.1 ¶¶ 119–21 (testifying she believed Vargas "describ[ed] himself as the firsthand witness"). As Reid testified, "it's clear that you can see a woman screaming at a child, so that's visual evidence of what" Vargas posted. 56.1 ¶ 122. It is also undisputed La Liberte herself agreed people who read Vargas's original post would believe La Liberte spoke the racist comments Vargas quoted. 56.1 ¶ 98. Others came to the same

conclusion; before Reid's June 29th Post, at least 75 posts stated that La Liberte yelled at Luevanos or spoke the words Vargas quoted.  56.1 ¶ 142.

There is "no triable issue of fact regarding whether [Reid] communicated these allegations knowing them to be untrue or having a serious doubt of their truth."  *Miller v. Nestande*, 192 Cal. App. 3d 191, 202 (1987); *see also Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 2023 WL 3568077, at *8 (N.D. Cal. Apr. 21, 2023) (summary judgment on issue of actual malice where no evidence defendant "harbored serious subjective doubts as to the validity of . . . assertions").  The record shows Reid sincerely and reasonably believed her Posts were true when she published them.  And her swift retraction underscores the lack of actual malice.  Reid concluded the Fox 11 Los Angeles report about La Liberte "raised . . . questions about [her] original Instagram post," so she withdrew her Posts "out of an abundance of caution" and apologized.  56.1 ¶ 176.  This is "irreconcilable with the suggestion" that Reid "purposefully or recklessly published false information."  *Palin v. New York Times Co.*, 588 F. Supp. 3d 375, 409 (S.D.N.Y. 2022).

La Liberte cannot show actual malice.  The Court should strike La Liberte's demand for presumed and punitive damages and limit her to "compensation for *actual injury* . . . supported by competent evidence concerning the injury."  *Gertz*, 418 U.S. at 349–50 (emphasis added).

**B.  La Liberte Cannot Show Actual Damages**

La Liberte also cannot identify a single dollar of actual damages.  Damages awards for defamation claims "must be supported by competent evidence concerning the injury."  *Gertz*, 418 U.S. at 350.  Four years of discovery later, La Liberte has not established any actual damages recoverable here: she (1) has not shown business losses, (2) could not suffer more reputational harm, and (3) has not disaggregated any damages attributable to Reid's unprotected speech from damages attributable to protected speech or others' speech.

*First*, there is no evidence La Liberte or her business lost income, value, or business opportunities as a result of the Simi Valley council meeting—much less as a result of Reid's Posts. La Liberte claims damages for lost business based on work she supposedly should have received from eight customers.  56.1 ¶ 181.  It is undisputed that only one of those customers, Charterhouse Innovations, actually ended its relationship with R.C. Construction in 2018—and there is no dispute it did so *before* either of Reid's Posts.[5]  Reid's Posts could not have caused Charterhouse to decide—12 hours before Reid posted—to terminate its relationship with La Liberte.  56.1 ¶ 184(a)–(b).  No other customer actually ended a relationship with R.C. Construction; La Liberte argues only she "should have" or "would have" received the opportunity to bid on more jobs absent *Reid's Posts* in particular.  But La Liberte's sole proposed expert on her alleged business losses, Burt Flickinger, never even mentioned Reid's Posts (let alone linked them to La Liberte's alleged business losses).  *See generally* Ex. 209.  Instead, Flickinger refers *collectively* to a "defamation event," defined as the "widespread telephone, digital, and social media campaign of false information and harassment which peaked on June 30, 2018."  *Id*. at 2.  Flickinger simply assumed, without analysis, this "defamation event" caused a wave of "personal attacks" on La Liberte and lost business for R.C. Construction.  *Id*. at 3.  Flickinger's report never mentioned Reid's name a single time.  As a matter of law, that analysis cannot support a damages claim attributable to Reid.

Flickinger also failed to reliably quantify any damages from the "defamation event."  He relied only on La Liberte's unsubstantiated guesses—without any support—as to what La Liberte thought her business *could* have earned.  And Flickinger did not even offset these imagined, unsubstantiated earnings against the profits R.C. Construction earned.  Indeed, his "damages"

---

[5] Charterhouse wrote La Liberte it was terminating her as a representative at 7:42 a.m. on June 29, 2018—almost 12 hours before the first of Reid's Posts at issue.  56.1 ¶ 184(b); *see also id.* ¶ 144.  Charterhouse wrote their relationship had already effectively ended long earlier:  "It's been months since we've engaged in a sales transaction."  56.1 ¶ 184(b).

analysis includes money La Liberte *did* earn. *Id*. at 15–16. These calculations are irrelevant because they say nothing about Reid's Posts; they also are hopelessly flawed and unreliable.

*Second*, there is no evidence of actual injury to La Liberte's reputation, excepting self-serving statements which a "court does not accept as true." *Wilens v. Doe Defendant No. 1*, 2015 WL 4606238, at \*19 (N.D. Cal. July 31, 2015). And regardless, La Liberte could not recover damages for harm to her reputation because her reputation was already so "badly tarnished" with respect to the "specific subject" at issue here—aggressive confrontations with young people and associations with extremists—that she could not "be further injured by allegedly false statements on that subject." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986); *see also Dewitt v. Outlet Broad., Inc.*, 1999 WL 1334932, at \*5 (R.I. Super. 1999) (criminal record of plaintiff and prior publicity meant no jury could award, "under any circumstances, anything but a peppercorn"); *Jones*, 1995 WL 819177, at \*11 (summary judgment against defamation claim because public "true facts" "had a devastating impact upon the plaintiff's reputation" and plaintiff had "failed to prove" the challenged statements "caused him to suffer any further injury").

