# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3

4   ROSLYN LA LIBERTE,

5              Plaintiff,

6       vs.                    No.

                               1:18-cv-05398-DLI-VMS

7   JOY REID,

8              Defendant.

    _____/

9

10

11

12      VIDEO-RECORDED DEPOSITION OF ROSLYN LA LIBERTE

13          REMOTE ZOOM PROCEEDING

14          Brooklyn, New York

15          Tuesday, August 17, 2021

16

17

18

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 294                    Job No. 4739510

                                      Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3

    ROSLYN LA LIBERTE,

4

                    Plaintiff,

5

            vs.                    No.

6                                  1:18-cv-05398-DLI-VMS

    JOY REID,

7

                    Defendant.

8    _____/

9

10

11        Video-recorded deposition of ROSLYN LA LIBERTE,

12    taken on behalf of the Defendant, Remote Zoom Proceeding

13    from Brooklyn, New York, beginning at 11:31 a.m. Eastern

14    Daylight Time and ending at 7:59 p.m. Eastern Daylight

15    Time, on Tuesday, August 17, 2021, before Leslie Rockwood

16    Rosas, RPR, CSR No. 3462.

17

18

19

20

21

22

23

24

25

                                              Page  2

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF ROSLYN LA LIBERTE:

 4         OLASOV LLP

 5         BY: DAVID M. OLASOV, ESQ.

 6         900 3rd Avenue

 7         New York, New York 10022

 8         (212) 895-2643

 9         dolasov@olasov.com

10

11    FOR THE DEFENDANT JOY REID:

12         GIBSON, DUNN & CRUTCHER LLP

13         BY: THEODORE J. BOUTROUS JR., ESQ.

14             MARISSA M. MULLIGAN, ESQ.

15             MELANIE SAVA, ESQ.

16         333 South Grand Avenue

17         Los Angeles, California 90071

18         (213) 229-7000

19         tboutrous@gibsondunn.com

20         mmulligan@gibsondunn.com

21         msava@gibsondunn.com

22

23

24

25
```

Page 3

```
 1    APPEARANCES (Continued):

 2

 3   FOR THE DEFENDANT JOY REID:

 4        JOHN REICHMAN LAW LLC

 5        BY: JOHN H. REICHMAN, ESQ.

 6             DAVID YEGER, ESQ., OF COUNSEL

 7        56 Oakwood Avenue

 8        Montclair, New Jersey 07043

 9        (917) 626-8025

10        john@johnreichmanlaw.com

11        david@yegeresq.com

12

13   Also Present:

14        Justine Beyda, MSNBC

15        Jeffrey W. Nichols, Videographer

16        Gregg Holderman, Concierge

17

18

19

20

21

22

23

24

25
```

Page 4

1                          I N D E X

2

3

4    TUESDAY, AUGUST 17, 2021

5

6    WITNESS                              EXAMINATION

7    ROSLYN LA LIBERTE

8

9        BY MR. BOUTROUS                          10

10

11   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12
                              Page        Line
13
                              234          12
14
                              243          13
15

16

17

18

19

20

21

22

23

24

25

                                              Page  5

```
 1              DEPOSITION EXHIBITS

 2                 ROSLYN LA LIBERTE

 3   NUMBER          DESCRIPTION              IDENTIFIED

 4   Exhibit 33      First Amended Complaint For      20

 5                   Defamation

 6   Exhibit 34      Photograph                       38

 7   Exhibit 35      Audio from interview             51

 8   Exhibit 35A     Transcript of Interview with     57

 9                   Roslyn la Liberte

10   Exhibit 36      Alan Vargas Tweet, 6.28.18       75

11   Exhibit 37      Joy Reid Retweet                 78

12   Exhibit 38      The Washington Post article     109

13   Exhibit 39      Video                           122

14   Exhibit 40      PLAINTIFF 10171 - 76            133

15   Exhibit 41      La Liberte v. Reid Opinion      144

16   Exhibit 42      JR_0000224                      147

17   Exhibit 43      PLAINTIFF 10060                 148

18   Exhibit 44      JR_0000216                      155

19   Exhibit 45      JR_0000155                      160

20   Exhibit 46      JR_0000221                      168

21   Exhibit 47      JR_0000220                      169

22   Exhibit 48      Screenshots of Tweets           172

23   Exhibit 49      Plaintiff's Initial             174

24                   Disclosures, As Further

25                   Supplemented
```

Page 6

| 1  | Exhibit 50 | PLAINTIFF 09999 - 10005            | 180 |
| 2  | Exhibit 51 | PLAINTIFF 00661                    | 184 |
| 3  | Exhibit 52 | Email from Marissa Mulligan to    | 209 |
| 4  |            | gregg@gypsykidproductions.com,    |     |
| 5  |            | 8.17.21                           |     |
| 6  | Exhibit 53 | PLAINTIFF 09966 - 68              | 211 |
| 7  | Exhibit 54 | PLAINTIFF 09971 - 73              | 214 |
| 8  | Exhibit 55 | PLAINTIFF 09976 - 78              | 215 |
| 9  | Exhibit 56 | PLAINTIFF 09981 - 83              | 217 |
| 10 | Exhibit 57 | PLAINTIFF 00811                    | 221 |
| 11 | Exhibit 58 | PLAINTIFF 00812                    | 222 |
| 12 | Exhibit 59 | PLAINTIFF 00813                    | 223 |
| 13 | Exhibit 60 | PLAINTIFF 00815                    | 224 |
| 14 | Exhibit 61 | PLAINTIFF 00816 - 818             | 225 |
| 15 | Exhibit 62 | JR_0000348 - 366                  | 230 |
| 16 | Exhibit 63 | Declaration in Support of         | 239 |
| 17 |            | Defendant's Motion to Revoke      |     |
| 18 |            | the Pro Hac Vice Admission of     |     |
| 19 |            | L. Lin Wood                       |     |
| 20 | Exhibit 64 | Declaration of Plaintiff          | 242 |
| 21 |            | Roslyn La Liberte in              |     |
| 22 |            | Opposition to Motion to Revoke    |     |
| 23 |            | Pro Hac Vice Admission of L.      |     |
| 24 |            | Lin Wood                          |     |
| 25 | Exhibit 65 | Facebook post by Ruth Luevanos    | 251 |

Page 7

1   Exhibit 66      Facebook post by Elsa Aldeguer        255

2   Exhibit 67      Tweet from Chad Loder                 257

3   Exhibit 68      Tweet from Chad Loder                 258

4   Exhibit 69      News article, "Conspiracy             261

5                   Charges Bring Proud Boys'

6                   History of Violence into

7                   Spotlight," 4.9.21

8   Exhibit 70      Rolling Stone article,                264

9                   "Sebastian Gorka, the West

10                  Wing's Phony Foreign-Policy

11                  Guru," 8.10.17

12  Exhibit 71      Facebook post by Roslyn La            267

13                  Liberte, 10.2.17

14  Exhibit 72      Tweet from Chad Loder                 279

15  Exhibit 73      Tweet from Chad Loder                 282

16  Exhibit 74      The State of the Union blog           284

17                  post

18

19              PREVIOUSLY MARKED EXHIBITS REFERENCED:

20

21  EXHIBIT NUMBER                                        PAGE

22  Exhibit 2                                             102

23  Exhibit 10                                            96

24  Exhibit 23                                            81

25  Exhibit 32                                            94

Page 8

1          Brooklyn, New York; Tuesday, August 17, 2021

2                    11:31 A.M.

3

4                    PROCEEDINGS

5          THE VIDEOGRAPHER:  Good morning.  We are going          11:31:01

6   on the record at 11:31 a.m. on August 17th, 2021.

7          This is Media Unit 1 of the video-recorded

8   deposition of Roslyn La Liberte, taken by counsel for

9   Plaintiff, in the matter of Roslyn La Liberte versus Joy

10  Reid, filed in the United States District Court Eastern          11:32:29

11  District of New York.  The case number is

12  18-cv-05398-DLI-VMS.  This deposition is being held

13  virtually via Zoom.

14          My name is Jeff Nichols from the firm Veritext

15  Legal Solutions, and I am the videographer.  The court          11:32:51

16  reporter is Leslie Rosas from the firm Veritext Legal

17  Solutions.

18          Counsel will now please state their appearances

19  and affiliations for the record.

20          MR. BOUTROUS:  Yes.  I'm Ted Boutrous          11:33:02

21  representing Ms. Reid, the defendant, and I will be

22  taking the deposition.

23          MR. OLASOV:  I'm David Olasov of Olasov LLP, and

24  I'm counsel for the plaintiff and the witness.

25          MR. REICHMAN:  I'm John Reichman from John          11:33:20

                                                        Page 9

```
 1   Reichman Law.  I am co-counsel for Defendant Ms. Reid.

 2          MS. MULLIGAN:  Marissa Mulligan from Gibson Dunn

 3   & Crutcher, co-counsel for Defendant Ms. Reid.

 4          MR. YEGER:  David Yeger, David Yeger Law, PLC,

 5   co-counsel for Ms. Reid.                        11:33:40

 6          THE VIDEOGRAPHER:  Thank you.

 7          Will the court reporter please swear in the

 8   witness.

 9          THE REPORTER:  If you would raise your right

10   hand, please, Ms. La Liberte.

11          Thank you.

12          You do solemnly state that the evidence you

13   shall give in this matter shall be the truth, the whole

14   truth and nothing but the truth, so help you God?

15          THE WITNESS:  I do.                       11:34:06

16          THE REPORTER:  Thank you.

17          You may proceed, Counsel.

18          MR. BOUTROUS:  Thank you.

19

20                      EXAMINATION                   11:34:09

21   BY MR. BOUTROUS:

22      Q.  Ms. La Liberte, my name's Ted Boutrous.  Good to

23   meet you.  I'll be taking your deposition today.

24          Have you ever had your deposition taken before?

25      A.  Once before.                              11:34:21
```

Page 10

```
 1          Q.  And in what matter?

 2          A.  It was for my work.  It was a liability issue

 3     for construction.

 4          Q.  What kind of liability issue?

 5          A.  It was where they -- where something fell on one    11:34:34

 6     of the people in the restaurant --

 7          Q.  And so you generally know the rules --

 8          A.  -- a picture.

 9          Q.  I'm sorry.  I didn't mean to interrupt you.

10          A.  I'm sorry.  A picture fell on someone in a          11:34:55

11     restaurant.

12          Q.  Thank you.  So you generally --

13          A.  And -- I'm sorry.

14          Q.  We'll get this down.

15              So let me back up a bit.  Where do you live?        11:35:06

16          A.  I live in Woodland Hills, California.

17          Q.  Where are you now?

18          A.  I'm in Brooklyn, New York.

19          Q.  When did you arrive in Brooklyn?

20          A.  I was here on Friday afternoon.                     11:35:18

21          Q.  Have you been preparing for your deposition with

22     your lawyers since Friday?

23          A.  On and off.

24          Q.  How many times have you met with your lawyers

25     since you arrived in Brooklyn on Friday?                     11:35:30
```

Page 11

```
 1          A.   Three times.

 2          Q.   And the first time was what day?

 3          A.   Friday.

 4          Q.   How long did you meet with your lawyers?

 5          A.   Just David was -- David Olasov, and I met with      11:35:46

 6     him for about three hours.

 7          Q.   Did you review any documents?

 8          A.   Yes, we did.

 9          Q.   Can you remember, sitting here today, any of the

10     documents you reviewed?                                       11:36:00

11          A.   The interrogatories?  Is that the word?

12          Q.   Correct.

13          A.   And the Amended Complaint.  You've got to help

14     me with some of this.  I can't remember things like that

15     sometimes.                                                    11:36:17

16          Q.   Sure.

17               And as we go today, a couple preliminary things,

18     if you want to take a break, that's fine.  Just let me

19     know.  You need to answer affirmatively verbally since

20     we're -- it's being transcribed.  We'll try not to           11:36:29

21     interrupt each other.  It's a little bit difficult on

22     Zoom.

23               You understand you're under oath today?

24          A.   Yes, I do.

25          Q.   And it's the same as being in a court of law?       11:36:40
```

Page 12

```
 1          A.  Yes.

 2          Q.  And that you need to answer truthfully, because

 3     the rules of perjury apply in this just as if you were

 4     testifying in court.

 5              You understand that?                         11:36:51

 6          A.  Yes.

 7          Q.  And are your lawyers in the same room with you

 8     right now?

 9          A.  Just David Olasov.

10          Q.  And is he facing you or --                   11:36:59

11          A.  No.  He's adjacent.

12          Q.  -- are you facing the same direction?

13              MR. OLASOV:  Ted, we're in my dining room.  I'm

14     facing -- I'm facing a set of windows, and Ros is

15     perpendicular to me at the end of the dining room table.  11:37:15

16              MR. BOUTROUS:  Thank you.  I'm picturing it.  I

17     can see part of it, so thank you.

18              MR. OLASOV:  This house was built in 1900, so

19     that -- I want you to have the full picture.

20              MR. BOUTROUS:  I want the full picture.  Thank   11:37:28

21     you very much.

22          Q.  Ms. La Liberte, did you watch any of Ms. Reid's

23     deposition yesterday?

24          A.  No, I did not.

25          Q.  Have you reviewed the -- any of the transcript   11:37:37
```

Page 13

1    of her deposition?

2         A.  No, I did not.

3         Q.  You'll have the opportunity to review your own

4    transcript in this case and make corrections, so I want

5    you to understand that.  And changes, though, can affect          11:37:50

6    your credibility as a witness.  So if you say something

7    today and then change it, that could be -- reflect on

8    your credibility.

9              Do you understand that?

10        A.  Yes, I do.                                               11:38:02

11        Q.  Tell me a little bit about your educational

12   background.  Did you attend college?

13        A.  Yes, I did.  I graduated from UCLA with a fine

14   arts degree in painting, turned graphic arts.

15        Q.  What year?                                               11:38:21

16        A.  1975.

17        Q.  Did you attend graduate school?

18        A.  No, I did not.

19        Q.  Tell me about your company RC Design

20   Construction Associates.  What does it do?                        11:38:31

21        A.  We do design and we do decor, which is the decor

22   in restaurants and construction.

23        Q.  When was it -- when was the company formed?

24        A.  I formed it in 1984.  And that was the beginning

25   of it, yes.                                                       11:38:59

                                                              Page 14

1          Q.  Did you have a job before you formed RC?

2          A.  Yes, I worked for a company -- a company called

3     Envel Design.

4          Q.  Can you say that again?  I didn't quite hear

5     that.                                              11:39:10

6          A.  I worked for a company called Envel.  Like

7     envelop, Envel Design.

8          Q.  Was it engaged in the same sort of business as

9     RC?

10         A.  Mostly decor.                             11:39:18

11         Q.  Got it.

12              And in addition to your -- you're the CEO of

13    your company?

14         A.  Yes, I am.

15         Q.  How many employees do you have?           11:39:33

16         A.  We have two now.

17         Q.  How many employees did you have in 2019?

18         A.  Like, four.  Four.

19         Q.  How about 2018?

20         A.  About seven.                              11:39:46

21         Q.  How about 2017?

22         A.  About six or seven.

23         Q.  Now, in addition to your work as CEO of your

24    company, you've played a significant role in the public

25    debate about immigration in California, haven't you?   11:40:01

                                              Page 15

```
 1            MR. OLASOV:  Objection to the form of the

 2    question.

 3            You can respond.

 4            THE WITNESS:  I didn't -- could you repeat it

 5    please, Mr. --                                    11:40:11

 6       Q.  BY MR. BOUTROUS:  Sure.  You bet.

 7            In addition to your work as CEO of your company,

 8    you've played a significant role in the public debate on

 9    our immigration system in California; correct?

10            MR. OLASOV:  Objection.                   11:40:21

11            THE WITNESS:  No, I did not.

12            MR. OLASOV:  Ros, you're going to have to let me

13    lodge objections as to form, because that -- that's

14    the -- that's -- an objection is waived unless you

15    preserve it.  He asked a second question, so I have to   11:40:33

16    raise my objection.  So you can explain.

17            THE WITNESS:  No.

18            MR. OLASOV:  I think she answered.

19            THE WITNESS:  No.

20       Q.  BY MR. BOUTROUS:  You haven't?  You haven't       11:40:41

21    participated -- you haven't testified at City Council

22    meetings in California?

23       A.  Just as one person, yes.

24       Q.  Why did you think it was important for you to

25    testify at City Council meetings in California on        11:40:55
```

Page 16

1    immigration?

2           MR. OLASOV:  Objection to the form of the

3    question.

4           You may respond.

5           THE WITNESS:  I didn't know what it was about at    11:41:02

6    the first meeting.  I was invited.

7        Q.  BY MR. BOUTROUS:  What was the first meeting?

8        A.  It was in West Covina, and it was a -- SB 4 vote

9    from the City Council of West Covina.

10       Q.  Who invited you to the meeting?                   11:41:20

11       A.  My friend Elsa.

12       Q.  Okay.  What's Elsa's last name?

13       A.  Elsa.  I think it's Aldeguer -- Aldeguer.

14       Q.  And what year was this, that she invited you to

15    the West Covina meeting?                                 11:41:39

16       A.  2018.

17       Q.  How long have you known Elsa?

18       A.  I met her in 2016.

19       Q.  And where did you meet her?

20       A.  I met her at -- in Hollywood and -- in           11:41:54

21    Hollywood.

22       Q.  Was that in 2017, perhaps?

23       A.  No, 2016.

24       Q.  2016.

25           Where did you meet her?                           11:42:10

                                                            Page 17

1        A.  I met her at the -- in Hollywood Boulevard.

2        Q.  And what -- what was the occasion on which you

3    met her?

4        A.  We were carrying flags and campaigning for

5    Donald Trump.                                        11:42:31

6        Q.  So this would have been before the election in

7    November of 2016?

8        A.  Correct, before November.

9        Q.  And who invited you to that event in Hollywood?

10   How did you get there?                               11:42:43

11       A.  What event in Hollywood?

12       Q.  The event at which you met Elsa Aldeguer.

13       A.  It was online.

14       Q.  And do you remember what forum?  Was it

15   Facebook?  Was it -- online how?                     11:43:01

16       A.  An email.

17       Q.  Who emailed you about that event?

18       A.  A woman.  Just a woman that I did not know,

19   named -- I don't even recall her name.

20       Q.  It -- was it during the 2016 presidential      11:43:18

21   campaign that you became interested in the immigration

22   issues as a public policy issue?

23       A.  No.

24       Q.  When did you first become interested in those

25   issues?                                             11:43:33

                                                   Page 18

1          A.  When I went to the meeting in West Covina.

2          Q.  And so Elsa invite you to that meeting in

3     West Covina.  And up until then, you hadn't focused on

4     those issues?

5          A.  Not at all.                                    11:43:47

6          Q.  And you said the West Covina meeting was 2018?

7          A.  Correct.  To the -- to the best of my

8     recollection, yeah.

9          Q.  And that's all you can do.  And I think you said

10    at the beginning that you have trouble remembering          11:43:59

11    things.  Is it for any particular reason?  Are you on any

12    medication?  Or is it just --

13         A.  No, no, no.  I mean, just large words and things

14    like that.

15         Q.  Legal terms?                                     11:44:09

16         A.  Not events and things but just large words.

17         Q.  And if you have any -- if I use a legal term or

18    anything that you don't know the definition, just let me

19    know because I may just do that naturally.

20         A.  Okay.                                           11:44:23

21         Q.  So let's take a look at what -- I'm going to

22    mark this exhibit or have Greg mark it.  It's Tab 13.

23    It's the First Amended Complaint that you filed in this

24    case.  And we'll mark that --

25              MR. BOUTROUS:  I guess, what will our exhibit     11:44:37

                                                          Page 19

```
 1    number be, sir?

 2            MS. MULLIGAN:  Next in order should be 33, Greg.

 3            THE CONCIERGE:  Bear with me a moment, please.

 4            MR. BOUTROUS:  Okay.  Sure.

 5        Q.  While he's looking for -- pulling that exhibit       11:45:44

 6    up, Ms. La Liberte -- ho, here he come.  There we go.  I

 7    see it coming in here.  There we go.

 8            (Exhibit 33, First Amended Complaint For

 9            Defamation, marked for identification

10            electronically by counsel.)                          11:45:52

11        Q.  BY MR. BOUTROUS:  So, Ms. La Liberte, this is

12    the First Amended Complaint in this action that you

13    filed.  Have you reviewed this document?

14        A.  Yes, I have.

15        Q.  Did you review it before it was filed by your       11:46:00

16    lawyers?

17        A.  I don't recall, but probably so, yes.  Yes.

18        Q.  So -- and you understand that when they file a

19    Complaint like this, they're speaking for you.  So

20    whatever they say in the Complaint, it's as though you      11:46:17

21    are saying it in court?

22            MR. OLASOV:  Objection to form.

23        Q.  BY MR. BOUTROUS:  You may answer.

24            You understand that's correct?

25            MR. OLASOV:  Objection to form.                      11:46:27
```

Page 20

```
 1         Q.  BY MR. BOUTROUS:  You may answer.

 2         MR. OLASOV:  You may respond as to what your

 3    understanding is.

 4         THE WITNESS:  Yes, I -- I reviewed the Amended

 5    Complaint.                                        11:46:43

 6         Q.  BY MR. BOUTROUS:  And did you provide any

 7    comments on the Complaint once you reviewed -- did you

 8    get a draft of it and then provide any comments on the

 9    draft?

10         MR. OLASOV:  Objection to the extent that you're  11:46:50

11    asking her to testify about her interactions with the --

12    with her counsel.

13         I direct her not to answer.

14         Q.  BY MR. BOUTROUS:  And, Ms. La Liberte, you

15    understand, though, that the Complaint, when your lawyers  11:47:04

16    file it, it's as though you yourself -- these are your

17    words and your allegations against Joy Reid?  You

18    understand that; correct?

19         MR. OLASOV:  Objection to -- object to form.

20    That actually calls for a legal conclusion as to what  11:47:17

21    those words mean and who's bound by them.

22         I don't think that's actually a correct

23    statement of law, but that's neither here nor there.

24         Q.  BY MR. BOUTROUS:  You may answer,

25    Ms. La Liberte.  What's your understanding?       11:47:30
```

                                              Page 21

```
 1          A.  I read the Complaint.

 2          Q.  But did you understand that it was being filed

 3     on your behalf?

 4          A.  Yes.

 5          Q.  And was it your idea to file the lawsuit?        11:47:40

 6          A.  Yes.

 7          Q.  Did anyone suggest to you that you file a

 8     lawsuit?

 9          A.  No.

10          Q.  How did you connect with Lin Wood?             11:47:54

11          A.  I had a tsunami of phone calls and death

12     threats, and I was very nervous about it, and I Googled

13     "The best attorney for defamation against the media," and

14     his name came up.  It was Sunday morning.

15          Q.  Sunday morning.                                 11:48:28

16              And that would have been what date?  Do you

17     remember?

18          A.  Yeah, it was -- Sunday morning was the 1st of --

19     of July.

20          Q.  Do you remember what time you did that, you     11:48:43

21     Googled his name?

22          A.  6 o'clock in the morning.

23          Q.  When did you reach out to Mr. Wood?

24          A.  6 o'clock in the morning.

25          Q.  How did you reach out to Mr. Wood?              11:48:55
```

Page 22

```
 1        A.  I left the message on his phone system and left

 2    my number, which I had just changed.  So I made two

 3    calls, one with -- with what my message was and one with

 4    the new phone number.

 5        Q.  Okay.  And this was 6:00 a.m. Pacific Time;        11:49:17

 6    correct?

 7        A.  Correct.

 8        Q.  You were at home in Woodland Hills?

 9        A.  Correct.

10        Q.  What time did Mr. Wood respond to your message?    11:49:25

11        A.  I left the message -- I -- I asked a friend to

12    email him and say that I left the message, and he

13    responded to her because I had no email up at that time.

14        Q.  Did you know that Mr. Wood was a supporter of

15    Donald Trump?                                             11:49:51

16        A.  No, I did not.

17        Q.  Was one of the reasons that you supported

18    Donald Trump in 2016 his positions on immigration?

19        A.  No.  I was focused on small businesses, which I

20    was one, and he was pro business.                         11:50:06

21        Q.  So it really wasn't until that West Covina

22    meeting where you became interested in immigration

23    issues?

24        A.  Yes.

25        Q.  Did conversations with Elsa inform your views     11:50:15
```

Page 23

```
 1    about immigration?

 2        A.  We went there, and I had never been to a public

 3    meeting before.  And that's what made me interested in

 4    the public meeting.

 5            I saw a lot of different people, men and women,      11:50:38

 6    with pictures of their sons and daughters, and they were

 7    called angel moms and dads.  And they were there to vote

 8    no on SB54, because they had a problem with criminals

 9    undocumented, mostly -- criminals of all types being

10    released into the general public.  And they were very      11:51:09

11    passionate about it.  And then I -- I was motivated to be

12    on -- be there more than just coming.

13        Q.  What -- going back to your connection with

14    Mr. Wood, which friend reached out to Mr. Wood on your

15    behalf in email?                                           11:51:37

16        A.  Her name was Cindy.

17        Q.  What was her last name?

18        A.  Kahn, K-A-H-N.  Kahn.

19        Q.  And what made her reach out?  Did you ask her to

20    reach out to Mr. Wood for you by email?                    11:51:52

21        A.  Yes, I did.

22        Q.  And where does Cindy live, Cindy Kahn?

23        A.  She's a neighbor.

24        Q.  Is she interested in immigration issues as well?

25        A.  No, not that I know of.  Not directly with me at   11:52:03
```

Page 24

1    all.

2         Q.  Thank you.

3             And you said before you called Mr. Wood on --

4    early in the morning on July 1, you had been -- you said

5    it was a tsunami of phone calls -- let me just repeat.        11:52:22

6             When you referred to that tsunami, what were you

7    referring to?

8         A.  People calling and -- and saying that I was a

9    racist?

10        Q.  And did that -- when did that start?  On           11:52:39

11   July 28th?

12        A.  It started, like, around lunchtime on, like,

13   Pacific Time, that I was getting some calls.  And I

14   didn't know what it was about.

15        Q.  And lunchtime on July 28th?                         11:53:02

16        A.  Yes.

17        Q.  So in addition to the West Covina rally --

18   meeting you attended, you attended a meeting of the

19   Simi Valley City Council on June 25, 2018; correct?

20        A.  Correct.                                            11:53:27

21        Q.  And just to go back, I think I said July 28th.

22   I meant June 28th.

23        A.  June 25th, right, was the -- the meeting?  And

24   June 28th was the first phone calls and emails.

25        Q.  And was it -- was it a tsunami once the phone       11:53:48

                                                          Page 25

```
 1    calls and emails started coming in on June 28, 2018?

 2         A.  No.  It was just a slow dribble of them.

 3    Because I -- I didn't know what it was.

 4         Q.  What do you mean you didn't know what it was?

 5         A.  I didn't know why people were calling me and        11:54:08

 6    being so antagonistic toward me.

 7         Q.  Did you talk with them --

 8         A.  Yes.

 9         Q.  -- the people who called?

10         A.  Yes.  And they would say bad things like bitch.     11:54:18

11    Can I say, "Bitch," on this?

12         Q.  Yes.  You can factually say anything that --

13    that happened to you.

14         A.  "Bitch," and then they would hang up.

15         Q.  Did that continue all through the day on            11:54:34

16    June 28th?

17         A.  My -- my daughter called me and said there was

18    something on the internet and -- and that was provoking

19    some calls.  And I -- and emails.  So I was answering

20    them at this point.                                          11:54:56

21         But it -- it progressively became more than I

22    could answer at that point.  Just, you know, 10, 20, 30.

23    Like that much.

24         Q.  Through the day, it just progressed -- through

25    the day of June 28th, it progressively increased?           11:55:13
```

Page 26

1        A.   Yes.

2        Q.   Now, who did you attend the Simi Valley meeting

3    on June 25 with?

4        A.   Elsa Aldeguer.

5        Q.   Did she invite you to the meeting?              11:55:26

6        A.   She did.

7        Q.   Now, you're not from Simi Valley.  Why did you

8    go to a City Council meeting from some other town?

9        A.   I had gone to a handful of them after

10   West Covina to speak because people were welcome to speak   11:55:41

11   at these meetings.

12           Most -- most people were not from the cities

13   on -- either for SB54 or against it.  They would always

14   have quite a few people attend these meetings.

15       Q.   When you say they would have quite a few people   11:56:08

16   attend the meetings, are you talking about a group?

17       A.   No, no.  I'm sorry.  I'm -- I'm saying the

18   council people.  The council people would invite people

19   to these meetings, and there were people who were pro

20   SB54 and there were people against SB54.  And they were   11:56:29

21   all nationalities and all kinds of people from both sides

22   of the issue.

23       Q.   And going -- going back -- forward to June 28th,

24   can you tell me what your daughter told you about what

25   was happening on the internet, what the post said?  What   11:56:50

Page 27

1    did your daughter tell you on June 28th about what was

2    happening?

3         MR. OLASOV:  Are you asking about the first

4    conversation?  Because I believe there were multiple

5    conversations.  So if you address the first conversation,    11:57:00

6    that's fine.

7         Q.  BY MR. BOUTROUS:  Yes, let's start with that,

8    Ms. La Liberte.

9         In the first conversation, where your daughter

10   told you that there was conversation going on on the    11:57:08

11   internet about you, what did she tell you?

12        A.  She said she saw a photograph on Facebook.  But

13   I was -- I was out of the office and did not get that

14   photograph.

15        Q.  Do you remember what time of day that was when    11:57:29

16   she first told you about a photograph on Facebook?

17        A.  Like around 2:00 or 3:00 in the afternoon.  I --

18   I don't really recall exactly, but I knew it was

19   afternoon.

20        Q.  So the afternoon of June 28?    11:57:43

21        A.  Yes.

22        Q.  And then did you have another conversation with

23   your daughter on that same day about --

24        A.  I came home -- eventually came home.  And she

25   lived with me at that point -- at that time.    11:57:55

Page 28

```
 1          Q.   And what's your daughter's name?

 2          A.   Savannah La Liberte.

 3          Q.   What did she tell you when you arrived home on

 4     June 28th?

 5          A.   She showed me the photo.                        11:58:10

 6          Q.   What was your reaction to the photo?

 7          A.   My reaction to the photo?  Just it was

 8     unbelievable.

 9          Q.   Why was it unbelievable?

10          A.   Because I did not recall that episode at all as  11:58:24

11     far as -- as far as the drama of it.

12          Q.   So three days after it occurred, you did not

13     remember your --

14          A.   No.  No.  I -- I -- I -- I saw the photo, and I

15     did not believe that it was me there in that photo.      11:58:46

16          Q.   But today you don't have any doubt that it was

17     you in the photo; correct?

18          A.   Yes.

19          Q.   Yes, you agree that is you in the photo?

20          A.   I know that's me in the photo, yes.            11:59:02

21          Q.   We'll come back to that.

22               How did your daughter describe the photo to you

23     before you saw it?

24          A.   She said -- she really -- she just wanted me to

25     come home and see it.  She didn't really describe it.  I  11:59:21
```

Page 29

```
1    mean, as far as I can recall, she didn't want to upset

2    me.

3        Q.  Sorry to interrupt you there.  She didn't want

4    to what you?

5        A.  Upset me.                                    11:59:34

6            MR. OLASOV:  Upset her.

7            THE WITNESS:  Upset me, I think.

8        Q.  BY MR. BOUTROUS:  Thank you.

9            So you spoke at the City Council Meeting in

10   Simi Valley; correct?                               11:59:43

11       A.  Yes, I did.

12       Q.  Do you remember what you said -- informally to

13   the City Council; correct?

14           MR. OLASOV:  Excuse me.  Can we have that

15   question read back, please?                         11:59:52

16           (The record was read by the reporter

17           as follows:

18           "QUESTION:  Do you remember what you said --

19           informally to the City Council; correct?")

20           MR. OLASOV:  Formally?                       12:00:02

21           MR. BOUTROUS:  Formally.

22           MR. OLASOV:  Okay.

23           THE WITNESS:  On tape.  It's taped, what I said

24   to the Simi Valley meeting, 1 of 200 people, yes.

25           And I'll tell you what I said.  I -- I        12:00:15
```

Page 30

```
 1    basically spoke about how the local law enforcement and

 2    ICE do not speak to each other when criminals are bailed

 3    out of jail and that I had spoken with the Sheriff of

 4    Ventura County, which is Simi Valley, and he had -- he --

 5    I mean, I had emailed with his office.  I didn't speak to     12:00:46

 6    him directly.  I emailed his office and was told -- was

 7    emailed back the prose of why the sheriff did not want

 8    SB54 to be in his city.

 9         Q.  BY MR. BOUTROUS:  Do you remember who emailed

10    you from the sheriff's office?                               12:01:11

11         A.  Yes, Sheriff Dean's office.  I -- it's in the

12    emails, the name.  I can't recall it right now.

13         Q.  Is that an email you produced to us?

14         A.  Yes.

15         Q.  I'm sorry.                                          12:01:24

16         And why did you feel it was appropriate for you,

17    someone who didn't live in Simi Valley, to be reaching

18    out to the Sheriff's Office of Ventura County to gather

19    information like that?

20         MR. OLASOV:  Objection to the form of the              12:01:41

21    question.

22         THE WITNESS:  I just wanted to be educated on

23    the law enforcement side of that city.

24         Q.  BY MR. BOUTROUS:  And the -- your statements at

25    the City, did you -- did you get any reaction from the      12:01:55
```

Page 31

```
 1    City Council?

 2        A.   Not directly, no.

 3        Q.   Now, going back to June 28th when you first saw

 4    the photo, were there comments made with the photo that

 5    you saw that day?                                        12:02:17

 6        A.   Yes.

 7        Q.   What were the comments?

 8        A.   Something to the effect that things were said at

 9    the council meeting that were against the boy in the

10    photo with me.                                           12:02:33

11        Q.   And was -- do you know that the photo was

12    published in the VC Star?  Is that -- do you remember

13    that?

14        A.   Yes.

15        Q.   And were you identified in the June 28th posts   12:02:47

16    that were made on the internet by name?

17        A.   Yes.

18        Q.   Did people reveal your phone number in those

19    posts?

20        A.   They -- they said my business, my name.  And     12:02:58

21    when you Google my name, my business comes up and all my

22    information comes up.

23        Q.   And that's really how this suit --

24        A.   My name.

25        Q.   I'm sorry I cut you off again.  I'll try to quit 12:03:18
```

Page 32

1   doing that.

2        What was the last thing you said?

3        A.   I said my name was all you needed to get all my

4   personal information.

5        Q.   And is this how the tsunami started?  The people     12:03:31

6   posted your name, the photograph was published on the VC

7   Star, it was posted on the internet?

8        A.   No.  No.  That didn't come until I -- I was

9   shown Joy Reid's post.  And the tsunami started after

10  this.                                                          12:03:52

11       Q.   And when you say "Joy Reid's post," are you

12  taking about her Retweet of Allan Vargas' Tweet?

13       A.   With additional commentaries of Little Rock,

14  Arkansas, and -- and racism is real, to that effect.

15       Q.   We'll come back to that.                             12:04:15

16       And let's go back now to the meeting on June 25,

17  2018.  How long were you at the meeting?

18       A.   I came a little late, and it was just starting

19  and filled to capacity.  So I stood on the side of the --

20  by the walls.  I did not get a seat.                           12:04:41

21       Q.   Do you remember what time you arrived?

22       A.   Like, shortly after 6:00, I'm thinking.

23       Q.   Was the meeting scheduled to start at 6:00?

24       A.   Yes.

25       Q.   And did you ever get a seat at some point?          12:04:57

Page 33

```
 1        A.   At around -- well, Elsa was late as well, and

 2   she stood by me and -- we stood for about two hours

 3   together listening to people giving their opinions.

 4        Then I saw two people get up, and I took her

 5   hand, and I said, "Let's grab those seats."  So we sat      12:05:23

 6   together at some random seats.

 7        Q.   And did you meet Genevieve Peters at that

 8   meeting in Simi Valley?

 9        A.   Not -- not directly.

10        Q.   Did you talk to anyone else at the meeting        12:05:40

11   besides Joey Luevanos?

12        A.   Just random people, but not -- not in

13   conversations, no.

14        Q.   Do you remember anybody's name that you talked

15   to at that meeting, other than Joseph Luevanos and Elsa?    12:05:59

16        A.   Not that I recall.

17        Q.   And I think you've already mentioned you did

18   interact with Joseph Luevanos; correct?

19        A.   Correct.

20        Q.   Do you recall your conversation with Joseph?      12:06:14

21        A.   Yes, I do.

22        Q.   How did it start?

23        A.   He came up to me with his laptop and asked me --

24   and asked me if I could answer a few questions.  And I

25   said, "Sure."                                               12:06:33
```

Page 34

```
 1          Q.  What questions did he ask you?

 2          A.  He said, "How can I -- how can I be -- how can I

 3     be" -- how do I say -- "in favor -- how can I be in favor

 4     of children being separated from their parents?"

 5          Q.  How did you respond to that?                    12:06:58

 6          A.  I said, "I would never be in favor of that,

 7     because my parents during World War II were in Indonesia,

 8     captured by the Japanese, and did not see their families

 9     for three to four years."

10          And he -- he just asked me another question.        12:07:20

11          Q.  What was -- what was his other question?

12          A.  I -- something to the effect of, "This is

13     different.  What about children coming now?"

14          Q.  How did you respond to that?

15          A.  I said -- I said, "It's very sad.  I -- I -- I    12:07:46

16     don't like that either."

17          Q.  And what did he say in response to that?

18          A.  Basically about a friend of his and how terrible

19     it was.  And then he started giving me, like, personal

20     things back -- personal stories back.  Like mine was        12:08:05

21     personal, his was personal.

22          Q.  What did he say about his personal stories?

23          A.  Just something to the effect that his friends

24     are -- are -- are, you know, afraid.  I don't really

25     recall, just the fear of his friends, basically.           12:08:26
```

Page 35

1      Q.  Did you have sympathy for what he was saying?

2      A.  Of course.

3      Q.  You also interacted with Joseph's mother, Ruth;

4  is that correct?

5      A.  Yes.                          12:08:40

6      Q.  Can you describe that interaction for me?

7      A.  Well, what happened was we were talking, her son

8  and I, and it was -- it was a conversation with people

9  standing all around us.

10      And it got -- the level of noise was very high,  12:08:58

11  and -- and we were talking past each on.  He was saying

12  one thing, and I was saying another thing.  And it was

13  hard relating to me because he's so young, and vice

14  versa.  There was a problem relating to each other.

15      And at one point, there was a bailiff, and he  12:09:20

16  said, you know, "Are you okay, ma'am?"  And I said, "Of

17  course.  We're fine.  We're just having a conversation."

18      And then there was a spontaneous hug between

19  Joseph and myself.  And his mother, which I didn't know

20  who she was at the time, was standing right next to me,  12:09:43

21  and -- and she introduced herself as his mother.

22      And I said, "Oh, you're his mom."  And she said,

23  "Yes.  I like to bring him to these meetings -- to

24  meetings where he can see how the city works and -- and

25  SB54."                             12:10:07

Page 36

```
 1              And I asked her if he was her youngest child,

 2      just -- I don't know why.  It just came up.  I said, "Is

 3      he your youngest child?"  And she said no, she had

 4      another child and that was at home.  But I don't remember

 5      if it was a boy or a girl.                          12:10:26

 6          Q.  And do you think it's appropriate -- let me back

 7      up.  Strike that.

 8              You said that you couldn't relate to Joseph --

 9      or he couldn't relate to you because of your age

10      difference; is that correct?                        12:10:39

11          A.  Yes, pretty much so.

12          Q.  What -- what makes you -- what makes you say

13      that?

14          A.  Because I would offer -- offer, like, things

15      of -- of -- of, like, countries and how things -- bad   12:10:58

16      things happen if different countries and that, you know,

17      this is just a point in time, and if -- if we really

18      wanted to solve the issue, we couldn't just have everyone

19      come here, we would have to deal with their countries and

20      maybe put money into their -- their agriculture or       12:11:19

21      farming.

22              And I was -- I was speaking to him as a -- as a

23      person who was a grownup.  You know what I mean?  And I

24      think it was very hard for him to relate.

25          Q.  Do you think it's appropriate for a stranger,    12:11:35
```

Page 37

1    like you at the time with Joseph, to be engaging with a

2    14 year old at an event like that?

3              MR. OLASOV:  Objection to form.

4              But you may respond.

5              I don't know what you mean by "appropriate," but          12:11:50

6    go ahead and respond.

7              THE WITNESS:  I love children, and I -- I found

8    it fine.  I -- I actually teach Junior Achievement.  So I

9    have always been interacting with children.

10             MR. BOUTROUS:  Let's mark as Exhibit 34 what          12:12:15

11   appears at Tab 1, Greg.

12             It's the June 25, 2018, photograph that we've

13   been discussing.

14             (Exhibit 34, Photograph, marked for

15             identification electronically by counsel.)          12:12:53

16       Q.  BY MR. BOUTROUS:  Do you see that up on the

17   screen now?

18       A.  Yes, I do.

19       Q.  Is this the photograph that your daughter showed

20   you when you came home that day, on June 28th?          12:12:59

21       A.  Yes, it is.

22       Q.  Does that, to you, look like a person who's just

23   having a conversation with a child?

24       A.  I was having a conversation with the child, and

25   apparently his mother was right there.  And I -- there          12:13:19

Page 38

 1    were people on all sides talking, and I -- I don't even

 2    think that I was facing Joseph when I did this.

 3          I was -- I was not yelling at him.  I was

 4    saying, "The noise level is so loud.  My throat hurts."

 5    And I put my hand on my throat because my throat was          12:13:51

 6    hurting me.

 7       Q.  Let me ask you, though, what it looks like to

 8    you.  Does it look like an adult having a conversation

 9    with a child?

10          MR. OLASOV:  Objection to the form.                    12:14:06

11          But you may respond.

12          THE WITNESS:  I think -- I think the level of

13    noise was so much that that moment in time was just a

14    snapshot.

15          I -- I know that I wasn't yelling at him,              12:14:23

16    because we had a conversation where we were both elevated

17    levels of speech.  And there is a video that shows that,

18    too.  And the police -- the police bailiff was right

19    there at that moment.

20       Q.  BY MR. BOUTROUS:  Have you had other                  12:14:47

21    conversations with children where a bailiff had to

22    intervene?

23          MR. OLASOV:  Objection to the form, assumes

24    facts --

25          Objection to the form, assumes facts not in           12:14:57

                                                        Page 39

```
 1    evidence, not testified to.

 2         Q.  BY MR. BOUTROUS:  Have you?

 3         A.  The bailiff was not me alone.  The crowd around

 4    us was the bailiff's position to -- to just de-escalate,

 5    not me.  The crowd around me.  He wasn't about me.        12:15:21

 6         Q.  And do you recall describing yourself as looking

 7    like a monster in this photograph?

 8         A.  Yeah, I do.

 9         Q.  You told the Fox News reporter that, "I look

10    like a monster.  If I saw that, I would be upset"; is     12:15:40

11    that correct?

12         A.  Yes.  And I'm sure -- I am sure many people have

13    had photos where they look bad and say something like

14    that.

15         Q.  So you agree you look bad in this photo?         12:15:55

16         MR. OLASOV:  Objection to the form of the

17    question.

18         Q.  BY MR. BOUTROUS:  You agree you look bad in this

19    photo, Ms. La Liberte?

20         A.  It's not my best photo, no.                      12:16:09

21         Q.  Were you embarrassed when you saw this photo?

22         A.  I was surprised.

23         Q.  Were you disturbed?

24         A.  I -- I -- I looked at the caption, and it

25    said -- it said things were said.  And there were other   12:16:23
```

Page 40

1    pictures -- I only got this one picture at that point.

2    This was the only picture.  I was surprised.

3        Q.  You were surprised, but were you worried that

4    people would find you to look like a monster when they

5    saw this photo?                                    12:16:51

6            MR. OLASOV:  Objection.

7            You may respond.

8        Q.  BY MR. BOUTROUS:  Without any words?

9        A.  It's not a --

10           MR. OLASOV:  Did you just modify the question?    12:16:59

11       Q.  BY MR. BOUTROUS:  Let me restate it.

12       A.  Repeat the question.  Repeat the question.

13       Q.  Fair point.  Fair point.

14           Were you concerned that people who saw only the

15   photo, without any words, would find it -- you to look    12:17:13

16   like a monster?

17       A.  I wasn't -- I wasn't thinking about that at that

18   time.  I -- it was -- it was surprising.  That's --

19   that's what it was.

20       Q.  But you agree that a person who came across this    12:17:38

21   photo would have been reasonable in thinking you look

22   like a monster?

23           MR. OLASOV:  Objection.

24           Are you finished with the question?

25       Q.  BY MR. BOUTROUS:  Correct?                    12:17:52

                                                     Page 41

```
 1              MR. OLASOV:  Excuse me.  Are you finished with

 2       the question, Mr. Boutrous?

 3              MR. BOUTROUS:  I am.  I am.

 4              MR. OLASOV:  Objection to the form of the

 5       question.                                              12:17:58

 6           You may respond, Ms. La Liberte.

 7              THE WITNESS:  I know I don't look like that.

 8       And anybody could have a horrible picture taken at any

 9       instant, and that's what I was thinking.  That's a

10       horrible picture.  I don't look like that.  And, boy, was  12:18:15

11       that a bad instant of someone taking that picture.

12       That's what I thought.

13           Q.  BY MR. BOUTROUS:  You don't dispute that the

14       picture -- that the photograph is accurate, do you?

15              MR. OLASOV:  Objection to the form.            12:18:31

16              THE WITNESS:  Accurate of me, what I look like?

17           Q.  BY MR. BOUTROUS:  Correct.

18           A.  I don't think it's accurate of what I look like,

19       no.

20           Q.  You don't think that it accurately depicts what  12:18:40

21       you were doing at that moment that's captured by the

22       photograph?

23           A.  No, I don't.

24           Q.  In what way does it not accurately capture what

25       you were doing?                                       12:18:51
```

Page  42

```
 1              MR. OLASOV:  Objection to the form of the

 2      question; you're arguing with the witness.

 3              But go ahead and respond.

 4              THE WITNESS:  There was a lot of noise.  I was

 5      frustrated because we couldn't talk to each other.  I put    12:19:01

 6      my hand on my throat.  His mother was right there.

 7      People were all right there.

 8              If I was abusing the child or screaming at him,

 9      I think people would have pulled us apart.  No one pulled

10      us apart.  And when I went to go sit down after this         12:19:21

11      whole thing, I asked Elsa for her water, which was almost

12      drank to the bottom, and I drank her water because my

13      throat hurt so badly.

14          Q.  BY MR. BOUTROUS:  Was your throat hurting before

15      the meeting started?                                          12:19:41

16          A.  No.

17          Q.  So it was only hurting because of all your

18      shouting at the meeting?

19              MR. OLASOV:  Objection.

20              You can respond.                                       12:19:49

21              THE WITNESS:  No.  I -- I -- I was talking

22      over -- a large crowd of people around me were talking.

23      I knew that if I continued to do this, my throat would

24      just not be able to talk at all.

25          Q.  BY MR. BOUTROUS:  But that was only because          12:20:15
```

Page 43

1    you'd been shouting and speaking so loudly at the meeting

2    that your throat hurt?

3          MR. OLASOV:  Objection.

4      Q.  BY MR. BOUTROUS:  Is that your testimony?

5      A.  It's not the length of time, it's the -- the --     12:20:25

6    trying to get my point across.  That also added to the --

7    how my throat felt.  Just, you know -- you know, you're

8    trying to do something, and there's too many people

9    talking around you.

10     Q.  You mentioned that you thought that if --          12:20:45

11   that -- you suggested no one came over to break up the

12   event.  Don't you remember the -- a sheriff or a law

13   enforcement officer did come over because it looked like

14   things were getting violent?

15          MR. OLASOV:  Objection.                           12:21:03

16          She's already testified, and that was not her

17   testimony.

18     Q.  BY MR. BOUTROUS:  You may answer.

19     A.  That -- that's not what happened.

20     Q.  Tell me again what happened.                       12:21:11

21          MR. OLASOV:  Asked and answered.

22          THE WITNESS:  I already answered the question.

23          MR. OLASOV:  Go ahead and answer it again,

24   Ms. --

25          THE WITNESS:  There was a large amount of          12:21:20

Page  44

```
 1    people, and it wasn't only us.  And the bailiff was

 2    there.  It's in the -- you can see it in the video if you

 3    have a question.

 4        Q.  BY MR. BOUTROUS:  We'll definitely look at the

 5    video, Ms. La Liberte.                                12:21:34

 6        A.  Please.

 7        Q.  Let me -- let me ask you the -- another

 8    question.

 9            Well, let me just go back, because you --

10        A.  Sure.                                         12:21:42

11        Q.  -- to the question.

12            You agree that someone who saw this photo would

13    be upset; correct?

14            MR. OLASOV:  Objection.  Objection to the form

15    of the question, vague.                               12:21:58

16        Q.  BY MR. BOUTROUS:  You agree that if you -- let

17    me rephrase it to respond to Mr. Olasov's objection.

18            If you had seen this picture -- you would have

19    been upset if you saw this picture of someone else?

20            MR. OLASOV:  Objection.  Asked and answered.   12:22:15

21            Go ahead and answer it again.

22            You know, Ted, if we -- if you keep asking the

23    same questions over and over again and getting the same

24    answers over and over again, we're never going to get

25    beyond this one meeting.  But you're welcome to do that,  12:22:29
```

Page 45

1    I guess, but I don't recommend it.

2            MR. BOUTROUS:  David, the witness is being

3    non-responsive and evasive, and -- and I don't appreciate

4    your speaking objections either.

5            MR. OLASOV:  I -- I beg your pardon.  I don't        12:22:42

6    agree with that, but I've lodged my objection.

7            MR. BOUTROUS:  Thank you.

8            MR. OLASOV:  This is your examination.  You do

9    what you wish.

10       Q.  BY MR. BOUTROUS:  Let me -- let me -- let me go        12:22:51

11   back, since we've been talking, and just give you the

12   question.  You agree with the following quote that you

13   gave to Fox News, quote, "I look like a monster.  If I

14   saw that, I would be upset"; correct?

15       A.  I said that.                                          12:23:08

16       Q.  Do you agree with it today?

17       A.  I have seen other pictures from very important

18   people where they are taken in a moment of time.  And I

19   probably would have said that picture was taken at a very

20   unopportune moment, and I do not look like that.            12:23:35

21           I was surprised.  That was my -- my main

22   feeling, was I was surprised.

23       Q.  So are you retracting what you said to Fox News,

24   quote, "I look like a monster.  If I saw that, I would be

25   upset"?                                                      12:23:55

Page 46

1      A.  No, I did say that.  I did say that.

2      Q.  And you stand by what you said; right?

3      A.  I said it.  It's on tape.

4      Q.  But you stand by it today.  You're not running

5  away from it?                                          12:24:05

6      A.  I do not.  Because I've seen other people with

7  pictures, and I don't want to mention names, but quite a

8  few people with their pictures taken in a moment of time,

9  and they look like monsters.

10         So it was probably not a good choice of words,   12:24:19

11  because now I realize that it was a photograph taken to

12  be and published to look like a monster.

13      Q.  Do you know who took the photograph?

14      A.  It was -- it's written on the VC Star who took

15  the photo.  I don't know him, no.  Personally, no.  Even  12:24:42

16  I don't recall the name.

17      Q.  What were you screaming at Mr. Luevanos here?

18  What were you saying?

19         MR. OLASOV:  Objection to the form, compound.

20  And part of it's inconsistent with the testimony.         12:25:04

21         Go ahead and respond.

22         THE WITNESS:  Yes.

23         I -- when someone grabs their throat, sometimes

24  nothing comes out of their mouth, they're just saying, "I

25  can't talk."  They are not screaming.                     12:25:21

Page 47

| | |
|---|---|
| 1 | If I was screaming at him, the people around us |
| 2 | would have -- would have pulled us apart.  You see the |
| 3 | video, you see his mother is just casually standing |
| 4 | there, probably just going -- you know, they're just |
| 5 | engaging in a conversations.                          12:25:42 |
| 6 | Q.  BY MR. BOUTROUS:  Ms. La Liberte, I'm not asking |
| 7 | you to interpret -- |
| 8 | A.  Yes. |
| 9 | Q.  -- the events for me.  I'm just asking you the |
| 10 | factual point -- the factual question.               12:25:52 |
| 11 | A.  I -- |
| 12 | MR. OLASOV:  I lodge my objection to the preface |
| 13 | to your question.  Please ask the question. |
| 14 | MR. BOUTROUS:  I will.  Thank you. |
| 15 | MR. OLASOV:  You're welcome.               12:26:05 |
| 16 | Q.  BY MR. BOUTROUS:  Is it your testimony that in |
| 17 | this photo, you were not saying anything? |
| 18 | A.  No, I -- I can't tell you yes or no.  But I |
| 19 | believe that if I was screaming at him, it would have had |
| 20 | a different outcome.                          12:26:25 |
| 21 | Q.  That's not -- I'm sorry.  Go ahead. |
| 22 | A.  A different outcome.  I am saying that we were |
| 23 | talking loudly.  And at this moment, it just became |
| 24 | intolerable with the ambient noise level and people |
| 25 | around us.  And I -- I just said, "I can't talk anymore."   12:26:45 |

Page  48

1          Q.   That wasn't my question, I respectfully submit.

2               Is it your testimony that in this photo, you are

3     not saying anything to Joseph Luevanos?   "Yes" or "no"?

4          A.   I do not know.   I do not know.   Knowing myself,

5     it is -- it could -- it is possible, very possible, that        12:27:15

6     I just was saying, "I can't talk anymore."

7          Q.   So your testimony is that from the time you

8     arrived at the meeting, a little after 6:00, to this

9     moment, your throat hurt so badly that you would be

10    making this gesture to show that you were in such pain?        12:27:35

11    That is your testimony?

12               MR. OLASOV:   Objection.

13               Let's have that question read back, because I

14    think you've mischaracterized the testimony.   But I want

15    to hear it read back before I lodge that objection.            12:27:49

16               MR. BOUTROUS:   That's fine.

17               (The record was read by the reporter

18               as follows:

19               "QUESTION:   So your testimony is that from the

20               time you arrived at the meetings, a little after

21               6:00, to this moment, your throat hurt so badly

22               that you would be making this gesture to show

23               that you were in such pain?   That is your

24               testimony?")

25               MR. OLASOV:   Objection.   That really            12:28:19

Page  49

```
 1   misconstrues the prior testimony.

 2            I want to note for the record that

 3   Mr. Boutrous --

 4            MR. BOUTROUS:  Noted.

 5            MR. OLASOV:  -- has been examining the witness    12:28:28

 6   awhile and took a drink of water so that his own throat

 7   would be relieved.  So I think that's a fair observation.

 8            Go ahead and ask another question.

 9       Q.  BY MR. BOUTROUS:  Can you answer the question?

10            MR. OLASOV:  Do you know what the question is?    12:28:57

11            THE WITNESS:  No.

12            MR. OLASOV:  So read back the question.

13            And then respond to it.

14            (The record was read by the reporter

15            as follows:

16            "QUESTION:  So your testimony is that from the

17            time you arrived at the meetings, a little after

18            6:00, to this moment, your throat hurt so badly

19            that you would be making this gesture to show

20            that you were in such pain?  That is your

21            testimony?")

22            MR. OLASOV:  Objection to the form.

23            Go ahead and respond.

24            THE WITNESS:  I just couldn't speak anymore.

25   That's what it was.  I could not speak anymore.  It was    12:29:32
```

Page 50

1    too loud, there was too many people, and I just couldn't

2    speak anymore.  And that was basically the end of our

3    conversation.

4        Q.  BY MR. BOUTROUS:  So this was a symbolic gesture

5    that you were making for Joseph Luevanos and others to          12:29:51

6    demonstrate that you could no longer speak?

7            MR. OLASOV:  Objection to the form of the

8    question.

9            You may respond.

10           THE WITNESS:  I don't know symbolic or not.  I          12:30:03

11   just couldn't talk anymore.

12       Q.  BY MR. BOUTROUS:  Isn't it true that you have

13   described your -- this photo as an explosion -- you

14   engaging in an explosion?

15       A.  No.                                                     12:30:18

16       Q.  Isn't it true that you've described what you're

17   doing in this photo as yelling at Joseph Luevanos?

18       A.  No.  No.

19       Q.  Let's go to -- let's mark as Exhibit 34 -- I

20   believe it will be Tab 12.                                      12:30:36

21           THE CONCIERGE:  I believe it would be 35.

22           (Exhibit 35, Audio from interview, marked for

23            identification electronically by counsel.)

24           MS. MULLIGAN:  Ted, do you want the video or the

25   audio?  I mean the audio or the document?                       12:30:46

                                                            Page 51

1          MR. BOUTROUS:  Let's go with the audio.

2      Q.  And, Ms. Luevanos, this is an interview that you

3  did with a man named Tony Aaron.  Do you -- we're about

4  to play some of the audio from it.  Do you remember an

5  interview with Tony Aaron?                          12:31:10

6      A.  I -- I never listened to it ever.

7      Q.  But do you remember doing the interview?

8      A.  I remember someone asked me if they could

9  interview me in my office, and the phone was ringing and

10  ringing, and I was doing an interview, having just not --   12:31:32

11  yes, I did.  I don't want to call it an interview.  He

12  was asking me questions.

13      Q.  And he was a journalist; correct?

14      A.  That's what he said, but I don't know from who

15  or from where.                                       12:31:51

16      Q.  I'm going to play a clip from the audio of your

17  interview with Mr. Aaron.

18          THE CONCIERGE:  For the record, this is

19  Exhibit 35.

20          MR. BOUTROUS:  Thank you.                   12:32:03

21          MS. MULLIGAN:  Ted, do you want him to go to a

22  specific time?  Do you want to start at 6:22?

23          MR. BOUTROUS:  Yes, that would be great.

24          Mr. Holderman, if you can go to 6:22 -- yeah,

25  6:22 time stamped.                                   12:32:16

                                              Page 52

| | |
|---|---|
| 1 | We're putting our concierge to the test here. |
| 2 | MR. OLASOV:  Do you have anything to |
| 3 | authenticate this document from which you are proposing |
| 4 | to claim snippets? |
| 5 | MR. BOUTROUS:  We -- we -- I'm just going to    12:32:38 |
| 6 | go ahead and play it, and you can -- and see what |
| 7 | Ms. La Liberte has to say about it. |
| 8 | MR. OLASOV:  So you want to play snippets rather |
| 9 | than play the whole thing for her? |
| 10 | MR. BOUTROUS:  It's an hour -- it's an hour    12:32:51 |
| 11 | long.  But I do have a transcript that I will -- I will |
| 12 | present to Ms. La Liberte. |
| 13 | Let's go ahead and play that place. |
| 14 | (Audio played.) |
| 15 | MR. AARON:  -- picture was taken.  Which part of    12:33:01 |
| 16 | your positivity is -- is being expressed by what you're |
| 17 | doing in the picture? |
| 18 | MS. LA LIBERTE:  That was wrong. |
| 19 | MR. AARON:  Which part?  Because when I -- |
| 20 | MS. LA LIBERTE:  That was wrong to be yelling.    12:33:19 |
| 21 | That was wrong. |
| 22 | MR. AARON:  But -- but -- |
| 23 | MS. LA LIBERTE:  It felt like everyone was |
| 24 | attacking me. |
| 25 | MR. AARON:  You weren't just yelling.  That was    12:33:25 |

Page 53

1    a -- that was a threatening posture you were taking.  It

2    wasn't yelling in defense.  You weren't running away.

3            MS. LA LIBERTE:  No.  But I -- it really wasn't

4    horrible like it shows, honestly.  It wasn't this

5    horrible.                                          12:33:40

6            MR. AARON:  Why was there a need for you to be

7    choking -- what was the choking of the neck in reference

8    to?

9            MS. LA LIBERTE:  My throat was hurting me."

10           (Audio ends.)                              12:33:49

11           THE WITNESS:  I what?

12           MR. BOUTROUS:  Pause right there, Mr. Holderman.

13           MR. OLASOV:  Excuse me.  She asked what was

14   being said.  The audio is not that good, and she's -- so

15   she said -- what do we say?  The -- I think it was --    12:34:01

16           THE WITNESS:  What --

17           MR. OLASOV:  -- that, "My throat is hurting me."

18   That's what you said there.

19           MR. BOUTROUS:  I believe that's correct.

20      Q.  And we can play the clip again for you, if you    12:34:08

21   would like.

22           MR. OLASOV:  You said, Ted, you have a

23   transcript.  It might be easier if you mark the

24   transcript, and she can follow -- follow the two of them.

25   I'm not --                                          12:34:24

Page 54

```
 1              MR. BOUTROUS:  We will do -- we will do that.

 2    That's fine.

 3              MR. OLASOV:  That would be -- that would be a

 4    better way to make sure that she follows what's being

 5    said.                                              12:34:34

 6              MR. BOUTROUS:  That's fine.  Let me just ask a

 7    few questions.

 8         Q.  Was that your voice on that recording,

 9    Ms. La Liberte?

10         A.  On the phone, yeah.                       12:34:40

11         Q.  That was you.

12              And that -- that was you talking about

13    Mr. Aaron; correct?

14         A.  Yes.  But I don't --

15         Q.  I -- "yes" or "no"?                       12:34:52

16         A.  Yes, it was.  Yes.

17         Q.  And you said to him it was wrong to be yelling

18    at Mr. -- at Joseph Luevanos; correct?  "Yes" or "no"?

19         A.  It was --

20              MR. OLASOV:  Objection.  Objection.  I don't  12:35:01

21    think it's clear what her testimony is and the way she --

22              MR. BOUTROUS:  Mr. Olasov, I -- you can make

23    your objections, but please don't try to explain to the

24    witness how to evade what she said on that interview.

25              MR. OLASOV:  I -- you're -- you're welcome to  12:35:18
```

Page 55

```
 1    make any speeches you want.  I suggest that you give her

 2    a transcript so that she can see what's said in context.

 3    You're -- you don't want to do it, you don't have to do

 4    it.  But then you run the risk, which I think you're

 5    embracing now, of mischaracterizing both the tape and her      12:35:34

 6    testimony when you do them separately.  And I object to

 7    it.

 8              MR. BOUTROUS:  Objection noted.  Objection

 9    noted.

10         Q.  And, Ms. La Liberte, my question --                   12:35:45

11         A.  I was not yelling at him.  It's -- I said it was

12    wrong to be yelling.  Just yelling.  There were so many

13    people around us.  I was not yelling at him.  I never

14    yelled at him.  I talked a -- loud enough to where he

15    could hear me.  He was not listening to me.  And we -- he      12:36:08

16    was yelling or talking loud back.

17              So that was the process going on.  If his mother

18    would have at any point thought that I was yelling at

19    him, I think she would have come between us.  I would not

20    yell at him.                                                   12:36:29

21              I have grandchildren and children.  And

22    sometimes they do not listen to you, and then you say, "I

23    can't talk anymore to you because you're not listening,

24    and we're going nowhere."  That was it.

25         Q.  So your testimony is you were not yelling at          12:36:48
```

Page 56

```
 1    Joseph Luevanos; correct?

 2         A.  Yes.

 3         Q.  "Yes" or "no"?

 4         A.  Yes.

 5         Q.  Not even for a minute?                        12:36:55

 6         A.  Yes.

 7         Q.  Not even for a second?

 8         A.  Yes.

 9              MR. BOUTROUS:  Let's do go to the transcript,

10    Mr. Holderman.                                         12:37:08

11              MR. OLASOV:  I don't want to interrupt you.

12              MR. BOUTROUS:  Please don't interrupt.

13              MR. OLASOV:  I just want to know whether what

14    you've marked is this entire interview, so that it's --

15    so that that's now, for whatever it's worth, part of the  12:37:20

16    record.

17              MR. BOUTROUS:  Correct.

18              And I'm now going to mark -- Mr. Holderman,

19    perhaps we mark the transcript as 35A.  Does that make

20    sense?                                                 12:37:30

21              (Exhibit 35A, Transcript of Interview with

22              Roslyn la Liberte, marked for identification

23              electronically by counsel.)

24         Q.  BY MR. BOUTROUS:  And then I'd like to go to

25    page 25 of the transcript.                             12:37:38
```

Page 57

```
 1          MR. OLASOV:  Can we have a representation on the

 2     record, because you're calling it a transcript, if it's

 3     not a document you've produced in this proceedings before

 4     now?  So this is -- this is not -- this is not part of

 5     the production up to now, and I should have -- since it        12:38:10

 6     hasn't been authenticated, it's not -- doesn't seem to be

 7     a formal transcript.  You might make a representation

 8     about how it's prepared.

 9          MR. BOUTROUS:  Yeah, this is a transcript

10     that -- that we prepared based on the audit tape.  And my      12:38:27

11     colleague, Ms. Mulligan, can correct me if I'm wrong, but

12     we have the audio, and we have this transcript that --

13     that we prepared.

14          Ms. Mulligan, do I have that correct?

15          MS. MULLIGAN:  That is correct.                           12:38:40

16     Q.  BY MR. BOUTROUS:  So here on page 25,

17     Ms. La Liberte, the transcript says, "I'm speaking to

18     many people on the phone."

19          Hold on.  So let me just read you this whole

20     paragraph.                                                     12:38:56

21     A.  Yes, please.

22     Q.  "I'm speaking to many people on the phone,

23     talking and learning, and everything is good.  And -- I

24     am -- I am -- you want to hear my friend here?  Hold on.

25     Speaker.  So, yeah, I'm on the phone with Tony" -- so          12:39:05
```

Page 58

```
 1    Tony Aaron -- "and just talking about white privilege and

 2    how I have no -- I don't see from the other side.  And I

 3    was yelling at the boy for a minute.  And I did

 4    apologize, and I have been."

 5            Do you see that, "I was yelling at the boy for a     12:39:20

 6    minute"?

 7            So you said to Mr. Aaron -- you said in this

 8    discussion you were yelling at the boy for a minute;

 9    correct?

10        A.  This was very early in the morning.  There          12:39:32

11    was --

12        Q.  That's not my question.

13        A.  I'm answering your question, Mr. Boutrous.  It

14    was very early in the morning.  Many people were calling

15    me.  I -- I -- just saying, "You yelled.  You yelled."     12:39:47

16    And I wasn't sure what was going on.

17            In fact, at that moment, I said, "You talk to

18    each other."  I went to the bathroom in the middle of

19    that.  I actually went to the bathroom and came back.

20    Okay?                                                       12:40:07

21            Because it was just too overwhelming.  So when I

22    said, "Just talk to each other," that means there were so

23    many phone calls going.  I put my cell phone to the other

24    phone and said talk to each other.

25            So I -- all my -- all I wanted to do was go to      12:40:24
```

Page 59

1   the bathroom.  That was on my mind.

2       Q.  And that definitely did not answer my question.

3   Here's my question:  Did you say to Mr. Aaron, quote, "I

4   was yelling at the boy for a minute, and I did apologize,

5   and I have been," closed quote?  Did you say that to him?    12:40:43

6       A.  I don't know.  I really don't know.

7       Q.  Do you want -- would it help you if I played the

8   audio, to refresh your recollection?

9       A.  If -- I was not in the state of mind at this

10  point to be coherent and to remember anything.  Because I    12:41:07

11  was very scared.  I was afraid.  I was hoping that

12  Tony Aaron would help me with this issue.

13          So I was just -- I didn't know what to say or

14  what to do.  I was actually asking Tony to help me.

15  And -- and -- and that was -- that was the gist of the      12:41:34

16  conversation, Mr. Dunn -- I mean, Mr. Boutrous.  I'm

17  sorry.

18      Q.  Boutrous.  You elevated me to be a named partner

19  in my firm.  Thank you.

20      A.  I'm sorry.                                           12:41:45

21          MR. OLASOV:  It may happen still.

22      Q.  BY MR. BOUTROUS:  Do you -- do you deny that you

23  said this to Mr. Aaron, that you were, quote, "Yelling at

24  the boy for a minute.  And I did apologize, and I have

25  been," closed quote?  Do you deny that you said that?       12:41:59

Page 60

1    "Yes," "no" or "I don't know"?

2        A.   If -- if it says so and you hear me saying it, I

3    have to say yes.  But that's not -- that's not -- that

4    was taken as, like, over a phone.

5            I -- I -- I don't know, you know.  I was just          12:42:23

6    very frightened by people calling me and saying things.

7    I was not in the state of mind to be -- I wanted it to

8    end.  I -- I just was saying things to make it end,

9    Mr. Boutrous.  It was -- just wanted it stopping, to

10   stop.                                                          12:42:46

11       Q.   I -- I understand.  And you said this was very

12   early in the morning.  And that would have been on

13   June 29 --

14       A.   29 --

15       Q.   -- 2018; correct?                                     12:42:55

16       A.   Yes.

17       Q.   So do you remember what time it was?

18       A.   I would say around 10:00 or so.  I don't know.

19       Q.   So just to clarify, around 10:00 a.m. on

20   June 29th?                                                     12:43:09

21       A.   Yes.

22       Q.   Thank you.

23            Just not to -- let me just ask a couple more

24   questions about this.

25            Mr. Aaron says, "Volcanos are full of magma, and     12:43:17

Page 61

```
 1    when they explode, magma comes out.  Do you see?  Do you

 2    see what I'm saying?  Okay, so what comes out of you when

 3    you explode is no less than you when you're calm."

 4          And that's -- that was the question that he

 5    asked you, to which you responded, "I was yelling at the      12:43:34

 6    boy for a minute.  And I did apologize, and I have been";

 7    correct?

 8       A.  You know, you know, you know -- what is he

 9    talking about?  He's doing a poetic literary thing.

10    I'm -- I'm, like -- want out of this whole mess,               12:43:58

11    conversation.  And that's what it is.

12          You can read everything you want into it.  I --

13    I was not in the state of mind to have a conversation

14    with someone talking about volcanos and magma.

15       Q.  Let's go back to page 12 of the transcript.  I         12:44:19

16    think -- well, let me strike that.

17          You see he's talking about an explosion;

18    correct?  In his question; right?

19          MR. OLASOV:  Objection.  I mean, this is really

20    improper procedure.  You don't have a transcript that's       12:44:35

21    been certified.  You haven't played the document for the

22    witness.  You're asking her questions from a transcript

23    that you yourselves prepared.  I mean, this is really

24    objectionable as to form.

25          And, you know, in order not to interfere with           12:44:51
```

Page 62

1    what you're doing, may I have a continuing objection to

2    lines of questions based on a transcript that you haven't

3    recorded, you haven't played for the witness, and the

4    transcript that you prepared?

5          MR. BOUTROUS:  Absolutely.  You have a standing          12:45:09

6    objection.  I appreciate that.  That will make it go more

7    quickly.

8          MR. OLASOV:  Yes.

9          Q.  BY MR. BOUTROUS:  So back to my question.

10         A.  See, see, if you read this, he's trying to be my          12:45:16

11   friend.  He's trying to be my friend here and this and

12   that.  And then he just accuses me of stuff.

13         So it's very misleading, what he's doing.  I do

14   not really want to engage in any questions and answers

15   about this myself, because I don't remember it, and I          12:45:35

16   don't -- I wasn't in the state of mind to actually know

17   it, and I left the room a few times, so --

18         Q.  I understand.

19         A.  I'm not -- I never listened to it, and this is

20   the first I'm seeing it.          12:45:54

21         MR. BOUTROUS:  Mr. Olasov, I do want to clarify,

22   we did produce the audio of this interview during

23   discovery.  I'm almost positive.  I don't believe we --

24   we did the transcript to try to make things go more

25   easily, but you have this audio.  My colleagues can          12:46:09

Page 63

```
 1    correct me if I'm wrong on that.

 2              MS. MULLIGAN:  That's correct, and I have the --

 3    I can give you the Bates Number now or later, if you need

 4    it.  But it has a Bates.

 5              MR. OLASOV:  All right.  Well, if you --          12:46:20

 6              MR. BOUTROUS:  So your objection is --

 7              MR. OLASOV:  You have a transcript without

 8    certification.

 9              MR. BOUTROUS:  Correct.

10              MR. OLASOV:  This is a document you couldn't use   12:46:30

11    in court.  You can't use it to cross-examine somebody in

12    court, and you're doing that now.  And that's what my

13    objection is.

14              I have no way of knowing whether this is

15    accurate or not accurate, and it's --                      12:46:45

16              MR. BOUTROUS:  Your objection is preserved.  I

17    understand.  I hear what you're saying.  I disagree with

18    it, but that will help us move forward.  No need to

19    restate the objection that you -- your standing objection

20    stands.                                                    12:46:58

21              MR. OLASOV:  Okay.  Okay.

22              MR. BOUTROUS:  So to proceed, let's --

23         Q.  Now, just -- all I want is a yes-or-no answer,

24    Ms. La Liberte.  You see --

25              MR. OLASOV:  You'll get what you will.           12:47:09
```

Page 64

```
1          Q.  BY MR. BOUTROUS:  -- Mr. Aaron is talking about

2     when -- when a volcano explodes; correct?  In the

3     question right above the highlighted portion; correct?

4          A.  It's too literary for me to respond to.  It's

5     too poetic.  I -- I -- I'm not -- I'm not in the -- I'm      12:47:27

6     not -- his idea of a volcano and my idea of a volcano are

7     two different things.  I'm not going to respond to that.

8          Q.  Ma'am, you're required to respond to my

9     questions unless there's privilege.

10         A.  Okay.                                               12:47:43

11         Q.  Do you see the word "explode" in that question?

12         A.  Correct.  Yes, I do.

13             MR. BOUTROUS:  Okay.  Let's go to page 12 of the

14     transcript, please.

15             Let's see here if we can find this.  If you can      12:48:06

16     just find the highlight for me.

17             MS. MULLIGAN:  It's right at the bottom of the

18     page, the last Roslyn La Liberte line.

19             MR. BOUTROUS:  Thank you.  Yeah, it's kind of --

20     yeah, if we can scroll down a bit.  Thank you.             12:48:29

21         Q.  So he says -- Mr. Aaron says --

22             MR. OLASOV:  One second, please.

23             MR. BOUTROUS:  Sure.

24             MR. OLASOV:  Give me a second.

25             THE WITNESS:  Those were his words.               12:48:46
```

                                                     Page 65

1          Q.  BY MR. BOUTROUS:  Not right above them.

2     Ms. La Liberte, do you see, "Roslyn La Liberte"?

3               MR. OLASOV:  Give me a second.  I just want to

4     read.

5               MR. BOUTROUS:  Sure.  Go ahead.  Both of you        12:48:59

6     take your time.  And if you want to read page 12, that's

7     fine.

8               MR. OLASOV:  That's what I'd like to do.

9               MR. BOUTROUS:  Go ahead.  We can scroll down so

10    you have the whole page.                                      12:49:11

11              MR. OLASOV:  I can't scroll -- I just can't

12    control it, apparently.  You're controlling it.

13              MR. BOUTROUS:  Yes, Mr. Holderman, if you could

14    scroll back up to the top of page 12 so that both

15    Ms. La Liberte and Mr. Olasov can read the whole page.        12:49:21

16              MR. OLASOV:  Could you go to the preceding page,

17    please, Mr. Holderman?

18              MR. BOUTROUS:  And you both take your time and

19    read whatever you need to read.

20              THE WITNESS:  I feel -- go ahead.  Go ahead,         12:49:34

21    David.

22              MR. BOUTROUS:  And just let us know when you

23    need us to scroll down.

24              MR. OLASOV:  Scroll down a little bit, please.

25              MR. BOUTROUS:  Okay.  Continue scrolling,            12:50:47

                                                          Page 66

```
 1    please.

 2            MR. OLASOV:  Continue scrolling down.

 3            Continue scrolling down.

 4            Continue scrolling down, please.

 5            A little more, please.                        12:52:45

 6            MR. BOUTROUS:  Okay.  May I proceed with my

 7    examination?

 8            MR. OLASOV:  Yes, surely.  I just want to lodge

 9    another objection, which is that you're taking these

10    questions -- taking these quotes and responses out of    12:53:09

11    context.

12            MR. BOUTROUS:  Noted.

13            So let's go back to the bottom of page 12,

14    please.

15        Q.  So you see the back-and-forth with Mr. Aaron.    12:53:23

16    He says, "Not the -- do you see what I'm saying?"

17            And then Roslyn La Liberte says, "And even

18    though -- even though it was just an explosion and" --

19            Then he says, "Well, so I asked you -- let me

20    ask you a little question.  When things explode, what    12:53:45

21    comes out of the explosion?"

22            So you agree, you called your interchange with

23    Joseph Luevanos an explosion; correct?

24            MR. OLASOV:  Objection to the form of the

25    question.                                              12:54:01
```

Page 67

1           THE WITNESS:  He -- he said it was that, and

2    I --

3           MR. OLASOV:  I don't think that's the question.

4           MR. BOUTROUS:  That's not the question.

5       Q.  You say, "Even though it was just an explosion";    12:54:09

6    correct?

7       A.  The photo was -- the photo was --

8           MR. OLASOV:  Objection to the form of the

9    question.

10          I don't think -- I think you have a sentence    12:54:21

11   fragmented, Ted, and I'm not trying to belabor this.

12          MR. BOUTROUS:  Why don't we do this:  Let's play

13   the audio -- the audio so Ms. La Liberte and Mr. Olasov

14   can hear what Ms. La Liberte says, please.

15          And the time --                                12:54:40

16          MR. OLASOV:  Is this --

17          MR. BOUTROUS:  This is something we produced to

18   you in discovery.  It's at timestamp 26:30.

19          MS. MULLIGAN:  26:30.

20          MR. BOUTROUS:  And for the court reporter, I'm    12:54:59

21   thinking we'll take a break at 10:00 a.m. Pacific,

22   1:00 p.m., in six minutes, if that works.  And for the

23   videographer.

24          THE REPORTER:  That's fine.

25          MR. OLASOV:  That's fine.  Absent personal    12:55:16

Page 68

```
 1    convenience, I do not believe in interrupting counsel's

 2    questions.

 3             MR. BOUTROUS:  Thank you.

 4             MR. OLASOV:  Can you -- can you get us the

 5    transcript of this, so we can follow this?              12:55:25

 6             MR. BOUTROUS:  Sure.  You have it available on

 7    the document share.  So when we post them, you now have

 8    it on --

 9             MR. OLASOV:  I mean now.  So we can follow this

10    while you're playing this thing.                        12:55:38

11             MR. BOUTROUS:  Oh, I see what you're saying.

12             MS. MULLIGAN:  Right.  So if you open up your --

13    if you open up your Exhibit Share, you would be able

14    to -- right now you could open up the transcript and

15    follow it side by side.                                 12:55:48

16             MR. OLASOV:  How do I do that?  Maybe Greg can

17    tell us how to get me to Exhibit Share, or you can put

18    Exhibit Share up on the screen, and then unfortunately --

19    from the background.  I don't have to follow a dot going

20    across the screen.                                      12:56:06

21             MR. BOUTROUS:  Well, if you don't mind, I would

22    like to play the audio tape so my examination is not

23    interrupted.

24             And I think we need to go back just a little

25    bit, Greg, to -- yeah, let's see.  So it's -- if we go to  12:56:15
```

Page 69

```
 1    26:30, you've got it -- yeah, that's what?  25:32, if I'm

 2    seeing this correctly.  Perfect.

 3          Let's play that, and then we'll address

 4    Mr. Olasov's request.

 5          (Audio played.)                              12:56:31

 6          MR. AARON:  -- when you did this one thing makes

 7    everything okay.  That's not, as I -- you know, to quote

 8    an ill-used phrase, that's not fair and balanced, that's

 9    not realistic.  Do you know what I mean?

10          MS. LA LIBERTE:  Hello?                       12:56:39

11          MR. AARON:  And you -- like I said, you've done

12    a disservice because you genuinely believe it is.

13          MS. LA LIBERTE:  Someone else got on the phone.

14    If you want to listen in, I don't mind.  Okay?

15          Are you there, Tony?                          12:56:42

16          MR. AARON:  Yeah, I'm still here.

17          MS. LA LIBERTE:  Another listener.  So I

18    understand what you're saying, that I have to own it

19    because I wore it, even though I -- I immediately told

20    myself --                                            12:57:08

21          MR. AARON:  It's bigger than that --

22          MS. LA LIBERTE:  I'm filling the other person

23    in about it.

24          MR. AARON:  I'm saying you have to own who you

25    are that lead to these actions.  Not own the actions.   12:57:19
```

Page 70

1    People aren't calling you because of the actions.

2    They'll never tell you this.  They're calling you because

3    of your personage.  Who you are as a human being is

4    encapsulated in the actions caught in the photo.  Not --

5           MS. LA LIBERTE:  Okay.                          12:57:37

6           MR. AARON:  Do you see what I'm saying?

7           MS. LA LIBERTE:  And even though -- even though

8    it was just an explosion and --

9           MR. AARON:  Well, but what -- what -- so I asked

10   you -- let me ask you a literal question.  When things    12:57:47

11   explode, what comes out of the explosion?

12          (Audio ends.)

13          MR. BOUTROUS:  Let's just pause right there.

14       Q.  So, Ms. La Liberte, I'm going to state my

15   question.  Mr. Olasov, all your objections are noted for   12:58:03

16   the record.  You called what you did and what's captured

17   in the photo an explosion; correct?

18          MR. OLASOV:  Objection.

19          MR. BOUTROUS:  "Yes," "no" or "I don't know"?

20          THE WITNESS:  I think --                         12:58:16

21       Q.  BY MR. BOUTROUS:  "Yes," "no" or "I don't know"?

22       A.  I don't know.  I don't know.

23       Q.  So hearing those words, you don't know that you

24   used the word "explosion"?

25       A.  He used the word "explosion."                   12:58:25

Page 71

```
 1          Q.  No, you used the word "explosion."

 2          A.  I was just agreeing with him, because I just

 3     wanted to get out of the conversation.  I have no idea

 4     what I was talking about at that moment.  Magma and

 5     artistic liabilities and you're a racist and you're this.    12:58:41

 6     I just wanted -- I just wanted it to end.  That's my --

 7     that's what I'm saying.  I'm sorry.

 8              I never listened to that conversation again,

 9     because it was at one of the lowest parts of my life.

10          Q.  Why did you keep talking with Mr. Aaron?  Why    12:58:58

11     didn't you just hang up?

12          A.  I wanted someone to help me, and I was grasping

13     at anybody who I thought would help me.

14          Q.  Would it surprise you if I told you -- well, you

15     can see on the screen that you stay on the phone for    12:59:13

16     another 45 minutes with Mr. Aaron after you called this

17     even an explosion.

18          A.  I just --

19              MR. OLASOV:  Objection.  Objection.

20              THE WITNESS:  Mr. --    12:59:26

21              MR. OLASOV:  Objection.  Mischaracterizes her

22     testimony.

23              Go right ahead.

24              THE WITNESS:  Mr. Boutrous, I just didn't know

25     what to do.  I thought maybe if I talked to someone they    12:59:38
```

Page 72

```
 1   would -- they would help me.  I had emails that I was

 2   answering.  And I said my son-in-law was Hispanic, I have

 3   grandchildren that are Hispanic, I would never ever do

 4   anything disparaging or say anything disparaging to a

 5   young man.                                         13:00:09

 6        And no one -- no one -- I just got back worse

 7   things.  Like you -- I don't want to use the words,

 8   because I feel that it's not appropriate for me to say

 9   them.  But the five words that you can't say on

10   television were the five words that were said to me over  13:00:27

11   and over and over again.  And I -- and then it just

12   became incredible that evening, that night, the next

13   night.  My phone wouldn't even operate.  It just

14   escalated and escalated and escalated.

15        This was just the beginning, and I couldn't take  13:00:49

16   it.  This was just dribbles and drabbles.  But then it

17   became insane.  I was worried about my life.  People were

18   calling me from country after country and emailing me

19   hundreds of emails that said those five words that you're

20   not supposed to say.  And that -- that's what it was.  13:01:10

21        So I think if that was you and you never -- you

22   were just a private person and this stuff happened to

23   you, you would -- you would be asking anybody to help

24   you.  And that's my testimony.

25        Q.  BY MR. BOUTROUS:  Thank you.              13:01:31
```

Page 73

1            And just to clarify, that's how you were feeling

2    the morning of June 29th around 10 o'clock -- 10:00 a.m.

3    when you were talking with Mr. Aaron?

4        A.  I was feeling horrible, but --

5        Q.  That's all -- that's all I'm asking.            13:01:44

6        A.  -- afterwards -- no.  Afterwards, it was

7    unbelievable.  It was like suffering a car accident, that

8    fear and panic of a car accident that you just missed

9    and -- and it going on and on.  That was how it was after

10   it was put on blast by Joy Reid.                        13:02:05

11           And we'll get to that; right?  You're going to

12   ask questions about that?

13       Q.  Absolutely.

14       A.  This was hard to take in the morning.  Then in

15   the evening, it just became unbelievable.               13:02:19

16       Q.  Thank you, Ms. La Liberte.

17           MR. BOUTROUS:  Why don't we take a five-minute

18   break, and then resume --

19           THE REPORTER:  Excuse me.  Counsel, can we take

20   ten minutes?                                            13:02:32

21           MR. BOUTROUS:  Absolutely.  Sure.

22           THE VIDEOGRAPHER:  We are going off the record.

23   The time is 1:01.

24           (Recess.)

25           THE VIDEOGRAPHER:  We are back on the record.    13:18:43

Page 74

1    The time is 1:17.

2         MR. BOUTROUS:  Thank you.  We're going to mark

3    as Exhibit 36 the -- what's in Tab 2, the June 28, 2018,

4    Tweet from Alan Vargas.

5         (Exhibit 36, Alan Vargas Tweet, 6.28.18, marked    13:19:02

6         for identification electronically by counsel.)

7         Q.  BY MR. BOUTROUS:  Do you recognize this

8    document, Ms. La Liberte?

9         A.  I do.

10        Q.  Is this what started it all, in terms of the    13:19:14

11   events we've been talking about in connection with the

12   June 25, 2018, meeting?

13        A.  I'm not sure.

14        Q.  Do you remember when you first saw this Tweet by

15   Mr. Vargas?                                              13:19:29

16        A.  Not exactly, but I -- the afternoon of the 28th

17   is what I'm saying.

18        Q.  Mr. Vargas shared the photograph of you and

19   Mr. Luevanos; correct?

20        A.  Yes.                                            13:19:50

21        Q.  His Tweet includes the photo that we were

22   looking at earlier, and then he has some text that he has

23   added; correct?

24        A.  Yes.

25        Q.  He had in quote marks, "You're going to be the   13:20:06

                                                      Page 75

```
 1    first deported," closed quote, and then another quote he

 2    has, "Dirty Mexican," closed quote; correct?

 3         A.  Yes.

 4         Q.  And then he says, "Were some of the things they

 5    yelled they yelled at this 14 year old boy.  He was         13:20:21

 6    defending immigrants at a rally and was shouted down.

 7    Spread this far and wide this woman needs to be put on

 8    blast"; correct?

 9         A.  That's what it says.

10         Q.  And this woman he's referring to is you;          13:20:35

11    correct?

12         A.  Clearly.

13         Q.  And when Mr. Vargas said "they" in this Tweet,

14    some of the things that they yelled, who do you think he

15    was referring to?                                          13:20:55

16         A.  I -- I never heard anybody yell those things.

17         Q.  Who do you think that a reasonable person who

18    saw this Tweet would think Mr. Vargas was referring to

19    when he said, "they yelled at this 14 year old boy"?

20         A.  It depends who read it -- read it correctly or    13:21:18

21    not.  I read it like 25 times, and every time I read it,

22    I saw that it said things were -- they yelled, because I

23    knew I wasn't the one that yelled it.

24         Q.  And so your testimony is you did not say, "You

25    are going to be the first deported"?                       13:21:39
```

Page 76

```
 1        A.  I -- I -- I never -- what -- can you repeat the

 2   question?

 3        Q.  Yeah.  I'm sorry.  That was a little unclear.

 4            Is it your testimony that you did not say, "You

 5   are going to be the first deported"?                    13:21:49

 6        A.  Yes.  It is my testimony that I did not say

 7   that, "You are going to be the first deported."

 8        Q.  Did you say dirty Mexican?

 9        A.  I never said dirty Mexican.

10        Q.  Did you hear anyone else say, "You are going to   13:22:08

11   be the first deported," or "dirty Mexican"?

12        A.  No, I did not hear anybody say those things.

13        Q.  You cannot dispute, however, that somebody might

14   have said those things during that Simi Valley City

15   Council Meeting; correct?                               13:22:27

16        A.  When they were -- when they were doing testimony

17   in front of the City Council?  Or just in random when

18   they were talking during the break?

19        Q.  At any point during the meeting.  You don't know

20   yourself whether -- you can't deny that someone --       13:22:44

21        A.  I never heard anything.  I don't know what was

22   said.  I never heard anything like that.

23        Q.  Correct.  And so my question is:  Therefore, you

24   cannot deny that those things might have been said by

25   other people and you just didn't hear them; correct?     13:22:58
```

Page 77

1          MR. OLASOV:  Do you understand the question?

2          THE WITNESS:  Yes.  I did not hear them, and

3    maybe they were said, but I can't say yes or no, because

4    I did not hear them.

5          Q.  BY MR. BOUTROUS:  And you allege in this action          13:23:15

6    that you are not a racist person; correct?

7          A.  I am not a racist person.

8          Q.  Have you ever in your life taken action where

9    someone used a racist slur and told them to stop it?

10         A.  I have.          13:23:34

11         Q.  When?

12         A.  I can't -- I can't give you, like, the exact

13    time, but I have in my life, yes.

14         Q.  And you remember that Mr. Luevanos, Joseph, said

15    that someone did say to him at the meeting, "You're going          13:23:50

16    to be the first deported"?  Do you remember that from the

17    Fox News report?

18         A.  Yes, he did say that.

19         Q.  And you believe him; right?

20         A.  I believe him.          13:24:03

21         Q.  Thank you.

22             Let's go to what will now be Exhibit 36 and mark

23    that -- oh, excuse me -- 37, Tab 3.

24             (Exhibit 37, Joy Reid Retweet, marked for

25             identification electronically by counsel.)          13:24:11

Page 78

```
 1              MR. BOUTROUS:  And this is Ms. Reid's Retweet of

 2      Mr. Vargas.

 3         Q.  Ms. La Liberte, do you use Twitter?

 4         A.  No, I don't.

 5         Q.  In 2018, in June and July, did you ever log on      13:24:52

 6      to Twitter and just check out what people were saying?

 7         A.  No.

 8         Q.  Before this event?

 9         A.  Not that I recall.  Unless someone sent me a

10      direct message.                                          13:25:08

11         Q.  And do you have a Twitter account?

12         A.  I do not.

13         Q.  So what we have here --

14         A.  I think I had one for, like, a month or so in --

15      in March, April, May of those -- 2018, but I didn't      13:25:22

16      really use it.

17         Q.  Did you ever delete it, your account?

18         A.  No.

19         Q.  So you may still have a Twitter account?

20         A.  I don't know how you would delete it.  I just      13:25:34

21      stopped doing it.  My daughter might have deleted it for

22      me.

23         Q.  Do you remember what your Twitter handle was,

24      what was your name on Twitter?

25         A.  No, I do not.                                      13:25:46
```

Page 79

```
1          Q.  Ms. La Liberte, have you seen this document

2   before?  It is the -- I'll represent to you it's the

3   Retweet by Joy Reid of Alan Vargas' Tweet.

4          MR. BOUTROUS:  I don't know if we can enlarge

5   that a bit, please.                               13:26:05

6          THE WITNESS:  Yes.  I saw that, but I'm not -- I

7   did see that, yes.

8          Q.  BY MR. BOUTROUS:  Do you know what a Retweet is?

9          A.  Yes.

10         Q.  What is a Retweet?                       13:26:18

11         A.  A Retweet is where she sees something that she

12   wants other people to see and Tweets it out herself.

13         Q.  You understand that it's -- a Retweet is simply

14   forwarding the Tweet of someone else; correct?

15         A.  Yes.                                      13:26:41

16         Q.  So when you look at this Retweet --

17         MR. OLASOV:  Excuse me, Ted.  I'm sorry.  I

18   neglected to note an objection to form.  She's answered

19   the question, but I wanted my objection to be on the

20   record.                                            13:26:56

21         MR. BOUTROUS:  Thank you.  Noted.

22         Q.  Why did you open a Twitter account in the spring

23   of 2018, Ms. La Liberte?

24         A.  No -- no special reason.

25         Q.  So in this Retweet, you see that Ms. Reid's  13:27:10
```

Page 80

1    name, "Joy Reid Retweeted," is at the top, right, of the

2    Retweet?

3        A.  No.  It says Alan Vargas.

4        Q.  But right above Alan Vargas, you --

5        A.  It says --                                          13:27:25

6        Q.  -- see, "Joy Reid Retweeted"?

7        A.  Oh, yeah.  Okay.  Yes.

8        Q.  And you see the content of the Tweet does not

9    have anything in addition to what Mr. Vargas' original

10   Tweet contained; correct?                                  13:27:39

11       MR. OLASOV:  Objection to the form of the

12   question.

13       Q.  BY MR. BOUTROUS:  Correct?  It's the same Tweet?

14       A.  It's the same Tweet.

15       Q.  And it ends with, "Spread this far and wide this   13:27:50

16   woman needs to be put on blast"; correct?

17       A.  Yes, that's what it says.

18       Q.  And earlier, right before the break, you said

19   that --

20       MR. OLASOV:  Excuse me.  I need to note an             13:28:00

21   objection to form, because there's obviously material

22   below that.

23       MR. BOUTROUS:  And if we could scroll down just

24   a little bit, please, so we get the full --

25       THE WITNESS:  Yeah.  She's advertising in --          13:28:16

                                                        Page 81

1        Q.  BY MR. BOUTROUS:  Right.  There you go.

2           And you see there that Ms. Reid had 1.2 million

3    followers at the time?

4        A.  Yes.  And when I saw that, I nearly fainted.  I

5    did not know who she was.                          13:28:29

6        Q.  And why did you nearly faint?

7        A.  Because this picture would go out again, and

8    people will misinterpret it as thinking I said those

9    things to a million and more people.

10       Q.  Did you view this Retweet by Ms. Reid as       13:28:50

11   extremely harmful to you?

12       A.  Yes, I did.

13       Q.  Did you view it as spreading this photograph far

14   and wide?

15       A.  I looked at it, where it said, "put her on      13:29:00

16   blast," I thought my life would be over.  I would be

17   blasted away.  I never -- when I saw Vargas say the word

18   "blast," I thought just telling people, but when I saw it

19   on her thing, I thought that someone was going to kill

20   me.  I read that blast entirely different.            13:29:21

21       Q.  Thank you.

22          MR. BOUTROUS:  I'm going to go -- I would like

23   to mark now as Exhibit 38 -- actually, the previously

24   marked Exhibit 23.  I'm sorry.

25          MR. OLASOV:  We're not marking this?  We're just  13:29:44

                                                    Page 82

1    going --

2           MR. BOUTROUS:  Just back to Exhibit 23, which

3    was marked -- yeah.  I think this was marked yesterday.

4           MS. MULLIGAN:  Tab 4, Greg.

5           MR. BOUTROUS:  Yes.                          13:29:57

6           THE CONCIERGE:  Do you want me to copy over the

7    previously marked exhibit or mark tab --

8           MS. MULLIGAN:  Tab 4 is a copy of the previously

9    marked exhibit, so it already has a stamp, so whatever is

10   good for you.                                      13:30:14

11          MR. OLASOV:  May I suggest to counsel, so we

12   avoid remarking documents time and again, that to the

13   extent we can, we use the first marked exhibit.

14          MS. MULLIGAN:  Yes.  That's what we're doing

15   right now.                                         13:30:35

16          MR. BOUTROUS:  Yep.

17          MR. OLASOV:  Okay.

18          MR. BOUTROUS:  There it is.

19          MR. OLASOV:  There you go.  Thank you.

20      Q.  BY MR. BOUTROUS:  So, Ms. La Liberte, this is an  13:30:43

21   Instagram post by Ms. Reid, which she posed on June 29,

22   2018.

23          Do you recognize this document?

24      A.  Yes, I do.

25      Q.  Did you see it on June 29th?                 13:30:53

                                             Page 83

1       A.  Yes, I did.

2       Q.  And Ms. Reid posted this at about 9:58 p.m.

3  Eastern Time on June 29; correct?

4       MR. OLASOV:  Objection.  Is that -- are you

5  pointing to something, Mr. Boutrous?                    13:31:11

6       MR. BOUTROUS:  I can get you the time stamp

7  Facebook, which is Exhibit 22, and represent to you that

8  the Instagram post automatically posted to Facebook, and,

9  therefore, the record reflects that this was posted at

10  9:58 p.m. Eastern Time.                                 13:31:30

11      MR. OLASOV:  9:58 p.m. Eastern Time?

12      MR. BOUTROUS:  Correct.

13      THE WITNESS:  It's 6 o'clock our time, in the

14  Pacific?

15      Q.  BY MR. BOUTROUS:  6:58; correct?              13:31:42

16      A.  And in Australia, it's a day ahead, and in South

17  America, it's a day behind, so it went all over the

18  world, so the time is different wherever you are.

19      Q.  Correct.

20      And you see -- so, Ms. La Liberte, you saw this    13:32:01

21  Tweet -- this Instagram post on June 29th.  Do you

22  remember what time?

23      A.  I know it was sometime in the late afternoon,

24  early afternoon.  It was afternoon.  I don't recall what

25  time.                                                   13:32:21

Page 84

1      Q.   How did you come to see this Instagram post?

2      A.   My children brought it to me.

3      Q.   And which -- both your children?  Or which

4    child?

5      A.   They talked to each other, and the one living      13:32:34

6    with me brought it to me.

7      Q.   And which child was the?

8      A.   Savannah.  Doug is --

9      Q.   And what did she say -- I'm sorry.  What was

10   that?                                                     13:32:48

11         MR. OLASOV:  She was saying where Doug lives.

12         THE WITNESS:  Doug is in San Francisco.

13     Q.   BY MR. BOUTROUS:  Got it.

14         Just going back, Ms. La Liberte, Ms. Reid's --

15   assuming Ms. Reid's Tweet -- excuse me -- Instagram post    13:32:59

16   is posted at about 9:58 p.m. Eastern Time, that would

17   have been 6:58 in California where you were; correct?

18     A.   Yes.

19     Q.   So you -- it sounds like you're saying you saw

20   it at about the time --                                   13:33:17

21     A.   The Retweet was earlier.

22     Q.   Yeah.  Let's go back to the Retweet.  You're

23   right about that.  I didn't mean to skip over that.

24         MR. BOUTROUS:  That, for the record, reflects --

25   I submit to you was posted -- the Retweet -- Ms. Reid's    13:33:28

Page 85

1    Retweet, which was exhibit -- I'm going to get better at

2    these documents -- Exhibit 37.  Thank you -- was posed --

3    was Retweeted at 2:55 p.m. Eastern Time.  Does this sound

4    about right to you?

5         A.  Yes.                                          13:33:51

6              MR. OLASOV:  What are you representing as to the

7    time?

8              THE WITNESS:  2:50 something.

9              MR. BOUTROUS:  2:55 p.m.

10             THE WITNESS:  So that was --                  13:33:57

11             MR. OLASOV:  Excuse me.  I just want to make

12   sure that I know where Mr. Boutrous is telling me that's

13   coming from.

14             MR. BOUTROUS:  I can -- Mr. Olasov, I can

15   represent the Reichman affidavit -- the Reichman          13:34:05

16   affidavit at page 12, which I'm going to mark as an

17   exhibit at some point.  I could do it now.  Also, your

18   July 29, '21, motion to compel also stated that it was --

19   the Retweet was at 2:55 p.m.  I'm happy to follow up and

20   document that for you.                                   13:34:27

21             MR. OLASOV:  I think that's fine, but I think

22   it's pretty clear that the -- both what John said and

23   what I may say in a document's not evidence, but okay.

24   I'm not saying it's wrong.  I'm just saying I wanted to

25   know where you got that from, so you told me.            13:34:43

                                                    Page 86

```
 1              MR. BOUTROUS:  Thank you.  Thank you.

 2         Q.  And, Ms. La Liberte, does that sound about

 3    right, 2:55 p.m. Eastern Time?

 4         A.  So this was around 10 o'clock our time, 10

 5    something.                                           13:34:52

 6         Q.  It would have -- more around noon Pacific Time.

 7    Does this sound about right?

 8         A.  Wait.  What time was it?  2 what?

 9         Q.  2:55 Eastern Time.

10         A.  Okay.                                       13:35:03

11         Q.  So three hours, yeah, so around --

12         A.  Would be 11 --

13         Q.  -- does this sound about; right?

14         A.  Yes.

15         Q.  Yep.  So it was late morning or early afternoon. 13:35:09

16         A.  Before -- before I was interviewed by Al Eisner,

17    yeah.

18         Q.  It was -- what time were you interviewed by

19    Mr. Eisner?

20         A.  I can't recall, but I think it was around noon. 13:35:23

21         Q.  Wasn't it in the morning?

22         A.  No.

23         Q.  You're sure about that?

24         A.  No, it wasn't, because I was -- hadn't eaten,

25    and someone asked me if I would please eat, and I said, 13:35:39
```

Page 87

1    "I can't eat," and it was probably around 1:00 or 1:30,

2    actually, because I don't miss a meal.  I eat three meals

3    a day like clockwork, and I hadn't eaten a few meals at

4    that point.

5        Q.  And so how did you -- we'll stick with the          13:36:02

6    Retweet for a moment.  Who showed you Ms. Reid's Retweet?

7        A.  The one from 6 o'clock?

8        Q.  Yes.  No, actually, this one.  The one from --

9    this is the Retweet, the -- we'll go back to the

10   Instagram post.                                            13:36:23

11        Who showed you the Retweet from Ms. Reid around

12   noon?

13        A.  I don't --

14        MR. OLASOV:  That's a document -- excuse me.

15   That's the document we've marked as Exhibit 37.           13:36:30

16        MR. BOUTROUS:  Thank you for the clarification,

17   yes.

18        THE WITNESS:  I don't recall.  I did not know

19   Joy Reid, and it wouldn't have been -- you know, I did

20   not know who she was, so I -- I don't remember seeing      13:36:45

21   it -- the first one.  Just the one where I was made the

22   face of racism was the one that I recall seeing.

23        Q.  BY MR. BOUTROUS:  Let's go back to the Instagram

24   post, which is Exhibit 23, please.

25        And I'll just read it for both of us so we have       13:37:21

                                                    Page 88

```
 1    a clear record.  This Instagram post reads:  "He showed

 2    up to a rally to defend immigrants... She showed up too,

 3    in her MAGA hat, and screamed, 'You are going to be the

 4    first deported"... "dirty Mexican!'  He's 14 years old.

 5    She is an adult.  Make the picture black and white and it    13:37:41

 6    could be the 1950s and the desegregation of a school.

 7    Hate is real, y'all.  It hasn't even really gone away,"

 8    closed quote.

 9          Do you see that?

10    A.  Yes, I do.                                              13:37:56

11    Q.  And I think you -- this is an asked and answered

12    question, but I'm going to ask it again since I forgot

13    what you answered.

14          When did you first see this Instagram post?

15    A.  That day, the 29th.                                     13:38:07

16    Q.  And I think you said it was -- it sounded like,

17    based on your recollection, it was probably around the

18    time it was posted, around 7:00 p.m. Pacific Time?

19    A.  Right.  And I noted that it said "showed up to a

20    rally," which was -- it was not a rally -- to defend        13:38:22

21    immigrants, and I was defending immigrants at the rally,

22    too.  I -- I'm sorry -- at not the rally, at this City

23    Council Meeting.  I was just talking about criminals at

24    this meeting.

25    Q.  Which criminals were you talking about?                 13:38:45
```

Page 89

1      A.  Criminals that were set -- let out of jail on

2  bail that would be put into the general public where ICE

3  could not interfere in them being let out into the

4  general public.  The federal government -- that was the

5  whole meeting, was SB54.  Did you read about that?          13:39:07

6      Q.  Are you asking me?

7      A.  No.  On SB54, that was the meeting -- City

8  Council Meeting, and I was -- I'm pro immigration, just

9  like the boy is.  I'm pro immigration.  I'm just not pro

10 criminals.                                                  13:39:33

11     Q.  Did you understand SB54 to only be about

12 criminals?

13     A.  That is what I was talking about, that -- yes,

14 SB54 is -- okay.  Let me put this correctly.

15         It is -- the police are able to contact ICE,       13:39:58

16 which is the immigration people, when an undocumented

17 alien has committed a crime and is going to be let go of

18 jail -- let out of jail -- bailed out of jail.  That way

19 the person would not be let go into the general public

20 and disappear in order to commit more crimes, as far as    13:40:27

21 violent crimes, such as rape, murder and things like

22 that.  That is SB54.  That was the meeting I attended.

23 It had nothing to do with immigration.

24     Q.  Let me ask you this:  When -- you'll recall when

25 Donald Trump announced he was running for president and    13:40:54

Page 90

```
 1    he was coming down the escalator and he made his first

 2    speech and he said Mexicans are rapists, did you agree

 3    with that when he said that?

 4         A.  Mexicans are rapists?  How can a whole entire

 5    country of people be racist -- rapist -- rapists?  Of        13:41:13

 6    course I did not agree with that.

 7         Q.  How could you be a Trump supporter, then, if

 8    that was something he said?

 9              MR. OLASOV:  Objection.  I really think you're

10    going pretty far afield here.                                13:41:31

11              Go ahead, Ms. La Liberte, and answer the

12    question.

13              THE WITNESS:  I did not interpret it the same

14    way you did, but that's negligible, because I was in

15    favor, as I said before, of Donald Trump running for        13:41:43

16    president.  He wasn't elected yet.  He wasn't doing

17    anything.  He was just talking about what he would do for

18    small businesses and regulations and things like this,

19    and that was what I was listening to.

20         Q.  BY MR. BOUTROUS:  Have you ever spoken at a City    13:42:03

21    Council Meeting or any sort of other event about

22    criminals and violent criminals outside the context of

23    SB54?

24         A.  No.

25         Q.  So you've only gotten involved where              13:42:17
```

Page 91

1    undocumented immigrants have been involved where violent

2    crime is at issue; is that correct?

3        MR. OLASOV:  Objection to the form of the

4    question.

5        You may respond.                                    13:42:28

6        THE WITNESS:  I'm sorry, could you repeat it

7    again?

8    Q.  BY MR. BOUTROUS:  Yeah.  Let me just -- let's

9    strike that question.  Let me just state it another way.

10       So you don't have any concern about violent        13:42:37

11   criminals unless it involves undocumented aliens?

12   A.  I've never been to a meeting at all about people

13   asking about am I in favor of criminals.  There's no

14   meetings as such.  I am not in favor of any kind of

15   criminal.                                               13:42:56

16   Q.  And, Ms. La Liberte, SB54 was also known as a

17   sanctuary city statute; is that correct?  Does this ring

18   a bell?

19   A.  Yes.  Sanctuary cities.

20   Q.  Are you against sanctuary cities in general?        13:43:08

21   A.  We're a sanctuary state, California is.

22   Q.  Are you against that?

23   A.  I have no feelings either way about that.

24   Q.  Then why were you protesting SB54?

25   A.  Because -- because the -- where we are living,      13:43:31

                                                         Page 92

1    in Southern California, could become very dangerous, and

2    in order to change -- change this, it's the city-by-city

3    thing.  The sanctuary State of California -- California

4    being a sanctuary state is something that I had no

5    control over.                                        13:44:03

6        Q.  You understand that the sanctuary city law,

7    though, and -- applies to all immigrants, not just

8    criminals; right?

9            MR. OLASOV:  Objection.

10           THE WITNESS:  Yes.  Of every kind from every   13:44:18

11   country.  It's not a Mexican or Hispanic thing.  There

12   are people -- criminals from every country in the world.

13       Q.  BY MR. BOUTROUS:  But the law -- the law doesn't

14   just protect the criminals.  It protects law-abiding

15   citizens who want to come to the United States and live   13:44:35

16   here; right?

17           MR. OLASOV:  Objection to the form.

18           You may respond.

19           THE WITNESS:  No, it does not.

20       Q.  BY MR. BOUTROUS:  So you understand it to only   13:44:43

21   protect criminals?

22       A.  Yes, because as I have -- did you listen to what

23   I talked about at the SB54 meeting?

24       Q.  I did.

25       A.  Yes, that's what it is.  It's that the ICE will   13:44:58

Page 93

```
 1    be notified of criminals being bailed out of jail into

 2    the general public.  What a lot of people thought SB54

 3    is, is not what it is.  That's what it is, and Sheriff

 4    Dean and many law enforcement office were not in favor of

 5    SB54.                                              13:45:22

 6        Q.  Did you support the Trump administration's

 7    policies of separating parents from their children at the

 8    border?

 9        A.  As I said before, no, I did not, because my

10    parents were Jews in Indonesia, and they were taken by    13:45:39

11    the Japanese as prisoners, because the Japanese were

12    allies of the Germans, and they said to intern all the

13    Jews as well, and my family was separated from each other

14    for three to four years.  I would never ever be in favor

15    of children being separated from their parents, and that   13:46:05

16    was the beginning statement I said to Joey Luevanos.

17        Q.  Did you do any research and determine based on

18    that research that illegal immigrants committed crime at

19    a higher rate then citizens or legal immigrants?

20        A.  Crime is crime, and if you're a citizen, you can   13:46:34

21    be tracked down a lot more because you have -- have more

22    ID.  If you're illegal in this country, you could be put

23    out into the general public and no one knows where you

24    are.

25        Q.  Let me move to what has been previously marked    13:46:57
```

Page 94

```
 1     as Exhibit 32.

 2              MS. MULLIGAN:  Tab 5, Greg?

 3              MR. BOUTROUS:  Is that -- let's see -- I can't

 4     see the exhibit tab on that.

 5              MR. OLASOV:  That's not 32.               13:47:33

 6              MR. BOUTROUS:  Okay.

 7              MR. OLASOV:  I don't think.

 8              MR. BOUTROUS:  While we're -- it looks like he's

 9     going to change it for me here.

10              MR. OLASOV:  Okay.                        13:47:42

11              MR. BOUTROUS:  There we go.  I think that's it,

12     Exhibit 32.

13         A.  Uh-huh.

14         Q.  Before I ask you a few questions, this is -- so

15     the bottom image, Ms. La Liberte, that says 2018, that's  13:47:58

16     the same photograph we've seen in all the other posts;

17     correct?

18         A.  Correct.

19         Q.  And the woman behind you that's smiling, is that

20     Genevieve Peters?                                 13:48:09

21         A.  I was told that, yes.

22         Q.  Had you met her before this meeting?

23         A.  I had met her briefly, but I didn't know her

24     name.

25         Q.  We'll come back to her.  So this is a post that  13:48:23
```

Page 95

1    Ms. Reid made on Instagram on July 1, 2018.

2         A.  Yes.

3         Q.  Do you recognize this document?

4         A.  Yes, I do.

5         Q.  When was the first time you saw this Instagram      13:48:36

6    post?

7         A.  When my children showed it to me.

8         Q.  Was it on July 1st?

9         A.  I didn't have email at that point, and I had --

10   had not gone to the phones at all, so I didn't really      13:48:58

11   know what time or what anything was, so I can't -- I'm

12   not sure.  I did see it, though, and it made me want to

13   throw up.

14        Q.  Do you -- put aside everything that you know

15   about the facts, but do you agree that someone who saw      13:49:19

16   those two photos would be justified and reasonable in

17   equating the images?

18        A.  I was alive during the civil rights movement,

19   and it was horrible what went on.  I would never ever

20   want to be put next to a picture like that, and it's just   13:49:40

21   dreadful.  Dreadful.

22        Q.  We're getting some feedback there.

23            MR. OLASOV:  I'm trying to deal with it.  I beg

24   your pardon.  You just muted me, which is fine.

25            MR. BOUTROUS:  Okay.  Thank you.                    13:50:03

                                                    Page 96

```
 1        Q.  Go on, Ms. La Liberte, were you finished with

 2   your answer?

 3        A.  It's -- it's inflammatory photo.  That's all I

 4   can say.

 5             MR. BOUTROUS:  I would like to go to what has    13:50:21

 6   been previously marked as Exhibit 10, and this is Tab 78.

 7             THE WITNESS:  Hat tip -- hat tip.  You know

 8   someone is so proud of that, putting that on Instagram,

 9   who didn't attend a meeting, who called it a rally.

10   It's -- I don't want to see this anymore.  Can you please   13:50:50

11   get your other picture on?

12        Q.  BY MR. BOUTROUS:  We'll move to the next

13   exhibit --

14        A.  Thank you.

15        Q.  -- certainly.                                      13:50:59

16             So, Ms. La Liberte, this is an essay that

17   Joseph Luevanos wrote about the events, and it was

18   entered into -- as an exhibit in his deposition last

19   week.

20             Have you seen this document before?              13:51:22

21        A.  Yes, I saw it --

22        Q.  So if we go to page 3 --

23        A.  -- when it was entered.

24             I'm sorry.

25        Q.  Thank you.                                         13:51:31
```

Page 97

```
 1              Did you read the transcript of Mr. -- of

 2    Joseph's deposition?

 3        A.  Yes, I did.

 4            MR. OLASOV:  I don't think --

 5            THE WITNESS:  No, no.  Not the deposition.      13:51:43

 6            MR. OLASOV:  I don't believe so.

 7            THE WITNESS:  I read this letter here, this

 8    essay.  Sorry.

 9            MR. OLASOV:  The record should show that I

10    have not yet provided a transcript of the testimony of    13:51:52

11    Joseph Luevanos to the witness.

12            MR. BOUTROUS:  Okay.  Thank you.

13            THE WITNESS:  No.  I thought you were talking

14    about this letter.  I'm sorry.

15        Q.  BY MR. BOUTROUS:  No problem.  Got it.          13:52:04

16            I just want to read you what Joseph said about

17    his interaction with you and get your reaction.

18        A.  Can we read the whole thing?  Can we just read

19    the whole thing?

20        Q.  You want to read the whole essay out loud?      13:52:16

21        A.  Yes, I do.  I do, because --

22        Q.  I'd rather -- that's going to take a lot of

23    time.  You --

24        A.  I don't mind.  I don't mind.  I want to hear --

25    I want you to read it out load.                          13:52:27
```

Page 98

1        Q.  Let me start with the section I want to focus

2    you on, and then we'll see if we need to do that.

3        A.  No.  I would really like to read the whole

4    thing, because I thought it was a fiction.

5        Q.  Well, your lawyer can ask you to read it later        13:52:44

6    if would he like you to.  I would like to focus you on

7    the following language, quote --

8        A.  Okay.  Please.

9        Q.  -- "After listening to many arguments about SB54

10   ranging from fear mongering to illuminati, the question       13:52:57

11   arose about how one of those MAGA hat people would

12   respond to my argument and any counterclaims to theirs.

13   I found a MAGA hat person who appeared to be more

14   restrained than the others during the sequence of

15   speakers, a woman who appeared to be in her fifties.  I       13:53:13

16   asked why she was against SB54 and she began to rant very

17   off topic very quickly about her parents who she claimed

18   to be prisoners at one time somewhere in Eurasia"; is

19   that correct?  Does that reflect what you said --

20       A.  No.                                                   13:53:31

21           MR. OLASOV:  Excuse me.  Object to the form of

22   the question.

23           Go ahead and posit your question.

24           THE WITNESS:  No, it's not true.

25       Q.  BY MR. BOUTROUS:  He then goes on to say, "I           13:53:40

Page 99

```
 1    asked why she was against SB54 and she began" -- oh, I'm

 2    jumping back.

 3           "I then asked what that had to do with SB54.

 4    She then repeated herself in a more mocking tone, as if

 5    she thought I had lost one too many brain cells"; is that      13:53:58

 6    correct?

 7           MR. OLASOV:  Objection.  These are impressions

 8    of this child.  How on earth would she know?

 9           MR. BOUTROUS:  I'm just asking her if she agrees

10    or disagrees with him?                                          13:54:11

11           THE WITNESS:  No.

12           MR. OLASOV:  Okay.  Well, if you agree or

13    disagree with the statement, that's fine.

14           THE WITNESS:  I disagree with the statement.

15       Q.  BY MR. BOUTROUS:  Then he goes on to say, quote,        13:54:19

16    "I then asked if I could share my take on SB54.  She said

17    yes so I began giving data on the good sanctuary cities

18    get when an immigrant populations feels and is safer.

19    She proceeded to interrupt and began giving her argument

20    again as if she was explaining to a toddler," close           13:54:37

21    quote.

22           Do you agree or disagree with that

23    characterization of your conversation?

24       A.  I disagree.

25       Q.  And did you say you think that this is a               13:54:45
```

Page 100

```
 1    fiction?

 2         A.  Yes.

 3         Q.  You think Joseph Luevanos is lying?

 4         A.  I think he wrote it as a good story.

 5         Q.  He then says, "After she spoke, I would continue    13:55:01

 6    with my points until I got interrupted again.  This

 7    process repeated four times and she got progressively

 8    louder each time until she had to hold her throat from

 9    screaming so loud.  A crowd began to form around.  An

10    officer who was in the room intervened and split the     13:55:21

11    crowd and the discussion if you could even call it one,"

12    closed quote.

13              You don't disagree with that description, do

14    you?

15         A.  I do disagree with that description.           13:55:29

16         Q.  Just give me a moment here.

17              Now, going back, would you like to read -- have

18    your lawyer read the entire --

19              MR. REICHMAN:  No, no, no, no, no.

20              MR. BOUTROUS:  Mr. Reichman, are you --        13:55:54

21              MR. REICHMAN:  Oh, I'm sorry.  I thought I was

22    on mute.

23              MR. BOUTROUS:  I take your hint.

24              MR. OLASOV:  He thinks he's at some Evangelical

25    thing and he speaking in --                             13:56:10
```

Page 101

1          MR. REICHMAN:  I apologize.  I didn't mean -- I

2     didn't think I was -- I didn't realize I had unmuted.  I

3     was screaming to myself.

4          MR. BOUTROUS:  No problem.  If you can go back

5     on mute.                                          13:56:22

6          Q.  So, Ms. La Liberte, a couple more questions.  So

7     you're saying that he wrote this as a story.  So you

8     believe Joseph Luevanos just made this up?

9          MR. OLASOV:  Objection to the form of the

10    question.  It's not her testimony.                 13:56:34

11          But you can give a response.

12          THE WITNESS:  I think it's a literary work and

13    that it did not capture what happened between the two of

14    us.

15          MR. BOUTROUS:  Let's go to what we will mark as    13:56:51

16    Exhibit 2.

17          MR. OLASOV:  Before you change exhibits, you

18    offered me to read because -- into the record other

19    stuff, and the only other sentence that I think ought to

20    be read is the -- is his conclusion of this interaction,    13:57:08

21    which I'm quoting from, "The entire time my mom was in

22    the bathroom and learned about the whole debacle shortly

23    after."  I think that needs to be put in as part of this

24    essay.

25          MR. BOUTROUS:  The testimony of the witnesses    13:57:28

Page 102

```
 1    will speak for itself.

 2            THE WITNESS:  She's standing right next to me.

 3        Q.  BY MR. BOUTROUS:  Thank you.

 4            In fact --

 5        A.  Wait.  Can I continue, please?              13:57:39

 6        Q.  Sure.

 7        A.  Can I continue?

 8            She's standing right next to me and yelling at

 9    other people that were having a civil conversation.  Not

10    once did she say, "Could you please stop talking to my    13:57:49

11    son because you're being rude and loud."  It never

12    happened.  I was always very intelligible to him and

13    considerate, and I was trying my best to tell him my

14    point of view, and that is what happened.

15            MR. BOUTROUS:  Let's go to what has been         13:58:15

16    previously marked as Exhibit 2, which is at Tab 77.

17        Q.  And this is going to be, Ms. La Liberte, the

18    video of the City Council Meeting that you had asked to

19    see.

20        A.  Which one?  The one where I'm talking?           13:58:45

21        Q.  This is the video of the City Council Meeting in

22    Simi Valley and at least part of your interaction with

23    Joseph Luevanos.

24        A.  Oh, the interaction.

25        Q.  And then I'll ask you -- well, why don't we      13:58:59
```

Page 103

```
 1    watch it, and then I'll ask you a few questions.

 2            MR. OLASOV:  So you're taking the piece out of

 3    this five-hour thing that she spoke?

 4            THE WITNESS:  No, no, no.  This is another --

 5            MR. OLASOV:  Oh, I'm sorry.  This is --          13:59:09

 6            THE WITNESS:  That's why I asked.

 7            MR. OLASOV:  This is the tape, not her

 8    statement?  Thank you.

 9            MR. BOUTROUS:  Correct.

10            (Video played.)                                 13:59:19

11            (Talking.  Talking.)

12            So how are you?

13            I'm good.

14            How are you?  Harder time -- they have a harder

15    time.                                                    14:00:10

16            Please don't record my minor son.

17            You know what, then take him out of a public

18    place.

19            You can't film him.

20            She doesn't know the law.                        14:00:34

21            It don't matter.  It don't matter.

22            You know what?

23            (Video ends.)

24            MR. BOUTROUS:  We lost the video there at the

25    very end.                                                14:00:43
```

                                                           Page 104

```
 1          Q.  Let's just kind of break it down,

 2    Ms. La Liberte.

 3          A.  Sure.  Sure.

 4          Q.  So that was you in the red hat; correct?

 5          A.  Yes.                                      14:00:51

 6          Q.  And that was Joseph Luevanos; correct?

 7          A.  Yes.

 8          Q.  And toward the beginning of the video where you

 9    appear, you sort of look in the camera and smile; right?

10          A.  I don't -- I don't know what I was looking at.   14:01:06

11          Q.  It appeared to me you were looking --

12          A.  I was called back into the conversation.

13          Q.  It looked to me like when you saw the camera,

14    you sort of smiled and decided to go in and put on a

15    performance and badger Joseph Luevanos again.  Isn't that   14:01:23

16    what happened?

17              MR. OLASOV:  Objection to the form of the

18    question.

19              THE WITNESS:  We were speaking for some time.  I

20    don't -- I -- I -- the mother was talking to someone      14:01:34

21    else, and one -- one of the other people he was talking

22    to called me back into the conversation.

23          Q.  BY MR. BOUTROUS:  And --

24          A.  And I smiled or anything -- maybe I just am

25    accustomed to smiling when someone's shooting my picture   14:01:54
```

Page 105

```
 1   on a camera.  I don't know.  I wasn't acknowledging

 2   anybody or anything.

 3        Q.  Weren't you trying to go viral when you did

 4   that?  Didn't you want Genevieve Peters to catch that --

 5   your interaction with Joseph Luevanos?              14:02:09

 6             MR. OLASOV:  Objection to the form.

 7             Go ahead and respond.

 8             THE WITNESS:  No.

 9        Q.  BY MR. BOUTROUS:  Do you think it's appropriate

10   to get in the face of a 14-year-old and be pointing and  14:02:19

11   badgering him like that in a public place?  Do you think

12   that's the right thing to do?

13             MR. OLASOV:  Objection to the form.

14             THE WITNESS:  He's pointing with a pennant and

15   -- at the -- in that.  Is it okay for a young man to do  14:02:33

16   that to an elderly woman?

17        Q.  BY MR. BOUTROUS:  Maybe not, but --

18        A.  What's your point -- what's your point?

19        Q.  My point is this -- go ahead.

20        A.  We were talking.  The gestures, the pen, all of  14:02:44

21   that is just ambulatory -- you know, it's not -- it's not

22   what it was.

23        Q.  So what I'm getting at is it's one thing for a

24   14-year-old to be pointing and gesturing.  Don't you

25   think it's improper and unreasonable for an adult like  14:03:07
```

Page 106

```
1     yourself to get into the face of a 14-year-old like you

2     did?  You agree that wasn't the right thing to do; right?

3            MR. OLASOV:  Objection to form, argumentative.

4            You may respond however you --

5            THE WITNESS:  No, no.                          14:03:31

6      Q.  BY MR. BOUTROUS:  So looking back, you would

7     have done the same thing?

8            MR. OLASOV:  Objection to the form.

9            THE WITNESS:  I don't know.  I was explaining

10    something to him.  There was a lot of noise.  I wasn't    14:03:45

11    like -- I wasn't -- I was in the moment of it, and we had

12    a spontaneous hug afterwards.  It's -- these things are

13    just little seconds in time.

14     Q.  BY MR. BOUTROUS:  Did it anger you or rev you up

15    when Joseph was pointing at you with a pen?               14:04:10

16     A.  No.

17     Q.  Then why did you use that to explain why you

18    were gesturing and jabbing at him?

19            MR. OLASOV:  Objection.

20            THE WITNESS:  Looking at the film, we were both   14:04:27

21    talking at the same time.  I did not notice him with the

22    pen.  We were talking.  We were having a discussion, but

23    looking at this now, I see the pen in my face, and I'm

24    saying was he trying to be rude or pushy or anything?

25    Probably not.  He's a nice boy.  We were talking.        14:04:51
```

Page 107

```
 1            But these are seconds in time, so you can look

 2     and dissect and -- but his mother was there, and if she

 3     would have thought that I was doing anything out of line,

 4     she would have said something.  She was standing there

 5     with her hand in her pocket.  Someone took a picture of     14:05:12

 6     me when I put my hand to my throat, and that was what

 7     happened.  If you see it differently, I can't understand

 8     that, because I was there.

 9        Q.  So when you look at this videotape, you think

10     that a reasonable person would think it was Joseph         14:05:30

11     Luevanos who was being rude, not you?

12        A.  No, I did not say that.  I said we were in a

13     heated discussion, and we were talking loud and

14     gesturing.  Both of us were doing that.  I don't think

15     that he was threatening me and being rude, and I don't     14:05:48

16     think he thought I was being rude.  That's my

17     perspective.

18        Q.  Isn't it true you initiated the hug that you

19     referred to once you saw the law enforcement officer

20     coming over to break things up?                            14:06:02

21        A.  It was a spontaneous hug.  He --

22        Q.  Is there --

23        A.  -- hugged me back.

24            If -- that's how -- that's how hugs are.  You

25     hug someone, and they hug you back.  It's spontaneous.     14:06:15
```

Page 108

```
 1      It's not a threatening gesture.  It's a hug.

 2          Q.  Isn't it true you have a pattern of getting into

 3      altercations with teenagers at political events?

 4              MR. OLASOV:  Objection.

 5              Go ahead and respond.                      14:06:36

 6              THE WITNESS:  No.

 7              MR. BOUTROUS:  Let's go to Tab 11, and we'll

 8      mark that as exhibit -- I know I'm going to drive you all

 9      crazy with my exhibit tabulations here.  I believe it

10      will be 37.                                        14:06:56

11              MS. MULLIGAN:  Thirty-eight.

12              THE CONCIERGE:  Thirty-eight, Counsel.

13              MR. BOUTROUS:  Thirty-eight.  I'm always one

14      behind.

15              MR. OLASOV:  This is a new exhibit?        14:07:05

16              MR. BOUTROUS:  Yes.  And just for the record,

17      it's a September 27, 2018, Washington Post article.

18              (Exhibit 38, The Washington Post article, marked

19              for identification electronically by counsel.)

20              MR. BOUTROUS:  And I know we're getting close to  14:07:13

21      lunch and dog walking time here.

22              MR. OLASOV:  All I can tell you is that one of

23      the dogs is making moaning sounds.

24              MR. BOUTROUS:  You're trying to make me crack

25      and be nice.  I can tell.  I shouldn't have told you I  14:07:24
```

Page 109

1    love dogs.

2         MR. OLASOV:  Ted, there's nothing I can do

3    that's going to make you crack, and you know it.

4         Q.  BY MR. BOUTROUS:  So this is Exhibit 38,

5    Ms. La Liberte.                                    14:07:38

6         A.  Yes.

7         Q.  It's an article from the Washington Post dated

8    September 27, 2018, entitled, "The shadowy network

9    shaping Trump's anti-immigration policies."

10        Have you ever seen this article?              14:07:50

11        A.  Yes, I did as the exhibition -- exhibits.  Yeah.

12        Q.  And you see there's a color photo there that

13   includes you; correct?

14        A.  Yes.

15        Q.  That's you, and you've got your Make America   14:08:08

16   Great hat on?

17        A.  And it has my name.  The first time this was put

18   out, it had no name, and after this thing came out, it

19   had my name.  No one -- no one knew who I was.  I was

20   at -- go ahead.  Ask your question.               14:08:28

21        Q.  No, no.  Let me just followup.  I'm not sure

22   what you're saying.

23        So are you saying that when this article first

24   came out on September 27, 2018, it didn't have a name?

25        A.  No.  It came out before then.  I -- with no --  14:08:42

                                                     Page 110

```
 1   no name, and then they put it out again.

 2        Q.  So do you know how they got your name?

 3        A.  From the -- from all the activity on this

 4   Joey Luevanos thing.  They thought they'd just put it out

 5   again so that it was -- I was -- I was no one until -- no    14:09:04

 6   one knew me.  No one -- I don't have a name tag on.  This

 7   was taken way before.  This was taken at Los Alamitos,

 8   which was way before Simi Valley.  No one knew who I was.

 9        Q.  So it's your --

10        A.  Wait.  Let me -- let me finish.                     14:09:27

11        Q.  Sure.

12        A.  We're standing outside of Los Alamitos.  There

13   are a lot of young people there who were brought in for

14   this SB54 meeting.  They were serving pizza and drinks,

15   and I went over to get some pizza and drinks because I      14:09:45

16   was hungry, and they said, "No pizza for you," so I

17   didn't get any pizza.  I didn't get into the meeting.

18   And these young people were talking to me, and that's all

19   it was.  She's explaining something, and I'm listening.

20   No one knew my name.  After Simi Valley, they put that      14:10:04

21   out with my name.

22        Q.  So was this Los Alamitos event before or after

23   the Simi Valley City Council Meeting?

24        A.  Way before Simi Valley.

25        Q.  And it's your testimony that this article         14:10:24
```

Page 111

```
 1    appeared earlier without your name on the caption of the

 2    photo?

 3         A.  No.  Just the photo, I was told.  Just the

 4    photo.

 5         Q.  Just the photo?                          14:10:34

 6         A.  Because I don't have The New York Times.  I

 7    never would have seen it.  Only that it had my name was

 8    when it was brought to my attention.

 9         Q.  And who brought it to your attention?

10         A.  I don't recall.                          14:10:49

11         Q.  And just let me clarify, so --

12         A.  I think it was an exhibit of yours.  I think it

13    was one of the exhibits.

14         Q.  So you're saying, though, that this photo was

15    from much earlier, not the article --             14:11:02

16         A.  Yes --

17         Q.  -- correct?

18         A.  The photo.

19         Q.  And you're saying originally the photo did not

20    have your name in the caption?                    14:11:09

21         A.  Correct.

22         Q.  And you first saw the photo at some point in the

23    past where it didn't have your name in the caption?  You

24    saw that yourself?

25         A.  No, I did not see it myself.  My attorney,    14:11:21
```

Page 112

```
 1    Taylor Wilson, told me that.

 2        Q.   Okay.  You'll see the captions says --

 3            MR. OLASOV:  I just want to make it plain that

 4    although she's answered, we're not waiving the

 5    attorney-client privilege.  I think you'll agree with      14:11:36

 6    this.

 7            MR. BOUTROUS:  Yes.  I'm not going to push you

 8    there.

 9        Q.   So --

10            MR. OLASOV:  Thank you.                            14:11:45

11        Q.   BY MR. BOUTROUS:  The -- so question for you,

12    Ms. La Liberte.  The caption says, "Jeanie Nguyen, left,

13    18, a pro-sanctuary-law protester, arguing with Roslyn La

14    Liberte in Los Alamitos."

15            Do you see that?                                  14:12:01

16        A.   Uh-huh.

17        Q.   So you were arguing with this young woman;

18    correct?

19        A.   No.  We were talking.

20        Q.   What did she say?                                14:12:09

21        A.   Okay.  This anger and out of context came after

22    Simi Valley.  I became the face of racism.  People saw

23    anything to do with Roslyn La Liberte, even with no name,

24    anything, they fished.  They -- how do you say where they

25    go through everything to find something about you and     14:12:44
```

Page 113

```
 1    change it to their narrative.

 2           I did not yell at this girl.  I am listening to

 3    her talking to me.  There were many young people there.

 4    They were brought in for this SB54 meeting, sometimes in

 5    buses, sometimes, you know, in groups.  They had pizza.      14:13:06

 6    They had a band, and it was an orchestrated thing.

 7           I never got in.  I stood outside, and people

 8    approached me.  Apparently, wearing the MAGA hat was not

 9    a good idea, because forever and ever now, every bad

10    photo, any photo, every photo can be taken out of            14:13:36

11    context.

12        Q.  Did you think there was something wrong with

13    groups bringing young people to these events?

14        A.  No.  No.  They can speak at these events.

15        Q.  And this article is about a shadowy network           14:13:54

16    shaping Trump's immigration policies.

17           Do you see this?

18        A.  I came there by myself.

19           MR. OLASOV:  Excuse me.  The article will speak

20    for itself.  Objection.                                        14:14:04

21        Q.  BY MR. BOUTROUS:  Have you ever heard of an

22    organization called FAIR, F-A-I-R?

23        A.  I never heard of it until it was put into the --

24    the -- your -- the -- the other -- what do you say?  It

25    said in the -- in the -- your -- the other side said that    14:14:28
```

Page 114

1    I was a member of FAIR.  I had never even seen FAIR in my

2    life.

3        Q.  Do you have any friends who are members of FAIR?

4        A.  No.

5        Q.  Do you know anybody who's been a member of FAIR?    14:14:46

6        A.  I do not -- if -- no one has told me, "I am a

7    member of FAIR," no.

8        Q.  Do you have suspicions that any of your friends

9    are members of FAIR?

10       A.  I did not know what it was, and after this SB54    14:15:01

11   meeting in Simi Valley, I -- I was done with all of

12   everything, and I had no -- even coming into it, I did

13   not know people.  I came to this thing here alone, this

14   Los Alamitos.  I was working in an adjacent town, and I

15   thought I'd go check it out, and I was -- I was there    14:15:29

16   for, like, the -- the -- like, later, like dinner time,

17   after dinner time.

18       Q.  How did you find out about the Los Alamitos

19   meeting?

20       A.  I think Elsa told me about it.    14:15:44

21       Q.  And did Elsa attend as well?

22       A.  I don't recall.

23       MR. OLASOV:  I want to note an objection to the

24   form, because I think her testimony was that she showed

25   up at this meeting but wasn't permitted to go in, and so    14:15:58

Page 115

```
1    didn't -- when you say "attended," you're assuming

2    something --

3             THE WITNESS:  I didn't attend.

4             MR. OLASOV:  -- that is contrary to the fact.

5             MR. BOUTROUS:  Fair enough.                    14:16:09

6             THE WITNESS:  I waited outside.

7             MR. BOUTROUS:  Fair enough.

8        Q.  And you mentioned that the MAGA hat might have

9    been a mistake.  You did continue to wear your Make

10   America Great Again red hat to other events after the   14:16:20

11   Simi Valley meeting; correct?

12            MR. OLASOV:  Objection.  Form.  You've not

13   established that she attended any SB54 meetings after

14   Simi Valley.  I think you ought to ask her that.

15            MR. BOUTROUS:  I may well do that.             14:16:34

16       Q.  But can you answer my question?  You continued

17   to wear your red Make America Great Again hat to public

18   events after the June 25, 2018, Simi Valley meeting;

19   right?

20       A.  No.                                             14:16:49

21       Q.  Never?

22       A.  Never after the --

23       Q.  Not once?

24       A.  Not once.

25            MR. BOUTROUS:  Why don't we take our break right 14:16:56
```

Page 116

1    here.

2            MR. OLASOV:  Okay.  We'll show up again in

3    45 minutes.

4            MR. BOUTROUS:  That sounds great.

5            THE VIDEOGRAPHER:  We are going off the record.    14:17:04

6    The time is 2:16.

7            (Recess.)

8            THE VIDEOGRAPHER:  We are back on the record.

9    The time is 3:03.

10       Q.  BY MR. BOUTROUS:  Welcome back, Ms. La Liberte.    15:03:58

11   You testified earlier --

12       A.  I don't see Ted.

13       Q.  Oh, you don't have me?

14       A.  I didn't see you for a long time.

15       Q.  I'm back.                                          15:04:11

16           MR. OLASOV:  In the break, the client told me

17   that she may have misspoken on one small thing, and she

18   asked me to correct it, and then you can question her

19   about it --

20           MR. BOUTROUS:  Sure.                               15:04:22

21           MR. OLASOV:  -- before you do further

22   examination.

23           MR. BOUTROUS:  Sure.

24           MR. OLASOV:  She testified, I think in

25   substance, that after the Simi Valley council meeting    15:04:29

                                                    Page 117

```
 1    that she attended, she didn't ever attend another event

 2    at which she -- she wear the MAGA hat, and she said she's

 3    not sure whether she wear the MAGA hat, and she's not

 4    sure exactly when this other event was, but there was

 5    some other event in which she may have worn the MAGA hat    15:04:51

 6    and doesn't recall, and she asked me to make sure that

 7    you knew that so that you can follow up if you'd like or

 8    not.

 9            MR. BOUTROUS:  Thank you.

10       Q.  Yeah.  Ms. La Liberte, let me just ask you, you     15:05:04

11    testified that after the Simi Valley meeting, quote, "I

12    was done with all of everything," closed quote.  What did

13    you mean by that?

14       A.  I didn't go to any more of the SB54 meetings,

15    and I recalled with David that this man whose child had    15:05:19

16    been raped that I met at one of these SB54 meetings asked

17    me to go to the consulate at LA to -- for nothing

18    American.  It was Tommy Robinson who's a journalist in

19    England, who was arrested for writing about -- how do you

20    say -- gangs of Middle Eastern men grooming young women.   15:05:53

21            And I said -- he said, "Can you go?"  And I

22    said, "All right.  I'll go."  And I don't think I wore

23    the hat, but I know that your people have been finding

24    random things of me, and there's one with the hat, which

25    I know is not my manicure, but, you know, so I just        15:06:16
```

Page 118

1      wanted to make sure.

2          Q.  BY MR. BOUTROUS:  Okay.  So thank you for that

3      clarification.

4              And a couple other things I just wanted to go

5      back to close the loop on.  At the June 25 Simi Valley        15:06:27

6      City Council Meeting, did you hear any racial slurs from

7      anyone on any topic, not just the ones that were

8      mentioned in the Tweets and the posts?  Did you hear

9      people making any remarks like that during that meeting?

10         A.  Not that I recall, because we were standing,         15:06:45

11     like, way on the edge until the break, and at the break,

12     you know, I sat there, and no one says things while, you

13     know, they're in session.  And during the break, he --

14     Joey immediately came to me, so I didn't hear anything.

15     I was involved in that conversation.                         15:07:08

16         Q.  How about when you were sitting next to Elsa,

17     your friend?  Did she make any remarks that could be

18     viewed as racially insensitive?

19         A.  Well, she's Hispanic.  She's from South America,

20     and so I think she's from El Salvador, so I've never        15:07:22

21     heard her make any racial comments on Hispanics ever.

22         Q.  So if someone said that they had heard her

23     making remarks to you and you two going back and forth

24     making racially insensitive, I'll say, remarks, that

25     person would be lying?                                       15:07:48

                                                       Page 119

```
1        A.  I would say so.  I can't think of where that

2   would happen, unless we were making fun of someone's

3   clothes or something like that.  I mean, you know, like

4   women do, but nothing racial.

5        Q.  On the Fox News interview, I just had a couple      15:08:03

6   more questions about that.  How did that come about?

7        A.  Oh, my -- we -- my husband, his office -- we

8   work at home, so my office is the large one in the back,

9   and his is right up front by the door, and he closed all

10  the shutters and blinds and everything, but he left his     15:08:25

11  open to see if any people were on the street, because we

12  were afraid, because of all of the emails and things.

13        Well, he was monitoring that, and he saw the

14  television van, so he said, "You're not talking to

15  anybody," and I said, "Okay."  And he -- the cameraman      15:08:50

16  and Hal Eisner came to the door, and my husband said,

17  "No, no, no.  We don't want any of this," and then

18  Hal Eisner said something to the effect that he'd already

19  interviewed the boy, Joey, and we want the hear your side

20  of the story.                                               15:09:16

21        And I said -- and he said, you know, "Joey was

22  not, you know, backing up any of this," so I started to

23  cry, actually, and I told my husband, "We have to do

24  this.  We have to do this."  So Hal Eisner came in with

25  the cameraman and took the interview right in my            15:09:33
```

Page 120

```
 1    breakfast area, and that's what we did.

 2         Q.  So by about noon or so on that day, according to

 3    your testimony, on June 20 --

 4         A.  It was after lunch, I'm thinking.

 5         Q.  So you're thinking it was after lunch, but by     15:09:51

 6    then Hal Eisner was able to find your home and come right

 7    to your doorstep because --

 8         A.  I asked him how he did that.  I said, "How did

 9    you know where to find me," and he says, "We have ways,"

10    you know, he made a joke about it.                         15:10:05

11         Q.  Got it.  Thank you.

12         A.  I asked him the same thing.

13         Q.  I'm sorry, what was that?

14         A.  I asked him the same thing you just asked me.

15         Q.  Got it.                                           15:10:18

16             So let's go back.  You also testified earlier

17    that you love children; correct?

18         A.  I do.

19         Q.  But isn't it true you do have a pattern of

20    getting into altercations with children or young people   15:10:30

21    at political events?

22             MR. OLASOV:  Objection.

23             THE WITNESS:  No.

24         Q.  BY MR. BOUTROUS:  Let's go to the next exhibit,

25    which I believe will be 39, and it's at Tab 18.           15:10:40
```

Page 121

```
 1              (Exhibit 39, Video, marked for identification

 2              electronically by counsel.)

 3              MR. BOUTROUS:  I'll play this video and then

 4      I'll ask you a couple questions about it.

 5              (Video played.)                          15:11:17

 6              (Screaming.)  Bitch.  Bitch.  Lady.

 7              Screaming.  Let go.  You let go.

 8              (Video ends.)

 9              MR. BOUTROUS:  You can just pause it right

10      there.                                           15:11:51

11              MR. OLASOV:  I object to you pausing this,

12      because we believe that part of the beginning of the tape

13      is actually replayed at the end so that it's out of

14      sequences.  You ought to play the whole thing.

15              THE WITNESS:  It's out of sequences, because  15:12:08

16      this is -- yeah.  Go ahead, please.

17          Q.  BY MR. BOUTROUS:  Let me ask you some questions

18      about it and you can clarify.  Is that you in the red hat

19      depicted in the video?

20          A.  Yes.                                      15:12:18

21          Q.  And you'll see that this was posted by someone

22      with a handle Camarillo Cares, and they posted it on

23      July 15, 2020, and you see the caption there says,

24      "Someone please let AM Joy on MSNBC Joy Reed know that

25      Roslyn Laliberte does have a history of being violent.   15:12:42
```

Page 122

 1    That is Roslyn in the red Maga hat."

 2              Do you see that?

 3         A.  Yes, I do.

 4              MR. OLASOV:  This exhibit says, "See More," and

 5    it's not shown.  Do you have the real version?          15:12:53

 6              MR. BOUTROUS:  This is the version that

 7    we located on Google through a Google search.

 8              MR. OLASOV:  So --

 9              MR. BOUTROUS:  It's publicly available

10    information.                                            15:13:04

11              THE WITNESS:  It never had my name on it.

12              MR. OLASOV:  Well --

13         Q.  BY MR. BOUTROUS:  So let me ask you a few more

14    questions and --

15         A.  That's --                                      15:13:12

16              MR. OLASOV:  There's something else that's not

17    being shown to the witness, and I just wondered whether

18    you had it.

19              THE WITNESS:  Yeah, it is.  He stopped it in the

20    beginning.                                              15:13:20

21         Q.  BY MR. BOUTROUS:  I'm showing you everything we

22    have, and, you know, I'm going to just ask my questions

23    here to get a sense from Ms. La Liberte what you viewed.

24              When did you first see this video?

25         A.  Right after it happened, like about an hour or  15:13:33

Page 123

1    two after.

2         Q.  After -- after your altercation with that young

3    woman occurred?  "Yes" or "no"?

4         A.  Altercation with me, yes.

5         Q.  I'm going to ask you about that.  So -- and          15:13:47

6    would it be safe -- do you agree this happened in --

7    would it have been December -- or excuse me --

8    February 25, 2017, before the Academy Awards?

9         A.  It was the day before the Academy Awards.

10        Q.  And was this in Hollywood?                            15:14:08

11        A.  Correct.

12        Q.  Was this the event where you met Elsa?

13        A.  No.  I think I knew her before that, yes.

14        Q.  And let's see here, where -- do you remember

15   precisely where this occurred in Hollywood, the street or     15:14:24

16   the location?

17        A.  Where they -- the front of where the awards were

18   going to be, where the red carpet -- we were on the red

19   carpet.

20        Q.  Got it.                                              15:14:38

21             So the red carpet at I think what may have still

22   been known as the Kodak Theatre in Hollywood?

23        A.  Can you see those bushes in the picture?

24        Q.  Yes.

25        A.  Porta potties are behind them.                       15:14:50

```
 1        Q.  Got it.  That helps us set the stage.

 2            So, Ms. La Liberte, my question for you is:  Why

 3   did you, when that young woman took -- first of all, why

 4   did you move towards that young woman with your signs

 5   that said, "Jobs.  Jobs.  Jobs"?  Why did you make that      15:15:05

 6   move?

 7        A.  She was -- she was aggressive to people behind

 8   me, and I was afraid that she was going to do something

 9   to them.  There was an older woman with a young child

10   behind me, and she was screaming very rude things at the     15:15:27

11   young child.

12        Q.  And you felt that justified you moving fairly

13   rapidly towards her with your sign?

14            MR. OLASOV:  Objection to the form of the

15   question.                                                    15:15:45

16            You may answer.

17            THE WITNESS:  I wasn't being aggressive toward

18   her.

19        Q.  BY MR. BOUTROUS:  Well, we'll go back and watch

20   the video again, but let me just say -- let me ask you       15:15:53

21   this:  She then grabs your sign; correct?

22        A.  Excuse me?

23        Q.  She grabbed your sign away from you; correct?

24        A.  And her friend on the other side, too.  Two of

25   them.                                                        15:16:08
```

                                                    Page 125

```
 1        Q.  And at that point, rather than step back and act

 2   peacefully, you went in and started punching and threw

 3   what is known as, like, a haymaker punch at a young

 4   woman; right?

 5        A.  I stepped back.  I was confused.  If you look at      15:16:20

 6   me, I was confused.  I didn't know what happened, and

 7   when I saw both of them attack me at the same time, I

 8   blocked the one, and I punched the other.

 9        Q.  And you punched her very hard, it looked like.

10   I mean, you really swung hard; right?                          15:16:39

11        A.  Well, they -- most women fight with their hands

12   coming from one side or another and then they grab your

13   hair and pull you to the ground, and I just didn't want

14   that to happen, so I just -- I just didn't want to have

15   my hair pulled and grabbed to the ground.                     15:16:57

16        Q.  Have you been in other fights with other women

17   besides this one?

18        A.  No.

19        Q.  Then how do you know how women generally fight?

20        A.  Because I just know that.  I went to Inglewood.       15:17:09

21   I mean, I know.  I know where -- I know about this stuff.

22        Q.  So let's go back and just watch again, because I

23   want you to see -- I'm going to have a couple more

24   questions.  If we go back to the beginning of the video.

25        A.  Sure.                                                 15:17:28
```

Page 126

```
 1              MR. OLASOV:  Do me the courtesy of playing the

 2      whole thing.

 3              MR. BOUTROUS:  Sure.  We'll play it through to

 4      the end this time.

 5              THE WITNESS:  There are people in the              15:17:35

 6      background.

 7              MR. BOUTROUS:  We'll play it through to the end.

 8      I'm just going to -- here we go.

 9              (Video played.)

10              THE WITNESS:  Do you hear screaming?              15:17:51

11              (Inaudible talk.)  You two let go.  Let go.  Let

12      go.

13              Break it down.  You did -- you mean bitch.

14              Hey.  (Screaming.)  Hang on.  This little girl

15      is just a girl.  You're crazy.  You're crazy.  What's     15:18:32

16      your problem, bitch?  You're cracking up.  (Screaming.)

17      Don't touch my camera.  You can't even vote.  I'm Latina

18      and I say build that wall.  These illegal immigrants -- I

19      actually have a son that was killed by an illegal

20      immigrant.  There's a lot of crimes happening by these    15:19:11

21      illegal immigrants that I'm not for.  They're losing, and

22      it's a price they're going to pay.  They're losing

23      support of the arts, of films.  We are boycotting many

24      actors and films and directors who have an anti-American

25      agenda, a globalist agenda or anti-Trump agenda.          15:19:33
```

Page 127

```
 1    (Sirens.)

 2            (Video ends.)

 3            MR. BOUTROUS:  And that's the end.

 4       Q.  So let me ask you this, Ms. La Liberte:  It

 5    appeared to me that you were sort of chasing that young    15:20:05

 6    woman with your sign back over to the rope line there.

 7            Do you think that's appropriate behavior for an

 8    adult with respect to a young woman?

 9            MR. OLASOV:  Objection as to form.  It assumes

10    something that's contrary to her testimony, I believe,    15:20:20

11    and so why don't you establish the predicate before you

12    ask her another value question?

13            MR. BOUTROUS:  The video speaks for itself.

14       Q.  I asked you a question.  You should answer it.

15       A.  No, I was not chasing her.                         15:20:36

16       Q.  You were -- were you following her?

17       A.  If you listen carefully, she's the aggressor

18    calling me a bitch and fuck you, bitch.  Oh, that's one

19    of the six words.  Anyway, no, no.

20       Q.  Did that make you mad?                             15:20:56

21       A.  No.  I'm confused.  I was confused when she

22    grabbed the sign.  Why don't you -- why don't you play it

23    back and see my face.

24       Q.  We've watched it twice --

25       A.  No.  Let's look at the faces.  Let's look at the   15:21:10
```

Page 128

```
 1    faces and who's the aggressor.  Let's look at that

 2    closely, please.

 3         Q.  You can do that -- you can do that when the

 4    deposition's over.  We've watched it twice.

 5         But let me ask you this:  Do you think that an        15:21:24

 6    adult --

 7         A.  I don't think you watched it correctly if you

 8    think that I was the aggressor, because if you see them

 9    doing their little pranks, which were just pranks, you'd

10    miss the part where they did the prank against the young   15:21:42

11    grandchild and called it a retard.  Is that one of the

12    six words we can't use, too?

13         Q.  You think that --

14         A.  She called the young boy a retard.

15         Q.  Do you think that a prank by a teenager          15:21:52

16    justifies an adult woman punching them and thrashing

17    them?

18         A.  No, no -- go ahead.

19         Q.  Isn't that what you did?

20         MR. OLASOV:  Objection as to form.                   15:22:05

21         Q.  BY MR. BOUTROUS:  Isn't that what you did?  You

22    punched a teenager in a public place during a protest;

23    right?

24         A.  I protected myself from two teenagers in a

25    public place, and --                                      15:22:17
```

Page 129

1          Q.   And do you have any regrets about that?

2          A.   Wait.  Why don't you say two teenagers punching

3     an elderly woman.  I was 64 years old.

4          Q.   How old are you now?

5          A.   67.  I'll be 68 in November.                    15:22:29

6          Q.   So if you had it to do over again, you'd punch

7     those two teenagers again?

8          A.   No.  I told -- I told the police how old I was.

9          Q.   And do you -- what were you protesting that day?

10         A.   We weren't protesting.                          15:22:46

11         Q.   What were you doing?

12         A.   We were supporting our president, because he was

13    being maligned by the arts.  This was right after he was

14    elected, and they were maligning him at the Academy

15    Awards.  And we -- we live in a town where if you're a     15:23:08

16    Trump supporter and -- and you work for the arts, it's

17    very difficult.  I'm sure a lot of the people on the red

18    carpet were -- there were some Trump supporters out of

19    all these hundreds of people, so we were representing

20    them.                                                     15:23:33

21         Q.   Had -- you know, so you say in your Complaint

22    that you have a passion for immigration issues.  Has that

23    passion caused you to lose your temper and get in

24    physical alterations with other people, other than the

25    events we've talked about so far?                         15:23:46

                                                         Page 130

```
 1        A.  No.  Not that I recall and -- no.

 2        Q.  Now, you said you were protesting because the

 3   Academy Awards were maligning Donald Trump, but they

 4   hadn't happened yet, right, they were going to be the

 5   next day?                                          15:24:00

 6            MR. OLASOV:  Objection.  Contrary to her

 7   testimony.

 8            THE WITNESS:  We -- the Emmy's had already --

 9   not the Emmy's.  I'm sorry.  The Golden Globes had

10   already taken place and many other events in Los Angeles.  15:24:10

11   I don't know if you follow it here in New York, but

12   they're pretty important there.

13        Q.  BY MR. BOUTROUS:  Let me ask you this:  Would it

14   be fair --

15        A.  I --                                      15:24:22

16        Q.  I'm sorry?

17            MR. OLASOV:  Excuse me, Mr. Boutrous, I think

18   I'll be able to help you here.

19            Ros, let Mr. Boutrous ask the questions.  You're

20   not proceeding in narrative form.  You're answering   15:24:34

21   questions that are posed by counsel.  Let him do it,

22   please.

23            THE WITNESS:  I'm sorry, Mr. Boutrous.

24        Q.  BY MR. BOUTROUS:  No problem.

25            Would you agree you're a person who can anger  15:24:43
```

Page 131

 1    quickly?

 2         A.   No.  I'm a business owner who works in

 3    construction with men all day long.  I cannot be an angry

 4    woman.

 5         Q.   But you're a woman who punched a teenager at a      15:25:03

 6    demonstration?

 7         A.   I defended myself at a -- from two women who

 8    were trying to hit me.

 9         Q.   And they looked like they were probably, what,

10    15 or 16 years old?                                         15:25:16

11         A.   Why don't you look up their names and ages?

12         Q.   How old did you think they were?

13         A.   I didn't -- I saw two women trying to beat me,

14    and I saw two women trying to be aggressive toward a

15    child smaller than them who was 12 and 10 years old.        15:25:31

16         Q.   Who was that child?

17         A.   It was a grandson of one of the people there.

18         Q.   Who was the person?

19         A.   She was the one in the wheelchair.  I don't know

20    her name.                                                   15:25:46

21         Q.   Did you hear anything on the video that

22    suggested that those two young women were directing any

23    comments towards a child?

24         A.   The whole event wasn't videoed.  This event

25    started at 10:00 in the morning.                            15:26:04

                                                          Page 132

```
 1          Q.  But did you hear anything in the clip that I

 2    played you that suggested that those two young women were

 3    making remarks about the grandchild?

 4              MR. OLASOV:  If you recall, you can --

 5              THE WITNESS:  Not in the video.  That was        15:26:20

 6    that -- that was -- they were moving away from it,

 7    because -- because I was there.

 8              MR. BOUTROUS:  I'd like to go to the next --

 9    mark another exhibit, please.  The -- it will be the next

10    in order, which I believe would be Number 40, and it's     15:26:44

11    Tab 70.

12              (Exhibit 40, PLAINTIFF 10171 - 76, marked for

13              identification electronically by counsel.)

14          Q.  BY MR. BOUTROUS:  Hopefully we can enlarge that.

15          A.  Thank you.                                       15:27:21

16          Q.  And, Ms. La Liberte, these are texts between I

17    think your son, Doug, and you that you produced during

18    discovery to us.  Do those look familiar?

19          A.  I think it's my daughter.  I don't know if it's

20    me.  Is it me?  Wait.                                      15:27:34

21          Q.  Oh, you're right.  I believe it's a text between

22    Doug, your son, it says and someone else.

23          A.  And Savannah.

24          Q.  You think it was Savannah?  Thank you.

25          A.  Yeah.                                            15:27:43
```

Page 133

1          Q.  That was what I was going to ask you.  You

2    helped me out there.

3          A.  Because I wasn't able to use my phone.  It was

4    all --

5          Q.  And this -- you see the name Doug at the top          15:27:56

6    there, so that's your son Doug, and what's -- and Doug's

7    last name?

8          A.  Is Codron.

9          Q.  Codron, C-O-D-R-O-N?

10         A.  Yes.                                                   15:28:10

11         Q.  And then the date of the texts are there,

12   June 29, 2018.

13         A.  Correct.

14         Q.  The time is 12:35 p.m.; correct?

15         A.  Yes.                                                   15:28:20

16         Q.  And does Doug live in California?

17         A.  He lives in San Francisco.

18         Q.  So he's on Pacific Time; correct?

19         A.  Correct.

20         Q.  So the texts read:  "How are things at the           15:28:29

21   house?"  And the response is, "Fine."

22              MR. OLASOV:  No.  The response is good.

23              THE WITNESS:  No.  It says fine.

24              MR. OLASOV:  Oh, fine.

25              MR. BOUTROUS:  Fine.  Yes.                           15:28:42

                                                          Page 134

```
 1              MR. OLASOV:  I misread.

 2         Q.  BY MR. BOUTROUS:  Then Doug responds, "Good.

 3    Always here to talk if you want to discuss anything";

 4    correct?

 5         A.  Yes.                                        15:28:53

 6         Q.  Then Savannah, who you believe is responding,

 7    says, "It's just horrible and frustrating"; correct?

 8         A.  Uh-huh.

 9         Q.  And again, this is at 12:35 p.m. June 29, 2018,

10    Pacific Time; correct?                               15:29:08

11         A.  Yes.

12         Q.  And Doug then says, "Mistakes happen.  Hopefully

13    we learn"; correct?

14         A.  Correct.

15         Q.  Do you have any sense of what Doug meant by     15:29:23

16    hopefully we learn?

17              MR. OLASOV:  Objection.

18              THE WITNESS:  No, I don't.

19         Q.  BY MR. BOUTROUS:  Have you talked about Doug

20    with -- about anything in terms of things that you should  15:29:33

21    have learned based on past events ever?

22         A.  No.

23         Q.  And then Savannah, the person who is replying

24    says, "Should of learned last time though."  Do you have

25    a sense what -- do you know what Savannah was referring    15:29:52
```

                                                    Page 135

1    to when she said, "Should have learned last time though"?

2        MR. OLASOV:  I think that you're asking the

3    second question, not the first question.

4        Q.  BY MR. BOUTROUS:  I'm asking -- the question is:

5    Do you know what Savannah was referring to when she said,    15:30:09

6    "Should of learned last time though"?

7        A.  No.

8        Q.  Is she referring to a prior event where you did

9    something where you should have learned your lesson?

10       A.  I don't know.  I don't know what she's referring    15:30:28

11   to.

12       Q.  Do you think perhaps she was referring to the

13   February 25, 2017, incident before the Academy Awards

14   where you punched and got into a fight with some

15   teenagers?    15:30:44

16       MR. OLASOV:  Objection to the form of the

17   question, assumes facts contrary to evidence.

18       Q.  BY MR. BOUTROUS:  Can you answer the question,

19   please?

20       A.  No.  I don't know what she talks to her brother    15:30:54

21   about me.  They're --

22       Q.  Is it possible -- oh, sorry.

23       A.  They're siblings.  They talk about different

24   things.

25       Q.  Is it possible that they're referring to that    15:31:05

Page 136

```
 1    event in February of 2017?

 2            MR. OLASOV:  Objection.  Calls for speculation.

 3            THE WITNESS:  This is a year -- this is two

 4    years after.  This is two years after that.  That was a

 5    year and three months after.  I don't think they'd be          15:31:21

 6    referring to anything of that sort.

 7        Q.  BY MR. BOUTROUS:  Did you discuss the

 8    February 25, 2017, altercation before the Academy Awards

 9    with Savannah?

10        A.  Yes, I did.                                            15:31:39

11        Q.  And can you describe your conversations with her

12    about that event?

13        A.  I told her how it happened, and I'm her mother,

14    and she probably, you know, didn't like to see her mother

15    in public like that.  It's embarrassing, but I explained      15:31:57

16    to her what happened, and she was good with it.

17        Q.  And did you have a discussion with Doug about

18    that incident in February of 2017?

19        A.  Doug was --

20            MR. OLASOV:  Excuse me, I'm not sure whether           15:32:12

21    you're asking about ever have a conversations with Doug

22    or have a conversation in February of 2017.  It's not

23    clear what you're asking.

24        Q.  BY MR. BOUTROUS:  I'm asking whether you ever

25    had a conversation with Doug about that event in 2017 in       15:32:28
```

Page 137

```
 1    February?

 2              MR. OLASOV:  You can answer.

 3              THE WITNESS:  Doug and I watched it on YouTube

 4    together.

 5         Q.  BY MR. BOUTROUS:  When?                        15:32:39

 6         A.  Probably the summer after it happened.

 7         Q.  So the summer of 2017?

 8         A.  Yeah.

 9         Q.  What was Doug's reaction?

10         A.  He just was amazed at how many people watched   15:32:53

11    it.

12         Q.  Was he embarrassed by it?

13              MR. OLASOV:  Objection.

14              THE WITNESS:  No, not really.

15         Q.  BY MR. BOUTROUS:  So the -- and what caused you  15:33:07

16    and Doug to watch this in the -- the video of the

17    February 25, 2017, event in the summer of 2017?

18              MR. OLASOV:  Objection to form.

19              You may respond.

20              THE WITNESS:  I said, "It's still -- this thing  15:33:20

21    is still up.  Do you want to see it?"

22         Q.  BY MR. BOUTROUS:  And so you had seen it before

23    you watched it with Doug?

24         A.  Oh, yeah.  I said I saw it the day it was -- the

25    day it happened.  Someone sent it to me.           15:33:34
```

Page 138

1          Q.  So it was posted the day it occurred,

2     February 25, 2019 --

3          A.  I don't know if it was posted.  Someone sent it

4     to me.

5          Q.  Someone sent it to you.                          15:33:47

6              And then it was publicly available on YouTube?

7          A.  Yes.

8          Q.  For all the world to see?

9          A.  With no name on it, yes.

10         Q.  But for anyone who knew you and saw you, they    15:33:56

11     would have seen what you were doing at that event?

12         A.  There are thousands of pictures and videos of

13     things like that.  It wasn't isolated as the video of the

14     time, no.

15         Q.  Were you embarrassed to have that video publicly  15:34:13

16     available on YouTube?

17         A.  Not really.

18         Q.  And the text conversation goes on after the --

19     Savannah, we believe, says, "Should have learned last

20     time though."  Doug says, "Sometimes it takes a big       15:34:30

21     jolt."

22             Do you see that?

23         A.  Uh-huh.

24         Q.  And then Savannah replies, "Yeah but it affects

25     us too"; correct?                                         15:34:39

                                                         Page 139

```
 1        A.  Correct.

 2        Q.  Doesn't that sound like your children were

 3   feeling pain from your actions?

 4            MR. OLASOV:  Objection to the form of the

 5   question.  It's really, really improper as to form.      15:34:50

 6        Q.  BY MR. BOUTROUS:  Doesn't that tell you that

 7   they were feeling pain because of our actions,

 8   Ms. La Liberte?

 9            MR. OLASOV:  Objection.

10            THE WITNESS:  No.                                15:35:04

11        Q.  BY MR. BOUTROUS:  And then --

12        A.  I have five kids.  I have five kids.  Okay.  At

13   one time or another I don't cook the right food, I don't

14   wash the clothes right, I don't pick them up on time, I

15   can't even then buy into this at all.                     15:35:24

16        Q.  So Doug then responds, "It's ok.  Anyone with an

17   opinion worth being concerned with would judge a person

18   by their own actions.  Not someone elses"; correct?

19        A.  Yes, that's what he wrote.

20        Q.  And isn't it fair to say that Doug is trying to  15:35:44

21   explain to Savannah why they shouldn't be judged by your

22   actions because they feel you acted improperly?

23            MR. OLASOV:  Objection.  Objection --

24            THE WITNESS:  I think just the opposite.  I'm

25   sorry.                                                    15:35:59
```

Page 140

```
 1          Q.  BY MR. BOUTROUS:  What do you think Doug meant

 2     when he said --

 3          A.  I --

 4          Q.  I'm sorry.  May I ask my question?

 5          A.  My son was very concerned about me and very much    15:36:09

 6     trying to work out what happened to me, help me solve it.

 7     This -- I don't know what you're -- what you're thinking

 8     this means.  He was there for me all night long on the

 9     29th.  They -- he saw the Hal Eisner account and sent it

10     out to -- multiple times to Joy Reid saying, "This is not    15:36:46

11     my mother, what you're writing here," so I don't know

12     what you're trying to put out here.  I'm sorry.  It's

13     going past me.

14              MR. BOUTROUS:  Can we go -- I think -- is there

15     another page to this document?  Go -- scroll down.  I       15:37:02

16     think that maybe --

17          Q.  So here's Doug again.  He says -- talking about

18     Tony Aaron.

19          A.  Yeah, that was that guy that you had this

20     morning, right.                                              15:37:26

21          Q.  And here you'll see there's a reference to

22     Hal Eisner; right?  I can't -- "the one who interviewed

23     her was Hal Eisner."

24              Do you see that?

25          A.  But it doesn't say the time.                       15:37:37
```

Page 141

1      Q.  But it does suggest that you had already

2   interviewed with Hal Eisner before this text chain, which

3   was at, I believe, 12:39 on June 29th; correct?

4         MR. OLASOV:  Let's have that read back, please.

5   I think you've got it just backwards.                    15:37:59

6      Q.  BY MR. BOUTROUS:  Well, the text at the top, do

7   you see if we go back.

8         MR. OLASOV:  Would be earlier; right?  The

9   Hal Eisner thing is later.

10        THE WITNESS:  It's later, yeah.  It's later than    15:38:18

11   12:35.  It could be any time.  It was -- because he

12   didn't come to my house until like 1:00 or so, so --

13      Q.  BY MR. BOUTROUS:  You're sure.

14      A.  -- it doesn't -- the times --

15      Q.  You're sure?                                       15:38:32

16      A.  Yes.

17      Q.  Okay.  Let's move to another topic.

18        So you've mentioned hate messages that you

19   received; correct?

20      A.  Yes.                                               15:38:53

21      Q.  And I'm going to ask you a few questions about

22   hate messages, and when I do that, I'm going to mean by

23   email, ordinary mail, phone, social media posts,

24   comments, so I'm going to kind of talk about anything

25   that, you know, is hateful towards you that was sent to   15:39:10

Page 142

```
 1    you.

 2             Prior to your attendance at the City Council

 3    Meeting in Simi Valley, had you ever received any hate

 4    mail at all?

 5        A.  No.                                          15:39:25

 6        Q.  Do you recall in paragraph 92 of your Complaint

 7    you said you began receiving hate messages as a result of

 8    Joy Reid's post.  Is that a true statement?

 9        A.  No, it's not.

10        Q.  Why is that not a true statement?             15:39:45

11        A.  Because I had some hate messages the afternoon

12    of the 28th, and then when -- after Joy Reid's posts came

13    to my attention, it was a tsunami of hate mail posts, so

14    it was dribs and drabs and things that I couldn't

15    explain, and then it got more and more when hers came    15:40:13

16    out, which made me the face of racism.  Hate is real,

17    y'all.  That came out.  It was unbelievable.

18        Q.  But you had already received a torrent of hate

19    mail and communications before you did your interview

20    with Hal Eisner; correct?                              15:40:36

21             MR. OLASOV:  Objection to the form of the

22    question.

23        Q.  BY MR. BOUTROUS:  Correct?

24        A.  Yes.

25             MR. BOUTROUS:  Let's go to Tab 10 and mark as   15:40:47
```

                                                    Page 143

```
 1    the next exhibit that document, please.

 2            (Exhibit 41, La Liberte v. Reid Opinion, marked

 3            for identification electronically by counsel.)

 4            THE WITNESS:  There you are.  I haven't seen you

 5    for so long.                                      15:41:16

 6        Q.  BY MR. BOUTROUS:  Oh, really?  Am I disappearing

 7    from the screen?

 8        A.  I'm not looking at you.  I'm looking at --

 9        Q.  That's weird.  I'm seeing myself.

10            MR. BOUTROUS:  Is everyone else seeing me?    15:41:25

11            THE WITNESS:  Now, now.

12            MR. OLASOV:  I'm seeing myself, to be honest.

13            THE WITNESS:  Oh, see, we can't see you at the

14    same time.

15            MR. OLASOV:  You were on screen for a while,    15:41:33

16    Ted.

17            THE WITNESS:  I don't want you to think I'm rude

18    because I'm looking over here.

19        Q.  BY MR. BOUTROUS:  No problem.  It's very weird,

20    because I'm looking over here and then looking at you, so   15:41:43

21    understood.

22            So if we could go to -- this is the opinion --

23    excuse me -- from the Second Circuit in this case, which

24    was issued July 15, 2020, and if we go to page 7, please.

25    This is now Exhibit 41.                           15:42:03
```

Page 144

1          You'll see the part that we have highlighted,

2     you'll see that the second blue highlighted section says,

3     "By the time of the interview," this is the interview

4     with Hal Eisner, "the photograph had gone viral, along

5     with accusations that La Liberte had screamed vile racist        15:42:28

6     remarks at a child."

7          Do you agree with that statement from the Court?

8          A.  Yes, but there's degrees of viral.

9          Q.  But you agree with that statement from the

10    Court?  "Yes" or "no"?                                           15:42:40

11         A.  Yes, I do, but there are degrees of viral.  It

12    was viral, and then there's worldwide viral where 100

13    and -- a million 200 people contacted -- how many million

14    people who contact how many million people.  It's like

15    that old ad about the shampoo, tell one person, and one         15:42:59

16    person will tell another person and another person and

17    we'll sell lots of shampoo.  That's what came into my

18    head, that it was never going to end, because she had

19    unleashed the whirlwind on -- with her media platform,

20    and that's when it became insufferable.                         15:43:19

21         Q.  Let me go back up in -- higher in that

22    paragraph.  It says -- this is the Court ruling, and the

23    Court says, quote, "La Liberte appeared for a television

24    interview after Vargas presented his tweet but before

25    Reid's posts were presented," closed quote.                     15:43:41

Page 145

```
 1              You agree that's a correct statement; correct?

 2        A.   We don't know that.  We do not know that.

 3   Because of the time difference, that's not true.  If she

 4   posed it in her time and we saw it at our time, it could

 5   have come out sooner, and that's what I'm thinking it is.    15:43:57

 6   I think it came out sooner.

 7        Q.   But you disagree with what the Court said in the

 8   decision?

 9              MR. OLASOV:  Objection.  Argumentative.

10              THE WITNESS:  I wasn't in the court.              15:44:10

11              MR. BOUTROUS:  Let's go to -- mark a new

12   exhibit.  Well, let me back up for a second.

13        Q.   So how many hate messages do you believe that

14   you received after Mr. Vargas published his Tweet on

15   June 28, 2018?                                              15:44:31

16        A.   Probably -- I don't know.  It's hard to count.

17   They were -- less than the hundreds, less than -- like,

18   maybe -- I don't know.  I would erase a lot of stuff, and

19   it went to different emails, too.  So some people would

20   send it to one email and then the other email.             15:44:50

21              So 50, 60, like that, and then there were phone

22   calls, and there were Twitters also, so 100 or so like

23   that, maybe.  But if you've never had anything like that,

24   100 is overwhelming.

25        Q.   And other well-known celebrities made social     15:45:12
```

                                                    Page 146

```
 1    media posts accusing you of engaging in racist conduct

 2    before Ms. Reid made her post; correct?

 3         A.  Yes.

 4         Q.  So let's look at a few of those.

 5              MR. BOUTROUS:  Let's go to -- let's mark as the      15:45:26

 6    next exhibit what's at Tab 30, please.

 7              (Exhibit 42, JR_0000224, marked for

 8              identification electronically by counsel.)

 9         Q.  BY MR. BOUTROUS:  So this, Ms. La Liberte, is a

10    Tweet from Nancy Sinatra.                                      15:46:09

11         A.  A singer, not a journalist, right?  She's a

12    singer.

13         Q.  She's a singer.

14         A.  But not a journalist.  No?  Right?

15         Q.  Correct.                                              15:46:20

16         A.  Okay.

17         Q.  She's the daughter of Frank Sinatra; correct?

18         A.  I know who she is.

19         Q.  She's a celebrity; correct?

20         A.  A singer.  One song hit, right.                       15:46:28

21         Q.  But a celebrity?

22         A.  Yes.

23         Q.  And she's blue check verified on Twitter;

24    correct?

25         A.  I'm sorry?                                            15:46:37
```

Page 147

1          Q.  She's got a blue checkmark, which on Twitter

2     means she's verified on Twitter; correct?

3          A.   Okay.  Yeah.  I know who she is.

4               MR. BOUTROUS:  Let's go to the next exhibit

5     please, which will be Number 43.                        15:46:48

6               THE WITNESS:  Uh-huh.

7               (Exhibit 43, PLAINTIFF 10060, marked for

8               identification electronically by counsel.)

9               THE CONCIERGE:  Which tab?

10              MR. BOUTROUS:  Oh, I'm sorry.  Tab 71.          15:47:10

11              MR. OLASOV:  Before we go from 42 to 43, is --

12     there's a signal that says, "This tweet is unavailable."

13     Can we have a representation of counsel as to what that

14     means in relation to this exhibit?

15              MR. BOUTROUS:  Yes.  Let me just describe it.   15:47:39

16     So the Tweet was at 6:50 p.m., June 28, 2018.  It -- I

17     can represent to you that it's, I believe, Retweeting

18     another tweet that was then deleted, and I believe she's

19     Retweeting the Alan Vargas Tweet here, but since

20     Mr. Vargas deleted his Tweet at some point, the Tweet is  15:47:59

21     no longer available.

22              MR. OLASOV:  So we don't know when this

23     document -- or you don't know when this document is

24     generated in this form?  I just want the record --

25              MS. MULLIGAN:  Ted, do you mind if I?          15:48:16

Page 148

```
 1              MR. BOUTROUS:  Please, Ms. Mulligan, go ahead.

 2              MS. MULLIGAN:  So this is a post from Nancy

 3      Sinatra.  Nancy Sinatra's post was at 6:50 p.m. on

 4      June 28, 2018.  It's a Retweet of the link you see, the

 5      beginning right here.  It says, "TRNorthridge."  It's a      15:48:32

 6      Retweet of that user's Tweet, and that user's Tweet was

 7      no longer available, but we can still see Nancy Sinatra's

 8      Tweet.

 9              MR. OLASOV:  So when was this document

10      generated?                                                   15:48:48

11              MS. MULLIGAN:  The Nancy Sinatra Tweet occurred

12      at 6:50 p.m. June 28, 2018.

13              MR. OLASOV:  No, no.  Not the date they did

14      theirs.  When did you copy -- when was this document

15      copied for use in this proceeding in its present form?       15:49:01

16      I'm just trying to figure out what this relates to, what

17      this -- when this became unavailable.

18              MS. MULLIGAN:  I believe that these are some of

19      the documents that, you know, you and -- not you

20      specifically, but Mr. Wood asked that Ms. Reid preserve      15:49:19

21      related to this issue, and I believe that those were

22      preserved around the time his letter was served, and this

23      was also produced to you in discovery.  It has the

24      Bates-stamp.

25              MR. BOUTROUS:  And we can follow up and get you      15:49:34
```

Page 149

1    more information, to the extent there is any on that.

2          So I'd like to now move to Exhibit 43.

3          MR. OLASOV:  This bears a Bates-stamp in the

4    base that shows it was a produced document.  Thank you.

5          MR. BOUTROUS:  Correct, yes.  Thank you.          15:49:48

6          THE WITNESS:  Okay.

7          MR. BOUTROUS:  If we can go to Exhibit 43.

8      Q.  So this is an email involving your son Doug.  I

9    believe Steven is his father; is that correct?

10     A.  Yes.                                               15:50:09

11     Q.  And you'll see that this is on July 2, 2018, at

12   10:46 a.m., and the -- the top email, but they're talking

13   about the fact that it was sent to Joy Reid.  Nancy

14   Sinatra is mentioned.  Alan Vargas is mentioned.  And

15   then a little bit down below, at 6:45 a.m., I guess it's   15:50:32

16   the first -- one of the earlier emails, Doug writes:

17   "Mom spoke with the lawyer this morning.  She said he's

18   taking the case pro bono and he's drafting a cease and

19   desist letter to Joy Reid.  She said he is going to sue

20   her personally.  She is also going to go after the 17      15:50:53

21   year old Vargas and Nancy Sinatra."

22          Do you see that?

23     A.  Yes, I do.

24     Q.  Was the lawyer you were talking about here

25   Lin Wood?                                                15:51:03

                                                    Page 150

1        A.  Yes, it was.

2        Q.  And did he take your case pro bono?

3        A.  Yes, he did.

4        Q.  Is anyone else funding your lawsuit?

5        A.  I'm paying.  I'm already into a large amount of      15:51:13

6    money.  Thank you.

7        Q.  So are your current lawyers --

8            MR. BOUTROUS:  Yes, Mr. Olasov?  Are you

9    objecting?

10           MR. OLASOV:  Let me just lodge my objection.      15:51:23

11   First, we agreed to exchange information concerning fee

12   arrangements provided one day to the other's documents.

13   You guys decided not to provide documents concerning

14   your -- our client's arrangements, but I can tell you

15   there's an unsigned engagement letter of one date, and      15:51:42

16   there's a signed letter of engagement of a very

17   subsequent date, much subsequent to this, and that's --

18   that's -- that's what the record would show if we

19   exchanged engagement and funding arrangements, which you

20   guys decided not to do.                                     15:52:01

21           MR. BOUTROUS:  Fair enough.

22       Q.  Let me ask you a couple other questions about --

23           MR. OLASOV:  (Inaudible) whether MSNBC, for

24   instance, is funding the Joy Reid defense.

25           MR. BOUTROUS:  Your objection is noted, and I'm      15:52:10

Page 151

```
 1   moving on.

 2            MR. OLASOV:  Okay.

 3        Q.  BY MR. BOUTROUS:  So my question for you,

 4   Ms. La Liberte, is:  This says that you were going to go

 5   after the 17-year-old Vargas and Nancy Sinatra, but you        15:52:21

 6   never did, did you?  You didn't sue them?

 7        A.  This is Doug and his father.  Doug -- I tell

 8   Doug something on one day, and then it changes to the

 9   next day.  It's hearsay.  I don't know what Doug is

10   telling his father.  I don't recall any of this.  Okay?        15:52:45

11            MR. OLASOV:  We can stipulate that the only

12   defendant in this case is your client.

13            MR. BOUTROUS:  Yeah, no.  I'm aware of this.  I

14   am aware of that.  I have more questions.  Please

15   don't --                                                       15:52:58

16            MR. OLASOV:  We haven't sued anybody else.

17            MR. BOUTROUS:  I'm reclaiming my time, as they

18   say in Congress.

19        Q.  So let me ask you this:  Do you know that

20   Nancy --                                                       15:53:06

21            MR. OLASOV:  I yield to the lawyer from Los

22   Angeles.

23        Q.  BY MR. BOUTROUS:  Ms. La Liberte, do you know

24   that Nancy Sinatra had 209,000 Twitter followers in 2018?

25        A.  209,000 Twitter followers?  You're telling me        15:53:19
```

Page 152

1    that now?

2         Q.  Yes.  Did you know that?

3         A.  Clearly substantially less, since she's not a

4    journalist, so -- that's a singer.  I mean, it's not the

5    same thing.                                              15:53:36

6         Q.  So you think it's very significant that

7    Ms. Reid, when she Retweeted Alan Vargas, had 1.2 million

8    followers, as opposed to the 209,000 that Ms. Sinatra

9    had; correct?

10         MR. OLASOV:  I don't think -- excuse me --        15:53:51

11         MR. BOUTROUS:  Mr. Olasov, stop interrupting.

12         MR. OLASOV:  Beg your pardon --

13         MR. BOUTROUS:  You're making speaking

14    objections.  The witness was about to answer my question.

15    Your objection is preserved.                           15:53:58

16         MR. OLASOV:  Objection is to form, because I

17    think you've assumed some fact not in evidence.

18         Q.  BY MR. BOUTROUS:  Ms. La Liberte, you can answer

19    the question.

20         MR. OLASOV:  Go ahead and respond.                15:54:09

21         THE WITNESS:  Her followers are different than

22    Ms. Joy Reid's followers, even if they are a substantial

23    amount of 200,000.  A million 200 of a journalist who has

24    a television show and a broadcast platform is different

25    than a has-been singer who basically talks to the LA     15:54:30

Page 153

```
 1    crowd in LA, so, no, there was no relation between the

 2    two.

 3        Q.  BY MR. BOUTROUS:  But you believe Nancy

 4    Sinatra's Tweet -- Retweet harmed you; correct?

 5        A.  Not in the same effect as putting me the face of    15:54:47

 6    racism from Joy Reid's Tweet.  Y'all race -- she was

 7    speaking to a different crowd.

 8        Q.  But do you agree with me that --

 9        A.  Wait.

10        Q.  -- that's not my question.                          15:55:01

11        A.  Can I finish?  Can I finish?  Nancy Sinatra was

12    speaking to the elitist crowd of actors and actresses and

13    performers, where Joy Reid is speaking to the whole --

14    the whole journalistic platform.  She's a journalist and

15    a renowned journalist and an influential journalist.  One   15:55:25

16    person is not the same as the other person.

17        Q.  So you think that when Joy Reid Retweeted

18    Vargas' Tweet to 1.2 million followers, that was

19    extremely damaging to you; correct?

20        A.  It was extremely damaging, and it was worse when     15:55:42

21    she added that photograph.

22        Q.  In the Instagram post?

23        A.  In the Instagram, yes.

24        Q.  Let's just stay with the Retweet, and part of

25    the reason you think it was extremely damaging when she     15:55:54
```

Page 154

1    Retweeted was because of the different nature of her

2    followers on Twitter compared to Nancy Sinatra; correct?

3        A.  And the number of followers and the world number

4    of followers.  She's a journalist that speaks to crowds

5    in every place.  She has a show that is a speaking show,          15:56:11

6    so it can go to everywhere, to -- I had phone calls and

7    things from Australia, from Africa, from South America,

8    from England.  I mean, it was a large, large platform.  I

9    don't think Nancy -- I can't say for certain, but being a

10   person who's in the real world, I don't think she has a          15:56:39

11   platform like that.

12       Q.  Let me show you another Tweet.  This will be

13   Exhibit 44.  It's Tab 31.  It's from someone named, on

14   Twitter at least, Immortal Technique.

15              (Exhibit 44, JR_0000216, marked for                   15:56:53

16              identification electronically by counsel.)

17       MR. OLASOV:  Mr. Boutrous, when you find a

18   suitable time, I'd like to take a short break.  I'm

19   finding that the afternoon bickering between parties is

20   taking place as always, and I think we could all benefit         15:57:16

21   from a short break, but I want you to tell us when you'd

22   like to do it.

23       MR. BOUTROUS:  Sure.  Maybe I'll go for another

24   ten minutes or so and then we can take a break.

25       MR. OLASOV:  Okay.  Thank you.                               15:57:31

                                                         Page 155

```
 1              MR. BOUTROUS:  You bet.

 2         Q.  So this is a Tweet, Ms. La Liberte, from

 3    Immortal Technique, and like Nancy Sinatra, it's a

 4    verified Twitter account, which is the blue check there,

 5    and Immortal Technique Tweets that, "They threaten us      15:57:48

 6    with violence.  They ask us to debate them scream

 7    horrible things at our youth.  We have to be 'proper.'

 8    We have to 'speak good English.'  We have to dress a way

 9    to be taken seriously.  You are NOT proper.  You don't

10    speak English well.  You dress like shit," he says.        15:58:06

11              And you'll see this was a Tweet at -- it's a

12    little bit hard to read.  I believe that's 5:05 p.m.,

13    June 28, 2018, so that's the afternoon of June 28th.

14         A.  I never saw this Tweet ever.

15         Q.  And he's Retweeting someone that says, "This      15:58:27

16    horrible woman" -- I apologize for reading these things

17    to you, Ms. La Liberte.  I'm not doing it to keep

18    pounding this, but this is what was out there.

19              "She yelled at this 14 year old boy at our Simi

20    Valley Council Meeting who was there to talk about         15:58:43

21    immigration and supporting SB54.  This MAGA zealot and

22    racist runs RC Design Construction in Woodland Hills.

23    You can email her and let her know how you feel," and

24    then it lists your email address, your cell phone number

25    and it says, "BOYCOTT RC Design."  This is the afternoon   15:59:00
```

Page 156

1    of June 28, 2018.

2         Do you see that?

3         A.  I see that, yes.

4         Q.  And would it -- if I told you that Immortal

5    Technique has 269,000 -- had 269 Twitter followers in        15:59:17

6    June 2018, would that surprise you?

7         A.  No, that doesn't surprise me.  But if you Google

8    Roslyn La Liberte, the first thing that comes up is

9    president of RC Design Construction Associates, Inc.,

10   located in Woodland Hills, California, phone number (818)     15:59:41

11   346-5480, website www.rcassociates.com, also doing

12   business as Charter House Industries, so I am -- Roslyn

13   La Liberte and RC Associates are one and the same on

14   Google.

15        Q.  Correct.  And so the information was publicly        16:00:07

16   available, in terms of your phone number, your business;

17   correct?  That's your point?

18        A.  Yes.  But the onslaught came after Joy Reid

19   posted things that were pointing me for the fifth or

20   eighth time as the face of racism.  I never had -- I          16:00:23

21   never had the face of racism to the whole United States.

22   Maybe in Southern California.  This SB54, people knew

23   about it, but everywhere else in the world did not know

24   what SB54 was, but they did know about the -- the civil

25   rights movement, which I was a part of in the '60s.  I'm      16:00:52

Page 157

```
 1    old enough to know about it, to have gone to high school.

 2            I was sitting in assemble when Martin Luther

 3    King was shot, and I cried.  I remember the civil rights

 4    thing, and to put that next to me was a big insult, a big

 5    hurt and a big, big tsunami of stuff.                    16:01:13

 6        Q.  So, Ms. La Liberte, I want to focus back on this

 7    Immortal Technique.  He's a hip hop artist.

 8        A.  I --

 9        Q.  Did you know he's a hip hop artist?

10        A.  No, I did not.                                   16:01:34

11        Q.  And you see he had 269,000 followers at the

12    time.

13        A.  Newspapers and magazines?  I don't know.  Are

14    they --

15        Q.  I'm not asking you that, ma'am.  I'm just        16:01:41

16    asking -- you know, asking you to focus on the fact that

17    he had 269,000 followers, and then he Retweets a Tweet

18    that says you're a zealot and a racist, and then lists

19    all your contact information, so as of June 28, before

20    Ms. Reid ever did anything, Immortal Technique had sent   16:02:00

21    this how out to 269,000 people.  You understand that;

22    right?

23            MR. OLASOV:  Objection to the form of the

24    question.

25            You may respond.                                 16:02:11
```

                                                              Page 158

1          Q.  BY MR. BOUTROUS:  "Yes" or "no"?

2              MR. OLASOV:  Well, you may respond however you

3      respond.

4              THE WITNESS:  I didn't -- can you repeat the

5      question?  I really --                            16:02:19

6          Q.  BY MR. BOUTROUS:  Did you understand that on

7      June 28, 2018, before Ms. Reid made any posts, any

8      Retweets, anything, Immortal Technique, a hip hop artist

9      with 269,000 followers on Twitter, Retweeted a Tweet that

10     had all your contact information, your name, and it       16:02:39

11     called you a zealot and a racist?  You understand that;

12     correct?

13         A.  Yes, I see that.

14         Q.  Did you know that before today?

15         A.  No, I did not.  I did not know who Immortal    16:02:52

16     Technique was.  I did not know that it was a hip hop

17     artist and that he had 200 and something followers.  No,

18     I did not know that.

19         Q.  And you did not know that he had tweeted -- he

20     had Retweeted or Tweeted out all your contact information  16:03:09

21     and your name; right?

22         A.  I didn't recall if I saw that before or not.  I

23     never -- if I did see it, it didn't flash in my head.

24             MR. OLASOV:  I'd just -- I'd like to note an

25     objection to this line of questioning, because it's       16:03:21

                                                        Page 159

```
1    argumentative, and it varies with part of her testimony.

2           THE WITNESS:  Did you know that he was a hip hop

3    artist?

4        Q.  BY MR. BOUTROUS:  Who are you asking the

5    question?                                          16:03:36

6        A.  Yes.  Did you know?

7        Q.  You don't get to ask questions here, so we can

8    talk later.

9        A.  Okay.

10       Q.  And so let me -- well, let me just ask you a    16:03:44

11   couple more questions, and then we'll take a short break,

12   as Mr. Olasov requested.

13          MR. BOUTROUS:  Let's go to the next exhibit.

14   It's at Tab 34.

15          (Exhibit 45, JR_0000155, marked for            16:03:54

16          identification electronically by counsel.)

17          MR. BOUTROUS:  And this will be Exhibit 45, if

18   I'm -- did we mark -- did we mark the Immortal Technique,

19   Mr. Holderman, as 44?

20          THE CONCIERGE:  Yes.                           16:04:13

21          MR. BOUTROUS:  Okay.  Great.  For some reason

22   I'm not seeing the exhibit tab.

23          Oh, there we go.  Thank you.  You're doing great

24   work, too, at making all our lives easier, so we all

25   thank you.                                           16:04:30
```

Page 160

```
 1              MR. OLASOV:  We do indeed.

 2              THE WITNESS:  Thanks.

 3              MR. BOUTROUS:  And so let's go to Exhibit 45,

 4    mark that Tab 34.

 5              THE CONCIERGE:  It's loading.  Bear with me here    16:04:56

 6    for a moment.

 7              MR. BOUTROUS:  Okay.  Sure.

 8        Q.  So this is a Tweet by another Twitter verified

 9    blue check celebrity, Ms. La Liberte, an actress named

10    Nadine van der Velde?                                         16:05:34

11              MR. OLASOV:  You're representing that she's a

12    celebrity?  We'll accept it.

13              MR. BOUTROUS:  Okay.  Thank you.

14        Q.  And you'll see that it's -- the time stamp below

15    is 11:50 a.m., June 29, 2018; correct?                        16:05:47

16        A.  Yes.

17        Q.  And you'll see -- I'm not going to read the

18    whole thing to you, but again, she has your name with a

19    hashtag RoslynLaLiberte, and calls it, "a hate filled

20    photo representing" -- excuse me -- "reminiscent of other     16:06:05

21    iconic hate filled images.  History's being written.

22    Roslyn La Liberte has crystalized her place on the wrong

23    side of history for future generations."

24              And she includes images from the civil rights

25    era with a white woman screaming at a black student;         16:06:23
```

                                                        Page 161

```
 1   correct?

 2        A.   Correct.  Is she a journalist?

 3        Q.   She's an actress and a Hollywood figure.

 4        A.   An actress.

 5            MR. OLASOV:  She's represented to be a          16:06:34

 6   celebrity.

 7            THE WITNESS:  An actress of what?  Of what --

 8   what has she acted in?

 9        Q.   BY MR. BOUTROUS:  You can research her later.

10            Had you seen this Tweet before today?          16:06:42

11        A.   I'm not sure.  I can't recall.

12        Q.   And so you didn't know that this was a Tweet

13   that occurred before Ms. Reid made her Instagram post; is

14   that correct?

15            MR. OLASOV:  Objection to the form of the       16:06:55

16   question.

17            THE WITNESS:  I can't say yes or no, because I

18   don't remember seeing it.

19        Q.   BY MR. BOUTROUS:  And did you know that

20   Ms. Van der Velde had over 16,000 followers at the time?  16:07:03

21        A.   16,000 followers of celebrities and people who

22   are fans, yes.  That's -- that's -- I'm sure she did.

23        Q.   And did you know she was a three time Emmy

24   winner?

25            MR. OLASOV:  Objection.  She's already          16:07:24
```

Page 162

1    established, as have I, that we don't know who she is.

2              THE WITNESS:  I don't know.

3              MR. OLASOV:  And I'm not clear that you know who

4    she is, but that's neither here nor there.

5              THE WITNESS:  I don't know who she is.                16:07:38

6              MR. OLASOV:  She's an academy award winning

7    unknown.

8              THE WITNESS:  I'm sure -- I'm sure this was

9    Tweeted by many actors and actresses, being in LA.  I

10   don't -- you know, this is where they live.              16:07:50

11        Q.  BY MR. BOUTROUS:  You understand that Tweets

12   from people in Los Angeles go to people all around the

13   world; correct?  You understand that, how Twitter works?

14        A.  But -- but --

15        Q.  Please answer my question.  You do understand     16:08:03

16   that, so I just want to clarify?

17        A.  I don't know her following.  No, you can't say

18   that.  I don't know who follows her.  Nadine van der

19   Velde might not know anybody in another part of the

20   world.  She's an Emmy winner.  What show is she on?        16:08:17

21   You're not giving me any -- you're just telling me what

22   I'm supposed to say.  No, I don't think so.  No.

23        Q.  So you think there is a big difference between

24   Nadine van der Velde's 16,000 followers and Ms. Reid's

25   1.2 million Twitter followers?  Is that what you're       16:08:36

                                                        Page 163

1    saying?

2        A.   Yes, I do.  And Instagram, and also she has a TV

3    show and a radio show as a journalist.

4        Q.   You realize Ms. Reid never mentioned your name

5    in her Retweet; correct?                                    16:08:52

6        A.   But her platform brings people to her show.  It

7    doesn't matter.  It doesn't matter that she never

8    mentioned me.  If she did mention me on her show, I

9    wouldn't know anyway.

10       Q.   Do you --                                          16:09:05

11       A.   How do you know she never mentioned me on her

12   show?  You never sent us anything that pertains to

13   anything she sent or did not send.

14       Q.   You understand that Ms. Reid didn't --

15       A.   Okay.  I'm going to take a step back.             16:09:15

16       Q.   -- Ms. La Liberte, just --

17       A.   I'm gonna just step back.

18           MR. OLASOV:  Ros, let Mr. Boutrous ask you

19   questions, and you answer the question.

20           THE WITNESS:  I'm sorry, Mr. Boutrous.            16:09:25

21       Q.   BY MR. BOUTROUS:  It's fine.  I'll just ask

22   a couple more questions on this -- this Tweet from

23   Nadine van der Velde and then we can take a quick break.

24           So you do understand that Ms. Reid, in her

25   Instagram post, did not mention your business; correct?    16:09:43

Page 164

1    And these are just yes-or-no questions and then we can

2    take a break.  Right, she didn't?

3        A.  I don't know.

4        Q.  You don't know?

5            Do you know that she did not mention your phone        16:09:51

6    number?

7        A.  But Tweets from other people have that, and they

8    go to her, so it -- it works where other people see other

9    people's Tweets.  It's not just her Tweets.  It's the

10   Retweets and the answers, and they all connect, so I        16:10:14

11   don't know.  I don't know, Mr. Boutrous.  I don't know.

12       Q.  Is it your contention that Ms. Reid's Retweet of

13   Mr. Vargas' Tweet caused all your harm?

14       A.  No.  It was the one that showed hate is all

15   real, and this is what happened in 1959, and this is        16:10:38

16   what's happening in 1918.  That's the Tweet that damaged

17   it.  It was that writing that damaged me.

18       Q.  How are you able to distinguish between the harm

19   that, say, that Instagram post caused and the harm that

20   Ms. Reid's Retweet caused?                                  16:11:00

21       A.  By the --

22           MR. OLASOV:  Objection to the form of the

23   question.

24           But go ahead.

25           THE WITNESS:  By the viciousness of the emails      16:11:10

Page 165

1    that came after.

2        Q.  BY MR. BOUTROUS:  How many emails do you have

3    that came after Ms. Reid's Instagram post?

4        A.  Between 300 and 500 that I -- that were not

5    deleted.                                              16:11:25

6          MR. OLASOV:  Are we talking -- I'm sorry.  Are

7    we talking emails or something else?

8          THE WITNESS:  Emails.

9          MR. OLASOV:  I didn't get the question,

10   Mr. Boutrous.                                         16:11:33

11         MR. BOUTROUS:  Could the reporter reread the

12   question?

13         MR. OLASOV:  Okay.  I just want the record to be

14   clear.  That's all.

15         (The record was read by the reporter

16         as follows:

17         "QUESTION:  How many emails do you have that

18         came after Ms. Reid's Instagram post?")

19         THE WITNESS:  And lots were deleted.

20       Q.  BY MR. BOUTROUS:  When were they deleted?      16:12:02

21       A.  When were they deleted?  When my daughter said,

22   "You can't read this stuff."

23       Q.  Do you remember if it was -- was it after

24   July 2?

25       A.  It was the Saturday morning when I -- when I    16:12:11

                                                        Page 166

```
 1    was -- saw all these thousands of emails, and she started

 2    deleting them in bulk.

 3              MR. BOUTROUS:  Why don't we take our break right

 4    there.

 5              MR. OLASOV:  Okay.                          16:12:27

 6              THE VIDEOGRAPHER:  We are going off the record.

 7    The time is 4:11.

 8              (Recess.)

 9              THE VIDEOGRAPHER:  We are back on the record.

10    The time is 4:27.                                    16:28:02

11        Q.  BY MR. BOUTROUS:  Ms. La Liberte, you understand

12    and agree that Ms. Reid, the defendant here, never

13    mentioned your name or any information about your

14    business, your phone numbers, your email, any identifying

15    information in any Tweet, Instagram post, Facebook post    16:28:20

16    or on her show; right?

17        A.  I don't know that.

18        Q.  You don't have any information to the contrary;

19    correct?  "Yes" or "no"?

20        A.  I don't -- I don't know.  I really don't know.    16:28:38

21        Q.  And you mentioned the hate mail, which I've

22    defined to kind of include any mean, hateful

23    communications you got in any form.  How many of those

24    mention Joy Reid?

25        A.  I don't know.                                16:28:57
```

Page 167

1        Q.  Do you have any idea?

2        A.  No, I have no idea.

3        Q.  So sitting here today, you can't tell me if any

4    of them reference Joy Reid's communications in

5    particular?                                              16:29:11

6        A.  I don't know.  I don't know.  I -- I didn't read

7    every single one, because they're very vile and vicious.

8    I honestly -- honestly just read a few, because they were

9    all terrible and disgusting, and I was afraid.  They

10   threatened me with death and hanging me by one of those   16:29:34

11   words that I'm not supposed to say, and it's really

12   disgusting.

13       Q.  I understand.

14           MR. BOUTROUS:  And with respect to others who

15   were tweeting about the situation, I want to go -- I'll    16:29:50

16   mark as the next exhibit Tab 36, Mr. Holderman.  It's a

17   Tweet from a journalist named Soledad O'Brien.  I want to

18   show you this Tweet.

19           (Exhibit 46, JR_0000221, marked for

20           identification electronically by counsel.)        16:30:40

21       Q.  BY MR. BOUTROUS:  So this is a Tweet from

22   Soledad O'Brien.  It was June 29, 2018, at 6:11 p.m.

23       A.  Uh-huh.

24       Q.  And she's verified on Twitter, and she says,

25   "Ugh.  These American racist.  But this kid" -- it looks   16:30:55

                                                    Page 168

1    like she had a typo -- "good gor him."  I think she meant

2    good for him, and you can see that she was Retweeting

3    Alan Vargas -- the Tweet is unavailable, because he

4    deleted the Tweet, so that's what we're looking at.

5            And do you know who Soledad O'Brien is?        16:31:15

6        A.  Now I do, yes.

7        Q.  You understand she's a well-known journalist?

8        A.  She's a journalist, yes.

9        Q.  She was at one time an MSNBC journalist;

10   correct?                                               16:31:29

11       A.  I didn't -- I didn't know that.  If you're

12   telling me, yes.

13       Q.  I can represent that to you.  I can also

14   represent to you she was also at CNN for some time, and I

15   can represent to you that she currently has her own       16:31:41

16   syndicated television show.

17           Did you know that Ms. O'Brien has over

18   1.3 million Twitter followers?

19       A.  I did not know that, no.

20           MR. BOUTROUS:  Let's go to the next exhibit, so   16:31:59

21   Exhibit 47.  It will be Tab 38.

22           (Exhibit 47, JR_0000220, marked for

23           identification electronically by counsel.)

24       Q.  BY MR. BOUTROUS:  I rearranged my screen.  Are

25   you able to see me now?                                 16:32:30

                                                    Page 169

1         A.  You just disappeared.

2         Q.  I don't know why that's happening.  I'm sorry.

3             MR. OLASOV:  I don't see you either, to be

4    honest.

5             MR. BOUTROUS:  It might be because when Greg      16:32:41

6    pops in -- now can you see me?

7             MR. OLASOV.  No.

8             THE WITNESS:  I only see you for the first five

9    minutes.  You're just like -- you come and then you go.

10            MR. BOUTROUS:  I'm seeing you both very nicely.     16:32:53

11   I don't know, Greg, if you have any advice for the team,

12   but --

13            THE CONCIERGE:  We made an adjustment on the

14   break.  I thought we resolved it.  If you'd like to go

15   off, we can try to fiddle with it some more.            16:33:06

16            THE WITNESS:  Now you have an exhibit, maybe

17   it's covering.

18            MR. OLASOV:  No.  The things are along the side,

19   but it may be that -- Greg, if you want to take some of

20   your personnel and unless people are asking questions of   16:33:16

21   you, you guys ought to go non-video for yourself.

22            THE CONCIERGE:  Yes.  We are all off video.  I

23   only go on so you can see that I'm talking.

24            MR. BOUTROUS:  Got it.  Okay.  Well, let's

25   continue.                                               16:33:32

                                                      Page 170

1          MR. OLASOV:  Okay.  Ted, you're disembodied.

2          MR. BOUTROUS:  I'm seeing myself, and I look

3    good, but -- I mean, I can see myself.  I didn't mean I

4    look good.

5          MR. OLASOV:  You're a male of a certain age.          16:33:46

6          THE WITNESS:  What else is important, right?

7          MR. OLASOV:  I'm a male of a slightly different

8    age, and I stopped seeing myself that way.

9          MR. BOUTROUS:  No, no, no.

10    Q.  So here -- I'm just going to do just a couple          16:33:58

11    more of these Tweets from other people, Ms. La Liberte.

12          So this is a Tweet from Ana Navarro-Cárdenas,

13    and she -- this is June 30th, 2018, at 7:20 a.m. it's

14    dated, and she says, "Oh look, here's today's racist

15    dujour.  Does she have a name, or should we just call          16:34:18

16    her, #RedHatHarriet."  And you can see again she's

17    Retweeting Alan Vargas, and the Tweet is unavailable,

18    because he deleted it.

19          So have you ever heard of Ana Navarro?

20    A.  No, I did not.          16:34:33

21    Q.  So you did not know that she was a CNN political

22    commentator?

23    A.  No, I did not.

24    Q.  You did not know that -- had you seen this Tweet

25    before?          16:34:40

Page 171

1          A.  I don't recall seeing it, but I might have.

2          Q.  Did you -- then you didn't know that Ms. Navarro

3    had 1.1 million followers in June 2018?

4          A.  No, I did not know that.

5          Q.  And this is going to be the last set of Tweet        16:34:59

6    exhibits for a while.

7              MR. BOUTROUS:  So I'd now like to mark as

8    Exhibit 48, Greg, the -- collectively it's Tabs 40

9    through 48.

10         Q.  And then I'm just going to ask you about a          16:35:09

11   couple of these, Ms. La Liberte, not to belabor the

12   point.

13             (Exhibit 48, Screenshots of Tweets, marked for

14                 identification electronically by counsel.)

15         Q.  BY MR. BOUTROUS:  While we're waiting there, so     16:35:26

16   do you think that Ms. Reid's Tweet and posts damage you,

17   but Ms. Ana Navarro didn't?

18         A.  Yes, because it had the picture of -- the civil

19   rights picture on it, which is very incendiary.  I don't

20   want to keep repeating myself.  I'm actually boring        16:35:45

21   myself, too.

22         Q.  And so you think the same thing about Soledad

23   O'Brien's Tweet?

24         A.  Yes, yes.

25         Q.  Okay.  So this exhibit is a collection of other    16:35:55

                                                      Page 172

```
1    Tweets.  I'll just give you an example.  Here's someone

2    who tweeted again and said terrible things about you,

3    included your -- the name of your company, from Yvette

4    Tichy.  The next -- on page 2 -- and again, I'm not

5    condoning this, so I'm not going to do a bunch of these,    16:36:18

6    but there -- I will represent to you if we go to the next

7    page --

8         A.  That's a good picture.

9         Q.  It's a good picture.

10             You've seen this before?                          16:36:29

11        A.  With the solo cup, yeah.  I'm rocking it.

12        Q.  And here we have the -- Tweeting out -- it's a

13   Tweet of your phone number and your name and other

14   photos, so had you seen either of these two Tweets before

15   today?                                                      16:36:50

16        A.  Well, I got rid of my Facebook, right, so it was

17   probably one of the few that got on to Facebook, and that

18   was probably really early on, and I don't even know

19   how -- they -- she probably took a screenshot and

20   Facebooked it, because she wouldn't have gotten it         16:37:09

21   through mine.  Do you see --

22        Q.  And that is a photo of you there with the solo

23   cup and --

24        A.  And my husband and I.  That's real scenery.

25        Q.  You're on vacation?                               16:37:23
```

Page 173

```
 1          A.   Yeah.

 2          Q.   And this was a Tweet by someone who went by the

 3     handle -- or the name Isabel on Twitter.

 4               So with that, I think I'll move on to another

 5     topic about your business.                              16:37:34

 6          A.   Okay.

 7               MR. BOUTROUS:  So if we -- I'm going to go to

 8     the next exhibit, 49.  I'd like to mark -- what is that?

 9     Tab -- our Tab 49.  Very symmetrical.

10          Q.   And as part of your claim here, Ms. La Liberte,  16:37:59

11     you allege that Ms. Reid's posts on social media caused

12     your business to lose customers; correct?

13          A.   Correct.

14               (Exhibit 49, Plaintiff's Initial Disclosures, As

15               Further Supplemented, marked for identification   16:38:11

16               electronically by counsel.)

17          Q.   BY MR. BOUTROUS:  And it caused you to lose

18     future profits; correct?

19          A.   Correct.

20          Q.   And I'm going to show you what are called the   16:38:20

21     supplemental initial disclosure.  That's the legal title

22     of the document.  Something that your lawyers filed with

23     just disclosure of more information concerning your

24     damages claims.

25               And while we're waiting, I can just kind of give   16:38:34
```

Page 174

```
 1    you the bottom line.  It's no big secret, but in the

 2    document, you claimed that lost business profits had been

 3    primarily calculated to be at least 1.43 -- excuse me --

 4    $1,043,114.69.  Let's see if I can find what page that's

 5    on here, but it's in this document.                  16:38:59

 6         A.  Right.

 7         Q.  And to speed things along, does that sound like

 8    the correct number?

 9         A.  Correct.

10         Q.  And is that the amount of lost business profits  16:39:09

11    you're claiming, as you sit here today?

12         A.  It's based on -- it's based on clients or

13    customers that had worked with us before and the work

14    that we should have gotten, yes.

15              MR. OLASOV:  Just so the record's clear --      16:39:25

16              THE WITNESS:  Go ahead.

17              MR. OLASOV:  -- as the witness has testified,

18    she said that we identified this in the document as a

19    preliminary calculation and expressly reserve the right

20    to provide other calculations using different            16:39:39

21    methodologies to calculate damages.

22              MR. BOUTROUS:  I understand.

23         Q.  And, Ms. La Liberte --

24              MR. OLASOV:  I just don't want you to think that

25    this is to the exclusion of other means of trying to show 16:39:52
```

Page 175

1    damages.

2          MR. BOUTROUS:  I was just going to ask that

3    question, so you helped short-circuit that.

4          MR. OLASOV:  Well, that's in the document, so it

5    doesn't matter whether she knows it or not, frankly.          16:40:03

6          MR. BOUTROUS:  It is in the document, yes.

7      Q.  So, Ms. La Liberte, how did you arrive at this

8    1,043,000 number?

9      A.  I took the people that were my customers for the

10   length of time that it showed and knowing that more          16:40:22

11   projects were coming and I wasn't invited to bid, there's

12   a way that franchisors and franchisees relate to their

13   vendors, and they have lists and things, and there's no

14   way of knowing how -- how -- how you disappear off of

15   this, but just by the monetary of what we make before and    16:40:55

16   what we should have been making and our customer base.

17   So that's how we did it.

18     Q.  Do you -- thank you.  That's very helpful.

19          Do you contend that the entirety of those lost

20   business profits that you've primarily calculated were      16:41:15

21   caused by Joy Reid?

22          MR. OLASOV:  Objection.  That calls for her to

23   draw a legal conclusion --

24          THE WITNESS:  I don't know.

25          MR. OLASOV:  -- as to whether Joy Reid is          16:41:24

Page 176

1    legally responsible for them.

2            Your use of the term "caused" is, therefore, a

3    loaded question.

4            But you may respond.

5            THE WITNESS:  I think I -- what -- because of        16:41:33

6    everything, I became too hot to handle.  I was a

7    lightening rod for these companies, and they -- they

8    don't need this type of thing.

9            You know, McDonald's -- I don't want to put too

10   much into this, because -- but McDonald's won't even let   16:41:52

11   Serena Williams be on their commercials because she

12   dresses too provocatively, so this is just -- this is one

13   of these things that you don't know.  I don't think

14   Serena knows that, and I don't want you to tell her, but

15   it's kind of like that sort of thing.  I don't know        16:42:13

16   what -- what happened to me.

17       Q.  BY MR. BOUTROUS:  So you don't know whether

18   Ms. Reid's conduct caused all or any of those damages;

19   right?

20       A.  Because of how many and how frequently people      16:42:29

21   were calling these companies and saying that I -- and my

22   website collapsed, so either new business or old

23   business, there was a problem.  The new business couldn't

24   reach me through my website, so you're not going to do

25   business without a website.  I mean, even you have a       16:42:48

                                                        Page 177

```
 1    website, and, you know, you have a nice picture on it,

 2    too.

 3           Anyway, besides that, it became very hard to

 4    find me with no phone, no email, nothing like that.  It's

 5    because of all -- it's because of the one picture.  The        16:43:12

 6    one picture destroyed my life.

 7        Q.  You don't know that those people who called or

 8    sent you hate mail or said terrible things about you

 9    were doing it because of Joy Reid as opposed to any --

10    Ana Navarro or any of the other people, do you?  You have      16:43:34

11    no idea?

12        A.  Hers was the most vicious, and people did call

13    me and -- a lot of my -- people that were my customers

14    and things saw -- saw it, and they were like -- they were

15    mad for me, and they were -- the people that really knew       16:43:53

16    me.

17           So I don't know about the people that didn't

18    know me as a person, but if the people that knew me as a

19    person were upset about it -- I mean, I have -- it's not

20    only people that I sell to, it's the people I employ.  I       16:44:11

21    employ many Hispanics in LA, and -- and it was just an

22    onslaught.  It went to everyone's Facebooks and emails.

23    It was terrible.

24        Q.  That really wasn't my question, though.

25        A.  I know.                                                16:44:34
```

Page 178

1      Q.  You're not able to say whose posts caused people

2  to react to you in this way; correct?

3          MR. OLASOV:  Objection to the form of the

4  question.

5          But you may respond.                          16:44:47

6      Q.  BY MR. BOUTROUS:  Right?  You don't know why

7  someone wrote you hate mail.  It could have been from a

8  post from Ana Navarro or from one of those other people;

9  right?

10     A.  They weren't -- I keep repeating myself.  They   16:44:57

11  weren't as divisive as hers or as damaging.

12     Q.  I understand --

13     A.  I think the other ones wouldn't have stuck

14  around as long.  I don't want to belabor it.  I could say

15  no.  I'll say no.                                      16:45:12

16     Q.  So your answer is "no," you cannot -- you have

17  no idea what caused any particular person to send you

18  hate mail or take action to say terrible things about

19  you; correct?

20     A.  No one would know that, yes.                    16:45:31

21     Q.  Correct.  Thank you.

22          So let's go to -- on the damages front, one more

23  question.  So have you done -- since these supplemental

24  disclosures were filed, have you done any additional work

25  to come up with additional damage calculations?        16:45:44

                                                   Page 179

1         A.  No, I have not, because we had the COVID after,

2    and that's a whole other issue, so this is basically

3    before that.

4         Q.  Got it.

5             MR. BOUTROUS:  Let's go to the next exhibit.         16:46:03

6             MR. OLASOV:  Just so the record's clear, the

7    time for us to exchange expert reports concerning damages

8    and other stuff hasn't come up, and I don't want you to

9    think from her answer that we're not doing other work.

10            MR. BOUTROUS:  Understood.                           16:46:19

11            Next exhibit I'd like to mark is Exhibit 50, and

12   it's Tab 50, and it's the -- your Charter House

13   agreement.

14            (Exhibit 50, PLAINTIFF 09999 - 10005, marked for

15            identification electronically by counsel.)         16:46:28

16            THE WITNESS:  Okay.

17        Q.  BY MR. BOUTROUS:  And while we're pulling that

18   up, can you tell me which of your clients called you and

19   said that they were not going to do business with you

20   in the future because of any posts on social media by     16:46:38

21   Joy Reid?

22        A.  Charter House is --

23        Q.  Can I just stop you right there?  Can you just

24   answer my question?

25        A.  I don't -- I'm sorry.  I'm sorry.                  16:46:52

                                                    Page 180

1          Q.  Can you just answer my question?

2               Which of your clients called you on the

3     telephone -- which, if any -- and said they would no

4     longer do future business with you because of the social

5     media posts regarding the Simi Valley meeting made by        16:47:03

6     Joy Reid?

7          A.  I did not have a phone number for them to call

8     me on and an email, so I --

9          Q.  So the answer is none; correct?

10         A.  None that I'm aware of.                             16:47:23

11         Q.  And did any clients email you to say

12    specifically that they were not going to do future

13    business with you because of any social media posts by

14    Joy Reid?

15              MR. OLASOV:  Are you excluding Charter House as    16:47:38

16    a client?

17              MR. BOUTROUS:  I'm saying any.  I'm about to ask

18    specific questions.

19              THE WITNESS:  Yes, there were.

20         Q.  BY MR. BOUTROUS:  Who specifically emailed you     16:47:47

21    and mentioned Joy Reid as a reason that they were not

22    going to do future business with you?

23         A.  I don't think they mentioned Joy Reid, per se,

24    but they said that there were too many -- they never even

25    acknowledged that it was because of this.  People are       16:48:06

Page 181

1    afraid to even get involved in this.  I mean, they're not

2    going to say, "Hey, Roslyn, you're a racist.  I don't

3    want to do work with you."  They just don't do work with

4    you, Ted.  I mean, you have a -- you're a famous lawyer,

5    and you know how this stuff works.                      16:48:25

6        Q.  So the answer is no client -- none of your

7    clients said that they were terminating you or refusing

8    to do future business with you because of Joy Reid, just

9    to button that up; correct?  No one said that.

10       A.  Not in -- not in words or --                    16:48:44

11       Q.  Thank you.

12       A.  -- emails or phone, no.

13       Q.  So now let's go to the Charter House agreement,

14   Exhibit 50.

15           So this is an agreement between you and         16:49:00

16   JRinnovations; correct?

17       A.  Yes.

18       Q.  And what is JRinnovations?

19       A.  They're also engaged by Charter House, and we're

20   not employees of Charter House.  We're -- we're, like,    16:49:17

21   contracted individuals as sales representatives, and I

22   was contracted by the California, Oregon, whatever,

23   regional manager for Southern California, which is a

24   big -- big franchise bulk -- a bulk franchise.

25       Q.  Got it.  Yep.                                    16:49:48

Page 182

1           And here -- so you would have been the

2    sub-representative?  On here it says, "The parties agree

3    that Sub-Representative will sell CHi's manufactured

4    commercial furniture"; is that correct?

5        A.  Yes.  Yes.                                    16:50:02

6        Q.  And then what's CHi?  I'm just trying to

7    understand the document.

8        A.   They make restaurant furniture and furnishings,

9    like booths, tables, chairs, bulkheads, things like that,

10   and they call out -- they do design.  This is what I was   16:50:18

11   doing for McDonald's for a number of years.  I was a

12   design, decor and construction, and then they limited the

13   design companies to four United States and worldwide

14   companies, just four, so these people employed me to sell

15   their restaurant equipment, because I knew everyone from   16:50:48

16   all the years that I was doing it.

17       Q.  Thank you.

18           And as the representative of CHi, did you ever

19   make sales to anyone other than McDonald?

20       A.  Yes, I did.  I brought some new people into it,    16:51:03

21   PizzaRev and Dunkin' Donuts.  I also -- also with the CHi

22   work that I did, being a contractor, I did a lot of

23   installation and construction and stuff, because I

24   knew -- I was familiar with the franchisees of the --

25   that now had to use CHi for decor.  They had used me for   16:51:30

Page 183

1    design and decor for a number of years, like 25 years.

2        Q.  Thank you.

3            And do you contend in this lawsuit that your

4    agreement, this sales sub-representative agreement with

5    JRinnovations, was terminated as a result of Ms. Reid's        16:51:49

6    posts on social media?

7        A.  I can't tell you -- I can't tell you that it

8    was because of hers, but I know that they received

9    hundreds and hundreds more after they terminated me, so

10   there was no going back when -- after that -- after        16:52:15

11   Joy Reid, there was no -- no listening that I wasn't that

12   person.

13           MR. BOUTROUS:  Let's mark -- let's mark the next

14   exhibit, Exhibit 51, and that's at Tab 51.  Get that up

15   here in a second.                                          16:52:53

16           (Exhibit 51, PLAINTIFF 00661, marked for

17           identification electronically by counsel.)

18       Q.  BY MR. BOUTROUS:  So this is an email -- take a

19   second to review it, but I'll just describe it.

20           MR. OLASOV:  Give me a second, would you, Ted?     16:53:11

21           MR. BOUTROUS:  Sure.  We'll give you both a

22   chance to read it.

23           MR. OLASOV:  Thank you.

24       Q.  BY MR. BOUTROUS:  All set?

25       A.  Yes.                                               16:53:59

                                                    Page 184

1          Q.  So do you remember receiving this email from

2     Jay Rothman?

3          A.  Yes, I do.

4          Q.  On June 29, 2018, at 7:42 a.m. Pacific Time?

5          A.  Yes.                                        16:54:11

6          Q.  And the subject matter is:  "Termination of

7     Agreement"?

8          A.  Correct.

9          Q.  And in this email, Mr. Rothman announces that,

10    "Effective immediately our sub rep agreement is        16:54:22

11    terminated between JR Innovations and RC

12    Associates/Roslyn LaLiberte"; correct?

13         A.  Yes.

14         Q.  And he says, "Therefor, your services are no

15    longer necessary to market, promote or sell any CHi    16:54:34

16    products in the marketplace"; correct?

17         A.  Correct.

18         Q.  Then he says, "It's been months since we've

19    engaged in a sales transaction."  It says that; correct?

20         A.  That's not true.                             16:54:48

21         Q.  But that's what it says?

22         A.  Yeah, but it was not true.

23         Q.  And then he says, "If there are any

24    outstanding" --

25         A.  Can I finish?                                16:54:57

                                                     Page 185

```
 1        Q.  Sure.

 2        A.  Because even through this, I still worked with

 3   people on behalf of them and worked with their customer

 4   service and everything, and I had -- I had people that I

 5   was working with in Texas, which was -- which they --        16:55:16

 6   they didn't have their eye on it.  You know what I mean?

 7   I'd been going and flying back and forth to Texas, so it

 8   was work that was going to happen and work that I was

 9   continuing to do on behalf of my customers, so I don't

10   think that's accurate.  I think it was written very          16:55:41

11   hastily, and they just wanted to get rid of me,

12   Mr. Boutrous.

13        Q.  And you'll note, again, that the time of this

14   receipt is 7:42 a.m. Pacific Time on June 29, 2018, and

15   that's before Ms. Reid Retweeted Alan Vargas; correct?       16:55:56

16        A.  I don't know.  If you can do the time and figure

17   it out, you might be right.

18        Q.  I will represent to you that both sides have

19   taken the position that it was at 2:55 p.m. on -- I

20   believe it was Eastern Time, so -- from Ms. Reid?            16:56:18

21        A.  We saw that.  We saw that.  I have no idea what

22   she tweeted beforehand, because there are no Tweets that

23   are available.

24        Q.  So you have no -- you have no proof --

25        A.  I have no proof.                                    16:56:31
```

                                                    Page 186

```
1        Q.  -- that Ms. Reid weighed in before this email

2   came from Mr. Rothman on the topic of the City Council

3   Meeting?

4        A.  I have no proof.  I have no proof.

5        Q.  Thank you.                              16:56:42

6        Let's see.  Going to the -- did you ever speak

7   to Mr. Rothman or anyone else at CHi about this

8   termination?

9        A.  I actually responded back in an email saying

10  that it wasn't true.                             16:56:57

11       Q.  Do we -- did you produce that email to us?

12       A.  I produced it to my attorney.

13       MR. OLASOV:  Everything that she produced to us,

14  we produced to you.  There are -- I believe there are

15  other exchanges.  That's my personal recollection.  16:57:12

16       MR. BOUTROUS:  We'll double-check that.

17       Q.  And, Ms. La Liberte, I do want to clarify:  The

18  lawsuit that you filed, you have a Tweet -- a Retweet

19  from Ms. Reid attached that says that it was Retweeted at

20  2:55 p.m. on June 29th, so that came from your lawsuit  16:57:31

21  and what you attached to the lawsuit, so it's not just

22  me.  I want to make sure you know.

23       A.  I believe you.  I believe you.

24       Q.  Thank you.

25       A.  But we just weren't able to get any Tweets or  16:57:42
```

Page 187

```
 1    anything beforehand, so I don't know what was out there.

 2           MR. BOUTROUS:  And, Mr. Olasov, I am going to

 3    confess I have not seen any sort of response from

 4    Ms. La Liberte in the documents you've produced, so I'd

 5    ask you -- we don't need to belabor it here -- to search      16:58:03

 6    for that email.

 7        Q.  And, Ms. La Liberte, so what do you recall you

 8    said to Mr. Rothman in your email response in detail?

 9        A.  I was sending the same thing out to everyone

10    that was emailing me back things.  And then it -- it          16:58:18

11    just -- it just was worthless.

12           It was to the effect that I did not say this,

13    and it's wrong, and I've never been -- I never would say

14    this.  And my family -- my son-in-law is Hispanic, my

15    grandchildren are half Hispanic, and I wouldn't do this.      16:58:46

16    And I just got a bunch of, like, who cares, you know, to

17    that effect.

18        Q.  And so that -- you said something along those

19    lines to Mr. Rothman --

20        A.  I did.                                                16:59:01

21        Q.  -- when you responded.  Did you respond right

22    away when you got this email?

23        A.  I don't -- yeah, you'd see it on the timestamp.

24    I don't know if it was right away.  I was just, you know,

25    going through --                                              16:59:15
```

Page 188

```
1          Q.  Got it.

2          A.  You know, Tony Aaron called, a zillion people

3    called.  I don't even know what I was doing.  I could

4    barely get to the bathroom.  So that was that.

5          Q.  So we'll, again, request that you look for that     16:59:25

6    email.  And we'll double-check and make sure we didn't

7    miss it, but I think we would have -- I would have been

8    asking you questions about it.

9              The next document --

10             MR. OLASOV:  Excuse me.  Just so the record's       16:59:36

11   clear, because I don't want to be faulted, we produced

12   some emails that were forms of things where they were

13   sent to bunches of the people, and we -- where we had

14   copies, we gave you copies.  But in many of those

15   instances, we did not have the -- have copies of everyone   16:59:54

16   that got stuff.

17             She may be referring to that.  And there is a

18   production of some document.  There's some other

19   communications, which may or may not have been

20   memorialized by Ms. La Liberte and Mr. Rothman.  But        17:00:09

21   you're free to inquire about, but I think you have not

22   inquired about, and that's up to you.  And I don't know

23   whether those are in writing or not.

24             MR. BOUTROUS:  So I will just repeat my request

25   that you search for that email.  We'll search for it.       17:00:25
```

Page 189

1            MR. OLASOV:  Okay.  I will -- I will search.

2   But as I said, there are some forms of emails of things

3   where --

4            MR. BOUTROUS:  I --

5            MR. OLASOV:  -- forms but don't have the copies        17:00:34

6   every one -- you know, these -- these -- these mailings

7   that went out to more than one person.

8            THE WITNESS:  And then -- and then there was an

9   email from CHi, where they were saying there were so many

10  things coming on that they've terminated -- they already     17:00:52

11  terminated me.  So I don't know what the date of that is.

12  We sent that to you, too.

13           MR. OLASOV:  No, no.  That's actually the

14  opposite.  They sent that document to us.

15           THE WITNESS:  You sent that document.  Excuse        17:01:06

16  me.

17           MR. BOUTROUS:  So let's move to the next

18  exhibit.  Actually, let's go back to what is marked

19  Exhibit 49, the supplemental initial disclosures.

20           And Mr. -- I mean, Greg, if we can --               17:01:21

21  Mr. Holderman, I'm sorry, if we can then go to Exhibit A,

22  which is attached to this document.

23           THE CONCIERGE:  Can I get the tab again, please?

24           MR. BOUTROUS:  Yes.  It's Tab 49.  We already

25  marked it as Exhibit 49.                                     17:01:37

                                                    Page 190

```
 1              If there's a way to flip it around so we can all

 2      see it horizontally.

 3              Yeah.

 4              MR. OLASOV:  A or B?  There were --

 5              MR. BOUTROUS:  A.                              17:02:06

 6              Yeah, I would like to look at Exhibit A.

 7              There we go.

 8          Q.  So, Ms. La Liberte, this Exhibit A provides some

 9      of the detail for your lost business profits claim;

10      correct?  The detail for each client; correct?          17:02:25

11          A.  Yes.  To a period of time, yes.

12          Q.  So I may find it necessary to drill down in

13      detail on each one, but let me just start with the

14      McDonald's/Steve Ho matter, that $899,479.01.

15              Is that money you had already received for       17:02:46

16      finished products --

17          A.  Yes.

18          Q.  -- during the period of 2014 to 2018?

19          A.  Before this episode, correct.

20          Q.  And is that the same for every one of these      17:02:57

21      accounts, that the money -- you list an amount.  That's

22      an amount for which you had already done work and already

23      received the payments that are listed in the "Amount"

24      column; correct?

25          A.  Yes, it is.                                      17:03:10
```

                                                        Page 191

```
 1          Q.  So the $1,043,000-plus total income number,

 2    that's the amount of past payments that you had received

 3    from these clients; correct?

 4          A.  That's the profit on the past payments.

 5          Q.  Got it.  You have the costs on there, and you      17:03:28

 6    deducted it, correct.  I see that.

 7               And there's a "Commission" column as well of

 8    177,767.42.  And these are all amounts you had -- you had

 9    collected for prior work for McDonald's/Steve Ho, Dunkin'

10    Donuts, and the whole list listed on this chart; correct?    17:03:50

11          A.  Yes.

12          Q.  And then there's an 18 percent profit mark-up

13    there.  Where did that come from?

14               THE CONCIERGE:  Everything's frozen on my end.

15          Q.  BY MR. BOUTROUS:  Are you back?  I think we were    17:04:22

16    frozen there.  My question was:  Where did that

17    18 percent profit number come from?

18               THE WITNESS:  Okay.  Go ahead.  You were

19    talking, David?

20               MR. OLASOV:  No.  It's your question.            17:04:30

21               THE WITNESS:  Okay.  This is -- this is what we

22    make on -- made on each project.  And it's around that.

23    It's an estimate.

24               But if you calculate what I -- what I -- we're a

25    small company, and we don't have a large overhead, and      17:04:51
```

Page 192

1    most people make around 10, 12 percent.  We make more

2    because we do a lot of the work ourselves and we

3    subcontract everything out.  And because we subcontract

4    everything out, I can pay people ahead of time and get

5    better prices.  And that's why we compete with these          17:05:10

6    larger companies.

7            And we're by far the smallest of the companies

8    that work with McDonald's.  And since we've been working

9    for them -- with them for so many years, like, 27 --

10   almost 30 years, more than 30 years, actually -- that we      17:05:31

11   can make this profit and still be competitive.

12       Q.  BY MR. BOUTROUS:  And so is that the actual

13   profit margin on --

14       A.  Yes.

15       Q.  -- the transactions and activity listed on this       17:05:44

16   page?

17       A.  Yes.

18       Q.  You made an 18 percent profit?

19       A.  Yes.  You multiply each one of those by .18.

20   You'll get a number.  And then if you add all those           17:05:56

21   numbers up, you get 1 million 43.

22           But the commissions are added separately,

23   because they also involve -- they involve a lot of work

24   that we do ourselves.

25       Q.  Now, isn't it true that McDonald's terminated          17:06:12

Page 193

1    CHi as one of its vendors for interior seating and decor

2    a year earlier, in June 2017?

3        A.  They terminated them?

4        Q.  Isn't that true?

5        A.  No.  Because I was still doing work in 2018.          17:06:26

6        Q.  Didn't McDonald's decide to reduce from six to

7    three its nationwide vendors, and one of the vendors

8    terminated was CHi in 2017?

9        A.  There's still people working for CHi in my job

10   capacity in Long Beach, named Rachel and Nick.             17:06:44

11       Q.  When is the last order that CHi placed with

12   McDonald's, that you know of?

13       A.  I have -- I don't know.  But I know that I've

14   done installations for Nick and Rachel with my

15   installation company last month.                          17:07:05

16       Q.  Last month?  So that was -- you would have been

17   terminated by CHi.

18       A.  I have been, but Nick and Rachel came to me.

19       Q.  Who are Nick and Rachel?

20       A.  They are the people that replaced me.             17:07:20

21       Q.  So you've been getting more business, but

22   through Nick and Rachel?

23       A.  Not a lot, but an installation is what -- to

24   install some -- a whole thing of furniture is probably

25   around 25,000 or so.  But it shows that they're still     17:07:35

Page 194

1    doing work.

2        Q.  Do you -- so you don't know for sure whether

3    McDonald's terminated CHi as a vendor in June 2017?

4        A.  No, I do not know that.

5        Q.  Do you remember when the last sale was that you        17:07:54

6    made as a CHi representative?

7        A.  Well, I -- I know it was in Orange County, and

8    it was a new construction job.  And it was Larry Kaplan,

9    and it was around -- I think it -- I was still working on

10   it after they terminated me, because he had some         17:08:21

11   problems, and I was helping them with customer service.

12       Q.  Do you remember what year?

13           It sounds like the dogs are going wild.

14       A.  It was after they terminated me.

15       Q.  So it was --                                       17:08:35

16       A.  2018 or so.  And --

17       Q.  You weren't making that sale as a CHi

18   representative, though; right?  Because you'd been

19   terminated.

20           When was the last sale you made?  What year?      17:08:47

21       A.  That was -- that was the last sale.

22       Q.  And what year was that?

23       A.  2018.

24       Q.  Do you remember what month in 2018?

25       A.  Well, when you build a new restaurant, it takes   17:08:58

Page 195

```
 1    90 days at least to build.

 2           So if they terminated me in July or June -- end

 3    of June, and this construction didn't complete until,

 4    let's say, August/September, I was still helping them on

 5    it.                                                    17:09:19

 6           You know, I'm not going to leave my customers,

 7    because since then, I've done work with them without CHi.

 8    Because I do construction.

 9       Q.  So in other words, you didn't lose some of that

10    business; right?  Your work continued, just not as a CHi  17:09:35

11    representative?

12       A.  Different.  It's different.  It's different.  It

13    would be nice to have both work and to be privy to stuff

14    but, you know, what I'm saying is they came and -- came

15    for me to be the salesman.  I never went to them.  They   17:09:53

16    called me on the phone and asked me to sell for them.

17    They needed me more than I needed them.

18       Q.  So let me ask you this:  Maybe I don't need to

19    go through each one.  But I'll ask the omnibus question

20    and try to speed this up.                              17:10:11

21       A.  Okay.

22       Q.  It's correct, isn't it, that no one from any of

23    the companies listed on this Exhibit A to your

24    supplemental discloses to -- which is marked as

25    Exhibit 49, called you and told you they were -- they     17:10:24
```

Page 196

1    would not do business with you in the future because of

2    the Simi Valley meeting in June of 2018; correct?

3        A.  Yes, no one called me.

4        Q.  None of --

5        A.  They told me that they wouldn't do work with me        17:10:43

6    because I was a racist.

7        Q.  And none of them told you that they would not do

8    business with you because of anything Joy Reid ever said

9    or did; correct?

10        A.  No.  No one called me or emailed me to that        17:11:00

11    effect.

12        Q.  In fact, no one communicated with you by any

13    means that they were ceasing doing business with you

14    because of anything Joy Reid said or did; correct?

15        A.  Not that I know of.        17:11:21

16            MR. BOUTROUS:  Should we take another short

17    break for the court reporter and everybody?  And Wilhelm,

18    the dog, just in case.

19            MR. OLASOV:  My -- my wife -- my wife is home.

20            MR. BOUTROUS:  Oh, good.        17:11:31

21            MR. OLASOV:  So she's -- she's returned

22    literally from the vet, so --

23            MR. BOUTROUS:  Okay.

24            THE REPORTER:  Can we go off the record,

25    Counsel?        17:11:45

Page 197

```
 1            MR. BOUTROUS:  Yes, please.

 2            THE VIDEOGRAPHER:  We are going off the record.

 3    The time is 5:10.

 4            (Recess.)

 5            THE VIDEOGRAPHER:  We are back on the record.      17:26:24

 6    The time is 5:26.

 7            MR. BOUTROUS:  Thank you.

 8        Q.  Ms. La Liberte, I had just, kind of, a couple

 9    tying-up-loose-ends questions I wanted to ask you on your

10    business.                                                17:27:58

11            First, can you identify any lost business or

12    project from any of the customers you identified in your

13    initial disclosures, which is at Exhibit 49 with Exhibit

14    A to it, from anything that happened at that Simi Valley

15    City Council Meeting in 2018?                            17:28:17

16            MR. OLASOV:  Objection to the form of the

17    question.

18            But go ahead and answer.

19            THE WITNESS:  I would not know.  People do not

20    call and say, "I do not want to do work with you because  17:28:28

21    you're a racist."  And I saw things that were horrible on

22    the internet.

23        Q.  BY MR. BOUTROUS:  Can you identify any lost

24    business or project --

25            MR. OLASOV:  Before you proceed, the client has   17:28:37
```

Page 198

1    found the email that she sent to Jay Rothman, which I'm

2    sure we gave you.  I don't have it in the form that we

3    Bates-Stamped it, but I'm going to email it to you now.

4    And while you're -- you're examining the witness --

5         THE WITNESS:  And I also refreshed my memory          17:28:56

6    that I did call him.  Then I sent the email.  And he

7    never got back to me, so I continued to call him.  And

8    then he -- he finally answered my call, and he said, you

9    know -- I said, "Is this because of that, the stuff on

10   the internet?"                                             17:29:16

11        And he said, "Well, I can't really tell you

12   that."  But because of the time and the space and -- so,

13   you know, I really pursued it.

14        I really wanted to be vindicated.  Between you

15   and me, Ted, I really liked that job.  It was fun.  We     17:29:30

16   got to go to parties and stuff.

17   Q.   BY MR. BOUTROUS:  We'll take a look at that.

18        MR. BOUTROUS:  And I have two production issues

19   here.

20        Mr. Olasov, your camera is, kind of, up, and        17:29:41

21   we're seeing your ceiling, not you.

22        And then, Mr. Reichman, your camera is on and

23   your -- I think you're unmuted.  So just to kind of --

24   we're back.

25        MR. OLASOV:  I'm going to forward this --            17:29:56

                                                              Page 199

```
 1              MR. BOUTROUS:  Yep.

 2              MR. OLASOV:  I'm going to forward you this email

 3    now.  We've previously produced it, but I -- I don't have

 4    the Bates-stamps marked.  And I looked for it, but that I

 5    can't find.  That's too much for someone like me.          17:30:11

 6              MR. BOUTROUS:  Well, we appreciate the effort.

 7    I've got my email up now, and I'll take a look at that.

 8         Q.  And in the meantime --

 9              MR. OLASOV:  Let me see where we are here.

10         Q.  BY MR. BOUTROUS:  In the meantime, I've got a     17:30:24

11    few more just general questions.

12              MR. OLASOV:  I have to get back on the system.

13              MR. BOUTROUS:  Okay.  Should we go off the

14    record for a second?

15              MR. OLASOV:  Okay.  I'm -- can you see me now?    17:30:36

16              MR. BOUTROUS:  There you go.  Now you're

17    adjusted.  That's good.

18              MR. OLASOV:  Good looking old man.

19              MR. BOUTROUS:  You're looking good, and I've got

20    your email, so I'll turn back to that in a second.         17:30:47

21         Q.  So my second, kind of, wrap-up question on this

22    topic, Ms. La Liberte, is:  Can you identify any lost

23    businesses or project from any of the customers you

24    identified on Exhibit 49, your supplemental initial

25    disclosures, that you lost because of anything Joy Reid    17:31:02
```

Page 200

1    said or did?

2          MR. OLASOV:  Objection to the form of the

3    question.

4          Go ahead and respond.

5          THE WITNESS:  I can't.  To the best of my          17:31:17

6    knowledge, I don't know.  I don't know.

7       Q.  BY MR. BOUTROUS:  And then more broadly,

8    basically the same question.  As to any other customer

9    anywhere in the world, can you identify any lost customer

10   or business that resulted from the Simi Valley City        17:31:34

11   Council Meeting or Ms. Reid?

12      A.  I had no website, and I had a lot of Yelps.

13   Like over 300 yelps that were terrible.  So if anybody

14   was looking to do work with me from any of these lists

15   that I was on before, they would have seen that.          17:31:52

16          So I have no way of knowing --

17      Q.  And you had said earlier, too, that you thought

18   that there were people who wanted to do business with you

19   but they couldn't reach you.

20      A.  Yes.                                                17:32:11

21      Q.  And are you aware of any specific business or

22   clients that you lost because people couldn't reach you

23   specifically by name?

24      A.  Not -- not by name.

25      Q.  Do you have any -- how would you know if there      17:32:21

Page 201

1    were people who couldn't reach you and wanted to do

2    business with you?

3          MR. OLASOV:  Objection.  Speculation.

4          You may respond.

5          THE WITNESS:  Yeah, because I had so much more          17:32:34

6    work in the years before.  I mean, I didn't suddenly

7    become a bad contractor.  I mean, there was a lot of work

8    going on, and I wasn't being asked to bid on it.

9          Q.  BY MR. BOUTROUS:  You mentioned an Orange County

10   project for CHi.  Can you identify more specifically what   17:32:50

11   that was?

12         A.  I've got to remember the town.  Can I look at my

13   phone a minute?  Is that okay?

14         Q.  Your lawyer might not want you to do that,

15   because if you look at things there, then I can look at    17:33:05

16   them.

17         A.  Oh, I was just trying to -- it wasn't San Juan

18   Capistrano.  It was -- oh, God, it was somewhere in

19   Orange County.  I can't remember.

20         Q.  Okay.  And you mentioned Larry --                 17:33:20

21         A.  I was doing clean-up on it --

22         Q.  Okay.

23         A.  -- you know, for my -- for my -- see, it wasn't

24   only CHi's customer.  I brought the customer to CHi.

25         So if I just said, "Hey, I'm gone," it's not          17:33:33

Page 202

```
 1    fair to him.  So I continued to do work on his behalf.

 2    And -- and -- and I would copy him to them so they could

 3    deal directly.

 4         Q.  And you mentioned someone named Larry.  Do you

 5    remember what Larry's last name was?                    17:33:54

 6         A.  Kaplan.

 7         Q.  Kaplan.

 8             And he was part of this Orange County project?

 9         A.  Yes, he was.

10         Q.  It was for him?                                17:34:01

11         A.  Yes.

12         Q.  And do you know the full name of the customer

13    for which that project was?  Was it Larry Kaplan or was

14    it a business?

15         A.  It's McDonald's.                               17:34:11

16         Q.  Okay.

17         A.  Larry Kaplan doing business as McDonald's.

18         Q.  So it was a McDonald's -- a project for

19    McDonald's in Orange County for Larry Kaplan?

20         A.  Yeah.  Reconstruction, yeah.                   17:34:23

21         Q.  You mentioned Rachel and Nick.  Who are they?

22    What's their last names?

23         A.  I mean, they're -- they're employed as field

24    people for CHi.  I knew them while I was working at CHi.

25         Q.  Got it.                                        17:34:44
```

Page 203

1          So they worked for CHi, and you interacted with

2     them in your sub representative capacity?

3          A.  Yes.

4          Q.  Do you remember their last names?

5          A.  I think hers was Cho, Rachel Cho.  And I can't     17:34:57

6     remember his last name.

7          Q.  Okay.  No problem.

8          As I read the service agreement that you had

9     with CHi, it was really -- it was -- your service area

10    was limited to McDonald's.  Are you now saying that you     17:35:13

11    made sales to Dunkin' Donuts, Pizza -- I think you said

12    Pizza Hut, or other entities as a CHi representative?

13         A.  I was --

14         MR. OLASOV:  Objection to the form of the

15    question.                                                  17:35:29

16         Ros, please let me lodge my objections before

17    you answer, and then I don't have to interrupt you and

18    annoy Mr. Boutrous and me at the same time.

19         THE WITNESS:  Being a sales rep, we were

20    actually told to see if we could get more work from other  17:35:47

21    companies.

22         So I was doing construction with Dunkin' Donuts,

23    and Dunkin' Donuts was looking for an alternate vendor

24    for seating and decor.  And I was working with them on

25    behalf of CHi.                                             17:36:07

                                                    Page 204

1        Q.  BY MR. BOUTROUS:  Was your contract ever amended

2    to incorporate sales to other entities beyond McDonald's?

3        MR. OLASOV:  Objection to the form of the

4    question.

5        I don't think you've actually put before her all      17:36:20

6    of the contractual engagements.  But that's up to you.

7        THE WITNESS:  I -- I was -- they told me to go

8    out and get more -- different work.  I was -- you know,

9    they were very happy with that.

10       Q.  BY MR. BOUTROUS:  Let me ask you this:  You --   17:36:38

11   you claim about $177,000 in damages for lost commissions

12   to CHi.  Did you lose any other commission business

13   besides CHi commissions?

14       A.  That was the only company I was a commissioned

15   rep for.                                                  17:36:55

16       Q.  And your Profit & Loss Statements, which I'm

17   going to come back to at least mark, we don't have to go

18   into detail, but they differentiate between construction

19   and decor.  What's the difference between those two

20   things?                                                   17:37:11

21       A.  Construction is the work.  Decor is, like, okay,

22   I buy the tile, I buy the wallpaper, I buy the graphics.

23   That's decor.  Construction is installation of that.

24   Installation, also plumbing, electrical, you know,

25   concrete work.                                            17:37:34

Page 205

```
1            I mean, that's -- that's why it's -- they're

2   large amounts.  They are a lot of work.

3        Q.  So sometimes we'll say a McDonald's or a company

4   hire your company only to do the construction work, to

5   install decor they got somewhere else?                        17:37:49

6        A.  No.  I -- I was on top of that.  I --

7        Q.  So you do both?  You do the decor, and then you

8   put it in?

9        A.  I didn't have another company come to my job and

10  install.  Unless -- unless they -- they made the -- the     17:38:02

11  decor.

12       Q.  Did you --

13       A.  If it was one of the other companies there and

14  they did the decor and installation on their stuff and we

15  did the construction, that was okay.                          17:38:20

16           But CHi didn't have installers that I would

17  allow on our -- on our job because I would install it.

18       Q.  And did you lose any decor business after the

19  Simi Valley meeting?

20       A.  All of it.  As far as -- as buying it, unless --   17:38:36

21  unless the owner said buy it for the construction part --

22  but, no, not the same amounts.  No.  Just, you know,

23  incidental stuff.

24       Q.  Since the Simi Valley meeting in 2018, have --

25  has anyone other than CHi officially terminated you?         17:39:02
```

Page 206

1      A.  With a letter?

2      Q.  In any way.

3      A.  No.

4      Q.  And are you still doing business with

5  McDonald's?                                           17:39:19

6      A.  Just the franchisee part, not the corporate.

7      Q.  How about Dunkin' Donuts?

8      A.  We haven't been asked to bid anything.

9      Q.  Since when?

10     A.  I don't know what their list is of vendors.  I   17:39:34

11  am not privy to that.  So if I'm not on the list, I don't

12  get asked to bid.

13     Q.  And when was the last time, to the best of your

14  recollection, that you did any business with Jersey

15  Mike's?                                               17:39:51

16     A.  I can't really recall.  Around -- we still were

17  bidding stuff and probably until 2 -- 2017.

18     Q.  Got it.  Thank you.

19         Now, let's turn -- I've got the email from

20  Mr. Reichman -- or Mr. Olasov here, and I'm going to send   17:40:12

21  it to my colleagues.  I don't know if we can -- since

22  it's not the official document, if we can use it as an

23  exhibit.

24         MR. OLASOV:  You're welcome to treat it

25  specially.  We've produced it.  I just don't know where   17:40:33

Page 207

```
 1    it is.

 2              MR. BOUTROUS:  Got it.  So if we can maybe

 3    stipulate that I'm marking this email, June 29, 2018, at

 4    10:47 Eastern Time.  So that would be --

 5              This is from Ms. La Liberte to -- it's a          17:40:47

 6    response to Mr. -- to Jay, "Dear Jay."

 7         Q.  And you say -- I'll just read it into the

 8    record.

 9              So this is very shortly after he sent you his

10    email -- or you received it at 7:47 a.m., I believe.       17:41:09

11         A.  Uh-huh.

12         Q.  And -- or 7:43.  And you responded four minutes

13    later, as I'm reading this.  So you respond:  "Thank you,

14    Jay.  I'm sorry if this is because of the posts, because

15    they are so exactly not true.  It did not happen like it   17:41:24

16    showed on the internet.  We calmed down, and his mom was

17    right there.  We even hugged each other.  Believe what's

18    put out there" -- let's see, "We hugged each other.

19    Believe what's put out there" -- you probably meant --

20    "it's unfair" -- you probably meant "don't believe."      17:41:37

21              "I never said anything they accused me of.  I

22    know you find it hard to believe, but I'm telling the

23    truth.  You should try to contact him, his mom or the

24    Simi Valley police if you really want to hear the truth.

25              "I wanted to tell you that my parents came from  17:41:51
```

Page 208

```
 1    Indonesia, they were both captured by the Japanese in

 2    World War II at the same age as that 14-year-old boy.  My

 3    mom was separated from her dad for three-and-a-half

 4    years.  I would never believe in separating children from

 5    their parents?                                          17:42:02

 6            "It was a pleasure working with you all.  Thank

 7    you, Roslyn."

 8            MR. BOUTROUS:  So I'd like to make that an

 9    exhibit -- the next exhibit in sequence, and I've

10    forwarded it to my colleague, Ms. Mulligan, who can     17:42:17

11    perhaps can get it to our concierge, Greg, and we can

12    just mark it as an exhibit.  Is that satisfactory?

13            MS. MULLIGAN:  Yes, I will upload it now.

14            (Exhibit 52, Email from Marissa Mulligan to

15            gregg@gypsykidproductions.com, 8.17.21, marked  17:42:26

16            for identification electronically by counsel.)

17       Q.  BY MR. BOUTROUS:  So -- so this was --

18            MR. OLASOV:  Greg --

19            MR. BOUTROUS:  Okay.

20       Q.  So a few questions, Ms. La Liberte.  So this was  17:42:36

21    early in the morning of June 29; correct?

22       A.  Yes.

23       Q.  And you were -- you get this email from your

24    client.  It's 7:43 a.m.  Let me find that exact date

25    here.  Excuse me, 7:42 a.m. Pacific Time, that morning,  17:42:56
```

Page 209

```
 1    on June 29.  And then you responded, it looks like, at

 2    7:47, so five minutes later.

 3            And were you upset when you received -- when you

 4    sent this email to him?

 5        A.  I was shocked when I got his email, and I was          17:43:14

 6    defensive, I think, more so.

 7        Q.  And, I'm sorry, go ahead.

 8        A.  More defensive than angry.

 9        Q.  And you said that -- here that you -- you said,

10    "I'm sorry if it's because of the posts."  So you felt at      17:43:41

11    that time that it was likely because of the posts

12    regarding the Simi Valley meeting that he had terminated

13    you?

14        A.  Yeah, because I was doing a good job working.

15        Q.  And did they -- and then you said you had called      17:43:55

16    him -- well, let me ask you -- I think it was before we

17    went on the record.  Did you say you tried to call him

18    to --

19        A.  Yeah, I would usually call before I emailed,

20    because I like to talk to people.  That's what I usually       17:44:10

21    do.

22        Q.  And how many times do you think you called

23    Jay Rothman that morning?

24        A.  Probably a couple times.  And then -- and then

25    after the email, maybe a couple times more.                    17:44:20
```

1          Q.  I think you said you serially called him.

2          A.  I serially called him.

3          Q.  And then did you ever talk to him?  Did he ever

4     call you back?

5          A.  I think -- I think we did have a phone          17:44:34

6     conversation, and he said, "I" -- "there's nothing I can

7     do," and he just, kind of, like, threw it off, like,

8     "Sorry."

9          Q.  Okay.  Thank you.  And thanks for getting --

10    pulling that email up for us.                           17:44:50

11         I'm now going to move to the Profit & Loss

12    Statements here in a moment, which I'm going to mark.

13         Let's go to the 2016, which is --

14         MR. BOUTROUS:  It's Tab 52, Greg, and so that

15    will be the next exhibit after that email that we just  17:45:19

16    marked.

17         (Exhibit 53, PLAINTIFF 09966 - 68, marked for

18         identification electronically by counsel.)

19         Q.  BY MR. BOUTROUS:  I'll try to be pretty crisp

20    going through these financial statements.  Maybe a few  17:45:34

21    preliminary questions, though, while we're pulling up the

22    2016.

23         So do you have your financial statements

24    audited?

25         A.  We have a bookkeeper, and we have an accountant, 17:45:45

Page 211

```
 1    but not an auditor, no.

 2         Q.  Got it.

 3             And is your bookkeeper an RC employee, or is it

 4    a separate accounting firm that you use?

 5         A.  She's a 1099.                                  17:45:57

 6         Q.  Got it.

 7             So an independent contractor that does your

 8    bookkeeping.  And then you have a separate accountant

 9    firm that you use?

10         A.  Yes, I have two different people that I use.   17:46:10

11         Q.  Who do you use as your accountants?

12         A.  Stan Goodman.  I'll have to get you this

13    information.  I don't know it offhand.

14         Q.  Okay.  That's -- that's --

15         A.  I really have known him for my whole life, and 17:46:24

16    I -- he's been working with me since I started my

17    business.

18         Q.  And were -- and then do you remember the name of

19    your other accountant?

20         A.  I'm sorry.  They talk to each other.  I'm sorry. 17:46:43

21         Q.  Okay.  We can follow up on that.  Not a problem.

22             So this document is a 2016 -- your Profit & Loss

23    Statement.  And as I read it, your total gross profit was

24    $179,656.70.

25             Do you see it there?                           17:47:07
```

Page 212

```
 1        A.  Yes.  We're an S corporation, so we try and pay

 2    everything off before the end of the year as far as

 3    balances due and -- and deposits given.  And that's okay

 4    with an S corporation.

 5            So you don't really show the real profit you       17:47:29

 6    make.  So you have to kind of go by the -- the income,

 7    the total sales, because the rest of it is -- is

 8    payment -- you know, that's pending payment.  You know,

 9    like deposits and --

10        Q.  Yeah.                                              17:47:55

11        A.  -- before we got paid.

12            Like, let's say we did a job in November, and we

13    get paid part of it in November, then the balance in

14    January.  Well, I will pay the people before I get the

15    balance.                                                   17:48:11

16        Q.  Okay.

17        A.  So not -- this is what business people do, Ted.

18        Q.  Okay.

19        A.  This is not a trade secret or anything.

20        Q.  Okay.  And if we could --                          17:48:24

21            MR. BOUTROUS:  Greg, if you could scroll, just

22    to make sure we're all the way at the bottom of this.

23            I think it's -- yeah, there we go.  So I just

24    want to make sure we've got the final.

25            Okay.  Thank you.                                  17:48:42
```

                                                     Page 213

```
 1              Let's move to the next exhibit, which will be

 2    Exhibit 54, I believe.  And that is going to be the

 3    Profit & Loss for 2017.

 4              THE CONCIERGE:  Which tab is that?

 5              MR. BOUTROUS:  That is Tab 53.              17:49:05

 6              (Exhibit 54, PLAINTIFF 09971 - 73, marked for

 7              identification electronically by counsel.)

 8         Q.  BY MR. OLASOV:  So this is 2017.  This will be

 9    Exhibit 54.  And if we look here, it shows -- you've got

10    a nice jump in commission income; correct, of          17:49:57

11    1.57 million?

12         A.  Uh-huh.

13         Q.  And sales and construction and -- with total

14    sales 3.222 million plus change.  And then total income

15    of $4,799,096.53; correct?                            17:50:18

16         A.  Uh-huh.

17         Q.  So we'll go to -- let's go to exhibit what will

18    be marked as Exhibit 55, which is the P&L for 2018.

19         A.  Uh-huh.

20         Q.  Just a quick -- just you were, I think, kind of,  17:50:46

21    explaining this to me.  Why was the gross profit in 2016

22    179,000, but then it seemed like you had a lot more gross

23    profit in 2017?

24         A.  We did more work.

25         Q.  Okay.  That seems like a rational -- a rational  17:51:05
```

Page 214

```
 1    reason.

 2            So 2018 -- oh, you were moving towards that.

 3            THE CONCIERGE:  Which tab?

 4            MR. BOUTROUS:  That's Tab 54.

 5            (Exhibit 55, PLAINTIFF 09976 - 78, marked for       17:51:17

 6            identification electronically by counsel.)

 7            THE WITNESS:  Yeah.

 8       Q.  BY MR. BOUTROUS:  So do you see that?  And here

 9    it shows a --

10            MR. OLASOV:  Just so the record's clear, we're      17:52:02

11    seeing bits and pieces of this thing.  We don't see the

12    whole document at all.

13       Q.  BY MR. BOUTROUS:  And if you'd like to take a

14    look, Ms. La Liberte, if -- we can scroll through the

15    whole document.  Do you want to take a few minutes?       17:52:12

16            MR. OLASOV:  We don't see it.

17            THE WITNESS:  I'm looking at the total income,

18    basically, so --

19       Q.  BY MR. BOUTROUS:  Let's start with that.  I

20    mean, if you want to look at anything else, just let us    17:52:24

21    know.  We can scroll down.

22            MR. OLASOV:  If you can scroll down before you

23    question her, so that I -- otherwise, I'm going to have

24    to find this document somewhere else, and you don't want

25    me to take the time to do that.                            17:52:39
```

Page 215

1          So, Greg, if you could scroll down this document

2     so I can give it a once-over.

3          MR. BOUTROUS:  I would remind you, Mr. Olasov,

4     this is your document, so I'm not surprising you with

5     anything.                                          17:52:57

6          THE WITNESS:  We're not all accountants here.

7          MR. OLASOV:  I understand that it's my document.

8     And while I have a prodigious memory, it's not for

9     numbers of this kind --

10         MR. BOUTROUS:  I understand.                   17:53:09

11         MR. OLASOV:  -- in this way, so I just want to

12    have some general familiarity.  You can ask her about

13    this stuff, whatever you want.  But she's not seeing the

14    whole document at any one time, as am I.

15         I don't even know whether you're seeing the      17:53:22

16    whole document at one time.

17         THE WITNESS:  I'm getting shocked at how many

18    blueprints right now.

19         MR. OLASOV:  All right.  So that's my only

20    observation.  You ask whatever you want.            17:53:31

21      Q.  BY MR. BOUTROUS:  Yeah.  So, Ms. La Liberte, I

22    just want to hear -- going back to the top of the

23    document, if we could.

24         It looks like the commission income went down to

25    $2,990.41.                                          17:53:44

Page 216

1      A.   Okay.

2      Q.   Do you remember what the source of those

3  commissions were?

4      A.   A lot of it has to do with -- we put -- we put

5  the commissions together with install.  And I did more        17:53:56

6  installation the year before.  So that's what it is.

7      Q.   Got it.

8      A.   Yeah.  It's a liability thing, too, so --

9      Q.   And it looked like there was little or no income

10  commission for the first half of 2018.  Was that the          17:54:22

11  reason?

12      A.   It -- it just was.  I'm -- I'm not sure, yeah.

13      Q.   Okay.  Let's just go back.  So the -- your total

14  income was 3,164,000?

15      A.   Yeah.                                                 17:54:47

16      Q.   Let me now show you the next P&L, which is

17  Tab 55.

18      A.   Okay.

19          (Exhibit 56, PLAINTIFF 09981 - 83, marked for

20          identification electronically by counsel.)           17:54:58

21      Q.   BY MR. BOUTROUS:  And that will be Exhibit 56.

22  That's for 2019.  And then I promise we'll stop with the

23  P&Ls.

24          MR. OLASOV:  You didn't want to do 2020?

25          MR. BOUTROUS:  I don't think we have 2020, do         17:55:11

Page 217

1  we?

2          MR. OLASOV:  You do.

3          MR. BOUTROUS:  I'll stop with 2019.

4          MR. OLASOV:  Okay.

5          THE WITNESS:  Yeah.  Concrete.  Different jobs        17:55:21

6  have different things.

7      Q.  BY MR. BOUTROUS:  So while we're doing this,

8  I'll preview -- really, I have, kind of, one main

9  question for you.  If you look at -- and I'm just

10 representing what was on the prior commission.        17:55:48

11         This one, we've got -- in 2019, sales were at

12 3.224.  You say total income, total sales.  Let's just

13 look at sales, 3,224,449.77.

14         And I'll represent to you that I'm going to give

15 you the numbers for the prior years for the same        17:56:11

16 category.

17         In 2018, the number was 3,161,764.24, so a

18 little bit less; 2017, $3,222,585.75; and then 2016,

19 2,698,648.25.

20         So it looks like your income in 2019 was greater        17:56:39

21 than 2018, the year of the Simi Valley incident; is that

22 correct?

23     A.  Can I explain it to you?

24         MR. OLASOV:  Let me get an objection to the

25 form.        17:56:55

Page 218

```
 1              But then you go ahead and answer.

 2         Q.   BY MR. OLASOV:  Yeah, if you could first answer

 3    "yes" or "no," did your income in 2019 increase --

 4         A.   Yes.

 5         Q.   So it's correct; right?                        17:57:05

 6         A.   Yes.

 7         Q.   And why is that?

 8         A.   Because a lot of it was McDonald's, and I was

 9    very lucky that -- to -- to bid on some big jobs instead

10    of smaller jobs.  So maybe I had only three jobs instead  17:57:22

11    of my usual 6 or 10, 14.  I had -- I had 30-something

12    jobs in 2017.  So it's -- it's not -- it's not the amount

13    of the -- what you make, it's the amount of jobs.  It

14    could have been way more.

15              Now, McDonald's got a lot of this stuff sent    17:57:50

16    their way, and I was told not to talk about this and not

17    to bring them into this.  But unfortunately it happened,

18    so this is dangerous to me.

19              But the vice president of McDonald's is -- when

20    I first met her, was just a supervisor.  And she was      17:58:12

21    promoted in all this time to vice president.  And she --

22    she happens to be Hispanic.  And we were very good

23    friends.  So she knows that I would have never said this.

24    So I did not lose work that she signed off on.

25         Q.   And then I notice that decor number in 2019     17:58:38
```

Page 219

1    jumps back up to $753,041.02.  So this is the year after

2    the Simi Valley event.  How did that come about?

3        A.  Just different jobs.  I have a construction

4    company that I work for in Nevada, and I did work for

5    them.                                                17:59:10

6            MR. OLASOV:  Just objection to the form of the

7    question.

8            MR. BOUTROUS:  And objection noted.

9        Q.  And you mentioned the McDonald's work.  When did

10   you bid on those McDonald's jobs that you referenced with   17:59:22

11   respect to 2019?

12       A.  We -- around the same.

13       Q.  So in 2019?

14       A.  Yeah.

15       Q.  And you got the contracts?  You succeeded?        17:59:37

16           MR. OLASOV:  Objection to the form of the

17   question.

18       Q.  BY MR. BOUTROUS:  Was your bids -- let me

19   rephrase.

20           Was your bid successful, and so you then were      17:59:47

21   chosen to perform the work?

22           MR. OLASOV:  Objection to the form of that

23   question.

24           THE WITNESS:  That's how it works, yes.

25       Q.  BY MR. BOUTROUS:  Thank you.                      17:59:59

                                              Page 220

```
1              A few more things on expenses that you're

2   claiming are part of your damages.

3              MR. BOUTROUS:  If we could go to Tab 65.

4              And while we're doing that, if I could ask the

5   court reporter or videographer about how much time we've      18:00:22

6   used on the record.

7              THE VIDEOGRAPHER:  We are at 4 hours and

8   22 minutes when we started this round, and we got on at

9   5:26.  So we are almost at five hours.  Like 4, 54.

10             MR. BOUTROUS:  Perfect.                            18:00:39

11             THE CONCIERGE:  Exhibit 57 has been introduced.

12             (Exhibit 57, PLAINTIFF 00811, marked for

13             identification electronically by counsel.)

14             MR. BOUTROUS:  Thank you very much.

15        Q.  So, Ms. La Liberte, Exhibit 57 is the document      18:00:49

16   you're seeing there, and it appears to be a plastering

17   bill for 12,290, and it's from May 31, 2019.  How is it

18   that you're claiming that's part of your damages in this

19   case?

20        A.  This is my residence, and we were changing the      18:01:07

21   look of the residence.  And that was to change the

22   plaster and paint color, and all that, to make it look a

23   little different, so we wouldn't get the drive-bys as

24   much as we were getting.

25        Q.  You didn't change your address, though?            18:01:32
```

Page 221

1        A.  No.  Unfortunately, I couldn't do that.

2        Q.  And then let's go to Tab 66, please.  That will

3    be our next exhibit.

4            (Exhibit 58, PLAINTIFF 00812, marked for

5            identification electronically by counsel.)        18:01:40

6        Q.  BY MR. BOUTROUS:  And maybe I can kind of

7    expedite us here.

8            The next exhibit is a painting bill from June 7,

9    2019.  Here we go, Perfection Painting.

10       A.  That was painting -- excuse me.                    18:02:14

11       Q.  Yeah, and that's dated June 2019.  Was that part

12   of the same cosmetic project that you referenced?

13       A.  Yes, it was.

14       Q.  And you claim that these damages relate to

15   Joy Reid?                                                  18:02:33

16       A.  I had to change the look of my house as best I

17   could.  That was one way to do it.  I mean, you know,

18   we're on Google Maps, and when you Google Map us, it

19   shows the old -- the old look.

20       Q.  And why did it take you a year to do this?  Had   18:02:54

21   you been continuing to be harassed?

22       A.  Yeah.  We had eggs thrown on our car -- cars

23   after the -- after -- long afterwards.  And just -- we

24   put cameras up, and we did a lot of things to help, but,

25   you know, there's only so much you can do.                18:03:17

Page 222

1        Q.  How long after the Simi Valley event did you

2   have eggs thrown at your house?

3        A.  Probably two months later.

4        Q.  So in August or so of 2018?

5        A.  Correct.                                    18:03:36

6        Q.  Okay.  And I've got -- maybe we could just

7   quickly mark, let's see, Tab 67, Tab 68, Tab 69 as -- in

8   sequence.  And I'll just describe them to you.  We can

9   put them up, but just to short-circuit, there was a

10  gutter and chimney invoice and a landscaping bill.        18:04:06

11         Gutter and chimney invoices from June 19, 2019.

12  The landscaping bill is July 10, 2019.  There was a

13  garage and shutter bill from 6/19/2019.

14         Would it be fair to say that all of those

15  expenses were in connection with this remodeling or       18:04:27

16  changing the appearance of your house?

17       A.  Yes.  Yes.  And these are subcontractors that we

18  used.  And, you know, they -- they can't just -- you

19  know, they're doing other work for us, so this is a time

20  they weren't busy.                                        18:04:47

21         So, you know, we had dropped off significantly

22  our jobs -- our net volume of jobs.  So they were free to

23  do work on our house at that point.

24         (Exhibit 59, PLAINTIFF 00813, marked for

25         identification electronically by counsel.)        18:05:05

                                                      Page 223

1          Q.  BY MR. BOUTROUS:  So here's the garage.

2          Do you recognize the -- Exhibit 59, the garage

3      and shutter bill?

4          A.  Yes.  And it's a very lovely garage, too.

5          Q.  I'm sure.                                    18:05:17

6          A.  It is.

7          Q.  And was it lovely before Dynamic remodeled it?

8          A.  It was -- it looked like just a regular garage

9      door.  Now it looks different.

10         Q.  So you've had a nice upgrade with the         18:05:29

11     remodeling?

12         A.  Well, it's not only that, it's just a different

13     look.  You know, how can you change the look of anything?

14     It's difficult.

15         Q.  And what did the garage and gutter work have to  18:05:45

16     do with trying to change the appearance of your house

17     because of the Simi Valley --

18         A.  It wasn't gutter.  It was shutter, not gutter.

19     Shutters.

20         Q.  Hmm, okay.                                    18:05:55

21         A.  Shutters, not gutters.

22         Q.  And -- well, there's another invoice I'm about

23     to show you that involves chimney and gutter work.

24     That's this exhibit, which is Exhibit 60.

25         (Exhibit 60, PLAINTIFF 00815, marked for          18:06:05

Page 224

```
 1                identification electronically by counsel.)

 2        Q.  BY MR. BOUTROUS:  Do you see they're reinstalled

 3   downspouts, chimney shroud, cover phone line, cover solar

 4   line, for $2,406?  Are you really claiming that that had

 5   something to do with the Simi Valley events?              18:06:23

 6        A.  Well, if you change one thing, you have to

 7   change the rest of it, you know, so it looks like a --

 8   the look is different.  I mean, yes, yes.  That had to be

 9   done.

10        Q.  Okay.  And then I think we have a landscaping    18:06:40

11   bill.

12        A.  Yes, I took out all the front landscaping

13   entirely.

14                (Exhibit 61, PLAINTIFF 00816 - 818, marked for

15                identification electronically by counsel.)   18:07:03

16        Q.  BY MR. OLASOV:  And this -- did it look a lot

17   better when you did this?

18        A.  It looked different.  I had complements before

19   on my yard, so --

20        Q.  So it's gravel -- three scoops of gravel?        18:07:15

21        A.  It wasn't like we had an ugly -- ugly house.  We

22   had a nice house.  We just wanted to change the look of

23   the house.

24        Q.  And here -- so the landscaping was three scoops

25   of gravel, weed barrier.  It looks like an expense of     18:07:28
```

Page 225

```
 1    staples.  How did that change the look of your house?

 2         A.  I did a lot of -- I bought a lot of cactuses and

 3    stuff.  That doesn't -- a lot of cactuses and stuff.

 4    This isn't -- this is probably just the one page of it.

 5    It doesn't show all of it.                          18:07:49

 6         MR. BOUTROUS:  Yeah, maybe if we can go to the

 7    next page, please.

 8         THE WITNESS:  But, you know -- yeah, there it

 9    is, all the -- agave --

10         Q.  BY MR. BOUTROUS:  There we go.              18:07:59

11         A.  Okay.  So I did quite a lot of -- of

12    different -- we had roses before, and now we have cactus.

13    It's entirely different.

14         Q.  Okay.  Thank you.

15         And then we have a -- the next, it's actually, I    18:08:13

16    believe, Tab 49.

17         That includes -- it's for an expensive computer

18    and email expense of $1,200.  We'll mark that as the next

19    exhibit.  But do you recall -- and this was in -- I'll

20    get the date for you.  But do you recall some computer    18:08:34

21    and email expense that you're claiming damages for?

22         A.  I have a company that does my server and

23    everything, and they had to -- to change my email address

24    and -- how do you say -- archive all the Tweets -- not

25    the Tweets, the emails.  They had to archive those.       18:08:55
```

                                                    Page 226

```
 1              They had to -- they had to put a lot of -- how
 2     do you say?  Where people can't get into your emails and
 3     your bank accounts -- locks, blocks into that.  And that
 4     was what it was.
 5              THE CONCIERGE:  The tab for me, please?          18:09:19
 6              MR. BOUTROUS:  Oh, yes.  I'm sorry.
 7              THE WITNESS:  We had five computers -- five
 8     different stations.
 9         Q.  BY MR. BOUTROUS:  I've got that back to Tab 49,
10     which is, I believe, the supplemental disclosures          18:09:30
11     document, which is our exhibit --
12              THE CONCIERGE:  49.
13              MR. BOUTROUS:  49.
14              THE CONCIERGE:  Thanks.
15         Q.  BY MR. BOUTROUS:  So that information all came     18:09:41
16     out of the supplemental disclosure document.
17              And in addition, you also claim telephone
18     expenses, and then a security installation -- security
19     system installation.
20         A.  Yes.                                               18:09:53
21         Q.  So you're claiming that all those expenses,
22     those weren't caused by Ana Navarro or Soledad O'Brien or
23     Alan Vargas or anybody -- all the people who Tweeted your
24     name, Tweeted your address, who, you know, made your name
25     a hashtag.  You're saying that those expenses, all the     18:10:08
```

Page 227

```
 1    ones we've just talked about, plus these phone and other

 2    expenses and security system, those were caused by Joy

 3    Reid?  That's your testimony?

 4              MR. OLASOV:  Objection to the form of the

 5    question.                                            18:10:23

 6              You're asking her to draw legal conclusions as

 7    to the scope of what a joint party -- she's responsible

 8    for.

 9              You're free to ask her.  If you think that gets

10    value to you, be my guest.  But I object to the question,  18:10:37

11    because it calls for a legal conclusion as to what

12    Joy Reid's legally responsible for.  As to which I think

13    you and I are not going to agree.

14         Q.  BY MR. BOUTROUS:  Ms. La Liberte, is that your

15    testimony, that --                                    18:10:54

16         A.  Yes.

17         Q.  You also claim noneconomic damages.  And just

18    to turn back to -- actually, I'd like to now go back to

19    Tab 19.  I don't believe we've marked that as an exhibit.

20    It's the -- I believe it's the Reichman declaration.   18:11:15

21              And while he's doing that, so you claim that

22    Ms. Reid caused you to suffer what are known as

23    noneconomic damages, including emotional distress;

24    correct?

25         A.  Yes.                                          18:11:31
```

Page 228

```
 1              MR. OLASOV:  Objection.

 2              She's answered the question.

 3              Objection to the form of the question.

 4              If you ask her to quantify, I'm going to object

 5    to that on the grounds that -- that's nothing she's in a      18:11:39

 6    position to do, as you know.

 7              So you're free to pursue whatever you want.

 8              MR. BOUTROUS:  Thank you.

 9        Q.  And you testified earlier today, and I think I

10    got the quote right.  You said that after the Simi Valley      18:11:56

11    meeting, you were all done with everything in terms of

12    political protests and the like?

13              MR. OLASOV:  Objection to the form of the

14    question.

15              Go ahead and respond.                               18:12:07

16              THE WITNESS:  It changed me.

17        Q.  BY MR. BOUTROUS:  And then you clarified your

18    testimony after a break saying that you may have gone to

19    this other event -- or that you did go to this other

20    event, and it was -- that was a July 4, 2018, rally in        18:12:22

21    Century City; is that right?

22        A.  No.

23        Q.  Does that sound about right?

24        A.  No, it wasn't.  It was just about four people

25    standing by the British Embassy, not even the American --     18:12:33
```

Page 229

```
 1    it was nothing to do with America or Trump or anything

 2    else like that.

 3             It was a friend of mine who's child -- or

 4    acquaintance of mine who's child was raped by -- by --

 5    you know, I don't -- I -- I can't even say an illegal        18:12:52

 6    immigrant or something.

 7             But he was saying that this British journalist

 8    was put in jail for writing about how Muslim packs of men

 9    are grooming women in England.  And he said, "Would you

10    go down there and -- and stand in front of the British       18:13:15

11    embassy?"  And I said I would.

12             So I don't think one is equivalent to the other.

13    It was something entirely different.

14        Q.   Let's go to page 5 of this document, please.

15             THE CONCIERGE:  For the record, this is            18:13:34

16    Exhibit 62.

17             MR. BOUTROUS:  Thank you.

18             (Exhibit 62, JR_0000348 - 366, marked for

19             identification electronically by counsel.)

20        Q.   BY MR. BOUTROUS:  So this is a document --          18:13:45

21        A.   Yeah, "Free Tommy Robinson."

22        Q.   Free Tommy Robinson.

23             So you were -- you viewed him as a political

24    prisoner.  And is that you holding that sign there?

25        A.   I'm the pink woman, yeah.                           18:14:00
```

Page 230

```
 1        Q.  Yes, got it.

 2             And you'll see that the photographs of the

 3    rally -- or this declaration states are included below

 4    with a link to the blog site and an apparent

 5    confrontation that you had at the rally.              18:14:19

 6             I know you disagree that it's a rally, but

 7    you'll see the blog is -- is a blog from Arthur Schaper.

 8    Do you know this name?

 9             MR. OLASOV:  Objection to the form of the

10    question.                                             18:14:31

11             You can respond.

12             THE WITNESS:  Huh?

13             MR. OLASOV:  He wants to know if you know --

14             THE WITNESS:  I know -- I know -- I know who

15    Arthur Schaper is, yeah.                              18:14:40

16        Q.  BY MR. BOUTROUS:  Who's Arthur Schaper?

17        A.  I think he's a journalist.

18        Q.  Have you -- you've met him in person; correct?

19        A.  Yes.

20        Q.  And so this event was only two days after      18:14:52

21    Ms. Reid's final post about the incident.  So that was on

22    July 2.  So two days later, you were back out with a

23    sign.  You were --

24        A.  No, it wasn't -- it wasn't two days after.

25        Q.  According to Mr. Schaper's blog, this event     18:15:11
```

Page 231

```
 1    occurred on July 4, 2018.

 2        A.  I was out of town on July 4th.  I was in -- I

 3    was in Maryland on July 4th.

 4        Q.  When did you leave for Maryland?

 5        A.  I spent July 4th in Maryland.                    18:15:29

 6        Q.  So you're telling me that after this -- this

 7    event -- this thing you went -- this terrible thing you

 8    went through starting on July 28th --

 9        A.  Yes.

10        Q.  -- 2018, and then culminating with Mr. Wood      18:15:46

11    sending a letter to Ms. Reid on July 2, you then left for

12    Maryland?  When did you leave?

13        A.  I left -- I left July 2nd.  In fact, I talked to

14    Taylor Wilson from the airport.

15        Q.  And who's Taylor Wilson?                         18:16:06

16        A.  Taylor Wilson --

17            MR. OLASOV:  Objection.

18            He's one of her former lawyers.  So she's

19    identified that she spoke with Taylor Wilson.  What she's

20    telling you is that the statement in Mr. Reichman's       18:16:21

21    affidavit has to be in error, because she was not in

22    California on July 4th.  That's her testimony.

23        Q.  BY MR. BOUTROUS:  Is that correct,

24    Ms. La Liberte?

25        A.  Yes, it is.                                      18:16:35
```

Page 232

```
 1        Q.  Do you remember when this event was in Century

 2   City for "Free Tommy"?

 3        A.  I have no recollection of the date.

 4        Q.  And if you can remind me, so are you saying that

 5   an illegal immigrant -- was it in London?  Was it in          18:16:51

 6   England?

 7        A.  No.

 8        Q.  Where --

 9        A.  Tommy Robinson is a journalist.  Tommy Robinson

10   is a journalist.  You can look him up.  He writes about        18:17:04

11   immigration.  I think in London.  And he was writing to

12   the effect that there were a lot of Muslim

13   fundamentalists who were harassing and raping women in

14   England.

15        He got thrown in jail for his article, which            18:17:34

16   they can't do here.  I mean, if you wrote an article,

17   they can't throw you in jail.

18        So this man who had a child who was raped took

19   offense to it, and called me and said, "Would you go down

20   to the British Embassy and hold a sign?"  I said I would.    18:17:55

21        And this was way after.  I think it was -- I

22   think it was in November.  Because it was before --

23   before the elections of 2018, the -- the -- what do you

24   call elections?

25        Q.  Presidential election?  Or the midterms?            18:18:24
```

Page 233

```
 1        A.  So I would say it was in November.

 2        Q.  Okay.  So in your Complaint, you seek

 3   noneconomic damages.  What amount are you seeking?  Do

 4   you recall?

 5            MR. OLASOV:  Objection.                    18:18:40

 6        Q.  BY MR. BOUTROUS:  Do you recall?  I can refresh

 7   your recollection, if you don't.

 8        A.  What I'm --

 9            MR. OLASOV:  Do you mean what's in the

10   Complaint?                                          18:18:53

11            THE WITNESS:  What are you asking?

12        Q.  BY MR. BOUTROUS:  In your disclosures, your

13   supplemental disclosures, you disclosed an amount of

14   noneconomic damages that you're seeking.  Do you recall

15   that amount?                                        18:19:04

16            MR. OLASOV:  Objection.

17            And I'll direct her not to answer that, because

18   you've misstated what's in the document.  We don't put a

19   number in, and we objected to the question, and you -- as

20   being improper under the law.  And you're asking her to  18:19:17

21   draw legal conclusions about these things, and there is

22   no such number.

23            So when you tell her, "What's the number,"

24   you're misstating what's in that document, and I really

25   think you ought not to be doing it.                 18:19:31
```

Page 234

```
 1            MR. BOUTROUS:  My mistake, if I did that.  And I

 2    didn't mean to.

 3        Q.  I just really want to know, Ms. La Liberte, do

 4    you -- do you have a sense of what your damages are for

 5    emotional distress?                                    18:19:41

 6            MR. OLASOV:  Objection to the form of the

 7    question.

 8            You -- you can respond, if you can respond.

 9            THE WITNESS:  No, I can't respond.

10        Q.  BY MR. BOUTROUS:  Did you seek any professional   18:19:53

11    help from a psychiatrist or counselor or anyone like that

12    to address the injuries you suffered as a result -- that

13    you claim you suffered as a result of Ms. Reid's posts on

14    social media?

15        A.  I have a friend who is a psychologist who I've    18:20:11

16    been talking to, but it wasn't in a professional or paid

17    capacity.

18        Q.  What's your friend's name?

19        A.  Betty Arias.

20        Q.  And --                                           18:20:23

21        A.  She's a clinical psychologist.

22        Q.  Where does she live?

23        A.  She lives in El Segundo.

24        Q.  Do you happen to have her address?

25        A.  I do not have it with me.                        18:20:33
```

Page 235

1      Q.  And it's Arias, A-R-I-A-S?

2      A.  Correct.

3      Q.  And so no, you did not consult anyone in a

4   professional capacity to address any emotional injuries?

5      A.  A friend of mine, yeah, who is --                18:20:47

6      Q.  And has your personal life suffered, your

7   marriage, your relationship with your children, with your

8   friends, as a result of Ms. Reid's posts, in your view?

9      A.  I think it has left a -- a lot of sadness in me.

10  I'm not as trusting.  I'm not as happy.  I -- I try        18:21:13

11  and -- and do things that make me happy.

12         I love my husband very much, and he's very

13  supportive of me.  If he hadn't been as supportive of me,

14  it -- it -- it would have been a lot worse.

15     Q.  Have you remained politically active since        18:21:38

16  June 29, 2018?

17     A.  No, not really.  No.

18     Q.  Are you supportive of the people who breached

19  the capital on January 6th, '21 --

20     A.  No.                                                18:21:56

21     Q.  -- 2021?

22     A.  I am not.  I was at my son's house in

23  San Francisco while this was going on.  With his -- and

24  they're not conservative by any means.  So we watched it.

25     Q.  Going back to Ms. Reid for a second, you          18:22:12

                                                        Page 236

1    understand that Ms. Reid ultimately, on July 2, posted an

2    apology to you and Joseph Luevanos; correct?

3           MR. OLASOV:  Objection.

4           She posted what she posted.  You're

5    characterizing it as an apology.  It will speak for          18:22:27

6    itself.

7           MR. BOUTROUS:  Fine.

8       Q.  You understand that, though, Ms. La Liberte?

9       A.  I was afraid of anybody that came near me.  I

10   bought a wig.  I did everything I could to disguise          18:22:46

11   myself and -- and -- and -- and hide from it.  And I -- I

12   did not recognize what she said as an apology, between

13   you and I.

14      Q.  Did anyone else post on Twitter or Instagram or

15   Facebook that they -- it seems like they had gotten this     18:23:09

16   wrong, and then say, "I apologize to Ms. La Liberte"?

17      A.  I -- excuse me?

18      Q.  Yeah, I was just going to say:  Do you remember

19   any -- you agree Ms. Reid said, "I apologize"; correct?

20          I can show you -- if you'd like me to, I can put     18:23:30

21   the apology up on the screen.

22          MR. OLASOV:  The words that she put in the

23   Tweets speak for themselves.

24          MR. BOUTROUS:  I agree.  Very -- very --

25          MR. OLASOV:  -- wouldn't characterize it as an       18:23:41

                                                      Page 237

1    apology.

2         THE WITNESS:  Very few people saw that.  If she

3    would have said it on her show, on her -- on her TV show,

4    there would not have been this.

5         If she would have said, "You know, Roslyn is a          18:23:52

6    good person, and I got this wrong," I would have said,

7    "Joy, I'm a fan of yours."

8         Q.  BY MR. BOUTROUS:  And do you recall anyone else

9    Tweeting or posting, saying that they may have gotten

10   this wrong and using the word "apology"?                    18:24:07

11        A.  I deleted all my social stuff.  I never was on

12   Twitter in any capacity.  I didn't have Facebook.  My

13   children never saw anything like that.

14        People just went around and -- and -- and a few

15   people saw the apologies.  Many people -- it was like she    18:24:29

16   put it in the front page, "Roslyn is the face of racism,"

17   and on the very last page of the back page of the

18   newspaper, she put, "Maybe not."

19        Q.  So you understand on Twitter, when Ms. Reid

20   Tweeted what I will call her apology, objections noted --    18:24:49

21   she Tweeted to her 1.2 million followers.  So she Tweeted

22   to the same group of people that she had re-Tweeted

23   Mr. Vargas Tweet in first place.

24        You understand that right?

25        A.  Yes.  But she didn't get very many likes or         18:25:06

Page 238

```
 1   anything like that.  Or even people who looked at it.
 2         It wasn't -- it wasn't -- it wasn't the red meat
 3   that she threw out before.  She threw out red meat, and
 4   then she had a carrot that she tossed in the air.  That's
 5   what it was.                                    18:25:25
 6      Q.  So in terms of your political activity, you
 7   recall when Lin Wood was your attorney, we filed a motion
 8   to revoke his status as an attorney in the case; correct?
 9      A.  I don't want to comment on Lin Wood.  He's not
10   my attorney anymore.                            18:25:44
11      Q.  I just have some questions -- I have some
12   questions for you, and I'm not going to ask about any
13   privileged information.
14         But you'll recall -- in fact, if we could go to
15   Tab 81.                                         18:25:55
16         (Exhibit 63, Declaration in Support of
17         Defendant's Motion to Revoke the Pro Hac Vice
18         Admission of L. Lin Wood, marked for
19         identification electronically by counsel.)
20      Q.  BY MR. BOUTROUS:  We filed a declaration in   18:25:57
21   support of our motion, and we listed a number of things
22   that Mr. Wood had done.
23         MR. OLASOV:  Objection.  Objection.
24         This has -- this has got nothing to do with this
25   case.  You want to -- you want to smear Lin Wood, you be  18:26:11
```

Page 239

1   my guest.  You do it in some other form, not in this

2   case.

3         I understand that that was an objective --

4   objection.  I thought it was completely inappropriate,

5   and I thought Lin Wood really did the -- the most          18:26:26

6   favorable thing he could by making him a non-issue by

7   withdrawing as her counsel.

8         MR. BOUTROUS:  That's -- that's fine.  That's

9   your opinion, and I'm entitled to ask these questions.

10  Because Ms. --                                             18:26:42

11        MR. OLASOV:  That is -- you're -- you're not

12  free to examine her --

13        MR. BOUTROUS:  Could you stop interrupting,

14  please?

15        Ms. La Liberte filed a declaration in court in       18:26:49

16  this case on this topic, and that's what I want to talk

17  about.

18     Q.  So, Ms. La Liberte, you'll recall on page 5, for

19  example, of this declaration, which has now been marked

20  as Exhibit -- it's going to be an exhibit, I bet -- 63.    18:27:03

21        THE CONCIERGE:  63.

22     Q.  BY MR. BOUTROUS:  63.

23        We noted that Mr. Wood had called for Vice

24  President Mike Pence to be arrested and face execution by

25  a firing squad.                                            18:27:20

Page 240

1          On page 10, we noted that Mr. Wood had accused

2    Vice President Pence of being a traitor and a communist

3    sympathizer and a child molester.

4          We noted on page 13 that there were posts from

5    Mr. Wood that Hilary Clinton had rigged the 2016 election          18:27:36

6    and that she had a plan to kill federal judges.

7          We -- on page 13, we noted that Mr. Wood had

8    wrote that Jeffrey Epstein arranged for the adoption of a

9    chief justice's children and used the children to enter

10   into a cabal of influence and power.                              18:27:56

11         And he -- he alleged that Justice Scalia of the

12   Supreme Court had been murdered.

13         In your declaration -- here's my question for

14   you:  In your declaration, you said --

15         MR. OLASOV:  It's not her declaration.  It's            18:28:12

16   your declaration.  It's not her declaration.

17         MR. BOUTROUS:  No, no.  She -- no.  I'm not

18   asking her -- that is our declaration.  I'm now going to

19   give Ms. La Liberte a chance to explain her own

20   declaration, which I'd like to mark as Exhibit 65.            18:28:26

21         MR. OLASOV:  I'd like to lodge my objection to

22   the form of the question, because it's got this oratorio

23   as a predicate.

24         Go right ahead and ask her your question.

25         MR. BOUTROUS:  Thank you.                               18:28:42

Page 241

```
 1        Q.  Do you recall filing your own declaration in

 2   support of Mr. Wood, in an opposition to our motion to

 3   revoke his status?  Do you remember that?

 4        A.  I -- I -- I hadn't been following Mr. Wood and

 5   what he has done.                                    18:28:58

 6        MR. OLASOV:  The question is -- the question is:

 7   Did you have that in your own declaration?  And the

 8   answer to that is yes.

 9        THE WITNESS:  No --

10        MR. OLASOV:  No, there is one.                   18:29:09

11        THE WITNESS:  I -- I -- I wanted to keep him as

12   my attorney, because he's a good attorney.

13        I did not know -- I didn't follow what he

14   believes in, you know.  I don't know what you believe in.

15   I don't know what anybody believes in.  I don't follow    18:29:22

16   people like that.

17        He was just -- he was just my attorney.

18        MR. OLASOV:  Why don't you show her her

19   declaration, if you want to ask her about her

20   declaration.                                         18:29:37

21        MR. BOUTROUS:  Yes, I was asking Mr. -- Greg to

22   pull up what would be Tab 82 and mark that as our next

23   exhibit.

24            (Exhibit 64, Declaration of Plaintiff Roslyn La

25            Liberte in Opposition to Motion to Revoke Pro    18:29:51
```

Page 242

```
 1            Hac Vice Admission of L. Lin Wood, marked for

 2            identification electronically by counsel.)

 3       Q.  BY MR. OLASOV:  Ms. La Liberte, did you see the

 4   motion we filed to revoke Mr. Wood's status?

 5       A.  Yes, I did.                              18:29:56

 6       Q.  And did you see the declaration of Mr. Reichman,

 7   which was attached to it, that also was discussed in the

 8   motion?

 9       A.  I did, but you'll have to refresh my memory.

10   I -- I don't -- I don't remember.  I was also traveling   18:30:12

11   at that pointing.  I know you're not going to believe it,

12   but I was in Texas when that --

13       Q.  Were you shocked when you saw that your attorney

14   had said these vile things about the chief justice of the

15   Supreme Court and about Mike Pence and about Hilary       18:30:32

16   Clinton?

17            MR. OLASOV:  Objection.

18            I'll direct her not to answer that question.

19   You can ask her questions about her own -- her own

20   actions.                                                  18:30:41

21            MR. BOUTROUS:  What's your basis for directing

22   her not answer that question?

23            MR. OLASOV:  Because it's argumentative and

24   completely outside of the scope of discovery.  You --

25   you -- and we have stipulated that the issue of Lin Wood   18:30:49
```

Page 243

1    is moot.  And that was filed with the Court, and the pro

2    hoc vice motion was dismissed as moot.

3           And, therefore, your inquiry of this, which has

4    maybe something to do with Lin Wood but nothing to do

5    with Roslyn La Liberte -- if you want to ask her a          18:31:05

6    question about this declaration, you be my guest.

7           If you want to ask her about Lin Wood, I'm

8    telling you that she's not going to give testimony about

9    that, because I think it's wholly improper and that you

10   have waived the right to do that.                           18:31:21

11          MR. BOUTROUS:  I disagree with that, obviously.

12      Q.  And, Ms. La Liberte, have you ever heard of the

13   saying that your --

14          MR. OLASOV:  Object --

15          MR. BOUTROUS:  Please stop.                          18:31:28

16          MR. OLASOV:  This is meant to be incendiary.

17   And that was -- that was the very thing that Lin Wood

18   did.  He took himself out of this equation.

19          You want to put him back in, you be my guest.

20   Maybe you're sore that he beat -- he and Taylor Wilson     18:31:40

21   beat you guys in the Court of Appeals.  I can't help

22   that, that's the Court of Appeals.  Unanimous decision.

23          You want -- you want to fight a war with

24   Lin Wood, you file a lawsuit against Lin Wood.  You

25   agreed to dismiss your motion to have --                    18:31:57

Page 244

```
 1            MR. BOUTROUS:  Please -- can you please stop?

 2    I'm going to ask some questions, and I have a very good

 3    predicate, and --

 4            MR. OLASOV:  I won't stop.

 5            MR. BOUTROUS:  -- you're burning up time.      18:32:05

 6       Q.  Ms. La Liberte, have you ever heard the

 7    expression "You're known by the company you keep"?

 8            MR. OLASOV:  You may respond to that.

 9            THE WITNESS:  I've heard of that, yes.

10       Q.  BY MR. BOUTROUS:  And do you agree it means    18:32:18

11    people judge you by the people you associate yourself

12    with?

13       A.  I don't believe that.

14       Q.  You don't believe that people make judgements

15    about you based on who you spend time with and who you   18:32:32

16    associate yourself with?

17       A.  I don't believe that.

18       Q.  So if you knew someone who was close friends

19    with a member of the Ku Klux Klan, you wouldn't think

20    less of that person?                                    18:32:47

21       A.  You had to go to that one?  How about someone

22    who's been in prison and is now out of prison?  How about

23    that example?

24            I don't -- I don't -- I don't find what you're

25    leading in to be anything that I want to get into.  I    18:32:58
```

Veritext Legal Solutions
866 299-5127

```
1    have new --

2         Q.  That's not your choice, I'm sorry.

3         A.  I have new --

4         Q.  I don't mean to cut you off, but I asked you a

5    question.  I'm going to ask you one more question, and        18:33:08

6    it's not your choice, other than certain objections that

7    your counsel could make.

8              Let me go to paragraph 4.

9              THE CONCIERGE:  And for the record, this is

10   Exhibit 64.                                                    18:33:23

11             MR. BOUTROUS:  Of Exhibit 64.

12        Q.  And all the things I read you came from our

13   motion in the declaration about what Mr. Wood had said

14   and done.  And in paragraph 4, you said -- you didn't say

15   you didn't know what Mr. Wood was doing.  You said, "I am    18:33:37

16   of course aware from extensive media coverage of

17   political activities Mr. Wood is engaged in relating to

18   the recent national elections that have attracted a lot

19   of public attention.  None of his public activities has

20   anything to do with me or my case."                           18:33:53

21             And then you say nothing he has done --

22             MR. OLASOV:  (Inaudible.)

23             MR. BOUTROUS:  "He has done nothing."

24             MR. OLASOV:  "All of his dealings with me have

25   been highly professional" --                                  18:34:03
```

                                                            Page 246

```
 1              MR. BOUTROUS:  You don't have the right to

 2      interrupt me.  You can object and --

 3              MR. OLASOV:  (Inaudible.)

 4              MR. BOUTROUS:  Sir, you can object and ask me to

 5      read additional information, but I am going to conduct    18:34:10

 6      this question the way I want to.

 7              But I'll read it for you.

 8              MR. OLASOV:  Ask her questions that --

 9              MR. BOUTROUS:  Please stop interjecting and

10      interrupting me.  I will read the rest of it.            18:34:21

11         Q.  "All of his dealings with me have been highly

12      professional.  He's done nothing in this case that has

13      embarrassed or concerned me or disrespected the Court or

14      counsel for the other side," period, closed quote.

15              Were you aware that he filed a declaration under  18:34:36

16      oath, making these vile attacks on the chief justice of

17      the Supreme Court and against the vice president?  And

18      that didn't embarrass you?

19              MR. OLASOV:  Objection to the form of the

20      question.                                                18:34:49

21              You misspoke.

22              MR. BOUTROUS:  I did not.

23         Q.  You did not find what he did embarrassing or

24      concerning, when he would file an affidavit himself in

25      court making these claims?  You thought that was okay?   18:35:02
```

Page 247

```
 1              MR. OLASOV:  Objection to the form of the

 2      question.

 3          Q.  BY MR. BOUTROUS:  Please answer.

 4              MR. OLASOV:  Go ahead and respond.

 5              THE WITNESS:  He's not my attorney anymore.  I      18:35:16

 6      don't need -- I don't need to get into this.

 7          Q.  BY MR. BOUTROUS:  You need to get into answering

 8      my question, ma'am.  He was your attorney.  You said

 9      nothing he had done embarrassed and concerned you in this

10      case, notwithstanding the fact that he filed an affidavit    18:35:28

11      that made the claims against the chief justice.  He said

12      he had information about Vice President Pence, that he

13      was engaged in terrible conduct.

14          A.  You're --

15              MR. OLASOV:  Are you finished with your             18:35:42

16      question?

17              MR. BOUTROUS:  I am, and I would like an answer.

18              MR. OLASOV:  Can we have the question read back?

19              MR. BOUTROUS:  Please read my first question,

20      which the witness would not answer.

21              MR. OLASOV:  No, no, no.  Let's read back the

22      question you just asked her.  I don't want to have

23      multiple questions rattling around in the air.

24              (The record was read by the reporter

25              as follows:
```

Page 248

```
 1                "QUESTION:  You need to get into answering my

 2                question, ma'am.  He was your attorney.  You

 3                said nothing he had done embarrassed and

 4                concerned you in this case, notwithstanding the

 5                fact that he filed an affidavit that made the

 6                claims against the chief justice.  He said he

 7                had information about Vice President Pence, that

 8                he was engaged in terrible conduct.")

 9        MR. OLASOV:  I'm going to lodge an objection on

10  the grounds that you've misstated what her testimony was,     18:36:38

11  and you've misstated what was in this declaration.

12        MR. BOUTROUS:  Objection noted.

13     Q.  Please answer.

14     A.  Where does it say that I said that?

15     Q.  It says right here.                                    18:36:50

16        MR. BOUTROUS:  And, please, Mr. Olasov, do not

17  interrupt me again.

18     Q.  It says, "He has done nothing in this case that

19  has embarrassed or concerned me, so far as I'm aware, or

20  so far as my" -- "disrespected the Court or counsel for      18:37:01

21  the other side."

22        My question to you is:  Doesn't the fact that he

23  filed a declaration in this case making these wild,

24  baseless, horrific allegations against the chief justice,

25  against Vice President Pence at the time, why didn't that     18:37:19
```

Page 249

```
 1    concern you?

 2         A.   It wasn't --

 3         MR. OLASOV:  Objection as to the form of the

 4    question on multiple grounds.  If you want me to state

 5    them, I will.  If you don't, I won't.              18:37:30

 6         MR. BOUTROUS:  You don't have to.

 7         Q.   Please answer.

 8         MR. OLASOV:  You may respond.

 9         THE WITNESS:  I did not follow him and what he

10    was doing to the extent that I read things like that.  It   18:37:41

11    wasn't my -- it wasn't in my purview.  All I cared about

12    is the litigation of my case.

13         And when he became toxic, he withdrew, and I

14    have two other lawyers that are doing my case now.

15         Q.   BY MR. OLASOV:  But this was a declaration that   18:38:06

16    you filed to try to keep him in the case after you knew

17    he'd become toxic; right, and you were fine with that?

18         A.   I didn't know --

19         MR. OLASOV:  Objection to the form of the

20    question.                                          18:38:17

21         Go ahead and answer.

22         THE WITNESS:  I didn't know all the ins and outs

23    of it.  Okay?  I was only concerned with someone who was

24    willing to be there for me.  When he couldn't be there

25    for me and went off on other things, I chose other   18:38:29
```

Page 250

1    attorneys.  That's all.  I -- I have no -- I have no cow

2    in this thing, no -- no cattle in this herd.  I don't

3    know.  I have nothing to do with it.

4           MR. BOUTROUS:  So I'd like to mark as Exhibit 65

5    what's at Tab 7.  It's a Facebook post by Ruth Luevanos.      18:38:50

6           (Exhibit 65, Facebook post by Ruth Luevanos,

7            marked for identification electronically by

8            counsel.)

9    Q.  BY MR. OLASOV:  So this is a Facebook post by

10   Ruth Luevanos.  She posted it on June 29, 2018.  Have you     18:39:32

11   seen this before?

12   A.  No, I have not seen this.

13   Q.  So this is June 29, the day -- four days after

14   the meeting, the day after the Alan Vargas Tweet.

15          She says, "All my son wanted was a chance to be       18:39:45

16   an active citizen who could state his case at the City

17   Council Meeting.  All these people from FAIR," F-A-I-R --

18   and then she says, in parentheses, "(SPLC identified them

19   as a hate group) wanted was to berate, divide, threaten,

20   boo and yell at Simi residents.  So sad that Simi Mayor       18:40:03

21   and City Council chose hateful outsiders instead of

22   listening to actual Simi residents.  So proud of my son

23   for doing his research and remaining calm in the face of

24   hate."

25          So this is the first time you've seen this?           18:40:18

                                                     Page 251

```
 1         A.  Yes.

 2         Q.  And were there people in the City Council

 3   Meeting who wanted to threaten -- berate, divide,

 4   threaten, boo and yell at Simi residents, in your

 5   observation?                                        18:40:28

 6         A.  No one that I knew.

 7         Q.  But did you observe anyone else doing it, people

 8   you didn't know?

 9         A.  No.  We were kept quite.  And during the

10   intermission, the only person I spoke with was Joe --   18:40:38

11   Joey.  And you could just substitute:  All I wanted was a

12   to be an active citizen who could state her case at a

13   City Council Meeting.  I did not know any of these people

14   from FAIR, and I never knew them as a hate group.  I

15   didn't want to berate, divide, threaten, boo or yell at   18:40:57

16   Simi residents.  So sad that the Simi Mayor and City

17   Council had to be in this position to do all of this for

18   so many hours.  I'm -- and I'm glad that I got a chance

19   to talk with Joey at this event.

20         That would be mine.  Okay?  They could be        18:41:20

21   interchanged.

22         Q.  And you said that you don't know anybody from

23   FAIR.  Are you sure that Elsa Aldeguer is not a member of

24   FAIR?

25         A.  She is Latinos For Trump.  That's what her    18:41:36
```

Page 252

```
 1    shirts say.  That's how I know her.  I don't -- I have

 2    nothing -- I never even knew what FAIR was until this

 3    thing came out saying that I was with FAIR.

 4            I'm -- I'm a Jewish person.  FAIR is BDS.  I --

 5    I don't -- I don't understand it.  I'm not for FAIR, no.    18:41:56

 6        Q.  How about Genevieve Peters?  Do you know whether

 7    she's a member of FAIR?

 8        A.  I have no idea.

 9        Q.  I think you said in your disclosures, and

10    Mr. Olasov will correct me if I'm wrong, that Genevieve    18:42:11

11    would have information about this case in support of your

12    case.  Do you know what that information is?

13        A.  A video that she was taking.

14        Q.  So you knew she took the video?

15        A.  No.  My lawyers saw it.  Taylor Wilson and --      18:42:27

16    said that he had been in contact with her and got a

17    video.  And that's the video we watched a while ago.

18            MR. BOUTROUS:  And if we could go to what would

19    now be Exhibit 65, I think.

20            MR. OLASOV:  Ted, I just want to say that that's    18:42:45

21    not what Taylor Wilson advised me.  So this is not

22    exactly correct, but that's the witness' testimony.

23            MR. BOUTROUS:  And just quick question:  It's

24    3:42, 6:42.  For the court reporter, would this be a good

25    time for a brief break?                                    18:43:03
```

Page 253

```
 1              THE REPORTER:  Sure, that's fine.

 2              MR. BOUTROUS:  Why don't we do like a

 3     ten-minute.

 4              MR. OLASOV:  Before we go off, can you tell me

 5     how much longer you're going to be at this?  It's already    18:43:15

 6     7 o'clock at night here.

 7              MR. BOUTROUS:  Yeah, I think --

 8              How much time have we consumed as of now?

 9              THE VIDEOGRAPHER:  I can tell you when we're off

10     the record.                                                  18:43:25

11              MR. BOUTROUS:  Okay.  Let's go off the record.

12     Let's go off the record.

13              THE VIDEOGRAPHER:  We are going off the record.

14     The time is 6:42.

15              (Recess.)                                           18:58:44

16              THE VIDEOGRAPHER:  We are back on the record.

17     The time is 6:58.

18         Q.  BY MR. OLASOV:  So, Ms. La Liberte, you have

19     talked about Elsa Aldeguer, your friend?

20         A.  We were just acquaintances from this campaign,       18:59:37

21     yes.

22         Q.  And you went --

23         A.  I don't know much about her.

24         Q.  Did you ever go to her house?

25         A.  I dropped her off in front of her house.            18:59:47
```

                                                         Page 254

```
 1        Q.  And how many meetings do you think you went to

 2   either with Ms. Aldeguer or where you met her at the

 3   meeting or event?

 4        A.  Events or SP 54?  What are we talking about?

 5        Q.  Any -- any kind of event.                      19:00:06

 6        A.  With her, probably four or five at the most.

 7        Q.  And let me show you now what has been marked as

 8   Exhibit 66.  It's at Tab 23.

 9            (Exhibit 66, Facebook post by Elsa Aldeguer,

10             marked for identification electronically by    19:00:18

11             counsel.)

12        Q.  BY MR. OLASOV:  So this is a Facebook post from

13   Ms. Aldeguer.  And it's -- she posts:  "This photo just

14   brings a tear to my eye."  At least that's what the post

15   says.  "Rare photo of Ronald Reagan babysitting          19:00:39

16   Barack Obama in early 1962."

17            And the photo depicts President Reagan giving a

18   chimpanzee, a monkey, a bottle to -- to drink from.

19            Do you see that?

20        A.  Yes, I do.                                      19:00:56

21        Q.  Do you think this is a racial -- racist social

22   media post?

23        A.  I can't speculate on that.  It's -- it's -- it's

24   not funny.

25        Q.  You don't think that's a racist post?           19:01:14
```

Page 255

1          A.   It could be a racist post.

2          Q.   How could it not be?

3               MR. OLASOV:   Objection.   That's argumentative.

4          Q.   BY MR. BOUTROUS:   But in your view, what

5     interpretation can you conceive of that would make this          19:01:32

6     post not racist?

7          A.   I think --

8               MR. OLASOV:   Objection to form.

9               You may respond.   That's also --

10              THE WITNESS:   I think it's a stupid post.   I          19:01:43

11    think it's -- it's dumb.   I don't know what was in her

12    head when she did it.   She's from another country.

13    She -- her son is half black, so I don't know what she

14    was thinking.

15         Q.   BY MR. BOUTROUS:   Okay.   So you don't think          19:02:01

16    making a post that equates the first African American

17    president as -- and depicts him as a monkey is racist?

18              MR. OLASOV:   Objection.

19              That's not the testimony.   You're trying to

20    summarize her testimony.   That's not it.                        19:02:17

21              Object to the form of the question.

22         Q.   BY MR. BOUTROUS:   Please answer the question.

23              MR. OLASOV:   Just answer the question.

24         Q.   BY MR. BOUTROUS:   It was a different question.

25         A.   Is that picture a racist picture?   What -- ask        19:02:27

Page 256

```
1    the question again, please.

2           MR. BOUTROUS:  Court reporter, could you read

3    that back?

4           (The record was read by the reporter

5           as follows:

6           "QUESTION:  Okay.  So you don't think making a

7           post that equates the first African American

8           president as -- and depicts him as a monkey is

9           racist?")

10          THE WITNESS:  Yes, it is racist.  But I don't       19:03:03

11   know what she was thinking, because she has a child who's

12   half black and is black, actually.  So I don't know

13   Mr. Boutrous.  I can't really see why she did it or

14   what -- to what effect she was doing it.  And that's

15   my -- my -- that's the truth.                              19:03:24

16          MR. BOUTROUS:  If we could go to the next

17   exhibit -- mark the next exhibit as Exhibit -- Tab 24.

18   Let's mark it as -- actually, let's do Tab 25 first, mark

19   that as Exhibit 67.

20          (Exhibit 67, Tweet from Chad Loder, marked for      19:03:39

21          identification electronically by counsel.)

22          MR. BOUTROUS:  And go ahead and share that.

23       Q.  So this is a photo that was posted on Twitter by

24   Chad Loder.  It's on Twitter.  And you see -- is that

25   Elsa Aldeguer in the corner there?  Do you see her on the   19:04:27
```

Page 257

1    left?

2         A.  It looks -- it looks like her.

3         Q.  And does that look like Genevieve Peters, who

4    you met at least at the Simi Valley event?

5         A.  Where?                                    19:04:44

6         Q.  On the right.  I think on the far right, in the

7    corner.  The one facing the screen.

8         A.  I can't tell.

9         Q.  And do you see that Ms. Aldeguer is making the

10   "okay" sign?                                        19:04:52

11        A.  Yes.  A-OK, yes.

12        Q.  And others in the photo are making that sign?

13        A.  A-OK, yes.

14        Q.  Are you aware that that OK hand gesture is known

15   as a symbol of white supremacy?                     19:05:09

16        A.  I did not know that.

17             MR. BOUTROUS:  Now, if we could just go to --

18   mark Exhibit --

19             MR. OLASOV:  I just want to note my objection to

20   the form of the question for the record.            19:05:16

21             She's already answered.

22             MR. BOUTROUS:  Thank you.

23             Mark as Exhibit 67, which is Tab 24.

24             (Exhibit 68, Tweet from Chad Loder, marked for

25             identification electronically by counsel.)  19:05:28

                                                        Page 258

1          Q.  BY MR. BOUTROUS:  By the way, Ms. La Liberte --

2          MR. OLASOV:  Is this a document -- there are all

3      these numbers.  And is this the only page of the

4      document?

5          MR. BOUTROUS:  Yes.  It's a photograph that was          19:05:38

6      Tweeted by Mr. Loder.  So that's the full -- that's the

7      full document.

8          MR. OLASOV:  I -- I just wondered, because there

9      was a number 1, 2 and 3, and then there's only one thing.

10     So is this a complete document?                             19:05:56

11         MR. BOUTROUS:  He Tweeted in what's known as a

12     thread various photos.  And so I'm just showing you the

13     first photo in -- in the thread.

14         MR. OLASOV:  So you're showing us something out

15     of context?  Okay.                                          19:06:12

16         MR. BOUTROUS:  I disagree with that

17     characterization, but your objection is noted.

18         MR. OLASOV:  That is my characterization.  Is

19     the exhibit only the first page, or does the exhibit have

20     the other pages?  Because I can't manipulate this          19:06:24

21     document.

22         MR. BOUTROUS:  Greg, can you scroll down?  It's

23     one -- it's one page.

24         MS. MULLIGAN:  There is no other page to the

25     exhibit.                                                    19:06:38

                                                   Page 259

```
 1            MR. BOUTROUS:  It's one Tweet.

 2            MS. MULLIGAN:  This is the full Tweet.  That's

 3     just not how the thread works.  It's a separate document

 4     that you would pull up.

 5            MR. BOUTROUS:  So there would be other Tweets      19:06:44

 6     that I'm not using exhibits, but this is the one I'm

 7     using.  It's the full copy of it.

 8            So if we can go to Exhibit -- mark Exhibit 67

 9     and display that.

10            THE CONCIERGE:  This is actually Exhibit 68.      19:07:01

11            MR. BOUTROUS:  68, I'm sorry.  I'll get it.

12        Q.  And while -- well, Ms. La Liberte, I was going

13     to ask you:  Have you ever met Elsa's son?

14        A.  Yes, I have.  A couple of times.

15        Q.  So here's --                                      19:07:14

16        A.  She would bring him with her when we went to

17     Hollywood -- bring him with her when we went to Hollywood

18     once.  And then once another time.  I can't recall.  For

19     a -- for dinner.

20        Q.  So here you see this is another Tweet from        19:07:33

21     @chadloder on Twitter.  And he says, Number 1, "Elsa

22     Aldeguer kneeling with the Proud Boys at the Battle of

23     Portland in August 2019."

24            And then, second, "Elsa Aldeguer in gas mask and

25     helmet at the violent April 2017 Proud Boys rally in      19:07:50
```

Page 260

```
 1    Berkeley."

 2            Do you see that?  Are you able to see the text,

 3    too?

 4        A.  Yes.  I see it, yes.

 5        Q.  And are you familiar with the Proud Boys?          19:08:04

 6        A.  No, I'm not.

 7            MR. BOUTROUS:  If we could mark as Exhibit 69

 8    Tab 87.

 9            (Exhibit 69, News article, "Conspiracy Charges

10            Bring Proud Boys' History of Violence into          19:08:13

11            Spotlight," 4.9.21, marked for identification

12            electronically by counsel.)

13        Q.  BY MR. BOUTROUS:  Do you have any reason to

14    believe that's not Ms. Aldeguer?

15        A.  I would not know.  I haven't seen her since        19:08:25

16    2018, and I -- and I definitely did not recognize

17    Genevieve in the other picture.  So she has a gas mask.

18    It could be anybody.

19            What is this about?  Like, I have to recognize

20    all these people?  I don't recognize any of them.          19:08:46

21        Q.  No, it's not meant to test your knowledge or

22    recollection of the people in the photo.  But why I'm

23    showing you this is these are publicly available social

24    media posts that state that your friend, Ms. Aldeguer --

25        A.  She's not my friend.  Was not my friend.           19:09:04
```

                                                      Page 261

1      Q.  -- your acquaintance, Ms. Aldeguer, who you

2   attended the Simi Valley event with, sat with at the Simi

3   Valley event, has been spending time with members of the

4   Proud Boys.

5      A.  Okay.  Yes, I see that.                    19:09:21

6          MR. OLASOV:  Well, that's what this portrays.

7          THE WITNESS:  Yes.  I don't know who these

8   people are.

9      Q.  BY MR. BOUTROUS:  I understand you.  I wasn't

10  asking you if you did.                            19:09:28

11     A.  Proud Boys, a lot of them are girls.

12         MR. BOUTROUS:  Let's move to Exhibit -- the next

13  exhibit, please, which will be Tab 87.

14     Q.  And are you aware that the Proud Boys played a

15  major role in the January 6 insurrection against the    19:09:56

16  United States?

17         MR. OLASOV:  Objection to the form of the

18  question.

19         You haven't established that she knows anything

20  about the January 6th events.                     19:10:05

21     Q.  BY MR. BOUTROUS:  Do you know anything about the

22  January 6th insurrection?

23     A.  I was watching MSNBC with my son and

24  daughter-in-law in San Francisco.  So I was watching

25  MSNBC and what it was was a repetition of the -- a lot of    19:10:23

Page 262

```
1    it.  And I don't think I ever saw the Proud Boys on

2    MSNBC, between you and I.

3         Q.  If you -- if we scroll to page --

4         MR. OLASOV:  You aren't about to tell me that

5    you're in this thing, are you?                        19:10:47

6         MR. BOUTROUS:  Pardon me?

7         MR. OLASOV:  You're not about to tell me that

8    you're in this picture, are you?

9         MR. BOUTROUS:  No.

10        Q.  Page 2 of this article -- I'll represent to you,   19:10:54

11   Ms. La Liberte, page 2 of this article notes that the

12   Proud Boys are described as a far right extremist group.

13   You don't have any reason to doubt that; right?

14        MR. OLASOV:  Objection.

15        THE WITNESS:  That's what it says in this thing,   19:11:10

16   yeah.

17        Q.  BY MR. BOUTROUS:  And on page 5, the Proud Boys

18   are described as, "Violent, nationalistic, Islamophobic,

19   transphobic and misogynistic."  And they describe

20   themselves as, "Western chauvinism."                  19:11:26

21        Do you have any reason to doubt that?

22        MR. OLASOV:  Objection to the form of the

23   question.

24        Go ahead and respond.

25        THE WITNESS:  I'm not knowledgeable about them   19:11:36
```

Page 263

```
 1    at all.  And that's the truth.  I really have nothing to

 2    say about it or -- or I'm not privy to what they believe

 3    or what they think or who they are or what they carry

 4    or -- I have no idea.

 5         I'm not -- I'm a Jewish girl.  I do not like        19:11:58

 6    white supremacist.  I do not believe in white

 7    supremacism.  I'm not even white for all extents and

 8    purposes.  I'm an Iraqi Jew, and all my relatives are

 9    twice as dark as I am.  And I -- I'm not what they are.

10    I've never been what they are.                          19:12:20

11         MR. BOUTROUS:  And, Greg, if we could mark the

12    next exhibit, Tab 93, which is the Rolling Stone article.

13         (Exhibit 70, Rolling Stone article, "Sebastian

14          Gorka, the West Wing's Phony Foreign-Policy

15          Guru," 8.10.17, marked for identification          19:12:24

16          electronically by counsel.)

17         MR. OLASOV:  Is this going to be Exhibit 70?

18         MR. BOUTROUS:  Pardon me?

19         MR. OLASOV:  Is this going to be Exhibit 70?

20         MR. BOUTROUS:  This should be Exhibit -- I           19:12:50

21    believe Exhibit 70.  I keep -- I'm one behind the whole

22    time, but -- I'll be corrected, I'm sure.

23         THE WITNESS:  I'm getting hungry looking at this

24    Cinnamon Toast Crunch and Cocoa Puffs.

25      Q.  BY MR. BOUTROUS:  So are you familiar with          19:13:04
```

Page 264

```
 1    Sebastian Gorka?

 2         A.  Yes, I am.

 3         Q.  And this article in the Rolling Stone, which has

 4    been marked as Exhibit 70, discusses him.  He was an

 5    advisor to President Trump; right?                    19:13:19

 6         A.  He was for a brief time in -- in 2017 or so,

 7    yes.

 8         Q.  And on page 5 of this article, if we could

 9    scroll down.  But I'll, just to speed things up, read it

10    to you.  And if you want to double-check it, you can.    19:13:33

11         It talks about how he wrote his Ph.D. thesis.

12    Of the three people who served as endorsers, two didn't

13    have credentials whatsoever, a third was a right wing

14    Hungarian politician who once studded -- who once

15    suggested studding a Hungarian border fence with pig    19:13:52

16    heads to send a message to Muslim refugees.

17         Did you know that about -- about

18    Sebastian Gorka?

19         A.  How do I even know this is true?  Who wrote

20    this?  You know what?  This is ridiculous.  This is    19:14:07

21    ridiculous, this question.  He can object.  You can say

22    it's a good question.  It's not -- I don't understand

23    what one little paper saying that -- they could say that

24    your ancestors who are Greek slaughtered sheep in their

25    front yard.  What does -- who knows what this was a    19:14:27
```

Page 265

1    hundred years ago?

2         Q.  Do you -- on page 5 of the article, it reports

3    that Gorka was enmeshed in a web of ultraright,

4    anti-Semitic and even Nazi-like parties, politicians and

5    media outlets.                                    19:14:42

6         A.  Which Gorka?  The father Gorka?  The son Gorka?

7         Q.  Sebastian Gorka.  We can go to page 5 --

8         A.  It doesn't say that.  It says, "Gorka."

9         Q.  -- and I'll show you.

10            MR. OLASOV:  Objection to the form of the      19:14:54

11    question.

12            THE WITNESS:  I'm not entering into this.

13         Q.  BY MR. BOUTROUS:  You need to answer my

14    questions.

15         A.  Sure, I'll answer.  I'm sorry.             19:15:00

16         Q.  So --

17            MR. OLASOV:  Object to the line of these

18    questions.  This doesn't seem to have anything to do with

19    the scope of the examination that the -- that the

20    Magistrate permitted you to take.  But it surely explains   19:15:13

21    the basis for our objection.

22            But go right ahead.

23            THE WITNESS:  Please.

24            MR. BOUTROUS:  Let me now go to the next

25    exhibit.  Let's mark 71, Tab 95.                   19:15:24

                                            Page 266

```
 1              (Exhibit 71, Facebook post by Roslyn La Liberte,

 2              10.2.17, marked for identification

 3              electronically by counsel.)

 4         MR. OLASOV:  Just so the record's clear,

 5    Mr. Boutrous, have you marked the entire article or just    19:15:57

 6    the pages you want to bring to this witness' attention?

 7         MR. BOUTROUS:  We marked the entire article.

 8    Q.   And, Ms. La Liberte, Exhibit 71 is a page -- a

 9    post from you on Facebook on October 2, 2017.

10              And you'll see the caption says, "Love         19:16:15

11    Sebastian Gorka.  Always the smartest man in the room";

12    correct?

13    A.   Yes.

14    Q.   It's got a smiley face?

15    A.   Yes.                                                 19:16:25

16    Q.   And so did you know at the time that Mr. Gorka

17    had been enmeshed in Nazi-like and anti-Semitic parties,

18    when you said he was the smartest man in the room?

19         MR. OLASOV:  Objection to the form of the

20    question.                                                 19:16:38

21              You're assuming facts actually not in evidence.

22    You can ask her whether -- you can ask her whatever you

23    want.

24         MR. BOUTROUS:  Thank you.  I just did.

25    Q.   Did you --                                           19:16:47
```

Page 267

```
 1        A.  Mr. Boutrous, I read two of his books.  And not

 2   once did he say anything about Nazis and being pro Nazis.

 3   He said he was against them.

 4        I -- I would love for you to read the books and

 5   find one paragraph where he was pro Nazi.  I would never     19:17:04

 6   be standing next to a man who is pro Nazi.  What that

 7   person wrote is their -- what they think.  Okay?

 8        I -- you could enter 15 people, and 15 people

 9   will say Sebastian Gorka is such and such.  He's tall,

10   that's for sure.  He's articulate, and I do not in any       19:17:27

11   way think he's a Nazi.  I read two of his books.

12     Q.  You agree with me that your reputation,

13   Ms. La Liberte, is affected by the people that you

14   associate with; correct?

15            MR. OLASOV:  Objection.                             19:17:44

16            She's actually testified to the opposite.

17            THE WITNESS:  I took a selfie with him.

18     Q.  BY MR. BOUTROUS:  And you said he was the

19   smartest guy in the room; correct?

20     A.  Because I read his books.                              19:17:55

21     Q.  So let's go back.  I had a couple questions --

22   I'm going to come back to this line of questioning, but

23   going back to damages for a second, just to clarify, are

24   the Charter House commissions reflected in the Profit &

25   Loss Statements that we reviewed or are they reflected       19:18:10
```

Page 268

```
 1    somewhere else?

 2         A.   It's not the whole commission, what you see,

 3    because I make money different ways, but, yes, they are

 4    in there.  That was in there, correct.

 5         Q.   So everything, including the Charter House        19:18:23

 6    commissions, are reflected in those Profit & Loss

 7    Statements?

 8         A.   Yes.  Because they were much more substantial

 9    than what I said to you.

10         Q.   And how did you arrive at the 177,000-plus        19:18:33

11    amount for the Charter House commissions?

12         A.   I went through what they gave me for

13    commissions, and then I went to all the wallpaper and the

14    tile and the -- and the installations that I did for

15    them -- not literally for them, for the clients that      19:18:56

16    bought the furniture and stuff.  They bought graphics

17    from me.  They bought other things from me that would

18    supplement.  I actually made more money on some of these

19    installations like in Texas and in -- in other states.  I

20    did a lot of that because I sent my crew there to do it.   19:19:24

21         Q.   Do you have any --

22              MR. OLASOV:  To be clear, we gave you guys a

23    supplemental calculation of breaking this stuff out, so

24    you haven't shown that to her yet.  Maybe you will, and

25    maybe you won't.                                           19:19:39
```

Page 269

1      Q.  BY MR. BOUTROUS:  And so you -- in terms of your

2   Charter House commissions, those are all past

3   commissions; correct?  Those are things you've already

4   collected?

5      A.  Yes, yeah.  And we just referenced them.          19:19:51

6      Q.  Earlier in your testimony you said -- you made

7   the comment that you can't even say illegal immigrant.

8   What did you mean by that?

9          MR. OLASOV:  Objection.  Without having it in

10  context --                                               19:20:06

11         THE WITNESS:  I don't understand.  Yeah.  In

12  what context?

13     Q.  BY MR. BOUTROUS:  You said, "I can't even say

14  illegal immigrant," and I just didn't understand what you

15  meant by that.                                           19:20:15

16     A.  I think it was more on the -- that there were

17  more criminals than just illegal Hispanic immigrants.

18  Maybe that's what I was trying to say.  I honestly don't

19  know.  You have to read me the context.

20     Q.  In your testimony about the -- some of the bills   19:20:31

21  that you say are your damages, the landscaping, the house

22  repair, the cosmetic, the -- all the things we talked

23  about, it was 2019.

24         When was the last time you had someone drive by

25  or come to your house as a result of, in your view, the    19:20:49

                                                          Page 270

1    Simi Valley events?

2        A.  Well, we have very substantial cameras out in

3    front, so I don't think people really will slow down and

4    make themselves known, so my husband follows all the

5    cameras.  You would have to ask him.  He kind of shelters          19:21:12

6    me from all of this stuff.  He doesn't tell me anything,

7    because he doesn't want to upset me, so you'd have to ask

8    him.

9        Q.  So you have no evidence that anyone during the

10   calendar year -- I'm asking about you.  You have no               19:21:29

11   evidence that anyone during the calendar year of 2019

12   came by your house or tried to harm your house or

13   anything like that?

14       A.  I wouldn't know, because they drive by and the

15   camera picks it up, and then people notice the camera,           19:21:44

16   and they go away.  I have two cameras.

17       Q.  And you personally don't have any knowledge that

18   anyone came by your house after August 2018; correct?

19       A.  I don't know.  I don't know.  They don't

20   announce themselves, you know.  They kind of look and            19:22:06

21   that kind of thing.

22       Q.  Now --

23       A.  They don't say, "Hey, oh, there's the bitch," in

24   front of the camera, no.

25       Q.  So you had no -- I got it.                               19:22:18

Page 271

```
 1          So you have no evidence on that issue; correct?

 2          MR. OLASOV:  Objection to the form of the

 3   question.

 4          THE WITNESS:  No one has come to my house and

 5   said, "You fucking bitch," past August.  Yes.          19:22:32

 6      Q.  BY MR. BOUTROUS:  But you have no evidence that

 7   anyone came to your house in order to harass you or call

 8   you names or anything since August 2018; correct?

 9      A.  As I said, you keep asking me.  My husband would

10   know that, because he keeps --                          19:22:46

11      Q.  I understand, and we may ask him about it, but

12   I'm just -- you're -- I'm not trying to badger you.  I

13   just want to, for the record, clarify.  You're saying

14   that you do not know of anyone?

15      A.  I do not know.                                   19:22:59

16      Q.  That's all I'm asking.  Yeah.  I'm not saying --

17   that's all I wanted to get to.

18          Now, back to the noneconomic damages, which

19   would include emotional distress and damages like that,

20   just to be even more specific, so have the -- have       19:23:10

21   Joy Reid's posts on Instagram and Facebook caused you any

22   damage to your relationships with your husband?

23      A.  Yes.

24      Q.  How?

25      A.  When I appealed this case and was risking         19:23:31
```

Page 272

```
 1   $300,000, it was a substantial amount of money that we

 2   both worked hard for, and we talked about it for quite

 3   some time.

 4        Q.  Anything else?

 5        A.  Anything else?  He was very frightened for me.    19:23:52

 6   He calls and asks me where I am all the time.

 7        Q.  I'm not looking for him --

 8        A.  You're asking about my husband.

 9        Q.  Yes.

10        A.  You asked how has it affected your marriage, and    19:24:14

11   I'm telling you.

12        Q.  How has it affected your mental state?

13        A.  I'm much more fearful of where I am.

14        Q.  How about your children?  Has Ms. Reid's social

15   media posts affected your relationship with your          19:24:28

16   children?

17           MR. OLASOV:  Objection to the form of the

18   question.

19           You can answer if you understand.

20           THE WITNESS:  I don't know what you're asking.     19:24:36

21        Q.  BY MR. BOUTROUS:  Let me phrase it a different

22   way.

23           So you said that you were sad after the -- after

24   Ms. Reid's posts.  What other injuries have you suffered

25   emotionally or mentally as a result of Ms. Reid's          19:24:52
```

Page 273

```
 1    Instagram and Facebook posts?

 2         A.  Well --

 3              MR. OLASOV:  Beyond what she's already testified

 4    to.

 5              THE WITNESS:  Okay.  Well, let me tell you that      19:25:02

 6    when people -- one day someone stopped next to me, behind

 7    me in the car, and jumped out of their car and came over

 8    to me and said, "Oh, you know, your license has expired."

 9    I nearly -- I didn't know what she was coming to the car

10    to do to me.  I nearly, like, jumped out of my skin.       19:25:21

11    Okay.  That was one time.

12              There's been many times where -- you know, I

13    bought the wig.  I was afraid people would know me when I

14    went to Maryland and Washington in that vacation of July

15    2nd to July 7th or 8th I was there.  I wore the wig.  I      19:25:47

16    was very frightened.  I wore the wig on the plane.  I

17    wore the wig the whole time.

18              I was -- I didn't know who these people were

19    that threatened to kill me and hang me by my pubic hairs

20    and make me suck their whatever it is that you suck, and    19:26:08

21    then, you know, all those horrible things.  I didn't know

22    who those people were.  They would pass by my house and

23    stop.

24         Q.  BY MR. BOUTROUS:  How long did you wear the wig

25    and your disguises after July 2, 2018?                      19:26:22
```

Page 274

1          A.  Well, I didn't go out a lot.  That's for sure.

2     I had to go out while I was on vacation, so I basically

3     stayed at home a lot.  I put the car in another place.  I

4     hid the car.  I didn't go out a lot.  I was afraid.

5          Q.  So is it fair to say you wore the wig the one          19:26:51

6     time when you were going on your trip over July 4th?

7          A.  Well, days, yeah.  I didn't go out much.  When I

8     went out to dinner, we went to Joey's.  I'd wear the wig.

9     Yeah, you know, I'd send my husband to the bank.  I

10    didn't go out a lot.                                             19:27:10

11         Q.  When do you think the last time was that you

12    wore your wig?

13         A.  Probably, like, a few months.  Like two or

14    three months.

15         Q.  So anything else from an emotional standpoint          19:27:30

16    for you, in addition to everything you've testified, any

17    other harms that you feel you've suffered, aside from

18    damages that you're seeking noneconomic damages for?

19         A.  My reputation was bulldozed.  I worked for

20    30 years building up RC Design Construction.  I brought         19:27:56

21    it from nothing.  The people at Envo, I was just a

22    salesman for.  I built this business.  I didn't steal it.

23    I didn't get customers from other people.  I built one

24    customer at a time for years.

25              I worked nights.  I had five children.  I             19:28:19

Page 275

```
 1    married Louie, who had three children, 7, 12 and 16.

 2    They came to live with me.  I had a son, Doug, which --

 3    who was four at the time.

 4            I worked all the time.  I called McDonald's for

 5    eight years until they let me have an appointment with        19:28:39

 6    them.  I worked very hard for this, and in one day,

 7    June 29 to June (sic) 2nd, 3rd, 4th, 5th, whatever it

 8    was, everything changed, so ask me how that affected my

 9    psyche, my feelings, my life, my children.  You know, you

10    can't know how that was.                                      19:29:12

11            You know, I don't know if you know about

12    construction.  I don't know how many hours you do with

13    your law practice, but construction is all day and night,

14    all day and night.  People call you.  You're responsible,

15    and I'm a woman in this field, and I have to be twice as      19:29:35

16    good.  I know you have lawyers there who are women, and I

17    know they know what I'm saying.  You have to be twice as

18    good, and that's what I'm saying.  It destroyed me,

19    Mr. Boutrous.  It destroyed me.

20       Q.  But then in 2019, it seemed like RC Construction     19:29:55

21    made more profits than it had in 2018, so you found a way

22    to be profitable.

23       A.  Sometimes you get paid later.  You don't get

24    paid all at once.  Until you get your retentions and it

25    goes through the -- the -- how do you say -- the City --      19:30:16
```

Page 276

```
 1    the public -- the city -- you know, you have it signed

 2    off.  Until you get your projects signed off, sometimes

 3    it can take four or five months, because you have the

 4    electric company and the gas company, and they have

 5    things, so then we have ADA has to sign off on it, so      19:30:36

 6    sometimes it takes longer.

 7              So it's a -- it's hard for me to tell you

 8    specifically, you know, but I know we lost business.  I

 9    know we lost business.  I know I didn't get calls from

10    people I usually get calls from.                           19:31:01

11       Q.  But you don't have any evidence that ties any of

12    that to Joy Reid's Instagram or Facebook posts, do you?

13              MR. OLASOV:  Objection.

14       Q.  BY MR. BOUTROUS:  Please answer.

15       A.  She was the tsunami.  She was the one that did      19:31:13

16    this to me, and I have -- I know it.  Okay?  You can

17    argue with me.  You can tell me no.  This is not what

18    we're here for.  You're here to just ask me questions.

19       Q.  Yeah.  And I don't mean to argue with you.  I'm

20    just trying to find out -- part of this process is just    19:31:33

21    gathering the facts from you as to what your claim is,

22    and so what you're saying is she was a tsunami because

23    she had 1.2 million Twitter followers; right?

24       A.  No.  She also put me as the face of racism, not

25    only against Hispanics, but blacks.  I live in LA.  I      19:31:48
```

Page 277

1    don't know where you live in.  You live in LA, right?

2       Q.  Yes.

3       A.  Okay.  I made my business with every single

4    person, every ethnicity.  I have black customers, Asian

5    customers, Hispanic customers.  This is why I was          19:32:07

6    successful in LA, because I could be one of them.  She

7    took that away from me.  She took my -- my shared

8    experience of being an LA person away from me.

9       Q.  Any other emotional injuries you suffered?  You

10   talked about your economic damages and how it made you     19:32:35

11   feel to lose, in your view, business.  Anything else?

12          MR. OLASOV:  Objection to the form the question.

13          You can respond.

14          THE WITNESS:  I don't know.  I don't know what

15   you mean.  Anything -- isn't that enough?  What is your    19:32:50

16   question?

17      Q.  BY MR. BOUTROUS:  My question -- I'm just trying

18   to button down whether you'll be making any other damages

19   claims beyond what you've made today in terms of how you

20   allegedly suffered emotionally and -- as a result of what  19:33:03

21   you claim --

22      A.  Like my hair failing out, things like that?

23      Q.  Just anything.  I'm just trying to gather -- I

24   just want to know what your claim is?

25      A.  Sleepless nights.  I don't know.  It's a bad --     19:33:16

                                                  Page 278

1    Mr. Boutrous --

2         Q.  I'm just gathering information.

3         A.  Mr. Boutrous, it was -- it was horrible.  It was

4    horrible.  I don't know what residual effects on my

5    health there were, but I'm not the same person that I was        19:33:34

6    before the event.

7         Q.  Okay.  Just a few more questions on

8    Elsa Aldeguer.

9              MR. BOUTROUS:  If we go back -- I'd like to mark

10   the next exhibit.  Tab 84 is the next exhibit.                   19:33:52

11             (Exhibit 72, Tweet from Chad Loder, marked for

12                  identification electronically by counsel.)

13             MR. BOUTROUS:  Let me see here.  Maybe I already

14   covered that.  Nope.  Let me just do that.  Two more of

15   those.                                                           19:34:08

16             Greg, are you able to find that?

17             THE CONCIERGE:  This is Exhibit 72.

18        Q.  BY MR. BOUTROUS:  So here's another photo that

19   Chad Loder posted claiming that, this is the, "1.

20   Elsa Aldeguer kneeling with the Proud Boys in the 'battle        19:34:45

21   of Portland' in August 2019."

22             Have you ever seen anything like this claiming

23   that Elsa was part of the Proud Boys in their activities?

24        A.  I don't even see Elsa.

25        Q.  I believe he's saying that she's the person            19:34:59

Page 279

```
 1    right at the back kneeling.

 2          MR. OLASOV:  What person?  There are lots of

 3    people kneeling.

 4          MR. BOUTROUS:  In the lower -- the lower

 5    left-hand corner, the farthest -- the closest to the       19:35:12

 6    camera.

 7          MR. OLASOV:  You haven't established that she

 8    knows anything about this picture, so you're going to

 9    make representations about this picture, and then you're

10    going to ask her questions about it.  Is that it?         19:35:20

11          THE WITNESS:  This has -- what does this have to

12    do with anything?

13       Q.  BY MR. BOUTROUS:  Well, your claim here is that

14    your reputation was injured, but --

15       A.  Am I there with her?                                19:35:30

16       Q.  No.  But you've been consorting -- associating

17    with a person who's been associated with the Proud Boys,

18    which is a --

19       A.  We didn't go to Proud Boy events.  We went to an

20    SB54 council meeting.  Council meeting.  A City Council     19:35:46

21    meeting where teachers go, rabbis go, priests go,

22    children go.

23       Q.  So you didn't -- you didn't know that she was

24    associated with members of the Proud Boys?

25       A.  She --                                              19:36:05
```

Page 280

```
 1            MR. OLASOV:  Objection to the form of the

 2    question.  She's already answered that.  And you're, I

 3    take it, agreeing that she -- that the plaintiff is not

 4    in this picture.

 5            MR. BOUTROUS:  I'm not claiming that the          19:36:18

 6    plaintiff is in this picture, but I'm claiming --

 7            MR. OLASOV:  So this is just a slander by -- by

 8    non-association or by slander association, is that it?

 9            MR. BOUTROUS:  You're not allowed to make

10    arguments.                                                19:36:27

11            MR. OLASOV:  I beg your pardon.  When you go on

12    for seven-and-a-half hours like this and then start

13    showing stuff like this and this is supposed to be

14    discovery, it's not discovery of anything having to do

15    with this case.  You're unfortunately inviting my not    19:36:49

16    positive response to this process.  I can't help myself.

17            THE WITNESS:  You're showing me a back of a

18    person with a backpack --

19        Q.  BY MR. BOUTROUS:  Let's go -- we'll go -- you're

20    both objecting.                                           19:37:05

21            MR. BOUTROUS:  First of all, I'm going to just

22    say to Mr. Olasov:  This is a reputation case, and

23    Ms. La Liberte's reputation is in part established by the

24    people that she associates with, so I have every right to

25    make these inquiries.                                     19:37:20
```

Page 281

```
 1              That said, I'm going to move to the next

 2    exhibit.  Let's go to Exhibit 73, which will be Tab 85.

 3              (Exhibit 73, Tweet from Chad Loder, marked for

 4              identification electronically by counsel.)

 5        Q.  BY MR. BOUTROUS:  So is that -- this is our next    19:37:47

 6    exhibit, Exhibit 73.  Is that Elsa Aldeguer?

 7        A.  It looks like her, yes.

 8              MR. OLASOV:  Who -- who is Elsa Aldeguer?

 9              MR. BOUTROUS:  The woman closest to the camera

10    making the okay sign.                                      19:38:25

11              MR. OLASOV:  Okay.  I just want that to be on

12    the record.  It's not clear who either of you is

13    referring to.

14              MR. BOUTROUS:  Thank you.

15        Q.  And that is her making the okay sign with the       19:38:36

16    white turtleneck sweater and then black or blue blazer?

17        A.  It looks like her.

18        Q.  And you'll see that Mr. Loder tweeted that this

19    is Elsa Aldeguer with Enrique Tarrio December 12/12.

20              Do you see that?                                  19:38:54

21        A.  Yes.

22        Q.  And his Tweet is marked March 11, 2021.

23              Do you see that?

24        A.  Where?

25        Q.  Just down in the bottom after the number 3.         19:39:07
```

                                                        Page 282

```
 1          Do you see that?

 2      A.  Okay, yeah.  I see that.

 3      Q.  And were you aware that Enrique Tarrio is widely

 4  known to be one of the leaders of the Proud Boys?

 5      A.  I didn't even know what the Proud Boys was, so      19:39:25

 6  I'm not familiar with anybody in it.

 7      Q.  Does it trouble you that you have been

 8  associating with someone who, at least according to

 9  Mr. Loder's Tweets, has been associating with a group

10  that's associated with white supremacy?                    19:39:42

11          MR. OLASOV:  Objection.

12          Go ahead and answer.

13          THE WITNESS:  I went to SB54 meetings.  Elsa

14  would accompany me.  I would give her a ride to maybe

15  three or four of them.  She did not ever talk about Proud  19:40:00

16  Boys.  This was two years before this.  People -- I don't

17  know what she's doing.  People have babies and stuff in

18  that length of time.  Two babies you could have in the

19  length of that time.  People do change.  I knew her only

20  in the context of SB4 -- no on SB54.                       19:40:25

21          If you hear what I said at that meeting, if you

22  play what I said at this meeting, which I'd love for you

23  to play and put on the record of this deposition, you

24  would see that I never said anything vaguely

25  anti-Hispanic, vaguely racist.                             19:40:48
```

Page 283

```
 1              So I don't -- I don't know what you want me to

 2     say.  I did not associate with Elsa the racist.  I don't

 3     even know anything about this picture.  That's your

 4     opinion of it.  That's maybe Chad's opinion of it.  I

 5     have nothing to do with it.                          19:41:13

 6              MR. BOUTROUS:  I'd like to now mark as the next

 7     exhibit what is at Tab 75, please.

 8              (Exhibit 74, The State of the Union blog post,

 9              marked for identification electronically by

10              counsel.)                                   19:41:40

11        Q.  BY MR. BOUTROUS:  And I asked you questions

12     earlier -- while we're getting the exhibit up -- about

13     Arthur Schaper; correct?

14        A.  Yes, you mentioned him.

15        Q.  And you know that his --                      19:41:48

16              MR. OLASOV:  I didn't get that.

17              THE WITNESS:  Arthur Schaper.

18              MR. BOUTROUS:  That's S-C-H-A-P-E-R.

19        Q.  And did you know that he was -- his group,

20     California Mass Resistance, is known to be anti-gay,    19:42:03

21     anti-trans?

22        A.  I did not know that.

23        Q.  And here's -- now, this is Tab 75.

24              MR. OLASOV:  Is this The State of the Union

25     piece?                                               19:42:21
```

Page 284

1                  THE WITNESS:  What is that?

2                  THE CONCIERGE:  Not Exhibit 75.  Exhibit 74.

3                  THE WITNESS:  Which day is this?

4         Q.  BY MR. BOUTROUS:  I'm just pulling this up.  I

5    believe this is -- this should be Mr. Schaper's blog          19:42:34

6    post, if I'm correct, July 6, yes.

7             So this is a post from Mr. Schaper, and if we

8    prune down, Mr. Schaper's quoted -- if we scroll down,

9    he's talking about you, and he says here on page --

10                 MR. OLASOV:  There's 11 pages of this.          19:42:56

11                 MR. BOUTROUS:  You're -- easy to -- it's got

12   more posts to the blog.

13        Q.  But what I want to draw your attention to,

14   Ms. La Liberte, very simply and easy, the last paragraph

15   says, "'We urge all major media outlets in the Southern      19:43:12

16   California and National media markets to assist us in

17   combatting the lies and help us correct the record and

18   restore the reputation of our friend and fellow Trump

19   supporter Roslyn La Liberte,' Schaper concluded."

20            So Mr. Schaper referred to you as a friend;          19:43:28

21   correct?

22                 THE WITNESS:  Our friend.  You people say our

23   friend Nancy Pelosi.  It doesn't mean that she's our

24   immediate friend.  I don't know -- I don't know how you

25   can say that we're friends.                                   19:43:48

                                                     Page 285

```
 1          Q.  BY MR. BOUTROUS:  How many times have you met

 2     Mr. Schaper?

 3          A.  The phrase "our friend" -- our friend Nancy

 4     Pelosi.  Our friend -- I don't know -- Boutrous.  I don't

 5     know.                                                  19:44:09

 6          Q.  How many times have you met Mr. Schaper?

 7          A.  It's a random remark.

 8          Q.  Can you answer my question?  How many times have

 9     you met Mr. Schaper?

10          A.  Probably three, four times.                   19:44:18

11          Q.  So I want to return to the topic of your

12     political activity and just maybe finish up with that.

13          A.  Yes.

14          Q.  So did you participate in campaign rallies or

15     efforts during the 2020 president election in support of  19:44:36

16     President Trump?

17          A.  No, I did not.

18          Q.  Does your First Amended Complaint accurately

19     describe you as a -- as passionate about this country's

20     immigration policies?  Is that accurate?                19:44:51

21          A.  I'm passionate about everything.  I'm just a

22     passionate person.  I'm passionate about my children.

23     I'm passionate about my lawyer here.

24          MR. OLASOV:  That's --

25          THE WITNESS:  I --                                 19:45:08
```

                                                        Page 286

1          MR. OLASOV:  Boy, my wife is in the other room.

2     You're going to cause me a lot of trouble.

3          THE WITNESS:  I was like, oh -- I'm just kind of

4     nervous here, and I was, like, patting him on the

5     shoulder, and I'm, like, oh, is that allowed?  I'm just          19:45:20

6     that kind of a person.

7          Q.  BY MR. BOUTROUS:  And -- but you feel strongly

8     about immigration issues; correct?

9          A.   About this SB54 and the children.  I don't know

10    if I told you that at that first meeting, this                    19:45:38

11    grandmother asked me if she could have a ride home.  She

12    said she lived in Pasadena.  I know you're familiar.  But

13    West Covina, Pasadena and Woodland Hills is kind of like

14    a straight line.

15         So I said I would take her home, and she said              19:45:52

16    that her grandson, who is an adult grandson over 18, was

17    pushed on the bridge, she pointed out the bridge to me,

18    by gang members who were illegally in this country, and I

19    went, "What do you say to that?  What do you say to

20    that."                                                           19:46:19

21         So I just -- I became involved.  Yes, I became

22    involved personally, passionately, because of that.  I

23    can't even imagine.  I have 18-year-old grandsons.  I

24    can't even imagine either one of them being thrown off a

25    bridge and found the next morning.  I can't tell you.           19:46:36

                                                       Page 287

1      Q.  How --

2      A.  I came to this as a grandmother, as a mother.  I

3  got sucked in that way, not as an activist, not as a

4  Trump supporter, and I say so.  I wish you would play

5  what I say in my address for two -- one minute and a          19:46:55

6  half, two minutes -- it didn't even go two minutes -- to

7  the board.

8          I said this is why I'm here.  It has nothing to

9  do with Trump.  It has nothing to do with anything but

10  the law of people who commit crimes who are illegally in    19:47:19

11  this country being let go into the general public to

12  commit more crimes.  There have been people very wronged

13  by this.

14          You're a father -- I don't know if you're a

15  father or your mom's a grandmother.  I don't know how       19:47:35

16  your family is, but older people see a lot more than

17  14-year-old boys.  We've seen everything at 67-years-old,

18  and sometimes we just want to talk about it.

19      Q.  How many events, like hearings, meetings,

20  rallies, protests, demonstrations, gatherings, did you      19:47:58

21  attend on the subject of immigration?  Just, you know,

22  how many things --

23      A.  I --

24      Q.  Go ahead.

25          MR. OLASOV:  Objection.  If you want to give her     19:48:08

Page 288

```
 1   a minute or two to think about it, maybe she can come up

 2   with some number.  Maybe she can't.  I don't know.

 3         MR. BOUTROUS:  I'm just looking for an estimate,

 4   like ten --

 5         THE WITNESS:  Like, a handful.  I went to some       19:48:20

 6   where I was in the area or I heard about it.  Some of

 7   them had hardly any people.  I think I went to -- I'm

 8   going -- I told you West Covina, I was in there, I told

 9   you, and I spoke for, like, a little bit, because I

10   didn't know anything at that point.                       19:48:38

11         The second one was Los Alamitos.  I couldn't

12   even get in, and then I was in South Bay, and there were

13   three the same night.  El Segundo, which was where I grew

14   up.  I grew up in Inglewood, so I am very familiar with

15   the area, and then Hermosa, which I talked, and I wasn't  19:49:01

16   that good of a speaker, but I did make a really good

17   joke, which I loved.  I said I was in Hermosa when I was

18   young, and I love this place, because I fell in love

19   there a few times.

20         Q.  BY MR. BOUTROUS:  That is good.                 19:49:25

21         A.  And then I went to Redondo Beach.  I walked in

22   and walked out.  I was just too tired.  I drove home.

23         And then one in Corona, because I have a person

24   that I do business with, Arturo Peralta, MP

25   Manufacturing, so I stopped to see him, and I went to     19:49:50
```

Page 289

```
 1    Corona, and I spoke, and I went home.

 2          And then Simi Valley was the last one, so those

 3    are all the ones I went to.

 4      Q.  And you may have said it, but did you also

 5    attend a May 22, 2018, meeting in Hawthorne?          19:50:06

 6      A.  No.  I didn't go to Hawthorne.  That picture of

 7    that hand is not mine.

 8      Q.  Let me just see what else I have.  Can we take a

 9    five-minute break and I can see if we can wrap this baby

10    up?                                                   19:50:32

11          MR. OLASOV:  Yes, sir.

12          THE WITNESS:  Let's do it.

13          THE VIDEOGRAPHER:  Going off the record.  The

14    time is 7:49.

15          (Recess.)                                       19:51:46

16          THE VIDEOGRAPHER:  We are back on the record.

17    The time is 7:57.

18          MR. BOUTROUS:  Ms. La Liberte, thanks for your

19    patience.  I just have, like, two or three questions back

20    on your company, RC, just so I know how it's constructed.  19:58:31

21          Are you the sole owner of RC Construction and

22    Design Associates, if I'm getting the name right?

23      A.  I started the business in 1984, and I met my

24    husband -- my present husband now in 1986, and we got

25    married, and he -- you know, the joke was I couldn't get  19:58:53
```

Page 290

```
 1    a superintendent on the job that would stay.  I had to

 2    marry him, so he actually worked for another company, and

 3    then came to work with me in 1990.

 4         Q.  Got it.

 5             And so what is his role in the company today?     19:59:16

 6             MR. OLASOV:  Just so the record's clear on this,

 7    I think it's in the initial public disclosures or some

 8    other response, answers to interrogatories, in which we

 9    disclosed that he has a small percentage.  That it's a

10    closely held company, and I don't know whether it's 80/20   19:59:32

11    or 70/30 --

12             THE WITNESS:  70/30.

13             MR. OLASOV:  -- something like that.

14         Q.  BY MR. BOUTROUS:  That was going to be my next

15    question.  Ms. La Liberte, did you say it's 70/30?          19:59:42

16         A.  Yeah, that's what it is.

17         Q.  And you said he had superintendent abilities?

18    Does he --

19         A.  No.  He's an amazing builder.  I was joking.

20    He's an amazing builder.                                    19:59:54

21         Q.  And does he -- was he performing those -- that

22    role in the company in 2018?

23         A.  Yes.  Yes.

24         Q.  Does he continue to perform the building role?

25         A.  Everything.  Yeah.  We work equally.  We do        20:00:07
```

Page 291

1    both, all of us.  We do everything.

2        Q.  Got it.

3            I think -- I think that's all I have, and with

4    that, we'll conclude the deposition.

5            THE VIDEOGRAPHER:  We are off the record at        20:00:26

6    7:59 p.m., and this concludes today's testimony given by

7    Roslyn La Liberte.  The total number of media units used

8    was one and will be retained by Veritext Legal Solutions.

9            (Time Noted:  7:59 p.m.)

10                        --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 292

1          I declare under the penalty of perjury under the

2   laws of the State of California that the foregoing is

3   true and correct.

4          Executed on _____, 2021, at

5   _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 293

```
1   STATE OF CALIFORNIA    ) ss:

2   COUNTY OF MARIN        )

3

4           I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5   hereby certify:

6           That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9           That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16          I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21  this 30th day of August, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 294

1    THEODORE J. BOUTROUS JR., ESQ.

2    tboutrous@gibsondunn.com

3                                    August 30, 2021

4    RE: ROSLYN LA LIBERTE vs. JOY REID

5    August 17, 2021, ROSLYN LA LIBERTE, JOB NO. 4739510

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13       Transcript – The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel – Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24       time of the deposition.

25

                                                    Page 295

```
1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, noting the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested - Reading & Signature was not

10        requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 296

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF NEW YORK

 3

 4   ROSLYN LA LIBERTE,                )
                                       )
 5            Plaintiff,               )
                                       )
 6            vs.                      ) No. 18-cv-5398
                                       )
 7   JOY REID,                         )
                                       )
 8            Defendant.               )
     _____      )
 9                                     )

10

11

12        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED

13            DEPOSITION OF JULIE MARTINEZ

14

15              Monday, October 4, 2021

16      Remotely Testifying from Pasadena, California

17

18

19

20

21

22

23   Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No. 4793781
```

Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF NEW YORK

3

4    ROSLYN LA LIBERTE,                )
                                       )
5            Plaintiff,                )
                                       )
6            vs.                       ) No. 18-cv-5398
                                       )
7    JOY REID,                         )
                                       )
8            Defendant.                )
     _____       )
9                                      )

10

11

12              Virtual videoconference video-recorded

13              deposition of JULIE MARTINEZ, taken

14              pursuant to subpoena, on Monday,

15              October 4, 2021, remotely testifying from

16              Pasadena, California, beginning at

17              9:08 a.m., PDT and ending at 10:40 a.m.,

18              before Hanna Kim, CLR, Certified Shorthand

19              Reporter, No. 13083.

20

21

22

23

24

25

                                        Page  2

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

 2

 3     For Plaintiff Roslyn La Liberte:

 4             OLASOV LLP

 5             BY:  DAVID OLASOV, ESQ.

 6              485 Madison Avenue, 7th Floor

 7              New York, New York 10022

 8              212.588.0540

 9              dolasov@olasov.com

10

11     For Defendant Joy Reid:

12             JOHN REICHMAN LAW

13             BY:  JOHN REICHMAN, ESQ.

14              BY:  DAVID YEGER, ESQ.

15              56 Oakwood Avenue

16              Montclair, New Jersey 07043

17              917.626.8025

18              john@johnreichmanlaw.com

19

20

21

22

23

24

25

                                          Page  3
```

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES: (CONTINUED)

 2

 3     For Defendant Joy Reid:

 4             -and-

 5             GIBSON DUNN & CRUTCHER

 6             BY:   MARISSA M. MULLIGAN, ESQ.

 7             333 South Grand Avenue

 8             Los Angeles, California 90071-3197

 9             213.229.7240

10             mmulligan@gibsondunn.com

11

12     Also Present:

13             JEFF NICHOLS, Video Operator

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  4
```

```
1                  INDEX OF EXAMINATION

2

3    WITNESS:  JULIE MARTINEZ

4    EXAMINATION                              PAGE

5         BY MR. REICHMAN:                   8, 62

6         BY MR. OLASOV:                    38, 65

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                         Page 5
```

```
 1                   INDEX OF EXHIBITS

 2

 3   MARTINEZ DEPOSITION EXHIBITS                    PAGE

 4   Exhibit 77      Article, "One Year Later -       12

 5                   Attack on SB54; The MAGA

 6                   Caravan Invasion of Santa

 7                   Clarita"; 11 pages

 8                        --o0o--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1          Remotely Testifying from Pasadena, California

 2            Monday, October 4, 2021; 9:08 a.m., PDT

 3                         --o0o--

 4          THE VIDEOGRAPHER:  Good morning.  We are

 5    going on the record at 9:08 a.m., on October 4th,      09:08:50

 6    2021.

 7          This is Media Unit 1 of the video-recorded

 8    deposition of Julie Martinez, taken by counsel for

 9    Defendant, in the matter of Roslyn La Liberte

10    versus Joy Reid, filed in the United States           09:09:06

11    District Court for the Eastern District of New

12    York.  The case number is 18-CV-5398.

13          This deposition is being held virtually

14    via Zoom.

15          My name is Jeff Nichols, from the firm          09:09:18

16    Veritext Legal Solutions, and I am the

17    videographer.

18          The court reporter is Hanna Kim, from the

19    firm Veritext Legal Solutions.

20          Will counsel now please state their             09:09:28

21    appearances and affiliations for the record.

22          MR. OLASOV:  David Olasov for Plaintiff

23    Roslyn La Liberte.

24          MR. REICHMAN:  John Reichman from John

25    Reichman Law for Defendant Joy Reid.                  09:09:43
```

Page 7

1          MS. MULLIGAN:  Marissa Mulligan from

2     Gibson, Dunn & Crutcher also a Defendant -- also an

3     attorney for Joy Reid.

4          MR. YEGER:  David Yeger, also an attorney

5     for Joy Reid.                                09:09:55

6          THE VIDEOGRAPHER:  Thank you.

7          Will the court reporter please swear in

8     the witness.

9                    JULIE MARTINEZ,

10       having been administered an oath over        09:10:00

11           videoconference, was examined

12            and testified as follows:

13

14          THE VIDEOGRAPHER:  Thank you.

15          We may proceed.                          09:10:25

16          MR. REICHMAN:  Thank you very much.

17                  EXAMINATION

18    BY MR. REICHMAN:

19       Q.   Good morning, Ms. Martinez.  As you just

20    heard, my name is John Reichman.  I represent     09:10:33

21    Defendant Joy Reid.

22          First of all, thank you for -- for -- for

23    coming today.  Our -- our system of justice would

24    not work, unless people like you were willing to

25    come and -- and give testimony both in civil and    09:10:47

                                                 Page 8

```
 1    criminal cases.

 2           So thank you very much for -- for being

 3    here.  We really appreciate it.

 4           I'm going to be asking you a series of

 5    questions today regarding the lawsuit that Roslyn    09:11:00

 6    La Liberte has brought against Joy Reid.

 7           If you don't understand any one of my

 8    questions, please let me know.  I will try to

 9    rephrase it.

10           Also, during the course of the time, you      09:11:15

11    may here objections from Plaintiff's counsel for

12    questions.  You should still answer those

13    questions.

14           And, similarly, I assume that Plaintiff's

15    counsel will also ask you questions after I'm        09:11:28

16    done.  I may also object to those questions, but

17    you should answer those questions anyway.

18           Are we clear so far?

19    A.    (Witness nods.)

20           Yes.                                          09:11:44

21    Q.    And -- and one other thing, ma'am, that's

22    -- so you have to answer sort of affirmatively by

23    vocally.  You can't just use a shake of the head.

24    A.    Okay.  Thank you.

25    Q.    Okay.  All right.  Okay.                       09:11:55
```

Page 9

```
 1              I'm going to just very briefly ask you a

 2     some series -- a series of questions about your

 3     background.

 4              Are you a high school graduate?

 5       A.    Yes, I am.                                09:12:06

 6       Q.    Okay.  Have you had any post-high school

 7     education?

 8       A.    Yes, I have.

 9       Q.    Can you describe that, please.

10       A.    I have a bachelor's degree from Cal State   09:12:15

11     Los Angeles, and I have a master's degree in

12     architecture in urban planning from UCLA.

13       Q.    Okay.  And can you -- can you briefly

14     describe chronologically, you know, what your

15     full-time work experience has been since          09:12:36

16     graduating from college?

17       A.    Since graduating from college, I worked

18     for various different nonprofits developing,

19     designing, and working in construction management

20     of affordable housing, which included housing for   09:12:54

21     the homeless and multifamily housing complexes.

22              In the last ten years, I worked part-time

23     in order to assist with the care of my elderly

24     parents.  So I -- I was employed by a local school

25     district as a substitute teach, which afforded me   09:13:20
```

Page 10

```
 1    a lot of flexibility.

 2         Q.   Okay.  Thank you.

 3              Are you -- are you familiar with

 4    California law SB 54?

 5         A.   Yes, I am.                          09:13:32

 6         Q.   Okay.  Did -- did you ever attend any

 7    public events, such as city council meetings,

 8    where SB 54 was an issue?

 9         A.   Yes, I did.

10         Q.   Okay.  What -- what council meetings did   09:13:45

11    you attend?

12         A.   I attended a Santa Clarita city council

13    meeting.  I attended a Camarillo city council

14    meeting.  I attended a Thousand Oaks city council

15    meeting.  And I attended a Simi Valley city        09:14:06

16    council meeting.

17         Q.   Okay.  And was that Simi Valley council

18    meeting on June 25th, 2018?

19         A.   Yes.

20         Q.   Okay.                                09:14:18

21              And why did you attend those meetings?

22         A.   I felt it was extremely important to stand

23    up for the California Values Act, which is the

24    name of the bill, SB 54, which serves to offer

25    some protections to our immigrant community.      09:14:35
```

Page 11

```
 1        Q.   Okay.  I'd like to -- to mark -- I'm going

 2   to mark a couple of exhibits today.  I think the

 3   first one is Exhibit 65 -- or 75.

 4             THE COURT REPORTER:  Excuse me, Counsel.

 5   Could you please repeat.                        09:14:56

 6             MR. REICHMAN:  Okay.

 7             I'm going to mark a couple of exhibits

 8   today.  The first one I'd like to have marked as

 9   Exhibit 75 is an article from the Santa Cla- --

10   Clarita Valley Advanced Post Times and -- entitled  09:15:13

11   "One Year Later-Attack on SB54; The MAGA Caravan

12   Invasion of Santa Clarita."

13             Could you please show the witness Exhibit

14   75.

15             MR. YEGER:  I'll just interject for a      09:15:33

16   moment, Jon.  The next exhibit on the list is 77.

17             MR. REICHMAN:  Oh, 77?  My apologies.  If

18   we can mark it as 77.

19             MR. YEGER:  Give me a moment.

20             (Martinez Deposition Exhibit 77 was       09:15:45

21             marked.)

22             MR. YEGER:  The exhibit should now be in

23   the shared files folder.  Does everybody see the

24   exhibit?

25             MR. OLASOV:  Not yet.  Let me -- let me --  09:17:05
```

Page 12

1    let me log back on.

2           MR. YEGER:  And I will pop it up on the

3    screen as well.

4           MR. OLASOV:  Hold on a second.  I'm not

5    seeing it yet, David.                            09:17:14

6           Okay.  I'll -- okay.  I -- I see -- I see

7    something, yeah.

8           MR. YEGER:  I've now shared the exhibit as

9    well, and it should be on the screen for everyone.

10          MR. OLASOV:  How do I -- how do I minimize   09:17:45

11   this so I still see the witness?

12          MR. YEGER:  That's a Veritext question.

13          THE COURT REPORTER:  May I go off the

14   record real quick, Counsel?

15          MR. REICHMAN:  Sure.                         09:21:01

16          THE VIDEOGRAPHER:  We are going off the

17   record.  The time is 9:18 a.m.

18          (Off the record.)

19          THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 9:21.                         09:21:13

21   BY MR. REICHMAN:

22      Q.  Ms. Martinez, have you ever seen this

23   article before?

24      A.  I do not remember reading that newspaper.

25      Q.  Okay.  I'd like you to take a look at the   09:21:32

                                                   Page 13

```
 1    section of the article that begins on page 6.

 2            MR. REICHMAN:  And, David, if you could

 3    navigate us there, that -- I'd appreciate it.  It

 4    starts with the heading "The For-" -- "The Foreign

 5    MAGA Caravan."                                    09:21:51

 6            Okay.  That's great.

 7    BY MR. REICHMAN:

 8       Q.   And -- and as you can see in the -- in the

 9    first paragraph on the screen, this article is --

10    is referencing the May 8th, 2018, council meeting   09:22:11

11    at Santa Clarita.

12            And I want to focus on the second

13    article -- the second paragraph on the -- on the

14    screen.  And maybe it -- it's -- it would be

15    helpful for me to just read that into the record.   09:22:27

16            It says, "There were several notable

17    speak- -- speakers among the crowd.  Harim

18    Uzziel/Harim Uziel, Genevieve Peters, Elsa

19    Aldeguer, Jo Reitkopp, Ben Bergquam, Leonor

20    Ferris, and Don Rosenberg, are just a small         09:22:57

21    selection of the anti-immigrant crowd.  They are

22    leaders and organizers" -- "organizers that

23    orchestrate crowds to attend city council and

24    county supervisor" -- "-visor all across

25    California.  They are argumentative, boisterous,    09:23:10
```

                                                    Page 14

1    combative, and outspoken.  Their caravan goes from

2    city to city fostering divisive anti-immigrant

3    discussions, and disrupting the meetings they

4    attend."

5        My -- my question to you, Ms. Martinez, is     09:23:30

6    if you've ever observed any of the conduct that

7    was described in the paragraph that I just read?

8        MR. OLASOV:  Ob- -- objection to the form

9    of the question.  Argumentative and leading.  And

10   assumes stuff that -- for which there's no          09:23:48

11   foundation.

12       You may answer, Ms. Martinez, please.

13       THE WITNESS:  Yes, I did see this type of

14   behavior at the --

15   BY MR. REICHMAN:                                     09:24:04

16       Q.   Let me just stop you right there.

17            What did you observe at the council

18   meetings that you attended?

19       A.   Combative, very angry speakers, very

20   offensive language, language that was racially       09:24:20

21   charged, and I would call some of the behavior as

22   dangerous.  And I did feel threatened.

23       Q.   Okay.

24            MR. OLASOV:  Objection to the answer and

25   move to strike.                                      09:24:39

                                                  Page 15

1    BY MR. REICHMAN:

2        Q.    Okay.  And -- and what did you -- what do

3    you mean by "dangerous"?

4        A.    Well, there were people --

5              MR. OLASOV:  Objection to the form of the       09:24:48

6    question.

7              But please respond.

8              THE WITNESS:  What I felt was dangerous

9    were people were very pushy.  They were physical.

10   They would physically push you.  They would come          09:25:01

11   into your fa- -- right in front of you, up to your

12   you face, and yell things that were racially

13   insensitive and inflammatory.

14   BY MR. REICHMAN:

15       Q.    And who were these people that -- that        09:25:19

16   were doing these things that you just described?

17       A.    These people were part of a group that

18   were identified as anti-immigration, anti-SB 54,

19   and some of these people have been identified with

20   white supremist groups and -- and groups that are        09:25:40

21   against immigration because of their

22   anti-immigration stance.

23       Q.    Okay.  What were -- and -- and were any

24   racial slurs made at any of the meetings?

25             MR. OLASOV:  Objection to the form of the       09:26:06

                                                        Page 16

```
 1    question.
 2            Mr. Martinez, it will be easier for all of
 3    us if you just pause a second and give me a chance
 4    to lodge an objection.  I'm not trying to interrupt
 5    you at all, of course.                        09:26:15
 6            Thank you.
 7            Please respond.
 8            THE WITNESS:  Can you repeat the question?
 9    BY MR. REICHMAN:
10        Q.    What, if any, racial slurs were made at   09:26:25
11    the meetings you attended?
12        A.    Racial slurs like "Go back to Mexico.
13    You're illegal.  I'm going to call ICE on you.
14    Build the wall.  America's for Americans.
15    Illegals go home.  You're a rapist, assassin."     09:26:44
16            They were -- they also did what I found
17    out were white supremist signs with their hands,
18    and --
19        Q.    Okay.
20        A.    -- they would use their hands to make   09:26:56
21    white supremist hand signals.
22        Q.    Can you describe what that gesture is that
23    you're referring to?
24        A.    I really don't want to actually physically
25    do it, but it's -- it's called the white power,    09:27:09
```

Page 17

```
1    and they use three fingers that are held up.  And

2    then there are fore- -- their forefinger and their

3    thumb are -- are made into a circle.  So three

4    fingers straight up and then the thumb connects

5    with the forefinger.                              09:27:28

6         Q.   Okay.

7         A.   And there was one other -- there was one

8    other one.  It's -- that I didn't know what it

9    was, and I looked it up, and it was identified as

10   called "Jew alert."  That was the i- --           09:27:42

11   identifying name of the hand signal.

12        Q.   Okay.  What, if any, violent instance

13   occurred during the course of the council meetings

14   you attended?

15             MR. OLASOV:  Objection to the form of the 09:28:07

16   question.

17             You may respond.

18             THE WITNESS:  I would -- I mean, I -- I

19   view that if -- if a family is standing in line to

20   speak and someone comes up to you and pushes you or 09:28:15

21   touches you, I think that I view that as a form of

22   violence and a form of a threat.

23             MR. REICHMAN:  Okay.

24             THE WITNESS:  And I -- and I did witness

25   that several times in Santa Clarita.  I did witness 09:28:29
```

Page 18

```
 1    that.
 2    BY MR. REICHMAN:
 3        Q.    Okay.  And did anyone ever brandish a gun
 4    at any of the -- the meetings you attended?
 5        A.    No, at the --                         09:28:39
 6              MR. OLASOV:  Objection to the form of the
 7    question.
 8              Please respond.
 9              THE WITNESS:  -- at the meetings that I
10    attended, I -- I personally never saw a gun being   09:28:43
11    brandished.
12    BY MR. REICHMAN:
13        Q.    Okay.  Okay.
14              If -- if we can go down to the -- sort of
15    the next section of the article, it talks about    09:28:55
16    "Harim Uzziel," U-Z-I-E-L [verbatim].
17              Are you familiar with this person?
18        A.    Yes, I am.
19        Q.    How did you become familiar with him?
20        A.    Prior to the city council meetings, I had  09:29:17
21    attended two separate rallies in the Los Angeles
22    area, and I witnessed him attack a senior citizen.
23              And in another event, he pushed me in the
24    back so much so that I had to ask for help from an
25    LAPD officer.                                     09:29:40
```

                                                    Page 19

```
 1        Q.   Okay.  What was the rally that you

 2   attended?

 3        A.   The first rally was -- I -- I'm -- I will

 4   be honest with you, I don't remember the name.  It

 5   was in July of 20- -- 2017, and I do not remember      09:29:59

 6   the -- the name of the rally.

 7             I do -- I do know that it was in July, and

 8   it occurred in Hollywood in front of the Grauman's

 9   Chinese Theatre.  That's where the rally started.

10   And then it turned into a march.  And it was a         09:30:19

11   permitted -- it was a permitted march, and we did

12   have police protection at that time.

13        Q.   Okay.  And what was the -- what was the

14   purpose of the -- of the march?

15        A.   As far as I --                               09:30:37

16             MR. OLASOV:  Objection to the form of the

17   question.

18             THE WITNESS:  It was a -- a march to

19   raise, I believe, awareness of -- I believe

20   awareness of immigration rights.                       09:30:48

21   BY MR. REICHMAN:

22        Q.   Okay.  And what was Harim Uziel doing

23   there?

24             MR. OLASOV:  Objection to the form of that

25   question.                                              09:31:01
```

Page 20

```
 1            THE WITNESS:  He was there protesting our

 2    rally with a -- a large group of mainly -- mainly

 3    men.

 4    BY MR. REICHMAN:

 5       Q.   Okay.  And -- and did you ever have        09:31:17

 6    further occasion to have -- to -- to find out

 7    or -- or to observe Harim Uziel at any other rally

 8    or meetings?

 9            MR. OLASOV:  Objection to the form of the

10    question.                                          09:31:33

11            THE WITNESS:  I did observe him at the

12    Simi Valley meeting and the Santa Clarita meeting.

13    BY MR. REICHMAN:

14       Q.   Okay.  Okay.

15            And if we could go down a little bit to    09:31:56

16    the next section, "Genevieve Peters."

17            Are you familiar at all with Genevieve

18    Peters?

19       A.   Yes, I am familiar with Genevieve Peters.

20       Q.   And how did you become familiar with her?  09:32:11

21       A.   I believe I read articles about her, and

22    people had spoken about her to me.

23       Q.   Okay.  Let's go further down to -- the

24    page to the section about "Elsa Aldeguer."

25            Do you know who Elsa Aldeguer is?          09:32:44
```

Page 21

```
 1        A.   Yes, I do.

 2        Q.   Okay.  How did -- how did you become

 3   familiar with her?

 4        A.   I attended a Civilian Oversight Commission

 5   meeting, and she spoke at that meeting.  And also     09:32:57

 6   she attended city council meetings that I also

 7   attended.

 8        Q.   Okay.  Did you ever observe her at any of

 9   the council meetings?

10        A.   Yes, I did.                                 09:33:14

11        Q.   At what -- which meetings?

12        A.   The -- she was at the Simi Valley meeting,

13   and she was also at the Santa Clarita meeting.

14   And, as far as I remember, she was at those two

15   meetings.                                             09:33:29

16        Q.   Okay.  Have you ever heard of a -- of a --

17   of a man by the name of Arthur Schaper?

18        A.   Yes, I have.

19        Q.   Okay.  And what, if anything, do you know

20   about him?                                            09:33:49

21        A.   I know that --

22             MR. OLASOV:  Objection to the form of the

23   question.

24             THE WITNESS:  From the many articles that

25   I've read about him and from seeing him in person,   09:33:55
```

                                                    Page 22

```
 1     I know that he is associated with a group called

 2     FAIR.  It's an anti-immigration national

 3     organization.

 4            I also know from multiple articles and

 5     news media that he has been arrested at several      09:34:11

 6     city council meetings.

 7            And I witnessed him at a city council

 8     meeting not related to SB 54 in the city of Oxnard,

 9     and he was bothering many of the people there.  So

10     much so that the police had to ask him if he would   09:34:34

11     be there, he had to stand in between two police

12     officers the entire time.  And he wasn't allowed to

13     interact with the -- the community that was in the

14     city council meeting.

15            And everything else I know I have read or      09:34:50

16     seen on news -- various different news sources.

17     BY MR. REICHMAN:

18        Q.   Do you know who Roslyn La Liberte is?

19        A.   I know who Roslyn La Liberte is, yes.

20        Q.   Okay.  And was she part of the same group     09:35:10

21     as Uziel, Peters, Aldeguer, and Schaper that

22     attended and disrupted the California council

23     meetings in opposition to SB 54?

24        A.   Yes.

25            MR. OLASOV:  Objection to the form --          09:35:23
```

Page 23

```
 1      excuse me, please.

 2              Objection to the form of the question.

 3      Ambiguous and leading.

 4              MR. REICHMAN:  You can just say

 5      "Objection," so that we can move on.  Okay?        09:35:32

 6              MR. OLASOV:  So -- so -- so -- so just so

 7      I don't -- so we're clear on that, all I have to

 8      say is "Objection," and it will cover any objection

 9      that I might have?

10              MR. REICHMAN:  That's fine.  If you        09:35:43

11      want to --

12              (Simultaneous speaking.)

13              THE COURT REPORTER:  Excuse me.  One

14      person -- excuse me.  One person at a time, please.

15      I can't hear both of you.                          09:35:50

16              MR. OLASOV:  And -- and just so we're

17      clear on this, because I don't want to interrupt

18      you again, Jon, if I lodge an objection, that will

19      also obviate any need to make any motion to strike?

20              MR. REICHMAN:  I'm not sure what that       09:36:02

21      means.  No, I don't know what that -- why -- that's

22      not the case.

23              Go ahead.  If you want to keep giving

24      detailed reasons, as long as you're not giving

25      speeches, that's fine.                             09:36:14
```

Page 24

```
 1            MR. OLASOV:  Okay.

 2    BY MR. REICHMAN:

 3        Q.   Now, I -- I believe you -- you

 4    testified --

 5            MR. REICHMAN:  All right.  Did we get an    09:36:17

 6    answer to that question?  I -- if the reporter

 7    could read it back, please.

 8            THE COURT REPORTER:  I have an answer

 9    "Yes."

10            MR. REICHMAN:  Okay.  Thank you.          09:36:30

11    BY MR. REICHMAN:

12        Q.   I believe you've testified previously that

13    you attended the Simi Valley council meeting on

14    June 25th, 2018; is that right?

15        A.   Yes, it is.                             09:36:42

16        Q.   Okay.  Were there any persons who -- at

17    the council meeting who you recognized?

18        A.   Yes, many.  There were Harim Uziel.  There

19    was Jesse Suave.  There was Raul Rodriguez.  There

20    was Elsa Aldeguer.  There was Genevieve Peters.    09:37:06

21    And there were many others faces that I

22    recognized, but I do not know their name.

23        Q.   Okay.  And is that the list of either

24    [verbatim] people who attended other city council

25    meetings in opposition to SB 54?                  09:37:21
```

                                          Page 25

```
 1        A.    Yes.
 2        Q.    Okay.  Can you generally describe what the
 3   atmosphere was at the Simi Valley council meeting?
 4              MR. OLASOV:  Objection.
 5              THE WITNESS:  The atmos- --            09:37:40
 6              THE COURT REPORTER:  Excuse me.  I didn't
 7   hear the objection.
 8              MR. OLASOV:  I watched -- I said
 9   "Objection."  That's all I said, per Mr. Reichman's
10   request.                                         09:37:50
11              THE WITNESS:  The atmosphere was -- I
12   would describe it as very highly charged, extremely
13   intimidating, a -- and a tremendous amount of
14   anger.  And things that I thought were yelled out
15   that were offensive and terrible and very          09:38:10
16   threatening.
17   BY MR. REICHMAN:
18        Q.    What statements of that kind did you hear?
19        A.    Well --
20              MR. OLASOV:  Objection to the form.      09:38:20
21              Please respond.
22              THE WITNESS:  -- "Go back to Mexico.
23   Mexico's -- go home.  Depart them all."  Sorry --
24   sorry if I get a little emotional.  I apologize.
25   Okay.  "Build that wall.  Illegals go home.  I'm    09:38:33
```

Page 26

```
1     calling ICE to deport you all.  America first."

2     BY MR. REICHMAN:

3         Q.   And who were making those statements?

4         A.   This was the group that I described that

5     are associated with white supremist groups and        09:38:56

6     anti-immigration groups.  These would include

7     Harim Uziel, Raul Rodriguez, Jesse Suave, Elsa,

8     Genevieve, and -- and many others.

9              MR. OLASOV:  Mo- -- motion to strike.

10    BY MR. REICHMAN:                                       09:39:18

11        Q.   Did -- did the -- did the --

12             (Simultaneous speaking.)

13             (Interruption in audio/video.)

14             THE COURT REPORTER:  Excuse me.  Counsel,

15    could you please speak into the microphone.            09:39:25

16             MR. REICHMAN:  Okay.  I don't know who

17    you're referring to, but...

18             THE COURT REPORTER:  You, sir.  If you

19    could just come --

20             MR. REICHMAN:  Okay.  Well, I -- I -- I       09:39:35

21    am.  I -- like I say, I haven't really had any

22    problems before in any of the other depositions.

23             MR. OLASOV:  I can tell you I'm hearing

24    Mr. Reichman perfectly well, so I can't say what

25    the problem is.                                        09:39:43
```

Page  27

```
 1              THE COURT REPORTER:  I'm going to ask --
 2    I'm going to ask that we go off the record for an
 3    audio issue.
 4              MR. OLASOV:  Okay.
 5              THE COURT REPORTER:  Thank you.          09:39:51
 6              THE VIDEOGRAPHER:  We are going off the
 7    record.  The time is 9:39.
 8              (Off the record.)
 9              THE VIDEOGRAPHER:  We are back on the
10    record.  The time is 9:41.                         09:41:21
11    BY MR. REICHMAN:
12        Q.   Did the -- did the conduct -- conduct that
13    you observed at the Simi Valley council meeting
14    ever go beyond racial slurs and towards other
15    forms of harassment or intimidation?              09:41:38
16              MR. OLASOV:  Objection to the form of the
17    question.
18              THE WITNESS:  Yes, it -- yes, it did.
19    BY MR. REICHMAN:
20        Q.   Can you --                                09:41:47
21        A.   I --
22        Q.   -- describe -- yes, please describe that.
23        A.   I observed families that were there, and
24    there were men who would approach them and say
25    racially insensitive things to them and intimidate  09:42:02
```

                                                    Page 28

```
 1     them so much so that they left.

 2            And a -- a man who towered over me put

 3     his -- his face in my face and proceeded to try to

 4     get me -- bait -- I -- I call it bait me to say

 5     something.  And he would say racially insensitive     09:42:24

 6     like, "Who are you?  Are you even legal?  Let me

 7     see your papers."

 8            And when I refused to say anything or

 9     answer, he pointed his finger at me and in a very

10     loud voice said, "She can't speak English.  She's     09:42:38

11     an illegal."

12            And he then said, "I'm calling ICE on

13     you."  And he pulled out his cell phone and

14     proceeded to dial a number and said, "I'm calling

15     ICE.  She's -- she's here illegally."  And I          09:42:51

16     also --

17            MR. OLASOV:  Motion --

18            THE WITNESS:  Can I include things that I

19     did not observe but other people told me?

20     BY MR. REICHMAN:                                      09:43:03

21     Q.    Sure.  Why don't -- why don't --

22            (Simultaneous speaking.)

23            (Interruption in audio/video.)

24            MR. OLASOV:  Objection -- objection and

25     move to strike.                                       09:43:14
```

                                                        Page 29

```
 1              (Simultaneous speaking.)

 2              (Interruption in audio/video.)

 3              THE COURT REPORTER:  Excuse me.  One --

 4      I'm sorry, I can't hear both of you.  I didn't hear

 5      any of that.  One person at a time, please.        09:43:15

 6      BY MR. REICHMAN:

 7         Q.   Let -- let me -- let me ask you another

 8      question, then, Ms. Martinez.

 9              Did anyone else tell you about other forms

10      of intimidation or harassment that occurred during  09:43:24

11      the course of the Simi Valley council meeting?

12         A.   Yes.

13              MR. OLASOV:  Move to -- objection.

14      BY MR. REICHMAN:

15         Q.   What were you told and by whom?             09:43:36

16         A.   I was told by one young Simi Valley

17      resident who lives in Simi Valley that she was

18      told that she was illegal.  I was also told that a

19      family that -- that is Muslim and -- and -- and --

20              (Interruption in audio/video.)             09:44:02

21              THE COURT REPORTER:  Excuse me.  There was

22      an -- excuse me.  Excuse me.  There was

23      interruption in the audio?

24              If you could please start over.

25              THE WITNESS:  Do you want to start from     09:44:16
```

Page 30

```
 1      the beginning?

 2              MR. REICHMAN:  If the court reporter could

 3      just read back how far she got in the answer, and

 4      then you can continue.

 5              (Record read back by the reporter as        09:44:49

 6              follows:

 7              Answer:  "I was told by one young Simi

 8              Valley resident who lives in Simi Valley

 9              that she was told that she was illegal.  I

10              was also told that a family that -- that    09:43:53

11              is Muslim and -- and -- and...")

12              THE WITNESS:  The family that was Muslim,

13      one of the family members was wearing a traditional

14      hijab scarf around her head, and she was spit on.

15      I was also told that people throughout the city     09:45:06

16      council auditorium, that they were intimidated.

17      And it was -- they left because of safety reasons,

18      that they felt intimidated, and it wasn't worth

19      staying there because they brought children and

20      their elderly parents with them.                    09:45:26

21      BY MR. REICHMAN:

22          Q.   Okay.

23              MR. OLASOV:  Motion to strike.

24      BY MR. REICHMAN:

25          Q.   Did you ever observe any interaction       09:45:32
```

                                                    Page 31

1    between Roslyn La Liberte and Joseph Luevanos?

2         A.   No, I did not.

3         Q.   Did you observe any of Roslyn La Liberte's

4    conduct during the course of the council meeting?

5         A.   Yes, I did.                              09:45:54

6         Q.   Okay.  What, if anything, attracted your

7    attention to her?

8              MR. OLASOV:  Object to the form of the

9    question.

10             You may respond, Ms. Martinez.           09:46:05

11             THE WITNESS:  I heard many disparaging

12   comments about people of color.  And throughout the

13   meeting, she talked throughout the meeting at times

14   and -- and her -- her and her conversations that

15   she had with the two women who were sitting next to  09:46:30

16   her were anno- -- annoying and distracting.

17   BY MR. REICHMAN:

18        Q.   Okay.  All right.  Let me -- let me sort

19   of go back.

20             The -- who -- do you know the -- the names  09:46:43

21   of the wo- -- the women Ms. La Liberte was sitting

22   with?

23        A.   The name of the woman who was sitting to

24   La Liberte's right, her first name is Deidra.  I

25   do not know her -- her last name.  And the person    09:47:05

                                              Page 32

1    sitting to the left of Ms. La Liberte was named

2    Elsa Aldeguer.

3        Q.    Okay.  And where were you in relationship

4    to Ms. La Liberte, when you heard these

5    conversations that you just described?            09:47:24

6        A.    I was sitting on the same row as

7    Ms. La Liberte.  I was sitting adjacent to Elsa

8    Aldeguer.

9        Q.    Okay.  Whe- -- when you say "adjacent,"

10   what do you mean?                                 09:47:41

11       A.    She was sitting to my right.  We were --

12   we were right -- our seats were right next to each

13   other.

14       Q.    Okay.  So, in other words, you were two

15   seats away from Ms. La Liberte; is that right?    09:47:54

16       A.    Yes.

17       Q.    Okay.  Can you describe in as much detail

18   as you can what conversation you heard that

19   Ms. La Liberte was having with Ms. -- with Elsa

20   Aldeguer and the other woman she was with?        09:48:17

21       A.    Like many people in that room, they were

22   booing and laughing and making comments after --

23   after people spoke.  They would -- would clap in

24   affirmation to people who they agreed with.  And

25   they also made comments against people who spoke  09:48:43

Page 33

```
 1    with a thick accent, and they would say things

 2    that I found -- found offensive.

 3         Q.   Okay.

 4              MR. OLASOV:  Motion to strike.

 5              MR. REICHMAN:  Okay.                        09:48:59

 6    BY MR. REICHMAN:

 7         Q.   Can you describe in any further detail any

 8    of the things that were said by Ms. La Liberte?

 9         A.   Yes.  A man whom I believe is of Muslim

10    descent and identified himself as Muslim descent,    09:49:17

11    I heard Roslyn say, "He's not an American."

12              Elsie [verbatim] responded, "He shouldn't

13    be speaking," and Roslyn responded, "Only

14    Americans should be allowed to speak."

15              And -- do you want me to continue?         09:49:37

16         Q.   Yes, please.

17         A.   Okay.  There was another incident where a

18    woman spoke again with -- with an accident --

19    accent, and I heard Elsa say, "Illegal, illegal."

20    And then Roslyn -- Roslyn responded, "Is she even    09:49:54

21    legal?  They should ask for proof."

22              And Elsa responded, "The police should

23    arrest the illegals."

24              And there was a -- a third incident

25    where -- where a gentleman who had -- a third -- a   09:50:11
```

Page 34

1    third spoken.  He did also have a heavy accent.

2    And after he spoke, Roslyn said, "He's another one

3    who has no right to speak," and Elsa answered,

4    "Yeah," and laughed.

5        Q.   Okay.  And you mentioned before that they    09:50:35

6    were booing.  Who was Roslyn La Liberte booing?

7            MR. OLASOV:  Objection to the form of the

8    question.

9            THE WITNESS:  The -- the boos came from

10   several people, and the boos would -- were directed    09:50:49

11   towards the speakers who spoke about -- who spoke

12   in favor of SB 54 and who were -- were asking the

13   city council to remain neutral and not join the

14   federal lawsuit that was suing the State of

15   California.                                            09:51:13

16           MR. OLASOV:  Motion to strike.

17   BY MR. REICHMAN:

18       Q.   Was Harim Uziel at the meeting?

19       A.   Yes, he was.

20       Q.   Did you observe anything that he did?         09:51:21

21       A.   Yes.  He was disruptive.  He yelled out

22   out of turn several times.  He interrupted people

23   when they were speaking and would yell things in

24   the middle of their -- their opportunity to speak

25   at the podium.  He started screaming when he was        09:51:42

Page 35

1    at -- when he had his opportunity to speak at the

2    podium.

3            He continued to scream and cause a

4    disturbance so much so that the mayor asked the

5    police to detain and remove him from the city          09:51:59

6    council meeting.

7       Q.   Okay.  Had -- had you seen Harim Uziel

8    ever engage in similar conduct at any other

9    meetings?

10           MR. OLASOV:  Objection.                         09:52:20

11           THE WITNESS:  Yes, at the Santa Clarita

12   meeting.

13   BY MR. REICHMAN:

14      Q.   Okay.  And did you ever observe any

15   interactions that Uziel had with Roslyn La Liberte     09:52:27

16   at the Simi Valley council meetings?

17      A.   Yes.  After Harim spoke, she had some type

18   of interaction with him and spoke with him.  So

19   when Harim finished speaking and departed the

20   podium and was walking towards the back of the         09:52:54

21   room, Ro- -- I observed Roslyn standing up and

22   saying in- -- in- -- saying some type of

23   interaction with -- to him, smiling.  It looked

24   like she was laughing.

25           And then Harim proceeded to sit down, but      09:53:12

Page 36

```
 1      by that time, the mayor was asking for the police

 2      to detain and remove him from the room.

 3         Q.   Okay.

 4         A.   Right around the time the -- the -- the

 5      mayor was asking the police to detain and remove       09:53:30

 6      Harim, that is when I saw the interaction with

 7      Roslyn La Liberte.

 8              MR. OLASOV:  Motion to strike.

 9              MR. REICHMAN:  I -- I don't have any

10      further questions.                                     09:53:44

11              MR. OLASOV:  May we go off the record for

12      five minutes, John, so I can do my preparation and

13      be quick?  Is that all right with you?

14              MR. REICHMAN:  That's -- that's fine with

15      me, as long as it's all right with everyone else       09:54:05

16      and Ms. Martinez.

17              MR. OLASOV:  Ms. Martinez, is -- is that

18      okay with your schedule?  I don't -- I don't want

19      to -- I won't be long, and I'll be shorter if I

20      take a look at my notes.  Okay?                        09:54:15

21              THE WITNESS:  Yes.

22              THE VIDEOGRAPHER:  We are going off the

23      record.  The time is 9:54.

24              (Off the record.)

25              THE VIDEOGRAPHER:  We are back on the           09:59:20
```

Page 37

1    record.  The time is 9:59.

2                      EXAMINATION

3    BY MR. OLASOV:

4        Q.   Ms. Martinez, I'm David Olasov.

5             I represent -- I represent Roslyn          09:59:36

6    La Liberte.  I'll be asking you a handful of

7    questions.  As with Mr. Reichman, if I ask you

8    something that you don't understand, you've got to

9    let me know that because otherwise I'm going to

10   assume that you do understand my question.  I'll    09:59:56

11   try to be as clear as possible, but that's what

12   I'd appreciate from you, if you can.

13            Do you -- do you know Ruth Luevanos?

14       A.   Yes, I do.

15       Q.   And how long have you known her?           10:00:15

16       A.   I met her after that particular meeting.

17   I met her briefly.

18       Q.   You -- you make a reference to a

19   particular meeting.  Which particular meeting?

20       A.   The Simi Valley city council meeting.      10:00:36

21       Q.   Are -- are -- did you know her before the

22   Simi Valley council meeting?

23       A.   I did not.

24       Q.   Okay.  So I -- I take it, although you had

25   as a role in part of your career being a teacher,   10:00:52

                                              Page 38

```
 1    you -- you did not know her in -- in that

 2    capacity?

 3         A.    No, I did not.

 4         Q.    Okay.  Thank you.  Thank you.

 5               Are -- are -- are you and she members of      10:01:05

 6    any political or social group together?

 7         A.    No, we are not.

 8         Q.    Okay.  She -- she described herself in her

 9    testimony in this proceeding, either or both, as a

10    community organizer and as a Chicano activist.          10:01:27

11               Do you describe yourself in that ei- -- as

12    well?

13               MR. REICHMAN:  Objection.

14               You may answer.

15               THE WITNESS:  I like to participate in       10:01:41

16    community organizing in some capacity.  I wouldn't

17    say that I've started a group, but I -- I like to

18    participate in my community activities.

19    BY MR. OLASOV:

20         Q.    Okay.  Do you consider yourself              10:02:04

21    politically active?

22         A.    Yes, I do.

23         Q.    Okay.  And what -- what do you regard as

24    the objectives of your political activity?

25         A.    It would depend on the different topic.      10:02:23
```

                                                    Page 39

```
 1     For example, I -- I'm very interested in rent
 2     control.  I am very interested in the environment.
 3     I am very interested in helping my community solve
 4     a problem like homelessness and houselessness.
 5     And I'm very concerned with immigrant rights.        10:02:46
 6         Q.   Okay.  And -- and -- and do -- do you
 7     regard the legislation that we've referred to as
 8     SB 54 as involving immigrant rights?
 9         A.   Yes.
10         Q.   Okay.  Now, in your prior testimony,        10:03:05
11     you -- you indicated that you went to several of
12     these city council hearings concerning SB 54.  Did
13     I hear that correctly?
14         A.   Yes.  I attended four.
15         Q.   And -- thank you.                           10:03:33
16              And did you attend them with others?
17         A.   No.  Each time I drove separately.
18         Q.   No -- okay.
19              Were you meeting others at any of these
20     sessions or -- or -- or not?                        10:03:48
21         A.   Yes, I did meet with a large group prior
22     to the Simi Valley meeting.  It was a group made
23     up of religious community leaders from all
24     different denominations.  We were -- we -- we were
25     provided the opportunity, this group, to meet with  10:04:07
```

Page 40

1    all four of the city council persons prior to the

2    meeting to speak with them to explain the policy

3    of SB 54 and why it benefitted our community.

4        Q.   And what was the name of that group?

5        A.   It -- it was not a group.  It was just a        10:04:27

6    group mainly of religious community leaders.  I

7    was included in that group as well even though I

8    am not a religious leader in any capacity.

9        Q.   Okay.  Do -- do you recall when that

10   meeting took place?                                       10:04:50

11       A.   Yes.  They scheduled our meeting at 5:30

12   prior to the Simi Valley city council meeting.  We

13   were given the opportunity to speak approximately

14   15 to 20 min- -- minutes which -- with each of the

15   four city council members that were in attendance        10:05:08

16   that day.

17       Q.   Did -- did you speak with them, with the

18   city council members as a group or individually?

19       A.   We -- the reli- -- the group made up of

20   religious community leaders, we spoke together as        10:05:22

21   a group in -- in each individual office of the

22   city council members.

23       Q.   Okay.  So you -- if -- if I understood

24   that correctly, you spoke with the city council

25   members separately, but you yourselves met with          10:05:38

Page 41

```
 1      them as a group; is that correct?

 2          A.    Yes, we did.

 3          Q.    Okay.  Thank you.  Thank you so much.

 4              And -- and was the total of these -- these

 5      conversations the 15 to 30 minutes you spoke          10:05:52

 6      about, or -- or were each of them of that length

 7      or was -- or do I have that wrong?

 8          A.    It was 15 to 20 minutes.  Because time was

 9      of essence, they scheduled us prior to the

10      meeting.  So they -- we didn't have more than 15      10:06:12

11      to 20 minutes to speak to each of the four city

12      council members.

13          Q.    Do -- do you know whether that opportunity

14      was afforded to any other group?

15          A.    I would not know how and whom they          10:06:25

16      scheduled.  I do not know.

17          Q.    Okay.  Thank you.

18              Was -- was Ruth Luevanos part of that

19      group?

20          A.    No, she was not.                            10:06:44

21          Q.    Okay.  Oh, were there many people that you

22      could identify as Hispanic at the Simi Valley city

23      council meeting that spoke in opposition to SB 54?

24          A.    Can you repeat the question?

25          Q.    I'm -- no problem.                          10:07:42
```

Page 42

```
 1              Were there any people that you could
 2    identify as of Hispanic heritage or ethnicity that
 3    spoke in opposition to SB 54 at the Simi Valley
 4    council meeting?
 5       A.   Yes.                                    10:07:59
 6       Q.   Do you have any estimate of how many
 7    people spoke in opposition to SB 54 whom you
 8    believed to be of Hispanic ethnicity or heritage?
 9              MR. REICHMAN:  Objection.
10              You can answer.                        10:08:21
11              THE WITNESS:  I think there were about
12    five that i- -- that identified themselves as being
13    Hispanic.
14    BY MR. OLASOV:
15       Q.   And -- and were there any others that did  10:08:33
16    not self-identify as Hispanic but that you thought
17    were His- -- of Hispanic heritage or ethnicity
18    that spoke in opposition to SB 54?
19              MR. REICHMAN:  Objection.
20              You may answer.                        10:08:48
21              THE WITNESS:  No.
22    BY MR. OLASOV:
23       Q.   Okay.  Did you yourself speak at the Simi
24    Valley council meeting?
25       A.   Yes, I did.                              10:09:11
```

Page 43

```
 1        Q.    And am I correct in assuming that you were

 2   given the same minute and a half as everyone else

 3   to say what you had to say?

 4        A.    I was provided the same time as everybody.

 5        Q.    Okay.  Ho- -- how did you come to be          10:09:26

 6   introduced to defendant's counsel?

 7        A.    I received a phone call.

 8        Q.    And from whom did you receive such a call?

 9        A.    I'm -- can you give me a minute to check

10   the spelling of the name?                                10:10:01

11        Q.    Please.  Take your time.

12        A.    Marissa would be the name, Ma- -- Ma- -- I

13   believe Marissa Moshell.

14        Q.    You -- do you know when that call took

15   place?                                                   10:10:38

16        A.    Early February.

17        Q.    Of -- of -- of this year?

18        A.    Of this year.

19        Q.    Did she tell you how she had gotten your

20   name?                                                    10:10:55

21        A.    Yes.

22        Q.    And what did she say?

23        A.    She indicated that someone had identified

24   me as sitting next to Ms. La Liberte in the

25   meeting.                                                 10:11:13
```

Page 44

```
 1        Q.   And did she say who that person was?

 2        A.   I do not recall.

 3        Q.   Okay.  Do you recall any other part of the

 4   conversation you had with her?

 5        A.   She asked if I had any interaction with      10:11:27

 6   Ms. La Liberte.

 7        Q.   And what did you tell her?

 8        A.   I told her that I did not -- did not see

 9   Ms. La Liberte having any conversations with --

10   with Joey Luevanos.                                    10:11:52

11        I told her that I sat next to -- to

12   Ms. La Liberte and heard her and the two people

13   she was with make several comments throughout the

14   meeting.

15        Q.   Mm-hmm.  Did -- did she ask you whether      10:12:12

16   you were prepared to be a witness in this

17   proceeding?

18        A.   At that time, she asked me some questions,

19   and she did explain that there was a lawsuit

20   pending.  And at that time, I was not sure if I        10:12:37

21   was going to be a witness.  I just shared what I

22   had witnessed and heard from Ms. La Liberte.

23        Q.   Did -- did -- did she ask you whether you

24   were prepared to be a witness?

25        A.   I believe she -- she asked me something      10:13:08
```

Page 45

```
 1    similar to that.  I don't know if those were the

 2    exact words.

 3        Q.   No, and words -- I'm not -- I'm not

 4    trying to hold you -- I'm not trying to ask you to

 5    speak -- to testify verbatim.  I'm asking you in        10:13:16

 6    words or substance whether she indicated that the

 7    defendant might want to call you as a witness?

 8        A.   Yes, that was brought up.

 9        Q.   Okay.  Did she ask you to give her any

10    documents that you had?                                 10:13:30

11        A.   She did not ask.  I mentioned that I did

12    have some -- some photos.

13        Q.   Okay.

14        A.   I told her -- she did -- she did not ask

15    me.  I told her that I had photos.                      10:13:48

16        Q.   And did you subsequently provide her with

17    those photos?

18        A.   Yes, I did.

19        Q.   And when did you do that?

20        A.   That -- that day.  Februar- -- early          10:13:55

21    February of this year.

22        Q.   Okay.  And did you provide her with any

23    video clip?

24        A.   Yes, I did.

25        Q.   And when did you provide her with that?        10:14:12
```

Page 46

```
 1        A.    I provided her that two days ago on
 2   Saturday, October the 2nd.
 3        Q.    Okay.  And fr- -- from whom did -- if
 4   anyone, did you obtain tho- -- the documents you
 5   provided her?                                    10:14:37
 6        A.    The -- the photos and the video on
 7   Saturday, I took.  On February 3rd, I sent her a
 8   video that had been circulating about Roslyn
 9   La Liberte.  It had been on multiple social media
10   sites.  And I don't know where else it's been.    10:15:01
11   But it was found on -- it had been viewed by me
12   and many others on multiple sites.  So it was
13   something that many people had, and -- yes.
14        I ha- -- I do have that -- I did have that
15   video.                                            10:15:22
16        Q.    Now, I -- I may have not heard you
17   correctly.  When you -- when you gave her
18   documents in February of this year, how many
19   documents did you give her?
20        A.    Would it be okay if I checked my phone  10:15:39
21   because I can tell you how many --
22        Q.    Yes, please.
23        A.    Okay.  I believe at that time I sent her
24   five photos and one video in early February and
25   then one video this particular -- particular      10:16:09
```

Page 47

```
 1     Saturday.  And this particular Saturday, I also
 2     sent her a screenshot of three social media post
 3     [verbatim].  And I -- I want to clarify that in
 4     addition to the video and the screenshots of the
 5     three social media post, I also sent her two        10:16:39
 6     additional photos this Saturday -- or wait, I'm
 7     sorry, one additional photo this Saturday.
 8         Q.   Do -- do you have those available with you
 9     now, the documents you produced in February and
10     the documents --                                    10:16:58
11         A.   Yes.
12         Q.   -- you produced a couple of days ago?
13              Can --
14         A.   Yes.
15         Q.   Can -- is -- is -- is there some way you   10:17:03
16     can get those to me?
17              MR. REICHMAN:  Well, let -- let -- let me
18     say this.  You've -- you've already --
19              MR. OLASOV:  No, no.  I -- I -- I have
20     a pending question.                                 10:17:13
21              MR. REICHMAN:  No, no, no, please don't
22     interrupt me.
23              (Simultaneous speaking.)
24              (Interruption in audio/video.)
25              THE COURT REPORTER:  Excuse me.  One
```

Page 48

```
 1     person at a time, please.

 2            MR. REICHMAN:  Let -- let me interrupt

 3     you.  Let me just say that the documents that were

 4     provided previously by the witness were -- that

 5     were relevant to your document request were          10:17:24

 6     provided to you already months ago.

 7            MR. OLASOV:  I -- I -- I -- I -- that's --

 8     that's what you --

 9            MS. MULLIGAN:  I just want to add -- I

10     just want to confirm, since I know that the witness  10:17:37

11     is testifying about what she provided to me --

12            MR. OLASOV:  I -- I just want to --

13            MS. MULLIGAN:  -- that --

14            MR. OLASOV:  I -- I object.

15            MR. REICHMAN:  Don't -- please don't        10:17:43

16     interrupt.

17            MS. MULLIGAN:  I'm not -- I'm not

18     trying -- can I -- I'm not trying to interrupt.  I

19     just want to clarify --

20            MR. OLASOV:  I -- I -- beg your -- I beg

21     your pardon.

22            MR. REICHMAN:  No, don't interrupt --

23            MS. MULLIGAN:  Can I --

24            (Simultaneous speaking.)

25            (Interruption in audio/video.)
```

Page 49

```
 1              THE COURT REPORTER:  Excuse me.  Excuse

 2     me.

 3              (Simultaneous speaking.)

 4              (Interruption in audio/video.)

 5              THE COURT REPORTER:  Excuse me.  Wait.  My

 6     hands are all -- I cannot hear both of -- I cannot

 7     hear --

 8              (Simultaneous speaking.)

 9              (Interruption in audio/video.)

10              MR. REICHMAN:  Don't interrupt.        10:17:55

11              MR. OLASOV:  Ms. Mulligan, if you -- if

12     you want to make a speech, I'm glad for you to make

13     the speech, but I would like the witness to be

14     excused.

15              MS. MULLIGAN:  I'm not making a speech.   10:18:13

16     I'm trying to help you, and I'm allowed to speak.

17              She provided me documents.  I then

18     produced those documents to you along with our

19     other documents before the June 30th discovery

20     cutoff.                                           10:18:26

21              As she testified, she then provided a

22     couple of more files on Saturday, which I also

23     produced to you and which you now have in your

24     possession.

25              If you want her to provide them to you    10:18:34
```

                                                 Page 50

```
 1    directly, that's fine.  I'm just telling you that

 2    you already have them.

 3    BY MR. OLASOV:

 4       Q.   Ms. Martinez, I'd be -- I'd be grateful if

 5    you could figure out a way to get those to me.        10:18:48

 6    I'm -- I'm not going to continue your deposition

 7    for -- for this purpose, but I'd like to give you

 8    my e-mail address so that you can forward the

 9    documents to me so that I may evaluate the

10    production.                                           10:19:00

11          Is that okay with you?

12       A.   I would like to ask a question.  Is

13    this -- is this the protocol?  Wouldn't I --

14    haven't I already submitted them?

15          MR. REICHMAN:  Yes.                             10:19:14

16          MR. OLASOV:  You've not -- no.  The answer

17    to that is, I have no way of knowing what came from

18    you and what didn't come from you with the

19    exception that there were some documents that

20    Marissa Mulligan Moshell [sic] gave -- gave me on     10:19:28

21    Sunday afternoon or evening.  So -- so the answer

22    to that is, you -- you may have given them to her

23    and she may have given them to me, but you didn't

24    give them to me and I can't identify which came

25    from you.                                             10:19:46
```

Page 51

1         Do you -- do you understand what I'm

2    saying with the exception of what I just told you,

3    there were things that came on Sunday?  So -- so

4    tha- -- that's my response to you.

5         If -- do you understand what I just said?    10:19:58

6         THE WITNESS:  Yes.  Is it -- I -- my --

7    and my question is, is it normal protocol for me to

8    send things to your e-mail?

9         MR. OLASOV:  It's --

10        THE WITNESS:  Is that --                      10:20:05

11        MR. OLASOV:  Well, I -- it's -- you --

12   you -- I -- I would like to have a direct

13   transmission.  I can't imagine anything that's

14   wrong.  You can surely -- at the same time that you

15   give them to me, I'd be glad for you to copy them    10:20:19

16   to Mr. Reichman and Marissa Mulligan who before her

17   marriage was called Moshell.  So I -- I'm -- I'm --

18   I'm not trying to get special information.  I'm

19   just trying to get the same information from you

20   that you gave to them.                              10:20:41

21        MR. REICHMAN:  And that you have already.

22        MR. OLASOV:  No, I don- -- I -- I --

23   that's not correct, John, but that's neither here

24   nor there.  I --

25        THE WITNESS:  Is -- Mr. Reichman, is it    10:20:54

Page 52

1    possible for me to just send everything to you, and

2    then you forward the e-mail?

3              MR. OLASOV:  Well, that's not how I'd like

4    this to be done.  If you want to give it to the --

5    if you want to give it to the videographer and not      10:21:03

6    give it to me, if there's some reason that you

7    don't want to give it to me directly, I'm not

8    trying to have a direct transmission in that

9    respect.  But I'd like to have a transmission that

10   does not go through -- through -- through counsel.      10:21:15

11   They're not represent- -- excuse me.  They're not

12   representing you in this -- in this deposition, are

13   they?

14             MR. REICHMAN:  Yeah, and -- and let me

15   say, I -- I am not representing the witness.            10:21:29

16             MR. OLASOV:  I asked -- I have a pending

17   question.

18   BY MR. OLASOV:

19        Q.   Ms. -- Ms. Martinez, I -- I've assumed

20   that defense counsel is not representing you in         10:21:38

21   this deposition.  Am I correct in that?

22        A.   No.

23        Q.   I'm not correct in that?

24             MR. REICHMAN:  And -- and you are not --

25   and let me just say, I cannot give you legal            10:21:49

Page 53

```
 1    advice.  I don't intend to give you le- -- le- --

 2    legal advice at all.  But I would also say that,

 3    you know, you have not been subpoenaed or gotten

 4    any request from Mr. Olasov.  So prior to today, no

 5    subpoena or anything else.  So that's the only        10:22:05

 6    thing I can say to you with respect to that matter.

 7    And certainly I can say that there's -- there's

 8    no -- there's been nothing filed in this court, in

 9    the court in this case that would require you to

10    provide any information to him --                     10:22:19

11              THE WITNESS:  Mr. --

12              MR. REICHMAN:  That he has already gotten.

13              THE COURT REPORTER:  Excuse me, one person

14    at a time, please.

15              THE WITNESS:  Mr. Olasov, I --              10:22:29

16    BY MR. OLASOV:

17        Q.  Yes, ma'am.

18        A.  -- I'd like to -- I'd like to explain this

19    to you.  I would like to maintain some degree of

20    separation.                                           10:22:36

21        Q.  That's fine.

22        A.  That is why I -- I don't feel comfortable

23    at this time.  I -- obviously I have already

24    explained to you that I feel very uncomfortable

25    with the groups that these people are associated     10:22:49
```

Page 54

```
 1    with, and it -- security and safety for me and my

 2    family is of concern.  So at this time, I don't

 3    feel comfortable utilizing my personal e-mail and

 4    sending you in the manner that you requested.

 5        Q.   Well, so what I'd like to ask you whether     10:23:08

 6    you're prepared to do is to provide Veritext with

 7    this -- with the same information you gave to

 8    Defendant's counsel so that they can give it to

 9    me.

10            You don't have to communicate with me         10:23:20

11    directly if -- if you -- if you are more

12    comfortable with that way.  Never mind that I went

13    to Yale Law School and did civil rights work

14    before you were born.  If you're not comfortable

15    dealing with me directly, that's okay.  I just       10:23:34

16    want you to give them to Veritext.

17            And if you're not prepared to give them to

18    Veritext, all you have to do is say you're not

19    prepared to do that.

20        A.   I would like to reserve the -- the right     10:23:45

21    to maybe talk to somebody else and ask them.  I'm

22    not comfortable with this protocol.

23            Like I said, the groups that are

24    associated with Ms. La Liberte engage in criminal

25    activity, and I'm not comfortable with revealing     10:24:01
```

Page 55

```
 1    my personal -- personal information.  I do believe

 2    that my family could possibly be impacted by that.

 3    And I'm just going to cautiously decline your

 4    request to send it to you for that reason that I

 5    stated.                                        10:24:19

 6       Q.   So -- so you're not only not going to send

 7    it to me, you're not going to send it to Veritext

 8    either?

 9            MR. REICHMAN:  Objection.

10            THE WITNESS:  I --                      10:24:27

11            You know what, this is -- we're getting --

12    this is not -- this is not proper --

13            MR. OLASOV:  I just want to --

14            (Simultaneous talking.)

15            (Interruption in audio/video.)

16            THE COURT REPORTER:  One person.

17    Gentlemen.  Gentlemen.

18            MR. REICHMAN:  Please, don't interrupt me.

19    This is not --

20            (Simultaneous talking.)

21            (Interruption in audio/video.)

22            THE COURT REPORTER:  Please, Gentlemen, I

23    can't -- look, I'm not taking anything down.  You

24    guys are talking at the same time.

25            MR. REICHMAN:  Okay.  Hold on.
```

Page 56

```
 1              THE COURT REPORTER:  I can't -- hold on.

 2     Everybody needs to speak one at a time.

 3              MR. REICHMAN:  Okay.  I have the right to

 4     raise an objection, which I am, and I'm saying that

 5     this is far outside the bounds of what the          10:24:49

 6     deposition should be.

 7              This is -- Ms. Martinez is here as a fact

 8     witness, and you can ask her questions about this.

 9     This whole line of questioning is completely

10     inappropriate and should end right now.            10:25:01

11              MR. OLASOV:  John, you have just violated

12     core principles of the Federal Rules of Civil

13     Procedure.

14              I'm -- I'm only asking this witness to

15     provide to me, through Veritext, documents that     10:25:14

16     she's already provided to you and to have indicated

17     that they've been provided to you from her.  That's

18     all.

19              And -- and -- and she's -- she's got

20     whatever concern she has, to which I have no        10:25:27

21     intention whatsoever of trying to cause her

22     personal concern.  So all I've done is ask her to

23     get to me, through Veritext, these documents.

24              And -- and I -- I'll repeat the request.

25     And if -- she'll either do it or she won't do it.   10:25:45
```

Page 57

```
 1     And if she doesn't it, then -- then -- then that's
 2     the end of it.  It's up -- it's up to her.
 3             MR. REICHMAN:  You made --
 4             (Simultaneous talking.)
 5             (Interruption in audio/video.)          10:25:58
 6             MR. OLASOV:  Excuse me.
 7             She's -- I've made the request.  She's not
 8     appearing pursuant to subpoena.  She's a volunteer
 9     witness, and I'm entitled to ask these questions.
10             And if she's not prepared to give me the    10:26:07
11     documents, that's okay.  She's -- she's indicated
12     in the -- on the record that she wants to consult
13     with someone of her choosing before she does this,
14     and she may not do it.  That's -- that's up to her.
15             I haven't subpoenaed her.  You haven't      10:26:21
16     subpoenaed her so far as I understand.  She's a
17     volunteer here.  So if she doesn't want to give me
18     these documents, that's up to her.  I've made the
19     request.
20     BY MR. OLASOV:                                      10:26:34
21        Q.  Ms. Martinez, I'll repeat the request.
22             MR. REICHMAN:  No.  No.  You're badgering
23     the witness.  There is no basis for you --
24             (Simultaneous talking.)
25             (Interruption in audio/video.)
```

Page 58

```
 1              MR. OLASOV:  I am not badgering the

 2      witness.

 3              (Simultaneous talking.)

 4              (Interruption in audio/video.)

 5              MR. REICHMAN:  There no basis you -- no --

 6              THE COURT REPORTER:  One person at a time.

 7      I can't hear both of you.  I cannot hear both of

 8      you --

 9              MR. REICHMAN:  This is completely wrong.

10      Ms. Martinez is unrepresented.  You've asked her      10:26:48

11      this questions six different ways.  She gave you a

12      clear answer -- no, don't interrupt me.

13              She gave you a clear answer on numerous

14      occasions she's not prepared to do it.  She wants

15      to consult with people.  And it's totally           10:27:02

16      inappropriate for you to continue to badger her.

17      It's simply wrong, and it's really inappropriate.

18              And don't talk about violation of ethical

19      rules and -- and rules for deposition, you're

20      engaging in it.  She's rep- -- rep- -- she's         10:27:17

21      unrepresentative [sic], and it's enough.

22              You asked her, and she gave an answer on

23      multiple occasions.

24              MR. OLASOV:  I -- I -- I -- I -- I think

25      it's unclear where this stands, John.  I just --    10:27:29
```

Page 59

```
 1              (Simultaneous talking.)

 2              (Interruption in audio/video.)

 3         MR. REICHMAN:  There's nothing unclear.

 4    She just said exactly what she wanted to do.  She

 5    wasn't going to do it.                          10:27:36

 6              And to the extent she was going to do

 7    anything, she was going to consult with someone

 8    else.  She couldn't be clearer.

 9         MR. OLASOV:  And -- and --

10              (Simultaneous talking.)              10:27:43

11              (Interruption in audio/video.)

12         MR. REICHMAN:  Now you're just badgering

13    her.

14         MR. OLASOV:  No, I'm not badgering her.

15         MR. REICHMAN:  Of course you are.         10:27:50

16         MR. OLASOV:  You're badgering me.  So if

17    you don't mind --

18         MR. REICHMAN:  Of course you're badgering

19    her.

20         MR. OLASOV:  Just --                       10:27:55

21    BY MR. OLASOV:

22       Q.   Ms. Martinez, so it's clear that -- where

23    I believe the discussion is between you and me,

24    you've indicated that you want to speak with

25    someone before you produce these documents, if   10:28:00
```

Page 60

```
 1    you're going to produce these documents.  And I've

 2    said that that's fine.

 3            And I've offered to have you produce them

 4    to Veritext so that there's no direct

 5    communication between you and me.  That's fine by      10:28:13

 6    me as well.

 7            And what I would like you to do is to

 8    indicate to Veritext, in whatever period of time

 9    you want to take to do this, whether you're going

10    to provide me, through Veritext, separately with      10:28:26

11    these documents.

12            And the answer will be you will or you

13    won't.  And that's -- that frankly is up to you.

14    I have no intention of serving you with a subpoena

15    to require the production of these documents.         10:28:43

16    It's up to you.  You'll either do it, or you won't

17    do it.

18            Are we clear on that between the two of

19    us?

20        A.   I am clear.                                   10:28:52

21        Q.   Thank you.

22            THE COURT REPORTER:  Counsel, I'm going to

23    request a break, please.  Thank you.

24            MR. OLASOV:  Okay.

25            THE VIDEOGRAPHER:  We are going off the        10:29:02
```

Page 61

```
 1    record.  The time is 10:28.

 2           (Short recess taken.)

 3           THE VIDEOGRAPHER:  We are back on the

 4    record.  The time is 10:36.

 5    BY MR. OLASOV:                                   10:36:20

 6       Q.   Ms. Martinez, only -- only one more

 7    question.  Did -- did you ever see anyone give

 8    Roslyn La Liberte the Jew alert hand signal that

 9    you testified about?

10       A.   No, I did not.                          10:36:39

11       Q.   Did you ever see her give that signal to

12    anyone else?

13       A.   No, I did not.

14       Q.   Okay.

15           MR. OLASOV:  No further questions.        10:36:50

16           MR. REICHMAN:  I do have a -- a -- a small

17    amount of follow-up.

18                 FURTHER EXAMINATION

19    BY MR. REICHMAN:

20       Q.   Ms. Martinez, you testified to sharing a  10:36:57

21    video that you were -- that was seen, as you

22    described it, by many different people on many

23    different platforms.

24           What's the video that you were referring

25    to?                                            10:37:19
```

Page 62

1          A.    It is a video that was, I believe, filmed

2     and produced by the anti-immigrant pro-white

3     supremacy group.  And it's showing Ms. La Liberte

4     engaging in a fistfight with what looks to be a

5     teenager.  I cannot verify the age of the person,        10:37:33

6     but the person looked extremely young.

7          And the video itself says, "This is Roslyn

8     La Liberte fighting with some girls."  They use

9     the word "girls," so I'm -- I took -- I'm assuming

10    that this person that she's hitting and slugging        10:37:53

11    with her arms and fighting at a -- at a protest I

12    believe in Hollywood.

13          The videotape also shows LAPD detaining

14    her.  And I cannot exactly explain what happened,

15    but it looks like they push her -- put her up          10:38:09

16    against a wall, Ms. La Liberte, and they're

17    handcuffing her and separating her from this young

18    girl that she engaged in a fight.  It looked like

19    both she and the girl were -- were engaged in

20    pushing.                                                10:38:25

21          The video clearly shows Roslyn La Liberte

22    using her fists to -- I -- I guess the best way to

23    do it is slug or punch somebody in the face --

24    face and head area.  I don't know exactly the

25    damage or the physical damage that was done to          10:38:40

Page 63

```
 1    this young person.  And it's a very violent video

 2    that -- that was shared very widely.

 3        Q.   Okay.  And --

 4            MR. OLASOV:  Motion to strike.

 5    BY MR. REICHMAN:                                   10:38:53

 6        Q.   -- do you recognize anyone -- do you

 7    recognize anyone else --

 8            MR. OLASOV:  Excuse me.  Excuse me.

 9    Excuse me.  I -- I just wanted to note on the

10    record my motion to strike.                        10:38:59

11    BY MR. REICHMAN:

12        Q.   Can you recognize anyone else in that

13    video?

14        A.   Well, I believe that there were some

15    familiar faces, but I cannot give you any names --  10:39:10

16        Q.   Okay.

17        A.   -- because I haven't seen the video for a

18    while.

19        Q.   Okay.  Okay.

20            And do you recall when it was that you     10:39:24

21    first saw that video?

22        A.   It e- -- it emerged immediately after the

23    Simi Valley meeting.  There was a lot of social

24    media posts on Roslyn La Liberte, and this video

25    showed up immediately.  I saw it on several        10:39:43
```

Page 64

1    different posts.  I believe I saw it on a Face- --

2    multiple Facebook pages and quite possibly

3    Instagram as well.  And it -- a -- a Google search

4    produced it as well.

5        Q.   Okay.                                    10:39:58

6             MR. REICHMAN:  Okay.  I -- I have no

7    further questions.

8                     FURTHER EXAMINATION

9    BY MR. OLASOV:

10       Q.   Ms. Martinez, just -- just one, maybe two.  10:40:05

11            Were you at the event where this video

12   that you saw was photographed?

13       A.   No, I did not attend the event.

14            MR. OLASOV:  Okay.  No further questions.

15            MR. REICHMAN:  Okay.                      10:40:26

16            THE VIDEOGRAPHER:  Off the record?

17            THE COURT REPORTER:  Off the record?

18            MR. REICHMAN:  Thank you very much,

19   Ms. Martinez.  Sorry you had to endure some -- all

20   of the colloquy between counsel, but we can thank    10:40:35

21   you for -- for being here today.

22            THE VIDEOGRAPHER:  We are off the record

23   at 10:40 a.m., and this concludes today's testimony

24   given by Julie Martinez.

25            The total number of media units used was   10:40:48

                                              Page 65

1    one and will be retained by Veritext Legal

2    Solutions.

3              (Proceedings concluded, 10:40 a.m., PDT,

4    on October 4, 2021.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 66

1                                    JURAT

2

3              I, JULIE MARTINEZ, do hereby certify under

4        penalty of perjury that I have read the foregoing

5        transcript of my deposition taken remotely on the

6        4th day of October, 2021; that I have made such

7        corrections as appear noted herein in ink,

8        initialed by me; that my testimony as contained

9        herein, as corrected, is true and correct.

10

11             Dated this _____ day of _____, 2021,

12       at _____.

13

14

15

16

17

18                        _____

                                   JULIE MARTINEZ

19

20

21

22

23

24

25

                                              Page 67

Page 68

```
 1              CERTIFICATE OF REPORTER

 2         I, Hanna Kim, a Certified Shorthand

 3    Reporter, do hereby certify:

 4         That prior to being examined, the witness

 5    in the foregoing proceedings was by me duly sworn

 6    to testify to the truth, the whole truth, and

 7    nothing but the truth;

 8         That said proceedings were taken before me

 9    at the time and place therein set forth and were

10    taken down by me in shorthand and thereafter

11    transcribed into typewriting under my direction and

12    supervision;

13         I further certify that I am neither

14    counsel for, nor related to, any party to said

15    proceedings, not in anywise interested in the

16    outcome thereof.

17         Further, that if the foregoing pertains to

18    the original transcript of a deposition in a

19    federal case, before completion of the proceedings,

20    review of the transcript [ ] was [ X ] was not

21    requested.

22         In witness whereof, I have hereunto

23    subscribed my name:  October 20, 2021.

24

25              Hanna Kim, CLR, CSR No. 13083
```

```
1           ERRATA SHEET FOR THE TRANSCRIPT OF:

2     Case Name: LA LIBERTE vs. JOY REID

3     Dep. Date: 10/04/2021

4      Deponent:  JULIE MARTINEZ

5                 CORRECTIONS:

6     Pg.  Ln.   Now Reads      Should Read    Reason

7     _____     _____     _____ _____

8     _____     _____     _____ _____

9     _____     _____     _____ _____

10    _____     _____     _____ _____

11    _____     _____     _____ _____

12    _____     _____     _____ _____

13    _____     _____     _____ _____

14    _____     _____     _____ _____

15    _____     _____     _____ _____

16    _____     _____     _____ _____

17    _____     _____     _____ _____

18    _____     _____     _____ _____

19                              _____

20                              Signature of Deponent

21    SUBSCRIBED AND SWORN BEFORE ME

22     THIS____DAY OF_____, 2021.

23     _____

24     (Notary Public) MY COMMISSION

25     EXPIRES:_____
```

Page 69

[section - system]

**section**  14:1 19:15
  21:16,24
**security**  55:1
**see**  12:23 13:6,6
  13:11 14:8 15:13
  29:7 45:8 62:7,11
**seeing**  13:5 22:25
**seen**  13:22 23:16
  36:7 62:21 64:17
**selection**  14:21
**self**  43:16
**send**  52:8 53:1
  56:4,6,7
**sending**  55:4
**senior**  19:22
**sent**  47:7,23 48:2,5
**separate**  19:21
**separately**  40:17
  41:25 61:10
**separating**  63:17
**separation**  54:20
**series**  9:4 10:2,2
**serves**  11:24
**serving**  61:14
**sessions**  40:20
**set**  68:9
**shake**  9:23
**shared**  12:23 13:8
  45:21 64:2
**sharing**  62:20
**she'll**  57:25
**sheet**  69:1
**short**  62:2
**shorter**  37:19
**shorthand**  2:18
  68:2,10
**show**  12:13
**showed**  64:25
**showing**  63:3
**shows**  63:13,21

**sic**  51:20 59:21
**signal**  18:11 62:8
  62:11
**signals**  17:21
**signature**  68:24
  69:20
**signs**  17:17
**simi**  11:15,17
  21:12 22:12 25:13
  26:3 28:13 30:11
  30:16,17 31:7,8
  36:16 38:20,22
  40:22 41:12 42:22
  43:3,23 64:23
**similar**  36:8 46:1
**similarly**  9:14
**simply**  59:17
**simultaneous**
  24:12 27:12 29:22
  30:1 48:23 49:24
  50:3,8 56:14,20
  58:4,24 59:3 60:1
  60:10
**sir**  27:18
**sit**  36:25
**sites**  47:10,12
**sitting**  32:15,21,23
  33:1,6,7,11 44:24
**six**  59:11
**slug**  63:23
**slugging**  63:10
**slurs**  16:24 17:10
  17:12 28:14
**small**  14:20 62:16
**smiling**  36:23
**social**  39:6 47:9
  48:2,5 64:23
**solutions**  7:16,19
  66:2
**solve**  40:3

**somebody**  55:21
  63:23
**sorry**  26:23,24
  30:4 48:7 65:19
**sort**  9:22 19:14
  32:18
**sources**  23:16
**south**  4:7
**speak**  14:17 18:20
  27:15 29:10 34:14
  35:3,24 36:1 41:2
  41:13,17 42:11
  43:23 46:5 50:16
  57:2 60:24
**speakers**  14:17
  15:19 35:11
**speaking**  24:12
  27:12 29:22 30:1
  34:13 35:23 36:19
  48:23 49:24 50:3
  50:8
**special**  52:18
**speech**  50:12,13
  50:15
**speeches**  24:25
**spelling**  44:10
**spit**  31:14
**spoke**  22:5 33:23
  33:25 34:18 35:2
  35:11,11 36:17,18
  41:20,24 42:5,23
  43:3,7,18
**spoken**  21:22 35:1
**stance**  16:22
**stand**  11:22 23:11
**standing**  18:19
  36:21
**stands**  59:25
**start**  30:24,25
**started**  20:9 35:25
  39:17

**starts**  14:4
**state**  7:20 10:10
  35:14
**stated**  56:5
**statements**  26:18
  27:3
**states**  1:1 2:1 7:10
**staying**  31:19
**stop**  15:16
**straight**  18:4
**strike**  15:25 24:19
  27:9 29:25 31:23
  34:4 35:16 37:8
  64:4,10
**stuff**  15:10
**suave**  25:19 27:7
**submitted**  51:14
**subpoena**  2:14
  54:5 58:8 61:14
**subpoenaed**  54:3
  58:15,16
**subscribed**  68:22
  69:21
**subsequently**
  46:16
**substance**  46:6
**substitute**  10:25
**suing**  35:14
**sunday**  51:21 52:3
**supervision**  68:12
**supervisor**  14:24
**supremacy**  63:3
**supremist**  16:20
  17:17,21 27:5
**sure**  13:15 24:20
  29:21 45:20
**surely**  52:14
**swear**  8:7
**sworn**  68:5 69:21
**system**  8:23

Veritext Legal Solutions
866 299-5127

[take - videoconference]

| **t** |
|---|

**take** 13:25 37:20
38:24 44:11 61:9
**taken** 2:13 7:8
62:2 67:5 68:8,10
**talk** 55:21 59:18
**talked** 32:13
**talking** 56:14,20
56:24 58:4,24
59:3 60:1,10
**talks** 19:15
**teach** 10:25
**teacher** 38:25
**teenager** 63:5
**tell** 27:23 30:9
44:19 45:7 47:21
**telling** 51:1
**ten** 10:22
**terrible** 26:15
**testified** 8:12 25:4
25:12 50:21 62:9
62:20
**testify** 46:5 68:6
**testifying** 1:16
2:15 7:1 49:11
**testimony** 8:25
39:9 40:10 65:23
67:8
**tha** 52:4
**thank** 8:6,14,16,22
9:2,24 11:2 17:6
25:10 28:5 39:4,4
40:15 42:3,3,17
61:21,23 65:18,20
**theatre** 20:9
**thereof** 68:16
**thick** 34:1
**thing** 9:21 54:6
**things** 16:12,16
26:14 28:25 29:18
34:1,8 35:23 52:3

52:8
**think** 12:2 18:21
43:11 59:24
**third** 34:24,25
35:1
**tho** 47:4
**thought** 26:14
43:16
**thousand** 11:14
**threat** 18:22
**threatened** 15:22
**threatening** 26:16
**three** 18:1,3 48:2,5
**thumb** 18:3,4
**time** 9:10 10:15,22
13:17,20 20:12
23:12 24:14 28:7
28:10 30:5 37:1,4
37:23 38:1 40:17
42:8 44:4,11
45:18,20 47:23
49:1 52:14 54:14
54:23 55:2 56:24
57:2 59:6 61:8
62:1,4 68:9
**times** 12:10 18:25
32:13 35:22
**today** 8:23 9:5
12:2,8 54:4 65:21
**today's** 65:23
**told** 29:19 30:15
30:16,18,18 31:7,9
31:10,15 45:8,11
46:14,15 52:2
**topic** 39:25
**total** 42:4 65:25
**totally** 59:15
**touches** 18:21
**towered** 29:2
**traditional** 31:13

**transcribed** 68:11
**transcript** 67:5
68:18,20 69:1
**transmission**
52:13 53:8,9
**tremendous** 26:13
**true** 67:9
**truth** 68:6,6,7
**try** 9:8 29:3 38:11
**trying** 17:4 46:4,4
49:18,18 50:16
52:18,19 53:8
57:21
**turn** 35:22
**turned** 20:10
**two** 19:21 22:14
23:11 32:15 33:14
45:12 47:1 48:5
61:18 65:10
**type** 15:13 36:17
36:22
**typewriting** 68:11

| **u** |
|---|

**u** 19:16
**ucla** 10:12
**unclear** 59:25 60:3
**uncomfortable**
54:24
**understand** 9:7
38:8,10 52:1,5
58:16
**understood** 41:23
**unit** 7:7
**united** 1:1 2:1 7:10
**units** 65:25
**unrepresentative**
59:21
**unrepresented**
59:10
**urban** 10:12

**use** 9:23 17:20
18:1 63:8
**utilizing** 55:3
**uziel** 14:18 20:22
21:7 23:21 25:18
27:7 35:18 36:7
36:15
**uzziel** 14:18 19:16

| **v** |
|---|

**valley** 11:15,17
12:10 21:12 22:12
25:13 26:3 28:13
30:11,16,17 31:8,8
36:16 38:20,22
40:22 41:12 42:22
43:3,24 64:23
**values** 11:23
**various** 10:18
23:16
**verbatim** 19:16
25:24 34:12 46:5
48:3
**verify** 63:5
**veritext** 7:16,19
13:12 55:6,16,18
56:7 57:15,23
61:4,8,10 66:1
**versus** 7:10
**video** 1:12 2:12
4:13 7:7 27:13
29:23 30:2,20
46:23 47:6,8,15,24
47:25 48:4,24
49:25 50:4,9
56:15,21 58:5,25
59:4 60:2,11
62:21,24 63:1,7,21
64:1,13,17,21,24
65:11
**videoconference**
1:12 2:12 3:1 4:1

Veritext Legal Solutions
866 299-5127

**[videoconference - zoom]**

8:11
**videographer** 7:4
  7:17 8:6,14 13:16
  13:19 28:6,9
  37:22,25 53:5
  61:25 62:3 65:16
  65:22
**videotape** 63:13
**view** 18:19,21
**viewed** 47:11
**violated** 57:11
**violation** 59:18
**violence** 18:22
**violent** 18:12 64:1
**virtual** 1:12 2:12
**virtually** 7:13
**visor** 14:24
**vocally** 9:23
**voice** 29:10
**volunteer** 58:8,17
**vs** 1:6 2:6 69:2

**w**

**wait** 48:6 50:5
**walking** 36:20
**wall** 17:14 26:25
  63:16
**want** 14:12 17:24
  24:11,17,23 30:25
  34:15 37:18 46:7
  48:3 49:9,10,12,19
  50:12,25 53:4,5,7
  55:16 56:13 58:17
  60:24 61:9
**wanted** 60:4 64:9
**wants** 58:12 59:14
**watched** 26:8
**way** 48:15 51:5,17
  55:12 63:22
**ways** 59:11
**we've** 40:7

**wearing** 31:13
**went** 40:11 55:12
**whatsoever** 57:21
**whe** 33:9
**whereof** 68:22
**white** 16:20 17:17
  17:21,25 27:5
  63:2
**widely** 64:2
**willing** 8:24
**witness** 5:3 8:8
  9:19 12:13 13:11
  15:13 16:8 17:8
  18:18,24,24,25
  19:9 20:18 21:1
  21:11 22:24 26:5
  26:11,22 28:18
  29:18 30:25 31:12
  32:11 35:9 36:11
  37:21 39:15 43:11
  43:21 45:16,21,24
  46:7 49:4,10
  50:13 52:6,10,25
  53:15 54:11,15
  56:10 57:8,14
  58:9,23 59:2 68:4
  68:22
**witnessed** 19:22
  23:7 45:22
**wo** 32:21
**woman** 32:23
  33:20 34:18
**women** 32:15,21
**word** 63:9
**words** 33:14 46:2
  46:3,6
**work** 8:24 10:15
  55:13
**worked** 10:17,22
**working** 10:19

**worth** 31:18
**wrong** 42:7 52:14
  59:9,17

**x**

**x** 68:20

**y**

**yale** 55:13
**yeah** 13:7 35:4
  53:14
**year** 6:4 12:11
  44:17,18 46:21
  47:18
**years** 10:22
**yeger** 3:14 8:4,4
  12:15,19,22 13:2,8
  13:12
**yell** 16:12 35:23
**yelled** 26:14 35:21
**york** 1:2 2:2 3:7,7
  7:12
**young** 30:16 31:7
  63:6,17 64:1

**z**

**z** 19:16
**zoom** 7:14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 3



# Racism rampant at California city council meetings on sanctuary policies

May 22, 2018                                          by Stephen Piggott

For the past two months, a campaign orchestrated by national anti-immigrant hate group the Federation for American Immigration Reform (FAIR) and its legal arm the Immigration Reform Law Institute (IRLI) has mobilized a small but vocal group of activists hell-bent on pushing city council members in Orange County, and other parts of southern California, to take a stance against the state's sanctuary policies.

IRLI enlisted support from cities to attach their name to an amicus brief it filed in opposition to California's Values ACT SB54, a law preventing state and local law enforcement agencies from using money or personnel to investigate or detain persons based on their immigration status. Other options for cities to fight back include filing their own suits, passing an ordinance to not comply with SB54. FAIR has offered "advice and legal assistance to all jurisdictions," according to a report by the *Los Angeles Times*. FAIR has also been busy emailing city council members and quietly promising them that their cities will be represented free of charge if they decide to file lawsuits against the state.

Carlos Perea of Resilience Orange County has been monitoring the anti-sanctuary campaign closely. "It is unacceptable that local elected officials are working with FAIR to launch a hate campaign that scapegoats immigrants for a political agenda that serves one purpose, to further polarize and divide our communities," Perea told Hatewatch.  "The public needs to know which elected officials are working with hate groups and they should be held accountable."

Perea is right. FAIR has an almost four decades-old track record of racism, starting with its founder, white nationalist John Tanton who wrote in 1993, "I've come to the point of view that for European-American society and culture to persist requires a European-American majority, and a clear one at that." FAIR received over $1 million in funding from the Pioneer Fund, one of the most influential hate groups of the 20th century and a group founded with an explicit eugenicist mission. FAIR's leadership has routinely espoused racist rhetoric. Its longtime president Dan Stein once warned that immigrants are "getting into competitive breeding."

Despite FAIR's toxicity, city councils across Southern California have taken FAIR up on their offer of pro bono help. IRLI hailed the plethora of cities voting against SB54 as a "firestorm of opposition." Over 25 cities to date have voted in opposition and the goal of anti-immigrant groups is to quadruple this number by the end of the summer. FAIR is coy about how deep its involvement is in this effort, attempting to portray it as a grassroots uprising. But emails obtained by the American Civil Liberties Union of California via Freedom of Information Act requests show that FAIR's national field director, Susan Tully, has been busy emailing city council officials and offering pro bono assistance. Tully has also been meeting with city council members across Southern California.

FAIR is also quiet on the fact that its orchestrated campaign has whipped a small band of anti-sanctuary activists from California and elsewhere into a frenzy, with this group traveling from city to city on a nightly basis and stoking racial tensions at city council meetings. Hatewatch has spoken to multiple meeting attendees and reviewed videos of the recent city council meetings which reveal blatant examples of hate speech and threatening behavior stemming from this small band of anti-sanctuary activists.  "Anti-sanctuary people showing at city council meetings in OC have become more aggressive and they feel more emboldened to launch racially charged slurs. They have become more aggressive that at times they have physically confronted young people attending city council meetings," said Perea.

The activists do not represent one group, ideology or ethnicity, but are rather a longtime anti-immigrant activists, newer activists inspired by Donald Trump, more hardcore elements including some who have espoused holocaust denial and white nationalist tropes, along with the leader of an anti-LGBT hate group. Coupled with anti-immigrant animus, anti-LGBT and antisemitic rhetoric has been a mainstay at the city council meetings over the past two months.

Reports have also <u>noted</u> that anti-sanctuary speakers have depicted undocumented immigrants as criminals who harbor disease. In one video reviewed by Hatewatch, Mike McGetrick of the anti-immigrant group <u>We the People Rising</u> can be seen confronting a younger attendee outside the meeting in Los Alamitos screaming, "I want you out of my country you illegal alien creep, you weirdo!"



<u>According</u> to the *Daily Bulletin*, antisemitic remarks were directed toward rabbis at least three of the meetings. Rabbi Stephen Einstein who is a supporter of the sanctuary law, was told to "get circumcised," at one meeting. "Those are telling comments. Many people who have issues with current immigration policy also hold virulently racist views toward other groups," Einstein told the *Bulletin*. In a <u>video</u> of the Huntington Beach meeting on April 2, "<u>Harim Uziel</u>," who runs the "Hardcore American Patriot" Facebook page can be heard shouting about circumcision at Einstein during his public remarks.

At a more recent Huntington Beach meeting, anti-sanctuary activist Gracey Van Der Mark who has a <u>history</u> of making antisemitic comments on her Facebook page addressed the city council. Van Der Mark's YouTube account even had a playlist titled, "Holocaust Hoax?" The playlist included a video from rabidly anti-LGBT pastor <u>Steven Anderson</u> titled, "The Holocaust Hoax Exposed." Van Der Mark, who has since deleted the playlist, formerly served on a number of government committees in Huntington Beach but was <u>removed</u> from them in early May due to her racist social media posts and <u>videos</u>.

Blanket attacks on people of color and others have also been a hallmark of the city council meetings. Genevieve Peters, a leader in the anti-sanctuary effort, has a number of videos on her Facebook account from the various meetings she has attended. In a video published on April 4 at the Escondido meeting, Peters can be heard yelling, "call ICE" at Latino speakers. At the meeting in Westminster on April 11, Peters repeatedly claims that an LGBT activist who addressed the city council has a "mental illness." Peters routinely attacks transgender people on her Facebook account saying they have a "mental disorder" and need "psychotherapy." Also at the Westminster meeting, she berates a man with shouts of "Mental illness!" after he mentioned he has husband. At the same meeting, Peters repeatedly yelled "Go back to the hellhole you came from," to a woman who was at the meeting with her two small children.



Joining Peters at many of the meetings, including Westminster, was Arthur Schaper. Schaper is the head of the California chapter of the anti-LGBT group Mass Resistance, a group whose founder falsely claimed that no homosexuals died in the Holocaust and that the pink triangle the Nazis forced imprisoned gays to wear actually signified Catholic priests. Schaper has a history of disruptive activity at city council meetings and was arrested at a meeting in Huntington Beach in 2017.

Local residents who spoke to Hatewatch are appalled by the ugly manifestation of the anti-sanctuary campaign in their cities. "In my observation, the racially charged language came from a single group of outsiders, that organized and went from city council to city council.  I did

Case 1:18-cv-05398-DLI-JRC   Document 81-4   Filed 09/24/24   Page 380 of 759 PageID #: 5936

not hear the language coming from residents of our city," said resident Trina Mangione.

Jody Kyle has attended multiple city council meetings in Orange County and blames elected officials for accepting FAIR's advances. "They are trying to make their own political fortunes and careers by capitalizing on human misery. The local elected officials insist on discussing SB54 in terms of 'state over-reach' and 'giving local law enforcement the freedom to act.'" Says Kyle. "I believe SB54 is a way to talk about Latinos, and Mexicans, and Arabs and Muslims without actually saying the words."

With multiple city council meetings scheduled to take place in the coming weeks, FAIR and its band of anti-sanctuary activists shows no signs of slowing down.

Photo credit: Jeff Gritchen/The Orange County Register via AP Images

*Comments, suggestions or tips? Send them to [HWeditor@splcenter.org](mailto:HWeditor@splcenter.org) and follow us on [Twitter @Hatewatch](https://twitter.com/Hatewatch).*



Get the latest investigative reporting from Hatewatch

| Your Email Address | SUBSCRIBE |

# EXHIBIT 4

My experience at the city council meeting...

about immigration...

in a Republican stronghold...

during the Trump era

It was 2018 in the middle of the summer. I only finished my first year of high school a month prior and had nothing much to do on a Monday in the middle of July. My mom had heard about a city council meeting that intended to address a recent controversy over immigration within California. A few hours later I was in the car heading towards the city chambers equipped with a bag of jolly ranchers and my laptop. My mom and I arrived around 3:30, a whole three hours before the meeting even began so we could get seats inside in case the meeting would be absolutely packed. We were the first ones there by a solid 20-30 minutes. The extra time also gave the chance to do some research beforehand on the main topic of the upcoming meeting, Senate Bill 54.

SB54 was fairly simple for something cause so much contempt. The sanctuary state law, as it was commonly referred to, prevented local and state law enforcement from assisting federal immigration agencies. The bill was passed in 2017, but a few cities led by Huntington Beach were suing the state saying it was unconstitutional. The meeting that evening was meant to determine whether Simi Valley would join in with Huntington Beach to assist with their lawsuit.

I myself was there to make my case to protect SB54 and was determined to try to present my case using as much data as I could find. I did not walk in with the intent to provoke anything but to only give some information and to say to myself "I at least tried". When my mom and I entered the city chambers we were told the order of the public opinions would be determined by who got there first once all the other items on the agenda were settled. A small wave of relief fell over me. I figured I could give the data I found refute some counterarguments I guessed would pop up later and would get to zone out until the meeting was over. I figured things could get a

EXHIBIT  10
WIT: J.LUEVANOS
DATE: 8-10-2021
Lynn Gearhart CSR 9466

little tense but would still be an overall calm ordeal. I figured a bag of jolly ranchers would last until I got to speak. I was wrong.

As more and more people started to enter the chamber and the time inched closer to 6:30, the room became very charged very quickly. Those who were pro-SB54 decided to dress in white and those who were against SB54 wore MAGA hats. As signs rose so did voices as chants grew louder and more off rhythm as the seats were filled and walls were lined. Amidst the growing chaos I decided to open google slides and make my own little sign. It read "Pro-SB54" and was held up not very high. It was the lone Pro-SB54 signs among a sea of cartoony letters saying dicey things at best and xenophobic chants at worst with multiple "love it or leave it" signs polluting the airspace. A lanky man who appeared to be in his fifties was parading around the front of the room with one of these signs before he caught a glimpse of my laptop. He walked over and looked briefly at me with face that implied that he was thinking "stupid kid" before returning back to his march. I lowered my laptop, and I changed my presentation so that all the letters were rainbow and I could flicker between a slide the said "Pro-" and another that said "SB54". The man walked past me again so I showcased my updated "sign" and he walked over to me and said in his attempt at a menacing tone "You're going to the first one on the buses". My mom who was sitting next to me had a stare of death and the man scuttled away as if he saw a ghost. Out of all the things I could feel after that moment the best I can describe it as I remember is "ok boomer" and a little chuckle at the end.

The meeting started and the room grew quiet as all the other items on the agenda were taken first. A very uncomfortable looking business man left the premises after talking about energy with a face that said "Nope". That night there were over 100 people who submitted speaker cards, so the time was reduced to a minute and a half per person. I was one of the first people to submit a speaking card so I was getting ready to speak and then I did not. Person after person spoke before a twenty minute recess was called. It was 10:00 at night, I was lied to by the person selecting the speaker cards, I was down to five jolly ranchers, my legs were numb from sitting, and the yelling and jeering from the people in the MAGA hats were making me go half deaf. Despite these things I still had some energy left in me because no one really supported their arguments with raw data and numbers but rather with personal anecdotes, Bible verses, or

conspiracy theories. After listening to many arguments against SB54 ranging from fear mongering to illuminati, the question arose about how one of those MAGA hat people would respond to my argument and any counterclaims to theirs. I found a MAGA hat person who appeared to be more restrained than the others during the sequence of speakers, a woman who appeared to be in her fifties. I asked why she was against SB54 and she began to rant very off topic very quickly about her parents who she claimed to be prisoners at one time somewhere in Eurasia. I then asked what that had to do with SB54. She then repeated herself in a more mocking tone, as if she thought I had lost one too many brain cells. I then asked if I could share my take on SB54. She said yes so I began giving data on the good sanctuary cities get when an immigrant population feels and is safer. She proceeded to interrupt and begin giving her argument again as if she was explaining to a toddler. After she spoke, I would continue with my points until I got interrupted again. This process repeated four times and she got progressively louder each time until she had to hold her throat from screaming so loud. A crowd began to form around and an officer who was in the room intervened and split the crowd and the discussion if you could even call it one. There is a picture of this happening if you type "Simi Valley city council meeting" into Google. This woman sued a news personnel for libel, lost, and then got blasted on social media for punching a young protester. The entire time my mom was in the bathroom and learned about the whole debacle shortly after.

The recess was eventually over and I finally got to speak and give my points at around 11:20 and by then the city council members seemed to be uninterested. After all the speaker cards were called, the four present city council members voted unanimously to join the lawsuit despite knowing that it was a losing battle. After the meeting all the MAGA hat people joined for a group photo like they won their little league game. I later learned that a considerable portion of the anti-SB54 people were not from Simi Valley but were part of an organization that goes around to different city council meetings to cause trouble and misrepresent the population.

That meeting left me feeling hungry out of all things because I did not eat the entire time besides a few too many jolly ranchers. Looking back at that night, I was still primarily feeling hunger but I now realize that I felt fulfilled that I tried to make difference.

HIGHLY CONFIDENTIAL                                                                    IR_0000410

# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3

4    _____

                                   )

5    ROSLYN LA LIBERTE,            )

                                   )

6            Plaintiff,            ) Case No.

                                   ) 1:18-cv-05398

7        vs.                       ) DLI-VMS

                                   )

8    JOY REID,                     )

                                   )

9            Defendant.            )

     _____

10

11       REMOTE VIDEO DEPOSITION OF LOUIS LA LIBERTE

12            Thursday, February 24, 2022

13                 Volume I

14

15

16

17

18

19

20

21

22   Reported Remotely and Stenographically by:

23   Gail E. Kennamer, CSR 4583, CCRR

24   Job No. 5099039

25   Pages 1 - 139

                                        Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3

4      _____

                                       )
5      ROSLYN LA LIBERTE,              )
                                       )
6               Plaintiff,             ) Case No.
                                       ) 1:18-cv-05398
7          vs.                         ) DLI-VMS
                                       )
8      JOY REID,                       )
                                       )
9               Defendant.             )
       _____

10

11

12          Remote Video Deposition of Louis La Liberte,

13     Volume I, taken on behalf of Defendant, beginning at

14     9:06 a.m. and ending at 2:46 p.m.; Thursday,

15     February 24, 2022, before Gail E. Kennamer,

16     CSR 4583, CCRR.

17

18

19

20

21

22

23

24

25

                                              Page  2

```
 1        REMOTE APPEARANCES:

 2

 3     For Plaintiff:

 4

 5          LAW OFFICE OF RONALD P. MYSLIWIEC

 6          BY: RONALD P. MYSLIWIEC, ESQ.

 7          530 Third Street

 8          Brooklyn, New York 11215

 9          rpm@rpmlawny.com

10

11

12     For Defendant:

13

14          GIBSON DUNN & CRUTCHER LLP

15          BY: MARISSA MOSHELL, ESQ.

16          333 South Grand Avenue, 47th Floor

17          Los Angeles, California 90071

18          mmoshell@gibsondunn.com

19

20          DAVID YEGER LAW PLLC

21          BY: DAVID YEGER, ESQ.

22          420 Lexington Avenue, Suite 300

23          New York, New York 10170

24          david@yegeresq.com

25     (Continued on following page.)
```

Page 3

```
 1      REMOTE APPEARANCES (Continued):
 2      For Defendant:
 3

 4           JOHN REICHMAN LAW LLC
 5           BY: JOHN REICHMAN, ESQ.
 6           475 Seventh Avenue
 7           New York, New York 10123
 8           john@johnreichmanlaw.com
 9

10

11

12      For NBC Universal:
13

14           NBC UNIVERSAL
15           BY: JUSTINE BEYDA, ESQ.
16           100 Universal City Plaza Building 1280, 9th Floor
17           Universal City, California 91608
18           justine.beyda.@nbcuni.com
19

20

21      Also Remotely Present:
22           Jeffrey W. Nichols, Videographer
23

24

25
```

Page  4

```
 1                        INDEX

 2    WITNESS                        EXAMINATION

 3    LOUIS LA LIBERTE

 4    Volume I

 5

 6                      BY MR. REICHMAN        10, 131

 7                      BY MR. MYSLIWIEC       130

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 5
```

```
 1                        EXHIBITS

 2      NUMBER                                      PAGE

 3      Exhibit 111    Combined Text messages        43

 4

 5      Exhibit 112    Profit & Loss Statements      47

 6                     for R. C. Construction

 7                     2016 to 2020 Bates

 8                     PLAINTIFF 09966 (15 pages)

 9

10      Exhibit 113    Balance Sheets for R.C.        57

11                     Construction 2016 to 2020

12                     Bates PLAINTIFF 09964

13                     (10 pages)

14

15      Exhibit 114    Sales by Customer Detail       97

16                     Bates PLAINTIFF 00656

17                     (5 pages)

18

19      Exhibit 115    Profit & Loss by Job          108

20                     July 16, 2014 through

21                     July 16, 2015 Bates

22                     PLAINTIFF 05243 (2 pages)

23

24

25      (Continued on following page.)


                                        Page 6
```

```
 1                          EXHIBITS

 2        NUMBER                                     PAGE

 3        Exhibit 116    Expert Report of            116

 4                       Burt P. Flickinger

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  7
```

```
1              DOCUMENTS PREVIOUSLY MARKED (ATTACHED HERETO)

2                    EXHIBIT                    PAGE

3                      49                        82

4                      57                        69

5                      58                        74

6                      59                        76

7                      60                        78

8                      61                        81

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  8

```
 1                  Thursday, February 24, 2022

 2                       9:06 a.m.

 3

 4          VIDEO OPERATOR:  Good morning.  We are going on

 5     the record at 9:06 a.m. on February 24th, 2022.            09:06

 6          This is Media Unit 1 of the video-recorded deposition

 7     of Louis La Liberte taken by counsel for defendants in the

 8     matter of Roslyn La Liberte versus Joy Reid filed in the

 9     United States District Court for the Eastern District of

10     New York.  The case number is one: 18-cv-05398-DLI-VMS.     09:06

11          This deposition is being held virtually via Zoom.  My

12     name is Jeff Nichols from the firm Veritext Legal

13     Solutions, and I am the videographer.  The court reporter

14     is Gail Kennamer from the firm Veritext Legal Solutions.

15          Counsel will now please state their appearances and   09:07

16     affiliations for the record.

17              MR. MYSLIWIEC:  This is Ron Mysliwiec.  I'm one

18     of the lawyers for the plaintiffs, Roslyn La Liberte, and

19     I am also counsel to Louis La Liberte, the witness here

20     today.                                                      09:07

21              MR. REICHMAN:  Good afternoon.  My name is John

22     Reichman from John Reichman Law.  I'm one of the attorneys

23     for defendant, Joy Reid.

24              MS. MULLIGAN:  My name is Marissa Mulligan from

25     Gibson, Dunn.  I'm also one of the attorneys for Joy Reid.  09:07
```

Page 9

```
 1              MS. BEYDA:  Justine Beyda, In-house counsel        09:07

 2      Universal also for Defendant Reid.

 3              MR. YEGER:  David Yeger, also for Defendant

 4      Reid.

 5              VIDEO OPERATOR:  Thank you.                         09:08

 6          Will the court reporter please swear in the witness.

 7

 8                      LOUIS LA LIBERTE,

 9      a witness herein, having been administered an oath, was

10      examined, and testified as follows:                        09:08

11

12              THE REPORTER:  Thank you.

13          Counsel may proceed.

14

15                      -EXAMINATION-                               09:08

16

17       BY MR. REICHMAN:

18          Q.   Thank you.

19          Good morning, Mr. La Liberte.  As you heard, my name

20      is John Reichman.  I'm one of Joy Reid's attorneys.  I am  09:08

21      going to be asking you a series of questions today

22      regarding the lawsuit.

23          A.   Can you speak up louder, please.

24          Q.   I'm speaking fairly loud.  I don't know if I can

25      speak much louder.  I think the problem might be on your   09:08
```

Page 10

```
 1      end.                                                    09:08

 2          As I have said, my name is John Reichman.  I'm one of

 3      the attorneys for the defendant, Joy Reid.  I am going to

 4      be asking you a series of questions today regarding the

 5      lawsuit that your wife, Roslyn La Liberte, has brought   09:09

 6      against Ms. Reid.

 7          If you do not understand any one of my questions

 8      please let me know.  I will then attempt to rephrase it.

 9      If you understand the question -- if you answer the

10      question, I will assume, and presumably anybody who reads 09:09

11      this transcript or sees this videotape will presume that

12      you understood the question.

13          (Reporter clarification.)

14          Q.  Are we clear so far?  Can you answer that

15      question, Mr. La Liberte?                               09:09

16            MR. MYSLIWIEC:  Obviously, one of the other

17      parties couldn't really hear you either, so there is a

18      little trouble, but go ahead.

19       BY MR. REICHMAN:

20          Q.  I need an answer to my question.  Did you hear  09:09

21      high question.  Are we clear so far?

22          A.  I heard part of it.

23          Q.  Okay.  Well, this is not going to work.  You

24      need to have a different kind of system that allows you to

25      hear my questions.                                      09:10
```

Page 11

```
 1                    MR. MYSLIWIEC:  One of the other participants,    09:10

 2      not a lawyer, said they had trouble picking up your

 3      question too, so if you could repeat it.

 4                    VIDEO OPERATOR:  Would you like to go off the

 5      record, and we can have them call in?                        09:10

 6                    MR. MYSLIWIEC:  Have who call in?

 7                    VIDEO OPERATOR:  You.  That would be much better

 8      audio, I believe.

 9                    MR. MYSLIWIEC:  The audio is not great.  Is

10      everybody else hearing Reichman?                             09:10

11                    VIDEO OPERATOR:  I am hearing him.  He's a

12      little muffled, but it's coming through loudly.

13           Let's try calling in everybody if there is no

14      objections.

15                    MR. MYSLIWIEC:  They are saying Reichman is      09:10

16      muffled.

17                    VIDEO OPERATOR:  On your end you will be able to

18      hear him better.

19                    MR. MYSLIWIEC:  All right.

20                    THE REPORTER:  We should go off the record for    09:11

21      technical issues.

22           Can we go off the record, Counsel?

23                    VIDEO OPERATOR:  We're going off the record.

24           The time is 9:11.

25                    (Technical difficulties.)                        09:11
```

Page 12

```
 1            (A recess is taken.)                          09:11

 2              VIDEO OPERATOR:  We are back on the record.

 3         The time is 9:17.

 4      BY MR. REICHMAN:

 5         Q.   Let me try it again.  Good morning,         09:18

 6    Mr. La Liberte.  Can you hear me?

 7         A.   Yeah, I can hear you, but you have a slight

 8    echo.

 9              MR. MYSLIWIEC:  Yeah.  I'm having difficulty.

10      BY MR. REICHMAN:                                    09:18

11         Q.   I'm one of the lawyers for defendant, Joy Reid.

12    I am going to be asking you a series of questions today

13    regarding the lawsuit that your wife, Roslyn La Liberte,

14    has brought against Ms. Reid.

15         If you do not understand any one of my questions,  09:18

16    please let me know.  I will then attempt to rephrase it.

17    If you answer the question, I will assume, and presumably

18    anyone reading this transcript will presume, that you have

19    understood the question.

20         Are we clear so far?                             09:19

21         A.   Yes.

22         Q.   I'm also going to refer to R.C. Design

23    Construction Associates as R.C.

24         A.   I didn't hear that.  Didn't hear that.

25              MR. MYSLIWIEC:  Didn't come through clearly.  09:19
```

Page 13

```
 1        BY MR. REICHMAN:                                    09:19

 2          Q.   Okay.  I'm going to refer to R.C. Design

 3     Construction Associates as R.C.

 4          Is that clear?

 5          A.   Yes.                                         09:19

 6          Q.   Where are you currently located?

 7          A.   Say again.

 8          Q.   Where are you currently located?

 9               MR. MYSLIWIEC:  Object to the form of the

10     question.  Do you mean him physically now this minute or  09:19

11     do you mean R.C. Associates?  Because you brought them

12     into play; so when you say "you," what do you mean?

13        BY MR. REICHMAN:

14          Q.   "You" means Mr. La Liberte.  Where are you

15     currently located?                                   09:20

16          A.   In my home.

17          Q.   Okay.  Where is that?

18          A.   Woodland Hills, California.

19          Q.   What address?

20          A.   24548 Eilat Street.                         09:20

21          Q.   Is the room that you are in the home office of

22     R.C.?

23          A.   Yes.

24          Q.   Is there anyone with you?

25          A.   Yes.                                        09:20
```

                                                        Page 14

```
 1          Q.   Who?                                          09:20

 2          A.   Ron.

 3          Q.   Is Mrs. La Liberte with you?

 4          A.   No.

 5          Q.   Do you have any documents in front of you?    09:20

 6          A.   Say again.

 7          Q.   Do you have any documents in front of you?

 8          A.   No.

 9               MR. MYSLIWIEC:  What did he say?

10               THE WITNESS:  Do I have a document in front of 09:21

11     me.

12               MR. MYSLIWIEC:  Okay.

13      BY MR. REICHMAN:

14          Q.   Do you suffer from any medical condition or

15     other condition that would prevent you from providing fair 09:21

16     and accurate answers to the questions I am going to ask

17     you today?

18          A.   I don't believe so, no.

19          Q.   What did you do to prepare for your deposition

20     today?                                                  09:21

21          A.   Spoke with Ron.

22          Q.   When did you speak with him?

23          A.   Say again.

24          Q.   When did you speak with him?

25          A.   I spoke to him yesterday and the day before.  09:21
```

Page 15

```
 1              Q.    Okay.  How many hours did you spend speaking      09:21

 2      with him?

 3              A.    It varied from day to day.

 4              Q.    How many hours did you spend each day?

 5              A.    Approximately, two to three.                      09:22

 6              Q.    Did you review any documents in preparation for

 7      your deposition?

 8              A.    Review any documents?  I did view the document

 9      that we installed the security system in the house.

10              Q.    Okay.  Is that the only document that you         09:22

11      reviewed?

12              A.    Yes.

13              Q.    Okay.  Have you ever read any deposition

14      transcripts in this case?

15              A.    No.                                               09:22

16              Q.    Are you a high school graduate?

17              A.    I'm sorry?

18              Q.    Are you a high school graduate?

19              A.    Yes.

20              Q.    Have you had any post high school education?      09:23

21              A.    No.

22              Q.    Can you please tell me what your work history,

23      full-time work history, has been since your graduation

24      from high school, starting with the earliest job that you

25      had going to the present?                                      09:23
```

Page 16

1          A.   I only heard part of that question.          09:23

2          Q.   You didn't understand the question?

3          A.   Yes.  Please repeat it.

4          Q.   Okay.  I'd like you to tell me what your work

5      history has been, starting from your first job after high   09:23

6      school to your current job.

7          A.   Well, let's see.

8          I was a busboy.

9          I graduated high school.

10         And went to work for Fluor Corporation.          09:23

11         And I got drafted.

12         And I came out.  Went back to Fluor.

13         Quit.

14         Went to work as a welder.

15         Then I joined the union.  Became a carpenter.          09:24

16         I got a contractor's license in June of 1977, and I

17     have been a general contractor since with one exception I

18     had a period where I worked for Carl's Jr. in the

19     construction position.

20         Q.   When was that?          09:24

21         A.   That was from 19- -- Approximately, 1984 to

22     1990, 1991.

23         Q.   Okay.  Do you have any children or stepchildren?

24         A.   Yes.

25         Q.   Who are they and what are their ages?          09:24

                                                   Page 17

```
1              A.    That's a good question.                    09:24

2        Michael is 50.

3        Deneen is 47.

4        Robbie is 41.

5        Doug is my stepchild.  He is 40.                  09:25

6        And then I have Savannah who is 26.

7              Q.    Do you have any grandchildren?

8              A.    Yes.

9              Q.    Who are they and what are their ages?

10             A.    Leo is 18.                             09:25

11       Alejandro is 16.

12       Christian is 17.

13       Nazzie is three.

14       And then Douglas is my stepchild.  His son is four

15  and two.                                               09:25

16             Q.    How long have you been married to

17  Mrs. La Liberte?

18             A.    Thirty-five years.

19             Q.    How old are you?

20             A.    Seventy-four.                          09:26

21             Q.    How old is Mrs. La Liberte?

22             A.    She's 67.

23             Q.    Are you receiving Social Security?

24             A.    Yes.

25             Q.    When did you start receiving Social Security?    09:26
```

                                                      Page 18

```
 1              A.    When I was 67.                          09:26

 2              Q.    Okay.  Is Mrs. La Liberte receiving Social

 3        Security?

 4              A.    Yes.

 5              Q.    When did she start receiving Social Security?    09:26

 6              A.    I believe it was last year.

 7              Q.    Do you have any plans to retire?

 8              A.    Maybe.  I'm not sure about that one yet.  I like

 9        working.

10              Q.    Do you know whether Mrs. La Liberte has any    09:27

11        plans to retire?

12              A.    She likes working too.

13              Q.    Okay.  But that doesn't answer my question.

14              Does she have any plans to retire?

15              A.    Not at the moment.                      09:27

16              Q.    Okay.  Do you have an ownership interest in

17        R.C.?

18              A.    Yes.

19              Q.    What's your ownership interest?

20              A.    30 percent.                             09:28

21              Q.    When did you acquire that interest?

22              A.    19- -- 1990 -- No.  19- -- 1999, I believe it

23        was.

24              Q.    Now, have you and/or your wife ever considered

25        selling R.C.?                                       09:28
```

Page 19

```
 1          A.   No.                                      09:28

 2          Q.   Have you ever received any offers to purchase

 3     R.C.?

 4          A.   No.

 5          Q.   What is your current position at R.C.?      09:28

 6          A.   Vice president of construction.

 7          Q.   How long have you had that role?

 8          A.   I'm sorry?

 9          Q.   How long have you been vice president of

10     construction?                                       09:29

11          A.   Ever since we started business together.

12          Q.   When was that?

13          A.   That was probably 1990 -- 1991.

14          Q.   How did it come about that you acquired a

15     30 percent interest in R.C. in 1999?                09:29

16          A.   We incorporated.

17          Q.   What was the business before that?

18          A.   What was that?

19          Q.   What form did the business take before that?

20          A.   It was R.C. Associates, not R.C. Design     09:29

21     Construction.

22          Q.   Does R.C. Associates still exist?

23          A.   Yes.

24          Q.   Does it -- Does it perform any construction

25     work?                                               09:30
```

Page 20

1          A.    We still do R.C. Associates as a dba.         09:30

2          Q.    Okay.  Have you and Mrs. La Liberte always

3    worked closely together at R.C.?

4          A.    Yes.

5          Q.    Do you consider yourself partners?            09:30

6          A.    Of course.

7          Q.    Is there anything of importance that has ever

8    happened that has affected R.C. that Mrs. La Liberte would

9    not share with you?

10         A.    No.                                           09:30

11         Q.    Is there anything that you would not share with

12   her that is of any importance with respect to R.C.?

13         A.    I didn't get that question.

14         Q.    Okay.

15         A.    I don't understand.                           09:31

16         Q.    I will rephrase it.

17         Is there anything of importance at R.C. that you did

18   not ever share with your wife, Mrs. La Liberte?

19         A.    No.

20         Q.    What are your duties as vice president of      09:31

21   construction?

22         A.    I didn't get the beginning of that.

23         Q.    What are your duties as vice president of

24   construction?

25         A.    Oh, I do most of the bidding.                 09:31

                                                    Page 21

1           And I make sure the projects run smoothly and finish    09:31

2      on time.

3           Q.    Has your role ever changed since 1999?

4           A.    Have we what?

5           Q.    Has your duties or roles at R.C. ever changed    09:32

6      since 1999?

7           A.    No.

8           Q.    Okay.  Can you describe what you do with respect

9      to the bidding on R.C. projects?

10          A.    Contact the subcontractors and request proposals    09:32

11     for their specific area.

12          Q.    Okay.  Do you also communicate bids to potential

13     clients?

14          A.    When I put the package together, yes.

15          Q.    Okay.  How does R.C. learn about potential    09:33

16     projects to bid on?

17          A.    Usually we get an invitation to bid via email.

18          Q.    Has that always been the case since 1999?

19          A.    No.  Sometimes it's face to face.

20          Q.    What do you mean by face to face?    09:33

21          A.    One person talking to another and requesting a

22     proposal.

23          Q.    Okay.  Have you -- have you ever tried to

24     solicit bids from potential customers?

25          A.    I don't understand that.    09:33

                                                              Page 22

1          Q.   Okay.  You mentioned before that you would get     09:33

2     email invitations to bid, and then you also testified that

3     you had face-to-face meetings.

4          Would you ever attempt to solicit any work in any

5     bids?                                                       09:34

6          A.   "Solicit," I don't understand what you mean.

7          Q.   Would you ever try to contact potential clients

8     or customers about new work?

9          A.   You mean requesting new projects from them?

10         Q.   Yes.                                              09:34

11         A.   Of course.

12         Q.   When -- When, for example, was the last time

13    that you did that?

14              MR. MYSLIWIEC:  Objection to the form of the

15    question unless we define who "you" is.  If you mean        09:34

16    Mr. La Liberte personally or if you mean R.C., when you

17    say "you," I don't know whether it's singular or plural.

18     BY MR. REICHMAN:

19         Q.   Okay.  Let's start with just you personally.

20         A.   Repeat the question, please.                      09:35

21         Q.   When is the last time that you personally

22    solicited any potential customer for a new project?

23         A.   Yesterday.

24         Q.   Okay.  Who was that customer?

25         A.   It was McDonalds.                                 09:35

                                                      Page 23

1           Q.   Okay.  And was it a particular franchisee of      09:35

2      McDonalds or McDonalds corporate?

3           A.   McDonalds.

4           Q.   McDonalds corporate?

5           A.   Corporate, yes.                                    09:35

6           Q.   What was the project that you -- that you were

7      soliciting yesterday?

8           A.   Coming out to bid.

9           Q.   I'm sorry.  I didn't catch that.

10          A.   No specific project.  I was just requesting what  09:36

11     was coming out to bid.

12          Q.   Okay.  When is the last time that you or R.C.

13     put in a bid on any project?

14          A.   Put in what?

15          Q.   When is the last time you individually or R.C.   09:36

16     bidded on a specific project?

17          A.   We just got a contract on a remodel in Anaheim,

18     California recently.

19          Q.   Okay.  Who is the client?

20          A.   McDonalds corporate and also the franchisee.     09:36

21          Q.   Okay.  Who is the franchisee?

22          A.   I'm not allowed to give that up.

23          Q.   Why is that?

24          A.   Because the franchisee wouldn't appreciate it,

25     and he's been a good customer for a lot of years.          09:37

                                                        Page 24

1            Q.    I'm sorry.  That's not a reason not to answer my   09:37

2       question now.  I will ask again who it is.

3            A.    I'm not going to tell you.

4            MR. REICHMAN:  Well, that's a problem, Ron.  I

5       suggest you talk to your client so that I get an answer to   09:37

6       that question.

7            MR. MYSLIWIEC:  How do we do this?  Can we do a

8       breakout room?  What do we do?

9            MR. REICHMAN:  That's fine.  We can do that.

10      Come back in three minutes?                                   09:37

11           MR. MYSLIWIEC:    Yeah.   Okay.

12           VIDEO OPERATOR:  We are going off the record.

13           The time is 9:37.

14           (A recess is taken.)

15           VIDEO OPERATOR:  We are back on the record.          09:43

16           The time is 9:43.

17           THE WITNESS:  Client's name is Neal Ruby.

18        BY MR. REICHMAN:

19           Q.    How many different projects have you done for

20      Mr. Ruby over the course of time?                           09:44

21           A.    There are too many to count.  He's a very good

22      customer of ours.

23           Q.    When was the first time that you did --

24      Withdrawn.

25           How many stores does Mr. Ruby own?                     09:44

Page 25

```
 1             A.   He owns 16 stores.                          09:44

 2             Q.   When did you first start doing work for

 3    Mr. Ruby?

 4             A.   Probably around the mid-'90s.  Can't be

 5    100 percent sure of that though.                          09:45

 6             Q.   That's fine.  I appreciate that.

 7             During -- How do you spell Ruby?

 8             A.   R-u-b-y.

 9             Q.   Did Mr. Ruby ever decline to do business with

10    R.C. because of the events that took place during the week 09:45

11    of June 25, 2018 when beginning with the Simi Valley

12    council meeting?

13             A.   No, he did not.

14             Q.   Since 2015, has Mr. Ruby been R.C.'s largest

15    customer?                                                 09:46

16             A.   I'm sorry.  Has he been what?

17             Q.   R.C.'s largest customer.

18             A.   I don't understand.

19             Yes, he has.

20             Q.   Do you share with Mrs. La Liberte and does    09:46

21    Mrs. La Liberte share with you any business opportunities

22    that come R.C.'s way?

23             A.   Yes.

24             Q.   Do you receive a --

25             (Reporter clarification.)                        09:47
```

Page 26

```
 1              Q.   Do you receive a salary from R.C.?              09:47

 2              A.   Yes and no.  Depends how much money is in the

 3         bank.

 4              Q.   Okay.  Well, let's take it -- Let's go back a

 5         bit in, say, 2017.  Did you receive a salary from R.C.?   09:47

 6              A.   Yes.

 7              Q.   Okay.  Did you receive a salary in 2018?

 8              A.   Yes.

 9              Q.   Okay.  And what was your salary in 2017?

10              A.   $600.                                           09:47

11              Q.   Okay.  And what was your salary in 2018?

12              A.   Same.

13              Q.   Okay.  Has it been the same every year?

14              A.   Yes.

15              Q.   Okay.  Does Mrs. La Liberte receive a salary    09:47

16         from R.C.?

17              A.   Yes.

18              Q.   What is her current salary?

19              A.   Her current salary, to be honest with you, I

20         don't know.                                              09:48

21              Q.   Okay.  Is there a place at R.C.'s books and

22         records that would indicate the salaries that you and

23         Mrs. La Liberte receive from R.C.?

24              A.   Yes.

25              Q.   What records are those?                         09:48
```

Page 27

```
 1            A.   It would be in QuickBooks.                   09:48

 2            Q.   Do you have any -- Do you know either exactly or

 3      ballpark what Mrs. La Liberte's salary was in 2017?

 4            A.   I'm sorry.  Could you -- the first part I didn't

 5      get.                                                    09:49

 6            Q.   Okay.  Do you know either specifically or in the

 7      ballpark what Mrs. La Liberte's salary was in 2017?

 8            A.   I think it was around 1,000.  Don't quote me on

 9      that though.

10            Q.   Okay.  Do you know what her salary was in 2018?  09:49

11            A.   I would imagine it would be the same.

12            Q.   Okay.  So is it fair to say that her salary has

13      been approximately $1,000 every year?

14            A.   Yes.

15            Q.   Okay.  What is the nature of R.C.'s business?   09:49

16            A.   What does that mean?

17            Q.   Can you describe what R.C.'s business is?

18            A.   We're interior design construction company.

19            Q.   So what type of projects?

20            A.   Fast food.                                    09:50

21            (Reporter clarification.)

22            Q.   Are all of R.C.'s customers fast food

23      franchisees?

24            A.   No.  Some are corporate.

25            Q.   Besides corporate and fast food franchisees,  09:50
```

Page 28

```
 1     does it do any other kind of business?                    09:50

 2          A.   No.

 3          Q.   Does it ever have any walk-in business?

 4          A.   No.

 5          Q.   Does it do any residential work?                09:50

 6          A.   No.

 7          Q.   Has R.C.'s business changed in any way since its

 8     inception in 1991?

 9          A.   More construction than interior design.

10          Q.   What do you mean by -- How do you distinguish    09:51

11     construction from interior design?

12          A.   Interior design is the decor package within the

13     restaurant.

14          Construction is --

15          Q.   I'm sorry.  The what package?                    09:51

16          A.   The decor package.

17          (Reporter clarification.)

18          Q.   If you could repeat your answer, please.

19               MR. MYSLIWIEC:  Start with decor and go from

20     there.                                                     09:51

21               THE WITNESS:  Okay.  Decor is the interior

22     seating package and finishes within the restaurant.

23       BY MR. REICHMAN:

24          Q.   So does the decor work include -- Withdrawn.

25          What does the decor work include?                     09:52
```

Page 29

```
 1            A.   All the finishes and the seating.              09:52

 2            Q.   Does that mean, for example, R.C. would actually

 3       buy the seating that would be installed?

 4            A.   We would actually -- One time we did our own

 5       manufacturing and installation.                          09:52

 6            Q.   When did you do your own manufacturing?

 7            A.   That was probably, we stopped doing that 2014.

 8            Q.   Why did you stop?

 9            A.   Just got to be too much of a problem as far as

10       putting things together.                                 09:53

11            Q.   Okay.  So the decor work, then, essentially buy

12       seating from some other manufacturer and install it; is

13       that right?

14            A.   We don't do any of that now.  We just do mainly

15       construction.                                            09:53

16            Q.   When did you stop doing decor work?

17            A.   About three years ago.

18            Q.   That would be 19- -- I'm sorry.  That would be

19       2019?

20            A.   Actually, no.  It was longer than that.  It was  09:53

21       probably 2016, 2017.

22            Q.   Why did you stop -- Why did you stop doing decor

23       work in 2016 or 2017?

24            A.   Because McDonalds Corporation, because we were

25       the smallest interior design company for McDonalds        09:54
```

                                                        Page 30

```
 1      Corporate, and they decided to go nationwide with        09:54

 2      nationwide companies, so that eliminated us immediately.

 3          Q.   How were you notified by McDonalds about the

 4      decision?

 5          A.   I believe they contacted Ros and talked to her.  09:54

 6          Q.   Was there anything ever put in writing with

 7      respect to that decision?

 8          A.   No.

 9          Q.   Do you recall what the last project R.C. did

10      that included decor work?                                 09:55

11          A.   No.

12          Q.   Do you know whether R.C. ever did any new

13      projects involving decor work in 2018 or later?

14          A.   No.

15          Q.   How many hours a week do you currently work?     09:55

16          A.   It varies from week to week.

17          Q.   What's the range?

18          A.   I'm sorry?

19          Q.   What's the range?

20               MR. MYSLIWIEC:  Object to the form of the        09:56

21      question unless you give the witness a timeframe.

22        BY MR. REICHMAN:

23          Q.   I was talking currently, but that's fine.

24               Currently, what's the number of weeks that you work

25      at R.C.?                                                  09:56
```

Page 31

1          A.    Fifty-two.                                    09:56

2          Q.    Okay.  How many hours do you generally work a

3     week for R.C.?

4          A.    Depends on what the workload is.

5          Q.    And what -- I'm sorry.  Go ahead.  You can    09:56

6     finish.

7          A.    I'm sorry.  Go ahead.

8          Q.    Okay.  What's the range of hours that you work

9     per week?

10         A.    There is no specific range.  It depends on what 09:56

11    our workload is.

12         Q.    Do you work more or less than you did in 2018?

13         A.    No.  The same.

14         Q.    How about in 2017?

15         A.    No.  Different.                                09:57

16         Q.    Does R.C. currently have any employees?

17         A.    I have got a 1099 employee.

18         Q.    And does that -- Who is that?

19         A.    Gregg Zuckerman.

20         Q.    Does Mr. Zuckerman work full time for R.C.?    09:57

21         A.    When we have work, yes.

22         Q.    Well, let's say in 2021, did Mr. Zuckerman work

23    full time for R.C.?

24         A.    Yes.

25         Q.    Okay.  Would he work on average 40 hours a week? 09:58

                                                      Page 32

```
 1          A.   When we had work, yes, he would.           09:58

 2          Q.   What about when you didn't have work?

 3          A.   Do or don't?  I'm sorry.

 4          Q.   When you did not have work.

 5          A.   Then he wasn't -- He wasn't on the payroll.  09:58

 6          Q.   Okay.  How long has Mr. Zuckerman worked at

 7     R.C.?

 8          A.   Approximately, 23 years.

 9          Q.   Has he always been an independent contractor?

10          A.   Yes.                                        09:59

11          Q.   Has R.C. ever had a W-2 employee?

12          A.   What's W-2?  I don't understand.  Say that

13     again.

14          Q.   Has anyone -- Okay.  Other than Mr. Zuckerman,

15     has R.C. ever had an employee?                        09:59

16          A.   We have had other employees, yes.

17          Q.   Okay.  When is the last time R.C. had an

18     employee other than Mr. Zuckerman?

19          A.   2010.

20          Q.   What are Mr. Zuckerman's duties?            09:59

21          A.   He's a superintendent.

22          Q.   When you say "superintendent," do you mean

23     superintendent for construction?

24          A.   Yes.

25          Q.   Did R.C. ever have any plans to expand its   10:00
```

Veritext Legal Solutions
866 299-5127

```
 1      business in 2017 or 2018?                              10:00

 2           A.   No.

 3           Q.   Has COVID affected R.C.'s business in any way?

 4           A.   Yes.

 5           Q.   How so?                                       10:00

 6           A.   Medical restrictions put on people.

 7      Restaurants, they weren't doing as much work.

 8           Q.   Okay.  Did R.C. have an office in 2018?

 9           A.   Yes.

10           Q.   Was it at your home at Eilat Street in Woodland  10:01

11      Hills?

12           A.   Yes.

13           Q.   Has that always been the location of R.C.'s

14      office?

15           A.   Since we lived here, yes.                    10:01

16           Q.   How long have you lived at 24548 Eilat Street?

17           A.   1994.

18           Q.   How many rooms in the house does R.C.'s

19      office -- Withdrawn.

20           Does R.C. have more than one room in the house that  10:02

21      it uses?

22           A.   No.  Ros has her office, and mine is on the

23      opposite side of the house.

24           Q.   Okay.  How many rooms does the -- does your

25      house have?                                            10:02
```

                                                    Page 34

```
 1          A.   Say again.                              10:02

 2          Q.   How many rooms does your house have?

 3          A.   We have five bedrooms, six baths.

 4          Q.   The house is approximately 4,000 square feet?

 5          A.   Approximately.  Just under.             10:02

 6          Q.   Okay.  Is the garage used in any way for R.C.'s

 7     business?

 8          A.   Is it what?

 9          Q.   Is the garage in your house used in any way for

10     R.C.'s business?                                 10:03

11          A.   Yes.

12          Q.   How?

13          A.   Store tools and some equipment.

14          Q.   Has there ever been a sign outside your house

15     showing that R.C.'s business is located there?   10:03

16          A.   No.

17          Q.   Is 24548 Eilat Street in an area that is zoned

18     to allow a construction business to operate?

19          A.   Not zoned for it, no.  It's a residential

20     neighborhood.                                    10:04

21          Q.   Has R.C. ever done any projects outside of

22     Southern California?

23          A.   We have done some in San Francisco.

24          Q.   When was the last time that R.C. did a project

25     in San Francisco?                                10:04
```

Page 35

1          A.    That was probably in the early '90s.          10:04

2          Q.    Other than that project, has R.C. ever done any

3     projects outside of Southern California?

4          A.    No.

5          Q.    Has R.C. ever done any projects outside the     10:05

6     Los Angeles area?

7          A.    Of course.

8          Q.    Other than San Francisco which you just

9     mentioned?

10         A.    We have done projects in Orange County,          10:05

11    California.

12         Q.    Okay.  Anywhere else outside of the Los Angeles

13    area?

14         A.    I'm sorry.  Say that again.

15              MR. MYSLIWIEC:  Objection.                        10:05

16         (Reporter clarification.)

17      BY MR. REICHMAN:

18         Q.    Other than what you just mentioned about work in

19    Orange County and San Francisco, has R.C. ever done any

20    projects outside the Los Angeles area?                     10:05

21              MR. MYSLIWIEC:  Object to the form of the

22    question unless you are more specific what you mean by

23    "area."  Area could mean different things.  It could mean

24    the County of Los Angeles.  It could mean the City of

25    Los Angeles.  So I'd object to the form of the question    10:05

Page 36

```
 1        unless you are a little more specific in your geographical   10:06

 2        description.

 3          BY MR. REICHMAN:

 4              Q.   You can answer the question.

 5                   MR. MYSLIWIEC:  If you can.                        10:06

 6                   THE WITNESS:  Can you repeat it?

 7          BY MR. REICHMAN:

 8              Q.   Okay.  Other than in Orange County and

 9        San Francisco, as you mentioned, has R.C. ever done any

10        work outside of the Los Angeles Metropolitan area?          10:06

11              A.   Yes.

12              Q.   What other work has it done?

13              A.   We have done -- area?  Or what type of work?

14              Q.   Just where else have you done worked on any

15        projects?  Let's start there.                               10:06

16              A.   Ventura.  San Diego County.

17              Q.   Okay.

18              (Reporter clarification.)

19                   THE WITNESS:  Basically, Southern California.

20              (Reporter clarification.)                             10:06

21                   THE WITNESS:  San Bernardino.

22          BY MR. REICHMAN:

23              Q.   When is the last time R.C. had done any work in

24        the San Diego area?

25              A.   Probably, ten years ago.                         10:07
```

Page 37

```
 1              Q.   Did you have a cell phone in June of 2018?        10:07

 2              A.   What?

 3              Q.   Did you own a cell phone in June 2018?

 4              A.   Yes.

 5              Q.   Did you also own a computer?                      10:07

 6              A.   Yes.

 7              Q.   During the course of the -- Withdrawn.

 8              Were you ever asked by anyone to preserve any

 9         documents that you had on your cell phone or computer?

10              A.   No.                                               10:08

11              Q.   Do you still use the same cell phone that you

12         had in June 2018?

13              A.   No.

14              Q.   Do you have the cell phone that you used in

15         June 2018?                                                 10:08

16              A.   No.

17              Q.   What happened to that cell phone?

18              A.   Got trashed.

19              Q.   Okay.  Do you have the same computer that you

20         used in June 2018?                                         10:09

21              A.   Yes.

22              Q.   Let me go back to the cell phone.  When you say

23         it was trashed --

24              MR. MYSLIWIEC:  Mr. Reichman, just to be clear,

25         you were given all the AT&T call logs that contained all   10:09
```

                                                          Page 38

```
 1       of the cell phones and the land lines, including        10:09

 2       Mr. La Liberte's cell phone.  You were given those in July

 3       of 2021.

 4         BY MR. REICHMAN:

 5         Q.   When you say "the cell phone was trashed," what   10:09

 6       do you mean?

 7         A.   Well, we got new phones and the old one went

 8       away.

 9         Q.   When you say "went away," do you mean just

10       thrown in the garbage?                                  10:09

11         A.   More or less, yeah.

12         Q.   Okay.  When you say "we," are you referring to

13       you and Mrs. La Liberte?

14         A.   Yes.

15         Q.   Were you ever asked to gather any records of any  10:10

16       kind, including financial records, in connection with a

17       lawsuit that Mrs. La Liberte has brought?

18         A.   I don't understand.  Please repeat it.

19         Q.   Okay.  Were you ever asked to find any documents

20       in connection with the lawsuit that your wife has brought?  10:10

21         A.   No.

22         Q.   How would you generally communicate bids to find

23       new projects?

24         A.   I'm sorry.  Could you start over, please.

25         Q.   Sure.                                            10:11
```

Page 39

```
 1              How would you generally submit bids on new projects?   10:11

 2         A.   We submit it on a bid form that's provided by

 3    McDonalds.

 4         Q.   Would you email those forms to McDonalds?

 5         A.   I'm sorry.  Say that again.                             10:11

 6         Q.   Would you email those forms to McDonalds?

 7         A.   Yeah.

 8         Q.   Okay.  How about with customers other than

 9    McDonalds?

10         A.   All by email.                                           10:12

11         Q.   I'm sorry?  By email?

12         A.   All --

13         (Reporter clarification.)

14         Q.   I believe the witness said -- I'm sorry.  Go

15    ahead.                                                            10:12

16         A.   All our proposals are sent by email.

17         Q.   When did you and Mrs. La Liberte get new phones?

18         A.   Probably the weekend after the incident.

19         Q.   And just so we're clear, the incident being the

20    June 25, 2018 Simi Valley council meeting?                       10:12

21         A.   6/29 is when we got the phones.

22         Q.   Okay.  Did -- What are you looking at?

23         A.   6/30.  I'm sorry.

24         Q.   Okay.  So what are you just referring to in

25    giving your answer?                                              10:13
```

Page 40

```
 1              A.   I'm sorry?                           10:13

 2              Q.   It seemed as if you looked down to look at a

 3         document that your lawyer was pointing to when you gave

 4         your answer.  What document were you looking at?

 5              A.   Just a piece of paper.               10:13

 6              Q.   What piece of paper is that?

 7              A.   One that had a date on it, making sure that we

 8         have the right answer for the phones.

 9              Q.   Okay.  All right.  Do you have any -- What else

10         is on that piece of paper?                     10:13

11              A.   I'm sorry?

12              Q.   I asked in the beginning of the deposition about

13         what documents you had.  Can you tell me what else is on

14         the document that you just referred to?

15              A.   The notebook paper.  It's not a document.  10:14

16              Q.   Okay.  So it's a notebook piece of paper with

17         some handwriting on it; is that right?

18              A.   Uh-huh.  Yes.

19              Q.   Okay.  Whose handwriting is it?

20              A.   I believe it was mine.                10:14

21              Q.   Okay.

22              A.   Yes.

23              Q.   And when did you prepare this or when did you

24         make these handwritten notes on this piece of paper?

25              A.   Just now.                            10:14
```

Page 41

```
 1              Q.   Okay.  Where did you get the dates June 29th and   10:14
 2      June 30th from?
 3              A.   That was the weekend after the incident.
 4              Q.   Okay.  But did something just refresh your
 5      recollection so that you were able to testify that the new   10:14
 6      phones were on June 29th or June 30th?
 7              A.   I don't understand.
 8              Q.   Okay.  When I first asked you about it, you
 9      weren't sure when the dates were.  Then you looked down
10      and referred to some sheet of paper that you were able to   10:15
11      answer June 29 or June 30.
12              I'm trying to just ask you what refreshed your
13      recollection that enabled you to answer that it was
14      June 29th or June 30th.
15              A.   Because I wasn't sure.                          10:15
16              Q.   Okay.  But you looked at something; right?
17              A.   I'm sorry?
18              Q.   Okay.  Let me try it another way.
19              Other than the handwritten note that you said with
20      those dates, is there anything else on that notepaper?      10:15
21              A.   No.
22              Q.   Okay.  Did your counsel provide you with those
23      dates?
24              A.   No.
25              Q.   Are you aware that certain financial records of   10:16
```

Page 42

```
 1      R.C. were turned over to us during the course of the        10:16

 2      litigation?

 3           A.   Not 100 percent.  I know that stuff was turned

 4      over.  I'm not sure exactly what.

 5           Q.   Okay.  Have you reviewed any of R.C.'s financial   10:16

 6      statements in preparation for your deposition today?

 7           A.   No.

 8                MR. REICHMAN:  I'd like to mark as the next

 9      exhibit some text messages that we received, I believe it

10      was from plaintiff's counsel around in December of 2021.    10:17

11      Can we mark that, please.

12                MR. MYSLIWIEC:  Let's take a second.  I want to

13      get some coffee started.

14                MR. YEGER:  Exhibit 111 is in the shared folder,

15      and I will put it on the screen.                            10:18

16         (Deposition Exhibit 111 was marked for identification

17      by counsel electronically.)

18       BY MR. REICHMAN:

19           Q.   I'd like you to take a look at this series of

20      texts, Mr. La Liberte.  I'm just showing you them in the    10:19

21      form that we received them so you can see that some are

22      maybe missing.  Doesn't have a date.  But I want to ask

23      you about the specific texts that you have -- appears that

24      you wrote on, I believe, page 3 of this exhibit.

25           A.   I didn't write that.                              10:19
```

Page 43

```
 1            Q.   Do you see in this exhibit it indicates that dad   10:19
 2     sent the text "Unbelievable."  Was that you who sent that?
 3            A.   I don't recall.
 4            Q.   Let me ask you more generally.  Did you ever
 5     send text messages -- Withdrawn.                              10:20
 6            Did you ever exchange text messages with
 7     Mrs. La Liberte in 2018?
 8            A.   I don't recall.
 9            Q.   Have you ever exchanged text messages with
10     Mrs. La Liberte?                                              10:20
11            A.   Of course.  She's my wife.
12            Q.   Okay.  Do you have any reason to believe that
13     you didn't exchange text messages in 2018?
14                 MR. MYSLIWIEC:  I object to the relevance of the
15     question.  I think the better question is: Did you send      10:21
16     text messages in 2018?
17       BY MR. REICHMAN:
18            Q.   Okay.  The question stands.
19            Can you answer it, Mr. La Liberte?
20            A.   I'm sure that I did at some point.               10:21
21            Q.   Okay.  Were you ever asked to find any of the
22     text messages that you exchanged with Mrs. La Liberte in
23     2018?
24            A.   I'm sorry.  The first part of that was what?
25     Did I ever --                                                10:21
```

Page 44

1        Q.    Were you ever asked to find any text messages        10:21

2    that you exchanged with Mrs. La Liberte in 2018?

3        A.    No.

4        Q.    After the Simi Valley City Council meeting in

5    June 25, 2018, did there ever come a point in time when        10:22

6    R.C. customers were unable to communicate with you?

7        A.    In what way?

8        Q.    In any way.

9        A.    Not with me, no.

10        Q.    Were you aware of any instance when an R.C.        10:23

11    customer was unable to communicate with Mrs. La Liberte?

12        A.    Not that I know of.

13        Q.    Was there ever a point in time when any person

14    who R.C. was doing business with, such as a subcontractor

15    or Mr. Zuckerman, could not communicate with R.C.?        10:23

16        A.    Can you explain that again, please?

17        Q.    Okay.  During or after the week of June 25,

18    2018, was there ever an instance when someone who R.C. was

19    doing business with, be it a client, a subcontractor, or

20    Mr. Zuckerman could not communicate with R.C.?        10:24

21        A.    Yeah.

22        Q.    When was that?

23        A.    I can't be specific.  I have no idea.

24        Q.    Are you aware of any specific instance when

25    someone --        10:24

                                                    Page 45

```
 1                    MR. MYSLIWIEC:  I think the witness might not      10:24

 2       have heard his answer being recorded.  I'm sorry.  What

 3       did you say?

 4                    THE WITNESS:  I believe that we -- I guess you

 5       have to ask the question again.                             10:25

 6                    MR. REICHMAN:  Why don't we reread what the

 7       record is right now so there is no nothing unclear.

 8            David, you can take down the exhibit.

 9                    MR. MYSLIWIEC:  I don't know you heard the

10       entire answer.                                              10:25

11                    MR. REICHMAN:  Well, let's see what the record

12       is, then we can go back.  I didn't understand why there

13       needed to be an interruption.

14                    MR. MYSLIWIEC:  Well, I mean --

15                    MR. REICHMAN:  Let's read the record, please.    10:25

16            (The record is read by the reporter.)

17         BY MR. REICHMAN:

18            Q.   Let me ask it again, Mr. La Liberte.  I will ask

19       the full question.

20            Was there ever an instance when someone who was doing   10:26

21       business with R.C. could not communicate with R.C.?

22            A.   No.

23                    MR. REICHMAN:  I'd like to mark as the next

24       exhibit the compilation of financial statements for R.C.

25       that we received for the years 2016 through 2020.           10:27
```

Page 46

```
 1              MR. YEGER:  One moment, please.              10:27

 2              MR. REICHMAN:  So you are clear, some of these

 3      were -- This is a profit and loss statements.  Some of

 4      these were marked individually as exhibits, but I think it

 5      will be a lot more efficient to have them marked together  10:27

 6      with 2020 which was not marked as an exhibit.

 7          (Deposition Exhibit 112 was marked for identification

 8      by counsel electronically.)

 9              MR. YEGER:  Exhibit 112 is in the folder, and I

10      am put it on screen.                                  10:28

11       BY MR. REICHMAN:

12          Q.   Are you being able to see, Mr. La Liberte, the

13      first three pages of this exhibit are the profit and loss

14      statement for R.C. for 2016, and then we have in the

15      exhibit the same profit and loss statements for subsequent  10:29

16      years.

17          So first, I'd just like to ask you a few questions

18      generally about the profit and loss statements.

19          Do you know who created the profit and loss

20      statements for RC?                                    10:29

21          A.   I'm sorry?

22          Q.   Who created -- In 2016, who created the profit

23      and loss statement for R.C.?

24          A.   Roslyn and our accountant.

25          Q.   Okay.  Did you ever review the profit and loss  10:29
```

Page 47

1    statements for RC?                                        10:30

2         A.   Did I?

3         Q.   Yes.

4         A.   No.

5         Q.   Have you ever seen the profit and loss          10:30

6    statements for R.C. before?

7         A.   I never -- I never look at that stuff.

8         Q.   Okay.  Let me ask you some questions about

9    the -- with respect to the first page of this exhibit,

10   particularly, the income portions at the top of the page.   10:31

11        Do you see that according to this statement,

12   $723,095.55 in commissions was earned in 2016?  Do you see

13   that?

14        A.   I see it.

15        Q.   Okay.  Were those commissions paid by Charter    10:31

16   House International?

17        A.   I don't know.

18        Q.   Are you aware of any source of commissions other

19   than from Charter House International?

20        A.   No.                                              10:31

21             MR. MYSLIWIEC:  Objection to the form of the

22   question.  It assumes Charter House International was a

23   source of commissions.

24     BY MR. REICHMAN:

25        Q.   Okay.  Well, was Charter House International a    10:31

                                                    Page 48

```
 1        source of commissions for R.C. in 2016?              10:32

 2            A.   I don't know.

 3            Q.   Do you know whether Mrs. La Liberte acted as a

 4        representative of Charter House International in 2016?

 5            A.   Can you come closer and repeat the question?   10:32

 6                 MR. MYSLIWIEC:  When you lean back, it's hard to

 7        hear you.

 8          BY MR. REICHMAN:

 9            Q.   Do you know whether Mrs. La Liberte acted as a

10        representative for Charter House International in 2016?   10:32

11            A.   She was a rep, yes.

12            Q.   Okay.  And do you know whether Charter House

13        International paid either Mrs. La Liberte or R.C. any

14        commissions in 2016?

15            A.   I believe so.                                  10:33

16            Q.   Okay.

17            A.   She was a rep, so she had to get paid.

18            Q.   Okay.  Do you know whether the money that was

19        paid to Charter House Internationally was paid to

20        Mrs. La Liberte or to R.C.?                             10:33

21            A.   I don't know.

22            Q.   Are you aware at any point in time of any client

23        or customer of R.C. that paid R.C. commissions other than

24        Charter House International?

25            A.   I don't know.                                  10:33
```

Page 49

1          Q.   If someone -- some other client or customer paid   10:33

2     commissions, is this something that you would be aware of

3     as a partner in R.C., a 30 percent owner and as an officer

4     of R.C.?

5          A.   No.                                                 10:34

6          Q.   Why not?

7          A.   Because I don't pay attention to that stuff.

8     That's strictly Ros's department, and I stay out of it.

9          Q.   Did Roslyn's work for Charter House

10    International help R.C. in any way?                           10:34

11         A.   Did who?

12         Q.   Okay.  Did Mrs. La Liberte's work for Charter

13    House International help R.C. in any way?

14         A.   I suppose it did.  She was getting paid

15    commissions.                                                 10:35

16         Q.   Okay.  I want you to take a look at the fourth

17    page of the exhibit.  It's the profit and loss statement

18    for December of January through December 2017.  And do you

19    see that there the commissions earned that year was

20    $1,576,048.13?  Do you see that?                             10:36

21         A.   Yeah.

22         Q.   Okay.  That was almost half of the total

23    commissions that RC -- half of the total revenue that RC

24    received that year.  Do you know what the source of those

25    commission payments were?                                    10:36

Page 50

```
 1              MR. MYSLIWIEC:  I object to the form of the        10:36

 2    question as it misstates what the document says.  The

 3    document says it's $1.5 million figure for commissions,

 4    and it has total income of $4.8 million, so 1.5 is not

 5    half.                                                       10:37

 6              MR. REICHMAN:  You are right.  Let me rephrase

 7    it.  I will withdraw the question.

 8         Q.   Do you know what the source or sources of that

 9    one -- more than $1,500,000 in commission income was that

10    R.C. received in 2017?                                      10:37

11         A.   Are you asking me who paid that?

12         Q.   Yes, I am.

13         A.   I don't know.

14         Q.   Well, were you aware of anyone other than

15    Charter House International who paid commissions to R.C.    10:38

16    in 20- -- in calendar year 2017?

17         A.   No.

18         Q.   Let's take a look at the seventh page of the

19    document, that which is the first page of the profit and

20    loss statement for RC in 2018.                             10:38

21         And do you see that the amount of the commissions in

22    20- -- in all of 2018 is only $2,109.41?  Do you know why

23    R.C.'s commissions went from more than $1.5 million in

24    2017 to less than $3,000 in 2018?

25         A.   No.                                               10:39
```

Page 51

1        Q.    So am I right that you and Mrs. La Liberte never    10:39

2     discussed at any point in time how it came about that R.C.

3     lost $1.5 million in commission revenue from one year to

4     the next?

5        A.    No.                                                10:39

6        Q.    You never discussed it?

7        A.    No.

8        Q.    Okay.  Please take a look at the -- I think it's

9     the page with the Bates stamp 9981.  It's the first page

10    of the profit and loss statement for 2019.  And do you see  10:40

11    that there is no commission income at all in 2019 for

12    R.C.?  Do you know why that was the case?

13       A.    She wasn't working for CHI.

14       Q.    Okay.  Do you know whether R.C -- Withdrawn.

15          Do you see, going back to the third page of the       10:41

16    exhibit, which is the third page of the 2016 profit and

17    loss statement -- Let's get it on the screen.

18             MR. YEGER:  This is the third page of the

19    exhibit.

20             MR. REICHMAN:  If you can go a little further       10:42

21    down to the net income at the bottom.

22       Q.    Do you see that this profit and loss statement

23    indicates that R.C. lost $1,028.12 in 2016?  Do you know

24    whether R.C. made or lost money in 2016?

25       A.    No.                                                10:42

                                                    Page 52

```
 1            Q.   Do you know whether the construction and decor    10:42

 2      portions of R.C.'s business in 2016 were profitable?

 3            A.   No.

 4            Q.   Do you know whether the commission portion of

 5      R.C.'s business is the only profitable part of R.C.'s       10:43

 6      business in 2016?

 7            A.   No.

 8            Q.   Do you know whether R.C. ever showed a profit on

 9      any of the tax returns it filed in 2016 or 2017?

10            A.   No.                                               10:44

11            Q.   Turning to the third page of the exhibit again,

12      I think it's -- You can see it's right in front of you.

13      It indicates officer's salary of $35,000.  Do you know

14      what that refers to?

15            A.   No.                                               10:45

16            Q.   Do you know whether you received a salary of

17      $35,000 in 2016?

18            A.   I'm sure I received a salary.  I'm not sure how

19      much it was.

20            Q.   Did you ever review the tax returns of R.C.       10:45

21      before they were filed?

22            A.   No.

23            Q.   Did you ever become aware that in 2017 McDonalds

24      terminated Charter House International as a vendor?

25            A.   No.                                               10:46
```

Page 53

1          Q.    Did R.C. ever do any construction work on a          10:47

2    project in which Charter House International was involved?

3          A.    We may have.

4          Q.    Can you recall any?

5          A.    No.                                                   10:47

6          Q.    Do you know whether R.C. was profitable in 2021?

7          A.    Say that again.

8          Q.    Do you know whether R.C. was profitable in 2021?

9          A.    No.

10         Q.    Do you know whether R.C. was profitable in any       10:48

11   year?

12         A.    No.

13         Q.    Do you know whether there are any books and

14   records of R.C. that would show the source of R.C.'s

15   commission income?                                               10:50

16         A.    No.

17         Q.    You don't know whether there are any records or

18   there aren't any records?

19         A.    I don't know.

20         Q.    In the course of preparing bids for projects,        10:50

21   would you ever go back and look at any financial records

22   of R.C.?

23         A.    No.

24         Q.    Did you ever attempt to determine -- Withdrawn.

25         Have you at any point in time ever attempted to            10:50

Page 54

```
 1        determine whether a specific project that R.C. performed    10:50

 2        was profitable or not?

 3             A.   No.

 4             Q.   Do you know whether Mrs. La Liberte ever did

 5        that?                                                        10:51

 6             A.   Not sure.

 7             Q.   How are you able to bid on projects if you don't

 8        know whether past work was profitable or not?

 9             A.   I'm sure that they were profitable.

10             Q.   Why do you say that?                               10:51

11             A.   Because I know my subcontractors.

12             Q.   How would knowing your subcontractors know

13        whether R.C.'s total cost on a project rendered it

14        profitable or not?

15             A.   By experience.                                    10:51

16             Q.   Did you and Mrs. La Liberte ever discuss whether

17        a project was profitable or not?

18             A.   Yes.

19             Q.   Okay.  Under what circumstances would you have

20        those conversations?                                        10:52

21             A.   Prior to us turning in our proposal we would

22        review.

23             (Reporter clarification.)

24             Q.   I'm sorry.  I didn't catch that.  I didn't catch

25        that.  Can you repeat your answer, please?                  10:52
```

Page 55

```
 1          A.   Prior to us submitting our proposal, we would    10:52

 2     review it.

 3          Q.   Okay.  I'm asking about whether a -- whether a

 4     project that was actually performed was profitable or not.

 5     Did you ever have a conversation with Mrs. La Liberte    10:52

 6     about that?

 7          A.   No.

 8          Q.   Do you know whether R.C. ever performed any kind

 9     of analysis of whether any of its projects were profitable

10     or not?                                                  10:53

11          A.   No.

12          Q.   Would R.C. be able to operate without

13     Mrs. La Liberte?

14          A.   Probably not.

15          Q.   Okay.  Would R.C. be able to operate without    10:53

16     you?

17          A.   No.

18          Q.   If you could -- Let's go to the second page of

19     the profit and loss statement for 2018 that has the Bates

20     stamp 9977.                                              10:54

21          I want to particularly turn your attention to --

22          (Reporter clarification.)

23          Q.   Please look at the item advertising and business

24     promotion expense of 6,000 --

25          (Reporter clarification.)                           10:55
```

Page 56

```
 1              Q.   6,881.02.                                  10:55

 2         Do you know what R.C. did to promote its business in

 3    2018?

 4              A.   No.

 5              Q.   Do you know if R.C. did anything to promote its   10:55

 6    business in 2018?

 7              A.   No.

 8              Q.   Do you know whether R.C. ever did any

 9    promotional work at any time?

10              A.   No.                                        10:56

11              Q.   Did you have -- Did you ever have check signing

12    authority at R.C.?

13              A.   I do.

14              Q.   Have you ever used that check signing authority?

15              A.   No.                                        10:57

16              MR. REICHMAN:  I'd like to take a look -- I'd

17    like to mark as our next exhibit a series of documents

18    that are balance sheets for R.C. for the years 2016 to

19    2020.

20              MR. YEGER:  One moment.                         10:57

21         (Deposition Exhibit 113 was marked for identification

22    by counsel electronically.)

23              MR. YEGER:  Exhibit 113 is in the shared folder

24    and on screen.

25       BY MR. REICHMAN:                                       10:59
```

Page 57

```
 1            Q.   As I indicated, I'm showing you now,          10:59

 2     Mr. La Liberte, balance sheets for R.C. that were produced

 3     to us during the course of the litigation.  I'd like to

 4     ask -- I'd like to ask a series of questions about the

 5     first page.                                               10:59

 6          Do you see there is right at the top, there's a list

 7     of checking and savings accounts?  Do you see that?

 8            A.   Yes.

 9            Q.   Are you familiar with those accounts?

10            A.   Somewhat, yes.                                10:59

11            Q.   Okay.  And the account checking, or I guess it's

12     CHKG-3917, is that the operating checking account for

13     R.C.?

14            A.   I believe so, but I'm not sure.

15            Q.   Okay.  Then there is a savings account; is that  11:00

16     right?  It's indicated OD SVGS-0172?

17            A.   I'm not sure.

18            Q.   Okay.  There is also an account that's listed as

19     MAXIMIZER-3242.  Do you know what that is?

20            A.   No.                                           11:00

21            Q.   Have you ever heard of an account that is

22     referred to as Maximizer?

23            A.   Not sure.

24            Q.   Let's go a little further down the page to other

25     assets under "AUTO," and there lists four cars.  Do you   11:01
```

Page 58

1      see a Chevy Cruze, a Hyundai 2007 -- 2007 Santa Fe, a      11:01

2      Chrysler 300, and Nissan Xterra?  Are these all

3      automobiles that were owned by R.C.?

4            A.   At that time.

5            Q.   Did you ever use those cars for your personal    11:01

6      use?

7            A.   Some of them, yes.

8            Q.   And did Mrs. La Liberte use some of those cars

9      for her personal use?

10           A.   Yes.                                             11:01

11           Q.   I'd like you to turn to the second page of this

12     exhibit.  Under "Long Term Liabilities," there is a line

13     item, "Officers Loan - Due to Shareholder."  There is no

14     "e" there.  In the amount of $238,816.45.

15           Did you and/or Mrs. La Liberte ever make any loans to  11:02

16     R.C.?

17           A.   Not sure.

18           Q.   Do you know what this line item of officers loan

19     due to shareholder refers to?

20           A.   No.                                              11:03

21           Q.   Did you or Mrs. La Liberte ever have to loan

22     money to R.C. subsequent to June 2018?

23           A.   Not that I know of.

24           Q.   Okay.  And if -- If such a loan had to be made,

25     is this something that you would have discussed with        11:03

Page 59

| | | |
|---|---|---|
| 1 | Mrs. La Liberte? | 11:03 |
| 2 | A.    Maybe. | |
| 3 | Q.    Okay.  Just to be clear, then, you never had a | |
| 4 | discussion with Mrs. La Liberte about either you or | |
| 5 | Mrs. La Liberte making loans to R.C.? | 11:04 |
| 6 | A.    No. | |
| 7 | Q.    Probably have two negatives in there.  Let me | |
| 8 | ask a clean question.  My fault. | |
| 9 | Did you ever at any point in time have a discussion | |
| 10 | with Mrs. La Liberte about you or Mrs. La Liberte making a | 11:04 |
| 11 | loan to R.C.? | |
| 12 | A.    No. | |
| 13 | Q.    Do you -- | |
| 14 | (Reporter clarification.) | |
| 15 | Q.    Do you or Mrs. La Liberte keep your finances | 11:04 |
| 16 | jointly? | |
| 17 | A.    Keep it what?  I didn't get the last word. | |
| 18 | Q.    Okay.  Are your finances and Mrs. La Liberte's | |
| 19 | finances joint? | |
| 20 | A.    Joint, yes. | 11:05 |
| 21 | Q.    Let's take a look at the third page of this | |
| 22 | exhibit, and there's an item again under Maximizer-3242, | |
| 23 | and it's an amount of $252,486.42. | |
| 24 | Do you know what that account is? | |
| 25 | A.    Do I what? | 11:05 |

Page 60

```
 1              Q.   Do you know what that account is?           11:05

 2              A.   No.

 3              Q.   Is this the first time that you are hearing that

 4    R.C. Design apparently had an account with more than

 5    $250,000 in it?                                           11:06

 6              A.   I'm not sure.

 7              Q.   Well, have you ever been aware of R.C. having an

 8    account with more than $250,000 in it?

 9              A.   Our company checking account.

10              Q.   When did the company have a checking account    11:06

11    with more than $250,000 in it?

12              A.   I'm not sure.

13              Q.   Have you ever looked back at R.C.'s checking

14    account?

15              A.   No.                                         11:07

16              Q.   So you have no idea what this $252,000 refers

17    to; is that right?

18              A.   Correct.

19              Q.   I'm turning to the next page.

20              Do you see that under the balance sheet, there's an    11:07

21    increase in officer's loan due to shareholders.  The

22    amount is now $304,447.40.  Do you know why that -- that

23    amount increased from 2016?

24              A.   No, I do not.

25              Q.   Let's take a look at the balance sheet for 2018,  11:08
```

                                                        Page 61

```
 1        and do you see there's an item under auto of --            11:08

 2                MR. MYSLIWIEC:  Is there a reason that's not on

 3        my screen.

 4                MR. REICHMAN:  It's on my screen.

 5                MR. MYSLIWIEC:  It's not on my screen.  In fact,  11:08

 6        I don't have any video on my screen.

 7                VIDEO OPERATOR:  Perhaps you switched to Exhibit

 8        Share, Counsel.  You need to hit Alt-tab and get back to

 9        Zoom.

10                MR. MYSLIWIEC:  Okay.                            11:09

11                MR. REICHMAN:  Do you have it now?

12                MR. MYSLIWIEC:  No.

13                VIDEO OPERATOR:  What do you see, Counsel?

14                MR. MYSLIWIEC:  I have a blank screen.  A blue

15        black screen.                                           11:09

16                VIDEO OPERATOR:  Perhaps something happened with

17        your laptop.

18                MR. REICHMAN:  Why don't I suggest this: We have

19        been going for a couple hours or so.  Why don't you try to

20        figure that out, maybe with Veritext.  Why don't we take  11:10

21        ten minutes.  If we can go into a breakout room, that

22        would be great.

23                VIDEO OPERATOR:  We are going off the record.

24        The time is 11:10.

25            (A recess is taken.)                                11:10
```

                                                          Page 62

```
 1              VIDEO OPERATOR:  We are back on the record.      11:33

 2         The time is 11:33.

 3       BY MR. REICHMAN:

 4         Q.   Mr. La Liberte, did you speak with

 5   Mrs. La Liberte during the break?                          11:33

 6         A.   Did I speak to her during the break?

 7         Q.   Yes.

 8         A.   Yes.

 9         Q.   What did you discuss?

10         A.   What we are going to have for lunch.            11:33

11         Q.   Okay.  Did you discuss anything else?

12         A.   No.

13         Q.   Did you discuss this deposition at all?

14         A.   No.

15         Q.   Okay.  Before going back to the balance sheets, 11:34

16   I'd like to ask you a few more questions generally about

17   R.C.'s financial statements.

18         Have you ever seen any R.C. financial statement of

19   any kind prior to today?

20         A.   No.                                             11:34

21         Q.   Do you know of any -- whether any R.C. financial

22   statements are prepared other than the balance sheets and

23   profit and loss statements that I have shown you today?

24         A.   No.

25         Q.   Do you know who it is who prepared the profit   11:34
```

                                                    Page 63

```
 1      and loss statements and balance sheets with          11:34

 2      Mrs. La Liberte?

 3           A.   No.

 4           Q.   I thought you mentioned that R.C. had an

 5      accountant or bookkeeper.  Does R.C. have an accountant or  11:34

 6      bookkeeper?

 7           A.   We have an accountant.

 8           Q.   Okay.  And who is that accountant?

 9           A.   Stan Goodman.

10           Q.   And Goodwin, G-o-o-d-w-i-n?               11:35

11           A.   Say that again.

12           Q.   Is it Goodwin or Goodman?

13           A.   Goodman.  Goodman.

14           Q.   Goodman.  Okay.

15           Do you know whether Mr. Goodman was involved in  11:35

16      preparation of either the profit and loss statements or

17      balance sheets?

18           A.   He's our accountant.  I would assume that he is.

19           Q.   Do you know whether R.C. has ever been audited?

20           A.   I'm sorry.  Say that again.               11:35

21           Q.   Has R.C. ever been audited by any taxing

22      authority?

23           A.   I think we were years ago.  Early '90s maybe.

24           Q.   Okay.  Has R.C. ever applied for a loan?

25           A.   Applied for a loan, no.                   11:36
```

Page 64

```
1              Q.   Has R.C. ever submitted financial statements to    11:36

2      anyone outside of R.C.?

3              A.   I don't know.

4              Q.   Okay.  Let's go back to the balance sheet for

5      2018.                                                           11:36

6              MR. YEGER:  Exhibit 113 is now on screen.

7        BY MR. REICHMAN:

8              Q.   Do you see that there is an entry for $90,521.56

9      for a Cadillac Escalade?

10             A.   Yes.                                                11:37

11             Q.   Did R.C. buy a Cadillac Escalade in 2018 for

12     more than $90,000?

13             A.   Yeah.  We bought the car, yes.

14             Q.   Okay.  Do you know when in 2018 R.C. made that

15     purchase?                                                       11:37

16             A.   Do I know when?

17             Q.   Yes.  What season of the year?  Month of the

18     year?  Date?

19             A.   I'm not sure exactly what month it was.

20             Q.   Do you know whether it was in the first half or    11:37

21     second half of 2018?

22             A.   Not sure what month it was.

23             Q.   Okay.  But do you know whether it was in the

24     first half or second half of 2018?

25             A.   I'm not sure.  I know it was in 2018.              11:38
```

Page 65

```
 1              Q.    Okay.  Do you know whether it was before or        11:38

 2        after the Simi Valley council meeting?

 3              A.    Sorry.  Say that again.

 4              Q.    Do you know whether it was before or after the

 5        Simi Valley council meeting?                                   11:38

 6              A.    I don't know.

 7              Q.    Is there some record that the company would have

 8        that would show when the purchase was made?

 9              A.    I'm sure I have the contract.

10              Q.    Okay.  Did R.C. pay cash for the vehicle?          11:38

11              A.    Did we pay cash for that?

12              Q.    Yes.

13              A.    Is that your question?

14              Q.    That is.

15              A.    It did, but I'm not sure.                          11:38

16              Q.    2018 at the bottom shows net income that year of

17        40,600 -- $40,665.22.

18              A.    Sorry.  Income?

19              Q.    What did you say?

20              A.    Yeah.  I don't see that on my screen.  I see       11:39

21        page 1 that goes from liabilities, starts with liabilities

22        on the top of the line.  Income would probably be above

23        that.

24              Q.    It's below that under "Equity."

25              A.    Oh.  Okay.  Net income.                            11:39
```

Page 66

```
 1              Q.   Okay.  So this is my question, Mr. La Liberte:    11:39

 2      During the period 2017 through 2021, did you or

 3      Mrs. La Liberte ever take any profits out of the business?

 4              A.   Not to my knowledge, no.

 5              Q.   Going back to the top of the page, you'll see    11:40

 6      that this is for 2019.  Excuse me.  Go to 2019.

 7              There's again this Maximizer account now that is

 8      apparently grown to $377,829.51.

 9              Do you know what that -- What does that --

10              A.   I do not.                                        11:41

11              Q.   You don't know anything about that account?

12              A.   No.

13              Q.   Let's take a look at 2020.  You see under

14      "Assets," there is no longer an entry for that Maximizer

15      account -- Maximizer account.                                11:42

16              Do you see that?

17              A.   Yeah.

18              Q.   Do you know why?

19              A.   No.

20              Q.   Do you know of any transfers the company made in  11:42

21      2019 or 2020 or 2021 of hundreds of thousands of dollars?

22              A.   What's the question?

23              Q.   Do you know of any transfers of hundreds of

24      thousands of dollars R.C. made in 2019, 2020, or 2021?

25              A.   No.                                              11:42
```

Page 67

```
 1              Q.   Let me switch topics.                    11:43

 2         Are you aware that Mrs. La Liberte had an interview

 3    with Fox News on Friday, June 29, 2018?

 4              A.   With who?

 5              Q.   With Fox News.                            11:43

 6              A.   Who at Fox News?

 7              Q.   I'm blanking on the name of the correspondent,

 8    but do you recall that a Fox News truck came to your house

 9    either late morning or around noon on June 29, 2018?

10              A.   Yes.                                      11:43

11              Q.   Okay.  Were you present at the house at that

12    time?

13              A.   Yes.

14              Q.   Okay.  Do you know how it came about that Fox

15    News came to your -- came to your house either late        11:43

16    morning or around noon of June 29, 2018?

17              A.   I suppose it was because of the incident.

18              Q.   Do you know how -- Do you know whether anyone

19    from your family had contacted anyone from Fox News before

20    Fox News came to your home on June 29, 2018?              11:44

21              A.   No.

22              Q.   Have you ever spoken with anyone from Fox News?

23              A.   The day they came to our house, I spoke.

24              Q.   Did they interview you?

25              A.   No.                                       11:44
```

Page 68

1          Q.   What was the conversation with Fox News the day    11:44

2     they came to your house?

3          A.   I didn't want them in the house, and then I let

4     them in after.

5          Q.   Why didn't you want them in the house?            11:45

6          A.   I'm sorry?

7          Q.   Why didn't you initially want them in the house?

8          A.   Because I didn't want them to interview Ros.

9          Q.   Why did you change your mind?

10         A.   Because Ros asked me.                              11:45

11         Q.   Do you know whether you and Ros decided to

12    change your phones before or after the Fox interview?

13         A.   It was after.

14         Q.   I'm going to show you a few exhibits that were

15    previously marked at Mrs. La Liberte's deposition.  If we   11:46

16    could take a look, please, at Exhibit 57.

17              MR. YEGER:  One moment, please.

18         Exhibit 57 is now on screen and in the shared folder.

19      BY MR. REICHMAN:

20         Q.   I'm showing you now, Mr. La Liberte, what was     11:47

21    previously marked as Exhibit 57.  It appears to relate to

22    work that -- plaster work that was done at your home on or

23    about May 31st, 2019.

24         Are you familiar with this work?

25         A.   Yes.                                              11:47

                                                        Page 69

```
 1              Q.   Did you arrange it?                    11:47

 2              A.   Yes.

 3              Q.   Why did you arrange for this work to be done?

 4              A.   To change the look of the house.

 5              Q.   Why did you want to change the look of the   11:47

 6         house?

 7              A.   Because we had strangers approaching the house.

 8         We didn't want having them coming again.

 9              Q.   When is the last time prior to May 2019 that a

10         stranger approached the house?                   11:48

11              A.   I can't answer that.  I don't know.

12              Q.   Are you aware of any time in 2019 when a

13         stranger approached the house?

14              A.   Am I aware of it?

15              Q.   Yes.                                    11:48

16              A.   Of course I'm aware or I was.

17              Q.   Okay.  When did that happen?

18              A.   Don't know when.

19              Q.   How many times did strangers approach the house

20         in 2019?                                         11:48

21              A.   I don't know.

22              Q.   Describe a time, any time, when a stranger

23         approached the house in 2019.

24              A.   Describe what?

25              Q.   Describe what happened when any stranger   11:48
```

Page 70

```
 1     approached the house in 2019.                          11:49

 2          A.   They would just approach the house and take

 3     pictures.

 4          Q.   Do you know why any of these strangers were

 5     taking pictures of the house?                           11:49

 6          A.   Probably because of the incident.

 7          Q.   Why do you say that?

 8          A.   Why else would they approach the house?

 9          Q.   Well, are you aware of any realtors that go and

10     take pictures of houses?                                11:49

11          A.   Real estate people.

12          Q.   Okay.  How do you know these persons who -- By

13     the way, can you describe any of the persons that came and

14     took pictures of your house?

15          A.   No.                                           11:49

16          Q.   Where were they when they took pictures of your

17     house?

18          A.   In front of the house.

19          Q.   On the property?

20          A.   Either on the sidewalk or in the street in a   11:50

21     car.

22          Q.   So not on the property; is that right?

23          (Reporter clarification.)

24          Q.   They were not on your property; is that right?

25          A.   I can't say that for 100 percent if they were on  11:50
```

Page 71

```
 1        the parkway or the sidewalk.  If they were on the parkway,   11:50

 2        it's on my property.

 3            Q.   When you say "the parkway," what do you mean?

 4            A.   The grass section between the sidewalk and the

 5        street.                                                       11:50

 6            (Reporter clarification.)

 7            Q.   We refer to it as the hill strip.  I hadn't

 8        heard of parkway being used in that way before.

 9            Did you ever report any of those incidents to the

10        police?                                                       11:50

11            A.   I don't remember.

12            Q.   What was the specific plastering work that was

13        being done?

14            A.   I'm sorry.  Say that again.

15            Q.   What was the specific plastering work that was       11:51

16        done?

17            A.   We stuccoed the house, painted the house, and

18        relandscaped the front.

19            Q.   Why do you believe that stuccoing the house or

20        painting the house would somehow keep people away if they    11:51

21        knew what your address was?

22            A.   I don't know why.  It was just a thought that we

23        had, and we did it.

24            Q.   Was this work performed on or about May 31st,

25        2019?                                                         11:51
```

Page 72

```
 1            A.   That's the date on the invoice.            11:52

 2            Q.   Okay.  Do you have any reason to doubt that the

 3       work was done any time other than around May 31st, 2019?

 4            A.   No.

 5            Q.   The Simi Valley council meeting and the events   11:52

 6       surrounding it took place almost 11 months before

 7       May 31st, 2019.  Why would you wait 11 months to have this

 8       work done?

 9            A.   Can't answer that question.  I don't know.

10            Q.   Okay.  Did any strangers come to your home in    11:52

11       20- -- in 2018?

12            A.   Yes.

13            Q.   When?

14            A.   On and off for at least a month or two.

15            Q.   A month or two after June 25, 2018; is that      11:53

16       right?

17            A.   You were breaking up.  Can you say it again?

18            Q.   Okay.  You mentioned a month or two.  Do you

19       mean they came a month or two after June 25, 2018?

20            A.   Yes.                                             11:53

21            Q.   Okay.  Do you know --

22                 (Reporter clarification.)

23            A.   Do I know what?

24            Q.   Do you know who any of the people were?

25            A.   No.                                              11:53
```

Page 73

1          Q.   Did any of the people who came to your house    11:53

2     ever say anything?

3          A.   Not to my knowledge.

4          Q.   Did they ever do anything?

5          A.   Threw eggs at my daughter's car.    11:54

6          Q.   Okay.  When was that?

7          A.   I don't know.  I don't know the specifics.

8          Q.   Was that shortly after the Simi Valley council

9     meeting on June 25, 2019 [verbatim]?

10         A.   Yes.    11:54

11         Q.   Okay.  Which car was it that they threw eggs at?

12         A.   My daughter's Volkswagen.

13         Q.   Did you have the entire exterior of the house

14    stuccoed and painted?

15         A.   Yes.    11:55

16         Q.   Take a look, please, at the next exhibit I'm

17    going to show you, Exhibit 58.

18         Is this part of the same painting work and stucco

19    work that you previously described?

20              MR. YEGER:  Hold on, please.  Exhibit 58 is now    11:56

21    on screen in the shared folder.

22       BY MR. REICHMAN:

23         Q.   I'm sorry.  I jumped the gun.  Let me repeat my

24    question.

25         Is this part of the same painting and stucco work you    11:56

Page 74

```
 1        previously described?                                11:56

 2            A.    Yes.

 3            Q.    What was the color of the house before the

 4        painting began and what was the color afterwards?

 5            A.    Boy, I don't remember what color it was.     11:56

 6            Q.    Okay.  When is the last time the house was

 7        painted prior to 2019?

 8            A.    I'm sorry.  Say that again.

 9            Q.    When was the last time the house was painted

10        prior to 2019?                                        11:57

11            A.    I don't think it was.  Not by us.

12            Q.    Okay.  Remind me when it was that you moved in.

13            A.    1994 in September.

14            Q.    So after 25 years, do you think the house needed

15        a paint job?                                          11:57

16            A.    That seems reasonable.

17                  MR. MYSLIWIEC:  Object to the form of the

18        question.  I think the arithmetic is wrong.

19          BY MR. REICHMAN:

20            Q.    Maybe I did.                                 11:58

21            Sir, what year was it that you moved in?  1994?

22            A.    1994 in September.

23            Q.    So it was about -- Counsel was right.  It was

24        about 27 years; right?  No, I think that is right.

25        Twenty-five years.  All right.  I'll move on.        11:58
```

Page 75

```
 1              MR. MYSLIWIEC:  I think 22 years would be more    11:58

 2     accurate.

 3       BY MR. REICHMAN:

 4         Q.   Okay.  Let's take a look, please, at an exhibit

 5     that was previously marked as Exhibit 59.              11:58

 6              MR. YEGER:  One moment, please.

 7         Exhibit 59 is now on screen and in the shared folder.

 8       BY MR. REICHMAN:

 9         Q.   I'm showing you now what was previously marked

10     as Plaintiff's Exhibit 59.  It appears to relate to     11:59

11     work -- to custom design manufacturing and install double

12     Spanish colonial garage door and four matching shutters.

13         Did you arrange for this work to be done?

14         A.   Uh-huh.  Yes.

15         Q.   And why did you arrange for this work to be      12:00

16     done?

17         A.   Change the look of the house.

18         Q.   Why did you want to change the look of the

19     house?

20         A.   Because of the incident.                        12:00

21         Q.   So can you explain why -- how putting on a new

22     garage door with matching shutters would somehow keep

23     the -- your identity or the identity of your place,

24     residence or business, secret from anyone who wanted to

25     find you?                                                12:01
```

                                                    Page 76

```
 1        A.   The question is why?                        12:01

 2        Q.   How would that be?  How would it help somehow,

 3   keep your place of business or residence concealed?

 4        A.   Well, the old one was an old metal ugly one, and

 5   this is a nice wood one which changes the look of the    12:01

 6   house.

 7        Q.   Okay.  All right.  Would anybody who wanted to

 8   find you still know the address of your house and

 9   business?

10             MR. MYSLIWIEC:  Object to the question.  It     12:01

11   calls for speculation.  It's the state of mind of

12   strangers.

13             MR. REICHMAN:  I'll rephrase it.

14        Q.   Did you ever consider whether even if you

15   changed the garage door, people would still know where you 12:01

16   lived and worked?

17        A.   No.

18        Q.   Would putting in a custom colonial garage door

19   improve the look of your house?

20        A.   It changed.                                   12:02

21        Q.   Did it improve it?

22        A.   Yes.

23        Q.   Okay.  And did the matching shutters also

24   improve the look of your house?

25        A.   Yes.                                          12:02
```

Page 77

```
 1              Q.   And did the painting and stucco work also      12:02

 2      improve the look of your house?

 3              A.   Yes.

 4              Q.   And did the landscaping also improve the look of

 5      your house?                                                 12:02

 6              A.   The what?

 7              Q.   Did the landscaping also improve the look of

 8      your house?

 9              A.   Yes.

10              Q.   Let's take a look at another exhibit previously  12:03

11      marked Exhibit 60.

12                   MR. YEGER:  One moment, please.

13              Exhibit 60 is in the shared folder and on screen.

14        BY MR. REICHMAN:

15              Q.   I'm showing you now an invoice from Bradford     12:04

16      Sheet Metal indicating that work -- Well, the invoice date

17      is June 19, 2019.  Did you arrange for this work?

18              A.   Yes.  Can you scroll down, please.

19              Okay.

20              Q.   Part of this invoice was for chimney work; is    12:04

21      that right?

22              A.   Chimney work, yeah.  Equipment covers.  Yeah.

23              Q.   Okay.

24              A.   Yeah.

25              Q.   Why did you have the chimney work done?          12:04
```

Page 78

```
 1            A.   Because we burned regular firewood, and we        12:04

 2       wanted to make sure that the sparks would not exit the

 3       flue.  More of a safety factor.

 4            Q.   Okay.  Did any of the work on this invoice

 5       relate in any way to the events that occurred subsequent   12:05

 6       to the Simi Valley council meeting?

 7            A.   No.

 8            Q.   Okay.  If you'd take a look at the second page.

 9       Is that a document that was generated by R.C.?

10            A.   What's the question?  I'm sorry.                  12:06

11            Q.   Is this second page of the document that's

12       before you now one that was generated by R.C.?

13            A.   That is probably the check number, yes.

14            Q.   Okay.  And this was an expense that was paid by

15       R.C.; is that right?                                       12:06

16            A.   Yes.

17            Q.   Okay.  And am I right that the other expenses

18       that we have referred to earlier: The stuccoing, the

19       painting, the garage door, and the shutters were also

20       expenses that were paid for by R.C.?                       12:06

21            A.   To the best of my knowledge.

22            Q.   Okay.  Can you explain to me why the chimney

23       work was paid for by R.C.?

24            A.   I'm sorry?

25            Q.   Why was the chimney work paid for by R.C.?       12:07
```

Page 79

```
 1          A.   I don't know.                              12:07

 2          Q.   Did R.C. ever pay personal expenses for you and

 3     Mrs. La Liberte?

 4          A.   Not to my knowledge.

 5          Q.   Really?  Didn't you know where the money was   12:07

 6     coming from to pay for this work we were just talking

 7     about: The painting, the shutters, the garage door, the

 8     chimney?

 9          A.   What's the question?

10          Q.   Well, didn't you know that this was all money   12:07

11     that came from R.C. that had nothing to do with the

12     business of R.C.?

13               MR. MYSLIWIEC:  Objection to the question.

14     Argumentative.

15       BY MR. REICHMAN:                                     12:08

16          Q.   Can you answer the question, please?

17          A.   I don't know.  I'm not sure what you're asking.

18               MR. REICHMAN:  All right.  If the reporter could

19     reread the question, please.

20          (The record is read by the reporter.)            12:08

21               THE WITNESS:  I don't know.

22       BY MR. REICHMAN:

23          Q.   Let me show you what was previously marked as

24     Plaintiff's 61.

25               MR. YEGER:  One moment, please.              12:09
```

Page 80

```
 1                  THE WITNESS:  Sorry about that.           12:09

 2                  MR. REICHMAN:  No problem.

 3                  MR. YEGER:  Exhibit 61 is in the shared folder

 4       and on screen.

 5         BY MR. REICHMAN:                                    12:10

 6           Q.   I'm showing you now Exhibit 61.  That's a

 7       landscaping bill that also is from the summer of 2019.

 8               Sir, is it your testimony that this change in

 9       landscaping was somehow connected with the events that

10       occurred subsequent to the Simi Valley council meeting?  12:10

11           A.   Changed the look of the house.

12           Q.   Can you explain somehow how the change in

13       landscaping --

14           (Reporter clarification.)

15           Q.   Can you explain to me how this change in       12:11

16       landscaping, such as putting in agave plants would somehow

17       deter anyone from finding out where you lived or where you

18       worked?

19                  MR. MYSLIWIEC:  Object to the question insofar

20       as it calls for speculation into minds of people who may   12:11

21       have vastly different intelligences.

22         BY MR. REICHMAN:

23           Q.   Can you answer the question, please?

24           A.   The existing landscaping that we had before were

25       large bushes and stuff in front of the windows, and we put  12:12
```

Page 81

```
 1      in drought tolerant plants which opened things up and      12:12

 2      changed the look of the house.

 3          Q.   Okay.  So in other words, it made the house more

 4      open and accessible to people driving by; is that right?

 5          A.   You can say that.                                 12:12

 6          Q.   All right.  I'd like to show you another

 7      Exhibit 49.  This was the plaintiff's initial disclosure

 8      in the case.

 9               MR. YEGER:  One moment, please.

10               MR. REICHMAN:  There are some invoices that were  12:12

11      also part of that exhibit that I want to go through.

12               MR. YEGER:  Exhibit 49 is now in the shared

13      folder and now on screen.

14        BY MR. REICHMAN:

15          Q.   There is only one page of this exhibit that I'd   12:14

16      like you to look at which is the last page.

17          This relates to some questions we talked about before

18      about replacement of your phones; is that right?  Do you

19      see there's two AT&T from June 30th, 2018?

20          A.   I didn't hear the question.  I don't know what    12:15

21      the question is.

22          Q.   Let me try it again.  Fair enough.

23          Do you see on this page there is two AT&T charges

24      from June 30th, 2018?

25          A.   Where is the 18?  Oh, those two right here.       12:15
```

Page 82

```
 1              Q.   One for $108.24 and another for $290.68 cents.    12:15
 2      Do you see that?
 3              A.   Okay.
 4              Q.   What were those charges for?
 5              A.   I have no idea.                                    12:15
 6              Q.   Were those charges related to the -- to your and
 7      Mrs. La Liberte changing your cell phones?
 8              A.   I have no idea.
 9              Q.   Okay.  Do you remember going to the -- Did you
10      ever go to an AT&T store to change your phones?              12:16
11              A.   Yeah, I believe we did.
12              Q.   Okay.
13              A.   That was probably the 30th.
14              Q.   And did you do that the morning of June 30th?
15              A.   I'm not sure if it was the morning, but it looks 12:16
16      like it was on June 30th.
17              Q.   Okay.  Do you remember at all what time of day
18      it was that you went?
19              A.   No.
20              Q.   I meant to ask you some of the remaining         12:16
21      charges.
22              Am I right that this is -- this last page is a
23      photocopy of the -- of a credit card account that you and
24      Mrs. La Liberte have?
25              A.   Looks like it, yeah.                             12:17
```

Page 83

1          Q.    Okay.  And do you see beginning on July 3rd,          12:17

2     there's a charge for the Trump International Hotel in DC?

3          A.    I have no knowledge of that.

4          Q.    Well, do you recall taking a vacation with

5     Mrs. La Liberte beginning on or about July 2nd, 2018 and     12:17

6     lasting through all or most of that week?

7          A.    I don't remember that.

8          Q.    So you don't remember taking a vacation to

9     Maryland in DC in July 2018?

10         A.    We went to see Ros's cousin in Maryland.          12:18

11         Q.    Okay.  And do you remember what else you did

12    there on that vacation?

13         A.    Sorry.  Do I what?

14         Q.    Do you remember anything else you did on that

15    vacation?                                                    12:18

16         A.    We went horseback riding.

17         Q.    Okay.  Do you recall how many nights you stayed

18    at the Trump International Hotel?

19         A.    You're breaking up.  You were garbled.

20         Q.    Did you ever stay at the Trump International       12:18

21    Hotel?

22         A.    No.

23         Q.    Okay.  Did you ever go there to have a drink or

24    a meal?

25         A.    We did.                                            12:18

                                                           Page 84

```
 1              Q.   Okay.  While you were away that week, who was        12:18

 2      minding the business of R.C.?

 3              A.   Business was closed.

 4              Q.   Okay.  Well, did you ever go on any -- would you

 5      always close the business of R.C. when you and                   12:19

 6      Mrs. La Liberte went on vacation?

 7              A.   Yes.

 8              Q.   Okay.  How often would you go in 2019?  How

 9      often would you close the business and go on vacation?

10              A.   No recall.  No recollection.                        12:19

11              Q.   Do you know how many days during -- Withdrawn.

12              Let's just take the most recent past.  I know it's

13      hard to recall years back.

14              In 2021, how many vacations did you and

15      Mrs. La Liberte take together?                                   12:20

16              A.   I don't know.

17              Q.   Well, can you recall, did you take any vacations

18      in 2021?

19              A.   We usually take vacations, but we do take --

20      usually evolve around a holiday or a long weekend.  No          12:20

21      vacations for any length of time.

22              Q.   Okay.  Well, did you ever go away for a week

23      like you apparently did on the date of July 2018?

24              A.   I don't remember.

25              Q.   Would you charge your travel expenses, such as     12:20
```

                                                          Page 85

1        on this vacation to R.C.?                                12:20

2            A.   I don't recall.

3            Q.   What, if any, travel expenses did R.C. incur

4        during the years 2017 through 2021?

5            A.   I really don't know.                            12:21

6            Q.   Are you aware of any travel expenses R.C.

7        incurred during the last five years other than driving a

8        car to various projects in Southern California?

9            A.   I'm sorry.  I didn't get the beginning of that

10       question.                                                12:22

11           Q.   Okay.  During the last five years, are you aware

12       of any travel expenses R.C. incurred other than driving to

13       project sites in Southern California?

14           A.   I don't know.

15           Q.   Do you know whether R.C. ever took as business  12:22

16       deductions personal travel expenses that were incurred by

17       you and Mrs. La Liberte?

18           A.   Repeat the beginning of that.

19           Q.   Okay.  Do you know whether R.C. ever took as

20       business deductions personal travel expenses of yours and 12:23

21       Mrs. La Liberte?

22           A.   I do not know.

23           Q.   Do you know whether R.C. ever took as business

24       deductions any personal expenses incurred by you or

25       Mrs. La Liberte?                                         12:23

Page 86

1          A.   I do not know.                                12:23

2          Q.   Did just Joy Reid's name ever come up in any

3     communication you ever had with any R.C. client or

4     customer?

5          A.   Communications for what?                      12:24

6          Q.   Any communications.

7          A.   Regarding what?

8          Q.   Any time.

9          A.   No.

10         Q.   Did any of the events surrounding the Simi     12:24

11    Valley council meeting ever come up in any of your

12    communications with any R.C. client or customer?

13         A.   Not to my knowledge.

14         Q.   Have you ever heard any R.C. client or customer

15    ever say anything disparaging about Mrs. La Liberte?     12:24

16         A.   No.

17         Q.   Did any R.C. client or customer ever communicate

18    with you that it is not going to do business with R.C.

19    because of accusations that Mrs. La Liberte was being a

20    racist or was racist?                                    12:25

21         A.   Not to my knowledge.

22         Q.   Are you aware of any other R.C. client or

23    customer who was pressured not to do business with R.C.?

24         A.   We lost business over it, yes.

25         Q.   What business did you lose over it?            12:25

                                                   Page 87

```
 1           A.    Fast food projects.                        12:25

 2           Q.    What fast food projects?

 3           A.    Dunkin' Donuts.

 4           Q.    Okay.  Anything else?

 5           A.    No.  There were more, but I'm thinking.    12:25

 6           Would have been El Pollo Loco.

 7           Would have been Taco Bell.

 8           Q.    I'm sorry.  What was that name?

 9           A.    I think might have been Taco Bell or Pollo Loco.

10           Dunkin' Donuts.                                  12:26

11           Ace Hardware.

12           That's all I can recall at the moment.

13           Q.    Okay.  What was the entity that you referred to

14      after Taco Bell?

15           A.    I'm sorry.  Say that again.                12:26

16           Q.    You mentioned four companies: Dunkin' Donuts,

17      Taco Bell, Ace Hardware.  I thought there was a fourth.

18           A.    Ace Hardware.

19           Q.    Okay.  Maybe the other one was Taco Bell.  You

20      recall these three; is that right?                    12:26

21           A.    Background.  You are not coming in very clear.

22               MR. MYSLIWIEC:   There's interference here.

23        BY MR. REICHMAN:

24           Q.    Let me try it again.

25           You said you identified three businesses who you    12:27
```

Page 88

```
 1     thought were pressured not to do business with R.C.;        12:27

 2     right?  You mentioned Dunkin' Donuts, Taco Bell, Ace

 3     Hardware.  Was there another one?

 4          A.   The record says Pollo Loco.  Pollo Loco.

 5          Q.   How do you spell that?                             12:27

 6          A.   It is Spanish.  Pollo Loco.  P-o-l-l-o.

 7     L-o-c-o.

 8          Q.   L-o-c-o, the second word?

 9          A.   L-o-c-o.

10          Q.   Okay.                                              12:27

11          (Reporter clarification.)

12          Q.   What basis do you have for believing that

13     Dunkin' Donuts was pressured not to do business with R.C.?

14          A.   They all just stopped inviting us to bid after

15     the incident.                                               12:28

16          Q.   Okay.  Well, let's start with Dunkin' Donuts.

17     When was the last project that R.C. had done for Dunkin'

18     Donuts?

19          A.   Ramona, California.  San Diego.

20          (Reporter clarification.)                              12:28

21               MR. MYSLIWIEC:  Is that the court reporter?

22               THE REPORTER:  I believe I heard Ramona,

23     California; is that correct?

24               THE WITNESS:  Correct.

25       BY MR. REICHMAN:                                          12:28
```

                                                        Page 89

1          Q.    What year was that project done?                    12:28

2          A.    I'm sorry?

3          Q.    What year was that project done?

4          A.    It was either the beginning or first quarter of

5     2018 or the last quarter of 2017.  I'm not 100 percent      12:29

6     sure of that.  So I'd have to go back to my records.

7          Q.    Okay.  At a break we will see what we can get on

8     that.

9          What was the -- Did you have any communication with

10    anyone from Dunkin' Donuts subsequent to your work on that  12:29

11    project?

12         A.    We haven't worked for Dunkin' Donuts in a long

13    time.  They haven't invited us since 2008 [verbatim].

14         Q.    Okay.  Did you ever ask Dunkin' Donuts --

15    Withdrawn.                                                   12:29

16         Did you ever communicate with Dunkin' Donuts about

17    why you're not being asked to bid on projects?

18         A.    No.

19         Q.    Why not?

20         A.    We just figured that it was because of the       12:30

21    incident because we were not getting any more invitations

22    to bid.

23         Q.    Okay.  But you never sought to contact Dunkin'

24    Donuts to see if that was the case; is that right?

25         A.    Sorry?                                           12:30

                                                          Page 90

```
 1              Q.   You never contacted Dunkin' Donuts to see if     12:30

 2       that was the case; correct?

 3              A.   Yes.  Yeah.  And they would not return our

 4       calls.

 5              Q.   Okay.  Who did you try to call?                   12:30

 6              A.   I don't have the list in front of me.  I'd have

 7       to go and get it.

 8              Q.   What document would you have that would show the

 9       people you tried to contact, but they would not return

10       your call?                                                   12:30

11              A.   I don't have any documents that would show that.

12              Q.   You just said you'd have to go and look at

13       something.  What were you referring to?

14              A.   The list of the franchisees on the phone record.

15              Q.   Did you ever email anyone from Dunkin' Donuts    12:31

16       with respect to bidding on new projects?

17              A.   Say again.

18              Q.   Did you ever email anyone from Dunkin' Donuts

19       about bidding on new projects?

20              A.   No.                                              12:31

21              Q.   Did Mrs. La Liberte ever email anyone from --

22       anyone at Dunkin' Donuts about bidding on new projects?

23              A.   Not to my knowledge.

24              Q.   You are the person at R.C. who would be

25       communicating with customers with respect to bidding on     12:31
```

Veritext Legal Solutions
866 299-5127

```
 1      new projects?                                        12:32

 2          A.   Not always.  It was both of us.

 3          Q.   Okay.  When is the last time R.C. did any work

 4      for Taco Bell?

 5          A.   Can't recall, to be honest with you.        12:32

 6          Q.   How many projects did R.C. ever do for Pollo

 7      Loco?

 8          A.   We probably did maybe ten or 15 projects over

 9      the years.

10          Q.   When is the last time you did a project with   12:32

11      Pollo Loco?

12          A.   When was the last time I did what?

13          Q.   When was the last time R.C. did a project for

14      Pollo Loco?

15          A.   I can't remember.  It's been a while.       12:33

16          Q.   "A while" meaning what?  At any time have you

17      done a project after 2010 with Pollo Loco?

18          A.   After 2010?

19          Q.   Yes.

20          A.   Yeah.  I think probably around 2014, 2013,   12:33

21      somewhere in there.

22          Q.   Okay.  Why didn't you do any projects for Pollo

23      Loco in 2015 or 2016 or 2017?

24          A.   Just stopped doing their work, and they didn't

25      contact us with any more bid proposals even then.    12:33
```

Page 92

1         Q.   Did you ever do any work for any Taco Bell store  12:34

2    subsequent to 2010?

3         A.   I honestly don't recall.

4         Q.   Okay.  Who at --

5         (Reporter clarification.)                             12:34

6         Q.   When you were -- When you were hired by Ace

7    Hardware, would you be hired by individual store owners?

8         A.   Yes.

9         Q.   Okay.  Are you aware of any project that any of

10   those individual store owners had subsequent to June 2018?  12:35

11        A.   Usually what they would do is most of the

12   franchisees do a five-year project or every five years

13   they remodel, so that's part of the reason why we didn't

14   get any work from Taco Bell and from El Pollo Loco.

15        Ace Hardware we did Encino Village, which is in the  12:35

16   city of Encino.  That was the last one we did.  That was

17   probably 2017, late 2017, December, somewhere in there.

18        Q.   Okay.  So five years would be this year; is that

19   right?

20        A.   That's standard within the industry, five to    12:36

21   seven.

22        Q.   Okay.  Have you been in touch with Ace Hardware

23   about any projects that they have?

24        A.   Not lately, no.

25        Q.   Are you aware of any project for Ace Hardware    12:36

                                                    Page 93

1       that you were not asked to bid on?                    12:36

2            A.   No, not recently.

3            Q.   Are you aware of any Pollo Loco project that you

4       were asked not to bid on?

5            A.   No.                                          12:36

6            Q.   Are you aware of any Taco Bell project that you

7       were not asked to bid on?

8            A.   No.

9            Q.   Are you aware of any Dunkin' Donuts project that

10      you were not asked to bid on?                         12:37

11           A.   No.

12           Q.   Is it fair to say a franchise may not ask a

13      contractor such as yourself, such as R.C. not to bid for

14      any variety of reasons, including they found someone that

15      they had a relationship with, they didn't like the work   12:37

16      that was previously performed, that there were price

17      reasons, or any of a host of other reasons why a

18      franchisee might choose one construction company over

19      another?

20           A.   After the incident happened, we got rid of our  12:38

21      website, so there was no communication.  The website -- No

22      advertising over the website.  Nothing.  No one could view

23      our company.

24           Q.   You took down the website in 2018.  Did you ever

25      consider putting the website back up?                 12:38

Page 94

1          A.    No.                                              12:38

2          Q.    Why not?

3          A.    Just wasn't a good idea based on the incident.

4          Q.    Are you aware of any project that you ever

5     obtained as a result of your website?                       12:38

6          A.    I don't understand the question.

7          Q.    Okay.  You seem to suggest that your website

8     generated business for R.C.  I'm asking if you're aware of

9     any project at any time in the history of R.C. that was

10    generated by R.C.'s website before it was taken down?       12:39

11         A.    Before the incident, yes, we did get projects

12    because of the website.

13         Q.    Okay.  Which -- Can you give me any examples of

14    projects that you obtained because of your website?

15         A.    No, I can't.  I don't remember.                  12:39

16         Q.    I want to go back to the profit and loss

17    statements.

18         A.    Sorry?

19         Q.    I would like to go back to the profit and loss

20    statements.  I believe it's Exhibit 112.                    12:40

21              MR. YEGER:  One moment, please.

22         Exhibit 112 is on the screen.

23      BY MR. REICHMAN:

24         Q.    I want to go through the revenue that R.C. had

25    received from construction work in the years 2016 through   12:41

                                                        Page 95

```
 1      2020.                                              12:41

 2          You see on the first page, am I right that the

 3      construction work -- the revenue for construction work in

 4      2016 was $2,466,451.73?  Do you see that?

 5          A.   Yeah, I see it.                           12:41

 6          Q.   Okay.  And do you see -- Turn to the first page

 7      of the profit and loss statement for 2017.

 8          And do you see that the construction work, for all

 9      the construction work in 2017 is 2,441,778?

10          A.   Yeah, I see it.                           12:42

11          Q.   Okay.  And do you see in 2019 it was

12      2,945,611 --

13          (Reporter clarification.)

14          Q.   It was 20 million -- $2,945,611.12; is that

15      right?                                             12:42

16          A.   I see it.

17          Q.   Okay.  And in 2019 it was 2,471,408.75?

18          A.   I see it.

19          Q.   Okay.  And in 2020 it was $2,253,229.53?

20          A.   I see it.                                 12:43

21          Q.   Okay.  Am I right that the revenue for

22      construction that R.C. had in 2020 was almost the same as

23      it had in 2016?

24          A.   I don't understand the question.

25          Q.   Okay.  If I want to know about the --      12:43
```

Page 96

```
 1            (Reporter clarification.)                    12:43

 2        Q.   Am I correct that the construction revenue was

 3    always in the range of $2,250,000 and $3 million annually?

 4        A.   I still don't understand the question.

 5        Q.   Well, let me try it another way.             12:44

 6        Do you have any reason to doubt the accuracy of any

 7    of the figures in the profit and loss statements that we

 8    were provided?

 9        A.   No.

10        Q.   Okay.  Did R.C. lose any McDonalds business of   12:44

11    any kind as a result of any of the Simi Valley -- the Simi

12    Valley council meeting or the events that took place

13    thereafter?

14        A.   I think we lost most of it because of the COVID.

15    McDonalds has been pretty loyal to us.               12:45

16            MR. REICHMAN:   I'd like to mark as the next

17    exhibit another financial document that we received from

18    you with respect to Jersey Mike's.

19            MR. YEGER:   One moment, please.

20        (Deposition Exhibit 114 was marked for identification  12:46

21    by counsel electronically.)

22            MR. YEGER:   Exhibit 114 is in the shared folder

23    and on the screen.

24     BY MR. REICHMAN:

25        Q.   I'm showing you now -- I'm sorry, David, what    12:47
```

Page 97

```
 1        did we mark this as?                                    12:47

 2               MR. YEGER:  114.

 3          BY MR. REICHMAN:

 4          Q.   I'm showing you now Exhibit 114, which we were

 5        provided, shows the customer detail for Jersey Mike's.   12:47

 6              And as you can see, this is a report that was

 7        apparently run, if you look on the left-hand corner, on

 8        April 19, 2021.  And it shows invoices rendered to Jersey

 9        Mike's in 2012.

10              Are you aware of any work that R.C. performed for   12:48

11        Jersey Mike's subsequent to 2012?

12          A.   2012 was -- Solana Beach was the first ones we

13        did for Jersey Mike's.  There were many after that.

14          Q.   Okay.  Do you know why no other jobs show up on

15        this report or any other report we received?             12:48

16          A.   The last job we did for Jersey Mike's was in

17        Bakersfield, and that was probably 2- -- I'm not sure --

18        maybe 2016, 2017.  The main contact we had, Dan Burell,

19        had left the company, so we lost contact with Jersey

20        Mike's at that point, and that was in 2018.              12:49

21          Q.   And how do you spell Mr. Burell's name?

22          A.   B-u-r-e-l-l, I believe.

23          Q.   The individual -- With Jersey Mike's, would you

24        be hired by individual store owners?

25          A.   Franchisees, yes.                                 12:49
```

Page 98

```
 1              Q.    Okay.  And is Dan Burell one of those          12:49

 2       franchisees?

 3              A.    No.

 4              Q.    Withdrawn.

 5              Was Dan Burell a Jersey Mike's franchisee?           12:49

 6              A.    No.  Let me clarify that.  Yes, he was a

 7       franchisee, but he was also the head of Jersey Mike's in

 8       Southern California.

 9              Q.    Okay.  You mentioned you were hired by Dunkin'

10       Donuts for a project you thought it was 2016 or 2017.      12:50

11              Who was the person who hired you at Dunkin' Donuts?

12              A.    I think it was -- He was a franchisee.  Can't

13       remember the first name, but I think the last name was

14       Wishner.

15              Q.    I'm sorry.  How do you spell that?            12:51

16              A.    That's a good one.  W-i-s-h-n-e-r.

17              Q.    Okay.

18              A.    I'm not 100 percent on that one.

19              Q.    Do you know whether Mr. Wishner ever had any

20       projects of any kind where he needed a contractor after   12:51

21       you performed the work that you performed for him?

22              A.    Not to my knowledge.

23              Q.    Do you recall the name of any other Dunkin'

24       Donuts franchisee who hired you or anyone?

25              A.    We had numerous Dunkin' Donuts in the L.A. area,  12:51
```

Page 99

```
 1        but none of them -- we didn't do any of the work.         12:51

 2             Q.   We'll go back and unpack that.

 3             Are you aware of any franchise of any fast food

 4        company who had a project after June 2018 and who you

 5        previously done business with who did not allow you to bid  12:52

 6        on a new project?

 7             A.   No.  I'm not aware of that.

 8             There was one McDonalds project or a franchisee that

 9        would not do work with us.  Last name was Sanchez.

10             Q.   How do you know Mr. Sanchez would not do work     12:53

11        with R.C.?

12             A.   He just said he would not do it.

13             Q.   Okay.  I thought we covered this earlier in our

14        examination, but let's go over it.

15             Did you have a conversation with Mr. Sanchez?         12:53

16             A.   I did not.  No.  We heard it through the

17        grapevine.

18             Q.   How did you hear it through the quote, unquote

19        "grapevine" that Mr. Sanchez would not do business with

20        you?                                                       12:54

21             A.   From other contractors.

22             Q.   Who was that other contractor?

23             A.   Let's see.  There was West Coast Construction.

24             Q.   Who at West Coast Construction told you that

25        Mr. Sanchez would not do business with you?                12:54
```

Page 100

```
 1              A.   God, what was his name?              12:54

 2         I can't remember the person's name, to be honest with

 3    you.

 4              Q.   Okay.  Was West Coast Construction a competitor

 5    of R.C.?                                            12:55

 6              A.   They are a much larger company than us.  So as

 7    far as being competitors, maybe on a smaller scale, yes.

 8              Q.   Okay.  How many competitors does R.C. have in

 9    Southern California?

10              A.   Probably, maybe three or four.        12:55

11              Q.   Who are those three or four?

12              A.   West Coast, BCK, Timberline, and Frans

13    Construction.

14              Q.   How do you spell the last one?

15              A.   F-r-a-n-s.                            12:55

16              Q.   Those are the only four companies that do

17    construction work for fast food franchisees in Southern

18    California; is that right?

19              A.   Only for McDonalds.

20              Q.   I see.  These are McDonalds' competitors?  12:56

21              A.   McDonalds.

22              Q.   The other fast food franchises, how many

23    competitors do you have?

24              A.   A lot of them are all the same.  Because they

25    all -- Everybody is a small, I guess, community.    12:56
```

Page 101

```
1              Q.   Did Mr. Sanchez ever sell --              12:56

2         (Reporter clarification.)

3              Q.   Did Mr. Sanchez ever sell any of his stores?

4              A.   I have no idea.

5              Q.   Do you know how many stores Mr. Sanchez'    12:57

6    entities that are controlled by him own today?

7              A.   We have no contact with them at all.

8              Q.   Did you have a good relationship with

9    Mr. Sanchez when you were doing work for his stores?

10             A.   Not a great relationship, but we did.  We were   12:57

11   on --

12             Q.   Why wasn't it a great relationship?

13             A.   Because the projects were complicated, and he

14   did not want to pay the price that we wanted.

15             Q.   Okay.  Do you know whether -- that the issues    12:57

16   that you had with Mr. Sanchez with respect to the prior

17   work that you did for him had anything to do with him not

18   wanting R.C. to bid on future projects?

19             MR. MYSLIWIEC:  Object to the form of the

20   question.  It misstates the witness's prior testimony that   12:58

21   was -- that was not in dispute in any way as to the

22   quality of the construction work that was done by R.C.

23   Associates.

24      BY MR. REICHMAN:

25             Q.   You may answer the question.              12:58
```

Page 102

```
 1                    MR. MYSLIWIEC:  As long as you understand he's   12:58

 2       mischaracterizing your testimony.

 3                    THE WITNESS:  What's the question again?

 4                    MR. REICHMAN:  Next time I'd appreciate just

 5       object to the question.  No speaking objections so we    12:58

 6       don't have to go through this so the witness loses the

 7       thread and I do as well.  So let's go back.  Let's go

 8       back.

 9                    MR. MYSLIWIEC:  Stop a second.

10        BY MR. REICHMAN:                                        12:59

11           Q.   You had some difficulties with Mr. Sanchez the

12       last time you worked with him; is that right?

13           A.   No.  There weren't difficulties.  It was just a

14       difference of opinion.

15           Q.   Okay.  You had differences of opinion with      12:59

16       Mr. Sanchez; is that right?

17           A.   I wanted "X" amount of dollars for the project.

18       He didn't want to pay it.  End of story.

19           Q.   Okay.  So you had a billing dispute with

20       Mr. Sanchez; is that right?                             12:59

21           A.   I'm sorry?

22           Q.   You had a billing dispute with Mr. Sanchez;

23       correct?

24           A.   No.  It wasn't a billing dispute.  We were

25       bidding the project.                                    12:59
```

Page 103

```
 1          Q.   Okay.                                    12:59

 2          A.   We had done probably 15 or 20 projects for him

 3     in the past.

 4          Q.   Okay.

 5          A.   And it ended up --                       12:59

 6          Q.   He didn't want to pay you what you wanted to be

 7     paid on a bid; is that right?

 8          A.   He wanted -- I'm sorry.  He what?

 9          Q.   You mentioned you had a dispute with

10     Mr. Sanchez.  That was with respect -- was that with  13:00

11     respect to a bid or with respect to construction work to

12     be performed?

13          A.   Again, it wasn't a dispute.  It was a matter of

14     opinion.  He didn't want to pay the money.

15          Q.   Okay.  So --                             13:00

16          A.   We lost the project.

17          Q.   All right.  You put in a bid for a project, and

18     Mr. Sanchez said it was too high; is that right?

19          A.   More or less, yeah.

20          Q.   Okay.  And that happened after you had this  13:00

21     difference of opinion with respect to what the amount of

22     the bid should be?

23          A.   We didn't do the work.

24          Q.   He didn't select you; correct?

25          A.   We didn't do the work.                   13:00
```

                                               Page 104

1          Q.   Does that mean -- Okay.  That means he -- Did      13:00

2     Mr. Sanchez then hire someone who bid lower than you?

3          A.   Obviously.

4          Q.   Okay.  And when -- When did you have this

5     difference of opinion with Mr. Sanchez?                      13:01

6          A.   I can't recall.

7          Q.   Do you recall what year it was?

8          A.   I'm sorry?

9          Q.   Do you recall the year it was?

10         A.   It was probably, if I'm not mistaken, either       13:01

11    late 2017 or beginning of 2018.

12         Q.   Okay.  And you had this difference with

13    Mr. Sanchez before the Simi Valley council meeting;

14    correct?

15         A.   I had heard after the meeting that he didn't       13:01

16    want to work with us.

17         Q.   Okay.  Let's break this down.

18         You left the bid for Mr. Sanchez's work prior to Simi

19    Valley council meeting; correct?

20         A.   Like I said, the last time we had done anything    13:02

21    or talked to him was 2017 or 2018.  It was after the

22    incident we found out he did not want to do work with us.

23         Q.   Okay.  All right.  I want to break this down

24    because you're getting out there.

25         Am I right that Mr. -- you had the difference of        13:02

                                                         Page 105

```
 1      opinion with Mr. Sanchez and didn't get a bid, wouldn't      13:02

 2      accept your bid on a project, prior to the Simi Valley

 3      council meeting?

 4           A.   Prior to, yes.

 5           Q.   Okay.  And afterwards a competitor of yours told  13:02

 6      you that Mr. Sanchez didn't want to do business with you;

 7      is that right?

 8           A.   After the incident.

 9           Q.   Okay.  And you don't know who it was who

10      actually said that to you; is that right?                    13:03

11           A.   Say that again.

12           Q.   You don't know who it was who told you that

13      Mr. Sanchez allegedly doesn't want to do business with

14      you?

15           A.   Correct.                                           13:03

16           Q.   Okay.  And you never contacted Mr. Sanchez to

17      determine why it was that Mr. Sanchez supposedly did not

18      want to do business with you; correct?

19           A.   I did not.

20           Q.   Okay.  And Mrs. --                                 13:03

21           (Reporter clarification.)

22           Q.   And Mrs. La Liberte also did not contact

23      Mr. Sanchez to determine whether or why he did not -- he

24      was not being to do business with R.C.; correct?

25           A.   To the best of my knowledge.                       13:04
```

                                                        Page 106

```
 1              Q.   And how many projects did Mr. Sanchez have that   13:04

 2     other contractors performed after the Simi Valley council

 3     meeting in June 2018?

 4              A.   I have no idea.

 5              Q.   What contractor won that bid that you lost on     13:05

 6     with -- with respect to Mr. Sanchez's project in 2017 to

 7     2018?

 8              A.   I do not know.

 9              MR. MYSLIWIEC:   John, how much longer is the

10     Sanchez line of questioning going to go?  We have been        13:05

11     here for four hours and want to take a little break.

12              MR. REICHMAN:   That's fine.  We can take one

13     now.

14              VIDEO OPERATOR:   We're going off the record.

15         The time is 1:05.                                         13:05

16         (A lunch recess is taken.)

17              VIDEO OPERATOR:   We are back on the record.

18         The time is 1:38.

19       BY MR. REICHMAN:

20              Q.   Good afternoon, Mr. La Liberte.                  13:38

21              A.   Good afternoon.

22              Q.   I want to follow-up on the -- just one more or

23     two more questions about Mr. Sanchez and the competitor.

24     You indicated Mr. Sanchez didn't want to do business with

25     R.C.                                                          13:38
```

Page 107

```
 1              Did this competitor ever give a reason why        13:38

 2     Mr. Sanchez supposedly did not want to do further business

 3     with R.C.?

 4         A.   You know, you are sitting too far back, and

 5     there is an echo.                                          13:39

 6              And can you repeat that, please.

 7         Q.   Okay.  You testified before that one of your

 8     competitors told you that Mr. Sanchez did not want to do

 9     work with R.C.

10              Did that competitor tell you the reason Mr. Sanchez  13:39

11     supposedly gave for not wanting to do business with R.C.?

12         A.   No.

13         Q.   Getting back to Dunkin' Donuts.  I'm not sure I

14     got this right.  Was the Ramona, California project the

15     last project you did for Dunkin' Donuts?                   13:39

16         A.   Yes.

17              MR. REICHMAN:  Okay.  Can we mark, David, as the

18     next exhibit the documents with respect to that Ramona

19     project.

20              MR. YEGER:  One moment, please.                   13:40

21         (Deposition Exhibit 115 was marked for identification

22     by counsel electronically.)

23              MR. YEGER:  Exhibit 115 is on the shared folder

24     and on the screen.

25       BY MR. REICHMAN:                                         13:41
```

Page 108

1          Q.    I'm showing you now, Mr. La Liberte, what we      13:41

2     marked as Exhibit 115.  This is one of the documents that

3     was produced to us in discovery, and it appears to relate

4     to the Dunkin' Donuts Ramona, California project.

5          Do you see it indicates that the work was done during  13:41

6     the 2014-2015 year?  Do you see that?

7          A.    Yes.

8          Q.    Does that refresh your recollection about the

9     time in which you did your last work or R.C. did its last

10    work for Dunkin' Donuts?                                     13:41

11         A.    Yeah.  That was the last project we did.

12         Q.    Okay.  So did R.C. ever bid on any Dunkin'

13    Donuts projects in 2016, 2017, or 2018?

14         A.    2018, no.

15         2017, maybe at the very beginning.                      13:42

16         And 2016 I know that we did, but they were more in

17    this area, not in San Diego.

18         Q.    What was the 2016 project that you bid on for

19    Dunkin' Donuts?

20         A.    There was one in, I believe, Encino.  It was in   13:42

21    a strip center.

22         Q.    Do you know why R.C. did not win the bid for the

23    Dunkin' Donuts store in Encino?

24         A.    The only thing I could assume is that we were --

25    our project and our proposal was too high.                   13:42

                                                      Page 109

```
 1          Q.   Okay.                                          13:43

 2          A.   Yeah.

 3          Q.   Was R.C. ever asked to bid on any Dunkin' Donuts

 4     project during 2017 and the first half of 2018?

 5          A.   We would make phone calls, but we would not get  13:43

 6     a return call.

 7          Q.   I apologize if you testified to this before.

 8     I'm not clear.

 9          Am I right it was the individual franchise owner in

10     Ramona who hired you for the Dunkin' Donuts project?     13:44

11          A.   It was a franchisee, yeah.

12          Q.   Okay.  Do you know whether that franchisee had

13     any other Dunkin' Donuts stores?

14          A.   No.  That was the first store that he was

15     building.                                                13:44

16          Q.   Do you know if he subsequently came to own other

17     Dunkin' Donuts stores?

18          A.   Well, if you look at the profit and loss

19     statement, you see where it says, "HA Builders, Inc."?

20          Q.   Yes.                                           13:44

21          A.   Right at the very top, that was his contractor.

22     Yes, HA Builders, Inc., that was his contractor.  He was

23     actually the go-between us and the franchisee when we

24     built the store in Ramona.

25          After that, he took over.                           13:45
```

Page 110

```
 1            Q.   I'm not sure I understand.  Were you then      13:45

 2     essentially a subcontractor on the Ramona project?

 3            A.   He worked directly for the franchisee, but he

 4     did other projects for him.

 5            After we had finished Ramona, he took over building   13:45

 6     the rest of Dunkin' Donuts.

 7            Q.   I see.  Okay.  Thank you.

 8            Do you know of any R.C. customer or client who did

 9     not do business with R.C. because of Yelp reviews?

10            A.   I have no idea.                                 13:46

11            Q.   Do you know of any potential customer or client

12     who did not do business with R.C. because of Yelp reviews?

13            A.   No.

14            Q.   Do you know whether any of your customers or

15     clients have ever relied on Yelp reviews in determining    13:46

16     whether to do business with R.C.?

17            A.   Not to the best of my knowledge.

18            Q.   Was R.C.'s approval to do work for franchisees

19     ever revoked by any franchisor?

20            A.   I don't understand that.  Please repeat the     13:47

21     question.

22            Q.   For example, you were an approved vendor for --

23     R.C. was -- was and is an approved vendor for McDonalds;

24     correct?

25            A.   We are, yes.                                   13:47
```

Page 111

1          Q.   Okay.  Was R.C. ever an approved vendor by any      13:47

2     other franchising company?

3          A.   Of course.

4          Q.   Which ones?

5          A.   All the companies that I told you that we worked    13:48

6     for.

7          Q.   Okay.  Was -- Did any of the franchising

8     companies ever revoke R.C. as an approved vendor?

9          A.   No.

10         Q.   I want to change topics.                            13:49

11         Did Mrs. La Liberte ever suffer at all because of the

12    events that took place at the Simi Valley council meeting

13    and thereafter?

14         A.   In what way?

15         Q.   In any way.                                         13:49

16         A.   Just the fact that Ros was freaking out was

17    because of all of this.  She was upset.  I'm sure she

18    would argue a little bit with Savanna and go back and

19    forth and probably Doug.  But her emotional state wasn't

20    great at that time.                                           13:49

21         Q.   Okay.  What was -- What was Mrs. La Liberte's

22    emotional state up to and the time of the Fox interview?

23         A.   Well, after it happened, of course, she was

24    really depressed.  Lost sleep.  I'd have to keep her away

25    from the front windows.  I had all the blinds closed.  She   13:50

                                                    Page 112

```
 1     wanted to peek out and see what was going on.  I wouldn't   13:50

 2     let her.  She was a mess.

 3          Q.   What period of time was she a mess for?

 4          A.   Oh, God.  I would say probably, of course, that

 5     first week.                                                 13:50

 6          And then she bought a wig.  She would wear the wig

 7     constantly because she didn't want people to recognize

 8     her.

 9          She parked her car around the corner so nobody would

10     see her car.  She just wasn't in good shape at all.  She    13:50

11     was not -- She's still not 100 percent.

12          Q.   Was she a mess during the vacation you spent in

13     Maryland in DC in the beginning of July 2018?

14          A.   She wore the wig even horseback riding in

15     Virginia.                                                   13:51

16          Q.   Okay.  Other than that, were there any other

17     indications during that week that she was a mess as far as

18     you're aware?

19          A.   Other than what?

20          Q.   Other than wearing a wig, did she do or say       13:51

21     anything during that week that you were on vacation that

22     indicated that she was still a mess, to use your term?

23          A.   She cried a lot.

24          Q.   Okay.

25          A.   She would stay in bed.                            13:51
```

                                                    Page 113

```
 1           Q.   I'm sorry?                               13:51

 2           A.   That she would stay in bed for a length of time.

 3           Q.   Okay.  What period of time did that occur where

 4      she would stay in bed?

 5           A.   Sorry.  What?                            13:52

 6           Q.   What was the period of time that she would stay

 7      in bed more than usual?

 8           A.   Periodically it would be every day, every other

 9      day, but I mean, it wasn't consistent.

10           Q.   Okay.  Well, and she would stay in bed more than  13:52

11      usual now because of the events that took place in

12      June 2018?

13           A.   Because of the event, yeah.  Yeah.  She just

14      didn't want to get up and didn't want to do anything.  She

15      was afraid to.                                    13:52

16           Q.   All right.  I'm trying to understand how long

17      that period -- when that period ended, if it ever ended,

18      when she was reluctant to get out of bed and didn't want

19      to do anything?

20           A.   I would say at least a couple weeks.      13:53

21           Q.   Okay.

22           A.   Maybe more.  Maybe three weeks.  I don't know.

23           Q.   So let's put aside Mrs. La Liberte's emotional

24      state.  I understand the -- what you have testified to

25      there.                                            13:53
```

Page 114

```
 1            But I am asking whether there was any change in the    13:53

 2     relationship Mrs. La Liberte had with any of her extended

 3     family members as a result of the events that took place

 4     at the Simi Valley council meeting and thereafter.

 5            A.   Is that the question you just asked me a couple    13:53

 6     minutes ago?

 7            Q.   I asked about you and your children.  Now I'm

 8     asking about any other the extent -- Mrs. La Liberte's

 9     extended family members.

10            A.   Not that I know of.                                13:54

11            Q.   Okay.  Did Mrs. La Liberte's relationships with

12     any of her friends change?

13            A.   No.  They probably got stronger.

14            Q.   Do you know whether Mrs. La Liberte remains

15     politically active?                                           13:54

16            A.   I'm sorry?

17            Q.   Do you know whether your wife remains

18     politically active?

19            A.   No.

20            Q.   "No," you don't know or she doesn't?              13:55

21            A.   She does not.  She does not.

22            MR. REICHMAN:  Okay.  I'd like to mark as the

23     next exhibit the expert report of Burt Flickinger.

24            MR. YEGER:  One moment, please.

25     (Continued on following page.)                                13:55
```

Page 115

```
 1              (Deposition Exhibit 116 was marked for identification  13:55

 2       by counsel electronically.)

 3              MR. YEGER:  Exhibit 116 is on screen and in the

 4       shared folder.

 5        BY MR. REICHMAN:                                        13:56

 6         Q.   Mr. La Liberte, have you ever seen this report

 7       before?

 8         A.   No.

 9         Q.   Are you aware that Mr. Flickinger was retained

10       by Mrs. La Liberte as an expert in this case?          13:56

11         A.   She has mentioned it, yes.

12         Q.   Okay.  And have you ever spoken with

13       Mr. Flickinger?

14         A.   No.

15         Q.   I'd like you to turn to page 7 of the report,    13:57

16       Paragraph 42.

17             As you can see in Paragraph 42, Mr. Flickinger

18       writes:

19         "I have been able to verify from the company's

20       records (including photocopies of checks) and from my   13:58

21       interviews with Roslyn and Louis La Liberte that the

22       average size of an R.C. Design Construction project for

23       interior and exterior work ranged from a few thousand

24       dollars up to $1,100,000."

25             Does this change at all your testimony about having  13:59

                                                        Page 116
```

1        spoken with Mr. Flickinger?                          13:59

2               A.   I don't recall that conversation.

3               Q.   Did you ever provide any documents to

4        Mr. Flickinger?

5               A.   No.                                       13:59

6               Q.   I'd like to turn to page 11 of the report, the

7        last paragraph on that page, Paragraph 16.

8                    MR. MYSLIWIEC:  Paragraph which?

9                    MR. REICHMAN:  Sixteen.  Page 11, Paragraph 68.

10       I'm sorry.                                            14:00

11              Q.   Do you see there Mr. Flickinger writes, the

12       first sentence:

13              "However, some franchisees who represented millions

14       of dollars in sales since the mid-1990s and whom

15       Ms. La Liberte had been very close on a personal level,   14:01

16       discontinued their business relationship with R.C.

17       Associates."

18              Are you aware of any such relationships other than

19       the ones that you have already testified to today?

20              A.   No.                                       14:02

21              Q.    Mr. Flickinger then next writes:

22              "For example, one family, an owner-operator of 16

23       McDonald's franchises, a reliable source of revenue for

24       R.C. Associates and for whom the firm performed numerous

25       projects (construction, maintenance of stores, et cetera),  14:02

                                                    Page 117

```
 1        would neither speak with nor do business with R.C.           14:02

 2        Associates again, even after repeated calls by

 3        Ms. La Liberte."

 4             Do you know if that McDonalds franchisee that is

 5        being referred to here is Mr. Sanchez?                       14:02

 6             A.    That's the only one I know of.

 7             Q.    Was Mrs. La Liberte personal friends with any of

 8        the R.C. clients and customers?

 9             A.    What was the question?

10             Q.    Let me try it again.                              14:03

11             Was Mrs. La Liberte friends at any time with any R.C.

12        customers or clients?

13             A.    Friends, you say?

14             Q.    Yes.

15             A.    She's got many friends.                           14:03

16             Q.    No.   No.   I want to focus on R.C. customers or

17        clients.   For example, did Mrs. La Liberte ever socialize

18        with any R.C. customers or clients?

19             A.    Yes, of course.   That's part of her job.

20             Q.    Okay.   Did any of those customers or clients     14:04

21        stop socializing with Mrs. La Liberte as a result of what

22        happened at the Simi Valley council meeting and the events

23        thereafter?

24             A.    Only Sanchez, to the best of my knowledge.

25             Q.    Okay.   I apologize if I asked you this before.    14:04
```

Page 118

1       Do you know whether Mr. Sanchez --                    14:04

2            (Reporter clarification.)

3            A.    Repeat.

4            Q.    Do you know whether Mr. Sanchez sold many of his

5       stores?                                               14:05

6            A.    I have no idea.  He may have.  I'm not even sure

7       if he's in the system still.

8            Q.    I'm sorry.  You say he's not in the system?  Was

9       that what you said.

10           Can you read back the last answer.  I didn't --   14:05

11           (Reporter clarification.)

12           A.    I'm not sure if he's still in the system.

13           Q.    What do you mean -- What do you mean by "being

14      in the system"?

15           A.    He doesn't operate.                         14:05

16           Q.    Whether he still owned stores?

17           A.    Correct.

18           Q.    Okay.  Let's take a look please at Paragraph 69

19      where Mr. Flickinger writes:

20           "According to Ms. La Liberte, because of the      14:06

21      defamation event, she was" --

22                 MR. YEGER:  Got to get in sync here, John.  You

23      want 69.

24                 MR. REICHMAN:  69, please.

25           Q.    Okay.  In Paragraph 69 Mr. Flickinger writes:   14:07

                                                     Page 119

```
 1              "According to Ms. La Liberte, because of the      14:07

 2      defamation event, she was left out of many business

 3      opportunities that other McDonald's franchisees that she

 4      would have won in the past (she remains off email list for

 5      franchisee networking functions to this day)."             14:07

 6         Are you aware of any such lost business opportunities

 7      other than with respect to Mr. Sanchez?

 8         A.   No.

 9         Q.   Are you aware of any email lists Mrs. La Liberte

10      has been left off of for franchisee network functions?     14:08

11         A.   No.

12         Q.   In the next sentence Mr. Flickinger writes:

13              "R.C. Design had also lost the chain's corporate

14      business, which according to Louis La Liberte 'just went

15      away.'"                                                     14:08

16         Did you ever tell that to Mr. Flickinger?

17         A.   Not to my knowledge.  Not directly.  Could have

18      been on a Zoom.  I don't know.  If he heard that from me,

19      then I didn't tell him directly.

20         Q.   Okay.  Well, just so we're clear, when I asked      14:09

21      you about conversations, communications with

22      Mr. La Liberte -- I'm sorry -- with Mr. Flickinger, I

23      didn't limit it to in-person conversations, so --

24         A.   No.  You are right.  I am corrected on that.  It

25      could have been a Zoom, and I might have been in a room at  14:09
```

                                                        Page 120

```
 1      the time and said that, but I did not sit in on a meeting.  14:09

 2          Q.   Okay.  Then let's go back.

 3          Did you ever participate in some sort of Zoom meeting

 4      with Mr. Flickinger?

 5          A.   Yes.                                            14:09

 6          Q.   Who else was present?

 7          A.   Ros.

 8          Q.   Okay.

 9          A.   And Mr. Flickinger.

10          Q.   Okay.  And do you remember anything that was     14:10

11      discussed during the course of that Zoom call?

12          A.   No, not to my recall.

13          Q.   Did you have only one Zoom call with

14      Mr. Flickinger?

15          A.   I did not have any Zoom calls with               14:10

16      Mr. Flickinger.

17          Q.   I'm --

18          A.   Ros did.

19          Q.   I'm confused.

20          So did you participate at all in the Zoom call that   14:10

21      Mrs. La Liberte had with Mr. Flickinger?

22          A.   Evidently, I did, yes, but I did not make the

23      Zoom call.  It was not between me and him.  It was between

24      Ros and him.

25          Q.   Okay.  I'm not asking about who initiated the    14:10
```

Page 121

```
 1        call.  I'm just asking were you on the call, "Yes" or        14:10

 2        "No"?

 3             A.   Yes.

 4             Q.   Okay.  So can you tell me what was discussed

 5        during that call?                                            14:11

 6             A.   No, I can't because I wasn't there the whole

 7        time.

 8             Q.   Okay.  Do you know how long the call was -- how

 9        long the call was?

10             A.   I'm sorry.  Say that again.                        14:11

11             Q.   Okay.  Do you know how long the Zoom call was

12        with Mr. Flickinger?

13             A.   No idea.

14             Q.   Okay.  How long were you on the call with

15        Mr. Flickinger?                                              14:11

16             A.   Thirty seconds, a minute.

17             Q.   Okay.  Did you ever tell him in that 30 seconds

18        or a minute that McDonald's corporate business quote

19        unquote, "just went away"?

20             A.   Evidently I did because it's there.                14:11

21             Q.   Well, I know it there.  But it seems to be

22        contrary to what you previously testified, and that the

23        records show did -- did McDonald's chain corporate

24        business just go away?

25             A.   Like I say, if it's there, I must have said it.    14:12
```

Page 122

```
 1            Q.   I'm not asking you now.  I'm just asking you for   14:12

 2       the fact.

 3            Did McDonald's chain corporation business just go

 4       away?

 5            Mr. La Liberte, can you answer the question, please?   14:12

 6            A.   I have answered it.  If it's in the paperwork, I

 7       must have said it.

 8            Q.   Okay.  I'm not asking right now what you said.

 9       I'll get to that in a moment.

10            But let me just ask you: Did McDonald's chain          14:13

11       corporate business just go away?  "Yes" or "No"?

12            A.   Yes.

13            Q.   So R.C. is no longer doing business, any

14       corporate business, with McDonalds; is that right?

15            A.   With the corporate stores.                         14:13

16            Q.   Okay.  When is the last time R.C. did business

17       with a corporate store?

18            A.   We did the McDonalds in Inglewood, California.

19            Q.   When was that?  When was that?

20            A.   I don't remember.  That was the last store we       14:14

21       did for corporate.

22            Q.   Okay.  Do you know whether you did that store

23       before or after 2016?

24            A.   I don't know.  I don't remember.

25            Q.   When was it that R.C.'s business with corporate    14:14
```

                                                      Page 123

```
 1        franchisees just go away?                              14:14

 2             A.   I don't remember.

 3             Q.   Do you know what the name or number of that

 4        Inglewood store is?

 5             A.   Name of what?                                 14:15

 6             Q.   Do you know the location of the Inglewood store?

 7             A.   Yes.  On the corner of Imperial, and I'm not

 8        sure of the cross street.  It's on Imperial in Inglewood,

 9        California.

10             Q.   Had McDonalds precluded R.C. from bidding on the 14:15

11        chain's corporate stores?

12             A.   We haven't bid one since.

13             Q.   Okay.  That's not my question.

14             Did McDonalds prevent you from bidding?

15             A.   I have no idea.                               14:16

16             Q.   I'd like you to take a look at the paragraph

17        further down on this page under the heading, "Jersey

18        Mike's."

19             Paragraph 75 Mr. Flickinger writes that in the second

20        sentence:                                              14:17

21             "Up to the time of the defamation event, R.C.

22        Associates was 'at the top of the list' of designated

23        contractors Jersey Mike's approved for the state of

24        California..."

25             Do you know whether R.C. was ever taken off that   14:18
```

Page 124

```
 1      list?                                              14:18

 2           A.   No idea.

 3           Q.   Have you ever seen that list?

 4           A.   No.

 5           Q.   Do you know whether Ms. La Liberte has ever seen  14:18

 6      that list?

 7           A.   Showed us at the top?

 8           Q.   Just the list period.

 9           A.   It's the list that showed us at the top, yes, I

10      saw that one.                                      14:18

11           Q.   Okay.  When did you see that?

12           A.   Last few years ago.

13           Q.   How many years ago?

14           A.   Huh?

15           Q.   How many years ago?                      14:18

16           A.   2017.

17           Q.   Okay.  Do you still have that list?

18           A.   I do not, no.

19           Q.   Do you know whether R.C. still has that list?

20           A.   I believe so.                            14:19

21           Q.   Have you ever seen a revised list of Jersey

22      Mike's approved contractors?

23           A.   No.

24           Q.   You write -- Withdrawn.

25                When is the last time R.C. bid a Jersey Mike's    14:20
```

Page 125

```
 1        project?                                        14:20

 2            A.   I can't remember.  It's been a while.

 3            Q.   Please take a look at Paragraph 80.

 4        Mr. Flickinger indicates you spoke to someone by the

 5        name of Brian O'Hagan.  Do you know who Brian O'Hagan is?  14:21

 6            A.   No.

 7                 MR. MYSLIWIEC:  I'm sorry.  You said that the

 8        witness spoke to Brian O'Hagan or Burt spoke to

 9        Brian O'Hagan?

10                 MR. REICHMAN:  Mr. Flickinger.          14:21

11                 MR. MYSLIWIEC:  Right.  Okay.

12          BY MR. REICHMAN:

13            Q.   Do you know whether Mrs. La Liberte has ever

14        spoken to Brian O'Hagan?

15            A.   I don't believe so.                     14:21

16            Q.   Do you know how Mr. Flickinger got

17        Brian O'Hagan's name?

18            A.   No idea.

19                 MR. REICHMAN:  Okay.  Why don't we take a break.

20        I think I'm either at the end or close to it.  So if we   14:22

21        can go to a breakout room that would be great.

22                 VIDEO OPERATOR:  We are going off the record.

23            The time is 2:22.

24            (A recess is taken.)

25                 VIDEO OPERATOR:  We are back on the record.      14:30

                                                           Page 126
```

```
 1              The time is 2:30.                                    14:30

 2        BY MR. REICHMAN:

 3         Q.   Mr. La Liberte, thank you for your patience.  We

 4    are at the home stretch.  Just a few more questions.

 5         A.   All right.  Thank you.                              14:31

 6         Q.   I'd like to go back to the Flickinger report,

 7    please.

 8              And in particular, Paragraphs 88 and 89.  Let's just

 9    start with 88.

10              Do you see that at the last sentence of Paragraph 88  14:31

11    Mr. Flickinger makes reference to customers canceling

12    orders.

13              Are you aware of any customer who canceled orders in

14    2018 because of what Mr. Flickinger calls the defamation

15    event?                                                       14:31

16         A.   I think part of that is because the phones were

17    so busy that nobody could get through.  Then we just had

18    to get rid of our website so they couldn't do it that way.

19    Then we got our --

20              (Reporter clarification.)                          14:32

21              MR. REICHMAN:  I will move to strike that.

22         Q.   Mr. La Liberte, I'd appreciate you answering my

23    question --

24         A.   I'm sorry.

25         Q.   -- which is: Did any customer cancel an order?     14:32
```

                                                      Page 127

```
 1            A.   No.                                          14:32

 2            Q.   Okay.

 3            A.   No contracts were canceled.

 4            Q.   Okay.  Let's take a look at Paragraph 89 where

 5       Mr. Flickinger writes that:                            14:32

 6            "...a lot of expenses and payments were coming out of

 7       personal cash reserves to keep things afloat during the

 8       initial phase of damage control."

 9            Can you tell me what expenses and payments came out

10       of personal cash reserves?                             14:33

11            A.   I can't -- I can't be specific.

12            Q.   Can you be -- generally tell me what expenses

13       came out of personal cash reserves?

14            A.   House payments and electric bill.

15            Q.   I'm not asking about --                      14:33

16            A.   Basic.

17            Q.   -- personal expenses.  I'm asking about what

18       business expenses were paid from personal cash reserves.

19            A.   What personal expenses?

20            Q.   What business, R.C. business expenses, were paid  14:33

21       out of personal cash reserves?

22            A.   Excuse me.  You know, I'm not sure I can really

23       answer that.  Ros is probably the better person to ask.

24            Q.   Well, you mentioned before you know you have

25       shared finances with Ros.  Did she ever mention that she  14:34
```

Page 128

 1       was paying R.C. expenses out of your or her personal cash    14:34

 2       reserves?

 3            A.    No.

 4            Q.    You mentioned early on in your testimony about

 5       how R.C.'s -- that R.C.'s business was affected by COVID.    14:34

 6       Can you explain further how R.C.'s business was affected

 7       by COVID?

 8            A.    Franchisees weren't doing business.  They

 9       weren't doing construction.  They were afraid to.

10            Q.    And did -- Did R.C. ever experience any cost    14:35

11       increases or supply issues as a result -- supply chain

12       issues as a result of COVID?

13            A.    Prices went up.  That's for sure.  I know lumber

14       costs, a sheet of plywood that was 20 bucks was now 100.

15            Q.    And did that have an effect on R.C.'s business?    14:35

16            A.    Of course.

17            Q.    How did it affect R.C.'s business?

18            A.    Well, you lost jobs because of it because the

19       prices were too high, the cost.

20            Q.    I'm sorry.  Did you want to continue to answer?    14:36

21            A.    I'm sorry?

22            Q.    Were you done with your answer?

23            A.    Yes.

24            Q.    Okay.  Did labor costs increase or the

25       unavailability of labor since the pandemic began also    14:36

                                                        Page 129

```
 1      affect R.C.'s business?                                14:36

 2           A.   No, not really.  The labor costs remained about

 3      the same.

 4           Q.   Are you able to estimate how much business R.C.

 5      lost because of COVID?                                  14:36

 6           A.   No, I can't.

 7           Q.   Do you believe it's hundreds of thousands of

 8      dollars?

 9           A.   I believe that there was a lot of business lost.

10      Putting a dollar amount on it, I can't do.             14:36

11             MR. REICHMAN:  Okay.  Okay.  Thank you.  I don't

12      have any further questions.

13           Ron, I don't know if you do.

14             MR. MYSLIWIEC:  I just have one, I think.

15                                                             14:37

16                        -EXAMINATION-

17

18       BY MR. MYSLIWIEC:

19           Q.   Very early on in the deposition the witness may

20      have made a statement about this when we came back on the   14:37

21      record this afternoon later where counselor, opposition

22      counsel asked whether there was any instance when someone

23      doing business with R.C. Associates could not communicate

24      with R.C. Associates.  What's the answer to that question?

25           A.   Should have been yes.                        14:37
```

Page 130

```
1              Q.   And why was that?                    14:37

2              A.   Because the phones were so busy, no one could

3         get through.

4              Q.   And anything else affect your ability to

5         communicate with people who wanted to do business with   14:37

6         R.C. Associates?

7              A.   We lost our website.

8              Computer emails were gone.

9              Our phones were changed.

10             They had no way of getting ahold of us.      14:38

11                  MR. MYSLIWIEC:  All right.  I don't have any

12        other questions counselor.

13

14                             -EXAMINATION-

15                                                          14:38

16          BY MR. REICHMAN:

17             Q.   Let me follow-up on that.

18             Are you aware of any specific R.C. customer or client

19        who was unable to get through to R.C.?

20             A.   Yes.                                    14:38

21             Q.   Who?

22             A.   During that, no one could get through.

23             Q.   Okay.  Do you know of anyone who was trying to

24        get through who couldn't get through?

25             A.   Neal Ruby was one.  He's one of our best   14:38
```

Page 131

```
 1     customers.                                          14:38

 2         Q.   Okay.  When did Neal Ruby try to get through to

 3     R.C. but couldn't?

 4         A.   When?

 5         Q.   Yes.                                        14:38

 6         A.   Is that the question?  I really couldn't tell

 7     you when.

 8         Q.   Okay.

 9         A.   All I know is he did mention that he was trying

10     to get ahold of us.                                 14:39

11         Q.   When did he mention that to you?

12         A.   Probably three or four weeks after the incident.

13         Q.   Okay.

14         A.   After we changed our phone.

15         Q.   All right.  So how did that communication come   14:39

16     about?  Was that in a telephone call?  A text?  An email?

17         A.   Well, actually my phone number -- Well, my phone

18     number did change.  I started calling the people that I

19     know, and Neal was one of them.

20         Q.   Okay.  And when did you -- and did you change   14:39

21     your phone number on June 30th?

22         A.   Yes.

23         Q.   Okay.  When did you call Neal who was -- who was

24     one of your best customers to tell him about the change in

25     your phone number?                                  14:40
```

Page 132

```
 1              A.   It was probably about the middle of July.        14:40

 2              Q.   Okay.  Why did you wait until the middle of July

 3         to contact him?

 4              A.   I can't answer that question.  I don't know why.

 5              Q.   Okay.  When you contacted him, was it by          14:40

 6         telephone?

 7              A.   Yes.

 8              Q.   Okay.  And during the course of that call, what

 9         did you say to him and what did he say to you?

10              A.   I just mentioned to him about what had happened   14:40

11         with Ros and the incident, and he was concerned because

12         he's a good friend, and he was asking if there was

13         anything he could do.

14              And I said, "No."

15              And he said, "Okay."                                   14:40

16              And that was it.  We hung up.

17              Q.   Prior to the call, did he know anything about

18         what you just described as the incident with Ros?

19              A.   Not -- Well, I can't say.  He probably did hear

20         something about it, but where he got his information from, 14:41

21         I do not know.

22              Q.   Why do you say he probably knew about it?

23              A.   I'm sorry?

24              Q.   Why do you say he probably knew about it?

25              A.   Because of Zoom, I guess.  We had a Zoom call.    14:41
```

Page 133

```
 1              Q.   Okay.  Let me go back.                      14:41

 2         At the Zoom -- So it was a Zoom call that you had

 3    with Mr. Ruby in mid-July; is that right?

 4              A.   No.  What had happened was his brother had died

 5    in a swimming accident, and we talked about that, and then  14:41

 6    we talked about Ros.

 7              Q.   Okay.  All right.  Let's go back.

 8         I'd like you to just go through with me the

 9    communications you had with Mr. Ruby after the Simi Valley

10    council meeting because now I'm confused.                  14:42

11              A.   I'm sorry.  You are asking --

12              Q.   When is the first time after the Simi Valley

13    council meeting that you had any communication with

14    Mr. Ruby?

15              A.   Like I said, earlier.  Probably the middle of  14:42

16    July.

17              Q.   Okay.  And did you call him or did he call you?

18              A.   I called him.

19              Q.   And you called him because you heard his brother

20    had died?                                                  14:42

21              A.   No.  I called him to let him know about what had

22    happened to Ros, and then he told me about it.

23              Q.   I see.  Okay.

24         So is there anything that Mr. Ruby said during that

25    first call you had with him in mid-July that led you to    14:42
```

Page 134

```
 1    believe he had known anything at all about what had        14:43

 2    occurred with respect to Mrs. La Liberte?

 3         A.   He had mentioned that he heard about it, yes.

 4         Q.   Okay.  And when he said -- What else did he say

 5    other than he heard about it?                              14:43

 6         A.   He asked if there was anything he could do, and

 7    I said, "No."

 8         Q.   Okay.  What did he tell you he had heard?

 9         A.   I'm sorry.  What did he tell me about what?

10         Q.   What did he tell you that he had heard?          14:43

11         A.   He just said he had heard about what had

12    happened to Ros with Joy Reid.

13         Q.   Wait a minute.  Are you telling me that he

14    specifically mentioned Joy Reid's name?

15         A.   I mentioned that, but he just said he heard what 14:43

16    happened to Ros through Facebook, I guess.

17         Q.   Well, did he tell you that he had heard about

18    what happened through Facebook?

19         A.   No.  He didn't directly say it.  I can only

20    assume.                                                    14:44

21         Q.   All right.  I'm trying to get -- Let me ask you

22    this: Can you tell me as specifically as you can what

23    Mr. Ruby said about his knowledge of what happened to

24    Mrs. La Liberte?

25         A.   He said, "I heard what happened to Ros and is    14:44
```

Page 135

1       there anything I could do?"                          14:44

2           The answer was, "No."

3           And that was it.

4           Q.   Okay.   That was the entire conversation with

5       Mr. Ruby about that subject; is that right?          14:44

6           A.   The --

7           (Reporter clarification.)

8           A.   That was the entire conversation between him and

9       I about Ros.

10              MR. REICHMAN:   Okay.   Thank you.   I don't have    14:45

11      any further questions.

12              MR. MYSLIWIEC:   I don't either.

13              VIDEO OPERATOR:   We're off the record at

14      2:45 p.m.

15          And this concludes today's testimony given by Louis    14:45

16      La Liberte.

17          The total number of media units was one and will be

18      retained by Veritext Legal Solutions.

19              MR. REICHMAN:   Thank you very much

20      Mr. La Liberte, I appreciate your patience.          14:45

21              THE REPORTER:   Ron, I just need to confirm, do

22      you need a certified copy of the transcript?

23              MR. MYSLIWIEC:   I do need to order a copy of the

24      transcript.

25              THE REPORTER:   Thank you.                    14:46

                                                      Page 136

```
 1            Off the stenographic record.                    14:46

 2         (TIME NOTED: 2:46 P.M.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
1                              ***

2

3      I, LOUIS LA LIBERTE, do hereby declare under penalty of

4    perjury that I have read the foregoing transcript;

5    that I have made any corrections as appear noted, in

6    ink, initialed by me, or attached hereto; that my

7    testimony as contained herein, as corrected, is true and

8    correct.

9

10         EXECUTED this _____day of _____, 2022,

11         at_____, _____.
                      (City)           (State)

12

13              _____

14                    LOUIS LA LIBERTE

                      VOLUME I

15

16

17

18

19

20

21

22

23

24

25

                                            Page 138
```

1

2          I, Gail E. Kennamer, the undersigned, a Certified

3     Shorthand Reporter of the State of California, do hereby,

4     certify:

5          That the foregoing proceedings were

6     taken before me at the time and place therein set

7     forth;

8          That any witnesses in the foregoing proceedings,

9     prior to testifying, were placed under oath; that

10    a verbatim record of the proceedings was made by

11    me using machine shorthand which was thereafter

12    transcribed under my direction; further that the

13    foregoing is an accurate transcription thereof.

14         I further certify that I am neither

15    financially interested in the action nor a

16    relative or employee of any attorney or any of the

17    parties.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20          Dated: February 28, 2022.

21

22

23    _____

24    GAIL E. KENNAMER, CSR 4583, CCRR

25

Page 139

1    MARISSA MOSHELL, ESQ.

2    mmoshell@gibsondunn.com

3                                    February 28, 2022

4    RE: ROSLYN LA LIBERTE vs. JOY REID

5    February 24, 2022, LOUIS LA LIBERTE, JOB NO. 5099039

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 140

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2       Transcript – The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested – Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 6

MINUTES OF THE CITY COUNCIL
SPECIAL MEETING

Simi Valley, California                                    June 25, 2018

AGENDA
ITEM____

CALLED TO ORDER:  6:35 p.m.  (OPEN SESSION)

CLOSED SESSION REPORTS:  None

PLEDGE OF ALLEGIANCE:  Led by Mayor Huber

ROLL CALL:   Present:   Council Members Cavanaugh, Mashburn, Judge and Mayor
Huber

Absent:    Mayor Pro Tem Becerra

1.      AGENDA REVIEW:  None

1A.     ACTION:  Council Member Cavanaugh moved that all resolutions and ordinances
presented tonight be read in title only and all further reading be waived. Council
Member Mashburn seconded the motion. **(CC)**

ROLL CALL
AYES:       Council Members Cavanaugh, Mashburn, Judge and Mayor Huber
NAYS:       None
ABSENT:     Mayor Pro Tem Becerra
ABSTAIN:    None

1C.     DECLARATION OF CONFLICT:  None

1D.     SPECIAL PRESENTATIONS/HONORARY RESOLUTIONS/PROCLAMATIONS:  None

2A.     PUBLIC STATEMENTS:

The following submitted speaker cards and spoke:

1.      Robert Lauten (no address given), in support
2.      Teresa Elms, Simi Valley, CA, in support

Note:  If this is a joint meeting of the City Council and Boards of Directors, the applicable entity is identified at the end of each
agenda item.

CC – City Council                              PFA – Public Financing Authority
WWD – Waterworks District No. 8                SA – Successor Agency
IDA – Industrial Development Authority         LB – Simi Valley Library Board of Trustees
PFFA – Simi Valley Public Facilities Financing Authority

Materials related to an item on this Agenda submitted to the CC, WWD, IDA, PFFA, PFA, SA, and/or LB after distribution of the
agenda packet are available for public inspection in the City Clerk's Office at 2929 Tapo Canyon Road, Simi Valley, CA during
normal business hours.

Minutes                              2                           June 25, 2018

AGENDA
ITEM____

3.    R. Lewis Fry, Simi Valley, CA, in support
4.    Dwight Odland (no address given), in opposition
5.    Rev. Ed McRae United Methodist Church, Simi Valley CA, in support
6.    Jean McLeod (no address given), in support
7.    John Lapper, Simi Valley, CA, marked comment only
8.    Jorge Garcia (no address given), in opposition
9.    Michelle LaPointe, Simi Valley, CA, in support
10.   Tamika Bridgewater, Simi Valley, CA, in opposition
11.   Douglas King (no address given), in support
12.   Jeffery Burum (no address given), in opposition (handout submitted)
13.   Guy BonGiovanni, Simi Valley, CA, marked comment only
14.   Kathy Layton, Simi Valley CA, in opposition (handout submitted)
15.   Jessica Freeman, Simi Valley, CA, in opposition
16.   Jenniffer Jones, Simi Valley, CA, in opposition (handout submitted)
17.   Kathy Nezhni (no address given), in support
18.   Ruth Luevanos, Simi Valley, CA, in support
19.   Leanna Brand, Simi Valley, CA, in support
20.   DeAnn D'Lean, Apple Valley, CA, didn't mark card (handout submitted)
21.   Alexis Lopez, Simi Valley, CA, in support
22.   Julie Harris (no address given), in opposition
23.   Dawn Kowalski, Simi Valley, CA, marked comment only
24.   Barbara Leighton (no address given), in support
25.   Arturo Guido (no address given), in support
26.   Yvonne Wilber, Simi Valley, CA, in support
27.   Sara Hadley, Moorpark, CA, in support
28.   Pastor Roberto Ghione, Simi Valley, CA, in support
29.   Peggy Sadler, Simi Valley, CA, in opposition
30.   Omar Jubran (no address given), in support
31.   Gordon Clint, Thousand Oaks CA, in support
32.   Martha Koehler, Simi Valley, CA, didn't mark card
33.   Catherine Willott, Thousand Oaks, CA, in support
34.   Monika Ramirez Wee, Simi Valley, CA, in support
35.   Tony Dolz (no address given), in opposition
36.   Lea Williams (no address given), didn't mark card
37.   Kerry Mellin, Simi Valley, CA, didn't mark card
38.   Deborah Tejeda, Winnetka, CA, in support
39.   Joseph Hornbek, Simi Valley, CA, marked comment only
40.   Tom Wolf, Simi Valley, CA, in opposition
41.   Robin Hvidston (no address given), in support
42.   Raul Rodriguez Jr. (no address given), in support

Case 1:18-cv-05398-DLI-JRC   Document 181-4   Filed 09/24/24   Page 532 of 759 PageID #: 6088

AGENDA
ITEM____

43.   Peggie Noisette, Simi Valley, CA, in support
44.   Marie Garside, Simi Valley, CA, in support
45.   Maria Ornelas, Newbury Park, CA, in support
46.   Rebecca Albarrán, Simi Valley, CA, in support
47.   Colleen Bush, Thousand Oaks, CA, in opposition (not present when called)
48.   Farooq Rajpoot, Simi Valley, CA, didn't mark card (not present when called)
49.   Mark Farrell, Simi Valley, CA, marked comment only
50.   Sara Matuzak, Simi Valley, CA, in support
51.   Waheed Akberzie (no address given), in opposition
52.   Philip Germain (no address given), in support
53.   Dale Roy (no address given), in opposition
54.   Michael Greer (no address given), in opposition
55.   Joy Gaylord (no address given), in support
56.   Lorena Saruwatari (no address given), in opposition
57.   Kathleen Baffone, Simi Valley, CA, in support
58.   Bob Ridley (no address given), didn't mark card
59.   Marleny Albarrán, Simi Valley, CA, in support
60.   Sergio Lopez (no address given), in support
61.   Adrienne Stuck, Simi Valley, CA, in opposition
62.   Elizabeth Hoskinson (no address given),in support
63.   Doug Felbinger (no address given), in support
64.   Brian Pletcher, Thousand Oaks, CA, in support
65.   Katharine Smith, Simi Valley, CA, in support
66.   Pamela Lopez (no address given), didn't mark card
67.   Petra Boswell, Simi Valley, CA, in opposition (not present when called)
68.   Connie Lynch, Simi Valley, CA, in support (not present when called)
69.   Gregory Gonzales (no address given), in support
70.   Vadim Manzos (no address given), in opposition
71.   Mandy Jacob (no address given), in opposition
72.   Kenneth Hurst, Simi Valley, CA, in opposition
73.   Pamela Mikita, Simi Valley, CA, in support
74.   Ralph Santitoro (no address given), in support (not present when called)
75.   Brooke Schick, Simi Valley, CA, marked comment only
76.   Rick Castaneda (no address given), in support
77.   Nicolette Muñoz, Simi Valley, CA, in support

It was noted that Council went into recess at 10:48 p.m. and reconvened at 11:08 p.m. with four Council Members present, Mayor Pro Tem Becerra absent.

Minutes                                    4                          June 25, 2018

AGENDA
ITEM___

78.    Jalala Ghulam, Simi Valley, CA, didn't mark card
79.    Sandy Harth, Simi Valley, CA, in support
80.    Michael Smith (no address given), in support
81.    Lori Mills, Simi Valley, CA, in opposition
82.    Taylor Von Molt, Simi Valley, CA, in opposition
83.    Teresa Amescua-Smith, Simi Valley, CA, in support
84.    Louise Pomes, Simi Valley, CA, in opposition (not present when called)
85.    Laura Gross (no address given), in support (not present when called)
86.    Daniel Learned, Simi Valley, CA, in support (not present when called)
87.    Eva Garcia Fucich (no address given), in opposition
88.    Rafael Torres III, Simi Valley, CA, in support
89.    Dura Young, Simi Valley, CA, in opposition
90.    Mazal London (no address given), in opposition
91.    Aviva Murphy, Simi Valley, CA, in opposition (not present when called)
92.    James McGreevy, Simi Valley, CA, in support
93.    Julie Diaz Martinez, Moorpark, CA, in support
94.    Joe Grinstead (no address given), in opposition
95.    Stephany Villagran, Simi Valley, CA, in support
96.    Floyd Martin, Simi Valley, CA, in support
97.    Michael Dougherty, Simi Valley, CA, in support
98.    Monique Giuffre, Simi Valley, CA, in support
99.    Barbara Dougherty, Simi Valley, CA, in support
100.   Suzanne Gunther, Thousand Oaks, CA, in opposition (not present when called)
101.   Abigail Albarrán, Simi Valley, CA, in support
102.   Joe Ayala, Simi Valley, CA, in opposition (not present when called)
103.   Genevieve Peters, Simi Valley, CA, in opposition
104.   Juan Partida (no address given), in support
105.   Daniel Strachan, Simi Valley, CA, in support
106.   Jennifer Dougherty, Simi Valley, CA, in support
107.   Daniel Robles (no address given), in support
108.   Willard Lubka, Thousand Oaks, CA, stay neutral (not present when called)
109.   Christina Lindstrom, Simi Valley, CA, in support
110.   Cindy Owen (no address given), didn't mark card
111.   Dan McBride, Simi Valley, CA, in support (not present when called)
112.   Dr. Martinez-Bravo (no address given), in support
113.   Elsa Aldeguer, Simi Valley, CA, in opposition
114.   Marlon (no last name provided), Simi Valley, CA, in support
115.   Harim Uzziel (no address given), in opposition
116.   Linda Allen Simi Valley, CA, in opposition
117.   Allessandro Neri, Newbury Park, CA, in support (not present when called)

Minutes                                    5                              June 25, 2018

AGENDA
ITEM

118.   Adrienne Vasquez, Simi Valley, CA, in support
119.   Mavis Sheley, Simi Valley, CA, in opposition (not present when called)
120.   Joseph Luevanos, Simi Valley, CA, in support
121.   Alan Mann, Simi Valley, CA, in opposition
122.   Keith Hardine, Los Angeles, CA, in opposition
123.   Gini Liu, Simi Valley, CA, in opposition
124.   Fred MacIntosh, Simi Valley, CA, in opposition
125.   Donna Chisholm, Simi Valley, CA, marked comment only
126.   Loraine Lundquist (no address given), in support
127.   Yvette Lopez, Simi Valley, CA, in support
128.   Jess S. (no address given), in opposition
129.   Murtaza Nagri (no address given), in support
130.   Roslyn LaLiberte, Simi Valley, CA, didn't mark card
131.   Matt Baker (no address given), didn't mark card (not present when called)
132.   Sophia Maxwell, Simi Valley, CA, in opposition
133.   Allison Wee, Simi Valley CA, in support
134.   Greg Allan, La Crescenta, CA, in opposition
135.   Bruce Boyer (no address given), in opposition

ACTION:  Mayor Huber moved that the City Council meeting tonight may extend
beyond the midnight deadline to conclude the agenda (Section 2-1.106 SVMC).
Council Member Judge seconded the motion.

ROLL CALL
AYES:          Council Members Cavanaugh, Mashburn, Judge, and Mayor Huber
NAYS:          None
ABSENT:        Mayor Pro Tem Becerra
ABSTAIN:       None

136.   David L. Berry, Simi Valley, CA, in opposition
137.   Joseph Chan (no address given), in opposition
138.   Beverly Dransfeldt, Camarillo, CA in support
139.   Heath Kline (no address given), in support

The following submitted cards and did not speak:

1.   Brent Rainforth, Simi Valley, CA, in support
2.   Barbara Moore, Simi Valley, CA, in support
3.   David Sadler, Simi Valley, CA, in support
4.   Thomas K. Talbott, Simi Valley, CA, in support

Minutes                              6                        June 25, 2018

AGENDA
ITEM____

    5.     Victor Burton, Simi Valley, CA, in support
    6.     Patricia Burton, Simi Valley, CA, in support
    7.     Tammy Wirtz, Simi Valley, CA, in support
    8.     Yenni Rangel, Simi Valley, CA, in support
    9.     Joni Schumacher, Simi Valley, CA, in support
  10.     Shari Freedman, Simi Valley, CA, in support
  11.     Christine Mocalis, Simi Valley, CA, in support
  12.     Nicholas Mocalis, Simi Valley, CA, in support
  13.     Laura Miller, Camarillo, CA, in support
  14.     Sharon Levine, Simi Valley, CA, in support
  15.     Denise Engel, Simi Valley, CA, in support
  16.     Virginia Ruelas, Simi Valley, CA, in support
  17.     Ian Candish, Simi Valley, CA, in support
  18.     Ruben Garcia, Simi Valley, CA, in support
  19.     Gracie Pekrul, Simi Valley, CA, in support
  20.     Jennifer Krumm, Simi Valley, CA, in support
  21.     Julia Honda, Simi Valley, CA, in support
  22.     Marian Walluks, Simi Valley, CA, in opposition
  23.     John Absmeier, Simi Valley, CA, in support
  24.     Mark Kamala, Simi Valley, CA, in support
  25.     Balmore Orellana, Simi Valley, CA, in support
  26.     Barb Holtwick, Simi Valley, CA, in support
  27.     Tim Holtwick, Simi Valley, CA, in support
  28.     Sarah Santitoro, Simi Valley, CA, in support
  29.     Timoteo Carrillo, Simi Valley, CA, in support
  30.     Maria Carrillo, Simi Valley, CA, in support
  31.     Andrew Gafvert, Simi Valley, CA, in support
  32.     Sophia Santitoro, Simi Valley, CA, in support
  33.     Doug Fuller, Simi Valley, CA, in opposition
  34.     Ellen Learned, Simi Valley, CA, in support
  35.     Juan Venegas, Simi Valley, CA, in support
  36.     Maria Venegas, Simi Valley, CA, in support
  37.     Melissa Gonzalez, Simi Valley, CA, in support
  38.     Lupita Fanning, Simi Valley, CA, in support
  39.     Susan Means, Simi Valley, CA, in support
  40.     Christine Cooper, Simi Valley, CA, in support
  41.     Paul D. Smith, Jr., Simi Valley, CA, in support
  42.     Katie Guthrie, Simi Valley, CA, in support

Case 1:18-cv-05398-DLI-JRC    Document 181-4    Filed 09/24/24    Page 536 of 759
PageID #: 6092

AGENDA
ITEM

43.    Richard P. Herrera, Simi Valley, CA, in support
44.    Linda Allen, Simi Valley, CA submitted a speaker card and noted the Senior
       Center's vending machine needs to be fixed (did not speak)
45.    Elena M. Korac, Simi Valley, CA, in support
46.    Elizabeth Diniakos, Thousand Oaks, in support
47.    Gina Vella (no address given), in opposition
48.    Elizabeth Quezada-Lopez (no address given), in support
49.    Armando F. Villanueva (no address given), in support
50.    Stephanie Villanueva (no address given), in support
51.    Quinn Clarke (no address given), in support
52.    Arnold Gonzalez, Moorpark, in support
53.    Judy Lautenschleger, Camarillo, CA, in support
54.    Shelia Smith (no address given), in support
55.    Ellie Valianos, Camarillo, CA, in support
56.    Janet Murphy, Moorpark, in support
57.    Hector Diaz (no address given), in support
58.    Stephan Manios (no address given), in support
59.    Christine Brown (no address given), in support
60.    John Clarke (no address given), in support
61.    Debbi Clarke (no address given), in support
62.    Wesley Tipton (no address given), in support
63.    Maria Elena Garcia (no address given), in support
64.    Pedro Gonzalez (no address given), in support
65.    Pam Campeau (no address given), in opposition
66.    Rosa Hernandez (no address given), in support
67.    Michael Mitchell (no address given), in support
68.    Ayrton Luke Arellano (no address given), in support
69.    Rachel Tom (no address given), in support
70.    Carol Mack, Newbury Park, CA, in support
71.    Rebecca Lirette (no address given), in support
72.    Alex Lopez (no address given), in support
73.    Scott Cummings (no address given), in support
74.    Kristin Cummings (no address given), in support
75.    Joseph Renzacci (no address given), in support
76.    Bianca Langlois, Simi Valley, CA, in support
77.    April Miller, Simi Valley, CA, in support
78.    Patricia Van Buskirk, Simi Valley, CA, in support
79.    Elizabeth Shahbazi, Simi Valley, CA, in support
80.    Yasa Rasakhoo, Simi Valley, CA, in support
81.    Armando Del Rio, Simi Valley, CA, in support
82.    Susan Martinez, Simi Valley, CA, in opposition
83.    Kyle Holcombe (no address given), in support

Case 1:18-cv-05398-DLI-JRC   Document 181-4   Filed 09/24/24   Page 537 of 759
PageID #: 6093

AGENDA
ITEM____

84.    Catherine Holcombe (no address given), in support
85.    Melissa Paredes, Simi Valley, CA, in opposition
86.    Felicia Parker (no address given), in support
87.    Kaitlyn Seckar, Simi Valley, CA, in support
88.    Angela Huaynate, Simi Valley, CA, in support
89.    Mel Kane (no address given), in support
90.    Jack Brutus (no address given), in support
91.    Franci Zalon (no address given), in support
92.    Micaela Munguia (no address given), in support
93.    Eleazar Munguia (no address given), in support
94.    Maggie Kestly (no address given), in opposition
95.    Sandra Castle, Simi Valley, CA, in support
96.    Maureen McGreevy, Simi Valley, CA, in support
97.    Ethlene Pollak (no address given), in support
98.    Sean Howard (no address given), in opposition
99.    Diane Howard (no address given), in opposition
100.   Carmen Torres (no address given), in support
101.   Catherine Collier (no address given), in support
102.   Mehreen Lockhat (no address given), in support
103.   Shiray Lockhat (no address given), in support
104.   Nylah Khan (no address given), in support
105.   Owais Javeed (no address given), in support
106.   Hala Javeed (no address given), in support
107.   Veronia Salinas (no address given), in support
108.   Tracy Ewing, Simi Valley, CA, in support
109.   Mariah Ewing, Simi Valley, CA, in support
110.   Terry Kaye, Simi Valley, CA, in support
111.   Maureen Kaye, (no address given), in support
112.   Umar Afridi (no address given), in support
113.   Akbar Afridi (no address given), in support
114.   Marwa Afridi (no address given), in support
115.   Raihana Afridi (no address given), in support
116.   Haseba Qasmei (no address given), in support
117.   Gulshan Molk, Winnetka, CA, in support
118.   Kevin Herrera (no address given), in support
119.   Rosalba Palma, Simi Valley, CA, in support
120.   Anthony Jauregui, Simi Valley, CA, in support
121.   Ana Sayuri Villagran, Simi Valley, CA, in support
122.   Tanner Woodley (no address given), in support
123.   Karen Coronado (no address given), in support

Minutes                                    9                              June 25, 2018

AGENDA
ITEM

124.  Jimmy Rogers (no address given), in support
125.  Will Henderson, Simi Valley, CA, in support
126.  Khadija Jalala, Simi Valley, CA, in support
127.  Ferdouse Kator (no address given), in support
128.  Sharie Kator (no address given), in support
129.  James Kator (no address given), in support
130.  Sahar Jalala (no address given), in support
131.  Milad Jalala (no address given), in support
132.  Hamza Qazi (no address given), in support
133.  Harris Jalala (no address given), in support
134.  Yousuf Jalala (no address given), in support
135.  Farishta Jalala, Simi Valley, CA, in support
136.  Saddaf Kator (no address given), in support
137.  Hayat Jalala, Simi Valley, CA, in support
138.  Jesus Tamayo, Simi Valley, CA, in support
139.  Lisa Johnson (no address given), in support
140.  Syed Kamran Ahmed (no address given), in support
141.  Hadeal Moustafa (no address given), in support
142.  Hosai Afridi, Simi Valley, CA, in support
143.  Zain Gulshad (no address given), in support
144.  Meana Arghandehwal (no address given), in support
145.  Dianne Oliver (no address given), in support
146.  Emerson Oliver (no address given), in support
147.  Maria I. Martinez, Simi Valley, CA, in support
148.  Heather Stephenson (no address given), in support
149.  Marissa Hull (no address given), in support
150.  Jessica O'Dea (no address given), in support
151.  Danielle O'Dea (no address given), in support
152.  Maureen Alphonso (no address given), in support
153.  Noah Scida (no address given), in support
154.  Jason Freeman, Simi Valley, CA, in support
155.  Judith Freeman, Simi Valley, CA, in support
156.  Ashley Jaron, Simi Valley, CA, in support
157.  Eulalia Lozano, Simi Valley, CA, in support
158.  Samuel Reynoso, Simi Valley, CA, in support
159.  Susan Means, Simi Valley, CA, in support
160.  Frank Rodriguez (no address given), in support
161.  Kathy Smith (no address given), in support
162.  Larry Arrasmith, Simi Valley, CA, in opposition
163.  Scott Layton, Simi Valley, CA, in opposition

Minutes                                    10                          June 25, 2018

AGENDA
ITEM___

   164.   George Leuning, Simi Valley, CA, in opposition
   165.   Marcelo Bromberg, Simi Valley, CA, in support
   166.   Ivy Giles, Simi Valley, CA, in opposition
   167.   Cynthia Richards, Simi Valley, CA, in opposition
   168.   Abedon Montano, Simi Valley, CA, in opposition
   169.   Lupe Montano, Simi Valley, CA, in opposition
   170.   Gina Stewart (no address given), in opposition
   171.   Ken Brown, Simi Valley, CA, in opposition
   172.   Rose M. Sforza, Simi Valley, CA, in opposition
   173.   Jean Odland (no address given), in support
   174.   Ligia Bromberg (no address given), in support
   175.   Jeannie Liss (no address given), in opposition
   176.   Carolyn Guillot (no address given), in opposition
   177.   Shayan Amlani (no address given), in opposition
   178.   Aziz Amlani (no address given), in opposition
   179.   Yasmin Amlani (no address given), in opposition
   180.   Larry Carroll (no address given), in opposition
   181.   Carol Brown (no address given), in opposition
   182.   Jim Woods, Simi Valley, CA, in opposition
   183.   Mark Guyer (no address given), in opposition
   184.   Aubrey Fuerstenberg, Simi Valley, CA, in opposition
   185.   Carol Thomaier, Simi Valley, CA, in opposition
   186.   Barbie LaBlanc, Simi Valley, CA, in support
   187.   Chris Eid, Simi Valley, CA, in opposition
   188.   Jeff Von Molt, Simi Valley, CA, in opposition
   189.   Mark Brown (no address given), in opposition
   190.   Wallis Brown (no address given), in opposition
   191.   Tara McBride, Simi Valley, CA, in opposition
   192.   Lee Kennedy, Simi Valley, CA, in opposition
   193.   Kat Shepherd (no address given), in opposition
   194.   Mark Williams (no address given), in opposition
   195.   Andrew Williams (no address given), in opposition
   196.   Scott Hansen (no address given), in opposition
   197.   Ruth Eid, Simi Valley, CA, in opposition
   198.   John Hritz (no address given), in opposition
   199.   James Fucich (no address given), in opposition
   200.   Kerry Locke, Simi Valley, CA, in opposition
   201.   Ursula Locke, Simi Valley, CA, in opposition
   202.   Ramon Garcia (no address given), in opposition
   203.   Nicole Raven (no address given), in opposition

Minutes 11 June 25, 2018

AGENDA
ITEM____

204. Kurt Wong (no address given), in opposition
205. Andrew Karsai, Simi Valley, CA, in opposition
206. Terry Fierro, Simi Valley, CA, in opposition
207. Ralph Fierro, Simi Valley, CA, in opposition
208. Scott Williams (no address given), in opposition
209. Michael Zak (no address given), in opposition
210. Rachel St. George, Simi Valley, CA, marked comment only (stay neutral)
211. Danny Neilligrew, Simi Valley, CA, in opposition
212. Eloise Cohen (no address given), in support
213. Kim Ewing, Simi Valley, CA, in support
214. Stephanie McIntyre, Simi Valley, CA, in support
215. Ronald McIntyre, Simi Valley, CA, in support
216. Mauro DeHaro (no address given), in support
217. Belen DeHaro (no address given), in support
218. Javier Guido, Simi Valley, CA, in support
219. Jesus Isabeles (no address given), in support
220. Carina Armenta, Simi Valley, CA, in support
221. Cory Dransfeldt (no address given), in support
222. Asma Q. (no address given), in support
223. Rida Q. (no address given), in support
224. Sanaa Mehdi, Simi Valley, CA, in support
225. Cataline Yanes (no address given), in support
226. Ana Rose (no address given), in support
227. Roger Hernandez (no address given), in support
228. Ivan Hernandez (no address given), in support
229. Celia Daniels (no address given), in support
230. Gabina Afridi (no address given), in support
231. M. Hassan Mulk, Winnetka, CA, in support
232. Amina Mubqriz, Winnetka, CA, in support
233. Khanum Gull Hussain (no address given), in support
234. Mohammad Hussain (no address given), in support
235. Nazita Kator (no address given), in support
236. Leticia Jimenez, Simi Valley, CA, in support
237. Olivia Villaseñor (no address given), in support
238. Merced Villaseñor (no address given), in support
239. Alejandra Hernandez, Simi Valley, CA, in support
240. Heidy Martinez, Simi Valley, CA, in support
241. Autumn Renzacei Giuffre, Simi Valley, CA, in support
242. Thomas Adams, Simi Valley, CA, in support
243. Francesca Adams, Simi Valley, CA, in support

Minutes 12 June 25, 2018

AGENDA
ITEM

244. Paige Ross (no address given), in support
245. Bill Garcia (no address given), in support
246. Delilah Orloff (no address given), in opposition
247. Gail Mirkliss (no address given), in opposition
248. James Smith (no address given), in opposition
249. Guadalupe Fanning, Simi Valley, CA, in opposition
250. Anita Villagran, Simi Valley, CA, didn't mark card
251. Pedro Villagran, Simi Valley, CA, didn't mark card
252. Jean Kammerer, Thousand Oaks, CA, in support
253. Radhika Parashar (no address given), in support
254. Muskan Parashar (no address given), in support
255. Tomas Beltran, Simi Valley, CA, in support
256. Irving Villaseñor, Simi Valley, CA, in support
257. Merleen Ruiz (no address given), in support
258. Marcia Boye, Simi Valley, CA, in support
259. Nancy Mason, Simi Valley, CA, in support
260. Walter Morosco, Simi Valley, CA, in support
261. Judy Lincoln, Simi Valley CA, in support
262. Deborah Baber (no address given), in opposition
263. Crystal Velzaquez, Simi Valley, CA, in support
264. Carmen Velzaquez, Simi Valley, CA, in support
265. Fernando Velzaquez, Simi Valley, CA, in support
266. Barbara Isch, Simi Valley, CA, in opposition
267. Thomas Isch, Simi Valley, CA, in opposition
268. Gerry A. Hainline, Simi Valley, CA, in opposition
269. Lawrence Hainline, Simi Valley, CA, in opposition
270. Gloria Binder, Simi Valley, CA, in opposition
271. Charles Webb, Simi Valley, CA, in opposition
272. Annette Leyba (no address given), in opposition
273. Gary Winthorpe (no address given), in opposition
274. Sandra Christ (no address given), in opposition
275. Deb Singer (no address given), in opposition
276. Mark Singer (no address given), in opposition
277. Dee Hughes, Simi Valley, CA, in opposition
278. James Paulson, Camarillo, CA, marked comment only
279. Grace DiTommaso, Camarillo, CA, marked comment only

The following submitted cards and did not indicate if they wished to speak, and were not
present when called:

1. Debra Tash, Somis, CA, no position indicated
2. Dale Donnelly (no address given), in opposition

Minutes                              13                        June 25, 2018

AGENDA
ITEM___

3.    Ann Duran, Simi Valley, CA, in opposition
4.    Jorge Cortez, Simi Valley, CA, in support
5.    Arturo Guzman, Simi Valley, CA, in support
6.    Maria Fernandez, Simi Valley, CA, in support
7.    Elizabeth Ohrt, Simi Valley, CA, in support
8.    Dory Raheb (no address given), in opposition
9.    Elizabeth Holder, Simi Valley, CA, in support
10.   Rollah Diho (no address given), in support
11.   Christopher Torres, Simi Valley, CA, in opposition
12.   Mike McHenry (no address given), in support
13.   Maria Urena (no address given), in support
14.   Pastor Fredy Gordon, Simi Valley, CA, in support
15.   Scott Stewart (no address given), in opposition
16.   Deborah M. Clark (no address given), in opposition
17.   William Clark, Simi Valley, CA, in opposition
18.   William Seeley, Simi Valley, CA, in opposition
19.   Vicki Crosley, Simi Valley, CA, in opposition
20.   Dwight Crosley, Simi Valley, CA, in opposition
21.   Nancy Seeley, Simi Valley, CA, in opposition
22.   Amal Merchant (no address given), in support
23.   Munir Merchant (no address given), in support
24.   Pablo Bautizta, Simi Valley, CA, in support
25.   Patricia Jimenez, Simi Valley, CA, in support
26.   Ghulam Reza, Simi Valley, CA, in support
27.   Orelia Tamayo, Simi Valley, CA, in support
28.   Maria Gamarro, Simi Valley, CA, in support
29.   Kamala Kator, Simi Valley, CA, in support
30.   Junaid Kator (no address given), in support
31.   Deanne Hritz (no address given), in opposition
32.   Mary Lu (no address given), in opposition
33.   Stephen Galvin, Simi Valley, CA, in support
34.   Danielle McClish (no address given), in support
35.   Mark Wilber (no address given), in support
36.   Joyce Thornton (no address given), in support
37.   Melanie McClish (no address given), in support
38.   Abdul Arghandehwal, Simi Valley, CA, in support
39.   Hasina Jalala (no address given), in support
40.   Rahela Kator, Simi Valley, CA, in support
41.   Nazifa Kator (no address given), in support
42.   Lall M. Qasmei (no address given), in support
43.   James Moresi, Simi Valley, CA, in support
44.   Syed Hisamuddin (no address given), in support

Case 1:18-cv-05398-DLI-JRC    Document 181-4    Filed 09/24/24    Page 543 of 759
PageID #: 6099

AGENDA
ITEM

45.    Pam Greffin, Simi Valley, CA, in support
46.    Daniel Greene (no address given), in support
47.    Cathy Pesiri, Simi Valley, CA, in opposition
48.    Juveriya Mehdi (no address given), in support
49.    Imaan Mehdi (no address given), in support
50.    Marisela Lopez, Simi Valley, CA, in support
51.    Alva Galindo (no address given), in support
52.    Maria Jimenez (no address given), in support
53.    Rae Anne Michael, Simi Valley, CA, no position indicated

2B.     CITY COUNCIL/BOARD MEMBER/SPECIAL DISTRICT COMMENTS REGARDING
        PUBLIC STATEMENTS:  None

3.      APPOINTMENTS:  None

4.      CONSENT CALENDAR:

        (1)    Approval of revisions to the resolution and ordinance adding Article 4 to Chapter
               5 of Title 3 of the Simi Valley Municipal Code to impose a tax on commercial
               cannabis activities for submission to the voters to conform to the Tax Fairness,
               Transparency and Accountability Act and resolution requesting the County
               Elections Official to render services, and direct staff to transmit the revised
               resolutions to the County of Ventura for inclusion on the November 6, 2018 ballot
               (Argabrite) **(CC)**

               Resolution No. 2018-44 - A RESOLUTION OF THE CITY COUNCIL OF THE
               CITY OF SIMI VALLEY CALLING AND GIVING NOTICE OF THE HOLDING OF
               A GENERAL MUNICIPAL ELECTION, AND TO REQUEST THE BOARD OF
               SUPERVISORS OF THE COUNTY OF VENTURA TO CONSOLIDATE THIS
               ELECTION OF SAID CITY TO BE HELD ON TUESDAY, NOVEMBER 6, 2018,
               WITH THE STATEWIDE GENERAL ELECTION TO BE HELD ON SAID DATE
               PURSUANT TO SECTION 10403 OF THE ELECTIONS CODE, AND
               RESCINDING RESOLUTION NO. 2018-36

               Resolution No. 2018-45 - A RESOLUTION OF THE CITY COUNCIL OF THE
               CITY OF SIMI VALLEY REQUESTING THE BOARD OF SUPERVISORS OF
               VENTURA COUNTY TO PERMIT THE COUNTY ELECTIONS OFFICIAL TO
               RENDER SERVICES TO THE CITY FOR THE GENERAL MUNICIPAL
               ELECTION TO BE HELD ON THE DAY OF THE STATEWIDE GENERAL
               ELECTION, AND RESCINDING RESOLUTION NO. 2018-37

               ACTION:  Adopted Resolution Nos. 2018-44 and 2018-45.

Minutes                                    15                          June 25, 2018

AGENDA
ITEM

> ACTION:  Council Member Judge moved to approve Consent Calendar 1, revisions to
> the resolutions and ordinance adding Article 4 to Chapter 5 of Title 3 of the Simi Valley
> Municipal Code to impose a tax on commercial cannabis activities for submission to the
> voters to conform to the Tax Fairness, Transparency and Accountability Act, adopt the
> resolution requesting the County Elections Official to render election services, and
> direct staff to transmit the revised version to the County of Ventura and Board of
> Supervisors for inclusion on the November 6, 2018 ballot.  Council Member Mashburn
> seconded the motion.
>
> ROLL CALL
> AYES:          Council Members Cavanaugh, Mashburn, Judge, and Mayor Huber
> NAYS:          None
> ABSENT:        Mayor Pro Tem Becerra
> ABSTAIN:       None

5.    INFORMATIONAL PRESENTATIONS/REPORTS:  None

6.    PUBLIC HEARINGS:  None

7.    CONTINUED BUSINESS:  None

8.    NEW BUSINESS:

8A.   Discussion and possible action, including the filing of an amicus letter or other action
      regarding California State Sanctuary Laws (AB450, AB103 and SB54) in the case of
      United States v. California, et al., U.S. District Court Case No. 2:18-cv-00490-JAM-KJN
      (E. D. Cal., filed March 6, 2018), and reconsideration of prior actions (Levitt/Eldridge)
      (CC)

> ACTION:   Council Member Judge moved to rescind the prior vote made on
> April 23, 2018 authorizing the filing of an amicus letter in the law suit and to authorize
> the filing of an amicus letter in the law suit at the next available opportunity which is
> likely to be the Ninth Circuit Court of Appeal.  Council Member Mashburn seconded the
> motion.
>
> ROLL CALL
> AYES:          Council Members Cavanaugh, Mashburn, Judge, and Mayor Huber
> NAYS:          None
> ABSENT:        Mayor Pro Tem Becerra
> ABSTAIN:       None

Case 1:18-cv-05398-DLI-JRC    Document 181-4    Filed 09/24/24    Page 545 of 759
PageID #: 6101

AGENDA
ITEM

9.          REPORTS:

9A.         City Council/Board Member/Trustees/Special District Member Reports:  None

10.         CLOSED SESSION:  None

            ADJOURNMENT:   Mayor Huber adjourned the meeting at 11:54 p.m. to the meeting
                           of July 30, 2018 at 6:30 p.m.  There being no objections, the
                           motion carried through acclamation.


                                       _____
                                       Keith L. Mashburn, Mayor of the City of
                                       Simi Valley, California,


_____
Ky Spangler, City Clerk

# EXHIBIT 7

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3

4      _____

       ROSLYN LA LIBERTE,            )

5                                    )

                    Plaintiff,       )

6                                    )

            vs                       ) No. 18-cv-5398

7                                    )

       JOY REID,                     )

8                                    )

                    Defendant.       )

9      _____)

10

11

12

13

14        VIDEOTAPED DEPOSITION OF JOSEPH LUEVANOS

15              Simi Valley, California

16            Tuesday, August 10, 2021

17                   Volume I

18

19

20

21

22     Reported by:

       LYNN GEARHART, RPR

23     CSR No. 9466

24     JOB No. 4741800A

25     PAGES 1 - 93

Page 2

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF NEW YORK

3

4    _____

     ROSLYN LA LIBERTE,              )

5                                    )

                Plaintiff,           )

6                                    )

          vs                        ) No. 18-cv-5398

7                                    )

     JOY REID,                       )

8                                    )

                Defendant.           )

9    _____)

10

11

12

13

14        Videotaped deposition of JOSEPH LUEVANOS,

15   Volume I, taken on behalf of Plaintiff, at 2655

16   First Street, Suite 250, Simi Valley, California,

17   beginning at 10:06 a.m. and ending at 1:10 p.m. on

18   Tuesday, August 10, 2021, before LYNN GEARHART,

19   Certified Shorthand Reporter No. 9466.

20

21

22

23

24

25

Page 3

1    APPEARANCES:

2

3    For Plaintiff:

4        OLASOV, LLP

5        BY:  DAVID OLASOV

6        Attorney at Law

7        485 Madison Avenue, 7th Floor

8        New York, New York 10022

9        (646) 583-5968

10        dolasov@olasov.com

11

12    For Defendant:

13        GIBSON, DUNN & CRUTCHER, LLP

14        BY:  MARISSA MULLIGAN

15        BY:  CHAPLIN CARMICHAEL

16        Attorneys at Law

17        333 South Grand Avenue, Suite 4700

18        Los Angeles, California 90071-3197

19        (213) 229-7000

20        mmulligan@gibsondunn.com

21

22

23

24

25

Page 4

1    APPEARANCES (Continued):

2

3    For The Witness:

4        COWDREY JENKINS LLP

5        BY:  ELIDIO LUEVANOS

6        Attorney at Law

7        1203 Flynn Road, Suite 160

8        Camarillo, California 93012

9        (805) 472-6050

10       eluevanos@cowdreyjenkins.com

11

12   Also Present:

13       JOHN REICHMAN, Esq., Gibson Dunn (Via telephone.)

14       RUTH LUEVANOS

15

     Videographer:

16

         JEFFREY NICHOLS

17

18

19

20

21

22

23

24

25

Page 5

1                          INDEX

2    WITNESS                              EXAMINATION

3    JOSEPH LUEVANOS

     Volume I

4

5                          BY MR. OLASOV              9

6                          BY MS. MULLIGAN           71

7

8

9

10                        EXHIBITS

11   EXHIBIT              DESCRIPTION           PAGES

12   Exhibit 1    Deposition subpoena            10

13

14   Exhibit 2    Video from council meeting    22

15                during the break

16

17   Exhibit 3    Video from TV news clip        25

18

19   Exhibit 4    Printout of tweet and retweet  27

20                by Alan Vargas dated 6/28/2018

21

22   Exhibit 5    Video of Hal Eisner interview  35

23                with Joseph Luevanos

24

25

```
                                                    Page 6
 1   INDEX (Continued):

 2                      EXHIBITS

 3   EXHIBIT              DESCRIPTION           PAGES

 4   Exhibit 6   Video from the 6/25/2018 Simi    37

 5               Valley City Council meeting

 6               with excerpts

 7

 8   Exhibit 7   Printout of tweet from Ruth       40

 9               Luevanos dated 6/26/2018

10

11   Exhibit 8   Printout of two tweets dated      42

12               7/2/18, one from Far D and one

13               from Leo Luevanos

14

15   Exhibit 9   Printout of tweet dated 7/3/18    49

16               from Norma Hernandez

17

18   Exhibit 10  Essay written by Joseph Luevanos  56

19

20   Exhibit 11  Printout of Facebook post dated   84

21               7/2/18 from Joy Reid

22

23                INFORMATION REQUESTED

24                    PAGE      LINE

                      63         5

25
```

Page 7

1        Simi Valley, California, Tuesday, August 10, 2021

2                            10:06 a.m.

3

4           THE VIDEOGRAPHER:  Good morning.  We are

5    going on the record at 10:06 a.m. on August 10th,

6    2021.  This is media unit one of the video-recorded

7    deposition of Joseph Luevanos taken by counsel for

8    plaintiff in the matter of Roslyn La Liberte versus

9    Joy Reid filed in the United States District Court,

10   Eastern District of New York.  The Case number is

11   18-cv-5398.

12           This deposition is being held at 2655 First

13   Street, Suite 250, Simi Valley, California 93065.

14   My name is Jeff Nichols from the firm Veritext Legal

15   Solutions, and I'm the videographer.  The court

16   reporter is Lynn Gearhart from the firm Veritext

17   Legal Solutions.

18           Counsel and all others present in the room

19   will now please state their appearances and

20   affiliations for the record.

21           MR. OLASOV:  My name is David Olasov.  I'm a

22   partner of the firm Olasov, LLP.  I am a New York

23   lawyer visiting your community, and I'm representing

24   the plaintiff Roslyn La Liberte in the action

25   against Joy Reid.

Page 8

1           MS. MULLIGAN:  My name is Marissa Mulligan

2    from the firm Gibson, Dunn & Crutcher.  I represent

3    defendant Joy Reid, and I'm here with my colleague

4    Chaplin Carmichael, also from Gibson Dunn &

5    Crutcher, and my colleague John Reichman is joining

6    by telephone.

7           MR. LUEVANOS:  Elidio Luevanos, representing

8    the deponent.

9           MS. LUEVANOS:  Ruth Luevanos.

10          THE VIDEOGRAPHER:  Thank you.

11          Will the court reporter please swear in the

12   witness.

13

14                   JOSEPH LUEVANOS,

15   having been first administered an oath, was examined

16   and testified as follows:

17

18          THE VIDEOGRAPHER:  Thank you.

19          We may proceed.

20          MR. OLASOV:  Thank you very much.

21          I wanted to put a handful of things on the

22   record just to make sure that we're all sort of on

23   the same page.

24          Mrs. Luevanos, because you are going to be a

25   witness, I had a short conference with my

Page 9

1    colleagues, and we both agreed that, notwithstanding

2    that you would ordinarily be excused as a witness,

3    your role as mother supersedes that role in our

4    view, and we're glad to have you sit in.

5            MS. LUEVANOS:  I'm fine with my husband being

6    here.

7            MR. OLASOV:  No, no, I -- well, I mean he --

8            MR. LUEVANOS:  You can be here.

9            MS. LUEVANOS:  Okay.  Okay.

10           MR. OLASOV:  The issue is not your husband.

11   Your husband's acting as a lawyer -- is that you're

12   a witness, and ordinarily witnesses for nonparties

13   would be excused.  So we agreed that that rule would

14   be waived for more useful social considerations.

15           MS. LUEVANOS:  Oh, thank you.  I appreciate

16   that.

17           MR. OLASOV:  It's our pleasure.

18                        EXAMINATION

19   BY MR. OLASOV:

20       Q   So let me just start briefly.  Please state

21   your name for the record.

22       A   Joseph Luevanos.

23       Q   And how old are you?

24       A   Seventeen.

25       Q   Are you -- are you appearing today pursuant

```
                                                    Page 10

 1   to subpoena?

 2      A   Yes.

 3          MR. OLASOV:  So let's mark as Plaintiff's

 4   Exhibit 1 a two-page document.

 5          (Exhibit 1 was marked for identification

 6      by the court reporter and is attached hereto.)

 7          MR. REICHMAN:  I'm having a lot of difficulty

 8   hearing from David and Joey.  So I don't know what

 9   the solution is.

10          MS. MULLIGAN:  I can move it down, John, but

11   I think -- and hopefully that helps, but we're just

12   going to have to deal with it how it is because this

13   is the best we got.

14          MR. REICHMAN:  Okay.  But just so the

15   record's clear -- I am literally unable to

16   everything that's being said.

17          MS. MULLIGAN:  Okay.

18   BY MR. OLASOV:

19      Q   Mr. Luevanos, as I was saying to your

20   parents, I'm probably old enough to be your

21   grandfather.  So -- but I want you to be as

22   comfortable as you can be in this deposition.

23   You're not a party.  So I had a couple of things to

24   ask you for my guidance.  One is how would you like

25   me to call you, and secondly, how would you like to
```

Page 11

1   refer to me?

2        Whatever it is that makes you comfortable

3   will be fine by me, but I wanted you to tell me how

4   you would like to be identified.  I'm glad to call

5   you Mr. Luevanos, but that creates possible

6   confusion with your father and I -- but I will do

7   whatever you want, and you can call me whatever you

8   want to call me.  You can tell me David.  You can

9   call me Mr. Olasov.  Whatever you want.  I wanted to

10  set that up.  So that's point one.

11       Point two is that obviously this is being

12  recorded so it would be best if you and I not speak

13  over one another and allow both of us to talk and my

14  colleagues for the defendant Joy Reid to speak and

15  your father also to speak.  Your mother is appearing

16  basically for moral support at this point, and she's

17  also welcome to speak if the spirit moves her.

18       So how would you like me to refer to you?

19   A    Joseph works.

20   Q    Okay.  That's my brother's name, my late

21  brother's name.  And how would you like to refer to

22  me?

23   A    I'll call you Mr. Olasov.

24   Q    Okay.  You're comfortable with that, then

25  I -- that's fine.

                                              Page 12

1          Because you are a minor, I want to make sure

2    that you understand the importance of testifying

3    under oath.  Have you discussed that with your

4    parents?

5       A    Not in full details, but I do understand it.

6       Q    Okay.  So that -- so that -- so that you

7    appreciate that your obligation, albeit you're a

8    minor, is to tell the truth and as best as you

9    understand it, including giving the truth of

10   testimony on matters that you might find

11   uncomfortable or embarrassing or what have you.

12      A    I go it.

13      Q    And correspondingly, my obligation to you is

14   to make sure that you understand the questions that

15   I'm asking you.  And because we are -- I don't have

16   any internal signals -- we don't even have facial

17   recognition at this point -- if you don't understand

18   something I ask you, you've got to tell me because

19   otherwise I'm going to assume that you do.

20          To aid us in this effort, if you actually

21   give testimony that, when you look at it when it's

22   transcribed for you, doesn't look like you

23   understood the question, you're able to correct the

24   answers, and I would therefore want -- I want to

25   know whether you want to read and sign the

```
                                              Page 13

 1   deposition after it's -- after it's transcribed or

 2   waive that.

 3          MR. LUEVANOS:  I'd prefer you could just

 4   send, like, an electronic copy --

 5          MR. OLASOV:  Okay.

 6          MR. LUEVANOS:  -- to look at.

 7          MR. OLASOV:  Okay.

 8          MR. LUEVANOS:  That's what we've been doing

 9   here.  So --

10          MR. OLASOV:  That's fine.  And that's what I

11   would prefer, frankly.  If there's some mistake,

12   there'll be an errata sheet.  So both your original

13   testimony and corrected testimony.

14          (Interruption in the proceedings.)

15          MR. OLASOV:  That's my granddaughter checking

16   in from San Francisco.  So --

17     Q   Did your mother accept the service of the

18   subpoena on your behalf?

19     A   I think so.  Is there a thing I got to sign

20   here or --

21     Q   No, I don't think you have to sign anything.

22   I'm just -- did you read through it or did you not?

23     A   I read through this part.  I did not read

24   through the second page yet.

25     Q   Well, I'm not going to be asking you any
```

Page 14

```
 1   questions about that, about the subpoena.
 2         Did you do anything to prepare for your
 3   deposition testimony today?
 4      A   I looked at some of the stuff I wrote
 5   earlier, like the article I submitted to my tia.
 6         (Reporter clarification.)
 7         MR. LUEVANOS:  So just tia.  And then Tita is
 8   T-i-t-a for the name of the aunt.
 9   BY MR. OLASOV:
10      Q   What's her proper name?
11      A   I believe it's Margarita Silva Jimenez.
12         MS. LUEVANOS:  Jimenez-Silva.
13         THE WITNESS:  Oh, Jimenez-Silva?  Okay.
14         MR. LUEVANOS:  You were close.
15   BY MR. OLASOV:
16      Q   Do you want to -- you want to spell that for
17   the court reporter, please?
18      A   J-i-m-e-n-e-z S-i-l-v-a.
19      Q   Did you review any other documents?
20      A   I remember going over the video that was shot
21   of, like, that one lady who was there.  I forget
22   who.  Forget their name.
23      Q   And did you -- did you take a look at the
24   video of your -- your statement to the city council?
25      A   No.
```

```
                                            Page 15

 1     Q    And did you do anything else to prepare for
 2   the deposition?
 3     A    I saw, like, one tweet that my dad made.
 4   That's it.
 5     Q    So I gave your father copies of the documents
 6   that I thought we might -- we might be using.  Did
 7   he show those to you?
 8     A    He showed some of them to me.
 9     Q    Okay.
10          MS. MULLIGAN:  And I just want to say to the
11   extent that the two of them discussed anything in
12   private, that would be privileged with his father
13   being his counsel.
14          MR. OLASOV:  Well, I didn't ask what the
15   conversation was between them.  I asked whether he
16   saw documents.  This is --
17          MS. MULLIGAN:  Well, the documents they
18   reviewed together would be privileged.
19          MR. OLASOV:  I don't think so.
20          MR. LUEVANOS:  Anything beyond --
21          MR. OLASOV:  If they discussed -- if they
22   discussed them, that would be one thing.  I'm asking
23   what he reviewed, not what their discussion was.
24          I'm not going to intrude in your discussions
25   with your -- with your lawyer who is also your
```

```
                                                 Page 16

 1    father.

 2              MR. LUEVANOS:  Yeah.  Anything beyond the

 3    identification of documents that may have been

 4    reviewed, I will just pose a standing objection

 5    based on attorney-client privilege.

 6              MR. OLASOV:  Okay.  That's --

 7       Q   In June of 2018, Joseph, were you in high

 8    school?

 9       A   Yes.

10       Q   And what year of high school were you in?

11       A   I believe transitioning from freshman year to

12    sophomore year.

13       Q   Have you ever given testimony in a court

14    proceeding before?

15       A   No.

16       Q   And I take it you've never given deposition

17    testimony either?

18       A   No.

19       Q   So this is a first experience for you.

20       A   Yes.

21       Q   And we've already discussed what the core

22    understandings should be that I'll -- I or my

23    colleague will ask you questions and that you'll

24    respond if you understand them to the best of your

25    ability.
```

```
                                              Page 17

 1        Now, you obviously are being called to

 2   testify about events that took place at and after a

 3   Simi Valley City Council public hearing on June 25,

 4   2018.  You understand that, do you not?

 5      A   Yes.

 6      Q   How did you come to attend this council

 7   meeting?

 8      A   So my mom was going to go there, and then she

 9   offered to me and my sister if we wanted to go,

10   because she said it was for SB54, the sanctuary city

11   law.  I said yes; my sister said no.  So I went.

12      Q   At -- at the point that you indicated you

13   wanted to go, was that -- did that conversation take

14   place the day of the council meeting or before that?

15      A   I can't remember.

16      Q   Was it within a few days of the council

17   meeting?

18      A   Yeah.

19      Q   At that point was your mother an announced

20   candidate for a seat on the Simi Valley City

21   Council?

22      A   No.

23      Q   Do you know when she announced her candidacy?

24      A   I don't know when she announced it, but I --

25   I do know that that city council meeting was the
```

```
                                          Page 18

 1   catalyst.

 2       Q    So --

 3       A    It was definitely after.

 4       Q    So her decision to run for city council

 5   followed -- followed this meeting --

 6       A    Yes.

 7       Q    -- to the best of your understanding.

 8       A    Yes.

 9       Q    Now, how did you come to speak with Roslyn

10   La Liberte, my client?

11       A    I wanted to more understand the side against

12   SB54.  So I still had my page of notes for when I

13   was going to speak.  So I went up.  I said, "What's

14   your opinion on the matter?"  And then she started

15   giving her opinion on the matter.  And I was like,

16   uh, and that's what started it.

17       Q    Now, did that happen before the city council

18   hearing started or at some point during those

19   proceedings?

20       A    It was during the break period.

21       Q    You didn't know her before -- before you

22   approached --

23       A    No.

24       Q    -- her, did you?

25       A    I did not.
```

                                                    Page 19

1      Q    And did you approach her for any particular

2   reason?

3      A    She didn't have a sign, and she didn't seem

4   as -- what's the word for it? -- unhinged as some of

5   the other people supporting SB54.

6      Q    So she --

7      A    Or against -- against SB54.

8      Q    She didn't strike you as being unhinged?

9      A    No.

10     Q    Is that -- is that your word?

11     A    Yes, that's my word.

12     Q    And was she wearing a red MAGA hat?

13     A    Yes.

14     Q    And was that part of what attracted you to

15   approach her?

16     A    Yes.  Because that showed she was against

17   SB54.

18     Q    Now, how many people were wearing a red MAGA

19   hat?

20     A    I want to say a number above 25.

21     Q    Above 25.

22     A    Yes.  Although that's -- that's a little bit

23   foggy.

24     Q    Perhaps when we show you some of the tapes

25   where this takes place, that may refresh your

```
                                            Page 20
 1   recollection.
 2          How long was your conversation with her?
 3     A    I do not remember.
 4     Q    Was it more than a few minutes?
 5     A    Probably around there.
 6     Q    Well, fewer than five minutes?
 7     A    Like I said, I don't really remember.
 8     Q    Do you have a recollection of what you said
 9   and what she said?
10          MS. MULLIGAN:  Objection.  Compound.
11          MR. OLASOV:  Sorry?
12          MS. MULLIGAN:  I just said compound.
13          MR. LUEVANOS:  You can answer.
14          THE WITNESS:  I forgot what she said at
15   first.  And then she finished speaking.  I'm, like,
16   okay, here's my counterpoint.  And then sometime
17   through me, like, going through, like, the first two
18   little things I wrote down, she started speaking
19   again.  I don't remember what she said, like, the
20   second time.  And then she finished.
21          I'm like, whoa, it's my turn now to talk.  It
22   happened again where she interjected and eventually
23   came to the point of her talking about her parents
24   and, like, some prison camps in a random country in
25   Asia.  I do not remember anything else besides that.
```

```
                                                    Page 21

 1   BY MR. OLASOV:
 2      Q    Now, had you prepared your remarks for the
 3   city council before you went to the hearing?
 4      A    Yes.  In, like, the little -- I did a little
 5   bit of research before I actually went to the city
 6   council, and then, like, in the two hours or an hour
 7   and 30 minutes or two hours I was sitting there
 8   waiting for the meeting to open, that's where I did
 9   the majority of my research.
10      Q    And you had, it appears from the video, a
11   tape -- a laptop with you?
12      A    Yeah.
13      Q    And you used that for your research?
14      A    Yeah.
15           MR. OLASOV:  What I'd like to do now is to --
16   you'll tell me how this gets done -- mark as the
17   next exhibit --
18           THE VIDEOGRAPHER:  Which one do you want to
19   play?
20           MR. OLASOV:  Not that one.  The -- not that
21   one.
22           THE VIDEOGRAPHER:  Not this one?
23           MR. OLASOV:  Not that one.
24           THE VIDEOGRAPHER:  5322?
25           MR. OLASOV:  No, that's the -- that's the
```

Page 22

```
 1   one.
 2           THE VIDEOGRAPHER:  Okay.
 3           MR. OLASOV:  So how -- how do you wish to
 4   have this marked?
 5           THE VIDEOGRAPHER:  We'll just mark it as
 6   Exhibit 2, and we'll give it to her.
 7           (Discussion off the record.)
 8           MR. OLASOV:  We're going to start from the
 9   beginning.  I think the whole thing is a little more
10   than a minute long.
11           MS. MULLIGAN:  Is it okay if I look over
12   here?
13           MR. OLASOV:  It's perfectly okay.  I'm
14   just --
15           THE VIDEOGRAPHER:  Okay.  Here we go.
16           (Video now playing.)
17           (Exhibit 2 was marked for identification
18      by the court reporter and is attached hereto.)
19   BY MR. OLASOV:
20      Q   So you -- does that tape refresh your
21   recollection of anything that happened or was said
22   during your conversation with Mrs. La Liberte,
23   Joseph?
24      A   I think I do remember.
25           MS. LUEVANOS:  If you cannot remember, it's
```

```
                                              Page 23

 1  okay.

 2           MR. LUEVANOS:  Don't guess.

 3           THE WITNESS:  Yeah, yeah.  I can't remember

 4  anything specific.

 5  BY MR. OLASOV:

 6     Q    Okay.  Do you -- did your mother say that

 7  they were having a civil con- -- you and she, you

 8  and Mrs. La Liberte were having a civil

 9  conversation?

10           MR. LUEVANOS:  On the tape or at any time

11  afterwards?

12           MR. OLASOV:  On the tape.

13           THE WITNESS:  On the tape.  Yeah, she said

14  that.  I don't remember it, but the video's --

15           MR. LUEVANOS:  You answered the question.

16  BY MR. OLASOV:

17     Q    Does it refresh your recollection that she

18  said that?

19     A    I don't remember her saying it, like, at that

20  moment.

21     Q    Did you ever say, of this conversation that

22  you had with Ms. La Liberte, that you were having a

23  civil conversation?

24     A    I said it was civil at some point in the

25  conversation.
```

Page 24

1     Q    How did the conversation end?

2     A    A security guard or whatever the city council

3  people are, they noticed a crowd gathering around

4  it, and they also noticed yelling from Roslyn

5  La Liberte.  So they decided they were going to

6  break up the crowd.  It's like, "All right.  All

7  right.  Let's break it up."  So that's essentially

8  how it ended.

9     Q    So do you recall you and she exchanging a hug

10 at the end of the conversation?

11    A    Yes.

12    Q    You did exchange a hug.

13    A    Yeah.  And the security guard, if I remember,

14 the security guard was like, "All right.  All right.

15 You two are on good terms.  All right.  Now make

16 up," and then a hug.

17    Q    Did he say that while you were exchanging

18 this hug or afterwards?

19    A    Before.  It was, like, prove you're on good

20 terms.  Or, like, just show you're on good terms and

21 hug.

22    Q    Was any of that conversation recorded in this

23 tape?

24    A    No.

25         MR. OLASOV:  Okay.  Let's play the next tape.

```
                                              Page 25

 1   Not that one.  The one that's --

 2            This is a --

 3            THE VIDEOGRAPHER:  Give me one second.

 4            MR. OLASOV:  I'm sorry.  Before you -- before

 5   you start playing it, this -- we'll mark this next

 6   tape playing as Exhibit 3.

 7            (Exhibit 3 was marked for identification

 8       by the court reporter and is attached hereto.)

 9            THE WITNESS:  Can you turn up the volume on

10   this one?

11            THE VIDEOGRAPHER:  Yeah, give me one second.

12            Sorry, that's the best I can get.

13            MR. LUEVANOS:  Yeah, technology.

14            MR. OLASOV:  It is what it is.

15            (Video now playing.)

16   BY MR. OLASOV:

17      Q   So do you see any officer of the law in -- in

18   the little clip between you and Mrs. --

19   Mrs. La Liberte on this tape?

20      A   I did not see any officer of the law in that

21   little clip.

22      Q   Does -- did -- does this refresh your

23   recollection that the hug was spontaneous?

24      A   No.  There was an officer of the law there.

25      Q   No.  Is it your testimony that the officer of
```

                                                        Page 26

1    the law told you to hug Mrs. La Liberte?

2           MS. MULLIGAN:  Objection.  Misstates the

3    testimony.

4           THE WITNESS:  Do I still got to answer?

5           MR. LUEVANOS:  Let me just explain.  Even

6    though they make objections, that's for a judge to

7    rule on later.  So unless I instruct not to answer

8    for whatever reason I decide to make that, you still

9    have to answer the question.

10          THE WITNESS:  Okay.

11          MR. LUEVANOS:  Sorry.  It's a little

12   confusing if you've never given testimony before.

13          MR. OLASOV:  Okay.

14          THE WITNESS:  No, I still -- I still do

15   remember the officer saying, "All right.  Now make

16   up," if -- if my memory serves correct.

17   BY MR. OLASOV:

18       Q   And -- all right.

19       A   Wait, wait, wait.  Okay.

20          MR. LUEVANOS:  Take your time.

21          THE WITNESS:  I think the officer said, "Are

22   you two on good terms?"  And then it may have been

23   La Liberte that prompted the hug.  Like, all right.

24   Let's prove we're on good terms, make up hug, bam,

25   the thing is done.

Page 27

```
 1        But now that I think about it, I think my
 2   memory's still a little bit fuzzy on that.  It was
 3   one of those two things.  I'm -- yeah, it was
 4   probably one of those two things.
 5        MR. OLASOV:  Let's mark as Plaintiff's
 6   Exhibit -- 5, is it?
 7        THE REPORTER:  4.
 8        MR. OLASOV:  4?  Well, okay.  4.
 9        (Exhibit 4 was marked for identification
10     by the court reporter and is attached hereto.)
11   BY MR. OLASOV:
12     Q   Have you seen the tweet and retweet that's --
13   that's on this document before?
14     A   I think this might be my first time seeing
15   it.
16     Q   Do you know Alan Vargas?
17     A   No.
18     Q   Did -- Did Mrs. La Liberte say to you, in
19   words or substance, ever, that -- quoting from this
20   page -- "You are going to be the first deported"?
21     A   No.
22     Q   Did she ever call you a "dirty Mexican"?
23     A   No.
24     Q   Your appearance was -- was at a -- at a city
25   council hearing of Simi Valley, was it not?
```

```
                                             Page 28

 1      A    Yes.

 2      Q    And it was not at a rally; is that correct?

 3      A    It had the energy of a rally, but no, it was

 4   not at a rally.

 5      Q    Did Roslyn La Liberte ever say any personally

 6   disparaging things to you?

 7      A    Not that I heard, but I did hear that there

 8   was some talk when I was speaking, and she was

 9   talking to someone and said things about me,

10   negative things.  I don't exactly remember what

11   because this -- this is secondhand information.

12   Someone told me about this after the time.

13      Q    And when did that conversation take place to

14   which you were referring?

15      A    The one where someone told me that she said

16   something or when she said something?

17      Q    The one when somebody told you that she said

18   something.

19      A    I think it might have been the day after.

20      Q    And who was it that said that to you?

21      A    I think my mom found out from someone else

22   that she was talking amongst her friends while I was

23   speaking.

24      Q    And that was the day after?

25      A    Yes.
```

Page 29

1      Q    And so that would -- this hearing was the
2    25th?
3      A    Yes.  So I believe I learned of this on the
4    26th.
5      Q    So learned on the 26th.  But that's
6    nothing -- you never heard any such thing from
7    Ms. La Liberte yourself.
8      A    No.
9      Q    Do you recall anything else about the
10   conversation you had with her during the hearing
11   break?
12     A    I think I remember bringing up the -- the
13   statistic that places with high amounts of
14   immigrants generally have less crime, and then she
15   said no.  And I -- she said immigrants are criminals
16   or something along the lines of that.
17     Q    I didn't hear what you said.  I beg your
18   pardon.
19     A    Immigrants are criminals.
20     Q    She --
21     A    Or something along the lines of that.
22     Q    Do you recall being interviewed by Hal Eisner
23   of Fox Channel 11?
24     A    Yes.
25     Q    And when did that take place?

```
                                              Page 30
 1     A    Like a few days after.  Like -- yeah, just a
 2   few days after.
 3     Q    And how did you come to be interviewed by
 4   him?
 5     A    My parents told me about it.  I think they
 6   con- -- he or whatever organization he works for,
 7   Fox, they contacted my parents.  They wanted to do
 8   an interview.  Yeah, that's it.
 9     Q    And -- and did they contact your parents more
10   than a day before the interview took place?
11     A    I do not remember.
12     Q    Did your parents agree to the interview?
13     A    Yes.
14     Q    Where did the interview take place?
15     A    On the grounds of city hall.  Not, like, in
16   city hall but outside, like near the library.
17     Q    Were -- were you accompanied by either/or
18   both of your parents during the interview?
19     A    By my mom.
20     Q    And, now, was there a part of your interview
21   that was video-recorded and another part that was
22   not recorded, or was it all recorded?
23     A    I think it was all recorded.
24     Q    Okay.  So you had no discussion with
25   Mr. Eisner before the video recording took place?
```

```
                                      Page 31

 1     A   We talked about how the interview would go,

 2   like just stand here, make sure you look at the

 3   camera, stuff like that.  But nothing about the

 4   meeting.  Off camera.  Nothing about the meeting off

 5   camera.

 6     Q   So do you recall anything else about the

 7   discussion you had -- was it with Mr. Eisner?

 8     A    It was with Mr. Eisner and his cameraman.

 9     Q   Okay.  But it was -- it only had to do with

10   where you were going to be?

11     A   Yeah.  Like how TV interview works.  Like I

12   got to look at the camera -- or not look at the

13   camera.  I have to look at him, ignore the camera,

14   stuff like that.

15     Q   Do you recall anything else that was said?

16     A   At the end of the interview they said -- the

17   cameraman said, "Where we got to go next?"  And then

18   Hal Eisner said -- I forget where, but it was where

19   they were going to go interview Roslyn La Liberte.

20   The cameraman said, like, darn, that's kind of far.

21   That's it.

22     Q   So tell me what was said in the interview

23   between Mr. Eisner and you, to the best of your

24   recollection.

25     A   So he asked me why I was there, like general
```

Page 32

```
 1   stuff, like when I got there, how long was the
 2   meeting, how long did I wait.  And then he asked me
 3   about how the meeting went.
 4        I said it was something.  It was -- it was a
 5   bit chaotic, to say the least.  I told him about,
 6   like, the loud -- there was some random guy in a
 7   suit going "No.  No," because people with the signs
 8   were chanting something.  I don't recall exactly
 9   what, but it was people with "Love it or leave it"
10   signs so I can't imagine they were chanting
11   something good.
12        And then he asked me how the conversation
13   during the break time went, and then I told him
14   essentially what I told you, like I went up to
15   Roslyn La Liberte.  I wanted an opinion of someone
16   who was against SB54.
17        Conversation ensued.  She said her piece.  I
18   tried to say my piece.  She interrupted.  This went
19   on for some time.  And she got progressively louder
20   and louder as it went on.
21   Q    Is that something you told him?
22   A    Yeah.  So it was -- and then after that he --
23   he asked me how the conversation went as a whole in,
24   like, the context of the meeting.  And I said it was
25   civil compared to some of the other people out
```

Page 33

1    there, like, that were at the meeting, like some

2    weird old MAGA-hat-wearing man in his 50s.

3         He said something very loudly in my face.  I

4    don't recall exactly what, and that might have been

5    the "you're going to be the first one on the buses"

6    thing.  'Cause I was told later that's what he said.

7    I kind of zoned out because I was typing on my

8    computer.

9         MR. OLASOV:  Will you -- will you read back

10   that answer for me, please.

11        (Record read.)

12        THE WITNESS:  That's how I talk?

13        THE REPORTER:  Yes, sir.

14   BY MR. OLASOV:

15     Q   Do you recall anything else that took place

16   in the conversation between you and Mr. Eisner?

17     A   Once he was done interviewing me, and I think

18   I told you everything we talked about, he just went

19   on to interview my mom, and what she was doing

20   there, because she was also there.

21        (Reporter clarification.)

22        MR. LUEVANOS:  Just repeat that again.

23        THE WITNESS:  Okay.  Once he was done

24   interviewing me, I don't remember anything else, he

25   interviewed my mom, and that's it.

                                                        Page 34

1    BY MR. OLASOV:

2        Q    And did he interview your mother on screen,

3    on videotape or not?

4        A    It was on camera.  It was not in, like, the

5    piece he did.

6        Q    And do you have a recollection of saying

7    anything to Mr. Eisner about how Ms. La Liberte was

8    being treated publicly?

9        A    I remember -- this is where "the civil

10   compared to the other people" thing came in.  'Cause

11   I remember I said do not boycott her.  Do not do all

12   that stuff you're doing to her 'cause there are

13   other people who probably deserve it more.  Like

14   there -- like -- 'cause later I learned there's also

15   some guy from the --

16       Q    No, I want your conversation with him then,

17   not of what you learned later or believed later.

18       A    Okay.  Yeah, I told -- I specifically told

19   him do not boycott her 'cause there are -- 'cause

20   she was civil compared to a good chunk of the other

21   people there.

22       Q    Did you use in your discussion with him that

23   she was only civil in comparison to other people?

24   Is that something you said to him?

25       A    I do believe so.

```
                                                    Page 35
```

1     Q    And did you say to him, in words or

2   substance, that she did not deserve how she was

3   being treated?

4     A    Yes, in substance.

5     Q    Did you use those words?

6     A    Exactly, no.

7          MR. OLASOV:  So let's play for Joseph the Hal

8   Eisner interview.

9          THE VIDEOGRAPHER:  Which one is that?

10         MR. OLASOV:  And that should be -- that's it.

11         That's 5?

12         THE REPORTER:  Yes.

13         THE VIDEOGRAPHER:  Yes.

14         Ready?

15         (Exhibit 5 was marked for identification

16      by the court reporter and is attached hereto.)

17         (Video now playing.)

18   BY MR. OLASOV:

19     Q    Did you learn before your interview with

20   Mr. Eisner, Joseph, that there were reports of

21   people advocating not doing -- not -- others not

22   doing business with Roslyn La Liberte and her

23   company?

24     A    Yes.

25     Q    How did you learn that?

```
                                              Page 36

 1      A    My parents told me.

 2      Q    Your parents told you.

 3      A    Yes.

 4      Q    Did you learn it -- do you know how they

 5   learned that?

 6      A    Social media.  Social media.

 7      Q    Were you yourself active on social media?

 8      A    No.

 9      Q    And what did your parents tell you about what

10   was happening to her business?

11      A    That it was being boycott, and she lost a

12   deal with McDonald's.

13      Q    Did you learn anything else?

14      A    Not really.

15      Q    Did you -- did you ever tell Mr. Eisner

16   that -- that Roslyn La Liberte had been rude to you?

17      A    I don't think I ever said that.

18      Q    After this brief interaction with

19   Ms. La Liberte, did you ever have any further

20   dealings with her, any other conversations, either

21   that day or any other day?

22      A    No.

23      Q    So this -- this small interaction is the only

24   one you ever had with her; is that correct?

25          MS. MULLIGAN:  Objection.  Mischaracterizes
```

                                                      Page 37

 1   the testimony.

 2          MR. LUEVANOS:  You can answer.

 3          THE WITNESS:  Yeah.

 4   BY MR. OLASOV:

 5      Q    Did you attend the city council hearing for

 6   its entirety?

 7      A    Yes.

 8      Q    Were you seated with your mother when you

 9   attended the hearing?

10      A    Yes.

11      Q    And where were you seated in the audience?

12      A    Front row.

13      Q    I'd like to play you now, as the next exhibit

14   number, a video excerpt from -- from the -- from the

15   council hearing.

16          THE REPORTER:  Be 6.

17          (Exhibit 6 was marked for identification

18      by the court reporter and is attached hereto.)

19          MR. OLASOV:  And the clip -- it's -- pages in

20   order.  And it's -- the times are hour 3, 59

21   minutes, 2 seconds through hour 4, 1 minute, 25

22   seconds.

23          (Video now playing.)

24   BY MR. OLASOV:

25      Q    You've heard this clip.  Was this the

```
                                         Page 38
 1    entirety of your presentation to the council?

 2        A    Yes.

 3        Q    Was there any impediment in your giving this

 4    presentation?

 5        A    There was a ridiculously long wait compared

 6    to when I arrived there.  Other than that, no.

 7        Q    Did you hear the comments delivered by

 8    Ms. La Liberte?

 9        A    When?  To the city council?

10        Q    Yes.

11        A    I heard them, yes.

12        Q    Do you recall what she said?

13        A    I believe it was a few points that she made

14    during our conversation, but other than that, no.

15        Q    So against the possibility that this may

16    refresh your recollection, I'm going to ask the

17    videographer to play what I believe is her statement

18    to the city council.  And this is at hour 4, minute

19    17, 45 seconds through hour 4, minute 19, 57

20    seconds.

21             THE VIDEOGRAPHER:  I can't get it exact to

22    4:17 --

23             MR. OLASOV:  Well, I mean -- well, then

24    you're just going to have just take it out in the

25    backyard and shot I'm afraid.
```

```
                                                 Page 39

 1            THE VIDEOGRAPHER:  It will be this other
 2     person --
 3            (Video now playing.)
 4     BY MR. OLASOV:
 5        Q    Joseph, does that refresh your recollection
 6     of anything that she said -- Ms. La Liberte said to
 7     you during your private conversation?
 8        A    She kept bringing up her parents in
 9     Indonesia.  Then I asked, "What does that have to do
10     with immigrants coming in from Latin America in
11     modern times?"  And then she kept bringing it up.
12        Q    Is there anything else?
13        A    I think she also used the term "illegals" in
14     her conversation.
15        Q    In what context, if you recall?
16        A    Something along the lines, illegals are
17     coming here and committing crimes.
18        Q    And did you say anything to her?
19        A    I brought up the crime statistics I used.
20     It -- I don't think it was like the Homeland
21     Security --
22            (Interruption in the proceedings.)
23            MR. OLASOV:  Sorry.
24            THE WITNESS:  I don't think it was the --
25     BY MR. OLASOV:
```

```
                                              Page 40

 1      Q    Go ahead.  I beg your pardon.
 2      A    I don't think I brought the Homeland Security
 3  plus FBI data statistic thing I used during the city
 4  council comments I made.  I believe it was a
 5  separate article about how immigrants generally have
 6  a lower crime rate than regular citizens of a
 7  nation.  I forget where the article's from, but I
 8  brought that up.
 9      Q    So this was an ordinary exchange of views
10  between you and her?
11      A    Yeah.
12           MR. OLASOV:  Let's mark as the next
13  Plaintiff's Exhibit number --
14           (Discussion off the record.)
15           THE REPORTER:  So this will be 7.
16           (Exhibit 7 was marked for identification
17      by the court reporter and is attached hereto.)
18  BY MR. OLASOV:
19      Q    Joseph, can you identify Plaintiff's Exhibit
20  7 for us.
21      A    This looks like my mom's tweet.
22      Q    Is that her handle, this luv2teachss?
23      A    I don't know, but like the ad, that's
24  familiar.  That's something she would use.
25      Q    Have you seen this before today?
```

```
                                                    Page 41
 1      A    Nope.

 2      Q    How many people were at the city council

 3  hearing on the 25th?

 4      A    I don't know.

 5      Q    Do you have any estimate?

 6      A    Not really.

 7      Q    Did you ever learn that Joy Reid had issued a

 8  tweet saying, in words or substance, that I believe

 9  that I've gotten this wrong?

10          MS. MULLIGAN:  Objection.  Mischaracterizes

11  the document, which isn't in front of him.

12          THE WITNESS:  Wait.  Could you repeat that?

13  BY MR. OLASOV:

14      Q    Did you ever learn that Joy -- Joy Reid

15  withdrew the assertion, any assertion that she

16  attributed to Roslyn La Liberte that she disparaged

17  you?

18      A    I do not remember.

19      Q    Were you ever told that or read that Ms. Reid

20  stated that she apologized to you?

21      A    To me?

22      Q    To you.

23      A    I think I may have remembered seeing that or

24  learning about it.

25      Q    Did you ever speak to -- to Ms. Reid?
```

```
                                         Page 42
 1     A    No.  I don't think so.
 2     Q    Did you ever acquire any understanding as to
 3   why she apologized to you --
 4     A    No.
 5     Q    -- if she apologized to you?
 6     A    No.
 7          MR. OLASOV:  What's the next exhibit number?
 8          THE REPORTER:  8.
 9          (Exhibit 8 was marked for identification
10     by the court reporter and is attached hereto.)
11   BY MR. OLASOV:
12     Q    Have you ever seen any version of this
13   document before?
14     A    Yeah.
15     Q    Can you -- can you identify the people shown
16   on this, Far D and Leo Luevanos?  I take it that's
17   your father.
18     A    Yeah.  Leo Luevanos is definitely my dad.  I
19   do not know who this other guy is.
20     Q    Were you pressured into giving the Hal Eisner
21   interview?
22     A    In what sense?
23     Q    In any sense.
24     A    Pressured while talking to him?  Pressured in
25   doing the interview in the first place?
```

```
                                              Page 43
 1      Q    Well, did your parents pressure you to be
 2    interviewed by Mr. Eisner?
 3      A    No.  That was voluntary.
 4      Q    I beg your pardon?
 5      A    No.  I wanted to be interviewed.
 6      Q    You wanted to be interviewed.
 7      A    Yeah.
 8      Q    Why did you want to be interviewed?
 9      A    Because this whole thing was blowing up, and
10    I was a 14-year-old kid, like, hey, TV.
11      Q    How -- how was it blowing up?
12      A    I heard the original tweet was, like, her
13    doing this.  It got to, like, something like over a
14    hundred thousand something on Twitter.  I was like,
15    hey, I'm kind of internet --
16          (Reporter clarification.)
17          THE WITNESS:  I'm kind of internet famous.
18    Not really, but, like, I'll take it.  When the
19    interview came up, I'm like, sure, why not.
20    BY MR. OLASOV:
21      Q    And your parents encouraged you to be
22    interviewed?
23      A    No.  They asked me.  Hey, do you want to be
24    interviewed?  And I'm like sure.  It wasn't like any
25    encouragement or -- mostly my decision.
```

Page 44

1    Q   So were -- were you pressured in -- in

2    stating anything during the Eisner interview?

3    A   When I did the interview, I felt that I said

4    what I wanted to say, which is essentially what this

5    tweet is saying, that she was civil, then the rest.

6    Was she yelling at me?  Yes.  Was she civil compared

7    to other people there --

8    Q   Did -- excuse me.  Did you testify -- did you

9    say --

10         MS. MULLIGAN:  Objection.  Let him finish his

11    answer.

12         MR. OLASOV:  Excuse me.

13    Q   Did -- did you tell Mr. Eisner that she

14    yelled at you?

15    A   I said it got to the point where she was

16    essentially screaming, yes.

17    Q   And -- and you said that to him?

18    A   Yes.

19    Q   And is -- that's not on the interview, is it?

20    A   It was on camera.  Was it in this piece?  No.

21    And that's essentially what this tweet is saying.  I

22    thought I said what I wanted to say.  Like, hey,

23    he's going to just report on this form, you know.

24         And then it was, when I watched the piece

25    when it came out on TV, I'm like -- 'cause he did

```
                                             Page 45
1    the editor magic thing, where it's like he took the

2    clips he wanted, he made the story he wanted.  Like,

3    well, that's my life.

4        Q    You said on the broadcast portion of the tape

5    that she did not deserve what was happening to her.

6    Is that -- is that something you wanted to have

7    said?

8        A    Yeah.

9        Q    And you said that.

10       A    At the time, yes.

11       Q    And was that -- was that your view then?

12       A    That was my view then, yes.  And then I heard

13   the little bit where he was talking with the

14   cameraman about how they had to go drive out to see

15   Roslyn La Liberte.  And then I thought about it for

16   like 15 minutes.  So, like, you know what?  She

17   drove in here from some outside city to stir up

18   trouble in Simi Valley, and she spoke even though

19   she's not a resident.  Maybe she does deserve this.

20       Q    So did you ever get in touch with Mr. Eisner

21   and say I should never have said -- in words or

22   substance, I should never have said that she doesn't

23   deserve this?

24       A    No.  I just kind of wallowed in regret.

25           THE REPORTER:  I'm sorry?
```

```
                                               Page 46

 1          THE WITNESS:  No.  I just kind of wallowed in

 2     regret.  Like, I should have said that, but I didn't

 3     contact him again.  I didn't really feel like doing

 4     another TV interview.  I got offered to do another

 5     one.  I said no.

 6     BY MR. OLASOV:

 7        Q    Who offered you to do another TV interview?

 8          THE WITNESS:  Who offered?

 9          MR. LUEVANOS:  It's based on what your

10     remembrance is.

11          THE WITNESS:  I don't remember.  It was

12     something.

13     BY MR. OLASOV:

14        Q    And when was that?

15        A    It was, like, a few days after that

16     interview.

17        Q    Did -- did you receive any criticism from

18     anybody concerning the portions of your interview

19     with Mr. Eisner?

20          MS. MULLIGAN:  Objection.  Vague.

21          THE WITNESS:  I wasn't on social media; so I

22     don't know.

23     BY MR. OLASOV:

24        Q    Did any of your friends tell you that they

25     thought you'd spoken poorly during the interview?
```

```
                                                Page 47
 1      A   My friends didn't know I went on -- I was on
 2   TV.
 3      Q   I beg your pardon?
 4      A   My friends didn't know I was on TV.
 5      Q   Have you been interviewed by anyone else
 6   since your Eisner interview?
 7      A   No.
 8      Q   Did you speak with any representative of Joy
 9   Reid concerning this matter?
10      A   Yes.  Yes.
11      Q   When did that happen?
12      A   Back in, like, June or something.
13      Q   June of?
14      A   I don't remember.
15      Q   What year?
16      A   This year.
17      Q   This year.
18      A   It might have been earlier than that.  It
19   was -- it was months ago.
20      Q   And with whom did you speak?
21      A   One of representatives of Joy Reid.
22      Q   And what was that person's name?
23      A   I don't remember.
24      Q   Did he give you any documents, or did you
25   give him any documents?
```

```
                                                    Page 48

 1       A    No.

 2       Q    And what was the conversation?

 3       A    Wait.  I -- I think I told him about the

 4   article I wrote for my tia Tita.

 5       Q    For your aunt.

 6       A    Yes.

 7       Q    And did you give that to him?

 8       A    I didn't give it to him.  I just told him

 9   about it.

10       Q    And tell me what the rest of the conversation

11   was, to the best of your recollection.

12       A    It was like, hey, we got this court case

13   coming up.  We're telling you in advance.  That's

14   all I remember.

15       Q    And how long did the conversation last?

16       A    Five minutes.  30 minutes.  It was brief.

17       Q    So was it -- was it in person or over the

18   phone?

19       A    Over the phone.

20       Q    And you don't remember the name of the person

21   that you spoke with?

22       A    No.

23       Q    Were either of your parents privy to the

24   conversation?

25       A    My dad was there.
```

Page 49

1    Q   This was by telephone or in person?

2    A   Telephone.

3    Q   Was your father on the phone?

4    A   Well, we put it on Speakerphone.  We just

5 kind of sat in an empty room.

6    Q   And you told -- you told this person about

7 this essay you wrote for your aunt?

8    A   Either that, or they already knew about it.

9 It was one of the two.  Not entirely sure.

10    Q   If they didn't get this information from you

11 concerning this essay, from whom did they get it?

12        MS. MULLIGAN:  Objection.  Foundation.

13        THE WITNESS:  I don't know.

14 BY MR. OLASOV:

15    Q   Who else had a copy of this essay?

16    A   My tia, my mom.  But I don't think they

17 talked to my mom.  And whatever magazine or whatever

18 my tia published it in.

19        MR. OLASOV:  Let's mark as the next

20 Plaintiff's Exhibit number, a single-page document.

21        THE REPORTER:  Exhibit 9.

22        MR. OLASOV:  Thank you.

23        (Exhibit 9 was marked for identification

24    by the court reporter and is attached hereto.)

25 BY MR. OLASOV:

```
                                                   Page 50

 1      Q    Joseph, have you ever seen Plaintiff's
 2   Exhibit 9 before?
 3      A    No.
 4      Q    Do you know who Dr. Nora Hernandez is?
 5      A    That's my tia.  Or my other tia.
 6      Q    And is she related to you on your father's
 7   side or on your mother's side?
 8      A    My mother's side.
 9      Q    Did you tell her that Roslyn La Liberte
10   shouted at you?
11      A    I don't know if I ever spoke to her about
12   this.
13      Q    Do -- do you know -- do you have any
14   information as to who did, if anyone?
15      A    My mom.
16      Q    And did -- did your -- did your mother tell
17   you that she had told -- this is her sister?
18      A    Yeah.
19      Q    -- that the exchange was not civil?
20      A    Wait.  Could you repeat the question?
21      Q    Did your -- did your mother tell you that she
22   had told your aunt that the exchange between Roslyn
23   La Liberte and you was not civil?
24      A    Well, I told my mom what happened after the
25   fact 'cause she was in the bathroom for a good chunk
```

1    of it.  And then she probably -- I know she told the

2    story to my tias.  And she probably told them what I

3    told her.  So yes.

4        Q   Do you know why your mother would have said

5    in the -- on -- on screen in that videotape that

6    they are having a civil conversation?

7        A   'Cause she didn't have all the context then

8    'cause, like I said, she was in the bathroom.  She

9    just walked out.  I'm there with my computer.  Some

10   lady's talking.  There's a crowd.

11           That hurts.  Wow, this collar's tight.

12           MR. LUEVANOS:  You can unbutton the collar.

13           THE WITNESS:  No.

14   BY MR. OLASOV:

15       Q   What part of your interview did Fox news cut

16   out, according to you?

17       A   Can you pull up the video?  There's a

18   specific part I noticed when watching it or

19   rewatching it.

20           THE REPORTER:  That's Exhibit 5.

21           MS. MULLIGAN:  Yeah, Exhibit 5.

22           (Video played.)

23           MR. OLASOV:  Not that.

24           (Discussion off the record.)

25           (Video now playing, Exhibit 5.)

```
                                         Page 52

 1          THE WITNESS:  Can you fast forward a little

 2   bit?

 3          THE VIDEOGRAPHER:  You can do it on your

 4   screen.

 5          THE WITNESS:  Oh.

 6          THE VIDEOGRAPHER:  You're probably better at

 7   it than me.

 8          THE WITNESS: Right there.  Right there.  So

 9   right there, the cutaway.  When I do this, I'm about

10   to go on, like, a tirade.  So I only had one finger

11   out and not two.  I just had one.  So they cut right

12   there, and I think that was the bit right before I

13   said, "'cause she was civil compared to some of the

14   other people there, but there were other people that

15   deserved it more."  That would have been three

16   fingers.  There was only one.

17   BY MR. OLASOV:

18      Q   You think this was edited.

19      A   Oh, that was edited, that part right there.

20   Like I have friends who do, like, editing whenever

21   there's, like -- whenever they want to do, like, a

22   funny cut, they just get their little clip, and then

23   before the rest of it's -- like go on, they fade

24   away like that.

25          (Video now playing.)
```

```
                                               Page 53

 1         THE WITNESS:  You don't stop after one chop.

 2   You do, like, chop, chop.  You don't -- you know.

 3   And you're, like, going on this?  You got to get

 4   edits, like a few of them, you know.  So it's

 5   definitely edited.

 6   BY MR. OLASOV:

 7       Q    That's your testimony.

 8       A    Yeah.

 9       Q    So you -- you said to him, "I don't really

10   want this upon -- it's like she doesn't deserve it

11   because she was giving her opinion in a place where

12   everyone should be able to share their opinion."

13   That's -- that's what you said.

14       A    Yeah.

15       Q    Are you -- is it your testimony that you now

16   regret having said that?

17       A    I regretted it, like, a day after saying

18   that.  It was like I said, I learned she lived

19   outside Simi Valley, and then I thought about it.

20   I'm like, dang, maybe she did deserve it.  But now I

21   regret it even more when later I found out she,

22   like, punched someone with a sign.

23       Q    How did you learn that?

24       A    Well, it blew up.  When you punch some guy --

25   no.  It was punch some -- some high schooler with a
```

Page 54

```
 1   sign, it's going to blow up.  And especially 'cause

 2   it's the same person that yelled at me earlier, I'm

 3   like, well, it blew up.  My parents found out about

 4   it and then showed me.

 5       Q   Did you ever see that videotape?

 6       A   Yeah.

 7       Q   Did you not see that the young lady was

 8   assaulting Ms. La Liberte?

 9       A   I did see that portion of it, but it -- from

10   what I remember of the clip, La Liberte swung first.

11       Q   Is that your recollection?

12       A   Yeah.

13       Q   And so if you have that wrong, how would that

14   affect your testimony today?

15           MS. MULLIGAN:  Objection.  Argumentative.

16           THE WITNESS:  I don't care.  She still

17   punched someone.  Be the bigger man.

18   BY MR. OLASOV:

19       Q   I beg your pardon, son?

20       A   Be the bigger man.  She -- she should have

21   learned this when she was doing it to me.

22           THE REPORTER:  She should what?

23           THE WITNESS:  She should have learned this

24   when she was doing it to me.  Or not like exactly

25   what she was doing to me, but when she was doing
```

Page 55

1    this (indicating.), she realized how bad it looks.

2    Don't -- I don't -- where's the restraint?  You got

3    caught once with your hand in the cookie jar, and

4    then you go in for another cookie.  What -- what do

5    you expect?

6    BY MR. OLASOV:

7       Q   So that your testimony is today that although

8    you said that she was civil to you, you do not feel

9    today she was civil to you.  Is that it?

10           MS. MULLIGAN:  Objection.  Asked and

11   answered.

12           MR. OLASOV:  That's not an objection to form.

13           THE WITNESS:  Back then I had a lot more

14   optimistic view of the world.  I'm going to be

15   honest.  So when she was doing this, I was still

16   looking at my laptop.  I was like na, na-na, na-na,

17   na-na, like little old freshman me was, or, like,

18   freshman transitioning into sophomore was.

19           And then the more I thought back on it, the

20   more I realized this isn't normal.  Why -- why --

21   huh?  You know.

22           I'm sorry.  I don't know how to put this into

23   words.  So I did say she was civil back then, but

24   I -- I do remember, clearly, I said she was civil

25   compared to other people.  And now I look back on

Page 56

```
 1   it, doing this -- right? -- the yelling, the
 2   bringing up your parents again in Indonesia, even
 3   though I kept asking "What does that have to do with
 4   anything?" and she didn't explain herself, that's
 5   not civil.  It's not.
 6   BY MR. OLASOV:
 7      Q   Do you have any other regrets about your
 8   interaction with her?
 9      A   No, not really.
10          MR. OLASOV:  Let's mark as the next
11   exhibit --
12          MS. MULLIGAN:  Objection.  That's
13   unnecessary.
14          (Reporter clarification.)
15          MS. MULLIGAN:  I said objection.  That's
16   unnecessary.  It's argumentative.
17          THE REPORTER:  Okay.  This is 10.
18          (Exhibit 10 was marked for identification
19      by the court reporter and is attached hereto.)
20          MR. LUEVANOS:  Probably seen it, but thank
21   you.
22          MR. OLASOV:  I should think.
23          MR. LUEVANOS:  Could we put the video off the
24   screen?
25   BY MR. OLASOV:
```

```
                                          Page 57

 1      Q    Can you identify Plaintiff's Exhibit 10?

 2      A    Yeah.  This is what I wrote for my tia Tita.

 3           (Reporter clarification.)

 4  BY MR. OLASOV:

 5      Q    And that's your father's sister?

 6      A    My mom's sister.

 7      Q    Your mom's other sister.

 8      A    Yes.

 9      Q    And when did you prepare this?

10      A    I sent it to my tia in, like, April, but I

11  think I started writing it back in, like, December

12  of last year, December or Septem- -- it's -- I wrote

13  this, like, over six months ago.  At minimum,

14  February.

15      Q    Of this year.

16      A    Yes.

17      Q    And how did you come to write this?  Were you

18  asked to write something?

19      A    Yeah, my tia wanted me to write this.

20      Q    And tell me what the process was of preparing

21  this document.

22      A    Well, I thought about what happened, to the

23  best of my knowledge, and then I wrote it down.  And

24  I did some revising and bam.

25           (Reporter clarification.)
```

Page 58

1          THE WITNESS:  And then I didn't some revising

2      and then -- bam.

3      BY MR. OLASOV:

4          Q    Did she tell you what she planned to do with

5      this document?

6          A    Publish it in something.

7          Q    And where was it published?

8          A    I don't know.

9          Q    And did anyone edit it with you?

10         A    I gave it to my mom to, like, look over for

11     spelling mistakes or, like, stuff like that.  But

12     she doesn't really touch, like, any of the main meat

13     and potatoes of what I wrote down.  She usually just

14     puts, like, Google doc suggestions.

15         Q    And -- is -- is this piece intended to be

16     factually correct or not?

17         A    Yes.

18         Q    So let's look on the second page.  There's a

19     sentence that says, "Those who were pro-SB54 decided

20     to dress in white and those who were against SB54

21     wore MAGA hats."  Is that a correct statement?

22         A    Yes.  Most of the people wearing white were

23     pro SB54 at that meeting.  And then if you had a

24     MAGA hat, you were definitely against SB54 at that

25     meeting.

```
                                            Page 59

  1     Q   So that's not that all those who were against

  2   SB54 wore MAGA hats, but those who wore MAGA hats

  3   were against SB54.  You said something different

  4   here.  You said that those who were against SB54

  5   wore MAGA hats.  Is that correct?  So that's not a

  6   correct statement, is it?

  7          MS. MULLIGAN:  Objection.  Argumentative.

  8          THE WITNESS:  Well, I said those who were

  9   against SB54 wore MAGA hats, which is true.  And

 10   those who were for SB54 decided to dress in white,

 11   'cause there was talk beforehand, like, hey, if

 12   you're for SB54, wear white.

 13   BY MR. OLASOV:

 14     Q   So what percentage of the people were against

 15   SB54 that -- that expressed their views at the city

 16   council meeting?

 17     A   Against SB54?

 18          MR. LUEVANOS:  And you're talking just at the

 19   city council hearing?

 20          MR. OLASOV:  At this hearing, yes.

 21          THE WITNESS:  At the hearing?  It's hard for

 22   me to think of a percentage 'cause it's hard to

 23   exactly remember how much space they took up just

 24   'cause their signs made their crowd seem a little

 25   bigger than it may have been, or there weren't that
```

```
                                                Page 60

 1   many people.  I'm not entirely sure.

 2        And then there were also the people there who

 3   didn't have MAGA hats and were dressed up in, like,

 4   regular clothes, but they still hung out with the

 5   MAGA hat crowd.  So, like --

 6   BY MR. OLASOV:

 7     Q   So were those -- you say in this piece that

 8   "Those who were pro-SB54 decided to dress in white."

 9   Were substantially all of those persons dressed in

10   white?

11     A   Yeah.  Most of the people there who were for

12   SB54 decided to dress in white, and these are people

13   from the community, activists, 'cause they decided

14   beforehand they're going to dress in white.

15        There were some people who were pro SB54 who

16   weren't in white, but these were just more like --

17   there was some movie guy who was in, like, a suit.

18   He said -- he was talking about the -- this isn't

19   important but or -- but there was this movie guy who

20   dressed up in a suit, saying, hey, if you're against

21   SB54, you can't shoot movies here anymore 'cause,

22   like, they all seem racist.

23        (Reporter clarification.)

24        THE WITNESS:  We can't shoot movies here

25   anymore because then you all seem racist if you're
```

```
                                            Page 61

 1   against SB54.  So be for SB54, it's neutral.

 2         Yeah, there are also people just saying be

 3   neutral.

 4   BY MR. OLASOV:

 5      Q   And were those people who were pro SB54, or

 6   were they just people who said be neutral?

 7      A   Generally if you said be neutral, you were

 8   still, like, pro SB54 'cause that meant not joining

 9   whatever city started the lawsuit.

10      Q   Did your aunt edit any part of this?

11      A   I think she sent me back a Google doc with

12   suggestions, just like minor word choices here and

13   there, rephrasing stuff better.  She may have done,

14   like, other -- again, some minor editing again after

15   I, like, sent back some of the suggestions that I

16   liked, some of the suggestions I didn't like.  But

17   meat and potatoes, nothing really changed.

18      Q   Now, on the third page of this document you

19   say in the last sentence of the carryover paragraph,

20   "This woman sued a news personnel for libel, lost."

21   You see that?

22      A   (No audible response.)

23      Q   Does that refresh your recollection as to

24   when you wrote this article, this essay?

25      A   Not really.
```

```
                                                     Page 62

 1      Q    Did you ever learn that the decision of the

 2   District Court was reversed in the Court of Appeals?

 3      A    I learned that after the fact.

 4      Q    After you prepared this article?

 5      A    Yeah.

 6      Q    And how did you learn that?

 7      A    I believe my parents told me.

 8      Q    And do you remember when that took place?

 9      A    Nope.

10      Q    Do you know whether this article, this essay

11   that you -- that you produced has been published?

12      A    I don't know if it's been published or not.

13   I'd assume so 'cause I gave it to my tia, like I

14   said, back in April.  I don't --

15      Q    This April.

16      A    Yeah.  Was it this April?  Hang on.

17   Essentially I gave it to her, like, a while back.

18   It should be published.  I don't know how long

19   publishing takes.  It may or may not be published.

20      Q    So are you able -- are you able to pinpoint

21   when you -- when you first composed this -- this

22   article?

23      A    No.  If I had my computer, maybe, 'cause I

24   could log into my account and see when this doc was

25   first created.
```

```
                                            Page 63
 1          MR. OLASOV:  Well, let's reserve a place in

 2   the deposition so that he can do that exercise and

 3   fill in that information.

 4          MR. LUEVANOS:  Sure.

 5          (Information requested:  _____

 6   _____.)

 7   BY MR. OLASOV:

 8      Q   How long -- if you look at the third page,

 9   you are to count this page, I think it says 410,

10   JR410.

11          MR. LUEVANOS:  Down in the corner?

12          THE WITNESS:  Okay.

13          MR. LUEVANOS:  Where are we looking at on

14   page --

15   BY MR. OLASOV:

16      Q   The question I had for you, Joseph, is

17   this -- is this intended to be an accurate statement

18   of the exchange between you and Ms. La Liberte, or

19   is it -- or is it a augmented or changed version of

20   what happened?

21      A   It is accurate.  May have just a little

22   dramaticized 'cause that's just how I write.  Like

23   this one line that said, "and the discussion if you

24   could call" -- "if you could even call it one,"

25   that's just dramatic effect.  Like everything, like,
```

Page 64

1   here, like, factwise, yeah, factual.

2       Q   You say at the end of the paragraph, "The

3   entire time my mom was in the bathroom and learned

4   about the whole debacle shortly after."  Is that a

5   correct statement?

6       A   Again, that's -- that's dramaticized.  She

7   did come in, like, the very tail end, but like I

8   said earlier, she didn't have any context.  So,

9   like, I had to fill her in about what happened.

10      Q   Did she see you hug Ms. La Liberte at the end

11  of your conversation?

12      A   I believe so.

13          MR. LUEVANOS:  Well, do you know one way or

14  the other?

15          THE WITNESS:  If I had said it, then I would

16  say yes, but I'll probably just say I don't know

17  'cause it's -- I don't know.

18  BY MR. OLASOV:

19      Q   Did her statement into the camera that

20  "they're having a civil conversation," a statement

21  she said twice, did that immediately precede the

22  hug?

23      A   No.

24      Q   How much after that was the hug?

25      A   Well, the crowd that did form --

Page 65

1    Q   No, I'd like you to answer my question, if
2  you don't mind.
3        MS. MULLIGAN:  Objection.  He is asking --
4  answering your question.
5        MR. OLASOV:  No, I don't think so.
6    Q   How much after her statement, that "they're
7  having a civil conversation," did the hug take
8  place?  That's either an amount of time or you don't
9  know.
10   A   I do not know.
11       MR. OLASOV:  Let's go off the record for a
12 few minutes.
13       THE VIDEOGRAPHER:  We are going off the
14 record.  The time is 12:02.
15       (Recess.)
16       THE VIDEOGRAPHER:  We are back on the record.
17 The time is 12:31.
18 BY MR. OLASOV:
19   Q   Joseph, I just have a few more questions, and
20 then my colleague will ask you some questions.  And
21 after she asks you some questions, I may have a few
22 more, who knows.
23       And I'd like you to look at the essay you
24 composed at your aunt's request, PX10, and look at
25 the third page, if you would, the last page.  And in

```
                                        Page 66
```

1   the -- in mid paragraph you say, "After she spoke,"

2   quoting, "I would continue with my points until I

3   got interrupted again.  This process repeated four

4   times and she got progressively louder each time

5   until she had to hold her throat from screaming so

6   loud."  You wrote that.

7       A    Yeah.

8       Q    Now, the holding of the throat, where did

9   that take place in relation to your discussions?

10      A    So it was near the end of it.  Not at, like,

11  the very end but like -- so after, like, the back

12  and forth between me trying to get my points in and

13  her interrupting and talking about her parents or

14  whatever she wanted to talk about again, she would

15  get louder and louder until -- and this went back,

16  like, I want to say, three times before she got to

17  here.  And like the fourth time -- after the fourth

18  time crowd forms, security guard broke it up.  So it

19  was, like, right before -- a little bit before the

20  security guard broke it up.

21      Q    And the security guards broke it up, as you

22  testified, just -- just at the end of your

23  conversation?

24      A    It would have kept going if they did not

25  break it up.

```
                                              Page 67

 1      Q    So you -- you and she were continuing your
 2   conversation until the police, you say, intervened
 3   to break it up?
 4      A    Yes.
 5      Q    Okay.  So was she at her loudest at the end
 6   of the conversation?
 7      A    Yes.
 8      Q    Was the crowd generating a lot of ambient
 9   noise?  You know the meaning of ambient; right?
10      A    Yeah, I know.  I don't know 'cause there was
11   already, like, a lot of noise in the room general,
12   just from the amount of people that were in there.
13   I don't know if it was the crowd or not.
14      Q    So there was a lot of noise in the -- in this
15   room.
16      A    Yeah, there was already, like, a lot of noise
17   in the room already.
18      Q    So to be heard in this room, you'd have to
19   speak in a louder voice; is that correct?
20      A    Not necessarily.  I mean we were close enough
21   where I -- I could talk like this and she could
22   still hear me.
23      Q    Now, in the video that was played, did that
24   accurately reflect the level of her speaking to you?
25      A    It did get louder than that.
```

```
                                              Page 68

 1      Q    Oh, it got louder than that.

 2      A    Yes.  But that -- that did accurately

 3   reflect, like, the beginning of it, yes.

 4      Q    It reflected the beginning of it?

 5      A    Yeah, the beginning/middle portion of it sort

 6   of like, yeah.

 7      Q    I thought -- correct me -- that you testified

 8   that that was at the -- her -- the exchange that was

 9   recorded was at the end of your conversation.  Is

10   that not correct?

11      A    Wait.  When did I testify to that?  Wait.

12   Okay.  Yeah, yeah.  So it was -- that's not really

13   at the end of it.  That was more like the middle of

14   it.  I guess it didn't take that long.  Yeah.  So it

15   was more like the middle of it.

16      Q    So how long was this conversation?  Was it

17   three minutes?

18      A    If I had to give a time, I'd give, like, four

19   or five-ish, three, four, five, those numbers,

20   probably four.

21      Q    And in that -- and when did the police

22   approach you?

23      A    Four minutes in, five minutes in.  They

24   approached us when there was a large enough crowd

25   there, and the crowd was large enough to reach from
```

                                              Page 69

1    the -- where the chairs were in the front row to,

2    like, little dais area they have for the city

3    council people to do their city councilings.  So

4    that's when they intervened, when the crowds started

5    getting big enough.

6        Q    Did the police ask you whether the two of you

7    were doing okay with one another?

8        A    Yes.

9        Q    And at the point that your mother stated to

10   the camera that "they're having a civil

11   conversation," how close was that to the end of the

12   conversation itself?

13       A    The middle portion.  Like I would say dead

14   near the middle.

15       Q    So you testified that she went to the

16   bathroom.

17       A    Yeah.

18       Q    And your article says, "The entire time my

19   mom was in the bathroom and learned about the whole

20   debacle shortly after."  Is that a correct

21   statement?

22       A    Like I said earlier, I dramaticized some of

23   this.

24       Q    So that's not a correct statement.

25       A    That right there, yeah.  In that context,

Page 70

1   yeah.

2       Q    In that context it is not a correct

3   statement?

4       A    Yeah.

5       Q    So your mother returned at the middle of the

6   conversation you had with Ms. La Liberte?

7       A    I guess she did.

8       Q    Well, I'm asking for your testimony.  I

9   mean --

10      A    Yeah, that's --

11      Q    -- I just want to get this pinned down

12  because you --

13      A    Yeah.

14      Q    -- your testimony is, if I may say so, not

15  very clear.  So I want to know what you say now.

16          MS. MULLIGAN:  Objection.  Argumentative.

17          MR. OLASOV:  Well, that's fine.

18          THE WITNESS:  Yeah, I guess she did return in

19  the middle of it.  I -- I didn't really pay

20  attention to the people around me.  I was mainly

21  focused on my computer, my points I was going to

22  bring up and her argument that she was making at

23  that point or the point she was making during the

24  exchange.  So I didn't really notice the people

25  around.  So if the video showed her coming in at

Page 71

1   like the midway point, then I guess she came in

2   during the midway point.

3          MR. OLASOV:  I think I'm done for now.  Do

4   you want to change?

5          MS. MULLIGAN:  Yeah, I can switch with you.

6          (Discussion off the record.)

7                         EXAMINATION

8   BY MS. MULLIGAN:

9      Q   Good afternoon, Joseph.  So I believe we saw

10  earlier, when we were watching the Simi Valley City

11  Council meeting video, which was Exhibit 6, you said

12  you were 14 years old at that time; is that correct?

13     A   Yes.

14     Q   And what school do you attend right now?

15     A   Technically, Northeastern University.

16     Q   Okay.  And what grade will you be in this

17  fall?

18     A   Freshman.

19     Q   Freshman in college?

20     A   Yes.

21     Q   Okay.  And are you going to Northeastern

22  University?

23     A   Yes.

24     Q   Okay.  So we've been talking a lot today

25  about the June 25th, 2018 city council meeting.  You

Page 72

1    said earlier that that meeting had the energy of a

2    rally.  Do you recall saying that?

3        A    Yeah.

4        Q    Can you explain a bit why you believe that

5    meeting had the energy of a rally?

6        A    I think I mentioned earlier chanting at,

7    like, the beginning of the meeting.  The beginning

8    of the meeting was a ruckus.  Oh, my lord.  As I

9    said earlier, the people with signs.  The room was

10   loud in general.

11        There was that one guy in the suit that said

12   "No" -- sure got people to calm him down, and I

13   think that just provoked him more.  They had to

14   limit people to speak for only, like, two minutes

15   'cause there was so many people.  The speeches that

16   some people gave were very, like, something you

17   would hear at a rally.  Yeah.

18        Q    Can you clarify a bit what you mean by that

19   when you say the speeches were speeches you would

20   hear, like, at a rally.

21        MR. OLASOV:  Objection to the form of the

22   question.

23        THE WITNESS:  Imagine you have, like, some

24   person about to give an impassioned speech about

25   something.  That's kind of what it was.  Like there

Page 73

1   was a lot of emotion in the speeches.  Sometimes

2   there was, like, data or statistics that people'd

3   throw out, but, like, the speeches that were

4   something you would hear at a rally.  They were very

5   emotional, very, like, play to pathos, stuff like

6   that.

7   BY MS. MULLIGAN:

8       Q    Do you recall hearing any statements at the

9   meeting about particular racial or ethnic groups?

10      A    Yes.

11      Q    What were those statements that you recall

12  hearing?

13      A    The word "illegals," that was used.  That's

14  the main one I remember.

15      Q    Do you recall hearing any other statements?

16      A    Specifically, like, a slur -- slurs, no.

17  Stuff like -- but stuff like people -- immigrants

18  are coming in, they're going to take our jobs,

19  they're going to rape our women, they're going to

20  steal our -- stuff like that.

21      Q    Were you offended by those comments?

22      A    I just -- I just kind of blocked them out.

23      Q    Did you hear anyone at the meeting say,

24  quote, You are going to be the first deported, end

25  quote?

```
                                                      Page 74

 1      A    I don't exactly remember that.  I was told

 2   later that's what someone said to me.  And it was,

 3   like, the old guy near the beginning of the meeting

 4   who like -- I was typing on my computer so I made,

 5   like, a little sign that said "Pro SB54."  I had

 6   that.

 7           And then he got -- he like -- he went on

 8   the -- duh-duh-duh-duh and -- he said something and,

 9   like, pointed at me, and apparently that's what he

10   said.

11      Q    Who told you he said that?

12      A    My mom.

13      Q    Did she tell you that she heard that?

14      A    Yeah.

15      Q    Did you hear anyone at the meeting say,

16   quote, dirty Mexican, end quote?

17      A    Specifically that phrase, I don't know.

18      Q    You mentioned earlier that someone might have

19   yelled, quote, you are going to be the first one on

20   the bus, end quote.  Who told you that?

21      A    My mom.

22      Q    And did she tell you that she heard that

23   directly?

24      A    Yes.

25      Q    Did people have signs at the meeting?
```

Page 75

1    A    Yes.

2    Q    Do you recall what was written on those

3    signs?

4    A    Love it or leave it signs.  Like a good third

5    of them were love it or leave it signs.

6    Q    What does love it or leave it mean to you as

7    you understand it?

8    A    You either love this country and for what it

9    stands for or get out.  There's no reform.  It's --

10   it's very anti-immigrant, especially, like, when

11   it's in the weird bubble cartoon red, white and blue

12   font that they had for some reason.

13   Q    So did you find that sign to be racially

14   insensitive?

15   A    Yes.

16   Q    Do you recall who was holding those signs?

17   A    If you had a MAGA hat, there was, like, a one

18   in third chance you had a sign like that.

19   Q    Do you recall Mrs. La Liberte interacting

20   with anyone with those signs?

21   A    Yes.

22   Q    How many people would you say?

23        MR. OLASOV:  Objection to form.

24        THE WITNESS:  So she had, like, a main crew

25   of, like, four other people she would hang around

Page 76

1   with.  And at the very end there was, like, a group

2   picture with people with MAGA hats and love it or

3   leave it signs and some guy who spoke about the

4   Illuminati.  They were all together in, like, a

5   group photo, like, "We won," at the very end when

6   the city council voted to join in the lawsuit

7   against SB54.  So she was definitely affiliated

8   with, like, a good amount of them.

9   BY MS. MULLIGAN:

10      Q   Okay.  And you mentioned specifically three

11  or four individuals that you saw her interacting

12  with; is that right?

13      A   Yeah, the most.  Like she sat with them.  She

14  was talking with them the most.

15      Q   Okay.  And do you know the names of any of

16  those individuals?

17      A   Not a clue.

18      Q   Do you know if they were men or women?

19      A   I believe they were mostly women, if not all

20  of them.

21      Q   Okay.  Do you recall anything about what they

22  looked like?

23      A   They were definitely older.

24      Q   Okay.  And do you recall if they had brown

25  hair or blond hair, anything like that?

                                                    Page 77

1      A    I would say a good chunk of them were blond.

2      Q    Now, you spoke earlier about your interaction

3   with Mrs. La Liberte, and I want to talk about that

4   a bit.  Did you feel that during that interaction

5   that Mrs. La Liberte was raising her voice at you?

6      A    Yes.

7      Q    Did you feel she was yelling at you?

8           MR. OLASOV:  Objection.

9           THE WITNESS:  At some point, yes.  Near the

10  tail end.

11  BY MS. MULLIGAN:

12     Q    Was the photograph of you and Mrs. La Liberte

13  taken while she was screaming at you?

14     A    I don't remember if it was at the screaming

15  portion yet, but it was definitely her voice was

16  louder than usual.

17     Q    You said earlier that you and Mrs. La Liberte

18  hugged at the end of your interaction; correct?

19     A    Yes.

20     Q    Is that something you wanted?

21     A    It diffused the situation.  There was no

22  longer a crowd.  So yes.

23     Q    During the interaction between you and

24  Mrs. La Liberte, were other people making comments

25  to you while that was happening?

Page 78

1    A   If they were, I couldn't hear them.  I don't

2  know.

3    Q   And during that interaction do you know if

4  other people were making comments to Mrs. La Liberte

5  while that was happening?

6    A   I don't think so.

7    Q   Let's turn back to -- I believe it's marked

8  as Exhibit 10.  It's your essay.  I believe it's in

9  front of you.  And let's turn to the third page.

10  Would you mind reading from where it says, "I found

11  a MAGA hat person who" -- do you see that?  It's

12  about the third line down to the right?

13    A   "I found a MAGA hat person who appeared to be

14  more restrained than the others during the sequence

15  of speakers, a woman who appeared to be in her

16  fifties.  I asked why she was against SB54 and she

17  began to rant very off topic very quickly about her

18  parents" --

19        THE REPORTER:  Could you read a little bit

20  slower, please.

21        THE WITNESS:  I'm sorry.

22        -- "and she began to rant very off topic very

23  quickly about her parents who she claimed to be

24  prisoners at one time somewhere in Eurasia.  I then

25  asked what that had to do with SB54.  She then

Page 79

1    repeated herself in a more mocking tone, as if she

2    thought I had lost one too many brain cells.  I then

3    asked if I could share my take on SB54.  She said

4    yes so I began giving data on the good sanctuary

5    cities get when an immigrant population feels and is

6    safer.  She proceeded to interrupt and begin giving

7    her argument again as if she was explaining to a

8    toddler.  After she spoke I would continue with my

9    points until I got interrupted again.  This process

10   repeated four times and she got progressively louder

11   each time until she had to hold her throat from

12   screaming so loud.  A crowd began to form around and

13   an officer who was in the room intervened and split

14   the crowd and discussion if you could even call it

15   one.  There's a picture of this happening if you

16   type 'Simi Valley city council meeting' into Google.

17   This woman sued a news personnel for libel, lost,

18   and then got blasted on social media for punching a

19   young protester.  The entire time my mom was in the

20   bathroom and learned about the whole debacle shortly

21   after."

22       Q    Thank you.  So when you refer to a MAGA hat

23   person, are you referring to Mrs. La Liberte?

24       A    Yes.

25       Q    And you say that she spoke to you in a

```
                                          Page 80
 1   mocking tone.  Is that accurate based on your
 2   memory?
 3           MR. OLASOV:  Objection.
 4           THE WITNESS:  Yes.  She would -- she would
 5   repeat what she said, like, slower, as if I didn't
 6   hear a word she said before.
 7   BY MS. MULLIGAN:
 8       Q   And you say, "she got progressively louder
 9   each time until she had to hold her throat from
10   screaming so loud."
11       A   Yes.
12       Q   Is that accurate based on your memory of the
13   interaction?
14       A   I don't remember exactly when she, like,
15   started holding her throat.  So that's why I said,
16   like, I don't know if she was screaming when she was
17   holding her throat, but I do -- actually, that's
18   just a --
19       Q   But you do recall her screaming at some point
20   during that interaction.
21       A   Yes.
22       Q   You say that eventually an officer who was in
23   the room intervened.  Is that accurate based on your
24   recollection?
25       A   Yes.
```

```
                                              Page 81

 1      Q    And you also say that "The entire time your

 2   mom was in the bathroom and learned about the whole

 3   debacle shortly thereafter."  Now, as you mentioned

 4   earlier, you actually say now that your mom entered

 5   in the middle of the interaction as we saw on the

 6   videotape which I believe was Exhibit 2.

 7           MR. OLASOV:  Objection to the form.

 8   Incorrectly summarizes his testimony.

 9   BY MS. MULLIGAN:

10      Q    You can answer.

11      A    What was the question?

12           MS. MULLIGAN:  Can you repeat it back?

13           (Record read.)

14           MR. OLASOV:  My objection to form stands.

15   BY MS. MULLIGAN:

16      Q    Is that correct?

17      A    Yes.

18      Q    And you -- as you mentioned, you didn't

19   realize exactly when your mom entered because you

20   were focused on your interaction with

21   Mrs. La Liberte; is that correct?

22      A    Yes.

23           MR. OLASOV:  Objection to form.

24   BY MS. MULLIGAN:

25      Q    Was Mrs. La Liberte screaming so loudly at
```

                                                              Page 82

1    you that it attracted a crowd?

2        A    I think originally it was the way she was

3    talking that attracted the crowd, which I said

4    before was in like the mocking tone.  And then as

5    she got louder, the crowd started to gather around

6    because there was already a crowd.

7        Q    So as Mrs. La Liberte got louder, more people

8    started to come over.

9        A    Yes.

10       Q    Was Mrs. La Liberte screaming so loudly at

11   you that it attracted a photographer from a local

12   newspaper?

13           MR. OLASOV:  Objection.

14           THE WITNESS:  I think it was the crowd itself

15   that attracted a local photographer.

16   BY MS. MULLIGAN:

17       Q    Do you believe that Mrs. La Liberte was

18   acting civilly while she was screaming at you?

19       A    No.

20       Q    Do you believe that Mrs. La Liberte was

21   acting civilly when she continued to raise her voice

22   during your interaction?

23       A    Not really.

24           MR. OLASOV:  Objection.

25   BY MS. MULLIGAN:

```
                                              Page 83

 1     Q   Do you believe Mrs. La Liberte was really
 2   listening to anything you were telling her?
 3          MR. OLASOV:  Objection.  Calls for
 4   speculation.  Completely calls for speculation.
 5          THE WITNESS:  Not really.
 6   BY MS. MULLIGAN:
 7     Q   Was Mrs. La Liberte dismissive of you, in
 8   your opinion?
 9     A   Yes.
10     Q   Did the hug between you and Mrs. La Liberte
11   make you feel uncomfortable?
12     A   A little bit, but it helped disperse the
13   crowd.
14     Q   So it assisted with the policemen or security
15   guard --
16          MR. OLASOV:  Objection.
17   BY MS. MULLIGAN:
18     Q   -- going away.
19     A   Yes.
20     Q   Earlier you said that Mrs. La Liberte -- you
21   agreed with counsel for plaintiff that
22   Mrs. La Liberte and you were having an ordinary
23   exchange of views.  Do you remember that?
24     A   Yes.
25     Q   You later testified that you, after the fact,
```

Page 84

1    realized it was actually abnormal.

2        A    Yes.

3            MR. OLASOV:   Objection.

4    BY MS. MULLIGAN:

5        Q    Is that correct?

6        A    Yes.

7        Q    And so is your view now that that interaction

8    was abnormal?

9            MR. OLASOV:   Objection.

10           THE WITNESS:   Yes.

11   BY MS. MULLIGAN:

12       Q    Did you hear Mrs. La Liberte interacting with

13   anyone else at the city council meeting?

14       A    I saw her.   I didn't hear her.

15       Q    I'm going to hand you what I will mark as --

16   I think we're up to Exhibit 11.   That's --

17           (Exhibit 11 was marked for identification

18       by the court reporter and is attached hereto.)

19   BY MS. MULLIGAN:

20       Q    You got it?

21       A    Yeah.

22           MR. OLASOV:   Are you marking this Defendant's

23   Exhibit 11 just so we're doing this sequentially?

24           MS. MULLIGAN:   I think we can do it

25   sequentially.

```
                                          Page 85
 1          MR. OLASOV:  I mean I'm just --
 2          MS. MULLIGAN:  Yeah.
 3          MR. OLASOV:  Just so -- just so I know --
 4          MS. MULLIGAN:  That works for me.
 5          So Defendant's Exhibit 11 is a July 2nd, 2018
 6    Facebook post from Joy Reid.
 7      Q   Have you seen this before?
 8      A   No.
 9      Q   So Mrs. Reid writes, "It appears I got this
10    wrong.  My apologies to Mrs. La Liberte and Joseph."
11    Do you see that?
12      A   Yes.
13      Q   And next to her written comment is the photo
14    of you and Mrs. La Liberte.
15      A   Yes.
16      Q   And in the -- to the back left, behind
17    Mrs. La Liberte, there is a woman, and she appears
18    to be holding an iPhone.  Do you see that?
19      A   Yes.
20      Q   Do you recall Mrs. La Liberte ever
21    interacting with that woman?
22      A   No.
23      Q   Okay.  And to the right of that woman is your
24    mother; correct?
25      A   Yes.
```

```
                                          Page 86

 1     Q   Now, when Mrs. -- when Ms. Reid says, "It

 2   appears I got this wrong.  My apologies to

 3   Mrs. La Liberte and Joseph," she doesn't say that

 4   she previously apologized to you, does she?

 5          MR. OLASOV:  Objection.

 6          THE WITNESS:  No.

 7   BY MS. MULLIGAN:

 8     Q   Do you believe Ms. Reid needed to issue an

 9   apology?

10          MR. OLASOV:  Objection.

11          THE WITNESS:  Not really.

12   BY MS. MULLIGAN:

13     Q   Why not?

14     A   She didn't really get it that wrong, and I

15   don't think she's the one who did the damage to

16   La Liberte.

17          MR. OLASOV:  Objection.

18          THE WITNESS:  People found out where

19   La Liber- -- what La Liberte did, where she operates

20   from, like, frame one after the meeting.  Like day

21   one, one day after the meeting, the day after, like,

22   all this information was kind of already out.  I

23   don't really think Joy Reid really, like, caused the

24   fire.

25          MR. OLASOV:  Objection.
```

```
                                              Page 87

  1   BY MS. MULLIGAN:

  2      Q    Earlier we were talking about the Fox 11 News

  3   interview.  Do you recall that?

  4      A    Yes.

  5      Q    And at one point you said you heard that

  6   Mrs. La Liberte lost a deal with McDonald's before

  7   your interview.

  8      A    Yes.

  9      Q    And that was -- you heard that before your

 10   interview with Mr. Eisner --

 11      A    Yes.

 12      Q    -- correct?

 13           Okay.  You said you have not spoken to

 14   Mrs. La Liberte since the city council meeting;

 15   correct?

 16      A    Yes.

 17      Q    Do you know if she's tried to contact you?

 18      A    The follow-up interview from another news

 19   station, it was intended to be a, like, little

 20   makeup session, like, oh, I'm sorry, oh, I'm sorry,

 21   and everything would be fine.  I did not go to that.

 22      Q    And do you recall what news station or outlet

 23   was asking you to do that?

 24      A    No.

 25      Q    And it's your understanding that Roslyn had
```

```
                                            Page 88

 1    agreed to that interview and wanted you to

 2    participate.

 3            MR. OLASOV:  Objection.

 4            THE WITNESS:  To my understanding, yes.

 5    BY MS. MULLIGAN:

 6        Q    But no one -- but she never actually got in

 7    contact with you.

 8        A    No.

 9        Q    Have you spoken to any of Roslyn's attorneys

10    since this thing happened?

11        A    I don't believe so.

12        Q    Did they ever try to contact you?

13        A    To my knowledge, no.

14        Q    Have you spoken to anyone in Roslyn's family

15    since the city council meeting?

16        A    No.

17        Q    Do you know if anyone in her family tried to

18    contact you?

19        A    No.

20        Q    Have you spoken to any other of Roslyn's

21    associates in the city council meeting?

22        A    No.

23        Q    Do you know if any of them tried to contact

24    you?

25        A    No.
```

```
                                              Page 89

 1        MS. MULLIGAN:  I think I'm probably done, but
 2   let me just take, like, a brief five-minute break
 3   and then we can switch.
 4        THE VIDEOGRAPHER:  We are going off the
 5   record.  Time is 1:03.
 6        (Recess.)
 7        THE VIDEOGRAPHER:  We are back on the record.
 8   The time is 1:09.
 9   BY MS. MULLIGAN:
10     Q   So you mentioned earlier that you heard
11   Mrs. La Liberte lost business with McDonald's before
12   your interview with Mr. Eisner.
13     A   Yes.
14     Q   And you mentioned that your parents told you
15   about that; correct?
16     A   Yes.
17     Q   Do you know how they heard about it?
18     A   Probably online through social media.
19     Q   Okay.  And did hearing that before your
20   interview make you feel sympathetic to
21   Mrs. La Liberte?
22     A   Yes.
23     Q   Do you know whether Mrs. La Liberte in fact
24   lost business because of this issue, your
25   interaction?
```

```
                                            Page 90
 1      A    I do believe that's -- that is the reason

 2    that -- my parents heard online that's why she lost

 3    the thing with McDonald's.

 4      Q    Okay.  But do you know whether she in fact

 5    did lose business?

 6           MR. OLASOV:  Objection.  Asked and answered.

 7           THE WITNESS:  Yes.

 8           MS. MULLIGAN:  No further questions.

 9           MR. OLASOV:  Nothing further from plaintiff.

10           THE VIDEOGRAPHER:  We are off the record at

11    1:10 p.m., and this concludes today's testimony

12    given by Joseph Luevanos.  The total number of media

13    units used was one and will be retained by Veritext

14    Legal Solutions.

15

16

17

18

19

20

21

22

23

24

25
```

**Page 91**

1

2

3

4       I, JOSEPH LUEVANOS, do hereby declare under

5   penalty of perjury that I have read the foregoing

6   transcript; that I have made such corrections as

7   noted herein, in ink, initialed by me, or attached

8   hereto; that my testimony as contained herein, as

9   corrected, is true and correct.

10       EXECUTED this _____ day of _____,

11   _____, at _____, _____.

                         (City)              (State)

12

13

14

15       _____

                         JOSEPH LUEVANOS

16                       Volume I

17

18

19

20

21

22

23

24

25

Page 92

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were placed under oath; that a

8     verbatim record of the proceedings was made by me

9     using machine shorthand which was thereafter

10    transcribed under my direction; further, that the

11    foregoing is an accurate transcription thereof.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16         I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney or any of the parties.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated:  August 16, 2021

23
                              *Lynn Gearhart*

24                            _____

                              LYNN GEARHART, RPR

25                            CSR No. 9466

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 8

# AUDIO FILE SUBMITTED TO COURT

# EXHIBIT 9

Transcript of Interview with Roslyn la Liberte
Duration: 01:27:32

Roslyn La Liberte:    I'm telling the truth, and if you call the police [unintelligible] try and find
                      out who she was.  I don't know who she was.

Tony Aaron II:        Who she was?  You mean --

Roslyn La Liberte:    The mother.

Tony Aaron II:        Well, yeah, I'm doing the report on this story and like I said, I mean, as
                      soon as we call in, you know, you just started telling me your story but
                      that's what I'm doing.  You said that you couldn't hear what he was saying
                      and you didn't say what people said you said.

Roslyn La Liberte:    I didn't say that.  I swear to god.  I was [unintelligible]

Tony Aaron II:        Well, I appreciate you -- you know, --

Roslyn La Liberte:    Just tell your friend who spoke to me [unintelligible]

Tony Aaron II:        I have a question.

Roslyn La Liberte:    What's your name?

Tony Aaron II:        My name's Tony.  I have a question for you, Roslyn.

Roslyn La Liberte:    Go ahead.

Tony Aaron II:        So --

Roslyn La Liberte:    [unintelligible] do it.  I will do it for you.  I would.

Tony Aaron II:        Well, yeah, I have a question I want to follow up with you about
                      something, so, if --

Roslyn La Liberte:    Hold on -- yeah, hold on a second please -- go ahead, Tony.

Tony Aaron II:        So, if you -- if you're saying -- you know I'm just asking the question, you
                      can answer it however you like.  If I wear clothing or accessories that are
                      related to a certain cause and with people who are known to speak a
                      certain way --

Roslyn La Liberte:    I really can't understand how absolutely divisive it is.  Now I see.  Okay,
                      and I have my own thoughts and my own feelings and I know very well
                      what they are and you know, that's all I can do at this point.

| | |
|---|---|
| Tony Aaron II: | Okay, and so how does that square with literally the first comments made by the person makes the hat are Mexicans and rapists and criminals? |
| Roslyn La Liberte: | You know, everything gets taken out of context. Everything just does. Like put in a category in a box, we all get put in a box. You know, I talk to people for the past few days and if you're -- everything --I look at it a different way than you do and you're saying how can look at it -- |
| Tony Aaron II: | Well, no -- I'm not -- you don't know how I look at it. I'm just calling to ask you your opinion explain to me how you look at it. |
| Roslyn La Liberte: | -- believe the [unintelligible] that's what I really think. |
| Tony Aaron II: | Okay, hold on, to be clear you're saying you don't believe he's as bad as she says he is. Because this is a direct quote -- |
| Roslyn La Liberte: | Or, what a lot of other people think he is. |
| Tony Aaron II: | Okay, but, so -- hear my -- hear my question very clearly here. These are direct quotes of the person. How would you say that isn't as bad as they are making it if you're -- are you saying -- |
| Roslyn La Liberte: | I don't think he meant it that way. |
| Tony Aaron II: | Mexicans are rapists and criminals -- |
| Roslyn La Liberte: | No, no he said no -- he said some of them are -- |
| Tony Aaron II: | No, no, no, this is a direct quote, Mexicans are rapists and criminals and some them I suppose are good people. That's the quote. |
| Roslyn La Liberte: | He should not have said it that way. |
| Tony Aaron II: | Okay, then -- |
| Roslyn La Liberte: | -- out of his mouth. |
| Tony Aaron II: | Okay, then we've got -- we've got -- |
| Roslyn La Liberte: | He's just a responsible, like I have to be responsible -- |
| Tony Aaron II: | The very first time that Donald Trump's name ever appeared in the paper it was because the government was suing him for discrimination against black renters in his building. Did you know that? |
| Roslyn La Liberte: | That's terrible, but he's brought change. |
| Tony Aaron II: | Okay. |

Roslyn La Liberte:     He wants to make the country better.

Tony Aaron II:     He still thinks that the Central Park Five deserves the death penalty.

Roslyn La Liberte:     [unintelligible]

Tony Aaron II:     -- from a point of view.  But you know all these things.  But you knew these things when you bought a hat that's three years old, that has three years of racism and sexism and gynophobia --

Roslyn La Liberte:     I don't really -- I don't think that way.

Tony Aaron II:     So, what -- a person wearing that hat, ran over and murdered a white woman at a rally that was -- you know, she was against the hatred and then he said a person whose father was caught at a Klu Klux Klan rally, Donald Trump's, he said that there were very foreign people there, chanting screaming, blood and soil, and you know, running over a white female activist with their car.  How is exactly -- and that happened a while ago --

Roslyn La Liberte:     -- one person, I didn't do that.

Tony Aaron II:     Okay, that wasn't one person, multiple --another guy there fired a gun into a crowd of liberal protestors --

Roslyn La Liberte:     That wasn't me either.  [unintelligible]

Tony Aaron II:     You're a business owner in southern California, correct?

Roslyn La Liberte:     Yes, yes I am.

Tony Aaron II:     Okay, southern California has a higher amount of legal Hispanic residents than other parts of the country, correct?

Roslyn La Liberte:     Yes, yes, and I'm happy about that.

Tony Aaron II:     If you're happy about that, please, and if you understand the responsibilities that being a small business owner and therefore representation of your community, how do you square that with wearing a hat and with being associated with -- I mean, this is not [unintelligible] associated.  You personally have been quoted by witnesses as being directly associated -- as being directly a mouth piece of racist and not only the picture --

Roslyn La Liberte:     I can't explain myself to you.

Tony Aaron II:     Well, wait --

Roslyn La Liberte:     [unintelligible]

3

| Tony Aaron II: | So explain to me if the moment that the picture was taken which part of your positivity is being expressed by what you're doing in the picture? |
|---|---|
| Roslyn La Liberte: | That was wrong. |
| Tony Aaron II: | Which part because when I'm . . . |
| Roslyn La Liberte: | That was wrong to be yelling, that was wrong.  I felt like everyone was attacking me. |
| Tony Aaron II: | You weren't just yelling.  That was a threatening posture you were taking.  It wasn't yelling in defense – you weren't running away. |
| Roslyn La Liberte: | No, but it really wasn't horrible like it shows honestly.  It wasn't that horrible. |
| Tony Aaron II: | Why was there a need for you to be choking – what was the choking of the neck in reference to? |
| Roslyn La Liberte: | My throat was hurting me. |
| Tony Aaron II: | If your throat's hurting you then you wouldn't be screaming. |
| Roslyn La Liberte: | That's why I stopped immediately after that. |
| Tony Aaron II: | So you're saying this person misquoted you and miraculously caught I'm assuming on a cell phone camera the one split second where you were both screaming and your throat was hurting and you were choking yourself? |
| Roslyn La Liberte: | They might have taken that picture.  They might have taken that picture.  I swear to God. |
| Tony Aaron II: | Hmmm.  The reason . . . |
| Roslyn La Liberte: | Don't believe it then.  If you don't believe it don't believe it. |
| Tony Aaron II: | Well I appreciate you answering some questions and allowing me to interview you but it's not a matter of whether I believe it or not, it's a question of if it is believable or not you know and I'm just saying to you – you're saying to me that you hear, you hear what Trump has said.  You hear what other people wearing that hat have said.  You've seen what they've done.  I mean they're literally American Nazis period full stop.  And yet you don't think . . . |
| Roslyn La Liberte: | Well I'm really sorry, I'm really sorry. |

4

| | |
|---|---|
| Tony Aaron II: | Well no, no, no, no, no well this isn't . . . it's not about an apology.  This is about again this is again about answering direct questions.  So my question is it believable -- on the other foot, is it believable to you if I tell you someone associates themselves directly in action, in deed and purchase with three straight years of racism and they're also coincidentally in the only split moment . . . |
| Roslyn La Liberte: | I don't think that way. |
| Tony Aaron II: | Okay what about . . . |
| Roslyn La Liberte: | I have no animosity towards any race. |
| Tony Aaron II: | Hmmm there's a person behind you standing with a sign that says "we are the revolution" there's a woman who's smiling at the moment that you are screaming at this 14 year old child. |
| Roslyn La Liberte: | I know what she said. |
| Tony Aaron II: | Well my point to you is that you know again I say you own a small business in Southern California.  You are genuinely, I know because you saw I have a (323) area code.  I spend a very long amount of time in that general area.  I've done a lot of recording in that area.  I have, there is a much higher percentage of Hispanic people in that area than there are in say you know Maine or Wisconsin. |
| Roslyn La Liberte: | Yes, I have nothing against Hispanic people.  I have nothing against them.  I am not a racist. |
| Tony Aaron II: | Okay let me ask you a straight question.  Honest to goodness question okay? |
| Roslyn La Liberte: | Yes. |
| Tony Aaron II: | If a Black Panther – I'm a black person – if a Black Panther . . . |
| Roslyn La Liberte: | I went to Morningside High. |
| Tony Aaron II: | If a black person, if a Black Panther excuse me, went on T.V. and they said this beret on my head, right, is a symbol of being a Black Panther and what Black Panther's believe is that white people are rapists and criminals and some of them I suppose are good people.  If that's the beginning of it and then after that it's people who killed white people you know some of them are decent people and people who want to kill white people, some of them you know there's some very fine people there.  If I didn't wear a beret on the street, after three years of that and someone takes a picture of me yelling at a 14 year old white kid while choking myself . . . |

5

Roslyn La Liberte:    Yes, yeah, I wasn't choking myself. I was my throat was hurting.

Tony Aaron II:    Okay, while having a very strained hand around my own neck . . .

Roslyn La Liberte:    Intent. I would never choke the boy.

Tony Aaron II:    But the question, mam, the question isn't about you. The question is about me. If I'd have done all of this, and then there's a concern, yet respectful 14 year old white child on the other side of that picture and I'm wearing a black beret on it that says . . .

Roslyn La Liberte:    Yeah, it would look bad. It would look very bad.

Tony Aaron II:    Would you believe me that I somehow didn't associate myself with the killing of white people or with the hating of white people?

Roslyn La Liberte:    I can't honestly answer you with that. I want you to know that when I was in the Ninth grade, the National Guard came in and took one of my friends out, a black boy . . .

Tony Aaron II:    When you say "take him out" you mean removed him from the class?

Roslyn La Liberte:    Yes, take him out exactly.

Tony Aaron II:    Uh huh.

Roslyn La Liberte:    And escorted him out and I never saw him until our 20th reunion and I went "Jerry" – his name was Jerry Brown. I went "Jerry" I go I never saw you after that day, what happened? What happened to you?

Tony Aaron II:    Um hum.

Roslyn La Liberte:    And he said [interrupted by a phone call] and I said "what happened to you?" and he said "oh you remember that day" and I said I can never forget that day. And he said "yeah they took me out thinking I was a Black Panther and they put me in another school." And I said [oh hold on] . . .

Tony Aaron II:    Uh huh.

Roslyn La Liberte:    I'm on the phone with another [inaudible] weighing this whole scenario. Do you want me to put you on speaker so you can hear it? This is someone who saw that deal or that picture online? [talking to another party on the phone – can you hear what I'm saying? Hold on.] Alright. I put her on speaker so she could hear him talk. I'm going to put you on speaker [inaudible]. Okay so I'm talking about an incident. So what happened is 20 years later he said that they took him away and that he had to go to a special school. So I said well what did you do? Were they

6

_____ to you or how did he _____ for you.  And he said no, it wasn't that bad.  There weren't a lot of staff that he worked for the police staff.  And I said are you kidding?  And I was shocked with that.  I was totally shocked.  I never knew what happened to him so, but you know I don't know, I don't know.  I wouldn't make adjustments because of my past experience.  I'm so much older than so many people and had so many experiences that maybe I was naïve you know what I mean?

Tony Aaron II:    I do not.  To be honest with you no.  You know I'm listening because you know I you didn't really give me a straight answer on my hypothetical question but . . .

Roslyn La Liberte:    I think, I think,

Tony Aaron II:    hold on.

Roslyn La Liberte:    I think it was shocking like you said.  I think it was shocking.

Tony Aaron II:    Okay, but the question was . . .

Roslyn La Liberte:    _____ if you called me and said would I tell you that I listen to you and if you don't believe it, it's okay.  I mean I can't, I can't put you in my skin _____ you know in my head.

Tony Aaron II:    Okay, so that's the whole point of me asking the questions and trying to get straight answers out of you I mean there's a story here and it's something that as you know, very well know, people are talking about it and they're going to continue to talk about it.  My thing is I'm asking you straight questions so that I can write, you know people can hear it in your own words and so that I can write my thoughts about it, we really haven't spoken about what my thoughts are.  I'm just, at this point, I'm just trying to get straight . . .

Roslyn La Liberte:    I think you're horrified at me, disappointed.

Tony Aaron II:    Well, yeah again, we haven't discussed how I feel.  My, so again though, you started off this interview by saying you were naïve about the hat right and everything else was . . .

Roslyn La Liberte:    I was naïve about the . . . okay I first thought you know throughout the dialogue that these people that they could understand you and at the end of my conversation with this boy, we did hug each other and thank each other for talking with them, so I did do a good thing.

Tony Aaron II:    Well hold on one second.  Let me ask you a follow up on that.  You told me that twice now, but at the end of the conversation with the child it ended positively.  Have you ever, have you ever been screamed at and felt threatened by a person of color in a conversation that you felt ended

7

|                   |                                                                                                                                                                                                                                                                                                         |
|-------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | positively?                                                                                                                                                                                                                                                                                              |
| Roslyn La Liberte: | Absolutely.  I went to Morningside High.                                                                                                                                                                                                                                                                 |
| Tony Aaron II:    | No, no we're talking about adult stuff.  We're not talking about – this person was a child which I think is why you keep . . . hold on, hold on, hold on, this person was a child which is why I think you keep referencing your childhood but . . .                                                         |
| Roslyn La Liberte: | Let me be adult.  Let me talk adult.                                                                                                                                                                                                                                                                     |
| Tony Aaron II:    | If you were, hold on, if you were a child, if we're going to bring up childhood.  If you were a child and you felt threatened and attacked by an adult who was a person of color and they were literally screaming at you when you were not screaming at them, would there be any scenario . . .            |
| Roslyn La Liberte: | If they apologized to me right away that's the _____.                                                                                                                                                                                                                                               |
| Tony Aaron II:    | Okay I'm going, because you said you were naïve, I would like to try to help you with something.  If you're open to it?                                                                                                                                                                                    |
| Roslyn La Liberte: | Okay.                                                                                                                                                                                                                                                                                                    |
| Tony Aaron II:    | Okay.  You feeling as though you can scream, wear clothing that is not associated with but is directly, it's not associated with hate, it is a direct weapon of hate, and scream at someone while as you said, intensely squeezing your own neck and having this go on for a while because there were witnesses and this was not, as much as you've tried to tell me it was, this was not a one moment thing, and then think that if you apologize immediately, that makes it okay?  That is the literal working definition of white privilege.  Because if a brown person did that, they would be going to jail. |
| Roslyn La Liberte: | No, no.  It wasn't like, let me tell you why it was not like [unintelligible], okay?                                                                                                                                                                                                                      |
| Tony Aaron II:    | You're a person who's claiming you were naïve about a Make America Great Again hat.  How exactly can you explain white privilege to me?  I'm trying to help you.                                                                                                                                            |
| Roslyn La Liberte: | Gosh.  I don't know.  I don't know.  I don't know what to tell you.  I understand where you're coming from, and I just, I think the only thing I can do now is apologize for my behavior.                                                                                                                   |
| Tony Aaron II:    | That's not true, though.  That's not the only thing you can do.  I'll give you an example.                                                                                                                                                                                                                |
| Roslyn La Liberte: | What can I do?  What can I do?                                                                                                                                                                                                                                                                            |

| | |
|---|---|
| Tony Aaron II: | Well, this is going to hurt to hear, but it's the truth. |
| Roslyn La Liberte: | All right. |
| Tony Aaron II: | You live in a country that's 40 percent minority, okay? |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | You can ensure that 40 percent of your employees and 40 percent of your business is done with minority communities, and you can do that publicly and make that transparent. |
| Roslyn La Liberte: | Before the [unintelligible] more than that. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | Okay?  [inaudible] |
| Tony Aaron II: | [talking simultaneously]  I don't know, I can't take your word at that but that's why I said you could do that publicly.  I would make sure that that was, like, on the website, transparent, and something people could follow up on and see to. |
| Roslyn La Liberte: | Well, you know, people who know me know it's true. |
| Tony Aaron II: | Well, here's the issue, though.  The issue is that the opinions that you have and, you know, the movement, the revolution, as the sign says directly behind you in your picture, that you have associated yourself with is bigger than you. |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | It therefore is a cop-out to resort back to who you claim you are, which, you know, no one in the conversation with you can really verify.  This isn't about you.  If you don't agree with racism, et cetera, et cetera, then you would not be wearing the red hat and you would be on the side of this photo with the child.  What you said to me earlier in this conversation basically amounts to, I am going to keep my own views.  I just don't like how people are responding to my views.  And that means that I'm still aligned with racism and with hatred, you know, et cetera, but I just don't like the response I'm getting from it.  You can't say, oh, I'm not going to wear the hat again but I'm going to keep everything that I used, you know, in my thinking and in my existence to get me to the point of buying and wearing the hat.  Do you see what I'm saying? |
| Roslyn La Liberte: | I see what you're saying. |

9

| | |
|---|---|
| Tony Aaron II: | Yeah. You're on the wrong side of history. You're on the -- I mean, and images last [bumping into microphone] |
| Roslyn La Liberte: | [unintelligible] |
| Tony Aaron II: | Yeah, sorry. That was -- sorry about that. You're on the side of history in a picture, you know, this lasts forever. The first thing I did when I saw the post was download the picture. So it's not, like a thing where, like, it can be taken down, and that's over. |
| Roslyn La Liberte: | But I didn't say those things. I swear. |
| Tony Aaron II: | I -- even in what you and I are talking about, do you think that what you have said to me in this interview -- |
| Roslyn La Liberte: | But it's piling on. Piling on, too. |
| Tony Aaron II: | You said, meaning I'm piling on? |
| Roslyn La Liberte: | That people are piling on [unintelligible] hatred. |
| Tony Aaron II: | How so? |
| Roslyn La Liberte: | Saying that I said those things. |
| Tony Aaron II: | Okay, I'm just talking to you about what you -- you know, as soon as I called in, right, to interview you, you literally answered the phone and immediately started talking. Right? |
| Roslyn La Liberte: | Yes. |
| Tony Aaron II: | And you were telling me, here's where I'm coming from. I want to get this on the record. Please share this with you friends, et cetera. Right? |
| Roslyn La Liberte: | [affirmative] |
| Tony Aaron II: | And I'm only responding to you from what I can see that you did and what you've said in this conversation. And I'm just telling you -- I said earlier I wanted to help. I'm honestly, at first, I mean, I called in just wanting to hear what you had to say and, you know, not caring at all. When you say that you're naïve, it's my instinct to want to help you, which is very different from reporting on your story. And in trying to help you I explained to you -- just, I tried literally to say one thing, and you immediately told me that it's, you know, it's not white privilege. It's not whatever. So if you can't be wrong, right, in any context that someone who's, you know, more objective about the situation can see, then how is it that you can have made -- what is there to apologize for? What is there to be taken out of context? What is there to pile on? Do you see my |

point?

Roslyn La Liberte:     Okay.  You have to own it is what you're saying.

Tony Aaron II:         You have to, this is, what you -- this is going to probably sound hyperbolic, but it's not.  I know from talking to you in this 20-minute conversation that what you have done, full stop, and become a part of is degrees of enormity beyond what you think.

Roslyn La Liberte:     Yeah.

Tony Aaron II:         It's way worse than what you're willing to see.

Roslyn La Liberte:     I agree with you.  I agree with you.

Tony Aaron II:         So, but the thing is, the problem isn't that you said it or did it or were a part of it; the problem is you genuinely don't want to change who you are. You're defending who you are as if someone else who looked like you did this.

Roslyn La Liberte:     Well, this all takes time to figure out on my end.

Tony Aaron II:         But you're not going to figure it out by starting off being defensive.  You know, nobody's ever …

Roslyn La Liberte:     So, but, okay, the enormity of it is -- I became the poster child of the MAGA hat.

Tony Aaron II:         I wouldn't say you're the poster child.  I would say that you are the post of the moment.

Roslyn La Liberte:     [laughing]  I love you, Tony.  Thank you.

Tony Aaron II:         But and that, again that --

Roslyn La Liberte:     [Unintelligible] burn the hat together and do a video?

Tony Aaron II:         Well, I'm actually not in southern California currently.

Roslyn La Liberte:     Well, come, anyway.

Tony Aaron II:         Yeah, I'm in Las Vegas.  That's a bit of a drive for me.  I think, you know, it's -- I would say that the story here has two -- and this is kind of, to be honest with you, I'm pretty sure I have a decent idea of where you get your news or where you, you know, what your experience is at this point. And you miss out on a greater understanding of change in one zone, responsibilities as it relates to these issues.

Roslyn La Liberte:     Apparently so.  Apparently so.

11

Tony Aaron II:          Because your honest thinking is -- and you see this on conservative news channels, is oh, this, person did something horrible.

Roslyn La Liberte:      Right.

Tony Aaron II:          And they apologized, so let's just move on.  Well, you know, Hillary Clinton literally didn't do anything in Benghazi.  There was nothing to apologize for, and yet you saw three years' worth of news stories about how horrible she was.  Yet, in this moment, when you've done something that you immediately started telling me before you even knew my name and before I even said anything on the phone that you knew was wrong, you honestly think that just the fact that you claimed you said you were sorry when you did this one thing makes everything okay.  That's not, you know, to quote an ill-used phrase, that's not "fair and balanced," that's not realistic.  You know what I mean?

Roslyn La Liberte:      [affirmative]

Tony Aaron II:          And you, like I said, you've been done a disservice because you genuinely believe it is.

Roslyn La Liberte:      Someone else got on the phone.  If you want to listen in, I don't mind. Okay?  Are you there, Tony?

Tony Aaron II:          Yeah, I'm still here.

Roslyn La Liberte:      Another listener.  So I understand what you're saying, that I have to own it because I wore it, even though I immediately [unintelligible]

Tony Aaron II:          [talking simultaneously]  It's bigger than that --I'm saying you have to own --

Roslyn La Liberte:      I'm filling the other person in about it.

Tony Aaron II:          I'm saying you have to own who you are that led to these actions, not own the actions.  People aren't calling you because of the actions.  They'll never tell you this.  They're calling you because of your personage.  Who you are as a human being is encapsulated in the actions caught in the photo.

Roslyn La Liberte:      Okay.

Tony Aaron II:          Not the -- do you see what I'm saying?

Roslyn La Liberte:      And even though, even though it was just an explosion and [inaudible]

Tony Aaron II:          [talking simultaneously]  Well, so I asked you -- let me ask you a literal question.  When things explode, what comes out of the explosion?  It's

12

|  |  |
|---|---|
|  | only the stuff that was inside of the explosion, correct, or inside of what exploded? |
| Roslyn La Liberte: | Yes.  I think I see that fashion, right? |
| Tony Aaron II: | So if a -- well, but, no. |
| Roslyn La Liberte: | If you're saying my beliefs are racist, that is correct. |
| Tony Aaron II: | I'm not, I haven't -- |
| Roslyn La Liberte: | [unintelligible]  brought it up.  I don't see things the way other people do. |
| Tony Aaron II: | So, well, I mean, that's a hard thing to admit especially when you know people are listening, so that's … |
| Roslyn La Liberte: | Hello? |
| Tony Aaron II: | Yeah. |
| Roslyn La Liberte: | No, it's nothing.  Hello? |
| Tony Aaron II: | Yeah, I'm here. |
| Roslyn La Liberte: | Are you back? |
| Tony Aaron II: | I'm here. |
| Roslyn La Liberte: | Are you back?  Is this the same person?  No. |
| Tony Aaron II: | This is Tony.  I'm here. |
| Roslyn La Liberte: | Okay.  Let me take this [unintelligible] call.  You can stay on the line if you want, Tony. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | Okay? |
| Tony Aaron II: | All right. |
| Roslyn La Liberte: | Hold up.  All right.  I'll put him on speaker. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | Hi, I'm taking a lot of calls here.  Good afternoon.  Trey is your name? |
| Male speaker: | Yeah. |

Roslyn La Liberte:    Yeah.  I'm speaking with people about that photo, and --

Trey Sherman:    Who am I speaking with?

Roslyn La Liberte:    Roslyn.

Trey Sherman:    Oh, Roslyn.  Got you.

Roslyn La Liberte:    Pardon me?

Tony Aaron II:    No, that's not a known.

Roslyn La Liberte:    Roslyn.  I'm the person in the photo.  Hello?

Trey Sherman:    Oh.  Oh, okay.  So what happened?

Roslyn La Liberte:    Okay.  All right.

Tony Aaron II:    Can I just say one thing before you get started, and I'll be quiet?

Roslyn La Liberte:    Go ahead.  I'm finishing a call with this man.  Go ahead.

Tony Aaron II:    Yeah, for the CBS News.  What's your name, sir, from CBS?

Roslyn La Liberte:    I think his name was Trey.  Trey.

Tony Aaron II:    Trey.  Yeah.  My name's Tony.  This is Roslyn.  She just did about a 30-minute interview with me.  I can send it to you if you like, and I just wanted to say that just before you got started, just in case, you know, anything.  But her name is Roslyn La Liberte, so.

Roslyn La Liberte:    Yeah.  I mean, you understand me, what we were talking about?

Tony Aaron II:    Especially the ending.  I mean, we just got to the point, just so you know, Trey, at the end of this conversation, just before you called in, I mean, literally right before, Roslyn said that the sort of impetus for the actions that were taken was her upbringing, and she admitted that some of the beliefs there are not good, to say the least.  And, so that's why I was wanting to point out that the interview had happened, because I think there were some very interesting points in that interview that, you know, that she explained herself very thoroughly.

Roslyn La Liberte:    I'm going to go get into a few other things with Trey about my background, and you can add it to yours, if you don't mind, Tony?

14

Tony Aaron II:        Sure.  Yeah.

Roslyn La Liberte:    I don't mind, but I've got to get a plug.  [unintelligible]

Trey Sherman:         Can I ask Tony, because I guess it might [unintelligible]?

Roslyn La Liberte:    Yeah.  Yeah.  I'm going to go get my plug real quick because I don't want it to die, okay?

Tony Aaron II:        Okay.  And Trey, you said you wanted to give me your contact info?

Roslyn La Liberte:    Thank you.  Can you get the plug?

Trey Sherman:         Yeah.  It's Sherman T.

Tony Aaron II:        Sherman T?

Trey Sherman:         Yeah.  At cbsnews.com.

Tony Aaron II:        Sherman, S-H-E-R-M-A-N T at cbsnews.com?

Trey Sherman:         Correct.

Tony Aaron II:        Okay.  Like I said, I've got full-length recordings here.  As soon as I called her, I mean, literally the moment she picked up the phone, she started the interview without me even getting to say anything, so the first couple of seconds of the recording are cut off.  But it's in two parts.  Whenever this is concluded, I can send you the second part.  But I'll go ahead and send you the first part now.

Roslyn La Liberte:    [inaudible] we need, like on a recording, but I'm okay with it.  You know, I don't know what to tell you, Tony.  It's [inaudible]

Tony Aaron II:        Well, no, I think it's good that, you know, you said you were going to talk some more about, you know, explaining your path.  I think that's --

Roslyn La Liberte:    Tony, let me talk a little bit more, okay?  And then you guys can connect later.

Trey Sherman:         I'm going to have to go.  I have to call back.

Roslyn La Liberte:    Oh.  Okay.  Is there a problem?

Trey Sherman:         No.  It's just that [unintelligible]

Roslyn La Liberte:    Okay.  Is this CBS-2 News in Los Angeles, or?

Trey Sherman:         We're in New York.

| | |
|---|---|
| Roslyn La Liberte: | Okay.  How do I know you're -- it's hard for me to get calls.  I don't know who you are.  People are calling all day and all day. |
| Tony Aaron II: | Why don't you give him -- can you give him an email address where he can email you when he wants to talk, and then you can call him?  Could that work? |
| Roslyn La Liberte: | Yeah.  That could.  Do you have my email address?  Hello?  Hello?  Hello?  Hello? |
| Tony Aaron II: | I guess he -- |
| Roslyn La Liberte: | Hung up?  Are you there, Trey?  Trey? |
| Tony Aaron II: | I guess he must have hung up. |
| Roslyn La Liberte: | Hello?  Look, do you think he's real?  He's for real? |
| Tony Aaron II: | I mean, he does have a CBS email address. |
| Female speaker: | I'm so sorry [unintelligible]. |
| Roslyn La Liberte: | Hello? |
| Tony Aaron II: | He's not there. |
| Roslyn La Liberte: | Hello? |
| Female speaker: | Okay, I'm going to hang up. |
| Roslyn La Liberte: | All right.  So I don't know what to tell you.  Who are you interviewing me for, what network? |
| Tony Aaron II: | It's freelance. |
| Roslyn La Liberte: | Freelance.  Okay. |
| Tony Aaron II: | Yeah. |
| Roslyn La Liberte: | Well, I wanted to tell you a few more things about me, okay? |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | Can I? |
| Tony Aaron II: | Oh, yeah.  Go for it. |
| Roslyn La Liberte: | My parents, both of them were prisoners of war in Indonesia by the Japanese.  And in that horrible war, they would separate the mothers and |

16

|  |  |
|---|---|
|  | their children from the father.  And my mom did not see a lot of her family for three and a half years. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | So I know about separation.  I'm also Jewish, and my grandparents were born in Iraq, both sides.  They would take the boys off the street and put them in their military.  That's how they ended up in Indonesia, and my father was born in Rangoon, Burma in those South Sea, Pacific Islands, to be traded.  They were put on ships, just like these Guatemalan kids, and sent to, you know, away from horror.  So I have sympathy in that. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | This was not what -- this was not why I was there.  [unintelligible] |
| Tony Aaron II: | But that's also, I mean, but the timing of that is -- to say that you have sympathy, again, that would have put you literally on the other side of the photo? |
| Roslyn La Liberte: | But I was telling them these things. |
| Tony Aaron II: | You were telling him -- where did? |
| Roslyn La Liberte: | [inaudible] |
| Tony Aaron II: | [talking simultaneously]  So how does you telling him that turn into you screaming at him while intensely holding your own throat? |
| Roslyn La Liberte: | He called me a racist, and then, asked me if I was -- he didn't call me one.  I think he asked me if I was one. |
| Tony Aaron II: | Okay. |
| Roslyn La Liberte: | And I said, how could I be.  And I told him how I felt -- |
| Tony Aaron II: | Well, you're -- but you're -- |
| Roslyn La Liberte: | -- about the Guatemalan people, genuinely sympathetic with the Guatemalan people because he had a lot of friends there. |
| Tony Aaron II: | You're explaining to me now that you have, I mean, to put a specific point on it, you have a racist upbringing.  So is that a reasonable question to ask you, if you consider yourself a racist? |
| Roslyn La Liberte: | A what? |
| Tony Aaron II: | You said you -- you said that you have a, you were taught beliefs that aren't right.  So is it -- so, is it such a stretch for him to ask you if you |

17

consider yourself a racist?

Roslyn La Liberte:   No.  I said no.  I --

Tony Aaron II:   But you tell -- hold on.  I asked you how you ended up screaming at him, and you said it was because he asked you if you were a racist.

Roslyn La Liberte:   No, no.  Not -- no, no.  No.  It wasn't because of that.  It was --no, that was.  That point in time when we were talking so loudly was he was saying that I had no compassion for the kids coming across the border and his friends.  He was making it like he was telling this personal story.  And so I said, well, let me tell you a story.  I didn't, you know what I mean?  So I went back with what I wanted him to hear.  And then it got like that.  We weren't listening to each other at that point.  So then I pulled back.  That's why I put my hand on my throat, and I said I can't do this.  Let me listen to you.

Tony Aaron II:   Well, I mean, it's -- I think that you should focus on the part of the conversation we were having just before Trey from CBS called.

Roslyn La Liberte:   Yeah, no.  I know, but I understand where you're coming from.  You think that I have, because I have all this in my background, how could be so nice is what you're trying to say.  Is that -- am I putting words in your mouth?

Tony Aaron II:   I'm saying that it's not believable that naiveté is the cause of your beliefs.

Roslyn La Liberte:   I'm not saying I'm naïve to think, to how -- how strongly people feel against it, that was what I was naïve to.

Tony Aaron II:   So, can I say -- I'm going to say something that I'm not trying to offend you.

Roslyn La Liberte:   Go ahead.  Go ahead.

Tony Aaron II:   I just want you to hear this on the other side.  In effect, you're saying that -- I want you to hear this.  Don't be defensive.  I just want you to hear what I'm saying to you.

Roslyn La Liberte:   Okay.  Go ahead.  Go ahead.

Tony Aaron II:   In effect, you're saying that you are shocked at how much, how strong the pushback was of on the association with or the appearance of racism.

Roslyn La Liberte:   Yes.

18

Tony Aaron II:       I just want you to know that that's what that -- but that's an outrageous statement in itself, and that says a lot about where you are mentally. Honestly.

Roslyn La Liberte:   Maybe.  Maybe.  Maybe it does.  Maybe it does.

Tony Aaron II:       Because it's basically saying, like, you know, I don't like -- I didn't know appearing or being associated with racism was this big of a deal.  And that, I mean it's -- so, I'll ask you a question.  You're a woman.  You own a business.

Roslyn La Liberte:   [affirmative]

Tony Aaron II:       Do you --

Roslyn La Liberte:   A long time.  So I could not have been a racist to have a business in L.A. for all these years.

Tony Aaron II:       That's not true.  There's racists who own football teams.

Roslyn La Liberte:   It's so true.  It's so true.

Tony Aaron II:       Who own basketball -- the Clippers.  The guy who owned the Clippers was a racist.  He's on, he's been recorded calling Magic Johnson and a lot of other people a lot of ugly stuff while he owned the Clippers and made billions of dollars off of black lives.

Roslyn La Liberte:   I have no -- I have never done that.  [unintelligible]  They made that [unintelligible].

Tony Aaron II:       Well, but, you don't have to just use the "N" word to be a racist.  I mean there's, you know --

Roslyn La Liberte:   Oh, no.  Of course not.

Tony Aaron II:       So, as a woman who owns a business, have you had experiences being discriminated against because you're a woman?

Roslyn La Liberte:   Not largely.  Especially not nowadays.  Maybe in the beginning, yeah.  At the beginning, yeah.

Tony Aaron II:       Okay.  So if I were to say, like, imagine your -- if your experience was that you walked in a place, and someone says, we don't do business with broads, you know?

Roslyn La Liberte:   Yeah.

19

Tony Aaron II:      Or whatever.  They just shouted you down because you're a woman, and then, when people started calling them because they're recorded treating you this way and they go, hey, I didn't know sexism was this big a deal.  Do you see how that -- you just said it's not as bad anymore?

Roslyn La Liberte:  Yeah, and it has happened like that, believe it or not.  So [inaudible]

Tony Aaron II:      [talking simultaneously]  But you should get my point, then.  When you say sexism isn't happening to you as much now, it's because people have made it clear that it's a big deal and it needs to stop.  And for you --

Roslyn La Liberte:  But that's what they're doing with me.  That's what they're vilifying me, because --

Tony Aaron II:      Well, it's not vilifying.  This is not vilifying.  This is just, this is --

Roslyn La Liberte:  I am the villain and acknowledging that [inaudible]

Tony Aaron II:      There we go.  Yes.  That's what's happening right now.

Roslyn La Liberte:  [inaudible] forceful.  Because they don't know me.

Tony Aaron II:      And again, had I said -- but hold on one second. Wait, wait, wait.  You just said --

Roslyn La Liberte:  But you're saying it is -- I know what you're saying.  [inaudible]

Tony Aaron II:      [talking simultaneously]  Yeah.  Because if I had said that to you as a sexist --

Roslyn La Liberte:  If it sounds like a duck, it looks like a duck, it is a duck.

Tony Aaron II:      Right.  If I found and act sexist towards you, I am sexist regardless of how great I treat my sister or how many female -- see what I'm saying?  How many women I've worked with.

Roslyn La Liberte:  All right.  All right.  Okay.

Tony Aaron II:      And so that's, I just want you to know that's where this is coming from is a real --

Roslyn La Liberte:  All right.

Tony Aaron II:      It's not being -- again, the Fox News of the world have been convinced you, oh, you're being persecuted.  No.  That's what white supremacists think.  They think that white supremacy and racism is a fair and just view, and anybody who has a problem with it is persecuting them.  And unfortunately, that's what these conservative news structures and conservative communities have clearly taught you as you've implied and

|                    |                                                                                                                                                                                                                                                                                                                                                   |
|--------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | as I'm saying directly.  My point is to say --                                                                                                                                                                                                                                                                                                     |
| Roslyn La Liberte: | So what do I do now?  I just [unintelligible].                                                                                                                                                                                                                                                                                                     |
| Tony Aaron II:     | You need to live the life of a person who lives in a -- so, just so you know, first-graders in American are majority minority.                                                                                                                                                                                                                     |
| Roslyn La Liberte: | Yeah.                                                                                                                                                                                                                                                                                                                                              |
| Tony Aaron II:     | This country will very soon be majority minority.  White people have actually started shrinking not -- there's more -- white people population in general is shrinking.  What you can do is -- that means rapidly.  This is very soon.  So, again, in exactly 12 years, the new voters in exactly 12 years will be majority minority for the rest of the history of America. |
| Roslyn La Liberte: | All right.                                                                                                                                                                                                                                                                                                                                         |
| Tony Aaron II:     | Okay?  Majority, meaning plus 50, over 50 percent will be brown people.  What you can do is catch up to the curve, like I said, in terms of who your employees are and what your communities are and put your actions and your money where you claim you want your heart to be.                                                                       |
| Roslyn La Liberte: | What do you do?                                                                                                                                                                                                                                                                                                                                    |
| Tony Aaron II:     | I do social -- I've dedicated my entire existence at this point to personally trying to find a damn woman and professionally doing social justice work.  That's my thing.  I got to -- that's, on a personal level, I'm trying to do social justice for Tony and a second.  And everything else is all about social justice for all people.           |
| Roslyn La Liberte: | You're very persuasive.  You speak well.  You're well-spoken.  I'm putting a lot of stuff out there about myself that I don't have to do.                                                                                                                                                                                                           |
| Tony Aaron II:     | Yeah.  Got you.  That's true.                                                                                                                                                                                                                                                                                                                      |
| Roslyn La Liberte: | I didn't have to talk to anybody.                                                                                                                                                                                                                                                                                                                  |
| Tony Aaron II:     | That's true.                                                                                                                                                                                                                                                                                                                                       |
| Roslyn La Liberte: | So I want you to know that this is overwhelming.                                                                                                                                                                                                                                                                                                   |
| Tony Aaron II:     | It should be.  But it should be.  That's something you need to work into how you're thinking about this.  It's overwhelming, as it should be.  Because …                                                                                                                                                                                            |
| Roslyn La Liberte: | R C Associations.  Hold on, Tony.                                                                                                                                                                                                                                                                                                                  |
| Tony Aaron II:     | [affirmative]                                                                                                                                                                                                                                                                                                                                      |

Roslyn La Liberte:    I'm talking to someone on the phone about the incident.  Do you want to join in the conversation?  Who are you?

Tony Aaron II:    I'm going to start a new recording.

Roslyn La Liberte:    Hold on.  I do understand where he's coming from.

Tony Aaron II:    Yeah.

Roslyn La Liberte:    So we were talking about how at the end, you know, we spoke, the young man and myself and his mother was there, and it wasn't as bad as it looked.  But Tony is saying that just wearing the hat and -- I sound like.  If it looks like a duck and it acts like a duck, it is a duck.  And I told him I was not racist because of my background, and we went into that.

Tony Aaron II:    But you also did say that you have some -- you also said that some of your things, the views you were taught are not good, either.

Roslyn La Liberte:    Well, it's different.  Coming from a side that most people who were at that meeting were, they were indefensible.

Tony Aaron II:    Right.  I feel like you're, you're, whenever you recap these things for the new people who come into the conversation, you're backtracking a little bit in an important way.

Roslyn La Liberte:    All right.  [inaudible] to do that.  If you want to fill them in, jump in.  [unintelligible]

Tony Aaron II:    Who is the person?

Roslyn La Liberte:    Are you still on?  Are you still on?  Hello?  I don't think the person's on still.

Male speaker:    [unintelligible]

Roslyn La Liberte:    Oh, you are.  Okay.  Go ahead, [unintelligible].

Tony Aaron II:    Who is the other person, just so I know who I'm talking to?

Roslyn La Liberte:    I don't know.  Who is -- who are we talking with?

Male speaker:    Well, I don't know.  [unintelligible]  So I wanted to get [unintelligible] some security lighting.

Roslyn La Liberte:    Oh, shoot.

Tony Aaron II:    Wow.  Geez.

Roslyn La Liberte:    Well, call them up another time.  [unintelligible]

22

| | |
|---|---|
| Tony Aaron II: | Oh, my goodness gracious. |
| Roslyn La Liberte: | Thanks.  Take care. |
| Tony Aaron II: | Wow. |
| Roslyn La Liberte: | All right.  I'm sorry, Tony. |
| Tony Aaron II: | That's -- |
| Roslyn La Liberte: | You know, I think, you know, it's, what do they say -- a sack of nepotism.  You know what I mean?  [unintelligible]  It's a mixed bag.  It's a mixed bag with this [unintelligible] |
| Tony Aaron II: | Right.  Yeah, that is a grafter to the $n^{th}$ degree right there, that person who just called in. |
| Roslyn La Liberte: | I've been called so many names that -- I'm answering this woman, you know, in an email.  I think we should keep in touch.  [unintelligible] print that out.  Do I have to sign it or anything? |
| Tony Aaron II: | No.  I mean, you consented in the recording.  So, I mean, that should be fine.  Like I said, I can't even tell you where exactly I'm going to be able to, where exactly the story is going to be published or anything.  But what I can do is I can be in touch if, you know, if there is an outlet, if CBS responds, et cetera.  Obviously, if it's a bigger company, they themselves will be in touch with you to verify permissions and clarify, you know, statements, et cetera. |
| Roslyn La Liberte: | Yeah.  Who knows if that guy really was [unintelligible]?  He said "Trey."  He didn't give a last name. |
| Tony Aaron II: | Well, his last name is in his email address.  So, I mean, he did give me that.  But we'll see.  You know, the bigger thing is just to know that -- you said, if you want to actually learn, you know, what sort of the.  There's no -- one thing that needs to be made really clear in these types of situations is there really is not a bunch of different correct answers.  There is no -- you can't say, I understand family separation and literally, at the height of the family separation issue, I'm screaming at a 14-year-old child who's questioning whether, who has legitimate reason to question if I'm racist or not.  But it's not because I'm on a different side of the issue.  But at the same time, I have a completely different view of the issues than that person.  There's too many contradictions in that for that to be able to hold as a reasonable perspective on the situation.  So if you understand -- |
| Roslyn La Liberte: | But I mean, we did have a conversation. |

| | |
|---|---|
| Tony Aaron II: | Right.  But what you have to understand, too, is that's a child, and that's a person who lives in a certain state of fear in America that you don't.  And so when a white woman starts screaming at them, they are actually under threat not just from you but at that point from the police, from the religious right, from the other people who are standing behind you who are totally okay with you screaming at a child while, as you say, "intensely grabbing your neck."  Had that, had I done that to a white child, the other white people in the room would not have stood behind smiling.  You see? |
| Roslyn La Liberte: | But I [inaudible] |
| Tony Aaron II: | Hold on.  Wait.  Really think about what I just said.  But hold on one moment. |
| Roslyn La Liberte: | I just wrote it down.  [inaudible] |
| Tony Aaron II: | You're going to the extreme.  Hold on.  You're missing the point.  There would not have been a continuance of the conversation had a tall, intense black man done that to a white child. |
| Roslyn La Liberte: | Okay.  So I see what you're saying.  Just being able to do that shows that -- |
| Tony Aaron II: | Yep. |
| Roslyn La Liberte: | Yeah.  I understand what you're saying, and I do get it.  I do get it. |
| Tony Aaron II: | My thing is, if it's something that you really -- I mean, because to me, like I said, I've dedicated my life to this.  It's not a joke.  There's no half measures with me.  If you really want to learn from it and move forward, I would have no problem making time to talk to you about it, as I've done, to listen to you, et cetera, but it would only be with the strict perspective of there being positive and constructive and tangible change made within you as a person on these issues. |
| Roslyn La Liberte: | Well, let's put it this way.  There's been, like, hundreds of people calling and, with different reasons and, you know, I can't take all the phone calls. |
| Tony Aaron II: | Right. |
| Roslyn La Liberte: | You know, I'm glad I took yours. |
| Tony Aaron II: | Me, too. |
| Roslyn La Liberte: | I don't know if you can put something out there saying, I don't know, whatever you want.  Cast it in any light you want to.  I'm not going to [unintelligible] to help you, but -- |

24

| | |
|---|---|
| Tony Aaron II: | I would say the best thing for you would be, there are parts of the conversation where you are willing to for a moment own, you know, it's really, own how you got here for a moment.  Right?  And I would say that's the best foot forward for you.  I know it's the most painful foot, but that's the best one.  The one where it's like, oh, you know, but we had a good conversation, and it ended in a hug.  That's a completely false representation of the reality of the problem.  That may be how the moment ended, but like I said, if I had done what you did to a white child, there is literal -- can you imagine, big black man or angry black woman getting to hug the white child after screaming at her and being threatening to her in a public place? |
| Roslyn La Liberte: | Interesting.  I might, I'll, I'll -- |
| Tony Aaron II: | Do you see what I'm saying? |
| Roslyn La Liberte: | [unintelligible]  Yeah, I do understand.  Are you there?  Yeah. |
| Tony Aaron II: | Yeah, I mean, that ending is a complete, you know, misrepresentation of what's actually happened, and it will cause you to think, oh, no, since it ended that way, I'm okay.  I don't need to change.  And that's not reality.  Like I said, keep in mind, |
| Roslyn La Liberte: | [unintelligible]  I totally understand what you're saying. |
| Tony Aaron II: | Volcanoes are full of magma, and when they explode, magma comes out.  Do you see?  Do you see what I'm saying?  Okay, so what comes out of you when you explode is no less you than you when you're calm. |
| Roslyn La Liberte: | All right.  [answering a phone call]  R C Associates.  Well, I'm speaking to many people on the phone, talking and learning, and everything is good.  And -- I am.  I am.  You want to hear my friend here?  Hold on.  Speaker.  So, yeah, I'm on the phone with Tony and just talking about white privilege and how I have no -- I don't see it from the other side.  And I was yelling at the boy for a minute, and I did apologize, and I have been.  Tony is saying that, if the shoe was on the other foot -- Tony can jump in at any time -- are you still there? |
| Tony Aaron II: | Yeah, I'm here. |
| Roslyn La Liberte: | All right.  Yeah, Tony's still here, too.  Okay.  So Tony was saying if it was a black man yelling at a white child, it would be over with, that he wouldn't have had the chance to get a hug and talk to the mother.  And that what I was wearing, my cap, is so divisive that even though, you know, I say that I'm not a racist and I'm a good person, just wearing the hat alone -- it's like if you look like a duck and act like a duck, you are a |

duck.

So I understand where this is coming from, and, you know, it's a life lesson. I've been vilified. I've been talking to a lot of people. Some people have been posting that they spoke with me. Sometimes I have two or three people on the phone at the same time. I'm writing emails to various people who want to understand me. So that's been my day.

Tony Aaron II:      And who is this, so I know? Who's the person on the other line?

Roslyn La Liberte:   Who are you on the phone? He wants to know.

Female speaker:     Oh, I'm just a concerned person. I grew up in southern California, and I still have family there. I'm planning on moving my biracial child there.

Roslyn La Liberte:   Oh. Okay.

Female speaker:     And when I see that, that terrifies me. And I don't think you understand, as a mother, what it feels like to see a child that looks like my child being yelled at by a woman. But that's -- but, you know what, that was, like, a second  [inaudible]

Tony Aaron II:      Hold on one second. Wait, wait, wait, wait, wait. But just hold on. Let me say something?

Female speaker:     [unintelligible]

Tony Aaron II:      Let me say something. So, ma'am, what's your name, by the way?

Female speaker:     My name's Tabitha.

Tony Aaron II:      Tabitha. I'm a black man. My name's Tony.

Female speaker:     [unintelligible]

Tony Aaron II:      So, you know, we're coming at this from similar angles. Roslyn just made a mistake just now. I've explained this to Roslyn. To say that, oh, I just, it only happened for a moment. It was a more than a moment. You just said before that that you yelled at him for a minute. A minute and a moment aren't the same thing. And threatening someone, you know, for example, I was once arrested for a woman claiming that I made criminal threats against her. She claimed that I threatened to kill her though I did not, and eight police officers showed up at my home and arrested me and put me in jail.

Roslyn La Liberte:   Oh, my god.

26

| | |
|---|---|
| Tony Aaron II: | Now, even if, let's say that -- I didn't do that, but let's say that I did. It was a white woman, and, you know, that's why I had to go to jail. That's fine. Southern California at that time works. If I had done that, I couldn't say, well, it was only a moment. I only threatened her for a moment. Do you see my point? |
| Roslyn La Liberte: | But I really wasn't, like, yelling at him, honestly. |
| Tony Aaron II: | You've already told me that you were yelling at him. |
| Roslyn La Liberte: | I was -- |
| Tony Aaron II: | You're backtracking. We just talked about this. |
| Roslyn La Liberte: | It was -- I was trying to get my point across, and I got too loud. |
| Tony Aaron II: | Roslyn, that's what yelling is. |
| Roslyn La Liberte: | And my throat was hurting me, so I -- that's why I put my hand on my throat. |
| Tony Aaron II: | All right. So Tabitha, just so you know, we -- Tabitha, we've had progress away from this sort of defensiveness, but whenever a new person gets on the phone, unfortunately it's like Roslyn resorts back to the most -- |
| Roslyn La Liberte: | I feel bad, Tony. I did feel bad, and I pulled it back immediately. I know you're saying that that was [unintelligible] |
| Female speaker: | [talking simultaneously] have a rough day and you're going to have a lot of deep conversations. All I'm going to say is, A, Tony, god bless you. You are a better man than I will ever be, and I hope my [unintelligible] to have the kind of dignity and the honor [unintelligible] you have, so bless you. Roslyn, I don't care if it was a second. That was in your heart. I've never yelled at someone that way. When I heard what you did -- |
| Roslyn La Liberte: | I didn't say those things. I swear to god. Those are wrong. I swear. |
| Female speaker: | I hope that you realize that what you did is going to have lasting effects and that you need to get right with yourself and you need to use this time to reflect on yourself. And you get less [unintelligible] for being there, for being someone that is taking the time. It shouldn't be your time. We shouldn't have to teach someone how not to be racist, but you're doing it, and god bless you. And Roslyn, I'm afraid for you. I really am. I hope that a year from now I won't hear of you doing this again, but I've seen you at other rallies [unintelligible]. You've done this before. So don't try to tell me it's a one-second thing. |
| Roslyn La Liberte: | No. |

27

| Female speaker: | The picture's online.  They're not Photoshopped. |
| Tony Aaron II: | Sh. |
| Female speaker: | [unintelligible]  Goodbye. |
| Tony Aaron II: | So I would advise you to really listen to those people.  That was actually a very eloquent and, she's not just an open-minded woman in the sense of, you know, she's, she's, cares about the issues.  She's an open-minded woman in the sense of she's had a baby.  She had sex and a relationship and a child who she loves with a brown person.  That is commitment to being on the right side of history. |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | And you need to listen, like, really listen to that person.  [laughing] |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | You know, again, as a black man, I'm telling you, a woman that eloquent and intelligent and passionate is extremely rare for her to be with a person of color, especially a Hispanic man, which I suspect her child's father is. |
| Roslyn La Liberte: | That's her [unintelligible] |
| Tony Aaron II: | Right.  I mean, that's very rare, and when she takes the time to call you and she does not immediately begin cursing you out and threatening you when the call starts, you should listen. |
| Roslyn La Liberte: | A lot of people have been kind of, you know -- |
| Tony Aaron II: | Well, I mean, but I'm saying, this is one person who wasn't, and you were still giving her the same line that you gave me. |
| Roslyn La Liberte: | [unintelligible]  There's been a lot of different people, but -- |
| Tony Aaron II: | Listen to what I'm saying.  You still tried to give her the patently unbelievable take that you, you know, did the sore throat, and everything's a coincidence, and it's not what it looks like.  What you're -- I'm going to tell you what you're doing right now, and you won't believe me, but it's true.  You are literally saying, literally, exactly the same thing that every single racist person has ever said in response to getting caught being racist.  And I mean word for word.  It's a coincidence.  That little snippet of my life does not define me.  That, if it's a picture, oh, that was just one picture from an entire conversation, and none of the other parts of the conversation look like that.  I apologize though I don't really think that I was wrong. |

| | |
|---|---|
| Roslyn La Liberte: | Hello? |
| Tony Aaron II: | Hello? |
| Roslyn La Liberte: | Hello?  No, I'm still, I think that's another call.  Hello? |
| Tony Aaron II: | Yeah.  So -- |
| Roslyn La Liberte: | Here.  I'll put you on the line here.  Tony's on the line with me talking to me about that.  Go ahead.  I have to tell you [unintelligible] |
| Male speaker: | I'm just calling to check.  Are you, you call yourself a Christian?  Are you a Christian? |
| Roslyn La Liberte: | Tony, answer that for me. |
| Tony Aaron II: | Well, so I'm as -- she's a lot of things right now, and the number one thing is confused.  I'm a black male, sir.  I was calling her to interview her.  It's been a very long conversation where I think we're approaching, like, an hour or something at this point.  Yeah, we just crossed an hour, literally, an hour and 30 seconds. |
| Roslyn La Liberte: | But -- |
| Tony Aaron II: | So I'm trying to sort of walk her through.  Actually, the point of the conversation we're at right now is me explaining to her that the way she's responding to these phone calls is the same exact way that every racist person has ever responded to being caught being racist.  And even if she, and they don't want to think they're racist either, or they don't want to think there's something wrong with it.  But when you say it was a coincidence, or, you know, this isn't how it looks, or, you know, what I -- you know, at the end of the day, it ended with a hug so, you know, obviously we just needed to take the time to hear each other.  That equivocation of both sides somehow being equal, or at the best, you know, her not being as wrong as assumed, that's bad.  And I've tried to explain that her. |
| Male speaker: | But what I was about to say is where do you think [unintelligible] that there are refugees out in that place living wherever.  What do you think happened with Jesus, man?  You know?  It's like, I don't understand how people can call themselves Christian and really believe that refugees have no place in the future of [unintelligible] |
| Roslyn La Liberte: | Tony? |
| Tony Aaron II: | Yes? |
| Roslyn La Liberte: | People are hurt by this. |

| | |
|---|---|
| Tony Aaron II: | Yes. |
| Roslyn La Liberte: | People are really hurt by this. |
| Tony Aaron II: | Yes, they are. |
| Roslyn La Liberte: | But they're calling and they're identifying that they're hurt. |
| Tony Aaron II: | Right. |
| Male speaker: | [talking simultaneously] get in their face and tell them that they need to go back home, how does that -- |
| Roslyn La Liberte: | I never said that. |
| Tony Aaron II: | Hold on.  Listen to him.  Listen to him. |
| Roslyn La Liberte: | I never said that. |
| Tony Aaron II: | Listen to him, Roslyn. |
| Roslyn La Liberte: | What? |
| Tony Aaron II: | Listen to him.  Stop trying to defend yourself. |
| Roslyn La Liberte: |  I did not say that. |
| Tony Aaron II: | And when he finishes talking, you can give him your response. |
| Male speaker: | -- that refugees should go back to a country where they're going to get murdered or brutalized [unintelligible] and their children are going to be killed.  Like, how do you justify that in your heart?  I want to know how you sleep at night.  You know? |
| Tony Aaron II: | That's his question.  He wants to know how you sleep at night when you -- how can you justify those views in your heart? |
| Male speaker: | When you're still telling him that he needs to go back to his own country. |
| Roslyn La Liberte: | I never said that. |
| Male speaker: | Like, [unintelligible] freaking right. |
| Roslyn La Liberte: | I never said that. |
| Male speaker: | Didn't you just tell him it's what he wanted to [unintelligible] this country, get out of the country?  By the way, children just want to live. |

| | |
|---|---|
| Tony Aaron II: | So, Roslyn. Hold on. So, sir, hold on one second. Roslyn, you had to have said something. It's not -- all you're telling these people is I didn't say that, I didn't say that, I didn't say that. No one's -- |
| Roslyn La Liberte: | I didn't say that he was a [unintelligible] to go back, and that's what they're saying I said. [unintelligible] |
| Tony Aaron II: | Okay, but you did say a lot of other things, Roslyn. You do feel a lot of other things. You bought a hat that says all of that by itself, and you wore it whilst yelling at a 14-year-old Hispanic child. You have to own that. Constantly talking over him by telling him you didn't say that is not -- he doesn't feel any better now speaking to the woman who's hurt him than he did at the beginning of the conversation. That is not good. You're wrong. He doesn't even feel like, he's not being made to feel like you know you're wrong. You are wrong. Period. |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | You cannot constantly talk over these people. You're saying you're recognizing how much this hurts people and how you said they identify, like I told you, they identify with this. |
| Roslyn La Liberte: | That's [unintelligible] identify. Yes. |
| Tony Aaron II: | But -- |
| Roslyn La Liberte: | And I know it. |
| Tony Aaron II: | But listen to yourself. Aside from that one statement, the only thing you've said to him is I didn't say that, I didn't say that, that's not right, I didn't say. Do you hear that? |
| Roslyn La Liberte: | Yeah. Yeah. |
| Tony Aaron II: | You, not in this instance, as a human being, everything about your life and who you've been got you to this point, and you are wrong. You are wrong. Not the way it was said is wrong. That's what the Republican party is teaching you. Racism is okay if you say it right. You know, it's not that you hate other people, it's just that you want to keep what you have for your people. That is racist. Period. Doesn't matter how it's said. You know? Because you're buying, you know -- if I, I don't even wear accessories. I don't wear watches or hats. If I did, I would make sure that they were label-less. Completely blank. And if a color was associated with something I didn't agree with, I wouldn't even wear that color because I care about -- if I'm such a great person, I need to make sure all the choices I make represent me that way. |
| Roslyn La Liberte: | Go ahead. |

31

| | |
|---|---|
| Tony Aaron II: | And you have represented yourself, and you have admitted, you know, to me at least that there are views you have that are not that of a great person. And you need to own that if you're going to answer these calls.  It's kind of like trolling people if you answer these calls and then don't show respect for their concern and their pain. |
| Roslyn La Liberte: | Okay. |
| Tony Aaron II: | That's really trolling them.  You know, imagine if I did this to someone who looks like you, and you felt like calling me and then I answered the phone, and the entire time you spoke to me I said I didn't say that, I didn't say that, I didn't do that, I didn't say that.  You see what I'm saying? |
| Roslyn La Liberte: | Yeah. |
| Tony Aaron II: | That's you right now. |
| Roslyn La Liberte: | I get it. |
| Tony Aaron II: | And this young man hasn't cursed at you.  He hasn't raised his voice at you. |
| Roslyn La Liberte: | Yeah. |
| Tony Aaron II: | You have to listen to him, and you have to change. |
| Male speaker: | [Unintelligible] |
| Roslyn La Liberte: | All right.  Thank you. |
| Tony Aaron II: | You have to listen, and you have to change. |
| Roslyn La Liberte: | [Unintelligible]  Thank you. |
| Male speaker: | All right.  Goodbye. |
| Tony Aaron II: | Here's something that's very perverse about this situation that will work in your favor.  It's extremely perverse and it's wrong, but it works in your favor.  You're a white woman.  You are the -- if you change and become on the right side of this issue, they'll have you on fucking *Good Morning, America* because you're a white woman.  There's so much opportunity for you. |
| Roslyn La Liberte: | You know, you know, you know, that's a good thought.  That's a good -- hold that thought.  Call me back.  I got a lot of people watching me right now.  I don't know how I'll know who you are. |

Tony Aaron II:        Well, take down my number, and if you'd like to speak with me, you give me a call back.

Roslyn La Liberte:    Okay.  Give me your number.

Tony Aaron II:        It's -- hold on.  Let me end my recording here.

**[END OF INTERVIEW WITH ROSLYN LA LIBERTE - AUDIO RECORDING]**

TAB 12 - TRANSCRIPT OF INTERVIEW WITH ROSLYN LA LIBERTE.DOCX

# EXHIBIT 10

```
1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF NEW YORK

3

4   ROSLYN LA LIBERTE,

5                        Plaintiff,

6   vs.                                  Case No.
                                         1:18-cv-05398-DLI-JRC
7   JOY REID,

8                        Defendant.

9
    _____/
10

11

12

13                 CERTIFIED TRANSCRIPTION OF

14                 DEPOSITION EXHIBIT 35 TO

15              ROSLYN LA LIBERTE'S DEPOSITION

16

17

18

19

20

21

22

23   Transcribed By:
     TERRI NESTORE
24   CSR No. 5614, RPR, CRR

25   Job No. 6798621
```

                                            Page 1

1          ROSLYN LA LIBERTE:  Yes, I'm so sorry.  I yelled.

2   We started talking, he and I.  He told me about how he was

3   from Guatemala and his friends, he was worried about them.

4   His mother came there.  She said she had two children.  I

5   said I was a grandmother.  I have four -- five children.

6          And -- and that was the whole story.

7          So if you want to believe what they put out

8   there, believe it, but that -- I -- you're talking to me

9   and I'm telling the truth.

10         And you could call the police in Simi Valley, try

11  and find out who she was.  I don't know who she was.

12         TONY AARON II:  Who she was, you mean his --

13         ROSLYN LA LIBERTE:  The mother.

14         TONY AARON II:  The mother?  Well, yeah, I'm

15  doing a report on this story and so, like I said, I

16  mean -- I mean -- I mean, as soon as we, uh, call in, you

17  know, you're -- you just started telling me your story,

18  but that's what I'm doing.

19         I mean, you said that you couldn't hear what he

20  was saying and you didn't say what people said you said?

21         ROSLYN LA LIBERTE:  I didn't say that.  I swear

22  to God.  I would take a -- a -- a lie detector test.

23         I didn't say anything like that.

24         TONY AARON II:  Okay.  Well, I appreciate you,

25  you know, I mean --

                                                  Page  2

1          ROSLYN LA LIBERTE:  -- tell your friends spoke to

2     me and I --

3          TONY AARON II:  Well, I have a question.

4          ROSLYN LA LIBERTE:  What's your name?

5          What's your name?

6          TONY AARON II:  My name's Tony.  I -- I have a

7     question for you, Roslyn.

8          ROSLYN LA LIBERTE:  Tony.

9          TONY AARON II:  So --

10         ROSLYN LA LIBERTE:  Please, Tony -- Tony, do

11    this -- I would do it for you.  I would.

12         TONY AARON II:  Well, yeah, I have a question.

13    Let me follow up with you about something.  So if --

14         ROSLYN LA LIBERTE:  Hold on.  Yeah.  Hold on a

15    second, please.  Go ahead, Tony.

16         TONY AARON II:  So if you're -- if you're

17    saying -- so if you -- and, you know, again, I'm just

18    asking the question, you can answer it however you like.

19         If I, uh -- if I wear clothing or accessories

20    that are related to a certain cause and -- and with people

21    who are known to speak a certain way.

22         ROSLYN LA LIBERTE:  Yeah, no, that was -- I

23    really -- I really -- I really didn't understand how

24    absolutely divisive it is.  Now I do, okay?

25         And -- and I have my own thoughts and my own

                                                    Page 3

1   feelings and I'm letting you know what they are.  And, uh,
2   you know, that's all I can do at this point.
3           TONY AARON II:  Okay.  And so how does that
4   square with literally the first comments made by the
5   person who makes the hat are, uh, "Mexicans are rapists
6   and criminals"?  Like --
7           ROSLYN LA LIBERTE:  You know, he -- you know,
8   everything gets taken out of context.  Everything gets
9   stuck, like put in a category and a box.  We all get put
10  in a box, everything.
11          You know, I've talked to people for the past few
12  days, and if you're -- if everything -- I look at it -- I
13  look at it a different way than you do, and you -- you --
14  you were saying, how can you look at it.
15          TONY AARON II:  Well, no.  Well, I'm not -- well,
16  you don't know how I look at it.  I'm just calling to ask
17  you your -- your opinion and explain to me how you look at
18  it.
19          ROSLYN LA LIBERTE:  I honestly believe that he's
20  not as bad as they make him out to be.
21          That's what I really think.
22          TONY AARON II:  Wait.  Hold on.  To be clear,
23  you're saying you don't believe he's as bad as she says he
24  is?
25          Because I'm -- this is a direct quote.

                                               Page  4

1          ROSLYN LA LIBERTE:  Or what -- what a lot of, um,

2     other people think he is.

3          TONY AARON II:  Okay, but hear -- so hear my

4     question very clearly here.

5          ROSLYN LA LIBERTE:  Yes.

6          TONY AARON II:  These are direct quotes of the

7     person.  How do you say that that isn't as bad as they are

8     making it?  It -- you -- are you saying that it's --

9          ROSLYN LA LIBERTE:  I don't think he meant it

10    that way.

11         TONY AARON II:  "Mexicans are rapists and

12    criminals"?

13         ROSLYN LA LIBERTE:  No.  He said -- he said, no,

14    some of them are.

15         TONY AARON II:  No, no, no, no.  No, no, no.  He

16    said, this is a direct quote, "Mexicans are rapists and

17    criminals, and some of them, I suppose, are good people."

18         That's the quote.

19         ROSLYN LA LIBERTE:  He should have -- he should

20    not have said it that way.

21         TONY AARON II:  Okay, but then there's --

22         ROSLYN LA LIBERTE:  But it came out of his mouth.

23         TONY AARON II:  Okay, so then we've got -- we've

24    got some --

25         ROSLYN LA LIBERTE:  He's, uh -- he has to, uh, be

                                                    Page 5

1    responsible, like I have to be responsible.

2         TONY AARON II:  The very first time that Donald

3    Trump's name ever appeared in a paper, it was because the

4    government was suing him for discrimination against black

5    renters in his building.  Did you know that?

6         ROSLYN LA LIBERTE:  That's terrible, but people

7    change.

8         TONY AARON II:  Okay.

9         ROSLYN LA LIBERTE:  This is why he wants to make

10   the country better.

11        TONY AARON II:  He still thinks that the Central

12   Park 5 deserve the death penalty.  All right, so my point

13   is -- but you -- but you know all these things -- but you

14   knew all these things when you -- you bought a hat that's

15   three years old, that has three years of racism and sexism

16   and xenophobia.

17        ROSLYN LA LIBERTE:  I don't -- I don't really --

18   I don't think that way, though.

19        TONY AARON II:  What would Donald Trump --

20   what -- so wait, wait.  A person wearing that hat ran over

21   and murdered a white woman at a -- at a rally against --

22   uh, uh, that was -- you know, she was against the hatred,

23   and then he said, a person whose father was caught at a Ku

24   Klux Klan rally, Donald Trump, he said that there were

25   very fine people there chanting, screaming blood and soil,

                                                  Page 6

1    and, you know, running over, uh, white female activists

2    with their car.  How exactly -- and that happened a while

3    ago.

4                ROSLYN LA LIBERTE:  I was a quiet person.

5                I didn't do that.

6                TONY AARON II:  Okay, there -- there wasn't one

7    person.  Multiple -- another guy there fired a gun into a

8    crowd of, uh, of liberal protestors.

9                ROSLYN LA LIBERTE:  -- all of us one.

10               TONY AARON II:  You're a business owner -- you're

11   a business owner in southern California, correct?

12               ROSLYN LA LIBERTE:  Yes.  Yes, I am.

13               TONY AARON II:  Okay.  Southern California has a

14   higher amount of legal Hispanic residents than other parts

15   of the country, correct?

16               ROSLYN LA LIBERTE:  Yes, yes, and I -- and I'm

17   happy about that.

18               TONY AARON II:  Uh, if you're happy about that,

19   please -- and if you understand the responsibilities of

20   being a small business owner and therefore representation

21   of your community, how do you square that with wearing a

22   hat and with -- and with being associated -- I mean,

23   not -- this is not tangentially associated.  You

24   personally have been quoted by witnesses as being directly

25   associated -- excuse me -- as being directly a mouthpiece

Page 7

1   of -- of -- of racism.  And by the way, the picture --

2            ROSLYN LA LIBERTE:  But I did explain myself to

3   him.

4            TONY AARON II:  Well, wait, wait.

5            ROSLYN LA LIBERTE:  She exchanged opinion.

6            TONY AARON II:  So explain to me, at the moment

7   that the picture was taken, which part of your positivity

8   is being expressed by what you're doing in the picture.

9            ROSLYN LA LIBERTE:  That was wrong.

10            TONY AARON II:  Which part?  Because when I --

11   when I'm --

12            ROSLYN LA LIBERTE:  That was wrong, to be

13   yelling.  That was wrong.

14            TONY AARON II:  You -- but -- but --

15            ROSLYN LA LIBERTE:  I felt like everyone was

16   attacking me.

17            TONY AARON II:  You weren't just yelling.  That

18   wasn't -- that was a -- a threatening posture you were

19   taking.  It wasn't yelling in defense.  You weren't

20   running away.

21            ROSLYN LA LIBERTE:  No, but I -- it really wasn't

22   horrible like it showed.  Honestly.  It wasn't that

23   horrible.

24            TONY AARON II:  Why was there a need for you to

25   be choking -- what was the choking of the neck in

Page 8

1    reference to.

2         ROSLYN LA LIBERTE:  My throat was hurting me.

3         TONY AARON II:  If your throat's hurting you,

4    then you -- you wouldn't be screaming.

5         ROSLYN LA LIBERTE:  That's why I stopped

6    immediately after that.

7         TONY AARON II:  So the -- so you're saying that

8    this person misquoted you and miraculously caught -- I'm

9    assuming on a cell phone camera -- the one split second

10   where you were both screaming and your throat was hurting

11   and you were choking yourself.

12        ROSLYN LA LIBERTE:  (Unintelligible) picture.

13   They might have taken that picture.  I swear to God.

14        TONY AARON II:  I'm -- I mean, I -- the reason --

15        ROSLYN LA LIBERTE:  If you don't believe it,

16   then -- if you don't believe it, don't believe it.

17        TONY AARON II:  Well, I appreciate you, you know,

18   uh, answering some questions and allowing me to -- to

19   interview you, but it's not a matter of whether I believe

20   it or not, it's a question of if it is believable or not,

21   you know?  And I'm just saying to you --

22        ROSLYN LA LIBERTE:  All right.

23        TONY AARON II:  You're saying to me that you

24   hear -- you hear what -- what Trump has said, you hear

25   what other people wearing that hat have said.  Um, you've

                                           Page 9

1    seen what they've done.  I mean, they're literally

2    American Nazis, period.  Full stop.  And yet you don't

3    think --

4            ROSLYN LA LIBERTE:  I'm really sorry.  I'm really

5    sorry --

6            TONY AARON II:  No, no, no, no, no.  We're --

7    this isn't -- but see, it's not about an apology.  This is

8    about, um, again, this is about answering direct

9    questions.

10           So my question is, is it believable?

11           Like on the other foot, is it believable to you

12   if I tell you someone associates themself directly in

13   action and deed and purchase with three straight years of

14   racism and they're also coincidentally in the only split

15   moment --

16           ROSLYN LA LIBERTE:  I don't think -- I don't

17   think -- I don't think that way.

18           TONY AARON II:  Okay.  What about the -- okay,

19   what about -- so it's not --

20           ROSLYN LA LIBERTE:  Maybe I'm wrong, but I have

21   no animosity towards any race.

22           TONY AARON II:  Mm.  There's a person behind you

23   standing with a sign that says, we are the revolution.

24   There's a woman who's smiling at the moment that you are

25   screaming at this 14-year-old child.

                                                    Page 10

1          ROSLYN LA LIBERTE:  -- she said.

2          TONY AARON II:  Well, uh, my point to you is

3    that, you know, again, I say, you own a small business in

4    Southern California.  You are -- you are genuinely -- I

5    know, because I -- you know, you saw.  I have a 323 area

6    code.  I spent a very long amount of time, uh, in that

7    general area.  I've -- I've -- I've done a lot of, um, of,

8    uh, you know, recording in that area.

9          I have, uh -- there is an -- a -- a much higher

10   percentage of Hispanic people in that area than there are

11   in, say, you know, Maine or Wisconsin.

12         ROSLYN LA LIBERTE:  Yes.  I have nothing against

13   Hispanic people.  I have nothing against them.

14         TONY AARON II:  Okay, so let me -- let me -- let

15   me ask you a straight question, honest to goodness

16   question, okay?

17         ROSLYN LA LIBERTE:  Yes.

18         TONY AARON II:  If -- if a Black Panther -- I'm a

19   black person -- if a Black Panther --

20         ROSLYN LA LIBERTE:  (Unintelligible).

21         TONY AARON II:  If a black person went on -- if a

22   Black Panther, excuse me, went on TV and they said this --

23   this beret on my head, right, is a symbol of being a Black

24   Panther, and what Black Panthers believe is that white

25   people are rapists and criminals, and some of them, I

                                             Page 11

1   suppose, are good people, if that's the beginning of it,

2   and then after that it's people who killed white people,

3   or, you know, some of them are decent people and people

4   who want to kill white people, some of them are, you know,

5   there's some very fine people there.  If I then wear a

6   beret on the street after three years of that, and I'm --

7   and someone takes a picture of me yelling at a 14-year-old

8   white kid whilst choking myself --

9          ROSLYN LA LIBERTE:  Yes.  Yes.  I wasn't choking

10  myself.  I was -- my throat was hurting.

11         TONY AARON II:  Okay.  Okay.  While having a very

12  strained hand around my own neck.

13         ROSLYN LA LIBERTE:  Intense.  Intense.

14         TONY AARON II:  Yes.  Okay.  Okay.

15         ROSLYN LA LIBERTE:  I would never choke the boy.

16         TONY AARON II:  But the question isn't about --

17  ma'am, the question isn't about you.  The question is

18  about me.  If I'd done all of this and there's a -- and

19  there's a concerned, yet respectful, 14-year-old white

20  child on the other side of that picture and I'm wearing a

21  black beret on it that says, you know --

22         ROSLYN LA LIBERTE:  Yeah, it would look bad.

23         It would look very bad.

24         TONY AARON II:  Would you believe me that I

25  somehow didn't associate myself with the killing of white

Page 12

1    people or with the hating of white people?

2          ROSLYN LA LIBERTE:  I -- I -- I can't honestly

3    answer you with that.  I want you to know that when I was

4    in the ninth grade, the -- the National Guard came in and

5    took one of my friends out, a black boy.

6          TONY AARON II:  When you said take him out, you

7    mean removed him from the class or --

8          ROSLYN LA LIBERTE:  Take him out -- yes, took him

9    out of the assembly and escorted him out, and I never saw

10   him until our 20th reunion.  And I went, Jerry -- his name

11   was Jerry Brown -- I went, Jerry, I go, I never saw you

12   after that day.  What happened?  What happened to you?

13         TONY AARON II:  Mm-Hmm.

14         ROSLYN LA LIBERTE:  And he said, I got a -- I --

15   hello?  Um, call back.

16         Um, I said -- I said, what happened to you?  And

17   he said, oh, you remember that day?  I said, I'd never

18   forget that day.  And he said, yeah, they took me out,

19   thinking that I was a Black Panther, and they put me in

20   another school.  And I said -- hold on a minute.

21         TONY AARON II:  Uh-huh.

22         ROSLYN LA LIBERTE:  I'm on the phone with another

23   person, explaining this whole, um, scenario.  Do you want

24   to put you on speaker so you can hear it?  This is

25   somebody who saw that video or that picture online?  Yes.

                                                    Page 13

1          CALLER:  Can you hear what I'm saying?

2          ROSLYN LA LIBERTE:  Hold on.  All right.  I put

3    it on speaker so she can hear.  I'm gonna put you on

4    speaker too, Tony.  Okay.

5          So I'm talking with Tony about the incident.

6          So -- so what happened is, 20 years later, he

7    said that they took him away and that he was -- he had to

8    go to a special school.

9          So I said, well, what did you do?  Were they

10   horrible to you?  Or how did it go for you?

11         And he said, no, it wasn't -- it wasn't that bad.

12   He learned a lot of stuff.  He works for the police now.

13         And I was like, are you kidding?  So I was

14   shocked with that.  I mean, I was totally shocked.  I

15   never knew what happened to him.

16         So, you know, I -- I don't know.  If I saw -- I

17   would make a judgement because of my past experiences.

18   I'm so much older than so many people and had so many

19   experiences that maybe I was naive then, you know what I

20   mean?

21         TONY AARON II:  I do not, to be honest with you,

22   no.  I -- I mean, I -- I'm listening because I, you know,

23   uh -- I -- you didn't really give me a straight answer on

24   my -- on my, uh, on my hypothetical question but -- but --

25   hold on.  Hold on.

1        ROSLYN LA LIBERTE:  I think it would be shocking,

2   like you're saying.  I think it would be shocking.

3        TONY AARON II:  Okay.  But no, the question

4   was --

5        ROSLYN LA LIBERTE:  If you called me and said

6   what I am telling you now, I would listen to it, and if

7   you don't believe it, it's okay because I mean, I can't --

8   I can't, um -- I can't put you in my skin, type of thing,

9   you know, or in my head.

10        TONY AARON II:  Okay.  Uh, so, well, I mean,

11   that's the whole point of me asking the questions and

12   trying to get straight answers out of you.  I mean,

13   there's a story here, and it's something that, as you

14   know, very well know, people are talking about, and

15   they're going to continue to talk about.

16        ROSLYN LA LIBERTE:  Yes.

17        TONY AARON II:  My thing is I'm asking you

18   straight questions and so that I can write, you know, uh,

19   I mean, I -- you know, you can -- people can hear it in

20   your own words and so that I can write my thoughts about

21   it.

22        Um, we haven't really spoken about what my

23   thoughts are, it's just, you know -- it's just at this

24   point, I'm just trying to get straight --

25        ROSLYN LA LIBERTE:  I think you're horrified.  I

Page 15

1    think you're horrified at me.  You're disappointed.

2            TONY AARON II:  Uh, well, you know, again, we

3    haven't -- we haven't discussed how I feel.  My -- my --

4    so -- so again, though, you started off this, uh,

5    interview by saying that you're -- you were naive about,

6    uh, the hat, right?  And -- and then everything else

7    was --

8            ROSLYN LA LIBERTE:  I was naive -- I was naive

9    about that -- that the -- the -- that -- I thought, okay,

10   I really thought that, you know, talk and dialogue between

11   people that basically understand you, and at the end of my

12   conversation with this boy, we did hug each other and his

13   mother thanked me for talking with him.

14           So I did do a few things --

15           TONY AARON II:  Well -- well, hold on one second.

16           Let me -- hold on one -- let me -- let me ask you

17   a follow up on that, though.  You've told me that twice

18   now, that at the end of this conversation with the child,

19   it ended positively.  Have you ever --

20           ROSLYN LA LIBERTE:  Yes.

21           TONY AARON II:  Have you ever been screamed at

22   and felt threatened by a person of color and a

23   conversation that you felt ended positively?

24           ROSLYN LA LIBERTE:  Absolutely.

25           I went to Morningside High.

Page 16

1          TONY AARON II:  No, no, no.  We're talking about

2     adult stuff.  We're not talking about -- this person was a

3     child, which I think is why you keep rep -- hold on --

4     hold on -- hold on.

5          ROSLYN LA LIBERTE:  Okay.

6          TONY AARON II:  This person was a child, which is

7     why I think you keep referencing your childhood, but

8     I'm --

9          ROSLYN LA LIBERTE:  Let me stay adult.  Let me

10    talk adult, uh --

11         TONY AARON II:  If you -- but if you were a

12    child -- hold on.  If you were a child -- let's -- if

13    we're gonna bring up childhood, if you were a child and

14    you felt threatened and attacked by an adult who was a

15    person of color and they were literally screaming at you,

16    when you were not screaming at them, would there be any

17    scenario where that --

18         ROSLYN LA LIBERTE:  -- right away.  If they

19    apologize to me right away, that's the difference.

20         TONY AARON II:  Okay, I'm -- because you said you

21    were naive.  I would like to try to help you with

22    something, if you're open to it.

23         ROSLYN LA LIBERTE:  Okay.

24         TONY AARON II:  Okay.  You feeling as though you

25    can scream, wear clothing that is not associated with, but

                                                      Page 17

1    is directly, uh, uh -- it's not associated with hate, it

2    is a direct weapon of hate, and scream at someone while,

3    as you said, intensely squeezing your own neck and having

4    this going on for a while -- because there are witnesses

5    and this was not -- as much as you've tried to tell me it

6    was, this was not a one moment thing -- and then think

7    that if you apologize immediately, that makes it okay,

8    that is the literal working definition of white privilege

9    because if -- if a -- if a brown person did that --

10            ROSLYN LA LIBERTE:  No, no, no.

11            TONY AARON II:  -- they would -- they would be

12    going to jail.

13            ROSLYN LA LIBERTE:  -- Not white -- let me tell

14    you why it's not white privilege, okay?

15            TONY AARON II:  You're a person who's claiming

16    you were naive about a Make America Great Again hat.  How

17    exactly can you explain white privilege to me?

18            I'm trying to help you.

19            ROSLYN LA LIBERTE:  Oh, gosh.  I don't know.  I

20    don't know.  I don't know what to tell you.  I -- I -- I

21    understand where you're coming from and -- and I -- I just

22    have -- I just -- I think the only thing I can do now is

23    apologize for my behavior.

24            TONY AARON II:  That's not true, though.  That's

25    not the only thing you can do.  I'll give you an example.

                                              Page 18

1          ROSLYN LA LIBERTE:  What can I do?

2          What can I do?

3          TONY AARON II:  This is gonna hurt to hear, but

4     it's the truth.  You live in a country that's 40 percent

5     minority, okay?  You can ensure that 40 percent of your

6     employees and 40 percent of your business is done with

7     minority communities, and you can do that publicly and

8     make that transparent.

9          ROSLYN LA LIBERTE:  I -- I -- it's more than --

10    it's more than that.  Okay?

11         TONY AARON II:  I don't know.  I can't take your

12    word at that, but that's why I said you could do that

13    publicly.  I would make sure that that was like on the

14    website, transparent, and something people could follow up

15    on and see to.

16         ROSLYN LA LIBERTE:  Well, you know, people who

17    know me know it's true.

18         TONY AARON II:  Well, here's the issue, though:

19    This -- the issue is that -- that the -- the -- the --

20    that the -- the -- the -- the -- the -- the opinions that

21    you have, uh, and, um, you know, the -- the, the movement,

22    as it's -- the revolution, as the sign says directly

23    behind you in your picture, um, that you're -- that you're

24    have associated yourself with is bigger than you.  It

25    therefore is a copout to resort back to who you claim you

Page 19

1    are which, you know, no one on the -- on these -- in

2    the -- in the conversation with you can really verify.

3          This isn't about you.  If you don't agree with

4    racism, et cetera, et cetera, then you would not be

5    wearing the red hat and you would be on the side of this

6    photo with the child.

7          What you said to me earlier in this, uh,

8    conversation, basically amounts to, I am going to keep my

9    own views.  I just don't like how people are responding to

10   my views, and that that means that I'm still aligned with

11   racism and with hatred, you know, et cetera, but I just

12   don't like the response I'm getting from it.

13         You can't say, oh, I'm not gonna wear the hat

14   again, but I'm gonna keep everything that brought me --

15   I'm gonna keep everything that I use, you know, in my

16   thinking and in my existence to get me to the point of

17   buying and wearing the hat.  Do you see what I'm saying?

18         ROSLYN LA LIBERTE:  I see what you're saying.

19         TONY AARON II:  Yeah.  You're on the wrong side

20   of history.  You're on the -- I mean, the images last.

21   Yeah, sorry, that was -- sorry about that.  There's --

22   you're on the -- you're on the side of history in a

23   picture -- you know, this lasts forever.

24         The first thing I did when I saw the post was

25   download the picture.  So it's not like the thing where

                                                    Page 20

1    like it can be taken down and that's over.

2          ROSLYN LA LIBERTE:  But I didn't say those

3    things, I swear.

4          TONY AARON II:  I'm -- even in what you and I are

5    talking about, do you -- do you think that what you've

6    said to me in this interview --

7          ROSLYN LA LIBERTE:  (Unintelligible) piling on

8    too.

9          TONY AARON II:  It's -- you said I'm -- meaning

10   I'm piling on?

11         ROSLYN LA LIBERTE:  Yes.  People are piling on.

12         TONY AARON II:  How so?

13         ROSLYN LA LIBERTE:  More and more hatred, saying

14   that I said those things.

15         TONY AARON II:  Okay.  I'm just talking to you

16   about what you've -- you know, as soon as I called in,

17   right, to interview you, you literally answered the phone

18   and immediately started talking, right?

19         And you're telling me --

20         ROSLYN LA LIBERTE:  Yes.

21         TONY AARON II:  Here's where I'm coming from.  I

22   want to get this on the record.  Please share this with

23   your friends, et cetera, right?

24         ROSLYN LA LIBERTE:  Uh-huh.

25         TONY AARON II:  And I'm only responding to you

                                          Page 21

1    from what I can see that you did and what you've said in
2    this conversation, and I'm just telling you, as I said
3    earlier, I wanted to help, um, honestly, at first, I mean,
4    I called in just wanting to hear what you had to say and,
5    you know, um, not caring at all.
6         When you say that you're naive, it's my instinct
7    to want to help you, which is very different from
8    reporting on your story.
9         And in trying to help you, I explained to you
10   just -- I tried literally to say one thing and you
11   immediately tell me that it's, you know, it's not white
12   privilege, it's not whatever.
13        So if you can't be wrong, right?  In any context
14   that someone who's, you know, more objective about the
15   situation can see, then how is it that you can have made
16   a -- what -- what is there to apologize for?  What is
17   there to be taken out of context?  You see?  What is there
18   to pile on?  Do you see my point?
19        ROSLYN LA LIBERTE:  Okay.  You have to own it, is
20   what you're saying.
21        TONY AARON II:  You -- you have to -- you -- this
22   is what you -- this is gonna probably sound hyperbolic,
23   but it's not.  I know from talking to you in this
24   20-minute conversation that what you have done and be --
25   what you have done, full stop, and become a part of is --

Page 22

1   de -- it is degrees of enormity beyond what you think.

2           It's way worse than what you are willing to see.

3           ROSLYN LA LIBERTE:  Yes, I agree with you.

4           I agree with you.

5           TONY AARON II:  So --

6           ROSLYN LA LIBERTE:  I agree with you.

7           TONY AARON II:  But the thing is, the problem

8   isn't that you said it or did it or were a part of it, the

9   problem is you genuinely don't want to change who you are.

10          You're defending who you are as if someone else

11  who looked like you did this.

12          ROSLYN LA LIBERTE:  Well, this -- this will take

13  time to figure out on my -- on my end.

14          TONY AARON II:  But you're not gonna figure it

15  out by starting off being defensive, you know.

16          Nobody's ever --

17          ROSLYN LA LIBERTE:  So -- but -- but it -- okay,

18  the enormity of it.

19          TONY AARON II:  Mm-Hmm.

20          ROSLYN LA LIBERTE:  The enormity of it is I

21  became the poster child of the MAGA hat.

22          TONY AARON II:  I wouldn't say you're the poster

23  child.  I would say that you are the post of the moment.

24          ROSLYN LA LIBERTE:  Oh, I love you, Tony.

25          Thank you.

Page 23

1          TONY AARON II:  But -- and -- and that -- again,

2    it -- that --

3          ROSLYN LA LIBERTE:  -- burn the hat together and

4    do a video?

5          TONY AARON II:  Uh, well, I'm actually not in

6    southern California currently.

7          ROSLYN LA LIBERTE:  Well, come anyway.

8          TONY AARON II:  Yeah, I'm in Las Vegas.  That's a

9    bit of a drive for me.  Um, I -- I think, you know,

10   it's -- um, I -- I would -- I would say that the -- the

11   story here has two -- and this is -- and this is kind of,

12   to be honest with you, I'm -- I'm pretty sure I have a

13   decent idea of where you get your news or where you -- you

14   know, what -- what your experience is at this point, and

15   you -- and you miss out on a greater understanding of

16   change in one's own responsibilities, uh, as it relates to

17   these -- these issues.

18          ROSLYN LA LIBERTE:  Apparently so.

19          Apparently so.

20          TONY AARON II:  Because your -- your -- your

21   honest thinking is -- and you see this on conservative

22   news channels, is, oh, this person did something horrible

23   and they apologized, so let's just move on.

24          Well, you know, Hillary Clinton literally didn't

25   do anything in Benghazi.  There was nothing to apologize

                                              Page 24

1   for, yet you saw three years' worth of news stories about

2   how horrible she was.

3           Yet in this moment when you've done something

4   that you immediately started telling me before you even

5   knew my name and before I even said anything on the phone

6   that you knew was wrong, you honestly think that just the

7   fact that you claimed you said you were sorry when you did

8   this one thing makes everything okay.

9           That's not as I -- you know, to quote an ill-used

10  phrase, that's not fair and balanced, that's not

11  realistic, you know what I mean?

12          ROSLYN LA LIBERTE:  Correct.

13          TONY AARON II:  And -- and you -- like I said,

14  you've been done a disservice because you genuinely

15  believe it is.

16          ROSLYN LA LIBERTE:  Someone else on the phone.

17          If want to listen in, I don't mind, okay?

18          Are you there, Tony?

19          TONY AARON II:  Yeah, I'm still here.

20          ROSLYN LA LIBERTE:  Listener, another listener.

21          So I, I understand what you're saying, that I

22  have to own it because I wore it, even though I -- I

23  immediately --

24          TONY AARON II:  It's bigger, though.  I'm saying

25  you have to -- I'm saying you have to own --

                                                Page 25

1          ROSLYN LA LIBERTE:  I feel like the other person

2     is --

3          TONY AARON II:  I'm saying you have to own who

4     you are that led to these actions, not own the actions.

5     People aren't calling you because of the actions.  They'll

6     never tell you this.  They're calling you because of your

7     personage.  Who you are as a human being is encapsulated

8     in the actions, caught in the photo, not --

9          ROSLYN LA LIBERTE:  Okay.

10          TONY AARON II:  It's -- do you see what I'm

11     saying?

12          ROSLYN LA LIBERTE:  And even though -- even

13     though it was just, uh, an explosion and --

14          TONY AARON II:  Well, but what -- so I -- let me

15     ask you a literal question:  When things explode, what

16     comes out of the explosion?  It's only the stuff that was

17     inside of the explosion, correct?  Or inside of what

18     exploded.

19          So if -- if a --

20          ROSLYN LA LIBERTE:  I do have passion.

21          TONY AARON II:  If a -- well, no --

22          ROSLYN LA LIBERTE:  You're saying my beliefs are

23     racist and incorrect.

24          TONY AARON II:  I'm not.  I haven't --

25          ROSLYN LA LIBERTE:  -- brought up, I don't see

                                                      Page 26

1    things the way other people do.

2           TONY AARON II:  So -- well, I mean, it's --

3    that's -- I'm -- that's a hard thing to admit, especially

4    when you know people are listening, so that's --

5           ROSLYN LA LIBERTE:  Hello?

6           TONY AARON II:  Yeah.

7           ROSLYN LA LIBERTE:  Hello?

8           TONY AARON II:  Yeah, I'm here.

9           ROSLYN LA LIBERTE:  Are you back?

10          TONY AARON II:  I'm here.

11          ROSLYN LA LIBERTE:  Are you back?

12          Is this the same person?  No.

13          TONY AARON II:  This is Tony.  I'm here.

14          ROSLYN LA LIBERTE:  Okay, let me -- let me take

15   this news call.  You can stay on the line, if you want,

16   Tony.

17          TONY AARON II:  Uh, okay.

18          ROSLYN LA LIBERTE:  Okay?

19          TONY AARON II:  All right.

20          ROSLYN LA LIBERTE:  Hold on.  All right.  I'll

21   put him on speaker.

22          TONY AARON II:  Okay.

23          ROSLYN LA LIBERTE:  Hi.  I'm taking a lot of

24   calls here.  Um, CBS News -- Trey is your name?

25          TREY SHERMAN:  Yeah.

                                              Page 27

1        ROSLYN LA LIBERTE:  Yeah.  And -- and speaking

2    with, uh, people about that photo, and --

3        TREY SHERMAN:  Who am I speaking with?

4        ROSLYN LA LIBERTE:  Roslyn.

5        TREY SHERMAN:  Oh, Roslyn Sinatra?

6        ROSLYN LA LIBERTE:  Pardon me?

7        TONY AARON II:  No, that's not her name.

8        ROSLYN LA LIBERTE:  No, Roslyn -- Roslyn -- I'm

9    the person in the photo.  Hello?

10        TREY SHERMAN:  Oh.  Oh, okay.

11        So what happened?

12        ROSLYN LA LIBERTE:  Okay.  Um, all right.

13        TONY AARON II:  Can I just say one thing before

14    you get started, and I'll be quiet?

15        ROSLYN LA LIBERTE:  Go ahead.

16        I'm finishing a call with this man.  Go ahead.

17        TONY AARON II:  Uh, yeah, for the CBS news, uh,

18    what's your name, sir, from CBS?

19        ROSLYN LA LIBERTE:  I think his name was Trey.

20        Trey.

21        TONY AARON II:  Trey?  Yeah.  Uh, my name's Tony.

22    Um, this is Roslyn.  Um, she just did a -- about a

23    30-minute interview with me.  Um, I can send it to you, if

24    you'd like.  Um, and I just wanted to say that, just

25    before you got started, just in case, you know, anything.

                                              Page 28

1  Uh, but her name is, uh, Roslyn, uh, La Liberte, so --

2         ROSLYN LA LIBERTE:  Yeah.  But I want to -- I

3  mean -- I mean, did you understand me, what we were

4  talking about?

5         TONY AARON II:  I -- especially the ending.  I

6  mean, we just got to the point, uh -- just so you know,

7  Trey, at the end of this conver -- just before you called

8  in, I mean, literally right before, Roslyn said that, um,

9  the sort of impetus for the actions that were taken was

10  her upbringing, and that she admitted that some of the

11  beliefs there are not good, uh, to say the least.

12         And, um, so that's why I was wanting to point out

13  that the interview had happened, because I think there was

14  some very interesting, uh, points in that interview that

15  she -- that, you know, that she -- where she explained

16  herself very thoroughly.

17         ROSLYN LA LIBERTE:  I'm going to go into a few

18  other things with Trey about my background and -- and you

19  can add it to yours, if you don't mind, uh, Tony.

20         TONY AARON II:  Sure, yeah.

21         ROSLYN LA LIBERTE:  If you want to stay on the

22  line, I don't mind, but I gotta get a plug, because I

23  might lose you.

24         TREY SHERMAN:  Can I have Tony -- can I give him

25  my phone --

Page 29

1        ROSLYN LA LIBERTE:  Yeah, I'm gonna go get my

2   plug real quick because I don't want it to die, okay?

3        TONY AARON II:  Okay.  And Trey, you said you

4   wanted to give me your contact info?

5        ROSLYN LA LIBERTE:  -- can you get the plug?

6        TREY SHERMAN:  Yeah, it's shermant --

7        TONY AARON II:  Shermant?

8        TREY SHERMAN:  Yeah, @cbsnews.com.

9        TONY AARON II:  Sherman, S-H-E-R-M-A-N,

10  t@cbsnews.com?

11       TREY SHERMAN:  Correct.

12       TONY AARON II:  Okay.  Uh, like I said, I've got,

13  uh, full-length recordings here.  Um, as soon as I called

14  her, I mean, literally the moment she picked up the phone,

15  she started the interview without me even getting to say

16  anything, so the first couple of seconds of the recording

17  are cut off, but, um, uh, it's in two parts.

18       Um, whenever this is concluded, I can send you

19  the second part, but I'll go ahead and send you the first

20  part now.

21       ROSLYN LA LIBERTE:  For my purpose, you're

22  interviewing me like on a -- on a recording, but I'm okay

23  with it, you know.  I -- I -- I don't know what to tell

24  you, uh, Tony.  It's, uh --

25       TONY AARON II:  Well, no, I think it's good that,

Page 30

```
 1    you know, you said you were gonna talk some more about,

 2    you know, explaining your -- your past.  I think that's --

 3              ROSLYN LA LIBERTE:  Yeah, let me -- let me talk a

 4    little bit more, okay?  Um, and then you guys can connect

 5    later.  So --

 6              TREY SHERMAN:  I'm gonna have to -- I'm gonna

 7    have to go.  I'm going to have to call back.

 8              ROSLYN LA LIBERTE:  Oh, okay.

 9              Is there a problem?

10              TREY SHERMAN:  No.  I need to discuss it with the

11    rest of the people here at the desk.

12              ROSLYN LA LIBERTE:  Okay.  Is this CBS News in

13    Los Angeles or --

14              TREY SHERMAN:  In New York.

15              ROSLYN LA LIBERTE:  In New York.  Okay.  Um, how

16    do I know you're -- it's hard for me to get calls.  I

17    don't know who you are.  People are calling all day and

18    all day.

19              TONY AARON II:  Uh, why don't you give him -- can

20    you give him an email address where he can email you when

21    he wants to talk and then you could call him?

22              Could that work?

23              ROSLYN LA LIBERTE:  Yeah, that's good.  Do you

24    have my email address?  Hello?  Hello?  Hello?

25              TONY AARON II:  I guess he --
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1              ROSLYN LA LIBERTE:  Hung up?

2              Are you there, Trey?

3              TONY AARON II:  I guess he must have hung up.

4              ROSLYN LA LIBERTE:  Hello?  Do you think he's

5     real?  He's for real?

6              TONY AARON II:  Uh, I mean, he does have a CBS,

7     uh, email address.

8              ROSLYN LA LIBERTE:  Hello?

9              TONY AARON II:  He's not there.

10             ROSLYN LA LIBERTE:  Hello.  No.  Okay, I'm gonna

11    hang up.  All right.

12             So I don't know what to tell you.

13             Um, who are you interviewing me for?

14             What -- what paper?

15             TONY AARON II:  Uh, it's freelance.

16             ROSLYN LA LIBERTE:  Freelance, okay.

17             TONY AARON II:  Yeah.

18             ROSLYN LA LIBERTE:  Well, I wanted to tell a few

19    more things about me, okay?

20             TONY AARON II:  Okay.

21             ROSLYN LA LIBERTE:  Can I?

22             TONY AARON II:  Oh, yeah, go for it.  Go ahead.

23             ROSLYN LA LIBERTE:  My parents, both of them were

24    prisoners of war in Indonesia by the Japanese, and in that

25    horrible war, they would separate the mothers and their

                                                    Page 32

1    children from the father, and my -- my mom did not see a

2    lot of her family for three-and-a-half years.

3              TONY AARON II:  Okay.

4              ROSLYN LA LIBERTE:  So I know about separation.

5              I'm also Jewish, and I was, uh -- my grandparents

6    were born in Iraq, both sides, and, uh, they would take

7    the boys off the street and put them in their military.

8    That's how they ended up in Indonesia, and my father was

9    born in Rangoon, Burma, in those South Sea Pacific Islands

10   that do trading.  They were put on ships just like these

11   Guatemalan kids and sent to -- and be away from horror.

12   So I have sympathy in that.

13             TONY AARON II:  Okay.

14             ROSLYN LA LIBERTE:  This was not what -- this was

15   not why I was there -- let me see if -- RC Associates.

16             No.  And, um, so --

17             TONY AARON II:  Well, that's also -- I mean, but

18   the timing of that is -- to say that you have sympathy,

19   again, that would have put you literally on the other side

20   of the photo.

21             ROSLYN LA LIBERTE:  But I was telling him this

22   thing.

23             TONY AARON II:  You were telling him -- where

24   does -- so how did you telling him that turn into you

25   screaming at him while intensely holding your own throat?

                                                    Page 33

1          ROSLYN LA LIBERTE:  He called me a racist and --
2     and then -- and asked me if I was -- he didn't call me
3     one.  I think he asked me if I was one.
4          TONY AARON II:  Okay.
5          ROSLYN LA LIBERTE:  And I said, how could I be?
6          TONY AARON II:  Well, you're --
7          ROSLYN LA LIBERTE:  And I told him --
8          TONY AARON II:  But you're explaining to --
9          ROSLYN LA LIBERTE:  How I felt.  I
10    (unintelligible) Guatemalan people, said he was
11    sympathetic with the Guatemalan people because he had a
12    lot of friends there.
13         TONY AARON II:  You're explaining to me now that
14    you have -- I mean, to put a specific point on it, you
15    have a racist upbringing.  So is that a reasonable
16    question to ask you, if you -- if you are -- consider
17    yourself a racist?
18         ROSLYN LA LIBERTE:  A what?
19         TONY AARON II:  You said you have -- you said
20    that you have a -- you have -- you were taught -- you
21    had -- you were taught beliefs that aren't right.
22         So is it so -- um, is it such a stretch for him
23    to ask you if you consider yourself a racist?
24         ROSLYN LA LIBERTE:  No, I -- I -- I said no, I --
25         TONY AARON II:  But you told -- well, hold on.  I

                                        Page 34

```
 1    asked you how you ended up screaming at him, and you said

 2    it was because he asked you if you were a racist.

 3              ROSLYN LA LIBERTE:  No, no, not -- no, no, no.

 4    It wasn't because of that.  It was -- no, that was -- that

 5    was -- that point in time when we were talking so loudly

 6    was he was -- he was saying that I had no compassion for

 7    the kids coming across the border and his friend.  He was

 8    making it like he was telling me personal stories.

 9              And so I said, well, let me tell you stories.  I

10    didn't -- you know what I mean?  So I went back with what

11    I wanted him to hear and -- and it got like that -- we

12    weren't listening to each other at that point.

13              So then I pulled back, that's why I put my hand

14    on my throat, and I said, I can't do this.  Let me listen

15    to you.

16              TONY AARON II:  Mm-Hmm.  Well, I mean, it's,

17    um -- I think that you should focus on the part of the

18    conversation we were having just before, um, Trey from CBS

19    called.

20              ROSLYN LA LIBERTE:  No, I know, but I -- I -- I

21    understand where you're coming from and you're --

22    you're -- you think that -- that I have -- I have -- that

23    I -- because I have all this in my background, how can I

24    be so naive, is what you're trying to say.  Is that -- am

25    I putting words in your mouth?
```

Page 35

1          TONY AARON II:  I'm saying that it's not

2     believable, that naivete is the cause of your -- your

3     behavior.

4          ROSLYN LA LIBERTE:  I'm not saying -- I'm not

5     saying naivete to how -- how -- how strongly people feel

6     against it.  That was what I was trying to say.

7          TONY AARON II:  So, you know, uh, so can I say --

8     I'm gonna -- I'm gonna say something that -- I'm not

9     trying to offend you -- offend you.

10          ROSLYN LA LIBERTE:  Go ahead.

11          TONY AARON II:  I just want you to hear this on

12     the other side.

13          ROSLYN LA LIBERTE:  Go ahead.

14          TONY AARON II:  Um, in effect, you're saying

15     that -- I want you to hear this.  Don't be defensive.  I

16     just want you to hear what I'm saying to you.

17          ROSLYN LA LIBERTE:  Okay, go ahead.

18          TONY AARON II:  In effect, you're saying that you

19     are shocked -- you are shocked at how -- at how much --

20     how strong the pushback was of on the association with or

21     the appearance of racism.

22          ROSLYN LA LIBERTE:  Yes.

23          TONY AARON II:  I just want you to know that

24     that's what that -- that -- but that's an outrageous

25     statement in itself, and that says a lot about where you

                                                    Page 36

```
 1   are mentally, honestly.
 2           ROSLYN LA LIBERTE:  Maybe.  Maybe.  Maybe it
 3   does.  Maybe it does.
 4           TONY AARON II:  Because it's basically saying
 5   like, you know, oh, I -- I didn't know appearing --
 6   appearing -- or being associated with racism was this big
 7   of a deal, and that's -- I mean, it's -- so I'll give
 8   you -- I'll ask you a question:  You're a woman.  You own
 9   a business.
10           ROSLYN LA LIBERTE:  Um-huh.  A long time.
11           So I could not have been a racist, to have a
12   business in LA for all these years.
13           TONY AARON II:  That's not true.  There's racists
14   who own football teams, who -- I mean, who own
15   basketball -- the Clippers.  The guy who owned the
16   Clippers was a racist.  He's on -- he's been recorded
17   calling Magic Johnson and a lot of other people a lot of
18   ugly stuff, while he owned the Clippers and made billions
19   of dollars --
20           ROSLYN LA LIBERTE:  I have no -- I have never
21   done that.
22           TONY AARON II:  -- off of black --
23           ROSLYN LA LIBERTE:  They made up that stuff they
24   said.
25           TONY AARON II:  Well, but --
```

Page 37

1          ROSLYN LA LIBERTE:  They made up that stuff.

2          TONY AARON II:  You don't have to just use the

3   N-word to be a racist.  I mean, there's -- you know.

4          ROSLYN LA LIBERTE:  Oh, no.  Of course not.

5          TONY AARON II:  So, um, as a woman who owns a

6   business, do you get -- do you -- have you had experiences

7   being discriminated against because you're a woman?

8          ROSLYN LA LIBERTE:  Not -- not largely,

9   especially not nowadays.  Maybe in the beginning, yeah.

10         In the beginning, yeah.

11         TONY AARON II:  Okay.  So if I were to say --

12  like imagine your -- if your experience was that you

13  walked in a place where someone says, uh, we don't do

14  business with broads, you know -- or whatever.

15         ROSLYN LA LIBERTE:  Yeah.

16         TONY AARON II:  They just shouted you down

17  because you're a woman, and then when people started

18  calling them because they're recorded treating you this

19  way, and they go, hey, I didn't know sexism was this big a

20  deal, do you see how that -- you just said it's not as bad

21  anymore.

22         ROSLYN LA LIBERTE:  Yeah, it has happened like

23  that, believe it or not, Tony.

24         TONY AARON II:  Okay, but -- so you should get --

25  so -- but you should get my point, then.

Page 38

1          When you say sexism isn't happening to you as

2     much now, it's because people have made it clear that it's

3     a big deal and it needs to stop, and for you --

4          ROSLYN LA LIBERTE:  And that's what they're doing

5     with me.  That's what they're vilifying me, because --

6          TONY AARON II:  Well, it's not vilifying.  This

7     is not vilifying.  This is just -- this is --

8          ROSLYN LA LIBERTE:  I am the villain.

9          TONY AARON II:  This is -- yes.

10          ROSLYN LA LIBERTE:  I'm acknowledging.

11          TONY AARON II:  There we go.  Yes.  That's what's

12     happening right now.  And it -- and again, had I said --

13          ROSLYN LA LIBERTE:  That's horrible, because they

14     don't know me.

15          TONY AARON II:  But hold on one second.  Wait,

16     wait, wait.  You just said --

17          ROSLYN LA LIBERTE:  But you're saying it is me.

18          I know what you're saying.

19          TONY AARON II:  Yeah, because if I had said that

20     to you as a -- as a -- as a sexist --

21          ROSLYN LA LIBERTE:  If it sounds like a duck, it

22     looks like a duck, it is a duck.

23          TONY AARON II:  Right.  If I sound and act sexist

24     towards you, I am sexist, regardless of how great I treat

25     my sister or how -- you know, how many female --

Page 39

1          ROSLYN LA LIBERTE:  All right.

2          TONY AARON II:  You see what I'm saying?  How

3     many women I've worked with.

4          ROSLYN LA LIBERTE:  All right.  All right.

5          TONY AARON II:  And -- and so that's -- I just

6     want you to know that's where this is coming from, is a

7     real --

8          ROSLYN LA LIBERTE:  Okay.

9          TONY AARON II:  It's not being -- again, the Fox

10    News of the world will convince you, oh, you're being

11    persecuted.  No, that's what white supremacists think.

12    They think that white supremacy and racism is a fair and

13    just view, and anybody who has a problem with it is

14    persecuting them, and unfortunately, that's what these

15    conservative news structures and conservative communities

16    have clearly taught you, as you've implied and as I'm

17    saying directly.  My point is to say --

18          ROSLYN LA LIBERTE:  So what -- so what -- what do

19    I do now?  I just --

20          TONY AARON II:  You need to live the life of a

21    person who lives in a -- so just so you know, first

22    graders in America are majority-minority.  This country

23    will very soon be majority-minority.  White people have

24    actually started shrinking -- not -- there's more -- white

25    people's population, in general, is shrinking.

                                        Page 40

1          What you can do is -- I mean rapidly -- this is

2     very soon.  So again, in exactly 12 years, the new voters,

3     in exactly 12 years, will be majority-minority for the

4     rest of the history of America.

5          ROSLYN LA LIBERTE:  Right.

6          TONY AARON II:  Okay?  Majority, meaning 50 --

7     plus 50 -- over 50 percent will be brown people.

8          What you can do is catch up to the curve, like I

9     said, in terms of who your employees are and what your

10    communities are and, um -- and put your actions and your

11    money where you claim you want your heart to be.

12         ROSLYN LA LIBERTE:  What do you do?

13         TONY AARON II:  I do social jus -- I -- I've

14    dedicated my entire, uh, existence at this point to

15    personally trying to find a damn woman, and professionally

16    doing social justice work.  That's my thing.  I gotta --

17    I -- you know, that's on a personal level, I'm trying to

18    do social justice for Tony, and in the second and

19    everything else is all about social justice for all

20    people.

21         ROSLYN LA LIBERTE:  Well, you're very persuasive.

22         You -- you speak well.  You're well spoken.  Um,

23    I'm putting a lot of stuff out here about myself.

24         TONY AARON II:  Yeah.

25         ROSLYN LA LIBERTE:  Which I don't have to do.

                                                      Page 41

```
 1            TONY AARON II:  That's true.

 2            ROSLYN LA LIBERTE:  I didn't have to talk to

 3     anybody.

 4            TONY AARON II:  That's true.

 5            ROSLYN LA LIBERTE:  So I want you to know that

 6     this is -- this is, uh, overwhelming.

 7            TONY AARON II:  It should be -- but it should be.

 8     That's something you need to work into how you're thinking

 9     about this.  It's overwhelming, as it should be.

10            ROSLYN LA LIBERTE:  RC Associates.

11            Hold on, Tony.

12            TONY AARON II:  Mm-Hmm.

13            ROSLYN LA LIBERTE:  I'm talking to someone on the

14     phone about, um, the incident.  Did you want to join in

15     the conversation?  Who are you?

16            TONY AARON II:  I'm gonna start a new recording.

17            ROSLYN LA LIBERTE:  Yeah, hold on.

18            I do understand where you're coming from.

19            TONY AARON II:  Yeah.

20            ROSLYN LA LIBERTE:  And uh, so -- so we -- we

21     were talking about how, at the end, you know, we spoke,

22     the -- the young man and myself and his mother was there

23     and it wasn't as bad as it looked, but Tony is saying that

24     just wearing the hat and -- and -- and I become like, if

25     it looks like a duck and it acts like a duck, it is a
```

                                                    Page 42

1    duck.  And I told him I was not racist, because of my

2    background, and we went into that.

3           TONY AARON II:  But you also did say that you

4    have some -- you also said that some of your things -- the

5    views you were taught are not good either.

6           ROSLYN LA LIBERTE:  Well, it's different, yes.

7           It's coming from a side that most, uh, uh, people

8    who were at that meeting were -- were -- would say was

9    indefensible.

10          TONY AARON II:  Right.  I feel like you're --

11   you're -- you're -- whenever you recap these things for

12   the new people who come to the conversation, you are

13   backtracking a little bit, in an important way.

14          ROSLYN LA LIBERTE:  (Unintelligible).  If you

15   want to fill them in, you can.  I have no problem.

16          TONY AARON II:  Who's the person?

17          ROSLYN LA LIBERTE:  Are you still on?  Are you

18   still on?  Hello?  I don't think the person's on still.

19          Hello?  Okay, go ahead, Tony.

20          TONY AARON II:  And who -- who is the -- who is

21   the other person, just so I know who I'm talking to?

22          ROSLYN LA LIBERTE:  I don't know.  Who is the --

23   who are we talking with?

24          CALLER:  Oh, I don't know.  I just figured your

25   business was going to slow down, so I wanted to get a

                                              Page 43

1    discount on something (unintelligible).

2            TONY AARON II:  Wow.  Jeez.

3            ROSLYN LA LIBERTE:  Call another time

4    (unintelligible).

5            TONY AARON II:  Oh, my goodness gracious.

6            ROSLYN LA LIBERTE:  Take care.

7            TONY AARON II:  Wow.

8            ROSLYN LA LIBERTE:  All right.  I'm sorry, Tony.

9            TONY AARON II:  That's --

10           ROSLYN LA LIBERTE:  You know, I -- I think -- I

11   think, you know, it's, uh -- what do they say?  Uh -- a --

12   a sack of everything, you know what I mean?  There's a

13   saying.  It's a mixed bag.  It's a mixed bag on -- in

14   this -- in these last few days.

15           TONY AARON II:  Right.  Um, yeah, that's a --

16   that's a -- that is a grifter to the nth degree right

17   there, that person who just called in.

18           ROSLYN LA LIBERTE:  I got called so many names.

19   And I'm answering this woman, you know, in an email.  Um,

20   yeah, everything -- I -- I -- I -- I think -- I think we

21   should, um, keep in touch, uh, put that out.  Do I have to

22   sign it or anything or?

23           TONY AARON II:  Uh, no, I mean, you -- you --

24   you've consented in the recording, so I mean, that should

25   be fine.  I -- I'm -- like I said, I'm -- I -- I -- I

                                              Page 44

1    can't even tell you where exactly I'm gonna be able to --

2    where exactly the story is gonna be published or anything,

3    but what I can do is I can be in touch if, you know, if

4    there is an outlet, if CBS responds, et cetera.

5            Obviously, if it's a bigger company, they

6    themselves will be in touch with you to verify permissions

7    and -- and -- and clarify, you know, statements,

8    et cetera.  Um --

9            ROSLYN LA LIBERTE:  Yeah, who knows if that guy

10   really was -- who hung up, he said Trey.  He didn't give a

11   last name.

12           TONY AARON II:  Well, his last name is in his

13   email address.  So I mean, he did give me that.  So, we'll

14   see.

15           You know, the bigger thing is just to know that,

16   um -- you said -- if you want to say it to -- if you want

17   to actually learn, you know, what sort of the -- there's

18   no -- there's -- one thing that needs to be made really

19   clear in these types of situations is there really is not

20   a bunch of different correct answers.

21           Um, there is no -- you -- you can't say I

22   understand family separation and literally, at the height

23   of the family separation issue, I'm screaming at a

24   14-year-old child who's questioning whether -- who has a

25   legitimate reason to question if I'm racist or not, but

                                                      Page 45

1    it's not because I'm on a different side of the issue, but

2    at the same time, I have a completely different view of

3    the issues than that person.

4          There's too many contradictions in that for that

5    to be able to hold as a -- a -- a reasonable perspective

6    on the situation.  So if you understand --

7          ROSLYN LA LIBERTE:  We did -- we did have a

8    conversation.

9          TONY AARON II:  Right, but -- but -- but -- but

10   what you have to understand too is that's a child and

11   that's a person who lives in a certain state of fear in

12   America that you don't, and so when a white woman starts

13   screaming at them, they are actually under threat, not

14   just from you, but at that point from the police, from the

15   religious right, from the other people who were standing

16   behind you, who were totally okay with you screaming at a

17   child while in -- as you say, intensely grabbing your

18   neck.

19         Had that -- had I done that to a white child, the

20   other white people in the room would not have stood

21   behind, smiling.  You see?

22         ROSLYN LA LIBERTE:  But I -- I --

23         TONY AARON II:  Hold on.  Wait.  Really think

24   about what I just said.

25         ROSLYN LA LIBERTE:  I did tone it down.

Page 46

1          TONY AARON II:  But hold on one moment.  No,

2    you're going to the excuse -- hold on.  You're missing the

3    point.

4          There would not have been a continuance of the

5    conversation had a -- had a tall, intense black man done

6    that to a white child.

7          ROSLYN LA LIBERTE:  Okay.  So I see what you're

8    saying.  Just being able to do that --

9          TONY AARON II:  Yep.

10         ROSLYN LA LIBERTE:  So that -- yeah, I -- I

11   understand what you're saying and I do get it.

12         TONY AARON II:  And so --

13         ROSLYN LA LIBERTE:  I do get it.

14         TONY AARON II:  My thing is, if it's something

15   that you really -- I mean, 'cause me, like I said, I've

16   dedicated my life to this.  It's not a joke.  There's no

17   half measures with me.  If you really want to learn from

18   it and move forward, I would have no problem making time

19   to talk to you about it, as I've done; to listen to you,

20   et cetera, but it would only be with the strict

21   perspective of there being positive and constructive and

22   tangible change made within you as a person --

23         ROSLYN LA LIBERTE:  Well --

24         TONY AARON II:  -- on these issues.

25         ROSLYN LA LIBERTE:  Well, let's -- let's put it

                                                    Page 47

```
 1   this way:  There's been like hundreds of people calling
 2   and with different reasons and, you know, I can't take all
 3   the phone calls.
 4            TONY AARON II:  Right.
 5            ROSLYN LA LIBERTE:  You know?  I -- I'm glad I
 6   took yours and, um --
 7            TONY AARON II:  Me too.
 8            ROSLYN LA LIBERTE:  I don't know if you could put
 9   something out there, say -- I don't know -- whatever you
10   want to cast it in any light you want to.  I'm not even
11   saying to help me, but --
12            TONY AARON II:  I would say the best thing for
13   you would be -- there were parts in the conversation that
14   where you were willing to, for a moment own -- you know,
15   to really own how you got here.  For a moment, right?
16            And I would say that's the best foot forward for
17   you.  It's prob -- I know it's the most painful foot, but
18   that's the best one.  The one where it's like, oh, you
19   know, but we had a good conversation and it ended in a
20   hug, that's a completely false representation of the
21   reality of the problem.  That may be how the moment ended,
22   but like I said, if I had done what you did to a white
23   child, there is literal -- can you imagine, big black man
24   or angry black woman getting to hug the white child after
25   screaming at her and being threatening to her in a public
```

Page 48

1  place?

2          ROSLYN LA LIBERTE:  Interesting.

3          TONY AARON II:  Do you see what I'm saying?

4          ROSLYN LA LIBERTE:  RC Associates.

5          Yeah, I do understand.  Are you there?  So, yeah.

6          TONY AARON II:  Yeah.  I mean that -- that ending

7  is a complete, you know, misrepresentation of what's

8  actually happened, and it will cause you to think, oh, you

9  know, since it ended that way, I'm okay.  I don't need to

10 change.  And that's not -- that's not reality.

11         And like I said, keep in mind when --

12         ROSLYN LA LIBERTE:  I totally understand what

13 you're saying.

14         TONY AARON II:  Volcanoes are full of magma and

15 when they explode, magma comes out, you see.  That is --

16 do you see what I'm saying?

17         ROSLYN LA LIBERTE:  Yeah.

18         TONY AARON II:  Okay.  So what happened, what

19 comes out of you when you explode is no less you than you

20 when you're calm.

21         ROSLYN LA LIBERTE:  Right.  RC Associates.  Bye.

22         Oh, I'm speaking to many people on the phone,

23 talking and learning and everything is good, and I am.  I

24 am.  You want to hear my friend here?  Hold on, speaker.

25         So, yeah, I'm on the phone with Tony and we've

Page 49

```
 1   been talking about -- about white privilege and how I have
 2   no -- I don't see it from the other side of it, and I was
 3   yelling at the boy for a minute and I did apologize and I
 4   hugged him, but Tony is saying that the shoe is on the
 5   other foot -- Tony, you can jump in at any time -- and --
 6   are you still there?
 7           TONY AARON II:  Yeah, I'm here.
 8           ROSLYN LA LIBERTE:  Yeah, Tony's still here too.
 9   Okay.  So Tony was saying if -- if it was a black man
10   yelling at a white child, it would be over with, that he
11   wouldn't have had the chance to get the hug and talk to
12   the mother.  And that what I was wearing, my -- my hat is
13   so divisive that even though, you know, I -- I say that
14   I'm not a racist and I'm a good person, just wearing the
15   hat alone, it's like, if you look like a duck and act like
16   a duck, you are a duck.
17           So I understand where this is coming from and um,
18   you know, it's a life lesson.  I've been vilified.  I've
19   been talking to a lot of people.  Some people have been
20   posting that they spoke with me.  Sometimes I have two or
21   three people on the phone at the same time.  Um, I write
22   emails to various people who want to understand me.
23           So that's been my day and, um --
24           TONY AARON II:  And who was -- just so I know,
25   who's the person on the other line?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          ROSLYN LA LIBERTE:  Who are you on the phone?  He

2    wants to know.

3          TABITHA:  Oh, I'm just a concerned person that

4    grew up in southern California, that still has family

5    there, but planning on moving my biracial child back.

6          ROSLYN LA LIBERTE:  Oh, okay.

7          TABITHA:  So when I see that, that terrifies me.

8    And I don't think you understand, as a mother, what it

9    feels like to see a child that looks like my child being

10   yelled at by a woman, but that -- but you know what, that

11   was like a second --

12         TONY AARON II:  Hold on one second.  Wait, wait,

13   wait, wait.  Just hold on.  Let me say something.  Um, let

14   me say something.  Uh, so, um, ma'am, what's your name, by

15   the way?

16         TABITHA:  My name is Tabitha.

17         TONY AARON II:  Tabitha, I'm a black man.  My

18   name's Tony.  Uh, so, you know, we're coming at this from

19   similar angles.  Um, Roslyn just made a mistake just now.

20   I've explained this to Roslyn, um, trying to -- to say

21   that, oh, just it only happened for a moment -- it was

22   more than a moment.  You just said before that that you

23   yelled at him for a minute.  A minute and a moment aren't

24   the same thing.

25         And, um, threatening someone, you know, uh -- for

Page 51

```
 1   example, um, I was once arrested for a woman claiming that
 2   I made, uh, criminal threats against her.  She claimed
 3   that I threatened to kill her, though I did not, and eight
 4   police officers showed up at my home and arrested me and
 5   put me in jail.
 6           Now, even if -- let's say that I -- I didn't do
 7   that, but let's say that I did -- it was a white woman,
 8   and, you know, that's why I had to go to jail.  That's
 9   fine.  Southern California, that's how it works.
10           If I had done that, I couldn't say, well, it was
11   only a moment.  I only threatened her for a moment.
12           Do you see my point?
13           ROSLYN LA LIBERTE:  But I -- I really wasn't like
14   yelling at him.
15           TONY AARON II:  You -- you've already told me
16   that you were yelling at him.
17           ROSLYN LA LIBERTE:  I was --
18           TONY AARON II:  You're backtracking.
19           We just talked about this.
20           ROSLYN LA LIBERTE:  I was trying to get my point
21   across and I got too loud.
22           TONY AARON II:  Roslyn, that's what yelling is.
23           ROSLYN LA LIBERTE:  And my throat was hurting me,
24   so I -- that's why I put my hand on my throat.
25           TONY AARON II:  All right.  So, Tabitha, just so
```

                                                    Page 52

1    you know, we -- Tabitha, we've had progress away from this

2    sort of defensiveness, but whenever a new person gets on

3    the phone, unfortunately, it's like Roslyn resorts back to

4    the most --

5           ROSLYN LA LIBERTE:  I feel bad, Tony.  I did feel

6    bad and I pulled it back immediately, but I know -- I know

7    you're thinking but that --

8           TABITHA:  (Unintelligible) you're gonna have a

9    lot of these conversations.  All I'm gonna say is, A,

10   Tony, God bless you.  You are a better man than I will

11   ever be, and I don't like (unintelligible) I don't like to

12   have this kind of (unintelligible) so bless you.

13          Roslyn, I don't care if it was a second.  That

14   was in your heart.  I've never yelled at someone that way.

15   When I heard what you did --

16          ROSLYN LA LIBERTE:  I didn't say those things.  I

17   swear to God, those are wrong.  I swear.

18          TABITHA:  I hope you realize that what you did

19   could have lasting effects, and you need to get right with

20   yourself and you need to use this time to reflect on

21   yourself and bless you, Tony, for being there, for being

22   someone that is taking the time -- it shouldn't be your

23   time.  You shouldn't have to teach someone how not to be

24   racist, but you're doing it, and God bless you.

25          And Roslyn, I'm gonna pray for you.  I really am.

Page 53

1    I hope -- I hope I don't, a year from now, I don't hear

2    you doing this again, but I've seen you at other rallies.

3    There's pictures.  You've done this before.  So don't try

4    to tell me it's a one second thing.

5           ROSLYN LA LIBERTE:  No (unintelligible).

6           TABITHA:  They're online.  They're not

7    Photoshopped.  They're (unintelligible) hat.  Goodbye.

8           TONY AARON II:  So I would advise you to really

9    listen to those people.  That was actually a very eloquent

10   and -- she's not just an open-minded woman in the sense

11   of, you know, she's cares about the issue, she's an

12   open-minded woman in the sense of she's had a baby, she

13   had sex and a relationship and a child who she loves with

14   a brown person.  That is commitment to being on the right

15   side of -- of history.  And you need to listen, like

16   really listen to that person.

17          Like, you know, again, as a black man, I'm

18   telling you, a woman that eloquent and intelligent and

19   passionate is extremely rare for her to be with a person

20   of color, uh, especially Hispanic man, which I suspect

21   her -- her -- her -- her, uh, child's father is.

22          ROSLYN LA LIBERTE:  She said (unintelligible).

23          TONY AARON II:  Right.  I mean, that's very --

24   that's very rare.  And when she takes the time to call you

25   and she does not immediately begin cursing you out and

                                              Page 54

1   threatening you when the call starts, you should listen.

2        ROSLYN LA LIBERTE:  A lot of people have been,

3   kind of, you know.

4        TONY AARON II:  Well, I mean, but I'm saying this

5   is one person who wasn't, and you were still giving her

6   the same line that you gave me.

7        ROSLYN LA LIBERTE:  There's been a lot of

8   different people.

9        TONY AARON II:  Listen to what I'm saying.

10  You're still trying to give her the patently unbelievable

11  take that you -- you know, the sore throat and

12  everything's a coincidence, and it's not what it looks

13  like.

14        What you're -- what -- I'm gonna tell you what

15  you're doing right now, and you -- you won't believe me,

16  but it's true.  You are literally saying, literally,

17  exactly the same thing that every single racist person has

18  ever said in response to getting caught being racist.  And

19  I mean, word for word.  It's a coincidence, that little

20  snippet of my life does not define me, that if it's a

21  picture, oh, that was just one picture from an entire

22  conversation and none of the other parts of the

23  conversation look like that.  I apologized, though I don't

24  really think that I was wrong.

25        ROSLYN LA LIBERTE:  Hello?

                                                    Page 55

1          TONY AARON II:  Hello?

2          ROSLYN LA LIBERTE:  I picked up another call.

3     Hello?  Here, I'll put you on the line here.  Tony's on

4     the line with me, talking to me about that.  Go ahead.

5          CALLER:  How do you call yourself -- do you call

6     yourself a Christian?  Are you a Christian?

7          ROSLYN LA LIBERTE:  Tony, answer that for me.

8          TONY AARON II:  Uh, well, so I'm -- she's --

9     she's a -- she's a lot of things right now, and the number

10    one thing is confused.

11         Uh, I'm -- I'm a black male, sir.  I was calling

12    her to interview her.  It's been a very long conversation,

13    um, where I think we're approaching like an hour or

14    something, at this point.  Yeah, we -- we just crossed an

15    hour, literally, an hour and 30 seconds.

16         So, um, I'm trying to sort of walk her through --

17    I was -- actually, the point of the conversation we're at

18    right now is me explaining to her that the way she's

19    responding to these phone calls is the same exact way that

20    every racist person has ever responded to being caught

21    being racist.

22         And even if she -- and they don't want to think

23    they're racist either or they don't want to think there's

24    something wrong with it, but when you say it was a

25    coincidence or, you know, this isn't how it looks or, you

                                                  Page 56

```
 1   know, what I -- you know, we -- we -- we -- at the end of
 2   it, it ended with a hug so, you know, obviously we just
 3   needed to take the time to hear each other, that that
 4   equivocation of both sides somehow being equal or at the,
 5   at the best, you know, her not being as wrong as it
 6   seems -- that's bad.  And I've tried to explain that to
 7   her.
 8            CALLER:  What I was about to say, what do you
 9   think would've happened if Jesus would've been, um, you
10   know, like Jesus was a refugee.  He -- he had to flee his
11   home country because Herod was trying to kill, you know?
12            So basically the message that she's trying to
13   portray is that -- that, you know, refugees have no place
14   anywhere, but what -- what -- what -- what do you think
15   happened with Jesus, man, you know?  It's like, I don't
16   understand how people can call themselves Christians and
17   they don't believe that refugees have no place --
18            ROSLYN LA LIBERTE:  Tony?
19            TONY AARON II:  Yes.
20            ROSLYN LA LIBERTE:  People are hurt by this.
21            TONY AARON II:  Yes, yes, they are.
22            ROSLYN LA LIBERTE:  But they're calling and
23   they're identifying with this.
24            TONY AARON II:  Right.
25            ROSLYN LA LIBERTE:  And what he said
```

Page 57

1    (unintelligible).

2          CALLER:  -- country and you spit in their face

3    and tell them that they need to go back home.

4          ROSLYN LA LIBERTE:  I never said that.

5          TONY AARON II:  Hold on.  Listen to him.

6          Listen to him.

7          ROSLYN LA LIBERTE:  I never said that.

8          TONY AARON II:  Listen to him, Roslyn.

9          ROSLYN LA LIBERTE:   What?

10          TONY AARON II:  Listen to him.  Stop trying to

11    defend yourself.

12          ROSLYN LA LIBERTE:  But I did not say --

13          TONY AARON II:  And when he finishes talking, you

14    can give him your response.

15          CALLER:  Yeah, refugees get sent back to the

16    country where they're gonna be murdered or brutalized

17    (unintelligible) and the children are getting scared.

18          Like, how do you justify that in your heart?

19          I want to know how you sleep at night.

20          TONY AARON II:  You know, that's his question.

21    He wants to know how you sleep at night when you -- how

22    can you justify those views in your heart?

23          CALLER:  And you keep telling him that he needs

24    to go back to --

25          ROSLYN LA LIBERTE:  I never said that.

Page 58

1           CALLER:  (Unintelligible) freaking life.

2           ROSLYN LA LIBERTE:  I never said that to him.

3           CALLER:  (Unintelligible) not your country, by

4  the way (unintelligible).

5           TONY AARON II:  So Roslyn -- hold on.  So sir,

6  hold on one second.  Uh, Roslyn, you -- we -- you -- you

7  had to have said something.  It's not you -- all -- all

8  you're telling these people is I didn't say that.  I

9  didn't say that.  I didn't say that.  No one said --

10           ROSLYN LA LIBERTE:  I didn't say that he was a

11  Mexican and to go back, and that's what they're saying.

12           TONY AARON II:  Okay, but you did say a lot of

13  other things, Roslyn.  You do feel a lot of other things.

14  You bought a hat that says all of that by itself, and you

15  wore it whilst yelling at a 14-year-old Hispanic child.

16  You have to own that.  Constantly talking over him by

17  telling him you didn't say that is not -- he doesn't feel

18  any better now, speaking to the woman who's hurt him, than

19  he did at the beginning of the conversation.  That is not

20  good.  You're wrong.  He doesn't even feel like -- he's

21  not being made to feel like you know you are wrong.

22           You are wrong, period.

23           ROSLYN LA LIBERTE:  Okay.

24           TONY AARON II:  You cannot constantly talk over

25  these people.  You are saying you -- you are recognizing

Page 59

1    how much this hurts people and how you said they

2    identify -- like I told you, they identify with this.

3             ROSLYN LA LIBERTE:  Everyone identified, yes.

4             TONY AARON II:  But --

5             ROSLYN LA LIBERTE:  I know it.

6             TONY AARON II:  But listen to yourself.  Aside

7    from that one statement, the only thing you've said to him

8    is, I didn't say that.  I didn't say that.  That's not

9    right.  I didn't say -- do you -- do you hear that?

10            ROSLYN LA LIBERTE:  Yeah.  Yeah.

11            TONY AARON II:  You -- not in this instance -- as

12   a human being, everything about your life and who you've

13   been got you to this point, and you are wrong.  You are

14   wrong.  Not the way it was said is wrong.  That's what the

15   Republican party is teaching you.  Racism is okay if you

16   say it right.  You know, it's not that you hate other

17   people, it's just that you want to keep what you have for

18   your people.  That is racist.  The -- period.  Doesn't

19   matter how it's said, you know?

20            'Cause you -- you buy -- you know, if I -- I

21   don't even wear accessories.  I don't wear watches or

22   hats.  If I did, I would make sure that they were

23   labelless, completely blank.

24            And if a color was associated with something I

25   didn't agree with, I wouldn't even wear that color because

                                                    Page 60

```
 1    I care about -- if I'm such a great person, I need to make

 2    sure all the choices I make represent me that way.

 3              ROSLYN LA LIBERTE:  Okay.

 4              TONY AARON II:  And you have represented yourself

 5    and you have admitted -- you know, to me at least -- that

 6    there are views you have that are not that of a great

 7    person.  Not that, you know, that -- and you need to own

 8    that.  If you're gonna answer these calls -- it's kind of

 9    like trolling people, if you answer their calls and then

10    don't show respect for their concern and their pain.

11              ROSLYN LA LIBERTE:  Okay.

12              TONY AARON II:  That's -- that's really trolling

13    them.  You know, imagine if I did this to someone who

14    looks like you and you felt like calling me, and then I

15    answered the phone and the entire time you spoke to me, I

16    said, I didn't say that.  I didn't say that.  I didn't do

17    that.  I didn't say that.  You see what I'm saying?

18              ROSLYN LA LIBERTE:  Yeah.

19              TONY AARON II:  That's you right now.

20              And this young man hasn't cursed at you, he

21    hasn't raised his voice at you.

22              ROSLYN LA LIBERTE:  No.

23              TONY AARON II:  You have to listen to him and you

24    have to change.

25              ROSLYN LA LIBERTE:  All right.  Thank you.
```

Page 61

1              CALLER:  (Unintelligible).

2              TONY AARON II:  You have to listen and you have

3     to change.  I'll tell you -- I'll tell -- I'll tell you

4     something that's very -- that's very perverse about the --

5              ROSLYN LA LIBERTE:  All right.  Thank you.

6              CALLER:  (Unintelligible).

7              TONY AARON II:  Here's something that's very

8     perverse about this situation, that will work in your

9     favor -- it's extremely perverse and it's wrong, but it

10    works in your favor.  You're a white woman.  You are

11    the -- if you change and become a -- on the right side of

12    this issue, they'll have you on fucking Good Morning

13    America because you're a white woman.  There's so much

14    opportunity for you.

15             ROSLYN LA LIBERTE:  You know -- you know -- you

16    know, that's good thought.  That's a good -- hold that

17    thought.  Call me back.  I got a lot of people, uh,

18    wanting me right now.  I don't know how I'll know who you

19    are.

20             TONY AARON II:  Well, take down my number and if

21    you'd like to speak with me, you give me a call back.

22             ROSLYN LA LIBERTE:  Okay.  Give me your number.

23             TONY AARON II:  It's, uh -- hold on.

24             Let me end my recording here.

25             (End of recording.)

```
1                   C E R T I F I C A T E

2

3

4           I, TERRI NESTORE, Certified Shorthand Reporter/

5    Transcriptionist, do hereby certify that I was authorized

6    to transcribe the foregoing recorded proceeding, and that

7    the transcript is a true and accurate transcription of my

8    shorthand notes, to the best of my ability, taken while

9    listening to the provided recording.

10

11          I further certify that I am not of counsel or

12   attorney for either or any of the parties to said

13   proceedings, nor in any way interested in the events of

14   this cause, and that I am not related to any of the

15   parties thereto.

16

17

18   Dated this 11th day of July, 2024.

19

20

21

22           TERRI NESTORE, CSR 5614, RPR, CRR

23

24

25
```

Page 63

[05398 - america]

| 0 | | | |
|---|---|---|---|
| **05398**   1:6 | | | |

| 1 | | | |
|---|---|---|---|
| **11th**   63:18 | | | |
| **12**   41:2,3 | | | |
| **14**   10:25 12:7 | | | |
| 12:19 45:24 | | | |
| 59:15 | | | |
| **1:18**   1:6 | | | |

| 2 | | | |
|---|---|---|---|
| **20**   14:6 22:24 | | | |
| **2024**   63:18 | | | |
| **20th**   13:10 | | | |

| 3 | | | |
|---|---|---|---|
| **30**   28:23 56:15 | | | |
| **323**   11:5 | | | |
| **35**   1:14 | | | |

| 4 | | | |
|---|---|---|---|
| **40**   19:4,5,6 | | | |

| 5 | | | |
|---|---|---|---|
| **5**   6:12 | | | |
| **50**   41:6,7,7 | | | |
| **5614**   1:24 | | | |
| 63:22 | | | |

| 6 | | | |
|---|---|---|---|
| **6798621**   1:25 | | | |

| 7 | | | |
|---|---|---|---|
| **7709**   63:21 | | | |

| a | | | |
|---|---|---|---|
| **aaron**   2:12,14 | | | |
| 2:24 3:3,6,9,12 | | | |
| 3:16 4:3,15,22 | | | |

5:3,6,11,15,21
5:23 6:2,8,11
6:19 7:6,10,13
7:18 8:4,6,10
8:14,17,24 9:3
9:7,14,17,23
10:6,18,22
11:2,14,18,21
12:11,14,16,24
13:6,13,21
14:21 15:3,10
15:17 16:2,15
16:21 17:1,6
17:11,20,24
18:11,15,24
19:3,11,18
20:19 21:4,9
21:12,15,21,25
22:21 23:5,7
23:14,19,22
24:1,5,8,20
25:13,19,24
26:3,10,14,21
26:24 27:2,6,8
27:10,13,17,19
27:22 28:7,13
28:17,21 29:5
29:20 30:3,7,9
30:12,25 31:19
31:25 32:3,6,9
32:15,17,20,22
33:3,13,17,23
34:4,6,8,13,19
34:25 35:16
36:1,7,11,14,18

36:23 37:4,13
37:22,25 38:2
38:5,11,16,24
39:6,9,11,15,19
39:23 40:2,5,9
40:20 41:6,13
41:24 42:1,4,7
42:12,16,19
43:3,10,16,20
44:2,5,7,9,15
44:23 45:12
46:9,23 47:1,9
47:12,14,24
48:4,7,12 49:3
49:6,14,18
50:7,24 51:12
51:17 52:15,18
52:22,25 54:8
54:23 55:4,9
56:1,8 57:19
57:21,24 58:5
58:8,10,13,20
59:5,12,24
60:4,6,11 61:4
61:12,19,23
62:2,7,20,23
**ability**   63:8
**able**   45:1 46:5
47:8
**absolutely**   3:24
16:24
**accessories**
3:19 60:21
**accurate**   63:7

**acknowledging**
39:10
**act**   39:23 50:15
**action**   10:13
**actions**   26:4,4,5
26:8 29:9
41:10
**activists**   7:1
**acts**   42:25
**actually**   24:5
40:24 45:17
46:13 49:8
54:9 56:17
**add**   29:19
**address**   31:20
31:24 32:7
45:13
**admit**   27:3
**admitted**   29:10
61:5
**adult**   17:2,9,10
17:14
**advise**   54:8
**ago**   7:3
**agree**   20:3 23:3
23:4,6 60:25
**ahead**   3:15
28:15,16 30:19
32:22 36:10,13
36:17 43:19
56:4
**aligned**   20:10
**allowing**   9:18
**america**   18:16
40:22 41:4

Page 1

**[america - boy]**

46:12 62:13
**american** 10:2
**amount** 7:14
  11:6
**amounts** 20:8
**angeles** 31:13
**angles** 51:19
**angry** 48:24
**animosity**
  10:21
**answer** 3:18
  13:3 14:23
  56:7 61:8,9
**answered**
  21:17 61:15
**answering** 9:18
  10:8 44:19
**answers** 15:12
  45:20
**anybody** 40:13
  42:3
**anymore** 38:21
**anyway** 24:7
**apologize** 17:19
  18:7,23 22:16
  24:25 50:3
**apologized**
  24:23 55:23
**apology** 10:7
**apparently**
  24:18,19
**appearance**
  36:21
**appeared** 6:3

**appearing** 37:5
  37:6
**appreciate** 2:24
  9:17
**approaching**
  56:13
**area** 11:5,7,8
  11:10
**arrested** 52:1,4
**aside** 60:6
**asked** 34:2,3
  35:1,2
**asking** 3:18
  15:11,17
**assembly** 13:9
**associate** 12:25
**associated** 7:22
  7:23,25 17:25
  18:1 19:24
  37:6 60:24
**associates**
  10:12 33:15
  42:10 49:4,21
**association**
  36:20
**assuming** 9:9
**attacked** 17:14
**attacking** 8:16
**attorney** 63:12
**authorized**
  63:5

**b**

**baby** 54:12
**back** 13:15
  19:25 27:9,11

31:7 35:10,13
  51:5 53:3,6
  58:3,15,24
  59:11 62:17,21
**background**
  29:18 35:23
  43:2
**backtracking**
  43:13 52:18
**bad** 4:20,23 5:7
  12:22,23 14:11
  38:20 42:23
  53:5,6 57:6
**bag** 44:13,13
**balanced** 25:10
**basically** 16:11
  20:8 37:4
  57:12
**basketball**
  37:15
**beginning** 12:1
  38:9,10 59:19
**behavior** 18:23
  36:3
**beliefs** 26:22
  29:11 34:21
**believable** 9:20
  10:10,11 36:2
**believe** 2:7,8
  4:19,23 9:15
  9:16,16,19
  11:24 12:24
  15:7 25:15
  38:23 55:15
  57:17

**benghazi** 24:25
**beret** 11:23
  12:6,21
**best** 48:12,16
  48:18 57:5
  63:8
**better** 6:10
  53:10 59:18
**beyond** 23:1
**big** 37:6 38:19
  39:3 48:23
**bigger** 19:24
  25:24 45:5,15
**billions** 37:18
**biracial** 51:5
**bit** 24:9 31:4
  43:13
**black** 6:4 11:18
  11:19,19,21,22
  11:23,24 12:21
  13:5,19 37:22
  47:5 48:23,24
  50:9 51:17
  54:17 56:11
**blank** 60:23
**bless** 53:10,12
  53:21,24
**blood** 6:25
**border** 35:7
**born** 33:6,9
**bought** 6:14
  59:14
**box** 4:9,10
**boy** 12:15 13:5
  16:12 50:3

Page 2

[boys - color]

**boys** 33:7
**bring** 17:13
**broads** 38:14
**brought** 20:14
   26:25
**brown** 13:11
   18:9 41:7
   54:14
**brutalized**
   58:16
**building** 6:5
**bunch** 45:20
**burma** 33:9
**burn** 24:3
**business** 7:10
   7:11,20 11:3
   19:6 37:9,12
   38:6,14 43:25
**buy** 60:20
**buying** 20:17
**bye** 49:21

**c**

**c** 63:1,1
**california** 7:11
   7:13 11:4 24:6
   51:4 52:9
**call** 2:10,16
   13:15 27:15
   28:16 31:7,21
   34:2 44:3
   54:24 55:1
   56:2,5,5 57:16
   62:17,21
**called** 15:5
   21:16 22:4

29:7 30:13
   34:1 35:19
   44:17,18
**caller** 14:1
   43:24 56:5
   57:8 58:2,15
   58:23 59:1,3
   62:1,6
**calling** 4:16
   26:5,6 31:17
   37:17 38:18
   48:1 56:11
   57:22 61:14
**calls** 27:24
   31:16 48:3
   56:19 61:8,9
**calm** 49:20
**camera** 9:9
**car** 7:2
**care** 44:6 53:13
   61:1
**cares** 54:11
**caring** 22:5
**case** 1:6 28:25
**cast** 48:10
**catch** 41:8
**category** 4:9
**caught** 6:23 9:8
   26:8 55:18
   56:20
**cause** 3:20 36:2
   47:15 49:8
   60:20 63:14
**cbs** 27:24 28:17
   28:18 31:12

32:6 35:18
   45:4
**cbsnews.com**
   30:10
**cbsnews.com.**
   30:8
**cell** 9:9
**central** 6:11
**certain** 3:20,21
   46:11
**certified** 1:13
   63:4
**certify** 63:5,11
**cetera** 20:4,4
   20:11 21:23
   45:4,8 47:20
**chance** 50:11
**change** 6:7 23:9
   24:16 47:22
   49:10 61:24
   62:3,11
**channels** 24:22
**chanting** 6:25
**child** 10:25
   12:20 16:18
   17:3,6,12,12,13
   20:6 23:21,23
   45:24 46:10,17
   46:19 47:6
   48:23,24 50:10
   51:5,9,9 54:13
   59:15
**child's** 54:21
**childhood** 17:7
   17:13

**children** 2:4,5
   33:1 58:17
**choices** 61:2
**choke** 12:15
**choking** 8:25
   8:25 9:11 12:8
   12:9
**christian** 56:6,6
**christians**
   57:16
**claim** 19:25
   41:11
**claimed** 25:7
   52:2
**claiming** 18:15
   52:1
**clarify** 45:7
**class** 13:7
**clear** 4:22 39:2
   45:19
**clearly** 5:4
   40:16
**clinton** 24:24
**clippers** 37:15
   37:16,18
**clothing** 3:19
   17:25
**code** 11:6
**coincidence**
   55:12,19 56:25
**coincidentally**
   10:14
**color** 16:22
   17:15 54:20
   60:24,25

Page 3

**[come - discriminated]**

**come**  24:7
   43:12
**comes**  26:16
   49:15,19
**coming**  18:21
   21:21 35:7,21
   40:6 42:18
   43:7 50:17
   51:18
**comments**  4:4
**commitment**
   54:14
**communities**
   19:7 40:15
   41:10
**community**
   7:21
**company**  45:5
**compassion**
   35:6
**complete**  49:7
**completely**
   46:2 48:20
   60:23
**concern**  61:10
**concerned**
   12:19 51:3
**concluded**
   30:18
**confused**  56:10
**connect**  31:4
**consented**
   44:24
**conservative**
   24:21 40:15,15

**consider**  34:16
   34:23
**constantly**
   59:16,24
**constructive**
   47:21
**contact**  30:4
**context**  4:8
   22:13,17
**continuance**
   47:4
**continue**  15:15
**contradictions**
   46:4
**conver**  29:7
**conversation**
   16:12,18,23
   20:2,8 22:2,24
   35:18 42:15
   43:12 46:8
   47:5 48:13,19
   55:22,23 56:12
   56:17 59:19
**conversations**
   53:9
**convince**  40:10
**copout**  19:25
**correct**  7:11,15
   25:12 26:17
   30:11 45:20
**counsel**  63:11
**country**  6:10
   7:15 19:4
   40:22 57:11
   58:2,16 59:3

**couple**  30:16
**course**  38:4
**court**  1:1
**criminal**  52:2
**criminals**  4:6
   5:12,17 11:25
**crossed**  56:14
**crowd**  7:8
**crr**  1:24 63:22
**csr**  1:24 63:22
**currently**  24:6
**cursed**  61:20
**cursing**  54:25
**curve**  41:8
**cut**  30:17
**cv**  1:6

**d**

**damn**  41:15
**dated**  63:18
**day**  13:12,17
   13:18 31:17,18
   50:23 63:18
**days**  4:12 44:14
**de**  23:1
**deal**  37:7 38:20
   39:3
**death**  6:12
**decent**  12:3
   24:13
**dedicated**
   41:14 47:16
**deed**  10:13
**defend**  58:11
**defendant**  1:8

**defending**
   23:10
**defense**  8:19
**defensive**  23:15
   36:15
**defensiveness**
   53:2
**define**  55:20
**definition**  18:8
**degree**  44:16
**degrees**  23:1
**deposition**  1:14
   1:15
**deserve**  6:12
**desk**  31:11
**detector**  2:22
**dialogue**  16:10
**die**  30:2
**difference**
   17:19
**different**  4:13
   22:7 43:6
   45:20 46:1,2
   48:2 55:8
**direct**  4:25 5:6
   5:16 10:8 18:2
**directly**  7:24,25
   10:12 18:1
   19:22 40:17
**disappointed**
   16:1
**discount**  44:1
**discriminated**
   38:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[discrimination - focus]**

discrimination
  6:4
discuss  31:10
discussed  16:3
disservice
  25:14
district  1:1,2
divisive  3:24
  50:13
dli  1:6
doing  2:15,18
  8:8 39:4 41:16
  53:24 54:2
  55:15
dollars  37:19
donald  6:2,19
  6:24
download
  20:25
drive  24:9
duck  39:21,22
  39:22 42:25,25
  43:1 50:15,16
  50:16

**e**

e  30:9 63:1,1
earlier  20:7
  22:3
eastern  1:2
effect  36:14,18
effects  53:19
eight  52:3
either  43:5
  56:23 63:12

eloquent  54:9
  54:18
email  31:20,20
  31:24 32:7
  44:19 45:13
emails  50:22
employees  19:6
  41:9
encapsulated
  26:7
ended  16:19,23
  33:8 35:1
  48:19,21 49:9
  57:2
enormity  23:1
  23:18,20
ensure  19:5
entire  41:14
  55:21 61:15
equal  57:4
equivocation
  57:4
escorted  13:9
especially  27:3
  29:5 38:9
  54:20
et  20:4,4,11
  21:23 45:4,8
  47:20
events  63:13
everything's
  55:12
exact  56:19
exactly  7:2
  18:17 41:2,3

45:1,2 55:17
example  18:25
  52:1
exchanged  8:5
excuse  7:25
  11:22 47:2
exhibit  1:14
existence  20:16
  41:14
experience
  24:14 38:12
experiences
  14:17,19 38:6
explain  4:17
  8:2,6 18:17
  57:6
explained  22:9
  29:15 51:20
explaining
  13:23 31:2
  34:8,13 56:18
explode  26:15
  49:15,19
exploded  26:18
explosion  26:13
  26:16,17
expressed  8:8
extremely
  54:19 62:9

**f**

f  63:1
face  58:2
fact  25:7
fair  25:10
  40:12

false  48:20
family  33:2
  45:22,23 51:4
father  6:23
  33:1,8 54:21
favor  62:9,10
fear  46:11
feel  16:3 26:1
  36:5 43:10
  53:5,5 59:13
  59:17,20,21
feeling  17:24
feelings  4:1
feels  51:9
felt  8:15 16:22
  16:23 17:14
  34:9 61:14
female  7:1
  39:25
figure  23:13,14
figured  43:24
fill  43:15
find  2:11 41:15
fine  6:25 12:5
  44:25 52:9
finishes  58:13
finishing  28:16
fired  7:7
first  4:4 6:2
  20:24 22:3
  30:16,19 40:21
five  2:5
flee  57:10
focus  35:17

**[follow - hear]**

| | | | **h** |
|---|---|---|---|
| **follow**  3:13 | 37:7 45:10,13 | 62:12,16,16 | **h**  30:9 |
| 16:17 19:14 | 55:10 58:14 | **goodbye**  54:7 | **half**  33:2 47:17 |
| **foot**  10:11 | 62:21,22 | **goodness**  11:15 | **hand**  12:12 |
| 48:16,17 50:5 | **giving**  55:5 | 44:5 | 35:13 52:24 |
| **football**  37:14 | **glad**  48:5 | **gosh**  18:19 | **hang**  32:11 |
| **foregoing**  63:6 | **go**  3:15 13:11 | **gotta**  29:22 | **happened**  7:2 |
| **forever**  20:23 | 14:8,10 28:15 | 41:16 | 13:12,12,16 |
| **forget**  13:18 | 28:16 29:17 | **government** | 14:6,15 28:11 |
| **forward**  47:18 | 30:1,19 31:7 | 6:4 | 29:13 38:22 |
| 48:16 | 32:22,22 36:10 | **grabbing**  46:17 | 49:8,18 51:21 |
| **four**  2:5 | 36:13,17 38:19 | **gracious**  44:5 | 57:9,15 |
| **fox**  40:9 | 39:11 43:19 | **grade**  13:4 | **happening**  39:1 |
| **freaking**  59:1 | 52:8 56:4 58:3 | **graders**  40:22 | 39:12 |
| **freelance**  32:15 | 58:24 59:11 | **grandmother** | **happy**  7:17,18 |
| 32:16 | **god**  2:22 9:13 | 2:5 | **hard**  27:3 |
| **friend**  35:7 | 53:10,17,24 | **grandparents** | 31:16 |
| 49:24 | **going**  15:15 | 33:5 | **hat**  4:5 6:14,20 |
| **friends**  2:3 3:1 | 18:4,12 20:8 | **great**  18:16 | 7:22 9:25 16:6 |
| 13:5 21:23 | 29:17 31:7 | 39:24 61:1,6 | 18:16 20:5,13 |
| 34:12 | 43:25 47:2 | **greater**  24:15 | 20:17 23:21 |
| **fucking**  62:12 | **gonna**  14:3 | **grew**  51:4 | 24:3 42:24 |
| **full**  10:2 22:25 | 17:13 19:3 | **grifter**  44:16 | 50:12,15 54:7 |
| 30:13 49:14 | 20:13,14,15 | **guard**  13:4 | 59:14 |
| **further**  63:11 | 22:22 23:14 | **guatemala**  2:3 | **hate**  18:1,2 |
| | 30:1 31:1,6,6 | **guatemalan** | 60:16 |
| **g** | 32:10 36:8,8 | 33:11 34:10,11 | **hating**  13:1 |
| | 42:16 45:1,2 | **guess**  31:25 | **hatred**  6:22 |
| **general**  11:7 | 53:8,9,25 | 32:3 | 20:11 21:13 |
| 40:25 | 55:14 58:16 | **gun**  7:7 | **hats**  60:22 |
| **genuinely**  11:4 | 61:8 | **guy**  7:7 37:15 | **head**  11:23 |
| 23:9 25:14 | **good**  5:17 12:1 | 45:9 | 15:9 |
| **getting**  20:12 | 29:11 30:25 | **guys**  31:4 | **hear**  2:19 5:3,3 |
| 30:15 48:24 | 31:23 43:5 | | 9:24,24,24 |
| 55:18 58:17 | 48:19 49:23 | | 13:24 14:1,3 |
| **give**  14:23 | 50:14 59:20 | | |
| 18:25 29:24 | | | |
| 30:4 31:19,20 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[hear - ii]**

15:19 19:3
22:4 35:11
36:11,15,16
49:24 54:1
57:3 60:9
**heard**  53:15
**heart**  41:11
53:14 58:18,22
**height**  45:22
**hello**  13:15
27:5,7 28:9
31:24,24,24
32:4,8,10
43:18,19 55:25
56:1,3
**help**  17:21
18:18 22:3,7,9
48:11
**herod**  57:11
**hey**  38:19
**hi**  27:23
**high**  16:25
**higher**  7:14
11:9
**hillary**  24:24
**hispanic**  7:14
11:10,13 54:20
59:15
**history**  20:20
20:22 41:4
54:15
**hmm**  13:13
23:19 35:16
42:12

**hold**  3:14,14
4:22 13:20
14:2,25,25
16:15,16 17:3
17:4,4,12
27:20 34:25
39:15 42:11,17
46:5,23 47:1,2
49:24 51:12,13
58:5 59:5,6
62:16,23
**holding**  33:25
**home**  52:4
57:11 58:3
**honest**  11:15
14:21 24:12,21
**honestly**  4:19
8:22 13:2 22:3
25:6 37:1
**hope**  53:18
54:1,1
**horrible**  8:22
8:23 14:10
24:22 25:2
32:25 39:13
**horrified**  15:25
16:1
**horror**  33:11
**hour**  56:13,15
56:15
**hug**  16:12
48:20,24 50:11
57:2
**hugged**  50:4

**huh**  13:21
21:24 37:10
**human**  26:7
60:12
**hundreds**  48:1
**hung**  32:1,3
45:10
**hurt**  19:3 57:20
59:18
**hurting**  9:2,3
9:10 12:10
52:23
**hurts**  60:1
**hyperbolic**
22:22
**hypothetical**
14:24

**i**

**idea**  24:13
**identified**  60:3
**identify**  60:2,2
**identifying**
57:23
**ii**  2:12,14,24
3:3,6,9,12,16
4:3,15,22 5:3,6
5:11,15,21,23
6:2,8,11,19 7:6
7:10,13,18 8:4
8:6,10,14,17,24
9:3,7,14,17,23
10:6,18,22
11:2,14,18,21
12:11,14,16,24
13:6,13,21

14:21 15:3,10
15:17 16:2,15
16:21 17:1,6
17:11,20,24
18:11,15,24
19:3,11,18
20:19 21:4,9
21:12,15,21,25
22:21 23:5,7
23:14,19,22
24:1,5,8,20
25:13,19,24
26:3,10,14,21
26:24 27:2,6,8
27:10,13,17,19
27:22 28:7,13
28:17,21 29:5
29:20 30:3,7,9
30:12,25 31:19
31:25 32:3,6,9
32:15,17,20,22
33:3,13,17,23
34:4,6,8,13,19
34:25 35:16
36:1,7,11,14,18
36:23 37:4,13
37:22,25 38:2
38:5,11,16,24
39:6,9,11,15,19
39:23 40:2,5,9
40:20 41:6,13
41:24 42:1,4,7
42:12,16,19
43:3,10,16,20
44:2,5,7,9,15

Page 7

**[ii - know]**

44:23 45:12
46:9,23 47:1,9
47:12,14,24
48:4,7,12 49:3
49:6,14,18
50:7,24 51:12
51:17 52:15,18
52:22,25 54:8
54:23 55:4,9
56:1,8 57:19
57:21,24 58:5
58:8,10,13,20
59:5,12,24
60:4,6,11 61:4
61:12,19,23
62:2,7,20,23
**images**  20:20
**imagine**  38:12
48:23 61:13
**immediately**
9:6 18:7 21:18
22:11 25:4,23
53:6 54:25
**impetus**  29:9
**implied**  40:16
**important**
43:13
**incident**  14:5
42:14
**incorrect**  26:23
**indefensible**
43:9
**indonesia**
32:24 33:8

**info**  30:4
**inside**  26:17,17
**instance**  60:11
**instinct**  22:6
**intelligent**
54:18
**intense**  12:13
12:13 47:5
**intensely**  18:3
33:25 46:17
**interested**
63:13
**interesting**
29:14 49:2
**interview**  9:19
16:5 21:6,17
28:23 29:13,14
30:15 56:12
**interviewing**
30:22 32:13
**iraq**  33:6
**islands**  33:9
**issue**  19:18,19
45:23 46:1
54:11 62:12
**issues**  24:17
46:3 47:24

**j**

**jail**  18:12 52:5
52:8
**japanese**  32:24
**jeez**  44:2
**jerry**  13:10,11
13:11

**jesus**  57:9,10
57:15
**jewish**  33:5
**job**  1:25
**johnson**  37:17
**join**  42:14
**joke**  47:16
**joy**  1:7
**jrc**  1:6
**judgement**
14:17
**july**  63:18
**jump**  50:5
**jus**  41:13
**justice**  41:16,18
41:19
**justify**  58:18,22

**k**

**keep**  17:3,7
20:8,14,15
44:21 49:11
58:23 60:17
**kid**  12:8
**kidding**  14:13
**kids**  33:11 35:7
**kill**  12:4 52:3
57:11
**killed**  12:2
**killing**  12:25
**kind**  24:11
53:12 55:3
61:8
**klan**  6:24
**klux**  6:24

**knew**  6:14
14:15 25:5,6
**know**  2:11,17
2:25 3:17 4:1,2
4:7,7,11,16 6:5
6:13,22 7:1
9:17,21 11:3,5
11:5,8,11 12:3
12:4,21 13:3
14:16,16,19,22
15:9,14,14,18
15:19,23 16:2
16:10 18:19,20
18:20 19:11,16
19:17,17,21
20:1,11,15,23
21:16 22:5,11
22:14,23 23:15
24:9,14,24
25:9,11 27:4
28:25 29:6,15
30:23,23 31:1
31:2,16,17
32:12 33:4
35:10,20 36:7
36:23 37:5,5
38:3,14,19
39:14,18,25
40:6,21 41:17
42:5,21 43:21
43:22,24 44:10
44:11,12,19
45:3,7,15,15,17
48:2,5,8,9,14
48:17,19 49:7

Page 8

**[know - liberte]**

| | | | |
|---|---|---|---|
| 49:9 50:13,18 | 19:9,16 20:18 | 48:5,8 49:2,4 | 5:19,22,25 6:6 |
| 50:24 51:2,10 | 21:2,7,11,13,20 | 49:12,17,21 | 6:9,17 7:4,9,12 |
| 51:18,25 52:8 | 21:24 22:19 | 50:8 51:1,6 | 7:16 8:2,5,9,12 |
| 53:1,6,6 54:11 | 23:3,6,12,17,20 | 52:13,17,20,23 | 8:15,21 9:2,5 |
| 54:17 55:3,11 | 23:24 24:3,7 | 53:5,16 54:5 | 9:12,15,22 |
| 56:25 57:1,1,2 | 24:18 25:12,16 | 54:22 55:2,7 | 10:4,16,20 |
| 57:5,10,11,13 | 25:20 26:1,9 | 55:25 56:2,7 | 11:1,12,17,20 |
| 57:15 58:19,20 | 26:12,20,22,25 | 57:18,20,22,25 | 12:9,13,15,22 |
| 58:21 59:21 | 27:5,7,9,11,14 | 58:4,7,9,12,25 | 13:2,8,14,22 |
| 60:5,16,19,20 | 27:18,20,23 | 59:2,10,23 | 14:2 15:1,5,16 |
| 61:5,7,13 | 28:1,4,6,8,12 | 60:3,5,10 61:3 | 15:25 16:8,20 |
| 62:15,15,16,18 | 28:15,19 29:1 | 61:11,18,22,25 | 16:24 17:5,9 |
| 62:18 | 29:2,17,21 | 62:5,15,22 | 17:18,23 18:10 |
| **known**   3:21 | 30:1,5,21 31:3 | **labelless**  60:23 | 18:13,19 19:1 |
| **knows**   45:9 | 31:8,12,15,23 | **largely**   38:8 | 19:9,16 20:18 |
| **ku**   6:23 | 32:1,4,8,10,16 | **las**   24:8 | 21:2,7,11,13,20 |
| **l** | 32:18,21,23 | **lasting**   53:19 | 21:24 22:19 |
| **la**   1:4,15 2:1,13 | 33:4,14,21 | **lasts**   20:23 | 23:3,6,12,17,20 |
| 2:21 3:1,4,8,10 | 34:1,5,7,9,18 | **learn**   45:17 | 23:24 24:3,7 |
| 3:14,22 4:7,19 | 34:24 35:3,20 | 47:17 | 24:18 25:12,16 |
| 5:1,5,9,13,19 | 36:4,10,13,17 | **learned**   14:12 | 25:20 26:1,9 |
| 5:22,25 6:6,9 | 36:22 37:2,10 | **learning**   49:23 | 26:12,20,22,25 |
| 6:17 7:4,9,12 | 37:12,20,23 | **led**   26:4 | 27:5,7,9,11,14 |
| 7:16 8:2,5,9,12 | 38:1,4,8,15,22 | **legal**   7:14 | 27:18,20,23 |
| 8:15,21 9:2,5 | 39:4,8,10,13,17 | **legitimate** | 28:1,4,6,8,12 |
| 9:12,15,22 | 39:21 40:1,4,8 | 45:25 | 28:15,19 29:1 |
| 10:4,16,20 | 40:18 41:5,12 | **length**   30:13 | 29:2,17,21 |
| 11:1,12,17,20 | 41:21,25 42:2 | **lesson**   50:18 | 30:1,5,21 31:3 |
| 12:9,13,15,22 | 42:5,10,13,17 | **letting**   4:1 | 31:8,12,15,23 |
| 13:2,8,14,22 | 42:20 43:6,14 | **level**   41:17 | 32:1,4,8,10,16 |
| 14:2 15:1,5,16 | 43:17,22 44:3 | **liberal**   7:8 | 32:18,21,23 |
| 15:25 16:8,20 | 44:6,8,10,18 | **liberte**   1:4 2:1 | 33:4,14,21 |
| 16:24 17:5,9 | 45:9 46:7,22 | 2:13,21 3:1,4,8 | 34:1,5,7,9,18 |
| 17:18,23 18:10 | 46:25 47:7,10 | 3:10,14,22 4:7 | 34:24 35:3,20 |
| 18:13,19 19:1 | 47:13,23,25 | 4:19 5:1,5,9,13 | 36:4,10,13,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[liberte - meaning]**

36:22 37:2,10
37:20,23 38:1
38:4,8,15,22
39:4,8,10,13,17
39:21 40:1,4,8
40:18 41:5,12
41:21,25 42:2
42:5,10,13,17
42:20 43:6,14
43:17,22 44:3
44:6,8,10,18
45:9 46:7,22
46:25 47:7,10
47:13,23,25
48:5,8 49:2,4
49:12,17,21
50:8 51:1,6
52:13,17,20,23
53:5,16 54:5
54:22 55:2,7
55:25 56:2,7
57:18,20,22,25
58:4,7,9,12,25
59:2,10,23
60:3,5,10 61:3
61:11,18,22,25
62:5,15,22
**liberte's**  1:15
**lie**  2:22
**life**  40:20 47:16
50:18 55:20
59:1 60:12
**light**  48:10
**line**  27:15
29:22 50:25

55:6 56:3,4
**listen**  15:6
25:17 35:14
47:19 54:9,15
54:16 55:1,9
58:5,6,8,10
60:6 61:23
62:2
**listener**  25:20
25:20
**listening**  14:22
27:4 35:12
63:9
**literal**  18:8
26:15 48:23
**literally**  4:4
10:1 17:15
21:17 22:10
24:24 29:8
30:14 33:19
45:22 55:16,16
56:15
**little**  31:4 43:13
55:19
**live**  19:4 40:20
**lives**  40:21
46:11
**long**  11:6 37:10
56:12
**look**  4:12,13,14
4:16,17 12:22
12:23 50:15
55:23
**looked**  23:11
42:23

**looks**  39:22
42:25 51:9
55:12 56:25
61:14
**los**  31:13
**lose**  29:23
**lot**  5:1 11:7
14:12 27:23
33:2 34:12
36:25 37:17,17
41:23 50:19
53:9 55:2,7
56:9 59:12,13
62:17
**loud**  52:21
**loudly**  35:5
**love**  23:24
**loves**  54:13

**m**

**m**  30:9
**ma'am**  12:17
51:14
**made**  4:4 22:15
37:18,23 38:1
39:2 45:18
47:22 51:19
52:2 59:21
**maga**  23:21
**magic**  37:17
**magma**  49:14
49:15
**maine**  11:11
**majority**  40:22
40:23 41:3,6

**make**  4:20 6:9
14:17 18:16
19:8,13 60:22
61:1,2
**makes**  4:5 18:7
25:8
**making**  5:8
35:8 47:18
**male**  56:11
**man**  28:16
42:22 47:5
48:23 50:9
51:17 53:10
54:17,20 57:15
61:20
**matter**  9:19
60:19
**mean**  2:12,16
2:16,16,19,25
7:22 9:14 10:1
13:7 14:14,20
14:22 15:7,10
15:12,19 20:20
22:3 25:11
27:2 29:3,3,6,8
30:14 32:6
33:17 34:14
35:10,16 37:7
37:14 38:3
41:1 44:12,23
44:24 45:13
47:15 49:6
54:23 55:4,19
**meaning**  21:9
41:6

Page 10

**[means - okay]**

means 20:10
meant 5:9
measures 47:17
meeting 43:8
mentally 37:1
message 57:12
mexican 59:11
mexicans 4:5
  5:11,16
military 33:7
mind 25:17
  29:19,22 49:11
minded 54:10
  54:12
minority 19:5,7
  40:22,23 41:3
minute 13:20
  22:24 28:23
  50:3 51:23,23
miraculously
  9:8
misquoted 9:8
misrepresent...
  49:7
missing 47:2
mistake 51:19
mixed 44:13,13
mm 10:22
  13:13 23:19
  35:16 42:12
mom 33:1
moment 8:6
  10:15,24 18:6
  23:23 25:3
  30:14 47:1

48:14,15,21
51:21,22,23
52:11,11
money 41:11
morning 62:12
morningside
  16:25
mother 2:4,13
  2:14 16:13
  42:22 50:12
  51:8
mothers 32:25
mouth 5:22
  35:25
mouthpiece
  7:25
move 24:23
  47:18
movement
  19:21
moving 51:5
multiple 7:7
murdered 6:21
  58:16

**n**

n 30:9 38:3
naive 14:19
  16:5,8,8 17:21
  18:16 22:6
  35:24
naivete 36:2,5
name 3:4,5 6:3
  13:10 25:5
  27:24 28:7,18
  28:19 29:1

45:11,12 51:14
51:16
name's 3:6
  28:21 51:18
names 44:18
national 13:4
nazis 10:2
neck 8:25 12:12
  18:3 46:18
need 8:24 31:10
  40:20 42:8
  49:9 53:19,20
  54:15 58:3
  61:1,7
needed 57:3
needs 39:3
  45:18 58:23
nestore 1:23
  63:4,22
never 12:15
  13:9,11,17
  14:15 26:6
  37:20 53:14
  58:4,7,25 59:2
new 1:2 31:14
  31:15 41:2
  42:16 43:12
  53:2
news 24:13,22
  25:1 27:15,24
  28:17 31:12
  40:10,15
night 58:19,21
ninth 13:4

nobody's 23:16
notes 63:8
nowadays 38:9
nth 44:16
number 56:9
  62:20,22

**o**

objective 22:14
obviously 45:5
  57:2
offend 36:9,9
officers 52:4
oh 13:17 18:19
  20:13 23:24
  24:22 28:5,10
  28:10 31:8
  32:22 37:5
  38:4 40:10
  43:24 44:5
  48:18 49:8,22
  51:3,6,21
  55:21
okay 2:24 3:24
  4:3 5:3,21,23
  6:8 7:6,13
  10:18,18 11:14
  11:16 12:11,11
  12:14,14 14:4
  15:3,7,10 16:9
  17:5,20,23,24
  18:7,14 19:5
  19:10 21:15
  22:19 23:17
  25:8,17 26:9
  27:14,17,18,22

Page 11

**[okay - phone]**

28:10,12 30:2
30:3,12,22
31:4,8,12,15
32:10,16,19,20
33:3,13 34:4
36:17 38:11,24
40:8 41:6
43:19 46:16
47:7 49:9,18
50:9 51:6
59:12,23 60:15
61:3,11 62:22
**old** 6:15 10:25
12:7,19 45:24
59:15
**older** 14:18
**once** 52:1
**one's** 24:16
**online** 13:25
54:6
**open** 17:22
54:10,12
**opinion** 4:17
8:5
**opinions** 19:20
**opportunity**
62:14
**outlet** 45:4
**outrageous**
36:24
**overwhelming**
42:6,9
**own** 3:25,25
11:3 12:12
15:20 18:3

20:9 22:19
24:16 25:22,25
26:3,4 33:25
37:8,14,14
48:14,15 59:16
61:7
**owned** 37:15
37:18
**owner** 7:10,11
7:20
**owns** 38:5

**p**

**pacific** 33:9
**pain** 61:10
**painful** 48:17
**panther** 11:18
11:19,22,24
13:19
**panthers** 11:24
**paper** 6:3 32:14
**pardon** 28:6
**parents** 32:23
**park** 6:12
**part** 8:7,10
22:25 23:8
30:19,20 35:17
**parties** 63:12
63:15
**parts** 7:14
30:17 48:13
55:22
**party** 60:15
**passion** 26:20
**passionate**
54:19

**past** 4:11 14:17
31:2
**patently** 55:10
**penalty** 6:12
**people** 2:20
3:20 4:11 5:2
5:17 6:6,25
9:25 11:10,13
11:25 12:1,2,2
12:3,3,4,5 13:1
13:1 14:18
15:14,19 16:11
19:14,16 20:9
21:11 26:5
27:1,4 28:2
31:11,17 34:10
34:11 36:5
37:17 38:17
39:2 40:23
41:7,20 43:7
43:12 46:15,20
48:1 49:22
50:19,19,21,22
54:9 55:2,8
57:16,20 59:8
59:25 60:1,17
60:18 61:9
62:17
**people's** 40:25
**percent** 19:4,5
19:6 41:7
**percentage**
11:10
**period** 10:2
59:22 60:18

**permissions**
45:6
**persecuted**
40:11
**persecuting**
40:14
**person** 4:5 5:7
6:20,23 7:4,7
9:8 10:22
11:19,21 13:23
16:22 17:2,6
17:15 18:9,15
24:22 26:1
27:12 28:9
40:21 43:16,21
44:17 46:3,11
47:22 50:14,25
51:3 53:2
54:14,16,19
55:5,17 56:20
61:1,7
**person's** 43:18
**personage** 26:7
**personal** 35:8
41:17
**personally** 7:24
41:15
**perspective**
46:5 47:21
**persuasive**
41:21
**perverse** 62:4,8
62:9
**phone** 9:9
13:22 21:17

Page 12

**[phone - rapidly]**

25:5,16 29:25
30:14 42:14
48:3 49:22,25
50:21 51:1
53:3 56:19
61:15
**photo** 20:6 26:8
28:2,9 33:20
**photoshopped**
54:7
**phrase** 25:10
**picked** 30:14
56:2
**picture** 8:1,7,8
9:12,13 12:7
12:20 13:25
19:23 20:23,25
55:21,21
**pictures** 54:3
**pile** 22:18
**piling** 21:7,10
21:11
**place** 38:13
49:1 57:13,17
**plaintiff** 1:5
**planning** 51:5
**please** 3:10,15
7:19 21:22
**plug** 29:22 30:2
30:5
**plus** 41:7
**point** 4:2 6:12
11:2 15:11,24
20:16 22:18
24:14 29:6,12

34:14 35:5,12
38:25 40:17
41:14 46:14
47:3 52:12,20
56:14,17 60:13
**points** 29:14
**police** 2:10
14:12 46:14
52:4
**population**
40:25
**portray** 57:13
**positive** 47:21
**positively**
16:19,23
**positivity** 8:7
**post** 20:24
23:23
**poster** 23:21,22
**posting** 50:20
**posture** 8:18
**pray** 53:25
**pretty** 24:12
**prisoners** 32:24
**privilege** 18:8
18:14,17 22:12
50:1
**prob** 48:17
**probably** 22:22
**problem** 23:7,9
31:9 40:13
43:15 47:18
48:21
**proceeding**
63:6

**proceedings**
63:13
**professionally**
41:15
**progress** 53:1
**protestors** 7:8
**provided** 63:9
**public** 48:25
**publicly** 19:7
19:13
**published** 45:2
**pulled** 35:13
53:6
**purchase** 10:13
**purpose** 30:21
**pushback**
36:20
**put** 2:7 4:9,9
13:19,24 14:2
14:3 15:8
27:21 33:7,10
33:19 34:14
35:13 41:10
44:21 47:25
48:8 52:5,24
56:3
**putting** 35:25
41:23

**q**

**question** 3:3,7
3:12,18 5:4
9:20 10:10
11:15,16 12:16
12:17,17 14:24
15:3 26:15

34:16 37:8
45:25 58:20
**questioning**
45:24
**questions** 9:18
10:9 15:11,18
**quick** 30:2
**quiet** 7:4 28:14
**quote** 4:25 5:16
5:18 25:9
**quoted** 7:24
**quotes** 5:6

**r**

**r** 30:9 63:1
**race** 10:21
**racism** 6:15 8:1
10:14 20:4,11
36:21 37:6
40:12 60:15
**racist** 26:23
34:1,15,17,23
35:2 37:11,16
38:3 43:1
45:25 50:14
53:24 55:17,18
56:20,21,23
60:18
**racists** 37:13
**raised** 61:21
**rallies** 54:2
**rally** 6:21,24
**ran** 6:20
**rangoon** 33:9
**rapidly** 41:1

Page 13

[rapists - roslyn]

**rapists**  4:5 5:11
  5:16 11:25
**rare**  54:19,24
**rc**  33:15 42:10
  49:4,21
**real**  30:2 32:5,5
  40:7
**realistic**  25:11
**reality**  48:21
  49:10
**realize**  53:18
**really**  3:23,23
  3:23 4:21 6:17
  8:21 10:4,4
  14:23 15:22
  16:10 20:2
  45:10,18,19
  46:23 47:15,17
  48:15 52:13
  53:25 54:8,16
  55:24 61:12
**reason**  9:14
  45:25
**reasonable**
  34:15 46:5
**reasons**  48:2
**recap**  43:11
**recognizing**
  59:25
**record**  21:22
**recorded**  37:16
  38:18 63:6
**recording**  11:8
  30:16,22 42:16
  44:24 62:24,25

63:9
**recordings**
  30:13
**red**  20:5
**reference**  9:1
**referencing**
  17:7
**reflect**  53:20
**refugee**  57:10
**refugees**  57:13
  57:17 58:15
**regardless**
  39:24
**reid**  1:7
**related**  3:20
  63:14
**relates**  24:16
**relationship**
  54:13
**religious**  46:15
**remember**
  13:17
**removed**  13:7
**renters**  6:5
**rep**  17:3
**report**  2:15
**reporter**  63:4
**reporting**  22:8
**represent**  61:2
**representation**
  7:20 48:20
**represented**
  61:4
**republican**
  60:15

**residents**  7:14
**resort**  19:25
**resorts**  53:3
**respect**  61:10
**respectful**
  12:19
**responded**
  56:20
**responding**
  20:9 21:25
  56:19
**responds**  45:4
**response**  20:12
  55:18 58:14
**responsibilities**
  7:19 24:16
**responsible**  6:1
  6:1
**rest**  31:11 41:4
**reunion**  13:10
**revolution**
  10:23 19:22
**right**  6:12 9:22
  11:23 14:2
  16:6 17:18,19
  21:17,18,23
  22:13 27:19,20
  28:12 29:8
  32:11 34:21
  39:12,23 40:1
  40:4,4 41:5
  43:10 44:8,15
  44:16 46:9,15
  48:4,15 49:21
  52:25 53:19

54:14,23 55:15
  56:9,18 57:24
  60:9,16 61:19
  61:25 62:5,11
  62:18
**room**  46:20
**roslyn**  1:4,15
  2:1,13,21 3:1,4
  3:7,8,10,14,22
  4:7,19 5:1,5,9
  5:13,19,22,25
  6:6,9,17 7:4,9
  7:12,16 8:2,5,9
  8:12,15,21 9:2
  9:5,12,15,22
  10:4,16,20
  11:1,12,17,20
  12:9,13,15,22
  13:2,8,14,22
  14:2 15:1,5,16
  15:25 16:8,20
  16:24 17:5,9
  17:18,23 18:10
  18:13,19 19:1
  19:9,16 20:18
  21:2,7,11,13,20
  21:24 22:19
  23:3,6,12,17,20
  23:24 24:3,7
  24:18 25:12,16
  25:20 26:1,9
  26:12,20,22,25
  27:5,7,9,11,14
  27:18,20,23
  28:1,4,4,5,6,8,8

Page 14

[roslyn - shrinking]

28:8,12,15,19
28:22 29:1,2,8
29:17,21 30:1
30:5,21 31:3,8
31:12,15,23
32:1,4,8,10,16
32:18,21,23
33:4,14,21
34:1,5,7,9,18
34:24 35:3,20
36:4,10,13,17
36:22 37:2,10
37:20,23 38:1
38:4,8,15,22
39:4,8,10,13,17
39:21 40:1,4,8
40:18 41:5,12
41:21,25 42:2
42:5,10,13,17
42:20 43:6,14
43:17,22 44:3
44:6,8,10,18
45:9 46:7,22
46:25 47:7,10
47:13,23,25
48:5,8 49:2,4
49:12,17,21
50:8 51:1,6,19
51:20 52:13,17
52:20,22,23
53:3,5,13,16,25
54:5,22 55:2,7
55:25 56:2,7
57:18,20,22,25
58:4,7,8,9,12

58:25 59:2,5,6
59:10,13,23
60:3,5,10 61:3
61:11,18,22,25
62:5,15,22
**rpr** 1:24 63:22
**running** 7:1
8:20

**s**

**s** 30:9
**sack** 44:12
**saw** 11:5 13:9
13:11,25 14:16
20:24 25:1
**saying** 2:20
3:17 4:14,23
5:8 9:7,21,23
14:1 15:2 16:5
20:17,18 21:13
22:20 25:21,24
25:25 26:3,11
26:22 35:6
36:1,4,5,14,16
36:18 37:4
39:17,18 40:2
40:17 42:23
44:13 47:8,11
48:11 49:3,13
49:16 50:4,9
55:4,9,16
59:11,25 61:17
**says** 4:23 10:23
12:21 19:22
36:25 38:13
59:14

**scared** 58:17
**scenario** 13:23
17:17
**school** 13:20
14:8
**scream** 17:25
18:2
**screamed** 16:21
**screaming** 6:25
9:4,10 10:25
17:15,16 33:25
35:1 45:23
46:13,16 48:25
**sea** 33:9
**second** 3:15 9:9
16:15 30:19
39:15 41:18
51:11,12 53:13
54:4 59:6
**seconds** 30:16
56:15
**see** 10:7 19:15
20:17,18 22:1
22:15,17,18
23:2 24:21
26:10,25 33:1
33:15 38:20
40:2 45:14
46:21 47:7
49:3,15,16
50:2 51:7,9
52:12 61:17
**seems** 57:6
**seen** 10:1 54:2

**send** 28:23
30:18,19
**sense** 54:10,12
**sent** 33:11
58:15
**separate** 32:25
**separation** 33:4
45:22,23
**sex** 54:13
**sexism** 6:15
38:19 39:1
**sexist** 39:20,23
39:24
**share** 21:22
**sherman** 27:25
28:3,5,10
29:24 30:6,8,9
30:11 31:6,10
31:14
**shermant** 30:6
30:7
**ships** 33:10
**shocked** 14:14
14:14 36:19,19
**shocking** 15:1,2
**shoe** 50:4
**shorthand** 63:4
63:8
**shouted** 38:16
**show** 61:10
**showed** 8:22
52:4
**shrinking**
40:24,25

**[side - take]**

| | | | |
|---|---|---|---|
| **side** 12:20 20:5 20:19,22 33:19 36:12 43:7 46:1 50:2 54:15 62:11 | **sore** 55:11 **sorry** 2:1 10:4 10:5 20:21,21 25:7 44:8 **sort** 29:9 45:17 53:2 56:16 | **started** 2:2,17 16:4 21:18 25:4 28:14,25 30:15 38:17 40:24 | **structures** 40:15 **stuck** 4:9 **stuff** 14:12 17:2 26:16 37:18,23 38:1 41:23 |
| **sides** 33:6 57:4 **sign** 10:23 19:22 44:22 | **sound** 22:22 39:23 | **starting** 23:15 **starts** 46:12 55:1 | **suing** 6:4 **suppose** 5:17 12:1 |
| **signature** 63:21 **simi** 2:10 **similar** 51:19 **sinatra** 28:5 **single** 55:17 **sir** 28:18 56:11 59:5 | **sounds** 39:21 **south** 33:9 **southern** 7:11 7:13 11:4 24:6 51:4 52:9 **speak** 3:21 41:22 62:21 | **state** 46:11 **statement** 36:25 60:7 **statements** 45:7 **states** 1:1 **stay** 17:9 27:15 29:21 | **supremacists** 40:11 **supremacy** 40:12 **sure** 19:13 24:12 29:20 60:22 61:2 |
| **sister** 39:25 **situation** 22:15 46:6 62:8 **situations** 45:19 | **speaker** 13:24 14:3,4 27:21 49:24 **speaking** 28:1,3 49:22 59:18 | **stood** 46:20 **stop** 10:2 22:25 39:3 58:10 **stopped** 9:5 **stories** 25:1 | **suspect** 54:20 **swear** 2:21 9:13 21:3 53:17,17 **symbol** 11:23 |
| **skin** 15:8 **sleep** 58:19,21 **slow** 43:25 **small** 7:20 11:3 **smiling** 10:24 46:21 | **special** 14:8 **specific** 34:14 **spent** 11:6 **spit** 58:2 **split** 9:9 10:14 **spoke** 3:1 42:21 50:20 61:15 | 35:8,9 **story** 2:6,15,17 15:13 22:8 24:11 45:2 **straight** 10:13 11:15 14:23 15:12,18,24 | **sympathetic** 34:11 **sympathy** 33:12,18 |
| **snippet** 55:20 **social** 41:13,16 41:18,19 **soil** 6:25 **somebody** 13:25 **soon** 2:16 21:16 30:13 40:23 41:2 | **spoken** 15:22 41:22 **square** 4:4 7:21 **squeezing** 18:3 **standing** 10:23 46:15 **start** 42:16 | **strained** 12:12 **street** 12:6 33:7 **stretch** 34:22 **strict** 47:20 **strong** 36:20 **strongly** 36:5 | **t** |
| | | | **t** 30:10 63:1,1 **tabitha** 51:3,7 51:16,16,17 52:25 53:1,8 53:18 54:6 **take** 2:22 13:6 13:8 19:11 23:12 27:14 33:6 44:6 48:2 |

Page 16

**[take - tony]**

55:11 57:3
62:20
**taken** 4:8 8:7
9:13 21:1
22:17 29:9
63:8
**takes** 12:7
54:24
**talk** 15:15
16:10 17:10
31:1,3,21 42:2
47:19 50:11
59:24
**talked** 4:11
52:19
**talking** 2:2,8
14:5 15:14
16:13 17:1,2
21:5,15,18
22:23 29:4
35:5 42:13,21
43:21,23 49:23
50:1,19 56:4
58:13 59:16
**tall** 47:5
**tangentially**
7:23
**tangible** 47:22
**taught** 34:20
34:21 40:16
43:5
**teach** 53:23
**teaching** 60:15
**teams** 37:14

**tell** 3:1 10:12
18:5,13,20
22:11 26:6
30:23 32:12,18
35:9 45:1 54:4
55:14 58:3
62:3,3,3
**telling** 2:9,17
15:6 21:19
22:2 25:4
33:21,23,24
35:8 54:18
58:23 59:8,17
**terms** 41:9
**terri** 1:23 63:4
63:22
**terrible** 6:6
**terrifies** 51:7
**test** 2:22
**thank** 23:25
61:25 62:5
**thanked** 16:13
**themself** 10:12
**thereto** 63:15
**thing** 15:8,17
18:6,22,25
20:24,25 22:10
23:7 25:8 27:3
28:13 33:22
41:16 45:15,18
47:14 48:12
51:24 54:4
55:17 56:10
60:7

**things** 6:13,14
16:14 21:3,14
26:15 27:1
29:18 32:19
43:4,11 53:16
56:9 59:13,13
**think** 4:21 5:2
5:9 6:18 10:3
10:16,17,17
15:1,2,25 16:1
17:3,7 18:6,22
21:5 23:1 24:9
25:6 28:19
29:13 30:25
31:2 32:4 34:3
35:17,22 40:11
40:12 43:18
44:10,11,20,20
46:23 49:8
51:8 55:24
56:13,22,23
57:9,14
**thinking** 13:19
20:16 24:21
42:8 53:7
**thinks** 6:11
**thoroughly**
29:16
**thought** 16:9
16:10 62:16,17
**thoughts** 3:25
15:20,23
**threat** 46:13
**threatened**
16:22 17:14

52:3,11
**threatening**
8:18 48:25
51:25 55:1
**threats** 52:2
**three** 6:15,15
10:13 12:6
25:1 33:2
50:21
**throat** 9:2,10
12:10 33:25
35:14 52:23,24
55:11
**throat's** 9:3
**time** 6:2 11:6
23:13 35:5
37:10 44:3
46:2 47:18
50:5,21 53:20
53:22,23 54:24
57:3 61:15
**timing** 33:18
**together** 24:3
**told** 2:2 16:17
34:7,25 43:1
52:15 60:2
**tone** 46:25
**tony** 2:12,14,24
3:3,6,6,8,9,10
3:10,12,15,16
4:3,15,22 5:3,6
5:11,15,21,23
6:2,8,11,19 7:6
7:10,13,18 8:4
8:6,10,14,17,24

Page 17

**[tony - uh]**

9:3,7,14,17,23
10:6,18,22
11:2,14,18,21
12:11,14,16,24
13:6,13,21
14:4,5,21 15:3
15:10,17 16:2
16:15,21 17:1
17:6,11,20,24
18:11,15,24
19:3,11,18
20:19 21:4,9
21:12,15,21,25
22:21 23:5,7
23:14,19,22,24
24:1,5,8,20
25:13,18,19,24
26:3,10,14,21
26:24 27:2,6,8
27:10,13,13,16
27:17,19,22
28:7,13,17,21
28:21 29:5,19
29:20,24 30:3
30:7,9,12,24,25
31:19,25 32:3
32:6,9,15,17,20
32:22 33:3,13
33:17,23 34:4
34:6,8,13,19,25
35:16 36:1,7
36:11,14,18,23
37:4,13,22,25
38:2,5,11,16,23
38:24 39:6,9

39:11,15,19,23
40:2,5,9,20
41:6,13,18,24
42:1,4,7,11,12
42:16,19,23
43:3,10,16,19
43:20 44:2,5,7
44:8,9,15,23
45:12 46:9,23
47:1,9,12,14,24
48:4,7,12 49:3
49:6,14,18,25
50:4,5,7,9,24
51:12,17,18
52:15,18,22,25
53:5,10,21
54:8,23 55:4,9
56:1,7,8 57:18
57:19,21,24
58:5,8,10,13,20
59:5,12,24
60:4,6,11 61:4
61:12,19,23
62:2,7,20,23
**tony's** 50:8
  56:3
**took** 13:5,8,18
  14:7 48:6
**totally** 14:14
  46:16 49:12
**touch** 44:21
  45:3,6
**towards** 10:21
  39:24

**trading** 33:10
**transcribe** 63:6
**transcribed**
  1:23
**transcript** 63:7
**transcription**
  1:13 63:7
**transcriptionist**
  63:5
**transparent**
  19:8,14
**treat** 39:24
**treating** 38:18
**trey** 27:24,25
  28:3,5,10,19,20
  28:21 29:7,18
  29:24 30:3,6,8
  30:11 31:6,10
  31:14 32:2
  35:18 45:10
**tried** 18:5
  22:10 57:6
**trolling** 61:9,12
**true** 18:24
  19:17 37:13
  42:1,4 55:16
  63:7
**trump** 6:19,24
  9:24
**trump's** 6:3
**truth** 2:9 19:4
**try** 2:10 17:21
  54:3
**trying** 15:12,24
  18:18 22:9

35:24 36:6,9
41:15,17 51:20
52:20 55:10
56:16 57:11,12
58:10
**turn** 33:24
**tv** 11:22
**twice** 16:17
**two** 2:4 24:11
  30:17 50:20
**type** 15:8
**types** 45:19

**u**

**ugly** 37:18
**uh** 2:16 3:19
  4:1,5 5:25,25
  6:22,22 7:1,8
  7:18 9:18 11:2
  11:6,8,9 13:21
  14:23,24 15:10
  15:18 16:2,4,6
  17:10 18:1,1
  19:21 20:7
  21:24 24:5,16
  26:13 27:17
  28:2,17,17,21
  29:1,1,1,6,11
  29:14,19 30:12
  30:13,17,24,24
  31:19 32:6,7
  32:15 33:5,6
  36:7 38:13
  41:14 42:6,20
  43:7,7 44:11
  44:11,21,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[uh - white]**

51:14,18,25
52:2 54:20,21
56:8,11 59:6
62:17,23
**um**  5:1 9:25
10:8 11:7
13:15,16,23
15:8,22 19:21
19:23 22:3,5
24:9,10 27:24
28:12,22,22,23
28:24 29:8,12
30:13,17,18
31:4,15 32:13
33:16 34:22
35:17,18 36:14
37:10 38:5
41:10,22 42:14
44:15,19,21
45:8,16,21
48:6 50:17,21
50:23 51:13,14
51:19,20,25
52:1 56:13,16
57:9
**unbelievable**
55:10
**under**  46:13
**understand**
3:23 7:19
16:11 18:21
25:21 29:3
35:21 42:18
45:22 46:6,10
47:11 49:5,12

50:17,22 51:8
57:16
**understanding**
24:15
**unfortunately**
40:14 53:3
**unintelligible**
9:12 11:20
21:7 34:10
43:14 44:1,4
53:8,11,12
54:5,7,22 58:1
58:17 59:1,3,4
62:1,6
**united**  1:1
**upbringing**
29:10 34:15
**use**  20:15 38:2
53:20
**used**  25:9

**v**

**valley**  2:10
**various**  50:22
**vegas**  24:8
**verify**  20:2 45:6
**video**  13:25
24:4
**view**  40:13 46:2
**views**  20:9,10
43:5 58:22
61:6
**vilified**  50:18
**vilifying**  39:5,6
39:7

**villain**  39:8
**voice**  61:21
**volcanoes**
49:14
**voters**  41:2
**vs**  1:6

**w**

**wait**  4:22 6:20
6:20 8:4,4
39:15,16,16
46:23 51:12,12
51:13,13
**walk**  56:16
**walked**  38:13
**want**  2:7 12:4
13:3,23 21:22
22:7 23:9
25:17 27:15
29:2,21 30:2
36:11,15,16,23
40:6 41:11
42:5,14 43:15
45:16,16 47:17
48:10,10 49:24
50:22 56:22,23
58:19 60:17
**wanted**  22:3
28:24 30:4
32:18 35:11
43:25
**wanting**  22:4
29:12 62:18
**wants**  6:9
31:21 51:2
58:21

**war**  32:24,25
**watches**  60:21
**way**  3:21 4:13
5:10,20 6:18
8:1 10:17 23:2
27:1 38:19
43:13 48:1
49:9 51:15
53:14 56:18,19
59:4 60:14
61:2 63:13
**we've**  5:23,23
49:25 53:1
**weapon**  18:2
**wear**  3:19 12:5
17:25 20:13
60:21,21,25
**wearing**  6:20
7:21 9:25
12:20 20:5,17
42:24 50:12,14
**website**  19:14
**went**  11:21,22
13:10,11 16:25
35:10 43:2
**whilst**  12:8
59:15
**white**  6:21 7:1
11:24 12:2,4,8
12:19,25 13:1
18:8,13,14,17
22:11 40:11,12
40:23,24 46:12
46:19,20 47:6
48:22,24 50:1

Page 19

**[white - young]**

| | | |
|---|---|---|
| 50:10 52:7 | **would've** 57:9 | **year** 10:25 12:7 |
| 62:10,13 | 57:9 | 12:19 45:24 |
| **willing** 23:2 | **wow** 44:2,7 | 54:1 59:15 |
| 48:14 | **write** 15:18,20 | **years** 6:15,15 |
| **wisconsin** | 50:21 | 10:13 12:6 |
| 11:11 | **wrong** 8:9,12 | 14:6 25:1 33:2 |
| **witnesses** 7:24 | 8:13 10:20 | 37:12 41:2,3 |
| 18:4 | 20:19 22:13 | **yelled** 2:1 51:10 |
| **woman** 6:21 | 25:6 53:17 | 51:23 53:14 |
| 10:24 37:8 | 55:24 56:24 | **yelling** 8:13,17 |
| 38:5,7,17 | 57:5 59:20,21 | 8:19 12:7 50:3 |
| 41:15 44:19 | 59:22 60:13,14 | 50:10 52:14,16 |
| 46:12 48:24 | 60:14 62:9 | 52:22 59:15 |
| 51:10 52:1,7 | **x** | **yep** 47:9 |
| 54:10,12,18 | **xenophobia** | **york** 1:2 31:14 |
| 59:18 62:10,13 | 6:16 | 31:15 |
| **women** 40:3 | **y** | **young** 42:22 |
| **word** 19:12 | **yeah** 2:14 3:12 | 61:20 |
| 38:3 55:19,19 | 3:14,22 12:22 | |
| **words** 15:20 | 13:18 20:19,21 | |
| 35:25 | 24:8 25:19 | |
| **wore** 25:22 | 27:6,8,25 28:1 | |
| 59:15 | 28:17,21 29:2 | |
| **work** 31:22 | 29:20 30:1,6,8 | |
| 41:16 42:8 | 31:3,23 32:17 | |
| 62:8 | 32:22 38:9,10 | |
| **worked** 40:3 | 38:15,22 39:19 | |
| **working** 18:8 | 41:24 42:17,19 | |
| **works** 14:12 | 44:15,20 45:9 | |
| 52:9 62:10 | 47:10 49:5,5,6 | |
| **world** 40:10 | 49:17,25 50:7 | |
| **worried** 2:3 | 50:8 56:14 | |
| **worse** 23:2 | 58:15 60:10,10 | |
| **worth** 25:1 | 61:18 | |

Page 20