UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

ROSLYN LA LIBERTE,

                              Plaintiff,

                    v.

JOY REID,

                              Defendant.

--------------------------------------------------------------------x

Civil Action No. 1:18-cv-05398 (DLI/JRC)

ECF Case

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT
AND RELATED RELIEF**

Plaintiff Roslyn La Liberte ("plaintiff" or "La Liberte"), by her attorneys Olasov, LLP and Ronald P. Mysliwiec, respectfully submits this Memorandum of Law in support of her motion, pursuant to F. R. Civ. P. Rules 37(e) and 56, for partial summary judgment, granting summary judgment in plaintiff's favor and against defendant Joy Reid ("defendant" or "Reid") on issues of liability for defamation by reason of Reid's publication of social media posts on June 29, 2018 and July 1, 2018 on Facebook and Instagram and granting evidentiary relief as sanctions by reason of defendant's spoliation of essentially all electronically stored information on her social media accounts relating to Reid's posts immediately preceding the commencement of litigation and after plaintiff's counsel's delivery of a document retention letter to defendant on July 2, 2018 (Exhibit 7 to First Amended Complaint, Dkt. No. 16-7).

The record amassed in the extended proceedings on defendant's motions to dismiss the First Amended Complaint (Dkt. No. 16) and supplemented in significant respects in discovery proceedings following the Second Circuit's remand have resolved questions relating to liability.

It is now settled that: (i) plaintiff is a private citizen for constitutional purposes of applying California defamation law; (ii) under applicable California law the standard of care governing defendant's liability for her social media posts is negligence, not a heightened standard of actual malice; (iii) the June 29, 2018 and the July 1, 2018 posts are both actionable as *per se* defamations, and (iv) Reid is the "author" of her posts and neither post is protected as a republication or re-communication of matters that other social media tortfeasors made in substantially similar false allegations or as defendant's statement of "opinion." We are also mindful of this Court's admonition in permitting the parties to make these motions that she expected the parties not to reargue matters that are now settled.[1]

**Falsity of Reid's June 29, 2018 and July 1, 2018 Social Media Posts**

As we all well know, this lawsuit begins with plaintiff's appearance at a Simi Valley (California) Town Council meeting convened to solicit public comment on SB54, legislation that was regarded by some as making California a "sanctuary state."  Defendant Reid published two pairs of social media posts to her Facebook and Instagram accounts on June 29, 2018 and July 1, 2018, relating to plaintiff's appearance at that meeting.  As defendant testified, her posting to her Instagram account was automatically posted to her Facebook account.  Reid dep., at p. 21:7 – 22:7.

---

[1] On October 30, 2020, after the mandate issued, defendant filed an answer (Dkt. No. 45).  Entirely disregarding the binding effect of the Second Circuit's decision, defendant's answer reasserted defenses that the Second Circuit's decision had resolved as a matter of law.  The reassertion of rejected defenses violated the "mandate rule."  *E.g., United States v. Quinteri*, 306 F.3d 1217, 1225 (2d Cir. 2002); *United States v. Dionisio*, 2010 U.S. Dist. LEXIS 1358, *5, *8-9 (E.D.N.Y. 2010)(Irizarry, J.). These defenses included, among others, failure to state a claim (first defense), the defenses that defendant's defamatory statements were "constitutionally protected" (second defense) or plaintiff was "a limited purpose public figure" (tenth defense), a defense that the defamatory statements were "not reasonably capable of the defamatory meaning attributed to them" (fifth defense) or "non-actionable statements of opinion" and the defense (sixth) that the amended complaint is "barred because Defendant is immune from liability where the alleged defamatory statements were republications and/or restatements of similar prior publications."

Reid's authorship of both sets of posts is conceded by defendant. Exemplars of each of the two pairs of posts were marked as Deposition Exhibits 129, 138, 139 and 140. *See* Mysliwiec Declaration, at ¶2. In the first, June 29 pair, defendant featured an unflattering photograph of plaintiff holding her throat with an open mouth and a 14-year-old Hispanic boy at the edge of the photo. According to Reid's posts the young man "showed up to a rally to defend immigrants." The post made no reference to any official, public meeting concerning state legislation. There was no "rally to defend immigrants". Portraying plaintiff as an interloper and purporting to quote plaintiff, Reid stated, "She showed up too, in her MAGA hat, and screamed, "You are going to be the first deported" … "dirty Mexican." After pointing out significant age differences between the two –"He is 14 years old. She is an adult."—Reid closed her piece:

> Make the picture black and white and it could be the 1950s and the desegregation of a school. Hate is real, y'all. It hasn't even really gone away.

In the second, July 1 pair of posts Reid added to the photo of plaintiff featured in her first post an iconic photograph from the civil rights era during the desegregation struggle in Little Rock, Arkansas, accompanied by the following text:

> It was inevitable that this image would be made. It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real. By[*sic*] every one of them were. History sometimes repeats. And it is full of rage. Hat tip to @josieiswriting. #regram #history #chooselove

As with the first post, the second made no reference to any public hearing, nor did it reference, even obliquely, any issue of public concern.