Before confronting Luevanos, La Liberte was already known for her *first* violent encounter with a young person. In 2017, while protesting the Academy Awards, La Liberte was involved in an altercation with a young woman; La Liberte grabbed the young woman's arms and punched her in the head. 56.1 ¶¶ 24–25. Video of this altercation circulated widely enough online that, not long after La Liberte's confrontation with Luevanos, witnesses readily identified and linked La Liberte to this prior confrontation. 56.1 ¶¶ 26–27. La Liberte's family testified they were upset and embarrassed by the controversy over La Liberte's prior violent brawl at the Academy Awards. 56.1 ¶¶ 28, 130–31. That was not all. In May 2018—months before Simi Valley—La Liberte was prominently featured in a photograph in *The Washington Post* arguing with a young woman about

SB54 at a prior event in Los Alamitos, California. 56.1 ¶ 31. Publicizing La Liberte's behavior with Luevanos was no more damaging than the existing publicity over her past conduct. *See, e.g.*, *Benanti v. Satterfield*, 2020 WL 1491374, at *6 (Tenn. Ct. App. Mar. 27, 2020); *Davis v. McKenzie*, 2017 WL 8809359, at *16 (S.D. Fla. Nov. 3, 2017), *report and recommendation adopted*, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018) (finding no damages where plaintiff's violent history had already been subject of media attention).

La Liberte had also already gained notoriety by associating with fringe groups and individuals who promoted racism and violence. 56.1 ¶¶ 24–27, 30–73. Simi Valley council meeting attendees recognized La Liberte's associates as radical activists they had seen engaging in disruptive conduct at past events. 56.1 ¶¶ 32–33, 39–42, 46–53, 56, 59–73. Another witness saw La Liberte engaged in similar activities and congratulating those individuals. 56.1 ¶ 49 (describing La Liberte high-fiving a member of the hate group FAIR as he was expelled from the Simi Valley council meeting). The saying is right: You are known by the company you keep.

*Third*, even if La Liberte suffered damages, and even if—in theory—she could prove Reid caused some harm as a general matter, her failure to identify any specific actual damages caused by Reid's Posts (as opposed to others' speech) dooms her claim. Defamation plaintiffs must distinguish between damages due to actionable conduct and non-actionable conduct. *E.g.*, *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732–33 (9th Cir. 1999) (applying California law and reversing judgment because court could not "discern how much may have been attributable to the two statements that were not actionable"); *see also Malden Transp., Inc. v. Uber Techs., Inc.*, 404 F. Supp. 3d 404, 424 (D. Mass. 2019), *aff'd in relevant part sub nom. Anoush Cab, Inc. v. Uber Techs.*, Inc., 8 F.4th 1 (1st Cir. 2021); *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 964 F. Supp. 956, 962 (M.D.N.C. 1997); *Wolf St. Supermarkets, Inc. v. McPartland*, 108 A.D.2d

24

25, 33 (N.Y. App. Div. 4th Dep't 1985). A jury cannot be "left to speculate about the damages attributable to [the defendant] and those arising from the actions of others." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 62 (2d Cir. 2002).

La Liberte has no evidence identifying the harm attributable to Reid's Posts alone. *See, supra*, at pp. 8–16. Nor has she has made any attempt to "disaggregate," *Malden Transportation*, 404 F. Supp. 3d at 424, actual damages caused by Reid's Posts from damages caused by the Photograph, Reid's Retweet, or others' posts. *See, supra*, at pp. 24–25. In years of discovery, La Liberte chose not to develop *any* evidence of damages "resulting from [] actionable conduct" by Reid.

The Court should grant summary judgment: La Liberte cannot seek presumed or punitive damages under the First Amendment; she cannot recover actual damages because she has not proved any exist; and she never tried to trace damages caused by Reid's Posts apart from damage caused by non-actionable speech or the speech of others. *Coastal Abstract*, 173 F.3d at 725.

## CONCLUSION

The Court should grant summary judgment to Reid. If not, the Court should strike La Liberte's demand for presumed and punitive damages and limit La Liberte to recovering only actual damages provably caused by Reid's actionable speech, apart from damages caused by the Photograph, the speech of others, or Reid's non-actionable speech.

Dated: July 16, 2024                          Respectfully submitted,
      Los Angeles, California


                                       By: */s/ Theodore J. Boutrous Jr.*
                                          Theodore J. Boutrous, Jr.

                                       Theodore J. Boutrous, Jr.
                                       Marissa Mulligan
                                       GIBSON, DUNN & CRUTCHER LLP
                                       333 South Grand Avenue
                                       Los Angeles, CA 90071
                                       (213) 229-7000
                                       TBoutrous@gibsondunn.com
                                       MMulligan@gibsondunn.com

                                       Connor S. Sullivan
                                       GIBSON, DUNN & CRUTCHER LLP
                                       200 Park Avenue
                                       New York, NY 10166
                                       (212) 351-4000
                                       CSSullivan@gibsondunn.com

                                       *Attorneys for Defendant*