Reid made her first actionable posts late on Friday, June 29, 2018. As discussed at length below, her June 29 posts attracted a huge response on social media. Earlier that same day, television Channel 11 Fox News in Los Angeles carried a news report in which both Luevanos and La Liberte were interviewed. Luevanos confirmed that the two of them had been

-3-

having a "civil" conversation and that his comment in his interview that La Liberte did not

deserve what was happening to her was something that he wanted to have said. Luevanos dep.,

at 45:1 – 10. He also gave deposition testimony that La Liberte and he hugged at the end of

their brief encounter (dep., at 26:21 – 25):

> I think the officer said, "Are you two on good terms?" And then it
> may have been La Liberte that prompted the hug. Like, all right.
> Let's prove we're on good terms, make up hug, bam, the thing is
> done.

This is not the response of someone who has just been called a "dirty Mexican" and told that he

will be the first one deported. The photo that Reid (and others) mischaracterized actually features

Joseph Luevanos' mother benignly standing behind and just to the side of La Liberte, something

that no mother would do while her son was being verbally assaulted.

In its decision the Second Circuit found each set of posts actionable as *per se* defamations.

The Court acknowledged that, between Reid's first pair of actionable posts on June 29 and the

second pair on July 1, 2018,:

> the teenager in the Photograph stated during an interview with Fox
> 11 Los Angeles that La Liberte did not yell any racial slurs and that
> their discussion was "civil."

*La Liberte v. Reid,* 968 F3d. 79, at 84 (2d Cir.2020).

In the course of discovery, plaintiff learned that in that same time period, probably on June

30, 2018, a publicist for MSNBC, Lorie Acio ("Acio") called the president of MSNBC, Phil Griffin

("Griffin"), to bring to *his* attention that a social media post of Joy Reid's had become embroiled

in a huge controversy in Los Angeles. Griffin recalled that Acio had reported that Reid had

commented in a post "about a report by a Fox reporter about an accusation about a woman who

made a charge against an immigrant, that she thought was an immigrant. I don't even remember

whether he was or was not an immigrant." According to Griffin he learned from Acio "that a

number of people had tweeted about it and had written about it and it had become part of the public

discourse, and that Joy had commented about it and put out the post." Griffin instructed Acio to "stay on top of this and let me know where it goes, if it goes anywhere, find out about it, and she ran point." That was, Griffin testified, "when the trouble began, that's when I got some information on it. I talked to Lorie [Acio]." After his conversation with Acio, as Griffin put it, "I then talked to counsel." But he did not call Reid. Griffin conceded that MSNBC did not do anything about the June 29 or July 1 posts until after La Liberte made her written demand of July 2, 2018 on Reid (on which MSNBC was copied). Griffin was told about the demand letter "immediately." *See* Griffin dep., at 129:20 – 132:9.

The foregoing testimony of Griffin establishes that MSNBC was aware of the controversy surrounding Reid's June 29 posts and of the Fox Television News report before Reid herself knew or did anything, proving that Reid published her July 1 defamation without bothering to follow the comments on Reid's own social media accounts. She must have observed that engagements with her Facebook and Instagram June 29 posts were exploding, which is almost certainly why she published her pair of July 1 posts. But she also must have done so without actually reviewing those comments as a whole, because she disregarded their implication that what she had written about on June 29 was probably untrue. Thus, her conduct was both negligent and reckless. How can it possibly be that, without such negligence and recklessness, Reid, the author of the actionable June 29 posts, knew less than the president of her employer MSNBC?

Following remand, discovery has proved what was evident before discovery. At his deposition, the young man, Joseph Luevanos, gave the following unambiguous testimony:

> Q  Did -- Did Mrs. La Liberte say to you, in
> words or substance, ever, that -- quoting from this
> page -- "You are going to be the first deported"?
> A  No.
> Q  Did she ever call you a "dirty Mexican"?
> A  No.

This testimony is corroborated by much other evidence.  For purposes of this motion for partial summary judgment, his testimony alone makes it clear that there is no triable issue of fact on this core point. The whole point of Reid's posts was to portray La Liberte as the face of racist evil, and ironically trying to deprive plaintiff of her own humanity by questioning whether such a person could be "real."

Had Reid been present at the Simi Valley Town Council meeting, there being no "rally to defend immigrants", defendant could have heard La Liberte's brief remarks to the Council at its public hearing, which we have transcribed from http://simivalley.granicus.com/MediaPlayer.php?view_id.5&clip_id=2102minute  04:17:45  – 04:19:57 (last visited July 4, 2022), as follows, in full:

> [Ms. La Liberte]
>
> Oh, God, it's late. Council, Mayor,
>
> My name is Roslyn La Liberte.  My parents were immigrants from Indonesia.  They came here legally. They were prisoners of war in World War II by the Japanese on the Island of Indonesia.  I'm Jewish.  I'm a Trump supporter.  And all of this does not matter one bit.
>
> I'm here because I have a few items to share with you, that I had discussed with numerous emails in regards to the view of Ventura County Sheriff Jeff Dean and other California local law enforcement.
>
> Even though it is not the Sheriff's job to enforce the immigration laws, they have a relationship with the federal government, ICE, within the jails.  SB54 changes the relationship that local law enforcement has with federal immigration enforcement.  This severing of communication is why the Sheriff has been opposed to SB54 since its inception.  Illegals who have committed crimes are more likely now to be able to post bail before coming under the scrutiny of ICE. In the past ICE would coordinate the pickup of inmates for immigration issues at the point of their release from Sheriff's custody.
>
> All but two elected officials of California were opposed to SB54. Your Sheriff Dean was a vocal, was in vocal opposition for SB54's introduction by Senator DeLeon.  Sheriff Dean wrote opposition editorials that were published in newspapers.  He spoke at

> community forums about the issue.  He conducted interviews with various media outlets.  He spoke …
>
> [time keeper] Time's up.
>
> [La Liberte]  …to various community groups.
>
> [time keeper] Time's up, ma'am.
>
> [La Liberte] Oh, I'm sorry. Just, uh. That's all I wanted to say.  To act in behalf of the community. [less than clearly audible]
>
> [short applause]

Olasov Declaration, Exhibit A.  The deposition testimony of Luevanos was that what La Liberte said to the Council was pretty much what she said privately to him.  *E.g.,* Luevanos dep., at 38:12 – 14.  He had approached her during a break in the Simi Valley Town Council to find out what the "other side" of the issue had to say, and to state his own views.

Thus, Reid "got it wrong" on two scores.  She baselessly attributed to La Liberte vile conduct that she had not done; and she failed to report any part of what La Liberte had actually said in exercising her constitutional rights of free speech and assembly.

**Negligence**

Ordinarily, negligence is an issue for a jury.  Here, however, the evidence of Reid's failure to meet that standard of care is beyond doubt.

She was, and is, a public personality with broad visibility to the public, by virtue of a weekend morning show she hosted for MSNBC and personal social media accounts she enjoyed, with some 206,400 Facebook followers, 96,600 Instagram followers and 1.24 million Twitter followers in 2018.  Her visibility increased the odds that something she posted might attract a lot of attention.

Reid was engaged in her business or professional when she posted on her "personal" Facebook, Instagram and Twitter social media accounts.  Her contract of employment by MSNBC

and NBCUniversal made her conduct of her personal social media accounts subject to their published policies and guidelines. Deposition exhibit 93; Griffin dep., at 103 - 104.

The policies and guidelines that MSNBC made applicable to its talents' personal media accounts were intended to control possible excesses in personal social media accounts of its talent. Griffin dep., *passim*. Reid's posts about La Liberte violated many of these policies. These included: "verifying and authenticating social media images." Policies, at p. 6. Reid failed to do this. "Do not share unsubstantiated information via social media. If it's not reportable on air or online, it's not ready for you to tweet/post." Reid entirely disregarded the MSNBC admonition that "We should be careful not to report information based on tips or rumors. Carefully screen people who say they are witnesses to an event to verify the person's identity and information before airing or publishing. Be cautious in broadcasting or publishing interviews with those who may not have complete or first-hand information." Reid admitted at her deposition that her apparent source for the story, Alan Vargas, was wholly "anonymous" to her. Reid dep., at 50:4.

NBCUniversal's commonplace policies and guidelines parallel the understanding of the duty of care of a reasonable person in Reid's media industry. Under California law it is proper to take into account a person's specialized knowledge or expertise that should have made them more cautious about a statement's accuracy or industry practices, especially for media professionals. Failure to comport with industry standards is evidence of negligent and reckless conduct. Serious allegations, with adverse consequences to a person's reputation or their acceptance in the community, require a greater degree of care. *See Khawar v. Globe International, Inc.,* 19 Cal.4th 254, 965 P.2d 696 (1998); *Brown v. Kelly Broadcasting Company,* 48 Cal.3d 711, 257 Cal. Rptr. 708 (1989).

-8-

**Sanctions under Rule 37(e) for Spoliation**
**of Electronically Stored Information Should**
**be Imposed on Defendant**

The day following Reid's July 1, 2018 social media posts, counsel for plaintiff sent Reid a demand letter requiring defendant to "take down" her defamatory posts, issue a "retraction and apology" and "preserve any and all evidence related in any way to your social media posts and any other accusations that you have published regarding Mrs. La Liberte." The letter called for Reid to "preserve and maintain all electronically stored documents in their original native format, including all metadata. This preservation demand specifically "encompasse[d] any and all electronic documents, including but not limited to … all databases, and any other electronically stored and/or generated documents or files." *See* July 2, 2018 demand (Dkt. No. 1-7 and Dkt. No. 16-7) for its full text.

Because of the course of motion practice, defendant did not respond to any discovery demands for three years. In June 2021 plaintiff first learned –and then in stages-- that Reid had "taken down" her social media posts but had not preserved any of their associated electronic data, including comments and other interactions and metadata or analytics. Discovery disclosed that Reid "took down" her offending social media posts, and she destroyed the almost 200,000 engagements with those posts. The decision to do so was made in meetings participated in by lawyers for Reid and lawyers for NBCUniversal, MSNBC's parent, and Reid's employer and one or more publicists assigned to Reid. Accordingly, the destruction of this information and the failure to preserve it could not have been inadvertent. At his deposition, Phil Griffin, the former present of MSNBC and Reid's boss, testified that NBCUniversal "certainly" had technical experts who knew how to preserve the posts and associated comments, metadata and analytics on the Facebook, Instagram and Twitter social media platforms. Griffin dep., at p. 139:21 *et seq.*

Plaintiff's social media expert Prof. Jim Jansen gave uncontradicted evidence that Twitter, Facebook and Instagram had procedures available to Reid as the account holder by which she could simply, easily and quickly have archived these files when she was deleting the offending posts. These procedures were not available to plaintiff or her counsel who, of course, lacked the passcodes and other credentials to access Reid's accounts. Bernard Jansen declaration, Dkt. No. 118-2.

Plaintiff has been able to identify 7 documents that can be directly traced to Reid's actionable social media posts. Mysliwiec Declaration, Exhibit 2. These few documents, remnants from databases with many thousands of pages of entries with comments, contain telephone numbers, addresses, and other contact information for La Liberte and her construction and renovation company RC Design Construction. Disparaging comments about La Liberte accusing her of racist conduct and calling for her to be shunned, confronted and diminished as a human being and her business boycotted permeate these seven social media posts. They are representative of thousands of others that Reid destroyed and plaintiff was unable to recover. These 7 documents show, with missing data, more than 24,972 engagements: 14,307 "likes," 8,920 "shares," and 1,745 "comments." One document alone –for Lizzy the Lezzy—showed 1,600 comments, running to 978 pages, of which only 11 pages of comments with text could be retrieved. According to screenshots, Reid's June 29 Facebook post attracted approximately 168,000 engagements: 66,000 "likes," 89,000 "shares," and 12,000 "comments." Mysliwiec Declaration, Ex. 2. If the 1,600 comments for Lizzy the Lezzy ran 978 pages (of which only 11 pages were recovered), then by extrapolation the 12,000 June 29 Facebook comments ran to some 7,335 pages, a simply staggering figure to be accumulated over only a few days. Reid's July 1 Facebook attracted an additional 3,900 engagements, including 2,200 "likes,"1700 "shares". Mysliwiec Declaration, Ex. 1. The

separate engagement figures for Reid's Instagram account for her June 29 and July 1 posts were, respectively, 14,765 "likes" for the June 29 post and 6,575 "likes" for the July 1 post.  *Id.*

By these measures, Reid destroyed a huge amount of highly relevant electronic data on or about July 2, 2018.   Both Reid and NBCUniversal asserted the attorney-client privilege for all communications and discussions involving lawyers and/or publicists and the spoliation of this massive amount of evidence.  Griffin dep., at 138; Reid dep., at 44; Acio dep., at 12:1 – 25, 26:11 – 27:5, 41;13 – 44:1, 47:3 – 50:14.  As a result, defendant Reid is in no position to offer any factual support for the proposition that the spoliation of this evidence occurred by accident or without fault, in the face of the July 2, 2018 demand letter from La Liberte's lawyers.  Nor can they assert their ignorance about how this data could have been archived, in view of the testimony of the president of MSNBC that NBCUniversal had the expertise to archive the data Reid chose to delete.

The law respecting remedies for spoliation of electronic evidence is straightforward. Under F. R. Civ. P. Rule 37(e),

> FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION.
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it can not be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

-11-

(C) dismiss the action or enter a default judgment.

To permit sanctions, the Court must find that (i) electronically stored information should have been preserved in the anticipation of litigation; (ii) a party "failed to take reasonable steps to preserve it;" (iii) "it cannot be restored or replaced through additional discovery;" and either (iv) "prejudice to another party from loss of the information," or (v) "the party acted with the intent to deprive another party of the information's use in the litigation." The sanctions available only under item (v) require proof of a party's intent to deprive. Intent to deprive may be established by circumstantial evidence.

Plaintiff's demand letter of July 2, 2018 is more than a sufficient trigger for giving rise to defendant's duty to preserve the evidence. Reid took affirmative steps in destroying the electronically stored information that she had a duty to take reasonable efforts to preserve. From these facts, and these facts alone, the law permits the inference based on her conduct that she acted with the intent to deprive plaintiff of their use in this litigation. In the very recent case of *Ahamed v. 563 Manhattan Inc.,* 2024 U.S. Dist. LEXIS 110569 (E.D.N.Y. June 17, 2024), the defendant "consciously chose" to disregard his duty to preserve evidence. As here, defendant remained silent about the status of the electronic data for many months. In the *Ahamed* case, however, the Court did not resolve whether the defendant had taken affirmative steps to destroy the evidence or had merely permitted the evidence to be lost. Either fact supported the conclusion that defendant intended to deprive plaintiff of use of the evidence.

> "A court may infer that a party acted with an intent to deprive on the basis of circumstantial evidence." Hice v. Lemon, No. 19 CV 4666, 2021 U.S. Dist. LEXIS 244521, 2021 WL 6053812, at *5 (E.D.N.Y. Nov. 17, 2021) (quoting Mule v. 3-D Bldg. & Constr. Mgmt. Corp., No. 18 CV 1997, 2021 U.S. Dist. LEXIS 124711, 2021 WL 2788432, at *12 (E.D.N.Y. July 2, 2021)), report and recommendation adopted, 2021 U.S. Dist. LEXIS 243478, 2021 WL 6052440 (E.D.N.Y. Dec. 21, 2021); see also CAT3, LLC v. Black Lineage, Inc., 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016) (noting

-12-

that even "standing alone," circumstantial evidence alone may support a finding of an intent to deprive).

*Ahamed v. 563 Manhattan Inc., id., at* 6.

As held in the often-cited case of *Ungar v. City of New York*, 329 F.R.D. 8, 13, aff'd, 2022 U.S. App. LEXIS 28812, 2022 WL 1021979 (2d Cir. Oct. 18, 2022), "a party's conscious dereliction of a known duty to preserve electronic data is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use under Rule 37(e)(2)."

On this motion for partial summary judgment, the Court should award as an appropriate sanction issue preclusion on the issues of Reid's posts constituting a substantial factor of causation of defamation damages that are either presumed by law or proved at trial and that the comments posted to Reid's Facebook account constituted a repository of doxing information and hostile and threatening comments against La Liberte, that is, that the 7 recovered documents were of the same tenor as the great many others that Reid destroyed. This proves actual reputational damage.

**California law Applies the "Substantial Factor" Test for Causation in Fact with Torts by Concurrent Tortfeasors and Making Tortfeasors in Intentional Torts Jointly and Severally Liable as a Matter of Public Policy**

Defendant Reid's 13th and 14th affirmative defenses, both entitled "proximate cause" should now be dismissed.

Historically, the analysis of causation in tort cases was divided into two principal parts: causation-in-fact, determined by application of the "but-for" test, and proximate causation, a concept requiring application of numerous secondary tests. This approach was regularly criticized by both scholars and courts as being too complex for juries readily to apply. The but-for test and the proximate cause analysis have now been combined into a single concept in California. If the defendant's acts were a "substantial factor" in bringing about plaintiff's injury, then those acts

-13-

were deemed a cause of that injury, and responsible for all of plaintiff's damages, even if there were other substantial factors contributing thereto.

One of the most influential early adoptions of the "substantial factor" test by the California Supreme Court was *Mitchell v. Gonzales, 54 Cal. 3d 1041* (1991). That court held that: the "but-for" and substantial factor tests were competing, not complimentary, tests; the traditional tests were flawed; and the "substantial factor" test was much preferable to the traditional analysis.

> It has generally been recognized [by the California intermediate appellate courts] that the 'but for' test contained in BAJI No. 3.75 should not be used when two 'causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result' [citation omitted].  In those few situations where there are concurrent [independent] causes, our law provides that one cannot escape responsibility for his negligence on the ground that identical harm would have occurred without it. The proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about.' [Citations omitted]

54 Cal.3d 1041 at 1049.

The Court in *Mitchell* wrote that the substantial factor test subsumes the but-for test. Importantly, it spelled out what it meant by "subsumes".

> Moreover, the substantial factor test subsumes the 'but for' test. 'If the conduct *which is claimed to have caused the injury had nothing at all to do with the injuries, it* could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.

*Mitchell v. Gonzales, id.,* at 1052. (Italics supplied.)

Other California Supreme Court decisions followed.  The final one to date was handed down in 2015, with the court's decision in *South Coast Framing, Inc. v. Workers' Compensation Appeals Board,* 61 Cal. 4th 291, 298 (2015):

> Legal causation in tort law has traditionally required two elements: cause in fact and proximate cause…. This has traditionally been expressed as the 'but for' test, if the injury 'would have happened anyway, whether the defendant was negligent or not, then his or her

> negligence was not a cause in fact.' [Citing, *inter alia, Viner v. Sweet,* 30 Cal. 4th 1232, 1239-40 (2003).]

The California Supreme Court then stated its current and controlling view of the matter. Just as it had held in *Mitchell v. Gonzales, supra.,* the Court in *South Coast Framing, Inc.* emphasized that the but-for test is subsumed into the substantial factor test and is not independent of it.

> California law definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. [Citation omitted.] Under that standard a cause in fact is something that is a substantial factor in bringing about the injury." *Rutherford v. Owens-Illinois, Inc.,* 16 Cal. 4th 953, 968-969, [67 Cal. Rptr.2d 16, 941 P.2d 1203] (1997). '[T]he substantial factor test subsumes the 'but for' test.' *Mitchell v. Gonzalez,* 54 Cal. 3d 1041, 1052, 1 Cal. Rptr. 2d 913, [819. P.2d 872] (1991); *see Viner* at p.1240. The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation omitted.] Thus, 'a force which plays only an infinitesimal or theoretical part in bringing about injury, damage or loss is not a 'substantial factor' (citation), but a very minor force that does cause harm is a substantial factor [citation omitted]. This rule honors the principle of comparative fault.' (*Bockrath v. Aldrich Chemical Co.,* 21 Cal. 4th 71, 78, [86 Cal. Rptr. 2d 846, 980 P.2d 398] (1999); *see* 6 Witkin, Summary of Cal. Law, *supra*, Torts, §1193, p. 568.)

*Id.* This clear understanding of the law is substantially embodied in the current California jury instruction, CASI 431:

### 431. Causation: Multiple Causes

> A person's negligence may combine with another factor to cause harm. If you find that [defendant's] negligence was a substantial factor in causing [plaintiff's] harm, then [defendant] is responsible for the harm. [Defendant] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [plaintiff]'s harm.

It has never been plaintiff La Liberte's position that defendant Reid was the only substantial factor or the sole cause of the harm done to plaintiff as the result of the defamation of plaintiff in which defendant aggressively participated. She doesn't have to be. However, there can be no doubt that defendant Reid was a substantial factor in causing plaintiff's harm.

Both of defendant's expert witnesses, Dr. Walker and Ms. Kelly, insist repeatedly and incorrectly that plaintiff must "disentangle" all the causes of plaintiff's harm, separating the effects of defendant Reid's actionable social media posts from the defamations committed by others and by Ms. Reid's nonactionable retweet of Vargas. (Dkt. No. 138 ¶12 at 6, ¶25 at 13, ¶32 at 17, ¶41 at 20, ¶46 at 23; ¶77 at 37, and ¶89 at 42.)  Even when given the additional opportunity specifically to address the question of whether defendant Reid's actionable posts were a substantial factor in causing plaintiff's harm, Ms. Kelly was unable to leave behind her erroneous assumption that plaintiff is obliged to "disentangle" defendant's actionable posts from other causative factors. (Dkt. No. 140, at 2, 3-4, 6, and 6-7.)

Asked to apply the law of causation as articulated in *Mitchell, supra,* and *South Coast Framing, Inc., supra,* plaintiff's expert witness on social media platforms, Prof. Jim Jensen, stated:

> My opinion, to a reasonable degree of scientific certainty, is: *The social media posts by defendant Reid on Instagram and Facebook, subsequent to her June 29, 2018 retweet of Vargas,* **were** *a substantial factor in causing the adverse publicity that plaintiff La Liberte and her business received following the June 25, 2018 Simi Valley Town Council meeting.*

(Dkt. No. 136 at 3.)

Plaintiff's position here is based on three key propositions. First, the defamation of plaintiff La Liberte case was overwhelmingly a social media phenomenon, carried out almost exclusively on social media platforms, including Facebook, Instagram and Twitter.  Second, the barrage of hate calls received on the telephone lines of plaintiff and her business are highly correlated, in particular with defendant's actionable, June 29, 2018 posts.  Third, the number of "engagements," defined below, generated by defendant Reid's posts are far greater than those generated by anyone else, singly or all together.  They are an objective measure permitting quantification of the impact of Reid's posts, specifically in comparison with other influencers/defamers tendered by Reid.

As already noted, defendant Reid published four actionable, defamatory posts about plaintiff La Liberte after defendant's retweet of Vargas. The first two were identical posts to Reid's social media accounts on Facebook and Instagram very late in the evening (about 10 pm DST) of June 29, 2018. She did the same thing on Sunday, July 1, 2018. Neither side has been able to determine the time of day for the July 1, 2018 Instagram and Facebook posts.

Defendant's communications expert, Jordan Rae Kelly, wrote in her expert report of March 11, 2022 that: "Relatively few traditional media outlets reported on Plaintiff and her conduct at the City Council meeting at all." (Dkt. No. 137 at 5.) The only "traditional media coverage" of plaintiff's participation in the June 25, 2018 Simi Valley Town Council meeting that her research could uncover was a June 26, 2018 article in the local Simi Valley newspaper, the *VC Star*, which said nothing derogatory about plaintiff, but which did include her photograph, and impromptu interviews with a television reporter from Channel 11 in Los Angeles. *Id.,* at 17. The interviews of La Liberte and the young man were broadcast on the evening news on June 29 and were sympathetic to plaintiff. Deposition of Joseph Luevanos, Exhibit 5.

According to Ms. Kelly the only other news outlet reference she could find to plaintiff's attendance at the Simi Valley  Council meeting was an article in the *Gateway Pundit,* a website with an unknown following, appearing on July 2, 2018, after the ignorant and generally anonymous social media mob had moved on to targets other than plaintiff La Liberte. Further, Ms. Kelly describes the *Gateway Pundit* as "a far-right publication". It is unlikely that its article provoked any negative reaction to plaintiff La Liberte. (Dkt. No. 137 at 18.)

Dr. Jonathan Walker, plaintiff's economics expert, was not nearly as judicious on the subject. He emphasizes the social media influencers, as did Ms. Kelly. Dr. Walker refers to a purported radio interview of plaintiff, but fails to give any station call sign or other means to confirm his radio claim. Dkt. No. 138 ¶17 at 8. He also refers to a telephone interview of plaintiff

-17-

by "freelance journalist" Tony Aaron, but never asserts that any news outlet published any part of Aaron's interview. (Id. ¶21 at 10.)  If one had, Ms. Kelly would surely have found it. She didn't.

Plaintiff first approached the task of demonstrating that defendant Reid was a substantial factor in causing harm to plaintiff La Liberte though defendant's defamatory Facebook and Instagram posts by analyzing the approximately 630 pages, containing approximately 13,869 entries, produced by AT&T in response to plaintiff's subpoena to AT&T in 2021 seeking the call logs of the mobile telephone and landlines for plaintiff and her business from June 2, 2018, through July 1, 2018.  (A copy of this voluminous data was provided to defendant's counsel immediately upon receipt by plaintiff.)  Of these 13,869 entries, 12,646 were recorded in a four-day period, from the beginning of the day, i.e., 00:00 hours, on June 28, 2018, through the end of the day (24:00 hours) on July 1, 2018. James Declaration, ¶5.

AT&T maintains the content of calls in the cloud (texts, voicemails) only for 90 days, but it keeps the meta data for calls for five years. Meta data includes the number of the telephone making the call, the time of the call in UTC (formerly known as Greenwich Mean Time) and the length of the call.

Plaintiff is aware that social media posts including her telephone number and that of her business  began in a very few social media posts on June 27, 2018, but the number of calls she received on that day was well within the normal number of calls she and her business had received every previous day that month.  James Declaration ¶ 4.

Because it was thought that calls made from the same number to the same number three seconds or less apart might, in fact, be duplicate calls, only calls made 10 seconds or more apart were considered nonduplicate calls. Also, because of the purpose to which she wanted to apply this data, plaintiff excluded all calls from the call logs that she thought more likely than not to be "friendly" calls.  Plaintiff defined friendly calls to those from the numbers of her family, and any

-18-

number which had called in June 2018 prior to June 28, 2018, considered to be calls made in the ordinary course of business. James Declaration ¶ 4.

These refinements reduced the calls received by the subject telephone numbers from June 28, 2018, through July 1, 2018, to 7,578: 850 calls on June 28, 2018, 2,080 calls on June 29, 2018, 3719 calls on June 30, 2018, and 929 calls on July 1, 2018. James Declaration ¶ 7 and Exhibit 1. These exercises reduced the number of AT&T entries which were considered separate calls made between June 28, and July 1, 2018, by 41 percent. However, as Dr. Walker conceded in his expert report, the reduction in no way altered the pattern of the calls. Dkt. No. 138¶84 at 39 – 40.

Of these 7,578 calls, only 2,668 or 34.21 percent were received before defendant Reid's first actionable Facebook and Instagram posts at 9:58 pm DST on June 29, 2018 (6:58 pm PDT). 4,910 calls, or 64.79 percent, were received by plaintiff and her business between Reid's first actionable posts and end of day, July 1, 2018, after her second set of actionable posts that day. James Declaration ¶7 and Exhibit 1.

Throughout the pretrial proceedings plaintiff has referred to these as "hate calls". She has done so with little resistance from defendant.  At one point in the proceedings, defendant's counsel suggested that these purported hate calls might be calls of encouragement to plaintiff or even calls from the media seeking comment.  Such suggestions were token at best.  Frankly, they defy common sense.  Even more importantly, such suggestion is contrary to the evidence of message content that has survived.  This evidence is found both in the Amended Complaint herein, and in hundreds of surviving emails out of the thousands sent to plaintiff during the four-day period in question. Those emails, with  few exceptions, spew hatred and vitriol at plaintiff and are laced with profanity.  On cross-motions for summary judgment, plaintiff sees no point in encumbering the record with hundreds of emails that are variants on the same themes.  However, we shall of course provide them if the Court requests, or if defendant insists.

Plaintiff does not claim that defendant Reid was the sole factor motivating this torrent of hate calls or that no hate calls would have occurred without her actionable posts. What La Liberte has demonstrated is that, more likely than not, the hate calls would not have occurred *to the extent they did* without Reid's actionable posts.

The law finds that proximity in time is probative in the analysis of causation in a wide variety of circumstances. *See, e.g., Morgan v. Regents of University of California,* 88 Cal App. 4th 52, at 69 (1st App. Dist. 2000) ("The causal link may be established by an inference derived from circumstantial evidence … such as the proximity in time between the protected action and allegedly retaliatory employment decision."); *and Chen v. Beacon Health Care Services,* 2019 Cal. Super. LEXIS 25012, *6 (Orange Co. 2019) ("Allegations of citations by Department of Public Health with a proximity in time to Decedent's incident are relevant to the issue of showing a conscious disregard.")

The A&T call logs are only one body of objective, quantifiable evidence upon which plaintiff relies in reaching the conclusion that defendant Reid was a substantial factor in the defamation perpetrated upon plaintiff. The other data that proves that point is the correct analysis of the universe of social media posts relating to this social media defamation event.

As set forth in the reports of her experts, defendant ultimately chose 15 purported social media influencers as important defamers of La Liberte. *See* Dkt. No. 137 at 26 – 35. She apparently relies on these 15 because of their reported number of followers. She steers well clear of discussing any better or more precise measure of influence that her social media notables might have had in our facts.

Such measures exist. One of them is the analysis of "engagements", *i.e.,* how many followers or other readers of the influencers social media post took enough notice of it to respond to it in some way. The response could have been as effortless as a thumbs-up emogi (a "like"), it

could have been a "share" or even a comment. The difference between a social media subscriber's number of followers and the number of persons who engaged with a given post can be profound.

The best example of this is probably Occupy Democrats, a social media subscriber highlighted by Ms. Kelly. According to Ms. Kelly Occupy Democrats had a Facebook following of 7.34 million, compared to the comparatively tiny Facebook following of 206,400 for defendant Reid. Ms. Kelly states that Occupy Democrats "received a significant number of interactions" for its early Facebook post on June 30, 2018. (Dkt. No. 137 at 6.)

Kelly enumerates slightly fewer than 15,000 engagements for Occupy Democrats, *i.e.,* an engagement rate of 0.20 percent. Kelly fails to reveal the engagements for Reid's late evening, actionable June 29, 2018 Facebook post. That's because it dwarfed the interactions received by Occupy Democrats. Reid's Facebook post that night received 167,473 engagements, a phenomenal engagement rate of 81 percent. By this measure the post of Occupy Democrats is insignificant; Reid's, profound.

All of the notable influencers relied upon by defendant Reid in Ms. Kelly's expert reports, who had an aggregate following in the millions, produced 137,473 engagements across all social media platforms, as set forth in the exhibits to Ms. Kelly's expert reports. This must be compared with the 192,865 engagements generated by defendant Reid alone with her four actionable posts. Thus, taking into account all 15 social media influencers found most notable by defendant Reid, Reid accounted for 60 percent of all engagements.

For undisclosed reasons, Ms. Kelly wants us to think that a post made at the end of one day can have no influence on the following day or two. As Ms. Kelly now would have it, each 24-hour day is its own silo and some undisclosed barrier prevents information from flowing from one silo to another downstream. The obvious irony of such argument is that it is the exact opposite of the position that defendant takes when making her erroneous but-for causation argument.

-21-

Dr. Johnathan Walker, defendant's other expert witness, compounds the same error in his expert report. In ¶88 at page 41 of his March 11, 2022 expert report, Dr. Walker observes that: "It is curious at best why [Reid's actionable] posts around 7 in the evening [PDT, 10 pm DST] would only have a noticeable effect the next morning…." Dkt. No. 138 ¶88 at 41.  It is not "curious" at all.

First and foremost, people access social media platforms (and do just about everything else) when it is most convenient for them. As Devona's bar charts show, the hate calls received by plaintiff and her company form a bell graph each day, from June 28, 2018, through July 1, 2018. Those bell graphs skew a little to the left (*i.e.,* peaking earlier in the day) on weekends (especially Saturday June 30) than they do on weekdays June 28 and 29.  James Declaration, Ex. 2 at 2.  That is understandable given that internet audiences are preparing themselves and others for work and school during the work-school week.

The only thing that is truly "curious" about Dr. Walker's observation is that he entirely failed to notice that Vargas' post, at 8:52 pm [PDT, 11:52 pm DST] on June 28, 2018 followed the exact same pattern and for the same reason as Reid's first actionable posts late in the day on June 29.

**Defendant is Liable for All Damages**
**Suffered by Plaintiff from her Defamation**

As in other jurisdictions, defamation is classified under California law as an "intentional" tort, as opposed to torts arising in negligence or in which responsibility is conferred by statute or otherwise as in "strict liability," regardless of assigned "fault."  Publication of the defamation is an intentional act that is an element of proof of the claim.  *See* Cal. Civ. Code §45 ("Libel is a false and unprivileged publication…."); *and In re Rolando S.*, 197 Cal. App. 4th 936, 129 Cal. Rptr. 3d 49 [2011] ("Libel is an intentional tort. [5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §

529, p. 782.]").  Other "intentional" torts include fraud, intentional infliction of emotional distress, assault or battery, false imprisonment, conversion and embezzlement.

Prior to the adoption of Cal. Civ. Code §1431,.2, in 1986, the liability of joint tortfeasors for intentional torts was joint and several, both for economic and non-economic damages.  There was also no right of contribution among such joint tortfeasors. *See Thomas v. Duggins Constr. Co., Inc.*, 139 Cal. App. 4th 1105, 44 Cal. Rptr. 3d 66 [2006]; *and* Cal. Civ. Code §1431.

In Cal. Civ. Code §1431,.2 California retained joint and several tortfeasor liability for economic losses[2] but made comparative the liability for non-economic losses, *e.g.,* pain, suffering, and emotional distress.  In such cases, the statute provided that each defendant would be liable only "for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault."

While the statute spoke to joint and several liability among "defendants", the courts soon made clear that the statute intended to cover all wrongdoers causing harm to a plaintiff.  In *DaFonte v. Up-Right, Inc.*, 2 Cal. 4th 593, 603 (1992), the California Supreme Court held that §1431.2(a) was not intended to limit apportionment of liability only to "defendants" in the formal sense, *viz.,* a defendant as a party to the lawsuit before the court. The word was to be applied to any person who was responsible for the injury to plaintiff, irrespective of whether a party to any lawsuit. It included even persons immune from suit.

Left unresolved was whether this new statutory provision should be applied to actions for intentional torts.  The *Thomas* case, *supra*, was the first appellate case in California which treated

---

[2]  The Act defines "economic loss" as follows:

> For purposes of this section, the term "economic damages" means objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.

the issue as squarely presented. The court held that, notwithstanding the jury's allocation, the intentional tortfeasor was liable for 100% of the damages sustained by the plaintiffs.

In *B.B. v. County of Los Angeles,* 10 Cal. 5th 1, 267 Cal. Rptr. 3d 203, 471 P.3d 329 (2020), the California Supreme Court, in complete agreement with *Thomas,* held the intentional wrongdoer (a sheriff's deputy) liable for *all* non-economic damages as well as economic damages. Under *B,B,* such liability is not affected by the enactment of Cal. Civ. Code.§ 1431.2.

> The preceding discussion demonstrates that California principles of comparative fault have never required or authorized the reduction of an intentional tortfeasor's liability based on the acts of others. Because section 1431.2, subdivision (a), incorporates those "principles of comparative fault," we agree with plaintiffs that the statute does not entitle [defendant sheriff's deputy] Aviles to reduce his liability based on the acts of [the decedent] Burley or the other defendants.

Defendant Reid is jointly and severally liable for all damages, monetary and non-monetary, caused to plaintiff La Liberte by all who defamed La Liberte. Defendant's "disentanglement" argument is not only contrary to applicable California law on causation, as shown in the preceding section, but, because it relies on an assertion that all the tortfeasors were making substantially the same defamation, fatal to Reid's claim that she is not liable for all the damage caused to by plaintiff.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for partial summary judgment should be granted, with the Court holding defendant Reid liable for all compensatory damages for defamation that plaintiff may prove at trial and striking the 13th and 14th defenses pleaded in defendant's answer to plaintiff's first amended complaint. In addition, both on the merits of the proofs, and as a sanction for spoliation of documentary evidence Reid had a duty to preserve, the

issues of substantial factor in causation and the fact of reputational damage should be determined

in favor of plaintiff and against defendant.

Dated:  Brooklyn, New York                    OLASOV, LLP
        July 16, 2024

                                               By:    s/David M. Olasov
                                                       David M. Olasov

                                               485 Madison Avenue
                                               New York, New York 10022
                                               dolasov@olasov.com
                                               917-214-8746

                                               s/  Ronald P. Mysliwiec
                                               Ronald P. Mysliwiec

                                               530 Third Street
                                               Brooklyn, New York 11215

                                               Attorneys for Plaintiff